UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                                                No. 06 Civ. 2621 (LTS)(DFE)

              Plaintiff,

   -against-

ANDREAS BADIAN, JACOB SPINNER,
MATTES DRILLMAN, POND SECURITIES
CORPORATION, EZRA BIRNBAUM,
SHAYE HIRSCH, AND JEFFREY GRAHAM,

              Defendants.

                                       MEMORANDUM OPINION AND ORDER

        In this civil action, Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC") accuses Defendants Andreas Badian ("Badian"), Jacob Spinner ("Spinner"), Mattes Drillman ("Drillman"), Jeffrey "Danny" Graham ("Graham"), Pond Securities Corporation ("Pond"), Ezra Birnbaum ("Birnbaum"), and Shay Hirsch ("Hirsch") of, inter alia, fraudulent and manipulative trading in the common stock of Sedona Corporation ("Sedona").

        Defendants Spinner and Drillman move to dismiss the claims asserted against them in the Complaint (First through Fourth Claims for Relief), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Defendant Badian moves for judgment on the pleadings on Plaintiff's First and Second Claims for Relief, pursuant to Federal Rules of Civil Procedure 12(c) and 9(b). For the following reasons, Defendant Badian's motion is denied, and the motion of Defendants Spinner and Drillman is denied in part and granted in part.

BACKGROUND

The facts alleged in Complaint are taken as true for the purposes of this motion. See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). Rhino Advisors, Inc. ("Rhino") is a New York-based unregistered investment advisor firm. (Comp. ¶ 22.) In Spring 2001, Badian worked for Rhino, which had helped its client Amro International S.A. ("Amro") enter into a Convertible Debentures and Warrants Purchase Agreement ("Agreement") with Sedona in November 2000. (Comp. ¶¶ 22, 24.) Under the terms of the Agreement, Amro provided Sedona with $2.5 million in financing and Sedona issued to Amro a $3 million, 5% Convertible Debenture ("Debenture"). (Comp. ¶ 24.) The Debenture obligated Sedona to pay Amro $3 million on March 22, 2001. (Id.) It also gave Amro the right to convert all or any portion of the Debenture into Sedona common stock on pre-established conversion dates at a discounted price based on the volume average weighted price of Sedona common stock during the five trading days before the conversion date. (Id.) To prevent Amro from manipulating Sedona's share price, the agreement specifically prohibited Amro from making any short sales of Sedona's stock as long as the Debenture remained issued and outstanding. (Id. ¶¶ 1, 25.) Copies of the Agreement were provided to defendants Badian, Spinner, Drillman, and Graham. (Id. ¶ 25.)

According to the Complaint, Badian engaged in a scheme of extensive short selling[1] of Sedona's stock in violation of the agreement and federal securities laws and

---

[1] An investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker. See Levitin v. PaineWebber, Inc., 159 F.3d 698, 700 (2d Cir. 1998). At a later date, the investor "covers" his short position by purchasing the security and returning it to the lender. Id. A short seller speculates that the price of the security will drop. Id. If the price drops, the investor profits by covering for less than the short sale price. Id.

defendants Spinner, Drillman, and Graham assisted Badian in carrying out this scheme. (Id. ¶ 27.) Spinner and Drillman were registered representatives associated with broker/dealers Refco Securities ("Refco") and Pond Securities Corporation ("Pond"). (Id. ¶¶ 9-10.) Spinner and Drillman were partners, sharing equally in the profits they generated, and sat within a few feet of each other at Refco's trading desk. (Id. ¶26.) Graham was a Refco employee who worked at their direction. (Id.) Spinner, Drillman, and Graham worked as a unit; each took orders from Badian and knew of his intention to manipulate Sedona's stock price downward. (Id.)

