UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                              :
SECURITIES AND EXCHANGE COMMISSION,                           :   No. 06 CV 2621 (LTS)
                                                              :
                                        Plaintiff,            :
                                                              :
              – against –                                     :
                                                              :
                                                              :
ANDREAS  BADIAN,  JACOB  SPINNER,  MOTTES                      :
DRILLMAN, JEFFREY "DANNY" GRAHAM, POND                         :
SECURITIES CORPORATION d/b/a/ POND EQUITIES,                  :
EZRA BIRNBAUM AND SHAYE HIRSCH,                                :
                                                              :
                                                              :
                                        Defendants.           :
                                                              :
------------------------------------------------------------- X

### DEFENDANT ANDREAS BADIAN'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION *IN LIMINE* TO EXCLUDE THE PROFFERED REBUTTAL EXPERT OPINIONS OF LAWRENCE GLOSTEN AND CHARLES JONES

Caryn G. Schechtman
Joshua S. Sohn
Megan K. Vesely
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4500

*Attorneys for Defendant Andreas Badian*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND FACTS.................................................................................... 3

1) Amro Lends Sedona $2.5 Million And Receives The Sedona Convertible
Debenture ................................................................................................ 3

2) SEC Brings Enforcement Action Alleging Market Manipulation Without Having
Conducted An Expert Analysis Of Rhino Trading ........................................ 4

3) Glosten And Jones Lack Experience With Future Priced Securities Or Market
Manipulation, So They Decide To Use Glosten's Price Impact Model To Analyze
The Entire Market's Trading In Sedona Stock ............................................. 6

4) Glosten And Jones Receive The Go-Ahead From The SEC And Make A Work
Plan.......................................................................................................... 9

5) Glosten And Jones Serve Their Rebuttal Report, Which Does Not Comport With
Their Original Work Plan ......................................................................... 10

ARGUMENT.................................................................................................. 12

    I. Glosten And Jones Are Not Qualified To Opine On The Securities Or
Issues Involved Here................................................................. 13

    II. Glosten And Jones's Conclusions Are Irrelevant To This Case...................... 15

        A. Glosten and Jones's Definitions of Manipulation Are
Contradictory and Irrelevant................................................. 16

        B. The Price Impact Model and Its Results Are Irrelevant to the Issues
Here.............................................................................. 18

    III. Glosten And Jones's Conclusions Are Admittedly Unreliable........................... 20

        A. The Data On Which Glosten and Jones Rely Was  Admittedly
Problematic and Incomplete .................................................. 20

        B. Glosten and Jones Failed to Follow Their Work Plan and  Cherry-
Picked Data to Render Their Conclusions.................................. 22

        C. Glosten and Jones's Conclusions Are Unsupported ................................. 23

CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)..................................................................................12, 20

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.,*
    No. 04 CIV 10014, 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009)....................................13, 14

*ATSI Commc'ns Inc. v. Shaar Fund Ltd.,*
    493 F.3d 87 (2d Cir. 2007)..........................................................................................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 595 (1993)..................................................................................12, 15, 20, 22

*Delehanty v. KLI, Inc.,*
    663 F. Supp. 2d 127 (E.D.N.Y. 2009) ...............................................................................13

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)..................................................................................................16

*Fernandez v. Central Mine Equip. Co.,*
    670 F. Supp. 2d 178 (E.D.N.Y. 2009) ............................................................................13, 14

*Highland Capital Mgmt., L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)..............................................................................12, 15

*In re Rezulin Prods. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................................15, 22

*Innis Arden Golf Club v. Pitney Bowes, Inc.,*
    629 F. Supp. 2d 175 (D. Conn. 2009) ...............................................................................22

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)..................................................................................12, 15, 20, 21

*McCullock v. H.B. Fuller Co.,*
    981 F.2d 656 (2d Cir. 1992)..........................................................................................13

*MTX Commc'ns Corp. v. LDDS/Worldcom, Inc.,*
    132 F. Supp. 2d 289 (S.D.N.Y. 2001)..............................................................................15, 22

*Premium Plus Partners, L.P. v. Davis,*
    653 F. Supp. 2d 855 (N.D.Ill. 2009) ...............................................................................18

*Quintanilla v. Komori Am. Corp.,*
    No. 07-23475-CV, 2009 WL 320186 (2d Cir. Feb. 10, 2009) ...................................................13

*Sante Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977)...........................................................................................................................16

*Trumps v. Toastmaster, Inc.,*
    969 F. Supp. 247 (S.D.N.Y. 1997) .................................................................................................13

*United States v. Scop,*
    846 F.2d 135 (1988).........................................................................................................................16


**OTHER AUTHORITIES**

Fed. R. Evid. 702 ...............................................................................................................12, 13, 15, 22

Lawrence R. Glosten & Lawrence E. Harris, *Estimating the Components of the Bid/Ask*
    *Spread,* JOURNAL OF FINANCIAL ECONOMICS 21 (1988) ...........................................................7

Defendant Andreas Badian respectfully moves this Court *in limine* for an order excluding the proffered rebuttal expert opinions of Professors Lawrence Glosten and Professor Charles Jones, both of whom were retained by Plaintiff the Securities and Exchange Commission (the "SEC").

## PRELIMINARY STATEMENT

This case involves allegations that in the spring of 2001, Defendant Andreas Badian, a trader employed by Rhino Advisors ("Rhino"), manipulated the market for the common stock of the Sedona Corporation ("Sedona") by placing orders for short sales. Badian placed these trades on behalf of Amro, Rhino's client, which had previously loaned Sedona $2.5 million in exchange for $3 million in Sedona future priced convertible debentures that were convertible into Sedona common stock at a prescribed discount off the market price. It is undisputed that at the time of these short sales, Sedona's stock price was declining and Sedona was in precarious financial health. Accordingly, Amro's short selling of Sedona stock was a strategic hedge against the risk that the price of Sedona stock would continue declining and the debentures would be rendered worthless causing Amro to lose its investment principal in this highly risky investment.