From March 1, 2001, through March 29, 2001, Badian and others directed Spinner, Drillman, and Graham to execute numerous short sales of Sedona stock through a proprietary account at Pond, which Spinner and Drillman controlled. (Id. ¶ 27.) The scheme was allegedy carried out as follows: Badian typically placed orders with Graham before the markets opened. Badian directed Graham to trade Sedona's stock to depress its price, to "clobber" the stock, to sell Sedona shares with "unbridled levels of aggression," and to be "merciless" in selling it. (Id.) Accordingly, Spinner, Drillman, and Graham each made sales of Sedona stock throughout the day in small amounts. (Id. ¶ 28.) These orders were routinely placed through various electronic communications networks (ECN's) linked to the Pond proprietary account. (Id.) Spinner, Drillman, and Graham executed Sedona trades through Pond. Just after the market closed, Spinner, Drillman, and Graham typically sold the Sedona shares from Amro's customer account at Refco to the Pond proprietary account. (Id.) These sales were priced slightly below the average price of Pond's daily sales of Sedona stock. (Id.) Spinner, Drillman, and Graham each falsely described these stock sales at Refco as long sales in order to disguise Amro's short sales. (Id.)

During this three week time period of short selling the stock, Spinner, Drillman, and Graham were responsible for over 40% of the total reported trading volume in Sedona's shares. (Id. ¶ 29.) They sold short over 843,000 shares on behalf of Badian, which was double reported as over 1.6 million shares due to their trading method. (Id.) This short-selling scheme also depressed Sedona's stock price. (Id. ¶ 30.) The stock price dropped from an average price of $1.43 per share between January 26, 2001, and March 1, 2001, to $0.75 per share on March 23, 2001. (Id.)

On or around March 21, 2001, Badian called Graham to congratulate him for his efforts that had led to the collapse of Sedona's stock price. (Id. ¶ 31.) Two days later, Badian called Graham again and said, "On Sedona, keep on wailing away, this is very good." Spinner, Drillman, and Graham knew that their trading was causing Sedona's stock price to plummet. (Id. ¶¶ 31-32.) Drillman acknowledged that they had managed to "drive the stock SDNA down to three quarters." (Id. ¶ 32.) Graham remarked that "we ran it down for weeks" and that Badian had them "killing SDNA down to seventy-five cents." (Id.) Spinner told a colleague, "Want to short something illegally for twelve months? You got my number." (Id.) Spinner also asked Badian whether he was concerned that Sedona's stock price would begin to rise now that they had stopped their selling pressure on the stock; Badian remarked that he was not concerned because he had a particular market maker "in the way" to keep the price from rising. (Id. ¶ 33.) Spinner, Drillman, and Graham's actions increased the number of conversion shares that Amro received from Sedona under the terms of the Agreement. (Id. ¶ 34.) Between March 27, 2001, and April 16, 2001, Amro exercised its conversion rights on four occasions and received over 1.6 million shares of Sedona stock in repayment of $1.1 million due under the terms of the

Agreement. (Id.) Rhino deposited the conversion shares that Amro received from Sedona into another account at a second U.S. broker-dealer designated to receive the conversion shares ("Conversion Shares Account"). (Id. ¶ 35.) In the majority of these conversions, Spinner, Drillman, and Graham used the shares to close the open and undelivered short positions they had created in Amro's account at Refco by purchasing the shares from Amro's Conversion Shares Account. (Id.) Instead of delivering the shares directly to broker-dealers that had handled the short sales, Spinner, Drillman, and Graham each executed wash sales and matched orders from the Conversion Shares Account to the accounts where they had engaged in short selling, giving the false impression that the short sales were being covered with open market purchases and other than conversation shares. (Id. ¶ 36.) On at least ten occasions during April 2001, Badian directed Spinner, Drillman, and Graham to process transactions which involved no change in beneficial ownership of shares of Sedona stock. (Id.)

DISCUSSION

The standard of review on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is the same as that on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Shaw v. Rolex Watch U.S.A., Inc., 745 F. Supp. 982, 984 (S.D.N.Y. 1990).

To survive dismissal, the plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." ATSI Commc'ns., Inc. v. The Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). Rule 9(b) of the Federal Rules of Civil Procedure refers to fraud actions generally, providing that "[i]n all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted); Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999). Although the SEC is subject to the pleading standard codified in Federal Rule of Civil Procedure 9(b), the heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA") do not apply to actions brought by the SEC. See 15 U.S.C. § 78u-4(b) ("The provisions of this subsection shall apply in each private action arising under this title that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure").