As a threshold matter, Glosten and Jones's proffered opinions are incorrect because neither Glosten, nor Jones, has any experience with future priced securities like those held by Amro in this case and, in this regard, Glosten and Jones lack a fundamental understanding of how these securities were commonly traded and why. Despite the fact that neither had ever previously studied them, they had no timidity about offering sweeping conclusions about their attributes—many of which they conceded at their depositions were wrong or unsupported. For example, their report states unequivocally that only risk entailed with holding a future priced security is that the share price would fall so low that conversion would require the issuance of more shares than authorized by the company's charter. But, at their depositions they conceded

that in fact there were at least four other risks, including a liquidity risk, the company filing for bankruptcy or being delisted and the company's refusal to actually honor the conversion notices. Indeed, despite the fact that this United States District Court for the Southern District of New York and the Second Circuit Court of Appeals have held that as a matter of law there are inherent risks in convertible debentures like the Sedona convertible debenture, Glosten and Jones failed to acknowledge those risks. Not surprisingly, given their lack of facility with the instruments underlying this case, they also erroneously opined that Amro's trading strategy was not rational. Again, at their depositions, they conceded not only that they were unable to articulate an optimal trading strategy for Sedona stock under the circumstances, but also their academic colleagues that they consulted on the question, were similarly stumped.

Next, Glosten and Jones's opinions are irrelevant to the issues before the Court because they employed a statistical analysis that has nothing whatsoever to do with identifying market manipulation— but instead analyzes the impact of information on trade pricing. Their use of an inappropriate analytical methodology is not surprising given Glosten and Jones's lack of experience with future priced securities, as well as their inability to articulate what "manipulate" means in the context of a market manipulation action. This confusion is made plain by Glosten and Jones's use of the "Price Impact Model" in their analysis. The Price Impact Model, which was developed by Glosten in the 1980s, examines intra-day, trade-by-trade price fluctuations to determine how large or small of a "price impact" a purchase or sale of a certain critical mass of stock—by any market participant—has on the market for that stock. It was not designed to identify or measure market manipulation, is not generally accepted as a proper method to identify or measure market manipulation and, in fact, has nothing whatsoever to do with market manipulation.

Finally, Glosten and Jones's opinions are incomplete because, even assuming the other deficiencies with their opinions did not exist, they failed to look at the relevant time period when conducting their flawed analysis. The SEC's complaint alleges that Badian manipulated the market for Sedona stock during 2001 and 2002, pursuant to a strategy where he would short sell the stock in advance of debenture conversions so that the market price would be depressed upon conversion and Amro would receive more shares than it would if the market were not manipulated. Glosten and Jones only considered Sedona market activity prior to Amro's first—and smallest—conversion. They did not conduct any analysis of Sedona trading during subsequent periods—when the overwhelming majority of Amro's trading in Sedona occurred. Moreover, Glosten and Jones did not distinguish between Amro's Sedona trades and Sedona trades by other market participants, which makes it impossible for them to form an opinion one way or another regarding whether any particular individual manipulated the market.

BACKGROUND FACTS

1)  Amro Lends Sedona $2.5 Million And Receives The Sedona Convertible Debenture

This case arises out of a debenture agreement (the "Debenture" or the "Agreement") executed approximately ten years ago by Amro, an offshore investment fund, and Sedona, a Pennsylvania software company that was in dire financial straits. Under the terms of the Debenture, Amro provided $2.5 million in financing to Sedona.[1] The Agreement provided that Amro's return on its investment would take one of two forms. Either Sedona would repay Amro $3 million by March 22, 2001; or in the event that Sedona did not repay Amro before March 22nd, Amro would have the right to convert all or any portion of the Debenture into Sedona

---

[1] A true and correct copy of the Convertible Debentures and Warrants Purchase Agreement is attached as Exhibit ("Ex.") 1 to the Declaration of Joshua S. Sohn, dated November 17, 2010 ("Sohn Daubert Dec.").

common stock at a discount off the average market price for the five trading days immediately preceding the conversion.[2]  Sedona did not repay Amro on or before March 22, 2001, triggering Amro's conversion right.

Accordingly, on March 27, 2001, Amro, through its investment-advisor Rhino, began converting the Debenture into common stock.  Between March 27, 2001 and February 25, 2002, Amro issued conversion notices to Sedona on eight occasions.[3]  The majority, as measured by dollar value, of the conversions occurred in April and May 2001, when $1.5 million in principal was converted into approximately 2 million shares of Sedona common stock.[4]  By February 2002, Amro had converted the entire face amount of the Debenture and had no position in Sedona stock.

> 2)     SEC Brings Enforcement Action Alleging Market Manipulation Without Having Conducted An Expert Analysis Of Rhino Trading

In April 2006, the SEC brought this action, accusing Badian of violating Section 10(b) and Rule 10b-5 by manipulating Sedona's stock price between "at least March 2001 through May 2001."[5]  Although not clearly articulated in the Complaint, the SEC's theory of the case seems to be that between March and April (and maybe May 2001, the Complaint is unclear), Amro short sold large quantities of Sedona stock, which had the effect of decreasing Sedona's share price, which in turn caused Amro's Debenture to be convertible into more shares of Sedona common stock had the stock price been higher.  According to the Complaint:

---

[2] *Id.*  The Agreement provided that Amro could convert Sedona stock at a price that equaled 85% of the volume weighted average stock price on the Nasdaq during the five-trading days (the "lookback period") before the conversion date.

[3] A true and correct copies of the eight Notices of Conversion are attached as Ex. 2 to the Sohn Daubert Dec.

[4] *Id.*

[5] A true and correct copy of the Complaint, dated April 3, 2006, is attached as Ex. 3 to the Sohn Daubert Dec., ¶¶ 45, 49.

> [Amro's] sustained sell pressure on Sedona's stock increased the number of conversion shares that Amro received under the terms of the Debenture. Between March 27 and April 16, 2001, Amro exercised its conversion rights under the Debenture on *four occasions* and received over 1.6 million shares of Sedona stock in repayment of $1.1 million due under the terms of the agreement.[6]

The Complaint alleges that the "sustained sell pressure" was the result of high-volume short selling. It does not allege or suggest that these short sales injected false information into the marketplace. All the Complaint alleges concerning these short sales is that some of them were, unsurprisingly, preceded or followed by colorful comments during phone calls between traders and brokers.