I. Claims One and Two: Violations of Sections 10(b) and Rule 10b-5 of the Exchange Act and 17(a)(1) of the Securities Act

Defendants Badian, Spinner, and Drillman move for dismissal of Claims One and Two of the Complaint, arguing that the two claims are not plead with sufficient particularity and fail to allege the requisite scienter. Defendants Spinner and Drillman further argue that Claims One and Two should be dismissed because they were not primary violators, and that Claim Two (Rule 17(a)(1)) should be dismissed because they were not statutory sellers. Additionally, defendant Badian argues that Claims One and Two should be dismissed as against him based on *res judicata* in light of Plaintiff's prior action brought against Rhino and Thomas Badian, the brother of defendant Badian in this action.

A. Particularity

To prove a violation under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, a plaintiff must establish that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device.  See Brown v. E.F. Hutton Group, 991 F.2d 1020, 1031 (2d Cir. 1993). Section 17(a)(1) of the Securities Act of 1933 (the "Securities Act") prohibits the same type of conduct.  S.E.C. v. First Jersey Securities, Inc., 101 F.3d 1450, 1467 (2d Cir. 1996).

The SEC's claims in this action are premised on allegation that the defendants engaged in unlawful market manipulation.  Market manipulation is the deliberate and knowing attempt to interfere with the free and efficient operation of the market by manipulative acts in connection with the purchase or sale of securities.  See ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007).  Although all securities fraud allegations are subject to the pleading requirements of Rule 9(b), this standard is relaxed somewhat with respect to claims of market manipulation because they can involve facts solely within the defendant's knowledge.  Id. at 102.  Therefore, at this early stage of litigation, "the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."  Id.  In order to meet the requirements of Rule 9(b) with respect to a market manipulation claim, a plaintiff must set forth "to the extent possible: '[1] what manipulative acts were performed, [2] which defendants performed them, [3] when the manipulative acts were performed, and [4] what effect the scheme had on the market for the securities at issue.'"  Id., quoting Baxter v. A.R. Baron & Co., Inc., No. 94 Civ. 3913, 1995 WL 600720, *6 (S.D.N.Y. Oct. 12, 1995); S.E.C. v. U.S.

Envtl., Inc., 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000). Plaintiff has stated each of these elements with sufficient particularity, therefore satisfying the requirements of Rule 9(b).

Plaintiff alleges that Defendants participated in a scheme to manipulate the market for Sedona stock in order to take advantage of the Debenture Agreement between Amro (Badian's client) and Sedona. Specifically, Badian allegedly directed Spinner and Drillman to execute short sales of Sedona stock with "unbridled levels of aggression" in order to artificially depress the stock's price. (Compl. ¶ 27.) These short sales were executed through Spinner and Drillman's proprietary account at Pond, effectively concealing the identity of Amro, whose covenant against short sales had been disclosed to investors, from the market as the seller and creating the false appearance that individual investors were selling large amounts of Sedona stock. Moreover, the Complaint alleges that Spinnner and Drillman mismarked order tickets and falsely described stock sales executed through Amro's account at Refco as long sales in order to conceal Amro's short sales.

The Complaint also alleges that Spinner and Drillman, at the direction of Badian, executed wash sales and matched orders from the Conversion Shares Account to the accounts in which they had engaged in short selling. These wash sales and matched orders were allegedly intended to conceal Amro's participation in this scheme to manipulate the market for Sedona stock by producing the false appearance that the accounts with short positions were purchasing the shares in the open market, rather than covering their short positions with shares obtained through the Debenture conversion. The Complaint thus alleges facts sufficient to identify what manipulative acts were performed, who performed them, and what effect they had on the market for Sedona stock.

Finally, the Complaint alleges that the allegedly manipulative acts were performed from March 2001 through April 2001. This time period is sufficient to satisfy the particularity requirements of Rule 9(b). Internet Law Library v. Southridge Capital Management, LLC., 223 F. Supp. 2d 474, 483 (S.D.N.Y. 2002) (holding that "a two month period is sufficiently circumscribed to satisfy the requirement of Rule 9(b)").

Defendants Spinner and Drillman argue that their individual actions are insufficiently particularized because they are almost always named together in the Complaint. The Complaint is, however, sufficient in this regard. It not only specifically alleges that Spinner and Drillman "operated as a unit" with Graham, but also alleges that "each" of the individuals took the particular offending actions. (See Compl. ¶¶ 26, 28, 36.)