Although the SEC represented in 2007 that it intended to designate and call expert witnesses, it did not disclose any expert witnesses by October 13, 2009 as required by the Court's Scheduling Order.[7] By contrast, Badian timely served the reports of his experts Dr. Stephen Prowse and Tsvetan Beloreshki (the "Prowse-Beloreshki Report") and Steven S. Thel (the "Thel Report") on November 25, 2009. These reports generally opined that Rhino's trading was consistent with legitimate, rational, lawful trading strategies. Moreover, the Prowse-Beloreshki Report opined that after performing a battery of generally accepted statistical analyses, the authors concluded that Rhino's trading was inconsistent with manipulation.

In the face of these unequivocal reports, the SEC sought on December 4, 2009, and this Court granted, leave to designate rebuttal experts.[8] At that point, the SEC still did not have approval from the Commission, which it did not formally receive until January 13, 2010, to

---

[6] Ex. 3, ¶ 34 (emphasis added).

[7] A true and correct copy of excerpts of the SEC's Responses and Objections to Defendant Badian's First Set of Interrogatories and Requests for Production of Documents, dated April 18, 2007, is attached as Ex. 4 to the Sohn Daubert Dec.

[8] *See* Memo Endorsed Motion dated December 7, 2009, Docket entry no. 126.

actually retain expert witnesses.[9]  Nevertheless, in advance of receiving approval, in late-December 2009, the SEC approached Glosten about serving as a rebuttal expert witness.

> 3)   Glosten And Jones Lack Experience With Future Priced Securities Or Market Manipulation, So They Decide To Use Glosten's Price Impact Model To Analyze The Entire Market's Trading In Sedona Stock

In his initial conversations with SEC representatives, Glosten said that he was interested in working on a rebuttal report even though he had not actually "heard much [about future priced securities]" and had never studied one before this case.[10]  Despite his lack of familiarity with the securities at issue here, Glosten believed that working on the rebuttal report would be "intellectually interesting" and may result in some research projects and/or provide him with the opportunity to be involved in "a real life case study."[11]  In late-December 2009, Glosten and Jones decided that serving as expert witnesses in this case would be interesting and decided to accept the engagement.

Like Glosten, Jones had no background in future priced securities and until this case, "had never studied them specifically or looked at one specifically."[12]  Similarly, neither Glosten nor Jones had any experience analyzing securities trading to detect market manipulation. Moreover, their own, definitions of "manipulate" or "manipulation" do not agree.[13]  Specifically, Glosten understood the word manipulate to mean "move," as he explained in his deposition,

---

[9] A true and correct copy of the deposition of Lawrence Glosten, dated April 16, 2010 ("Glosten April Depo."), is attached as Ex. 5 to the Sohn Daubert Dec., 115:14-20.

[10] Ex. 5, 120:21-25, 121:2-22, 158:13-25, 159:2-6.

[11] Ex. 5, 119:10-25, 120:1-6.  A true and correct copy of the deposition of Charles Jones, dated April 13, 2010 ("Jones April Depo."), is attached as Ex. 6 to the Sohn Daubert Dec., 94:2-10.

[12] Ex. 6, 48:12-14.  A true and correct copy of the Deposition of Charles Jones, dated May 13, 2010, is attached as Ex. 7 to the Sohn Daubert Dec., 375:7-12.

[13] Ex. 5, 60:3-6; Ex. 7, 115:11-17.

"[a]s in I can manipulate this glass.  I can move it around."[14]  Jones, by contrast, understood

manipulation to mean "trading in order to drive the price away from its fundamental value, to

artificially increase or artificially depress the share price for a temporary amount of time."[15]  But,

as Jones also explained in his deposition, "fundamental value" is an academic construct that does

not actually exist and is not observable.[16]

 Glosten specializes in the study of market microstructure and is probably best known in

academic circles for his development of the "Price Impact Model," which is an academic model

that he co-developed with a colleague in the mid-to-late 1980s (the "Price Impact Model").[17]

The model was developed through an analysis of the bid/ask spread[18] of NYSE common stock

transaction prices from 1981-1983, and in essence, examines how "private information," (*i.e.,*

information that is not widely known to the market), affects the price of stock.[19]  Mechanically,

the model "looks at every transaction that takes place in a particular stock . . . to see what

happens to the quoted prices after . . . a transaction takes place."[20]  It is "designed to measure

exactly how much the price goes up after a buyer initiates a buy transaction with a dealer and

---

[14] Ex. 5, 60:3-6.

[15] Ex. 6, 115:11-17.

[16] Ex. 6, 25:17, 27:5; 122:23, 123:3.

[17] Ex. 6, 102:10-22.  A true and correct copy of Lawrence R. Glosten & Lawrence E. Harris, *Estimating the Components of the Bid/Ask Spread*, JOURNAL OF FINANCIAL ECONOMICS 21 (1988) is attached as Ex. 8 to the Sohn Daubert Dec.

[18] The bid/ask spread refers to the amount by which the ask price exceeds the bid or the difference in price between the highest price that a buyer is willing to pay for an asset and the lowest price for which a seller is willing to sell it.

[19] Ex. 8; Ex. 6, 102:10-22.

[20] Ex. 6, 102:18-22.

exactly how . . . much the price goes down after a sale transaction with a dealer."[21]  According to

Jones:

> The price impact model is essentially a model that looks at every transaction that
> takes place in a particular stock and it looks to see what happens to the quoted
> prices after that – after a transaction takes place.
>
> So it's designed to measure exactly how much the price goes up after a buyer
> initiates a buy transaction with a dealer and exactly how – how much the price
> goes down after a sale transaction with a dealer.[22]

The Price Impact Model has never been used to detect manipulation, nor is it able to do so.[23]

Instead, it is an academic model used to measure how purchases or sales of blocks of

shares impact the market price for a security and how efficient or inefficient that security's

pricing is:

> [T]here are really two things that come out of the price impact model.  One is a
> measure of price impact itself, and the other is how big the deviations are from
> what we would call the efficient price, so essentially, how big is the bid-ask
> bounce.  So how far – how far away from this efficient price are the bid price and
> the ask price.[24]

Being an academic model, the Price Impact Model looks to how far stock prices deviate from

their "efficient" price.  The concept of an efficient price is a "construct . . . in financial

economics," and "[i]t's not something that's observable."[25]  Accordingly, the Price Impact

Model is "used in the financial economics literature to identify . . . the sensitivity of price to a

certain amount of trading.  And that can tell you something – under certain assumptions, . . .

about how informed the traders are that come and trade the stock."[26]  Finally, because the Price

---

[21] Ex. 6, 102:12-22.