### B. Scienter

Defendants contend that the Complaint fails to allege the requisite scienter. In a securities fraud action, scienter is "an intent to deceive, manipulate, or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). Under Federal Rule of Civil Procedure 9(b), "intent, knowledge, and other conditions of the mind may be averred generally." Accordingly, Plaintiff need only allege facts sufficient to create a strong inference of scienter. Id. at 138. Plaintiff is entitled to a "strong inference of fraud" if it: (1) alleges facts to show that defendants had both motive and opportunity to commit fraud; or (2) alleges facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004); see also Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000).

In its Complaint, Plaintiff alleges: (1) that Badian directed Spinner, Drillman, and Graham to depress Sedona's stock price while concealing Amro's identity; (2) that Spinner,

Drillman, and Graham each executed trades on behalf of Badian and mismarked order tickets by filling out the tickets themselves or ordering someone else to fill them out; (3) that Spinner, Drillman, and Graham falsely characterized stock trades to disguise Amro's short sales; and (4) that Spinner, Drillman, and Graham executed wash sales and matched orders to give the appearance that accounts with short positions were purchasing shares in the open market. In addition, the Complaint alleges facts demonstrating that Badian, Spinner, and Drillman knew that their trading was artificially depressing the price of Sedona stock. On March 21, 2001, Badian congratulated Graham for his efforts that led to the collapse of Sedona's stock price. Two days later, Badian called Graham and said, "On Sedona, keep on wailing away, this is very good." (Compl. ¶¶ 31-32.) Drillman acknowledged that they had managed to "drive the stock SDNA down to three quarters." (Id. ¶ 32.) Spinner told a colleague, "Want to short something illegally for twelve months? You got my number." (Id.) Spinner also expressed his concern to Badian that Sedona's stock price would begin to rise after they had ceased their selling pressure. (Id. ¶ 33.) These allegations indicate Defendants' intent to manipulate the market for Sedona stock by artificially depressing its price and demonstrate the use of unusual techniques and measures to conceal their actions. Amro's agreement prohibiting short sales while the Debenture was outstanding is, furthermore, alleged to have been disclosed to each of the defendants. (Compl. ¶ 25.) These facts, as alleged in the Complaint, constitute strong circumstantial evidence of conscious misbehavior or recklessness sufficient to create a strong inference of scienter.

Defendants contend that this Court should apply the pleading standard established by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights Ltd., 127 S. Ct. 2499 (2007). Tellabs instructs courts applying the scienter pleading standard of the PSLRA to consider

whether, "[w]hen the allegations are accepted as true and taken collectively, . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference" of non-fraudulent intent. 127 S. Ct. at 2511; see also In re Crude Oil Commodity Litig., No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *7 (S.D.N.Y. Jun. 28, 2007). The Second Circuit has yet to extend the application of this test outside of the PSLRA context. Even if this Court were to apply the Tellabs standard here, however, the facts alleged in the Complaint support an inference of scienter at least as strong, if not stronger, than any inference of lawful market activity because the Complaint clearly alleges Defendants' knowledge of the prohibition on short sales and other terms of the convertible securities agreement, their use of numerous techniques to disguise activity that was intended artificially to drive down the price of Sedona stock, and their satisfaction with their success in achieving that goal.

C. Primary Violator Status

Defendants Spinner and Drillman assert that Plaintiff did not plead sufficient facts to establish that they were primary violators under Sections 10(b) and 17(a)(1) and Rule 10b-5. The SEC plead in its Complaint that Spinner and Driller were brokers who executed purchases and sales of Sedona stock and that they sold stock short and mismarked order tickets in order to drive down the price of Sedona stock. (Compl. ¶¶ 26-30.) These allegations are sufficient to plead that Spinner and Drillman were primary violators. S.E.C. v. U.S. Envtl., 155 F.3d 107, 110 (2d Cir. 1998) (holding that trader who executes buy and sell orders that played role in manipulative scheme is primary violater).