[22] Ex. 6, 102:12-22.

[23] Ex. 6, 124:5-11.

[24] Ex. 6, 103:25, 104:8.

[25] Ex. 6, 104:18-22.

[26] Ex. 6, 103:2-8.

Impact model does not differentiate between market participants, it assumes that all purchases of a certain volume increase the price similarly and all sales of a certain volume decrease the price similarly.[27]

Despite all of these limitations of the Price Impact Model, Glosten and Jones immediately agreed to use it and did not seriously consider any alternative approaches to analyzing Rhino's trading, including using the sorts of regression analyses that are commonly accepted in the economic community to detect manipulation.[28]

4)   Glosten And Jones Receive The Go-Ahead From The SEC And Make A Work Plan

In early January 2010, Glosten and Jones put together a work plan of the tasks they thought were required before they could offer their opinions on Rhino's trading.  Among these critical tasks that they identified before commencing work, were:

- Assembly of "a data file constructed from the audit trail," for the time period March 1 to May of 2001;[29]

- construction of databases from the SEC's data for March and April 2001;[30]

- Construction of a "'tracking portfolio' for Sedona—a portfolio of 10-15 stocks that are of a similar size and in a similar industry."[31]

Consistent with this work plan, on January 5, 2010, Glosten submitted a budget and proposal to the SEC, which indicated that Glosten and Jones planned to rely on "data from March 1, 2001 to May 1, 2001 for Sedona and peer firms" to conduct their analysis of whether there was evidence

---

[27] Ex. 5, 204:20, 205:3.

[28] Ex. 5, 142:12-23 (testifying that they needed to know "whether or not it would even be possible to manipulate the stock"); Ex. 6, 109:14-20.

[29] A true and correct copy of the January 3, 2010 email from Glosten to Frederick Dunbar is attached as Ex. 9 to the Sohn Daubert Dec.

[30] A true and correct copy of the January 7, 2010 email from Glosten to Jones, et al. is attached as Ex. 10 to the Sohn Daubert Dec.

that "defendant did not manipulate" Sedona stock and whether there was evidence "consistent with defendant manipulation."[32]  On January 13, 2010, the Commission formally approved the engagement of Glosten and Jones as expert witnesses in this case.[33]

> 5)   Glosten And Jones Serve Their Rebuttal Report, Which Does Not Comport With Their Original Work Plan

Glosten testified that by early February, "the data set . . . appeared to be as right as it could be."[34]  Indeed, by early February, Glosten testified that he was "getting really nervous" about the February 10th deadline and that he and Jones had begun drafting the Rebuttal Report before they received the data to run the Price Impact Model.[35]  Ultimately, Glosten and Jones worked with the data they had available and finished their rebuttal report; serving it (the "Glosten Jones Report" or "Rebuttal Report") on February 10, 2010.  Glosten and Jones were subsequently deposed in April and May 2010.

Between their depositions and the Rebuttal Report, the following points were made plain that neither Glosten, nor Jones:

- has any experience whatsoever analyzing future priced securities similar to those they purport to opine on in this case;
- has an appropriate working definition of "manipulation" despite using the word throughout the Rebuttal Report;
- was able to articulate an optimal trading strategy for the Debentures, despite opining that Rhino's trading was inconsistent with such a strategy;
- performed any analysis whatsoever of seven of the eight Amro conversions, despite the fact that the single conversion that they did analyze was the smallest one;

---

[31] Ex. 10.

[32] A true and correct copy of the January 5, 2001 email from Glosten to Dunbar is attached as Ex. 11 to the Sohn Daubert Dec.

[33] Ex. 5, 115:14-20.

[34] Ex 5, 178:9-25, 179:2-25, 180:2-4.

[35] *Id.*

- was able to form any empirically informed conclusions about Rhino's trading in Sedona stock as they did not conduct any analyses that isolated all of Rhino's actual buys and sells of Sedona stock during the March-through-May time period that they originally identified; and

- was able to run all the calculations that they originally intended to complete.

Despite the fact that Glosten and Jones intended to focus on the March 2001 to May 2001 timeframe, the conclusions in their Report are based on an analysis of just the "latter half" of March 2001 period.[36]  Indeed, they only ran the Price Impact Model for March 2001, even though they intended to focus on the broader time period and acknowledged that the majority of the conversions occurred in April and May 2001.[37]  Further, despite the fact that they had the SEC's data for the April and May 2001 months, their analysis and report ignores the trading in those months.[38]

In addition, although they intended to include it, the Rebuttal Report and Glosten and Jones's analysis failed to consider an index of Sedona peer firms.[39]  Glosten testified that if they had more time, they would have included this analysis.[40]  Further, Jones testified that if they had had more time, they would have "started from scratch" and not relied on the SEC's data.[41]

---

[36] A true and correct copy of the Expert Rebuttal Report of Lawrence R. Glosten and Charles M. Jones, Ph.D, in response to the expert report by Stephen D. Prowse and Tsvetan N. Beloreshki, dated February 10, 2010, is attached as Ex. 12 to the Sohn Daubert Dec., ¶¶ 58, 61, 68, and a true and correct copy of the Expert Rebuttal Report of Lawrence R. Glosten and Charles M. Jones, Ph.D, in response to the expert report by Steven S. Thel, dated February 10, 2010, is attached as Ex. 13 to the Sohn Daubert Dec. (collectively, the "Glosten-Jones Report").

[37] Ex. 6, 169:14-21, 170:2-25; 231; Ex. 5, 194:12-15, 195:2-25, 196:2-24.

[38] Ex. 6, 169:14-21, 171:9-21, 231:2-25, 232:2-13; Ex. 5, 194:12-15, 195:2-25, 196:2-24.

[39] Ex. 5, 173:15-25, 174:2-4.  A true and correct copy of the deposition of Glosten, dated May 10, 2010, is attached as Ex. 14 to the Sohn Daubert Dec., 356:9-22.

[40] Ex. 5, 173:15-25, 174:2-4.

[41] Ex. 6, 169:18.