D. Statutory Seller Status

Defendants Spinner and Drillman, analogizing to Section 12 of the Exchange Act, assert that Section 17(a)(1) incorporates a "statutory seller" requirement, such that it applies only to the actual seller of securities. Spinner and Drillman argue that Count Two should be dismissed as against them because they are not "statutory sellers," citing statements in judicial decisions that Section 17(a)(1) applies "only to sellers"[2] and a Supreme Court decision declining to construe Section 12(1) of the Securities Act as reaching beyond those who offer or solicit offers for the sale of unregistered securities.[3] Section 17(a)(1), unlike Section 12(1), does not specifically define a private cause of action for rescission or damages arising from particular sales of securities. Rather it, like Section 10(b) and Rule 10(b)(5), establishes broad anti-fraud prohibitions that the SEC is empowered to enforce. Compare Section 12(1) of the Securities Act, 15 U.S.C.A. § 77l) (West 2008) ("Any person who . . . offers or sells a security in violation . . . shall be liable . . . to the person purchasing such security from him . . . .") with Section 17(a)(1) of the Securities Act, 15 U.S.C.A. § 77q (West 2008) ("it shall be unlawful for any person in the offer or sale of any securities . . ., directly or indirectly . . . to employ any device, scheme or artifice to defraud . . . .") and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j (West 2008) ("it shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection

---

[2] See Mem. in Supp. of Spinner and Drillman Mot. at 17-18 and cases cited therein.

[3] Section 12(1) provides in pertinent part that a "person who . . . offers or sells a security in violation of [prohibitions on interstate sales of unregistered securities] . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C.A. § 77l) (West 2008). In Pinter v. Dahl, 486 U.S. 622, 651-53 (1988), the Supreme Court declined to extend Section 12(1) liability to those whose actions were merely "substantial factor[s]" in causing sales of unregistered securities, citing accountants and lawyers who provide only their professional services as among those could be caught up by a "substantial factor" analysis.

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . .") (emphases supplied). The decisions cited by Defendants do not foreclose Section 17(a)(1) liability for individuals who, like Defendants, are alleged to have placed and executed manipulative buy and sell transactions and, indeed, Section 17(a) has been held applicable to persons who neither passed title nor solicited offers on behalf of securities issuers or sellers. See S.E.C. v. Savino, No. 01 Civ. 2438, 2006 WL 375074, *12 (S.D.N.Y. Feb. 16, 2006) (holding that the defendant violated §§ 10(b) and 17(a) through fraudulent schemes to give kickbacks to bond trader); S.E.C. v. KPMG, LLP, 412 F. Supp. 2d 349, 376 (S.D.N.Y. 2006) (holding that, because three audit partners functioned as engagement partners in the challenged audits, the partners were liable for misstatements under §§10(b) and 17(a)). Defendants' motion to dismiss the Section 17(a) claim on this ground is therefore denied.

E. Res Judicata

Defendant Badian contends that this action should be dismissed as against him on grounds of *res judicata* based on the prior resolution of an action by the SEC against Rhino Advisors and Thomas Badian. Because Badian was not a named defendant in the prior action, he must demonstrate that: 1) the prior action was adjudicated on the merits, 2) the prior action involved those in privity with him, and 3) the claims raised in this action were, or could have been, raised in the prior action. Monahan v. New York City Dept. of Corrections, 214 F.3d 275, 284 (2d Cir. 2000); SEC v. First Jersey Securities, 101 F.3d 1450, 1463 (2d Cir. 1996). Badian argues that the issues in the two cases are the same and that he was in privity with his employer, Rhino.

Badian's dismissal motion is denied to the extent it is premised on the applicability of *res judicata*. The allegations and evidence in this case are not co-extensive with those in the prior action. Indeed, Badian was not mentioned in the pleadings in the prior action and, here, the SEC's claims against him are premised on allegations concerning his personal conduct. Thus, Badian has failed to establish that the claims at issue here are the same as those in the prior action or could have been brought in the prior action.

II. Claim Three: Aiding and Abetting Violations of Section 7 of the Exchange Act and Section 220.8 of Regulation T (15 U.S.C. § 78g(c) and 12 C.F.R. § 220.8(a))

Defendants Spinner and Drillman assert that Claim Three of the Complaint must be dismissed because Plaintiff failed to allege a violation by a primary violator, as well as the requisite scienter.