ARGUMENT

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony, requiring that a proffered expert be qualified "by knowledge, skill, experience, training or education." [42]   Moreover, the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* that the trial court serves a "gatekeeping" function under Rule 702 to ensure that expert testimony "is not only relevant, but reliable."[43]  The Second Circuit has interpreted this gatekeeping role as  requiring the trial court to determine whether: (1) the proffered expert is qualified, (2) the proffered expert testimony is "relevant,"(*i.e.,*  whether it will assist the trier of fact in understanding the evidence or determining an issue), and (3) "the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered.'"[44]  Accordingly, expert testimony that is not likely to assist the trier of fact or is unreliable should be excluded.  Indeed, the district courts must serve as gatekeepers of expert testimony because such testimony can be "'both powerful and quite misleading.'"[45]

Here, neither Glosten nor Jones is qualified "by knowledge, skill, experience, training or education" to render conclusions or opinions on the issues involved in this case.  Moreover, Glosten and Jones's conclusions and opinions are based on an irrelevant and unreliable economic model, admittedly unreliable data, and incomplete and contradictory analyses.  In this regard,

---

[42] Fed. R. Evid. 702.

[43] 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending the scope of the *Daubert* analysis to all expert testimony, not just scientific expert testimony).

[44]*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 472 (S.D.N.Y. 2005) (testimony about federal securities laws and possible criminal charges was not relevant to the claims in the civil matter and therefore was inadmissible).

[45] *Daubert*, 509 U.S. at 595.

their testimony is *not* likely to be helpful to the finder of fact and they should be precluded from testifying in this case.

I.    Glosten And Jones Are Not Qualified To Opine On The Securities Or Issues Involved Here

Under Rule 702, a court will exclude a proffered expert who lacks relevant experience or qualifications.[46] Even if a proposed expert witness possesses credentials to render certain expert opinions on one subject, the trial court should exclude any testimony that extends beyond the witness's demonstrated, actual expertise.[47] For example, in *Fernandez v. Central Mine Equipment Company*, the district court for the Eastern District of New York, held that plaintiff failed to demonstrate that his proffered expert's "prior experience [was] relevant to the issues involved [in the litigation]" and, therefore, "any opinion [the expert] would offer would be based on nothing more than improper speculation."[48] The court noted that the proffered expert, a mechanical engineer and licensed professional engineer who specialized in "accident reconstruction and industrial accidents" and "'the evaluation, troubleshooting and design of

---

[46] *See Fernandez v. Central Mine Equip. Co.*, 670 F. Supp. 2d 178, 183-85 (E.D.N.Y. 2009) (proposed expert, who had never been qualified by a court as an expert witness, was not qualified by experience or background to render expert opinions); *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 132-33 (E.D.N.Y. 2009) (plaintiff failed to show that its expert was "qualified" in the relevant field); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 251-53 (S.D.N.Y. 1997) (mechanical engineer was not qualified to express an expert opinion).

[47] *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*, No. 04 CIV 10014, 2009 WL 3111766, at *18 (S.D.N.Y. Sept. 28, 2009) (limiting expert's testimony to hedging strategies as financial accounting was outside his expertise); *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657-58 (2d Cir. 1992) (holding that an engineer was qualified to testify about the need for ventilation when using a hazardous product, but not regarding the sufficiency of the warning about that risk on the product's label); *Quintanilla v. Komori Am. Corp.*, No. 07-23475-CV, 2009 WL 320186, at *1 (2d Cir. Feb. 10, 2009) (excluding proposed expert testimony regarding the design of a printing press where the purported expert "ha[d] experience in the mechanical design of certain specific mechanisms . . . [but] there is no indication that [the purported expert's] work involves machines that are in any way similar to printing presses, or that he has received any education or training regarding printing presses or similar machines").

[48] *Fernandez*, 670 F. Supp. 2d at 183-85.

machinery'" was not qualified to opine on the issues in the case related to injuries sustained by plaintiff while using a drilling device manufactured by defendant, a maker of geotechnical or water well drilling apparatuses.  Similarly in *Aristocrat Leisure Ltd. v. Deutsche Bank*, the Court limited the areas of testimony to be offered by one of the SEC's proferred experts here, Charles Jones.  In *Aristocrat Leisure*, the Court found that Jones had improperly attempted to offer expert opinions on financial accounting and rejected the over-reach and barred that testimony.

Here, Glosten and Jones are similarly unqualified to testify in this litigation.  Like the rejected expert in *Fernandez*, neither Glosten nor Jones has been qualified by any federal court to serve as an expert witness in a litigation involving market manipulation or securities fraud. Indeed, prior to this case, Glosten had never been retained as an expert witness in a litigation or testified under oath in any case he could identify.[49]  Jones has been retained as an expert witness in three previous litigations—none of which involve issues relevant here—and, as discussed previously, in one of those litigations, *Aristocrat Leisure*, the court held that Jones was unqualified to render expert testimony on the issue of financial accounting, which was discussed in his expert report.[50]

Moreover, like the *Fernandez* expert, even though Glosten and Jones are generally familiar with the stock market, neither has any background in future priced securities or the issues involving such securities—such as hedging or trading strategies for these securities or the

---

[49] Ex. 5, 97:17-25; Ex. 6:85:12-25, 86:2-25, 87:2-20.  Glosten testified that he was retained as an expert witness in a case ("in probably 1992"), in which he may have written a report, but he had "no memory" of the case or the report.  Ex. 5, 97:178-25.

[50] *Aristocrat Leisure*, 2009 WL 3111766, at *18 (precluding Professor Jones from providing a discussion of "financial accounting methodology").

debenture agreements that govern the issuance of such securities. As they both testified, Sedona was the *first* future priced security that either had ever studied.[51]

II.     Glosten And Jones's Conclusions Are Irrelevant To This Case

Even if Glosten and Jones were "qualified"—which they are not—to testify in this litigation, their findings and analyses are irrelevant to this case.[52]  It is well-settled that "[o]ne of the fundamental requirements of Rule 702 is that the proposed testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue'"[53] "This helpfulness requirement is 'akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence . . . [but] goes beyond mere relevance because it requires expert testimony to have a valid connection to the pertinent inquiry.'"[54]  The Supreme Court in *Daubert* described this requirement as "'fit'" and pointed out that "'Rule 702's helpfulness standard requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.'"[55]

Here, Glosten and Jones fail to meet the basic requirement of "fit" (or relevance). First, their inability to agree on the definition of (or even explain) the term "manipulate"—despite

---

[51] Ex. 5, 120:21-25, 121:2-22, 158:13-25, 159:2-6; Ex. 6, 48:12-15; Ex. 7:375:7-12.