Plaintiff's allegations as to knowledge and use of accounts at Refco Securities for short sales are vague and seemingly contradictory. (Compare Compl. ¶¶ 27 and 38 with ¶¶ 53 and 58.) Accordingly, Plaintiff's allegations in Claim Three against Spinner and Drillman as to aiding and abetting primary violations by Refco Securities are insufficient to meet the plausibility standard, and the motion by Spinner and Drillman to dismiss Claim Three as against them is granted. The Court will grant Plaintiff leave to amend Claim Three.

III. Claim Four: Aiding and Abetting Violations of Section 17(a) of the Exchange Act and Exchange Act Rule 17a-3 (15 U.S.C. § 78q(a) and 17 C.F.R. § 240.17a-3(a))

Defendants Spinner and Drillman argue that Claim Four of the Complaint must be dismissed because Plaintiff failed to allege properly a violation of Exchange Rule 17a-3, as well

as the required scienter.

## A. Duty to Maintain Accurate Records

Defendants Spinner and Drillman contend that the version of Rule 17a-3(a)(6) that was in place in 2001 did not require a broker-dealer to identify on an order ticket whether its customer's sale was "long" or "short" and that, as a result, they cannot be held liable for mismarking order tickets. Though Defendants are correct regarding the text of the 2001 rule, the SEC nonetheless requires broker-dealers to maintain accurate books and records, even if the information itself is not mandated. See In the Matter of Merrill Lynch, et al., 51 S.E.C. 892, 900 (Dec. 22, 1993). Even assuming no legal obligation to furnish particular information, there is an obligation, upon voluntarily supplying that information, to be truthful. Sinclair v. SEC, 444 F.2d 399, 401 (2d Cir. 1971) (holding that order tickets were records that must be true and accurate memoranda of each brokerage transaction, and that any dealer name furnished on the tickets had to likewise be truthful, even if the information was not required). The Complaint alleges that Spinner and Drillman mismarked the order tickets "long" when they should have been marked "short," causing Refco to create and maintain inaccurate records. (Compl. ¶ 58.) Given the duty to maintain accurate records, the allegation of false designation of short sales as long is sufficient plausibly to allege a primary violation of Rule 17a-3.

## B. Scienter

Defendants also assert that the fourth claim is not plead with the requisite scienter. Section 20(e) of the Exchange Act imposes liability on "any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or

regulation issued under this title." 15 U.S.C. § 78t(f) (emphasis added). Two recent decisions from this District interpret "knowingly" as requiring actual knowledge for the state of mind required for aiding and abetting misconduct. See S.E.C. v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006); KPMG, LLP, 412 F. Supp. 2d at 372-75. The Complaint alleges that Badian illegally directed Spinner, Drillman, and Graham to sell short massive amounts of Sedona stock. (Compl. ¶ 2). In early March 2001, Badian and others directed Spinner, Drillman, and Graham to execute numerous short sales through a proprietary account at Pond. (Id. ¶ 27). Immediately following the close of the market Spinner, Drillman, and Graham sold Sedona shares from Amro's Refco account to the Pond account and they each falsely described the stock sales at Refco as long sales. (Id. ¶ 28). The Complaint also asserts that Spinner, Drillman and Graham intentionally marked all of the order tickets as long although they actually sold those shares short (Id. ¶ 37); and that Defendants knew that the Sedona short sales flowed through a cash account (Compl. ¶ 54). Thus, the Complaint alleges sufficient facts to establish that Spinner and Drillman, who were Refco employees or partners, had actual knowledge that their actions were unlawful, and that Plaintiff has adequately pled its fourth claim with scienter. Accordingly, Defendants' motion to dismiss Claim Four is denied.

CONCLUSION

For the foregoing reasons Defendant Badian's motion to dismiss the Complaint is denied in its entirety and the motion of Defendants Spinner and Drillman is granted as to Claim Three and is denied in all other respects.

Plaintiff is granted leave to replead the Third Claim for Relief. Plaintiff shall

serve and file any Amended Complaint repleading the Third Cause of Action by September 12, 2008. In the absence of such a timely amendment, the Third Claim for Relief will be deemed dismissed with prejudice as against Defendants Spinner and Drillman.

This case remains referred to Magistrate Judge Eaton for pre-trial management. This Memorandum Opinion and Order resolves docket entry nos. 10 and 66.

SO ORDERED.

Dated: New York, New York
August 22, 2008

LAURA TAYLOR SWAIN
United States District Judge