[52] *Daubert*, 509 U.S. at 589; *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004); *Kumho Tire Co.*, 526 U.S. at 141; *MTX Commc'ns Corp. v. LDDS/Worldcom, Inc.*, 132 F. Supp. 2d 289, 290-91 (S.D.N.Y. 2001).

[53] *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 540 (holding that proposed expert's testimony on ethical standards was not relevant to the issues in the case, which involved whether defendants breached their legal duties).

[54] *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 540.

[55] *Id.*; *Daubert* 509 U.S. at 591-92. *See also Kumho Tire Co.*, 526 U.S. at 141; *MTX Commc'ns Corp.*, 132 F. Supp. 2d at 290-91 (recognizing that Daubert has been extended to "testimony based on technical and other specialized knowledge" and "must not only have a reliable foundation but also be relevant in that it 'fits' the facts of th[e] case"); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d at 473 (holding that the proffered expert's testimony was not "relevant" to the case and therefore, would not "'assist the trier of fact to understand the evidence or to determine a fact in issue'").

concluding in their Report that Badian engaged in manipulative trading strategy[56]—shows that

their testimony will not only be unhelpful, but will likely confuse the fact finder.  Second, the

conclusions in their Report are based on the results of the Price Impact Model, an irrelevant and

outdated economic model that has no applicability to the facts of this case.

A.    *Glosten and Jones's Definitions of Manipulation Are*
*Contradictory and Irrelevant*

Glosten and Jones's conclusion that Badian "manipulated" the price of Sedona stock in

the Spring of 2001 is not likely to be helpful to the fact finder because their testimony

demonstrates that they do not agree on a definition of "manipulation" and, in any event, their

respective definitions of the term "manipulate" are contradictory to settled case law.

The Supreme Court has held that "manipulation" is "virtually a term of art when used in

connection with securities markets" and refers to conduct artificially affecting market activity in

order to mislead investors.[57]  Moreover, manipulation "connotes intentional or willful conduct

designed to deceive or defraud investors by controlling or artificially affecting the price of

securities"[58]

Neither Glosten nor Jones appears to have applied or even understood the Supreme

Court's definition when reaching their conclusion that Badian engaged in a "manipulative

trading strategy."[59]  In fact, their testimony indicates that they did not even agree on a definition

---

[56] Ex. 12, ¶¶ 59, 68.

[57] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 198 (1976) (manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"); *United States v. Scop*, 846 F.2d 135, 140 (1988) (precluding expert's testimony on "manipulation" as invading the province of the jury) (citing *Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977)).

[58] *Ernst & Ernst*, 425 U.S. at 186.

[59] Ex. 12, ¶ 68; Ex. 5, 59:12-25, 60:2-25, 61:2-5; Ex. 6, 115:2-25, 2-15.

16

when drafting the Report and reaching their conclusions.[60]  Specifically, Glosten testified that he

understood the term "manipulate" to be akin to moving (or manipulating) an object:

> Q:       …[W]hen is price change in relation to trading manipulative?
> A:       I don't know.  "Manipulation" I think is a legal term….
> Q:       Okay.  So you  don't what manipulation means in this context?
> A.       Like 982 of the Exchange Act, I know what it says; but am I an expert in that?  No.
> Q.       And in your reports that you've submitted in this case, you would agree with me that the word either "manipulation" or "manipulative" occurs – appears?
> A.       That's right.  In the – but not – we did not intend it in a legal sense.
> Q.       How did you intend it?  How do you define it?
> A.       As in I can manipulative this glass.  I can move it around.
> Q.       And presumably moving the glass around is not unlawful?
> A.       I don't think so.
> Q.       So you don't have any understanding, sitting here today, how the word "manipulation" is used in the legal context?
> A.       Do I not have any understanding?  I do have an understanding, but that's not what I'm opining on.
> Q.       … [Y]ou used the word "manipulation" or "manipulative," whatever version of that root, in the reports that you've submitted in this case in the same way that use manipulating this glass by moving it around?
> A.       Uh-huh.
> Q.       That's the extent of it?
> A.       That's the extent of what?
> Q.       Of your use of the word.
> A.       Yes.
> Q.       So it has no value judgment associated with it one way or another?
> A.       No.[61]

Jones testified that he understood manipulation to mean "trading in order to drive the

price away from its fundamental value, to artificially increase or artificially depress the share

price for a temporary amount of time."[62]  However, he conceded that the "fundamental value" of

---

[60] *Id.*

[61] Ex. 5, 59:12-25, 60:2-25, 61:2-5.

[62] Ex. 6, 115:4-24, 116:2-15.

a stock is not generally "observable"—that he had never seen it—and could not describe when a stock is being "artificially depressed."[63]

In view of the fact that Glosten and Jones's divergent definitions of "manipulate" are not consistent with the law or one another, it is axiomatic that their conclusion that Badian engaged in a manipulative trading strategy is inappropriate and irrelevant here. Accordingly, they should be precluded from testifying to this conclusion.

      B.    *The Price Impact Model and Its Results Are Irrelevant to the Issues Here*

Even if Glosten and Jones properly and consistently used the term "manipulate" in reaching their conclusions, which they did not, their analysis is based on the results of the Price Impact Model, which has no bearing on the issue of whether Rhino engaged in manipulative trading of Sedona stock in 2001.

As an initial matter, the model was developed in 1987. It is over twenty years old and is based on the analysis of stocks, trading on the NYSE, in 1981-1983, nearly twenty years before the trading of Sedona, which traded on the Nasdaq in 2001.[64] Indeed, in *Premium Plus Partners, L.P. v. Davis*, the Illinois district court precluded an expert rendering conclusions on market conditions in October 2001 because the expert's analysis was based on a comparative model using "market conditions in 1990 and 1993."[65]

Even if the Price Impact Model examined the relevant time period, market, and type of stock, which it does not, it was developed to determine how a stock price reacts to information in

---

[63] *Id.*

[64] *See Premium Plus Partners, L.P. v. Davis*, 653 F. Supp. 2d 855, 867-68 (N.D.Ill. 2009) (precluding expert testimony that compared market conditions in 1990 and 1993 with conditions in 2001 and different types of securities).

[65] *Id.*

the marketplace—a proposition that is irrelevant to the effect of Rhino's trading here.[66]

Regardless, neither Glosten nor Jones even looked at the news or public information about

Sedona in 2001 to determine if other factors may have affected Sedona's stock price at that

time.[67]

Moreover, the Price Impact Model:

- has never been used to detect market manipulation,[68]

- was developed in a radically different information environment on a different market
  with different trading mechanics,[69]

- has never been updated to account for the vastly different information sources
  available in the twenty-first century that were not available when the model was
  developed in the 1980s (e.g., on-line news accounts, on-line SEC filings),[70]

- had never been studied to determine whether it would yield useful results on
  NASDAQ traded securities,[71] and

- is not designed—and has not been used—to examine a single entity's (i.e., Amro's)
  trading of a particular security.[72]

With regard to the last point, despite the fact that Glosten and Jones render conclusions on

*Badian's* trading in Sedona stock, they did not analyze the impact of *Amro's* trading on the price

of Sedona stock.[73]  Indeed, the model is designed to examine all trading in a stock to determine

whether information impacts the price, not to examine whether a defendant's trading in a stock

---

[66] Ex. 5, 41:18-25, 42:2-25, 43:2-25, 44:2-25, 75:20-24; Ex. 6, 147:16-23, 244:14-25.

[67] Ex. 5, 159:10-17; Ex. 6, 147:16-23, 244:14-25.

[68] Ex. 5, 67:18-23.

[69] Ex. 5, 47:15-25, 48:2-25, 29:2-25, 50:2-19.

[70] *Id.*

[71] *Id.*

[72] Ex. 5, 65:2-25, 66:2-25; Ex. 6, 149:2-25, 150:2-25.

[73] Ex. 5, 203:15-19; Ex. 6, 167:11-25, 168:2-25, 169:2-18; Ex. 6, 169:2-18.  (Professor Jones
testified that time constraints made it impossible to look specifically at Rhino's trading.)

was manipulative.[74]  For these reasons, the results of the Price Impact Model are irrelevant and the SEC should be precluded from using them in this litigation.

III.   Glosten And Jones's Conclusions Are Admittedly Unreliable

Besides being irrelevant, Glosten and Jones's conclusions wholly fail to meet the reliability standard under *Daubert*.[75]  In *Daubert*, the Supreme Court held that the inquiry into reliability is a "flexible one."[76]  The Second Circuit has held that "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."[77]  "To warrant admissibility . . . it is critical that an expert's analysis be reliable at every step."[78]

A.   *The Data On Which Glosten and Jones Rely Was Admittedly Problematic and Incomplete*

Even if the Price Impact Model were an appropriate method for analyzing Sedona's share price here (which it was not), the data on which Glosten and Jones relied to run the model was admittedly inaccurate and incomplete.[79]  In this regard, the data and the results of the Price Impact Model (which depends on that data) are not reliable and Glosten and Jones did not

---

[74] *Id.*

[75] *Id.*

[76] *Daubert*, 509 U.S. at 590-94 ("Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community' . . . may properly be viewed with skepticism"); *see also Kumho Tire Co.*, 526 U.S. at 147 (expert's methodology lacked reliability in that it had not been adopted in the industry or literature); *Amorgianos*, 303 F.3d at 265 (after determining that an expert's testimony is relevant, the court must determine "'whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered'").

[77] *Amorgianos*, 303 F.3d at 267.

[78] *Id.* at 267.

[79] Ex. 5, 137:15-25, 138:2-25, 139:2-14; Ex. 6, 164:2-25, 165:2-24, 166:4-25, 167:2-3, 169:2-25.

"employ[] in the courtroom the same level of intellectual rigor" that securities experts normally would employ in their field.[80]

From the outset, Jones had "concerns" about the data that was provided by the SEC.[81]  As discussed above, Jones, who did "most of the empirical work," testified that the first step in the price impact model was to "get an audit trail that had all of the prevailing bid and ask prices in it."[82]  Because they did not have time to "start from scratch," as they typically would have done, Glosten and Jones relied on the audit trail created by the SEC.[83]  Jones noticed that the SEC's data had "discrepancies," which Glosten and Jones could not verify or correct because they did not have access to the account statements, but the issue of time forced Glosten and Jones to nevertheless use the SEC's audit trail in their analysis.[84]

In addition to problems with the SEC's data, Glosten and Jones admitted and the documentary evidence establishes unequivocally that the data they received from an outside vendor was not complete or correct.[85]  Indeed, as late as early-February 2010, Glosten and Jones were communicating with the vendor about quality-control issues and quote-matching problems, and were admittedly becoming "nervous" about the encroaching February 10, 2010 deadline.[86]  Indeed, because they did not have unlimited time, they had to accept the data as it was— "as

---

[80] *See Kumho Tires Co.*, 526 U.S. at 152 (the court must evaluate the proposed expert testimony to ensure that "an expert . . .  employs in the courtroom the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field").

[81] Ex. 6, 164:2-25, 165:2-24, 166:4-25, 167:2-3, 169:2-25.

[82] Ex. 6, 100:17-23.

[83] Ex. 6, 164:2-25, 165:2-24, 166:4-25, 167:2-3, 169:2-25.

[84] *Id.*

[85] A true and correct copy of correspondence among Glosten, Jones and the outside vendor is attached as Ex. 15 to the Sohn Daubert Dec.

[86] *Id.*

right as it could be"—and commence writing the Rebuttal Report.[87]  The truncated timeframe under which Glosten and Jones were operating and the fact that they began drafting the Rebuttal Report before they received the data raise significant questions as to whether they reached their conclusions without first seeing the data.  Significantly, an "inquiry with a preordained conclusion is neither scientific nor legally reliable."[88]

> ### B.     *Glosten and Jones Failed to Follow Their Work Plan and*
> ###        *Cherry-Picked Data to Render Their Conclusions*

Even if the data were not inaccurate and problematic—which it was—Glosten and Jones's analysis was still incomplete.  Expert testimony that incorporates only a portion of the available evidence, or "cherry-picks" the data that suits the expert's desired conclusion, is not sufficiently reliable and should be excluded under Rule 702 and *Daubert*.[89]  Rather, in order for expert testimony to be sufficiently reliable to present to the fact finder, the expert witness must consider the totality of evidence, and "account[] adequately for obvious alternative explanations."[90]

In their original proposal to the SEC, Glosten and Jones provided that they planned to analyze Rhino's trading from March 2001 through May 2001.[91]  Instead, however, they only ran the Price Impact Model for the first conversion period, which occurred in March 2001, even

---

[87] Ex. 178:2-25.

[88] *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 190 (D. Conn. 2009); *Daubert*, 590 U.S. at 595 ("The focus (under Rule 702) . . . must be solely on principles and methodology, not on the conclusions they generate").

[89] *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 563 (expert's "selectivity in defining the universe of relevant evidence...violated his own standard of proper methodology"); *MTX Commc'ns Corp.*, 132 F. Supp. 2d at 292 (excluding expert's testimony where he failed to consider relevant evidence in formulating his opinions).

[90] *Innis Arden Golf Club*, 629 F. Supp. 2d at 188 ("[A]n additional factor bearing on reliability is '[w]hether the expert has adequately accounted for obvious alternative explanations'").

[91] Ex. 9, Ex. 10, Ex. 11.

though the majority of the conversions occurred in April and May 2001.[92]  They ignored and did

no analysis on the later periods in April or May 2001—even though they had data for that time

period and repeatedly indicated that the March through May 2001 timeframe was the operative

period of trading.[93]

Second, Glosten and Jones's proposal indicates that they intended to do an index of

Sedona's peer-firms to incorporate into the price impact model.[94]  However, they were unable to

complete this index because of the February 10, 2010 deadline.[95]

As Jones testified, despite the fact that the SEC had been investigating this case for seven

years, they had a mere "three weeks" to gather and analyze the data, run the model and draft the

report, so they needed to make determinations on how to proceed and to adjust their workplan

accordingly.[96]  These determinations resulted in incomplete and baseless conclusions that were

cherry-picked from the available (and unreliable) data.  In this regard, Glosten and Jones's

opinions and conclusions are not reliable and should be excluded here.

C.      *Glosten and Jones's Conclusions Are Unsupported*

Glosten and Jones testified that they relied on the article, "Death Spiral Convertibles" by

Theo Vermaelen and Pierre Hillion (the "Vermaelen article") in reaching the conclusions in their

Report.  Glosten testified that the first thing that he did when he was retained by the SEC was try

to "understand the security" and that his background in the security was based on the Vermaelen

article.[97]  Similarly, Jones testified that he "read the Hillion and Vermaelen article" when he was

---

[92] Ex. 6, 169-70, 231; Ex. 5, 194:12-15, 195:2-25, 196:2-24.

[93] Ex. 9; Ex. 10; Ex. 11.

[94] Ex. 5, 173:15-25, 174:2-4; Ex. 14, 356:9-22.

[95] *Id.*

[96] Ex. 6, 169:2-24.

[97] Ex. 5, 120:21-25, 121:2-22, 158:13-25, 159:2-6; Ex. 6, 48:12-14; Ex. 7, 375:7-12.

researching future priced securities for the Report.[98]  Despite their reliance on the article,

however, Glosten and Jones were apparently selective about what principles they distilled from

the article.  For example, in their Rebuttal Report, Glosten and Jones opined that these securities,

and related debenture agreements, present only "one possible downside risk for holders of the

Debentures"—that "the stock price [will] fall so low that conversion could lead to more shares

than authorized by the issuer's charter."[99]  It was on this basis that Glosten and Jones concluded

that the short selling strategy employed by Amro was not a legitimate strategy.  As both Glosten

and Jones conceded in their depositions, however, the Vermaelen article identifies a host of risks

associated with these types of securities, including the possibility of bankruptcy and/or the

company being delisted and a lack of liquidity.[100]  Even the Second Circuit and Southern District

have recognized this.[101]  Glosten and Jones ignored each of these identified risks in their Report,

even though, they conceded at their depositions that these risks, in fact, applied to Sedona.

Further, despite their lack of background in future priced securities, they opine, in their

Report, that Rhino did not engage in a "rational" hedging strategy with respect to these

securities.[102]  Contrary to this conclusion, both Glosten and Jones testified that determining "an

optimal trading strategy for this security" is difficult.[103]  Specifically, Glosten testified that he

had not been able to develop a model (though he tried) to demonstrate an optimal trading

strategy and that colleagues, with whom he discussed the situation, stated that it would be "hard"

---

[98] Ex. 6, 192:4-22.

[99] Ex. 12, ¶ 16.

[100] Ex. 5, 130:2-25, 131:2-25, 132:2-10; Ex. 6, 300:2-25, 301:2-25, 302:2-25, 303:2025, 304:2-25.

[101] *See generally ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007).

[102] Ex. 12, ¶¶ 19-24, 68.

[103] Ex. 5, 186:16-25, 187:2-15; Ex. 6, 275:10-23, 276:2-25, 277:2-25.

to determine an appropriate strategy for this type of security.[104] Moreover, Jones testified that he did not "think these [securities] are so well studied that there's one route to holding and trading" them.[105]

In view of their contradictory conclusions about the appropriate trading strategy for these securities coupled with their general lack of experience with these types of securities, Glosten and Jones are not qualified to testify in this litigation.

CONCLUSION

For the foregoing reasons, Badian respectfully requests that this Court grant his motion *in limine* for an order to exclude the opinions of the SEC's witnesses, Lawrence Glosten and Charles Jones.

Dated: November 17, 2010
       New York, New York

Respectfully submitted,

DLA PIPER LLP (US)

_____/s/_____

Caryn G. Schechtman
Joshua S. Sohn
Megan K. Vesely
1251 Avenue of the Americas
New York, New York  10020
Tel: (212) 335-4500
Fax: (212) 335-4501
caryn.schechtman@dlapiper.com
joshua.sohn@dlapiper.com
megan.vesely@dlapiper.com

*Attorneys for Defendant Andreas Badian*

---

[104] Ex. 5, 186:16-25, 187:2-15.

[105] Ex. 6, 275:10-23, 276:2-25, 277:2-25.