Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

```
 1   UNITED STATES DISTRICT COURT

 2   FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   --------------------------------------------

 4   SECURITIES AND EXCHANGE COMMISSION,

 5          Plaintiff,

 6   v.

 7   ANDREAS BADIAN, et al.,

 8          Defendants.

 9

10   CIVIL ACTION NO. 06-CV-2621 LTS (DFE)

11   --------------------------------------------

12            VIDEOTAPED DEPOSITION OF

13           STEPHEN DAVID PROWSE, Ph.D.

14               March 5, 2010

15

16          T R A N S C R I P T  of the deposition

17   taken before BRIDGET LOMBARDOZZI, a Certified

18   Shorthand Reporter, CRR, RMR, RPR, and Notary

19   Public of the State of New York, at the

20   offices the SECURITIES AND EXCHANGE COMMISSION,

21   3 World Financial Center, New York, New York,

22   on March 5, 2010, commencing at 10:07 a.m.

23

24   Reported by:

25   Bridget Lombardozzi, CSR, RMR, CRR, CLR
```

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

---

                                                    Page 2

1  A P P E A R A N C E S :
2     SECURITIES AND EXCHANGE COMMISSION
3        Attorneys for the Plaintiff
4           100 F Street N.E.
5           Washington, D.C.  20549
6           202.551.4480
7        BY:  KENNETH J. GUIDO, ESQUIRE
8
9     DLA PIPER LLP (US)
10       Attorneys for Defendant Andreas Badian
11       and the Witness
12          1251 Avenue of the Americas
13          New York, New York  10020-1104
14          212.335.4892
15       BY:  JOSHUA S. SOHN, ESQUIRE
16          CARYN G. SCHECHTMAN, ESQUIRE
17          MEGAN VESELY, ESQUIRE
18
19  A L S O   P R E S E N T :
20     FREDERICK C. DUNBAR, US SEC
21     LAWRENCE R. GLOSTEN
22     CHARLES M. JONES
23     JONATHAN CLAY, Videographer
24
25

---

                                                    Page 4

1  PREVIOUSLY MARKED EXHIBITS (continued):
2  EXHIBIT 86     Page 210
3  EXHIBIT 87     Page 210
4  EXHIBIT 88     Page 210
5  EXHIBIT 89     Page 210
6  EXHIBIT 90     Page 210
7  EXHIBIT 10     Page 220
8  EXHIBIT 57     Page 241
9  EXHIBIT 47     Page 242
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

                                                    Page 3

1          I N D E X
2  Witness                        Page
3  STEPHEN DAVID PROWSE, Ph.D.
4    By Mr. Guido                   6
5
6          E X H I B I T S
7  I.D.      Description         Page
8  BP-21  11/4/09 Retention Letter for
9         FTI Consulting to DLA Piper      7
10  BP-22  Subpoena for Mr. Prowse    104
11  BP-23  Exhibit 13B - Regression Analysis   95
12  BP-24  Exhibit 13B - Regression Analysis  106
13  BP-25  DS Pet Quarters Random Notes    223
14  BP-26  Confidence Intervals - 4 pages   281
15  BP-27  "Death Spiral Convertibles"
16         Article by Hillion and Vermaelen   320
17  BP-28  "What's Wrong with Bonferroni
18         Adjustments" article by Perneger   324
19
20  PREVIOUSLY MARKED EXHIBITS:
21  EXHIBIT 4      Page 9
22  EXHIBIT 14     Page 43
23  EXHIBIT 12     Page 158
24  EXHIBIT 15     Page 171
25  EXHIBIT 5      Page 196

---

                                                    Page 5

1            * March 5, 2010 *
2          THE VIDEOGRAPHER:  Good morning.
3  We are now on the record in the matter of
4  Securities and Exchange Commission versus
5  Badian.  Today's date is Friday, March the 5th,
6  2010.  The time is 10:07 a.m.
7          This is the video recorded
8  deposition of Mr. Stephen Prowse being taken at
9  3 World Financial Center located in New York
10  City.
11          I am the camera operator.  My name
12  is Jonathan Clay, in association with Alderson
13  Reporting.  The court reporter is Bridget
14  Lombardozzi, also in association with Alderson
15  reporting.
16          Will all the attorneys please
17  identify themselves and the parties they
18  represent, beginning with the party noticing
19  this proceeding.
20          MR. GUIDO:  Kenneth Guido
21  representing the Securities and Exchange
22  Commission.  I'm accompanied by Larry Glosten
23  and Charles Jones and Fred -- Fred Dunbar.
24          MR. SOHN:  Joshua Sohn from DLA
25  Piper with Caryn Schechtman and Megan Vesely.

                                          2 (Pages 2 to 5)

Stephen David Prowse, Ph.D.                                    March 5, 2010

New York, NY

Page 6

1          - STEPHEN D. PROWSE -
2          THE VIDEOGRAPHER:  Will the court
3    reporter please administer the oath.
4          S T E P H E N   D A V I D
5    P R O W S E, Ph.D., FTI Consulting, 2001 Ross
6    Avenue, Suie 400, Dallas, Texas, having been
7    duly sworn, testified as follows:
8    DIRECT-EXAMINATION
9    BY MR. GUIDO:
10       Q.    Will you state your full name for
11   the record, please?
12       A.    Stephen David Prowse.
13       Q.    Where are you employed?
14       A.    I'm employed at a company called
15   FTI Consulting.
16       Q.    How long have you been there?
17       A.    I've been at FTI Consulting since
18   November of 2003.
19       Q.    Were you retained to be an expert
20   in this litigation?
21       A.    Yes.
22       MR. GUIDO:  I'd like to have the
23   court reporter hand you what I've marked as
24   Exhibit No. 21.  It's a premarked exhibit.  The
25   court reporter has it.

Page 7

1          - STEPHEN D. PROWSE -
2          THE REPORTER:  I gave it back to
3    you, sir.
4          MR. GUIDO:  She did, and I don't
5    have it.
6          MR. SOHN:  Mark this one.
7          (Whereupon, exhibit is received and
8    marked BP-21 for identification.)
9    BY MR. GUIDO:
10       Q.    Is Exhibit 21 the letter of
11   retention that you signed on November 4th,
12   2009, to appear as an expert witness in this
13   matter?
14       MR. SOHN:  Objection to form.
15       A.    Yes, this is the one I signed.
16       Q.    Now, prior to November 4th, 2009,
17   had you done any work with regard to the
18   Sedona's trading -- I mean the trading by
19   Andreas Badian in the Sedona stock?
20       A.    I have not done any work with
21   regards to Rhino trading in Sedona stock prior
22   to being retained on this matter.
23       Q.    For definitional purposes for the
24   record, I'll be referring to Badian's trading
25   and you're perfectly free to use whatever term

Page 8

1          - STEPHEN D. PROWSE -
2    you wish to use to refer to it.  But I will be
3    referring to Badian's trading.
4          So if you want to each time
5    clarify that in your view it's Rhino trading,
6    I'm perfectly happy for you to do so.
7          But my question was:  Were you
8    retained to do an -- a study of Badian's
9    trading of Sedona stock?
10       A.    I was retained in this matter to
11   do a study of Rhino's trading of Sedona stock,
12   yes, understanding that clarification.
13       Q.    Now -- and prior to that time, you
14   had not examined the trading in Sedona stock?
15       A.    Prior to that time, I had not done
16   any examination of trading in Sedona stock.
17       Q.    And what did you do after you were
18   retained on November 4th, 2009, to prepare for
19   the expert report that you provided in this
20   case?
21       A.    Well, Mr. Beloreshki and I were
22   hired as joint experts in this matter.  So
23   after I was retained, I discussed with him the
24   matter and the appropriate approach to answer
25   the questions that we were asked to address.

Page 9

1          - STEPHEN D. PROWSE -
2          And based on our -- our discussion
3    with -- based on my discussion with him, we
4    proceeded to perform the analysis.
5        Q.    Okay.  Will you take a look at --
6    in front of you in the blue batch are the
7    exhibits from Mr. Beloreshki's deposition.
8    I'll be using them in this deposition.
9          And I'd like you to take a look at
10   Exhibit No. 4.
11       MR. JONES:  I think it's not on
12   top.
13       MR. SOHN:  Number 1's on top.
14       MR. JONES:  You're good.
15       (Whereupon, there is a pause in
16   the proceedings.)
17   BY MR. GUIDO:
18       Q.    Have you had a chance to review
19   Exhibit No. 4?
20       A.    Yes.
21       Q.    Okay.  Is that the expert report
22   that you prepared in this matter?
23       A.    Yes, it is.
24       Q.    Okay.  Now, what documents did you
25   review prior to signing this report?  I think

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

Page 10

1          - STEPHEN D. PROWSE -
2     the date is November 24th?
3          A.    November 24th, correct.
4          Q.    What documents did you review?
5          A.    The documents I reviewed, I
6     believe, would be listed in Exhibit 3.  These
7     would be documents I directly reviewed, or the
8     team that was working on the engagement
9     reviewed.
10         Q.    Pardon?
11         A.    The team that was working on the
12    engagement reviewed.
13         Q.    I asked what you reviewed.
14         A.    I reviewed -- I reviewed the
15    Complaint; I reviewed the responses and
16    objections, and the first supplemental
17    responses and objections; I reviewed the audit
18    trail reports.  I believe I reviewed some of
19    these individual numbered Bates documents, if
20    not all of them.  I reviewed the trading data
21    which was in electronic format.  And I may
22    have reviewed some of these account statements.
23    I reviewed the Chaplinsky and Haushalter
24    article.
25         Q.    Pardon?

Page 11

1          - STEPHEN D. PROWSE -
2          A.    I reviewed the Chaplinsky and
3     Haushalter article.  And I reviewed various
4     data from Bloomberg, from FactSet, from the
5     NBER, and reviewed various SEC filings.
6          Q.    Well, let me ask you something:
7     How did you obtain the Chaplinsky article to
8     review?
9          A.    I can't remember.  I may have had
10    it.  I may individually have had it, a hard
11    copy of it.
12         Q.    What is your understanding of the
13    subject matter of that paper?
14         A.    That it looks at -- it examines
15    the financial characteristics of certain -- of
16    PIPEs, private investments in public equity,
17    and looks at the characteristics of firms that
18    are issuing them and performs some -- a variety
19    of economic tests.  And --
20         Q.    Did you review any other
21    literature that covered that subject matter?
22         A.    For this particular engagement,
23    no.  I'm aware of other literature out there
24    that talks about the -- similar to the
25    Chaplinsky and Haushalter article.

Page 12

1          - STEPHEN D. PROWSE -
2          Q.    Can you tell us what literature
3     that is?
4          A.    There's a Hillion and Vermaelen
5     article that would have appeared, I believe, in
6     the Journal of Financial Economics.  There is
7     Mr. Beloreshki's article.  There is --
8          Q.    What article is that?
9               MR. SOHN:  Mr. Guido, can you
10    please let the witness finish?
11              MR. GUIDO:  I'm sorry.
12         A.    That is the article that you
13    questioned him about on Tuesday, I believe.
14         Q.    The one that you co-authored
15    with --
16         A.    Yes.
17         Q.    -- Mr. Beloreshki?
18         A.    Yes.
19              There may be -- there may be other
20    articles that are on the broad topic of PIPEs
21    or future price securities out there that I
22    have read before, but I can't -- they don't
23    come to mind as I sit here.
24         Q.    Well, when you were sitting there
25    and you were preparing the report, did they

Page 13

1          - STEPHEN D. PROWSE -
2     come to mind?
3          A.    I didn't review them specifically
4     for the report, but my body of knowledge that
5     is -- that has been accumulated over 25 years
6     doing economics, or longer, it's -- it's just
7     sitting there as general awareness and general
8     knowledge of what the literature says and
9     what -- what some people have written.
10         Q.    Okay.  Let's take Mr. Beloreshki's
11    article.  Okay?
12         A.    Uh-huh.
13         Q.    In his article, does he address
14    the question of the motivation of people that
15    bring lawsuits contending that the prices of
16    stock have been manipulated?
17         A.    Does he address the motivation of
18    people bringing lawsuits?
19         Q.    Alleging market manipulation.
20         A.    He may talk about that.
21         Q.    Well, what did he say?
22         A.    I can't recall specifically what
23    he said.
24         Q.    What about --
25         A.    I'd be happy to look at the

4 (Pages 10 to 13)

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 14

1           - STEPHEN D. PROWSE -
2    article if you want me to.
3        Q.    We'll have to look at the
4    article?
5        A.    I'd be happy to if you want me to
6    look at it.
7        Q.    No, I understand that.  You'd be
8    happy to look at the article.
9        A.    Yeah.
10       Q.    And what about Hildebrand?  What
11   did they say about the motivations of people
12   who allege market manipulation?
13       A.    Hildebrand?
14       Q.    I think it was --
15       A.    I'm not aware of the person you
16   said, Hildebrand.
17       Q.    I'm sorry.  You mentioned -- I
18   thought that you said Hildebrand.
19             What was the -- what was the other
20   article that you said that you were aware of?
21       A.    There were two authors:  One
22   was -- one's surname is Hillion.
23       Q.    Hillion, excuse me.
24       A.    H-i-l-l-i-o-n.  And the other's
25   surname Vermaelen, V-e-r-m-a-e-l-e-n, I think.

Page 15

1           - STEPHEN D. PROWSE -
2    They're telling me I got that right.
3        Q.    What was the subject matter of
4    that paper?
5        A.    I don't believe they talked about
6    the motivations of bringing -- I don't believe
7    they talked about the motivations for people to
8    bring lawsuits alleging market manipulation in
9    that paper.  I think it was more of a
10   descriptive analysis of the types of firms that
11   issue future price securities and how most of
12   them are extremely small, risky firms.
13       Q.    Did F -- did FTI recently issue
14   future price securities?
15       A.    I would be very surprised.  Well,
16   what do you mean by that?  Could you define a
17   future price security for me?
18       Q.    Did it recently issue a
19   convertible debenture?
20       A.    Well, that's a different -- that's
21   a different instrument than a future price
22   security.
23       Q.    Okay.
24       A.    So, they may have -- they may have
25   issued a convertible bond.  I don't know.

Page 16

1           - STEPHEN D. PROWSE -
2        Q.    Do you know?
3        A.    I haven't done a study of what FTI
4    has issued in terms of financing their
5    activities.  I know they're buying back stock
6    just from my general knowledge, so...
7              It would be extremely surprising
8    to me if they had issued an FPS, as I
9    understand what an FPS is.  But I wouldn't be
10   surprised maybe if they issued a convertible
11   bond.
12       Q.    What do you understand an FPS
13   is?
14       A.    A future -- well, FPSs can be
15   customized -- they're customized securities
16   between, you know, sophisticated entities.  So
17   their terms can vary a lot.  But, generally, I
18   would describe a future price security as a
19   convertible note that is convertible after some
20   lock-up period into the equity of the firm
21   issuing the bond or issuing the note at some
22   discount to a -- to a benchmark price that's
23   calculated based on some -- some measure of the
24   current stock price of the firm.
25       Q.    Now, when you reviewed the -- or

Page 17

1           - STEPHEN D. PROWSE -
2    when you were preparing your report, did you
3    review any literature on market
4    microstructure?
5        A.    No, not for preparing this report.
6    I -- based on my training and my education,
7    I've obviously read a lot of articles on market
8    microstructure and that forms sort of the
9    background or base of my knowledge, but I did
10   not specifically review any for this -- for
11   this engagement.
12       Q.    Did you review any literature that
13   related trading activity to price changes?
14             MR. SOHN:  Anything?
15             MR. GUIDO:  Any literature.
16       A.    For this engagement?
17       Q.    For this engagement?
18       A.    No, I don't believe I did.
19       Q.    Do you consider yourself an expert
20   on trading activity and price changes?
21       A.    I would consider myself an expert
22   in financial economics, financial instruments
23   and financial markets, and understanding how to
24   measure the stock pricing impact of a news
25   announcement or an event or trade.  I consider

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

Page 18

1          - STEPHEN D. PROWSE -
2    myself an expert in those areas.
3        Q.    So, prior to this case and Pet
4    Quarters, had you ever done an analysis of the
5    relationship between trading activity and price
6    change?
7        A.    Not in terms of my consulting
8    work, no.
9        Q.    Okay.  In any other context?
10       A.    It may -- I may well have.  I
11   believe I did do study courses on that for my
12   Ph.D. training.  I reviewed articles and
13   studied articles on that as part of my Ph.D.
14   training in finance and economics.
15       Q.    When did you get your Ph.D.?
16       A.    I'm sorry?
17       Q.    When did you get your Ph.D.?
18       A.    1989.
19       Q.    1989.  So that's 20 years ago.
20       A.    Yes.  I may also have reviewed
21   literature around that topic for my CFA
22   charter.
23       Q.    When did you get your CFA charter?
24       A.    Nine -- 2001, I believe.
25       Q.    Okay.  So that was about nine

Page 19

1          - STEPHEN D. PROWSE -
2    years ago.
3        A.    Yes.
4        Q.    Did you go back after you were
5    retained to prepare this report to review the
6    literature that you had studied in your Ph.D.
7    program and when you got your CFA on trading
8    activity and price changes?
9        A.    I didn't -- I didn't review any
10   specific literature.  I used my knowledge
11   gained as an economist for 25 years in
12   financial economics.
13       Q.    The -- well, based on your
14   recollection of what you studied 10 and 20
15   years ago, can you tell us what theories of
16   price change in tradings are in the
17   literature?
18           MR. SOHN:  Which literature?  The
19   literature that he read 20 years ago?
20       Q.    The ones you reviewed 20 years ago
21   and 10 years ago.
22       A.    Yeah, I mean, there's various
23   theories about trading behavior and how it
24   affects the price through inventory
25   adjustments, through asymmetric information,

Page 20

1          - STEPHEN D. PROWSE -
2    through impact -- trading impact on the stock.
3           There's various theories that have
4    been tested by and run by people such as
5    Professors Glosten and Jones.
6        Q.    What did -- what sort of work did
7    Professor Glosten and Jones do that you just
8    referred to?
9        A.    Various studies they've done.
10       Q.    Well, can you name one of them?
11       A.    I can -- I can't name the title of
12   it.  It looks at the impact on price of
13   trading.
14       Q.    And what -- it looks at the impact
15   of price on trading or trading on price?
16       A.    On price of trading.
17       Q.    On the price of trading.
18           And what does -- what does it
19   measure in terms of the impact on the price of
20   trading?
21       A.    Well, I'd have to look at the
22   article to be -- to be able to tell you.  I
23   can't sit here and --
24       Q.    Did you look at the article before
25   you --

Page 21

1          - STEPHEN D. PROWSE -
2           MR. SOHN:  Mr. Guido, you --
3           MR. GUIDO:  Excuse me.
4           MR. SOHN:  He wasn't finished with
5    his answer.
6        A.    I'd have to look at the article
7    specifically to tell you exactly what they did
8    and exactly how they measured things.
9        Q.    Well, did you look at their
10   articles before you wrote that report?
11       A.    No.
12       Q.    What does the -- what do the
13   articles that Professor Jones and Professor
14   Glosten wrote suggest about the appropriate
15   measure of active in determining prices?
16       A.    Again, I'd have to look at the
17   specific article to be able to tell you.
18       Q.    Okay.
19       A.    I believe one of the things
20   they -- they look at is whether there's a trade
21   or not.
22       Q.    Okay.  Well, is one of the -- have
23   you seen any literature that indicates that --
24   with regard to analyzing trading that buys move
25   prices up and sells move prices down?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                              March 5, 2010

New York, NY

Page 22

1         - STEPHEN D. PROWSE -
2         A.    I'm generally aware that I think
3    there are some results that suggest that, yes.
4         Q.    Okay.  And that -- how are buys
5    defined in that literature?
6         A.    I think the literature would
7    probably have different definitions of buys,
8    depending on who's doing the study.  I mean,
9    there's lots of studies out there.
10        Q.    Well, is one of the definitions of
11   buys are trades executed at the offer or above
12   the offer?
13        A.    I don't know about -- above maybe.
14   Yeah, could be.
15        Q.    Okay.  And that sells are sells if
16   the bidder put in a lower bid?
17        A.    That may be, too.
18        Q.    In fact, didn't -- didn't you have
19   a -- such a study done in Pet Quarters?
20             MR. SOHN:  Objection.
21        A.    I'd have to see the Pet Quarters
22   report to see exactly what you're referring to.
23   We did an initial report and a rebuttal report.
24   We did a lot of analysis in there.  So I'd like
25   to see the report to see exactly what you're

Page 23

1         - STEPHEN D. PROWSE -
2    referring to.
3         Q.    Well, in -- in the report --
4         A.    There were two reports.
5         Q.    There were two reports.
6         A.    Yes.
7         Q.    There was an initial report and
8    there was -- there was a rebuttal report.
9         A.    Yes.
10        Q.    And was one of the reports -- one
11   of the studies that you did, was the impact on
12   purchases at the offer on the price of Pet
13   Quarters stock?
14        A.    Sitting here, I'd have -- I can't
15   tell you.  I'd have to look at the report, look
16   at the analysis, to be able to give you a full
17   and complete answer to that.
18             Whatever it was we did that you're
19   talking about, I'm almost certain it was done
20   either in response to or in anticipation of
21   what the plaintiffs would do in that -- what
22   the plaintiff's expert would do in that report.
23             And I think we were pretty clear
24   that that's why we were doing it.  I'm not
25   sure.

Page 24

1         - STEPHEN D. PROWSE -
2         Q.    Well, let me ask you, what is
3    your understanding of why transactions move
4    prices?
5         A.    Transactions can move prices for
6    information reasons; for supply and demand
7    reasons on the inventory of a broker.  Reasons
8    like that.
9         Q.    Well, in the papers that you
10   studied 20 years ago and 10 years ago, did they
11   suggest what the key measures of trading
12   activity would be when looking to -- at price
13   changes?
14        A.    I believe they used a variety of
15   different trading measures, one of which is
16   whether a trade occurred or not.
17        Q.    Well, can you tell us what
18   literature says that?
19        A.    I think that's in the Glosten and
20   Jones papers and other papers.
21        Q.    What are the other papers?
22        A.    Well, I can't name them
23   specifically for you, but I know there's a body
24   of literature out there.
25        Q.    Does the body of literature

Page 25

1         - STEPHEN D. PROWSE -
2    indicate which would be the most powerful tests
3    to measure the relationship between trading and
4    price change?
5         A.    I can't tell you without looking
6    at a specific article.
7         Q.    Well, when you did your report,
8    did you select different ways of determining
9    the relationship between trading and price
10   changes?
11        A.    Yes, we did.
12        Q.    But you didn't go back and look at
13   the literature to see what they had to say
14   about that?
15        A.    I did it based on my understanding
16   of the appropriate way to conduct an
17   investigation about whether an event, whether
18   it be a news announcement or a trading, trade,
19   occurred and what impact that had on the price.
20        Q.    Well, but you didn't -- you didn't
21   go back and look at the literature to determine
22   which one -- which measure or variable would be
23   the more powerful variable to consider in
24   determining the impact of trading on prices?
25        A.    I don't think there is a most

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

---

Page 26

- STEPHEN D. PROWSE -

1      - STEPHEN D. PROWSE -
2   powerful variable. I think it depends on the
3   facts and circumstances of the case, the
4   trading, the firm, exchange the firm trades on,
5   liquidity of the stock. Lots of things.
6          And, so, that's why I think you
7   need to look at a variety of different measures
8   of potential trading activity.
9      Q.    Well, if you look at -- let's
10  take that and let's look at a couple of
11  examples.
12         If you're looking at the trading
13  to try to determine what impact trading had in
14  December of 2009, between December 1st, 2009
15  and December 10th, 2009, would it be
16  appropriate to look at the trading that
17  occurred in January two thousand -- January 1,
18  2007 and January 31st of 2007?
19      MR. SOHN: Can we -- can you just
20  read that back so we can make sure we're all
21  together?
22         (Whereupon, the record is read
23  back.)
24      A.    It depends on what -- overall what
25  big-picture question you're trying to answer.

---

Page 27

- STEPHEN D. PROWSE -

1      - STEPHEN D. PROWSE -
2   If you're trying to answer the question that
3   we're trying to answer in this case, I think
4   you need to look at the -- one of the things
5   you need to look at is the entire trading range
6   of the defendant, all the dates that he traded,
7   to understand what, if any, price impact there
8   is as a result of those trades.
9      Q.    I'm sorry, I didn't ask you about
10  this case. I asked you a hypothetical.
11      A.    And I replied saying it depends,
12  and gave you an example of how it might vary.
13  And this is a case in how it might be
14  important.
15      Q.    No, you just said that you
16  concluded this case is of some importance. I
17  think is your answer. Now, the question --
18      A.    Right.
19      Q.    Excuse me.
20         My question, okay, is is it
21  relevant what happened in my hypothetical in
22  January 1, 2007 -- between January 1, 2007 and
23  January 31st of 2007 in terms of determining
24  what the impact of trading was on December 1st,
25  2009 through December 31st of 2009?

---

Page 28

- STEPHEN D. PROWSE -

1      - STEPHEN D. PROWSE -
2      A.    Well, that's an incomplete
3   hypothetical. What's the question you're
4   trying to answer?
5      Q.    I asked you is it relevant --
6      A.    Whose trades are you looking at
7   and what's the purpose of the analysis?
8      Q.    Well, the purpose -- I'll give you
9   the purpose of the analysis. To determine
10  whether or not the trading that occurred by "X"
11  in -- between December 1st, 2009 and December
12  31st of 2009, and you're trying to determine
13  what the impact of that trading was during that
14  time period.
15         Is the time period of what that
16  person did on January 1, 2007 through January
17  31st, 2007 relevant?
18         MR. SOHN: I'm going to object to
19  the form of the question, and it's been asked
20  and answered.
21      A.    Yes, it's relevant. If you're
22  trying to determine whether an entity "X" had
23  an impact on the price in December, you
24  certainly want to look at December. But if "X"
25  is also trading in the stock other months, you

---

Page 29

- STEPHEN D. PROWSE -

1      - STEPHEN D. PROWSE -
2   want to ask yourself, well, did it have an
3   impact in those other months? And if it
4   didn't, why am I finding -- why -- that may
5   influence how you're looking at December. Or
6   if it did, that may also influence on how
7   you're looking at December.
8      Q.    Okay. So that's not -- that's --
9      A.    So I think if you're looking at an
10  entity impact on a stock, entity's trades, you
11  need to look at all of their trades.
12      Q.    Well, when you're looking at --
13  you're taking "X," using my hypothetical "X,"
14  and we're using the early time period of in '07
15  and comparing to the later time period in '09,
16  okay, and you indicated that what the person
17  did in the earlier time period could be
18  relevant to what he did in the later time
19  period. Is that fair?
20      A.    Not only what he did, but what the
21  impact was, whether there was an impact on the
22  price.
23      Q.    Now, would it be important to know
24  what his motivations were in those two time
25  periods?

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 30

1        - STEPHEN D. PROWSE -
2        A.    It might be, but sometimes you
3   don't know that.
4        Q.    Okay.
5        A.    I mean...
6        Q.    Well, but is motivation an
7   important factor to determine whether or not
8   the model you developed is relevant?
9        A.    It might be.
10        Q.    Did you try to determine what the
11   motivation was here?
12        A.    We weren't asked to determine
13   intent.  We were asked to look at the data to
14   understand what the data told us about what the
15   price impact was and to objectively look at the
16   trading strategy and understand whether that
17   was a legitimate optimal-type trading strategy
18   to employ based on the characteristics of
19   Sedona and based on the characteristics of the
20   FPS.
21        Q.    Well, did you attempt to decide --
22   to determine what the impact of buys were on
23   prices?
24        MR. SOHN:  You're talking about
25   this case now?

Page 31

1        - STEPHEN D. PROWSE -
2        MR. GUIDO:  This case.
3        A.    Yes.
4        Q.    Did you measure it against bid-ask
5   prices?
6        A.    No.
7        Q.    Did you determine what -- did you
8   attempt to determine what the impact of sells
9   were in this case?
10        A.    Yes.
11        Q.    Did you attempt to determine
12   whether the sells were at the ask?  I'm sorry,
13   at the bid.  Excuse me.
14        A.    We looked at the impact of buys
15   and sells on the stock price.
16        Q.    Okay.  But you didn't look to see
17   whether or not the buys and sells were the bid
18   or the ask?
19        A.    I believe we did not.
20        Q.    Who selected the variables for the
21   various regressions that were included in the
22   expert report?
23        A.    Tsvetan Beloreshki -- Beloreshki
24   and I jointly agreed that, for all of our
25   statistical tests -- the parametric tests,

Page 32

1        - STEPHEN D. PROWSE -
2   nonparametric tests and the regression
3   analysis -- what tests to run and what
4   specifications to run.
5        Q.    Okay.  Well, let's take Regression
6   Number 1.
7        Do you have the report in front of
8   you?
9        A.    Yes.
10        Q.    Look at 13B, Exhibit 13B.
11        Do you have that in front of you?
12        A.    Sorry?
13        Q.    Do you have that in front of
14   you?
15        A.    I didn't say.
16        Q.    What is -- what -- what is the
17   variable, the independent variable, for
18   Regression Number 1?
19        A.    There are two independent
20   variables:  One is the NASDAQ return, and one
21   is any Rhino open market trade.
22        Q.    What do you mean by "open market
23   trade"?
24        A.    A buy or a -- a trade.  A buy or a
25   sell.

Page 33

1        - STEPHEN D. PROWSE -
2        Q.    A buy or a sell.
3        So any time there was a buy or a
4   sell, you indicate a buy one; and if there
5   wasn't, it was a zero.  Is that correct?
6        A.    Right.  And that's excluding
7   direct purchases, conversions, transfers,
8   things like that.
9        Q.    Okay.  And what about the second
10   regression?  What was the independent variable
11   there, or variables?
12        A.    Regression Number 2, there were
13   three independent variables.
14        Q.    Okay.
15        A.    The NASDAQ return, Rhino purchases
16   and, thirdly, Rhino sales.
17        Q.    And those are open market sales
18   and purchases?
19        A.    Correct.
20        Q.    And those are transactions
21   reported to the market?
22        A.    I believe so, yes.
23        Q.    Okay.  And the third regression,
24   what were the independent variables there?
25        A.    There were five independent

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010

New York, NY

Page 34

- STEPHEN D. PROWSE -

1
2    variables.
3        Q.    Okay.  And what were those?
4        A.    The NASDAQ return, Rhino
5    purchases, Rhino sales, transfers between Rhino
6    accounts, and principal transactions which are
7    either conversions or direct purchases of stock
8    from Sedona.
9        Q.    And that's -- is that the fourth?
10   I mean is that the third?  I'm sorry.
11       A.    That's the third regression.
12       Q.    The third regression.  Okay.
13       A.    Yes.
14       Q.    Now, in that regression, were
15   there transfers reported to the market?
16       A.    I don't -- I don't believe they
17   were.
18       Q.    Okay.  Well, did you go out and
19   attempt to ascertain whether they were reported
20   to the market?
21       A.    We didn't determine that.  It
22   wasn't relevant to our analysis.
23       Q.    And what about the principal?
24   What are those?
25       A.    As I said before, those were

Page 35

- STEPHEN D. PROWSE -

1
2    either conversions of the FPS into Sedona stock
3    or direct purchases of Sedona stock by Rhino.
4        Q.    And this is the time period May
5    1st through May 31st.  Is that correct?
6        A.    No.
7        Q.    Are you looking at 13B or 13A?
8        A.    I'm looking at 13B.
9        Q.    What's the time period?
10       A.    The time period is March 1st, 2001
11   through May 31st, 2001.
12       Q.    During that time period.
13           Do you know what the -- the number
14   of transfers in terms of shares and the number
15   of principals and conversions of nonmarket
16   transactions were during that time period?
17       A.    I know there were a number of
18   conversions.  Four or five at least, probably;
19   maybe more.  There may have been a direct
20   purchase of stock in there, as well.  I don't
21   know off the top of my head.
22           And I couldn't tell you without
23   looking at the data how many transfers were in
24   that period.
25       Q.    So you don't know what the numbers

Page 36

- STEPHEN D. PROWSE -

1
2    were here?
3        A.    The number of shares?
4        Q.    The number of shares that were
5    transferred -- transfers or principals in the
6    data that you looked at.
7        A.    No, not -- not sitting here off
8    the top of my head.  I could look at the data
9    and tell you just by adding them up.
10       Q.    Well, do you have any charts that
11   indicate whether that -- whether you considered
12   that variable in your report as an exhibit to
13   your report?
14           MR. SOHN:  Objection to form.
15       A.    What variable?
16       Q.    The size of the transfers in terms
17   of number of shares to the size of the
18   principals compared to the number of shares.
19       A.    That regression is not reported
20   here, but I believe that that is one of the
21   variables we ran in one of our regressions.
22       Q.    Well, you believe or you reviewed
23   it before you signed that report?
24       A.    I don't understand your question.
25       Q.    Well, I mean, I'm asking you what

Page 37

- STEPHEN D. PROWSE -

1
2    you did.  I'm not asking you what you believe.
3        A.    I'm -- I'm saying that we ran a
4    number of regressions.  Four are reported here.
5    In one of those other -- these are just flags.
6    Okay?  Zero/ones.  So they don't count the
7    number of shares.
8           But I believe one of the other
9    regressions that we ran counted the number of
10   shares involved in transfers and principal.
11       Q.    No, but did you ever determine
12   what the magnitude of the transfers in the
13   principals were in relationship to the other
14   transactions that were engaged in by Badian in
15   this case?  You refer to Badian as Rhino.
16       A.    We didn't do that specific
17   calculation.  That's easily done just by
18   looking at the data.
19       Q.    You didn't do that, did you?
20       A.    We didn't do the specific
21   calculation, but it basically is inherent in
22   the data.
23       Q.    Well, I mean -- I mean, is it
24   relevant what the size is in terms of the
25   total number of transactions that you're

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 38

- STEPHEN D. PROWSE -
1   - STEPHEN D. PROWSE -
2   considering --
3        MR. SOHN:  Objection to form.
4        Q.    -- whether it's principal and
5   transfers as opposed to open market sales?
6        A.    Well, if it's relevant, it will
7   show up in the regression results in terms of
8   having a price impact.
9        Q.    Or not having one.
10       A.    Exactly.  And that will tell you
11  whether it's relevant or not.
12       Q.    Well, if a transaction is not
13  reported to the market, how does that have a
14  price impact?
15       A.    There -- it could easily have a
16  price impact.  Just the information that
17  someone has converted is important information
18  for investors in that firm.  That's a big
19  event.  That means that the person that's
20  converted has a large number of shares, which
21  if he hasn't -- if he hasn't shorted them
22  earlier, that's important information that an
23  investor might like to know.
24           And, so it's quite, quite
25  legitimate to test to see whether a non -- an

Page 39

1   - STEPHEN D. PROWSE -
2   off-market transaction might have an impact on
3   the stock through that information.
4        Q.    Well, did you -- did you try and
5   determine whether or not that information was
6   available to the market?  Conversions.
7        A.    We didn't -- we didn't determine
8   whether the information was available to the
9   market or not.  We tested in our regression
10  whether that channel of information might have
11  had an impact.
12       Q.    Okay.  But you don't know whether
13  or not it was reported to the market?
14       A.    I don't know.  I don't know
15  whether the market became aware of the
16  conversion soon after it happened.
17       Q.    Okay.
18       A.    But --
19       Q.    But is it important for the market
20  to be aware of the transaction to measure it as
21  having an impact on price of Sedona stock?
22       A.    Well, that's the channel through
23  which the price might be impacted, is the
24  information that other --
25       Q.    You didn't --

Page 40

1   - STEPHEN D. PROWSE -
2        A.    -- that other investors might
3   obtain by virtue of knowing that a
4   conversion happened --
5        Q.    Do you --
6            MR. SOHN:  Mr. Guido.
7            MR. GUIDO:  I'm sorry.
8        A.    -- or a direct purchase happened.
9        Q.    So you included in your analysis
10  conversions and transfers, although you didn't
11  know whether or not they were -- that
12  information was available to the market at the
13  time?
14       A.    We didn't do a study to determine
15  that, but that's a complete and legitimate
16  channel through which price might be affected.
17  And, so, we wanted to test that.
18       Q.    Well, what's -- what has to happen
19  before it has an impact?
20       A.    I've already told you.
21       Q.    It's available to the market.
22  Right?
23       A.    The information -- if the
24  information of a conversion or a direct
25  purchase becomes available to the market,

Page 41

1   - STEPHEN D. PROWSE -
2   that's important information.  It's documented
3   in the economic literature that issuance of
4   stock is important information to investors.
5   And if other investors become aware of it, then
6   that's important information that may have an
7   impact on the price.
8        Q.    Now, I think there's one more
9   regression that's reported here?
10       A.    There's Regression Number 4 in
11  Exhibit 13B.
12       Q.    Okay.  And what were the variables
13  that were included there?
14       A.    There were two independent
15  variables:  The NASDAQ return, and net daily
16  shares transacted as a percent of total
17  reported trading volume.
18       Q.    So there were three:  NASDAQ, net
19  transactions, and the market volume.  Is that
20  right?
21       A.    No, there are two independent
22  variables.  There are three pieces of
23  information that go into those variables.
24       Q.    Okay.
25       A.    One is the NASDAQ return; and the

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

Page 42

1         - STEPHEN D. PROWSE -
2    other two, which go into one variable, are net
3    daily shares transacted as a percent of total
4    reported trading volume.
5         Q.    Okay.  And -- and -- what -- what
6    went into determining the net transactions?
7         A.    Net daily shares transacted was
8    just the net -- the net of buys and sells.
9         Q.    Buys and sells or buys, sells,
10   transfers and --
11        A.    Buys and sells.
12        Q.    Just buys and sells?
13        A.    Buys and sells.
14        Q.    Not transfers and not principal --
15        A.    Not transfers, not principal.  We
16   ran another regression that included those.
17        Q.    Now, which one of the two is
18   included in Exhibit 13B?
19        A.    Regression number 4 is -- one of
20   the independent variables in Regression Number
21   4, the numerator of that variable is net daily
22   shares transacted.  Net daily shares transacted
23   is computed as buys minus sells as I previously
24   defined buys and sells.
25        Q.    I'd like you to take a look at a

Page 43

1         - STEPHEN D. PROWSE -
2    document that has been marked as Exhibit No.
3    14.
4              MR. SCHECHTMAN:  I'm sorry, what
5    number did you say?
6              MR. GUIDO:  Fourteen.
7              MR. SCHECHTMAN:  Fourteen?
8              MR. GUIDO:  Yes, Deposition
9    Exhibit No. 14.  I had put a Tab 13B on it from
10   BP-04.  And as I explained to Mr. Sohn
11   yesterday, that if you look at B-4, this is
12   really, I think, something called SDA -- SDAN.
13   It is not 13B, but it's the backup for Exhibit
14   13B.
15   BY MR. GUIDO:
16        Q.    I want to direct your attention.
17   Does that have -- at the top -- across the top
18   there are columns, I think.  Is that correct?
19   It starts, I think, with "B" and then it moves
20   on --
21        A.    Yes.
22        Q.    I'd particularly like to address
23   your attention to the second set which is -- I
24   think it's AU -- or it's AS through AW.
25              MR. SOHN:  Mr. Guido, do you mind

Page 44

1         - STEPHEN D. PROWSE -
2    if I give the witness this version?  It's a
3    little better.  Maybe he could see it easier.
4              MR. GUIDO:  That's fine.
5              MR. SOHN:  Okay.
6              MR. GUIDO:  I'm sorry, but the
7    court reporter condensed it.
8              MR. SOHN:  Yeah.
9        A.    Yeah, I think I'm -- I think I'm
10   there.
11        Q.    Okay.
12        A.    Well, there are a large number of
13   sheets with AS -- columns AS through A --
14        Q.    Yeah, I mean, but -- but I'm --
15   what I want you to look at is the first -- or
16   the first of the sheets that have AS through
17   AW, because it has the calculations at the top
18   of it, of this sheet.
19        A.    Okay.  I think I'm there.
20        Q.    Now, it has -- in AS it says
21   "Regression 4," and in AV it says "Regression
22   5A."
23              Do you see that?
24        A.    No.
25        Q.    I mean 4A.  Excuse me.

Page 45

1         - STEPHEN D. PROWSE -
2        A.    I see that.
3        Q.    Okay.  Now one of them says -- AT,
4    it says "Net daily sales transacted as A
5    percentage of volume."  AT it says.
6              In AW it says "Net trading as
7    percentage of volume."  Although your Exhibit
8    13B in your report says, "Net daily shares
9    transacted as a percent of the total reported
10   trading volume."
11             Which is which?
12        A.    I believe the results that are
13   reported in Regression 4 are the results
14   associated with the Regression 4A, net trading
15   as a percent of volume.
16        Q.    Okay.  And what's the "P" value
17   there?
18        A.    Seven percent.  7.08 percent.
19        Q.    All right.  And what percentage of
20   significance is that?
21             MR. SOHN:  Objection to form.
22        A.    I don't understand your question.
23        Q.    Well, is it -- is it -- is it 92.9
24   here?
25        A.    It's not significant --

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                         March 5, 2010
New York, NY

Page 46

- STEPHEN D. PROWSE -

1      - STEPHEN D. PROWSE -
2   significant at the 95 percent level, which is
3   the level we used here.
4        Q.   But it is significant at the 90
5   percent level if you use the 90 percent
6   level?
7        A.   If you use the 90 percent level,
8   yes, it is.
9        Q.   Okay.  Have you used the 90
10  percent level?
11       A.   I haven't used the 90 percent
12  level.  I've used the 95 percent level.
13       Q.   Did you use the 90 in Pet
14  Quarters?
15       A.   I don't believe we used 90 in Pet
16  Quarters for the variables of interest.  We may
17  have -- we may have talked about something
18  being weakly significant at 90.
19       Q.   But you did talk about 90 percent
20  significance level?
21       A.   You'd have to show me the Pet
22  Quarters report.
23       Q.   Well, I'm just asking you what you
24  know.
25       A.   And without looking at the report,

Page 47

1      - STEPHEN D. PROWSE -
2   I couldn't give you the specifics apart from
3   what I've already given you.
4        Q.   You remember or you don't.  Okay.
5        Now, the -- this Exhibit 13B, from
6   your testimony, you said it's not significant
7   at the 95 percent level, but the
8   significance -- if you use your calculations,
9   the significance is 92.92 percent, is it not?
10       MR. SOHN:  Objection to the form.
11       A.   On a stand-alone basis, correct,
12  but none of these regressions are significant
13  after you apply the appropriate correction to
14  them.
15       Q.   Well, we'll talk about that a
16  little later.
17       The -- now, I want to go back to
18  the literature that you were aware of with
19  regard to how the market performed.
20       And I think you mentioned the
21  market conditions.  Excuse me.  I think you --
22  you mentioned one study that was -- that you
23  reviewed.  That's the Chaplinsky piece.
24       Was that in a peer-reviewed
25  journal?

Page 48

1      - STEPHEN D. PROWSE -
2        A.   I believe -- let me turn to
3   Exhibit 3.  The way it's written here, we don't
4   have a -- we don't have a journal associated
5   with it, but I do believe it came out in a
6   peer-reviewed journal.  We may have been
7   referring here to the working paper, but I do
8   believe it did come out in a peer-reviewed
9   journal.
10       Q.   What's the significance of
11  something being in a peer-reviewed journal?
12       A.   It means it's been reviewed by --
13  it's gone through a peer-review process.
14       Q.   What's the significance of that?
15       A.   It means it's gone -- gone through
16  a peer-review process and it's been approved
17  for publication because it's relevant and of
18  interest to -- the editor thinks it's of
19  relevance and of interest to the readers of the
20  journal.
21       Q.   You've written peer-reviewed
22  articles, haven't you?
23       A.   Yes.
24       Q.   And, in fact, you claim that it's
25  a positive for your qualifications as an expert

Page 49

1      - STEPHEN D. PROWSE -
2   witness, do you not?
3        A.   I don't think I claim it as a
4   positive.  It's the truth, so I put it down.
5        Q.   Okay.  Well, how tall are you?
6        A.   Six-three and three-quarters.
7        Q.   Okay.  Do you put that down?
8        A.   No.
9        Q.   Okay.  So you thought it was
10  relevant that you put it -- that you published
11  articles in peer-reviewed journals, didn't
12  you?
13       A.   I did think it was relevant.
14       Q.   And the question is why you
15  thought it was relevant.
16       A.   Because people would be interested
17  to know that I've published in peer-reviewed
18  journals.
19       Q.   And what's the significance of
20  publishing in a peer-reviewed journal?
21       MR. SOHN:  Objection.
22       A.   That you have had articles
23  published on relevant topics in peer-reviewed
24  journals.
25       Q.   Okay.  And -- and having an

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 50

- STEPHEN D. PROWSE -

1       - STEPHEN D. PROWSE -
2    article published in a peer-reviewed journal as
3    opposed to nonpeer-reviewed journals indicates
4    that it's more accepted in the scientific
5    community?
6            MR. SOHN:  Objection to form.
7       A.    I believe -- I wouldn't agree with
8    that the way you stated it.  I mean, there are
9    plenty of articles out there that are -- that
10   may not have appeared in peer-reviewed
11   journals, but are used.  But generally going
12   through a peer review process shows that your
13   article has been deemed relevant and
14   interesting.
15      Q.    And significant?
16      A.    Well, I don't know about
17   significant.  Relevant and interesting.
18      Q.    Okay.  Now, have you published
19   anything in any journals on micro -- market
20   microstructure studies?
21      A.    I don't believe you would call any
22   of the peer-reviewed analysis I've done,
23   studies I've done, under the heading of market
24   microstructure.  I think we categorize them
25   under the heading of how financial markets

Page 51

1       - STEPHEN D. PROWSE -
2    work, how financial instruments work.  In
3    particular, how financial markets work for
4    small, risky firms like Sedona.  I think that
5    would be the cate -- category that I would
6    place them under.
7       Q.    Well --
8       A.    Among other categories.
9       Q.    Well, take a look at your resume.
10   Can you point out which one of those you're
11   referring to?
12      A.    Well, there are a variety of
13   articles that touch on or focus on how firms
14   raise finance.  In particular, how small, risky
15   firms raise finance.  Those would be the
16   following:  "Recent Developments in Corporate
17   Finance," the last one on the list.
18      Q.    What was --
19      A.    The last one -- the last one on
20   the list.  I'm starting at -- I'm going -- I'm
21   starting at the latest and moving forward.
22      Q.    Okay.
23      A.    The -- "A Look at America's
24   Corporate Finance Markets; "The Economics of
25   the Private Placement Market:  A New Look."

Page 52

1       - STEPHEN D. PROWSE -
2       Q.    Excuse me.  That's the next one
3    above?
4       A.    That's the next one above.
5       Q.    Okay.
6       A.    Then, the next one above that, "An
7    Economic Analysis of the Private Equity
8    Market."
9       Q.    Okay.
10      A.    And then, the next one above that,
11   "Innovation and Finance in High-Tech Firms."
12      Q.    Okay.
13      A.    Then, the next one above that,
14   "Angel investors and the Market for Angel
15   Investments."
16           Those would all be articles that
17   either touch on or focus specifically on the
18   financial markets that are available to small,
19   risky firms.
20      Q.    Okay.  Do any of those --
21      A.    So there -- hang on.  I'm not
22   done.  There are others.
23      Q.    I'm sorry.
24      A.    That topic may be touched on in
25   the two articles at the bottom of the first

Page 53

1       - STEPHEN D. PROWSE -
2    page of Exhibit 1, "Corporate Finance and
3    Governance in an International Perspective."
4    And "Corporate Governance in Eastern Europe and
5    Russia:  The Role of Banks."  May be touched on
6    in "Alternative Models of Financial System
7    Development," the one above that.
8            There's two art -- three
9    articles --
10      Q.    Excuse me, I'm sorry.  I missed
11   that last one.  What was it?
12      A.    "Alternative Models of Financial
13   System Development."  It's third from the
14   bottom.
15      Q.    Okay.
16      A.    Eight from the bottom, "Trends and
17   Prospects in Venture and Angel Investments in
18   New Media Companies."
19      Q.    Okay.
20      A.    The one above that, "Angel
21   Investors and the Angel Capital Electronic
22   Network."
23           The one above that, "The Private
24   Equity Market."
25           And, again, those are all articles

14 (Pages 50 to 53)

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 54

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2    that focus on the finan -- how the financial
3    markets for small, risky firms behave; what the
4    incentives are for providers of finance and
5    users of finance and how contracts are
6    structured.  Financial contracts are structured
7    between the providers of finance and firms with
8    regards to the types of securities that those
9    small, risky firms will use.
10       Then there is another article,
11   "Dura's Impact on Damages," which doesn't talk
12   about that -- that topic talks about event
13   studies.
14       Q.    I think that what you just said is
15   that these articles addressed how financial
16   instruments are structured to raise capital for
17   companies.
18       Is that a fair characterization?
19       A.    No.
20       Q.    Okay.
21       A.    They either touch on or focus on
22   how small firms don't have access to, say,
23   the corporate bond market or even the corporate
24   equity market, how they raise finance.  And the
25   various different players in -- in the

Page 55

1    - STEPHEN D. PROWSE -
2    financial markets that they do have access to,
3    such as the private equity markets, such as the
4    private placement market.
5        And the roles and incentives of
6    the providers of finance and the -- the lenders
7    and the users of finance, the firms, to -- how
8    their -- how their incentives interplay to come
9    up with the characteristics of the financial
10   instruments that are actually used for the
11   small firms to raise finance.
12       Q.    Do any of these articles address
13   the benefits and costs to the -- the investors?
14       A.    Absolutely.  They talk a lot about
15   the structures that investors put in place to
16   ensure that their -- they get a return on their
17   money.
18       Q.    Do any of these address the
19   benefits to the users for the issuance of these
20   instruments?
21       A.    Absolutely.  They talk about the
22   benefits to the users of structuring contracts
23   in particular ways in order to raise finance of
24   most favorable terms.
25       Q.    Do any of these address the

Page 56

1    - STEPHEN D. PROWSE -
2    relative merits of different forms of
3    financing?
4        A.    Well, we take -- we look at it
5    from the point of view of economics, which --
6    from a positive viewpoint as opposed to a
7    normative viewpoint.  We look at costs and
8    benefits of different types of financing
9    instruments.  And we con -- we either imply or
10   conclude that, you know, certain ways of
11   raising finance for small, risky firms are just
12   not possible because of the costs involved.
13   The asymmetric -- asymmetric information costs,
14   corporate control costs, other costs.  Things
15   like that.
16       And, therefore, they are forced to
17   go to other forms of finance such as the
18   private equity market and the private debt
19   market.
20       Q.    Okay.  But the thrust of the --
21   the thesis here is the benefits and cost of
22   either going to the corporate bond market and
23   the issuance of on-the-spot stock as opposed to
24   privately negotiated instruments?
25       A.    I wouldn't say that's the focus.

Page 57

1    - STEPHEN D. PROWSE -
2    I'd say that was -- that's part of what was --
3    I'd say the focus is on how exactly are the
4    private equity markets and the private debt
5    markets structured?  What types of financial
6    instruments do we see existing in those markets
7    and why do we see them?
8        Q.    Okay.  Did you --
9        A.    And that's based on the costs and
10   benefits to the investors and the firms of
11   entering into financial contracts with each
12   other.
13       (Cell phone ringing.)
14       MR. GUIDO:  Excuse me.
15       We have to go off the record.
16   Cellular phone.
17       THE VIDEOGRAPHER:  Going off the
18   record at 11:10 a.m.
19       (A recess is taken.)
20       THE VIDEOGRAPHER:  Going back on
21   the record at 11:21 a.m.
22   BY MR. GUIDO:
23       Q.    When we broke, I was asking you
24   about your publications.  And one of the
25   questions I have for you is, do any of those

15 (Pages 54 to 57)

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 58

```
1        - STEPHEN D. PROWSE -
2    address the risks and benefits of future price
3    securities to the issuer?
4        A.    Most of this work was done in the
5    early '90s, before future price securities came
6    on the scene, basically.
7        Q.    Okay.
8        A.    I think the studies tell us that
9    the first future price securities were out
10   there around 19 -- 1995.  And while that was
11   still a specialty of mine, small firm finance
12   and how firms raise finance, I was very aware
13   of future price securities around that time
14   period, I don't believe a discussion of those
15   got into any of these articles, with the one
16   exception of the private equity market in the
17   Handbook of Corporate Finance in 2002.  I don't
18   believe there's a discussion of FPS securities
19   in there, but it's possible that there's a
20   reference to them.
21       But most of my articles were
22   written in the early '90s, and the focus was on
23   securities, you know, similar to FPS securities
24   and the role they played in terms of giving
25   firms access to finance that didn't have access
```

Page 59

```
1        - STEPHEN D. PROWSE -
2    to other forms of finance, but didn't -- didn't
3    specifically address FPS securities.
4        Q.    Well, I mean, a number of the
5    papers, I think, that you indicated that you
6    had written during that time period seem to
7    have been written by -- at the time that you
8    were at the Federal Reserve?
9        A.    Yes.
10       Q.    And were those papers that were
11   intended to educate people on the various forms
12   of financing that might be available to assist
13   in economic development?
14       A.    That was part of it.  The Fed is
15   always interested in research on how firms
16   raise finance, particularly those firms that
17   don't have access to traditional forms of
18   finance, like the corporate bond market and the
19   corporate equity market.
20       And particularly at this time
21   period, we're in the credit crunch.  And there
22   was a very -- there was a very policy-oriented
23   concern that, because of the credit crunch,
24   firms -- small, risky firms, like Sedona, were
25   getting shut out of traditional markets.  And
```

Page 60

```
1        - STEPHEN D. PROWSE -
2    the concern was, well, where -- where do they
3    go?  Where do they go for finance?
4        So there was an institutional
5    motivation for me to be doing such research,
6    but that was a research interest in and of
7    itself by me.
8        And, so, me and a group of others
9    conducted an immense amount of research in that
10   time period into the exact issues that, for
11   example, Sedona would face in raising finance:
12   Where do they go?  How do they get it?  What
13   kinds of contracts could they construct with
14   potential investors?
15       And, so, there was -- and, so,
16   there was definitely a -- a policy-oriented
17   motivation, but there was also, just from a
18   pure economics motivation, a desire to
19   understand how do these markets work that we
20   don't know much about that provide finance to
21   small, risky firms like Sedona?
22       Q.    Okay.  Thank you.
23       Now, in any of these articles, did
24   you address the question of market manipulation
25   in future price securities?
```

Page 61

```
1        - STEPHEN D. PROWSE -
2        A.    I don't believe we did.
3        Q.    Now, most of these articles are
4    dated, it looks like, prior to 2000.
5        A.    Most of them.  There's one in 2002
6    and one in 2001.
7        Q.    Right.
8        A.    And one in 2000.
9        Q.    And there's one in 2008.  Let's
10   look at the one in 2008.
11       Does that address the application
12   of an event study to determine what damages are
13   in a securities matter?
14       A.    Yes, specifically in a 10b-5
15   matter.
16       Q.    Okay.  And it's an allegation of
17   fraud that you're --
18       A.    It's a.
19       Q.    -- talking about measuring in that
20   article?
21       A.    An allegation that the firm made
22   misrepresentations and omissions that investors
23   would have found material.
24       Q.    And was that in a securities
25   filing with the SEC?
```

16 (Pages 58 to 61)

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 62

- STEPHEN D. PROWSE -
1
2       A.      Was what in a security --
3       Q.      What you were writing about.
4       A.      Well, we weren't writing about
5   anything specific to the SEC.  We were writing
6   about what the proper method is to -- in using
7   an event study to analyze the effect of a
8   particular news -- a particular event such as a
9   disclosure by a firm.
10      Q.      Well, what were the proper methods
11  that you discussed in that paper to do event
12  studies?
13      A.      Well, event study methodology is
14  generally accepted in the economics literature
15  and finance literature.  And there's general
16  accept -- I think there's general acceptance
17  about how to go about doing an event study.
18  There are, obviously, details about an event
19  study that people may disagree about, but I
20  think the overall approach to doing an event
21  study is generally accepted.
22              And we talked about that.  And
23  then, also, how the legal -- the legal
24  environment affected -- or the changing legal
25  environment affected the exact method by which

Page 63

- STEPHEN D. PROWSE -
1
2   you calculate damages in a shareholder class
3   action using an event study, but also using
4   other methods to calculate damages.
5       Q.      Well, what were the generally
6   accepted methods that you addressed in that
7   article that should be applied in the event
8   study?
9       A.      We talked -- I think -- without
10  having the article in front of me, I can't
11  recall the exact details of what we talked
12  about, but we talked about the fact that an
13  event study is a generally accepted way to go
14  about doing things.
15              And I think we talked in general
16  about how you go about doing an event study:
17  You set up a market model; look at daily
18  changes in stock returns; understand how stock
19  returns vary with various market or industry
20  indexes; and then, focus on the particular
21  disclosures or events that you're interested in
22  focusing on to identify whether there was a
23  stock price impact due to those events.
24      Q.      So, in other words, in the market,
25  you'd look to see -- you consider what the

Page 64

- STEPHEN D. PROWSE -
1
2   background market was that might have an effect
3   on the particular stock price in your study.
4               Is that one of the factors?
5       A.      That's one of the things that you
6   look at to see how influential market and
7   industry factors are on stock price movements
8   of the company you're interested in.
9       Q.      Okay.  And you said that you would
10  focus on the particular event.
11              What did you refer to when you
12  said that?
13      A.      The particular event you're
14  interested in in determining the price impact
15  of.  Whether it be a disclosure, whether it be
16  some other event.  That's what you want to look
17  at.
18      Q.      Is it important that you pick the
19  correct event to determine what the impact that
20  event had on stock price?
21      A.      Well, if you know the event, I'm
22  not sure there's an issue about picking the
23  event.  If you know the event that you're
24  interested in studying, I'm not sure there's an
25  issue about picking it.  It's kind of a

Page 65

- STEPHEN D. PROWSE -
1
2   tautology.  Once you determine what the event
3   is, then you measure the impact of it.
4       Q.      Let me ask you, you used the term
5   "market manipulation" in this report?
6       A.      Yes.
7       Q.      What do you mean by that?
8       A.      Well, I know there are legal
9   definitions of market manipulation.  And I'm
10  not a lawyer.  So I'm not -- I don't want to
11  get -- I'm talking from an economics point of
12  view, an economist's point of view.  And I
13  understand that one of the -- one of the
14  aspects that you look at from an economics
15  point of view in -- in determining overall
16  whether or not there's been manipulation is
17  whether there's been a price impact of the
18  trades or other -- other transactions.
19              So I understand that's one element
20  in the ultimate legal judgment about whether
21  there's been market manipulation or not.
22      Q.      No, I'm asking you how you used
23  the term "market manipulation."  It appears
24  that -- in the very last paragraph of your
25  expert report.

17 (Pages 62 to 65)

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 66

- STEPHEN D. PROWSE -
1    - STEPHEN D. PROWSE -
2            How are you using that term?
3        A.   In my last paragraph?
4        Q.   Uh-huh.  The one that -- the
5    conclusion paragraph.
6        A.    Oh, that's the second to last
7    paragraph.
8        Q.   I'm sorry.
9        A.    Right.  The conclusion there comes
10   from the analysis we have performed in the
11   report, which shows a number of things:  One,
12   that Rhino pursued a legitimate strategy in
13   trading Sedona stock given the riskiness of
14   Sedona and giving the riskiness of the FPS
15   security that it was holding.
16           Two, that Sedona was an extremely
17   risky company.  Sedona knew it; investors knew
18   it.  And, so, investors had to react and hedge
19   appropriately.
20           And, also, the poor performance of
21   Sedona shares over any time period can -- can
22   be contrib -- can be explained by a lot of
23   other fact -- a lot of factors that don't have
24   anything to do with manipulation, such as the
25   decline of the overall market, Sedona's

Page 67

1    - STEPHEN D. PROWSE -
2    specific -- the decline in Sedona's industry,
3    Sedona's peers, and Sedona-specific factors,
4    such as, you know, it being a going concern, it
5    never making any money.  That type of thing.
6           And then, finally, the economic or
7    econometric and statistical analysis which
8    fails to show any price impact of any kind --
9    any kind of Rhino trading over any time period
10   at all.
11       Q.   Okay.  So, one of -- I mean, one
12   component of your definition of market
13   manipulation is that the econometrics failed to
14   show a price impact?
15       A.   That's one component.
16       Q.   Okay.
17       A.    That's one component in our
18   conclusion in paragraph 62.
19       Q.    And that the other components was
20   that there was a -- there was a legitimate
21   strategy --
22       A.   Correct.
23       Q.   -- that -- that was used here.
24           Now, I think you said that you did
25   not look to see whether or not at any given

Page 68

1    - STEPHEN D. PROWSE -
2    point in time Badian's trading hit the bid in
3    the trading.
4           You also testified that you didn't
5    look to see whether or not Badian's purchases
6    were at the offer.
7           How can you determine whether or
8    not something's a legitimate strategy unless
9    you look to those two factors?
10       MR. SOHN:  Objection to form.
11       A.    I'm talking about the strategy
12   that Rhino employed, because Sedona was an
13   extremely risky company and the FPS was an
14   extremely risky security, to short his position
15   prior to conversion.  That isn't -- on a broad
16   level, overall level, that's an optimal
17   strategy to pursue.
18       Q.    Okay.  Let's take that --
19       A.   Because it -- because it minimizes
20   your risks.  And there are a lot of risks that
21   you have to minimize.
22       Q.    Okay.  Is it -- is it legitimate
23   activity to violate a contract provision?
24       A.    That -- my understanding is that's
25   not part of the SEC's -- that a violation, any

Page 69

1    - STEPHEN D. PROWSE -
2    violation of a contract is not part of the
3    SEC's allegation, and we weren't asked to look
4    at that.
5        Q.   No, I didn't ask you that
6    question.  I asked you the question whether
7    violating a contract provision was a legitimate
8    strategy.
9        MR. SOHN:  Objection to form.
10       A.   We weren't -- is that a
11   hypothetical?
12       Q.   Yeah.
13       A.    What do you mean by "legitimate"?
14       Q.   I said, does violation of a
15   contract provision constitute legitimate
16   activity to you?
17       MR. SOHN:  Any contract provision?
18       MR. GUIDO:  Any.
19       A.    What do you mean by "legitimate"?
20       Q.    That -- you're the one who used
21   the term.  What do you mean by it?
22       A.    So are you using -- are you asking
23   -- you --
24       Q.   I'm asking you.
25       A.    It's your hypothetical, though.

18 (Pages 66 to 69)

Stephen David Prowse, Ph.D.                                March 5, 2010

New York, NY

Page 70

1          - STEPHEN D. PROWSE -
2    So I just want to make sure that --
3        Q.    My hypothetical is using your term
4    "legitimate."
5        A.    Okay.
6        Q.    I'm asking whether or not within
7    your term "legitimate" includes violations of
8    contract terms.
9            MR. SOHN:  Any contract terms?
10           MR. GUIDO:  Any contract terms.
11       A.    It may be if there's a dispute
12   over a contract and what a term means.  One
13   firm -- one side may say you violated a
14   particular term.  The other side may say, no,
15   we interpreted it this way.  So there may be --
16   there may be a dispute.
17           So it may be legit -- perfectly
18   legitimate from one firm's point of view if
19   they don't believe the contract provision means
20   what the other firm says it means.
21       Q.    Take the hypothetical that there's
22   no question what the contract term means.
23           Is it legitimate to violate the
24   contract terms using your definition of
25   legitimate?

Page 71

1          - STEPHEN D. PROWSE -
2            MR. SOHN:  So any unambiguous
3    contract terms?
4            MR. GUIDO:  Any unambiguous
5    contract terms.
6        A.    Well, it's hard for me -- in this
7    world it's hard for me to think of something
8    that's completely unambiguous to anybody, but
9    in your hypothetical it may be.  It may be.
10       Q.    Well, let me give you another
11   hypothetical, and we'll get closer to this
12   case.  You have a contract provision that says
13   you may not short stock prior to submission of
14   a conversion letter.  And the person holding
15   the convertible debenture shorts the stock
16   prior to submitting the conversion letter.
17           Is that legitimate activity in
18   your view?
19           MR. SOHN:  Legitimate economic
20   activity?
21           MR. GUIDO:  Yeah.
22       A.    In your hypothetical, again, there
23   may be a dispute about the definition of
24   shorting.  There may be a dispute about the
25   meaning of what was meant in the contract.

Page 72

1          - STEPHEN D. PROWSE -
2    There may be disputes about issues like that.
3            So, you know, I can't answer your
4    hypothetical.
5        Q.    Well, assume that there is no
6    dispute about the prohibition against shorting.
7    It's perfectly clear.  There is no dispute
8    between the holder of the convertible debenture
9    and the issuer.  They don't have a dispute
10   about it.  Assume that.
11           Is a violation of that legit --
12   that provision a legitimate activity in your
13   view, using your term "legitimate activity"?
14           MR. SOHN:  Economic legitimate
15   activity.
16           MR. GUIDO:  Just his term
17   "legitimate activity."  You're the one who
18   added "economic."  The witness said legitimate
19   activity.
20       A.    Well, I said before, I'm not --
21   I'm not a lawyer.  So I'm not looking at, for
22   example, market manipulation terms in -- market
23   manipulation in legal terms.
24           So I'm going to answer your
25   question as an economist.

Page 73

`
1          - STEPHEN D. PROWSE -
2        Q.    Okay.  That's fine.
3        A.    And there may be economic reasons
4    that are legitimate to violate a contract.
5        Q.    Okay.
6        A.    Violate a provision.
7        Q.    Are there legitimate economic
8    terms (sic) to rob a bank?
9        A.    Legitimate --
10           MR. SOHN:  Objection.
11       A.    -- economic reasons?
12       Q.    To rob a bank.
13       A.    I doubt it because the risks are
14   just too high.
15       Q.    Oh, because of the question of the
16   risks?
17       A.    Yeah, because the risks are too
18   high of getting caught.
19       Q.    So legitimacy in your view is
20   determined by what the risks are?
21       A.    From an econo -- I'm saying from
22   an economic -- I'm not answering any of your
23   hypotheticals from a legal perspective.  Okay?
24   I don't know what the law is regarding, in your
25   hypothetical, the violation of a particular

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010
New York, NY

Page 74

1           - STEPHEN D. PROWSE -
2    provision.
3            From a -- from a purely economic
4    point of view -- and all economists will agree
5    with this.  From a purely economic point of
6    view, you weigh the costs and benefits of doing
7    something.  And if the benefits outweigh the
8    costs, then you do it.
9            Now, that is from a purely
10   economic point of view.  It's taking law out of
11   it, although law might have a role in forming
12   the costs and benefits, and it's taking
13   morality out of it.  So it's purely from an
14   economic point of view, weigh the costs and
15   benefits.  And you say, how do I -- do I
16   benefit?
17       Q.    So the cost and benefit is -- the
18   benefit is whatever the financial benefit is
19   and the cost is getting caught?
20       A.    And the cost is whatever the
21   financial cost is.
22       Q.    Including getting caught?
23       A.    Including the risk of getting
24   caught maybe.
25       Q.    And including getting put in jail?

Page 75

1           - STEPHEN D. PROWSE -
2           MR. SOHN:  Objection.
3       A.    Well, I'm not sure you get put in
4    jail for violating the provision of a
5    contract.
6       Q.    No, but you do get put in jail for
7    robbing a bank, don't you?
8       A.    If you get caught, I guess, yeah.
9       Q.    I mean -- and that's why I gave
10   you the hypothetical.  In terms of -- I'm
11   trying to understand how you're using the term
12   "legitimate activity."
13           So if -- so if -- I gather you're
14   saying is, is that irrespective of what the
15   contract provisions are or legal provisions
16   are, legitimate activity, in economic terms,
17   the way you're using it, is whether or not the
18   benefits outweigh the cost?
19           MR. SOHN:  Objection to the form.
20       A.    No, that's not true, because the
21   law has an element in forming what the costs
22   are.
23       Q.    No, I understand that, but --
24       A.    So you said irrespective of
25   the law.  Well, it's not irrespective of the

Page 76

1           - STEPHEN D. PROWSE -
2    law.
3       Q.    Well --
4       A.    It recognizes the law.
5       Q.    But you said you're not -- you're
6    not using the term "legitimate" in a legal
7    sense.
8       A.    Except in your hypothetical when
9    you told me you'd go to -- when you rob a bank,
10   you go to jail.
11       Q.    Now, the other point that you make
12   is that you looked at what their performance
13   was over time.
14       A.    Yes.
15       Q.    And that that affected your view
16   of whether the market was manipulated.
17           What was the time frame that you
18   were comparing?
19       A.    We looked -- generally we looked
20   at two different time periods.  We looked over
21   the entire time period of Rhino's trading, and
22   we looked at the period March 1st through May
23   31st, 2001.
24       Q.    And you looked to see whether or
25   not the price declined over that time period?

Page 77

1           - STEPHEN D. PROWSE -
2       A.    We looked to see what happened to
3    the price and what happened to other factors
4    that potentially could have affected that
5    price, such as the market, such as the
6    industry, such as Sedona-specific price --
7    Sedona-specific events.
8       Q.    Well, what events did you look
9    to?
10       A.    Well, I can point some out in our
11   section on that.  We looked at Section A.  We
12   looked at market and industry peer group
13   factors.  Section B we looked at Sedona --
14       Q.    I asked you about the
15   company-specific factors.
16       A.    Okay.
17       Q.    That's what I said.
18       A.    Okay.  And I'm turning to --
19       Q.    And I want to know what the
20   company-specific factors are that you looked to
21   in this study.
22       A.    And page 9, Section B, is entitled
23   "Company-specific factors."
24       Q.    Okay.  Does it make reference to
25   any exhibit?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010
New York, NY

Page 78

1           - STEPHEN D. PROWSE -
2           A.    Let me look.  Exhibit 7 and
3    Exhibit 9 and Exhibit 8 are the exhibits that
4    are referenced in that section.  But there's
5    also a lot of other information in the text
6    that doesn't need an exhibit.
7           Q.    No, I understand that.  But the
8    "Company-specific factors," does it make
9    reference to an exhibit in that section to
10   support the statements about company-specific
11   factors?
12          A.    And I've just told you that
13   there are three exhibits referenced in that
14   section.
15          Q.    Okay.  Let's take a look at seven.
16          A.    But I want to make sure that
17   that's not the only information -- I want to
18   make sure you understand that that's not the
19   only information we're relying on.  We're
20   relying on the entire section in the report
21   which talks about a lot of other factors that
22   are not in exhibits.
23          Q.    All right.  With that
24   qualification, take a look at Exhibit No. 8.
25          A.    Yes.

Page 79

1           - STEPHEN D. PROWSE -
2           Q.    These are specific events.  Right?
3           A.    Yes.
4           Q.    Did you do an event study on any
5    of them?
6           A.    No, I did not.
7           Q.    In Pet Quarters, didn't you
8    criticize the plaintiff's expert report because
9    they pointed to company specific -- specific
10   events and they failed to do event studies?
11          A.    You'd have to show me the specific
12   section of the Pet Quarters report to remind me
13   of that.
14          Q.    I --
15          A.    The point of this chart is not to
16   do an event study on what happened to the stock
17   price when a convertible issued.  The point of
18   this chart is to show that Sedona was a serial
19   FPS issuer.  This company couldn't raise money
20   anywhere except through future price
21   securities.
22                 That is a terrible indictment of
23   the financial performance and the ability of
24   that company to raise money, and is an
25   indicator of the extreme riskiness of that

Page 80

1           - STEPHEN D. PROWSE -
2    company.
3                 I believe there's statistics in
4    the Hillion and Vermaelen paper that says if
5    you issue more than one FPS on average, there's
6    a very high likelihood that you're going into
7    bankruptcy in the next -- in the next year.
8           Q.    Is that just --
9           A.    And that is -- all this chart says
10   is look at how many FPSs this company issued
11   since its IPO.  And, in particular, getting
12   close to the issuance of the Series G in
13   November 2000.
14                 This company was so risky it
15   couldn't get money from anywhere.
16          Q.    So, therefore, it justified
17   anything that Badian did to its stock.  Is that
18   your conclusion?
19          A.    No, that's not my conclusion at
20   all.  My conclusion is this company was
21   extremely risky and -- by indication of its
22   numerous issues of FPS securities.  And,
23   therefore, any investor buying those securities
24   had better have a good strategy to hedge
25   against those risks.  Otherwise, he's going to

Page 81

1           - STEPHEN D. PROWSE -
2    lose his shorts.
3           Q.    Even if he violates a contract
4    provision?  Assuming --
5           A.    I'm sorry, is there a question
6    pending?
7           Q.    Assuming that there was a clear
8    violation of the contract provision, is what
9    you're saying is he better short the stock even
10   if he's contractually agreed, clearly and
11   unequivocally, not to do so?  Is that your
12   testimony?
13          MR. SOHN:  Is that a question?
14          MR. GUIDO:  That is a question.
15          A.    Well, now we're talking about this
16   specific case and --
17          Q.    I --
18          A.    -- my -- and my understanding is
19   that's not an allegation in the SEC --
20          Q.    I didn't ask you --
21          A.    It's not an allegation in the SEC
22   complaint.
23          Q.    I didn't ask you whether it was an
24   allegation in the complaint and that's a
25   legal judgment --

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 82

1           - STEPHEN D. PROWSE -
2       A.    Well --
3       Q.    -- and you said you were not
4    making legal judgments. Put the Complaint
5    aside. I'm asking you a question about a fact,
6    not about the Complaint.
7       A.    And what is the question?
8       Q.    And the question is: Does the
9    condition of Sedona -- based on your statement
10   about Chart 8 is an indictment of Sedona's
11   performance, does that justify Badian violating
12   a clear-cut contractual provision? Assuming
13   it's clear-cut.
14       MR. SOHN: Mr. Guido, two things:
15   One, I'm going to object to your question; two,
16   your voice is going up a little bit.
17       MR. GUIDO: Well, I'm sorry, I'm
18   trying to help the court reporter. She
19   complained about my soft voice. Okay?
20       MR. SOHN: We're going to work for
21   a middle ground.
22       A.    And I have one clarification.
23   It's not just Chart 8 that indicates the poor
24   performance of Sedona. There's a lot of other
25   charts in there.

Page 83

1           - STEPHEN D. PROWSE -
2       Q.    Okay.
3       A.    But, in addition, we weren't asked
4    to address that issue. So I don't have an
5    opinion on it.
6       Q.    Well, I mean, you -- you used --
7    you used the term when I just asked you. You
8    used the term "legitimate strategy." I'm just
9    trying to find out what you're saying.
10       A.    And my -- my answer is that a
11   legitimate strategy is an optimal strategy to
12   hedge an FPS. And what we see Rhino doing is
13   that optimal strategy.
14       Q.    Even if it's a violation of a
15   clear-cut contractual provision?
16       A.    My understanding is that's not an
17   issue in this case. And --
18       Q.    And --
19       A.    -- we specifically weren't asked
20   to address it.
21       Q.    Okay. So now I'm asking you to
22   address it.
23       A.    And --
24       Q.    You're the expert.
25       A.    And how do you want me -- what do

Page 84

1           - STEPHEN D. PROWSE -
2    you want me to address?
3       Q.    I want you to answer, you know,
4    whether or not it's a legitimate economic
5    strategy as you've used the term. You've used
6    the term.
7       MR. SOHN: Objection.
8       Q.    So please answer the question
9    based on your use of the term.
10       A.    Factoring in now your -- your
11   assertion that this is a clear violation of the
12   contract --
13       Q.    A contract provision.
14       A.    A contract provision?
15       Q.    That's correct.
16       A.    Well, it may be.
17       Q.    It may be?
18       A.    It may be a legitimate strategy.
19       Q.    Okay. Under what circumstances is
20   it a legitimate strategy to violate a clear
21   contractual term?
22       MR. SOHN: Objection. This is
23   like the tenth time that we've gone through
24   this.
25       A.    Yeah, we weren't asked to address

Page 85

1           - STEPHEN D. PROWSE -
2    that issue and I can't give you an answer to
3    all the conditions that would be in place.
4    That's not something that we were asked to
5    address as it's clear in our -- in our report.
6       Q.    Is there anywhere in your report
7    where you indicate that you're not taking into
8    consideration the contract terms?
9       A.    What is indicated in our report is
10   the tasks we were asked to answer, the
11   questions we were asked to answer.
12       MR. GUIDO: Okay. Why don't we
13   take a break. We'll get to the questions.
14       THE VIDEOGRAPHER: This concludes
15   Tape Number 1 in the videotaped deposition of
16   Mr. Stephen Prowse. Going off the record at
17   11:52 a.m.
18       (A recess is taken.)
19       THE VIDEOGRAPHER: This begins
20   Tape Number 2 in the videotaped deposition of
21   Mr. Stephen Prowse. Going back on the record
22   at 12:01 p.m.
23   BY MR. GUIDO:
24       Q.    Now, I think you testified before
25   we went off the record that another one of the

22 (Pages 82 to 85)

Stephen David Prowse, Ph.D.                                         March 5, 2010
New York, NY

Page 86

1        - STEPHEN D. PROWSE -
2   factors that you considered in reaching your
3   conclusion there was no more manipulation was
4   that Sedona's performance over time explained
5   by the market, the lack of the market, and the
6   peers.  Is that correct?
7        A.    Correct.
8        Q.    Okay.  Did you do a statistical
9   regression analysis against the new market
10  indices?
11       A.    We did a regression analysis that
12  included the NASDAQ as the -- one of the
13  independent variables, correct.
14       Q.    Where -- where -- where in the
15  exhibits can I find that?
16       A.    For example, Exhibit 13A.
17       Q.    Okay.  And where is --
18       A.    Or 13B?
19       Q.    Pardon?
20       A.    Or 13B.
21       Q.    Or 13B or both?
22       A.    Or both.
23       Q.    Now, how can I tell looking at 13A
24  whether there's a statistical significance of
25  the relationship between Sedona stock and --

Page 87

1        - STEPHEN D. PROWSE -
2   stock price movement and NASDAQ's price
3   movement?
4        A.    Well, if you were looking at these
5   on a stand-alone basis, you'd look at the star
6   indicators.
7        Q.    Okay.  And that does -- under
8   "NASDAQ return," does that double star denote a
9   significance in the relationship between Sedona
10  -- Sedona's stock price movement and NASDAQ
11  price movement?
12       A.    Just looking at that one
13  regression, the "P" value is greater than -- or
14  less than .01.
15       Q.    Okay.  So -- and -- so how -- I
16  mean, how was that analysis done?  What were
17  the variables?  Was it every day over this time
18  period of June 26th 2000 to June 14th, 2002, or
19  was it just the beginning and end time?
20       A.    No, it was daily data.
21       Q.    Daily data?
22       A.    So it was a regression analysis
23  using however many trading days there are in
24  that period, going from day to day, seeing what
25  happened to Sedona's stock price, seeing what

Page 88

1        - STEPHEN D. PROWSE -
2   happened to the NASDAQ stock price, in terms of
3   a return, and then correlating the two through
4   regression.
5        Q.    Okay.  And in the correlating and
6   through regression, do you average out those
7   price changes over that time period to come up
8   with a figure to compare it?
9        A.    No.
10       Q.    You use every day?
11       A.    It's a day-to-day comparison,
12  correct.
13       Q.    All right.  Now -- and it shows
14  that there is a statistically significant
15  relationship between the NASDAQ return and the
16  Sedona return in 13A?
17       A.    It shows the "P" values are less
18  than .01.
19       Q.    Okay.  Which is 99 percent
20  significant?
21       A.    That's -- that's looking at each
22  regression on a stand-alone basis.  Correct.
23       Q.    I understand.
24            Now, take a look at 13B.  That's
25  March 1, 2001 through May 31st, 2009.  The

Page 89

1        - STEPHEN D. PROWSE -
2   NASDAQ return there doesn't have any asterisks.
3            What does that signify?
4        A.    That signifies that the "P" value
5   is greater than .05.
6        Q.    Okay.  And does that indicate, in
7   your opinion, that it lacks statistical
8   significance?
9        A.    That's correct.  It lacks
10  statistical significance.
11       Q.    Now -- so that for the time period
12  March 1 through May 31st, 2001, is it fair to
13  conclude that you have not shown that Sedona's
14  stock price was influenced by the NASDAQ
15  return?
16       A.    You can't reject the hypothesis
17  that the coefficient is zero.
18       Q.    Or that you can't reject the
19  hypothesis that there's no relationship?
20       A.    You can't reject the hypothesis
21  that there's no relationship.
22       Q.    Now, I'd like to also direct your
23  attention to another exhibit which there was a
24  -- that you chose to put in the exhibits and
25  that is Exhibit 5A.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
                              New York, NY

Page 90

- STEPHEN D. PROWSE -
1
2        I think you indicated that the --
3   that the Sedona stock performance was an
4   indictment of it and, therefore, it explained
5   that any impact on its price was not due to
6   market manipulation.
7        And I'd like to direct your
8   attention --
9        A.   No, I didn't say that.
10       Q.   I'm sorry.  Well, you did give a
11  quite lengthy response in which you did
12  indicate that Sedona's stock -- stock price
13  performance and its characteristics was an
14  indictment, didn't you, of something?
15           MR. SOHN:  Objection.
16       A.   I said -- I said --
17       Q.   And what was that something?
18       A.   I said that its operating
19  performance as -- and then as reflected, I
20  believe, in its stock price volatility, its
21  stock price decline, and -- and the fact that
22  it relied almost solely on, or very largely on,
23  FPS issues to raise money was indicative of it
24  being a very risky stock.
25       Q.   Okay.  Now, take a look at Exhibit

Page 91

- STEPHEN D. PROWSE -
1
2   5A.  5A, the Sedona price returns were in red.
3   And look at the time period from -- the chart
4   doesn't address the May 1 -- March 1 through
5   May 31st, '01, but the chart seems to indicate
6   that the price of Sedona during that period of
7   time increased from a factor of about whatever
8   this factor is on the left of 20 to somewhere
9   just short of 40.
10       What do those numbers mean on the
11  left of this chart?
12       A.   These are -- this is just an
13  index.  So all the -- the three stock price
14  indices -- the three stock price measures we're
15  using here are all normalized to be the same on
16  June 26, 2000.
17       Q.   Okay.
18       A.   And, so, basically you're
19  comparing how the NASDAQ, Sedona and the peer
20  group stock price performed since 2006 -- since
21  June 26, 2000, relative to each other.
22       Q.   Okay.  Well, does it indicate that
23  the stock price of Sedona between March 1, 2001
24  and May 31st, 2001, appears to have almost
25  doubled in value?

Page 92

- STEPHEN D. PROWSE -
1
2        A.   Well, I don't have a color copy of
3   the chart.
4            MR. SOHN:  [Handing document to
5   witness.].
6        A.   Okay.  So, Sedona is red.  Well,
7   it's hard to tell what it did without drawing
8   lines on for the two dates you mentioned, which
9   were March 1st and March 31st?
10       Q.   March 1st through May 31st.
11       A.   March 1st through May 31st.  Okay.
12  March 1st through May 31st.  It looks like it
13  went up, but -- overall, on average, but just
14  eyeballing it, it doesn't look like it doubled
15  to me.
16       Q.   Well, it did go from 20 to
17  somewhere short of 40, didn't it?
18       A.   At some point in time, but I'm not
19  sure where that is relative to May 31st.
20       Q.   Well, let me ask you something.
21  You used the time period of June 26, 2000
22  through June 14th, 2002, and you used March
23  1st, 2001 through May 31, 2001, but -- for most
24  of your other charts.  But for some reason when
25  you talk about stock price performance versus

Page 93

- STEPHEN D. PROWSE -
1
2   peer group companies and NASDAQ, you don't do
3   it for that time period, do you?
4        A.   No, we don't.
5        Q.   Why not?
6        A.   I don't know.  We talk -- I think
7   we talk about it in the report.  The report
8   numbers are actually in the body of the report.
9        Q.   Where is that?
10       A.   But --
11       Q.   Where?
12       A.   Let me see.
13       Q.   Look at paragraph 37 in --
14       A.   Paragraph 37.
15       Q.   But that talks absolute prices.
16  It doesn't talk about corrected prices, like
17  you did for Exhibit 5A, does it?
18       A.   Well, I'm not sure what you mean
19  by "corrected prices."
20       Q.   Well, you said that you
21  normalized --
22       A.   Right, but that wouldn't change --
23  that wouldn't change anything.
24       Q.   Okay.  Well, it says --
25       A.   That wouldn't change anything.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                   March 5, 2010
New York, NY

Page 94

- STEPHEN D. PROWSE -
1      - STEPHEN D. PROWSE -
2      Q.    Where is the data that supports
3  paragraph 37?
4      A.    Well, the -- you have the data
5  that supports paragraph 37.
6      Q.    Where is that?
7      A.    It's in the work sheets that were
8  produced to you.
9      Q.    No, I mean in the report.  In the
10  report.
11      A.    Well, we didn't -- we didn't
12  produce all of the data that support all the
13  numbers in here.  Most of the data's in the
14  work sheets.
15      Q.    Really?  Hmm.
16      Now, --
17      A.    In fact, this data shows that the
18  stock price declined over this period that you
19  were talking about.
20      Q.    Well, then why did you put 5A in?
21  What is the purpose of 5A, that shows an
22  increase in the normalized -- or the adjusted
23  back to 6/26/2000?
24      A.    I don't know.  I'd have to look at
25  the data -- I'd have to look at the data behind

Page 95

- STEPHEN D. PROWSE -
1      - STEPHEN D. PROWSE -
2  Exhibit 5A to understand what's going on, which
3  is in the work sheets.
4      Q.    Do you know?
5      A.    And, you know, I made a decision
6  not to -- not to include every single piece of
7  analysis we did as an exhibit to the report.
8  That would have been overkill.  I would have
9  had --
10      Q.    Overkill or data mining?
11      A.    No, it would have been overkill.
12      Q.    Now, --
13      A.    We didn't do any data mining.
14      MR. GUIDO:  I'd like to have
15  marked as Exhibit No. 23 a rendition of Exhibit
16  13B.
17      MR. SOHN:  Did you say "a
18  rendition of"?
19      MR. GUIDO:  That's what I said,
20  which is extracted from BP-4.
21      (Whereupon, exhibit is received
22  and marked BP-23 for identification.)
23  BY MR. GUIDO:
24      Q.    Do you have Exhibit 23 in front of
25  you?

Page 96

- STEPHEN D. PROWSE -
1      - STEPHEN D. PROWSE -
2      A.    Yes.
3      Q.    Okay.  Is this the -- the document
4  that you relied upon to prepare Exhibit 13B in
5  your expert report?
6      A.    I don't know where this comes
7  from, 13 -- this exhibit.
8      Q.    Well, I'll represent to you it
9  comes from a file called BP-4 and it's Tab
10  13B.
11      A.    Okay.
12      Q.    In the documents that were
13  produced by your office to the SEC.
14      A.    Okay.
15      Q.    Okay?  Now, is that the document
16  that you reviewed to prepare the 13B that is in
17  your report?
18      A.    No, I didn't review this document.
19      Q.    Okay.  Now, did you -- you know,
20  when you did the report, okay, what did you
21  review?
22      A.    What I --
23      Q.    In terms of data.
24      A.    In terms of data?
25      Q.    Uh-huh.

Page 97

`
- STEPHEN D. PROWSE -
1      - STEPHEN D. PROWSE -
2      A.    I reviewed the exhibits as they
3  were in -- as they were reported.
4      Q.    Okay.
5      A.    And I re -- and I had discussions
6  with Erica Rose about the results of all the
7  statistical analyses that we did on the Sedona
8  matter.
9      Q.    Okay.  And let's take the text of
10  the report.
11      Who wrote the initial draft?
12      A.    I believe the initial draft was
13  written by Mr. Beloreshki.  I'm not sure when.
14  Prior to me getting involved in the -- in the
15  engagement.  But I took over the writing of the
16  draft because, in November of 2009, we didn't
17  have a whole lot of time to get the report out.
18  And, so, I had -- I had spare time and
19  Mr. Beloreshki didn't.  So I took over,
20  basically, the editing of the draft and the
21  writing of the draft.
22      Q.    Well, take the second to the last
23  paragraph in the -- in the report.
24      Did you edit that paragraph?
25      A.    I can't remember.  I can't

25 (Pages 94 to 97)

Stephen David Prowse, Ph.D.                                              March 5, 2010
New York, NY

Page 98

                - STEPHEN D. PROWSE -
1
2    remember if I edited it or not.
3         Q.     Well, when you edited the draft,
4    did you review your edits with anyone?
5         A.     Did I review my edits?
6         Q.     Uh-huh.
7         A.     Mr. Beloreshki would have seen,
8    and probably Erica would have seen, the final
9    version before it went out, yes.
10        Q.     Well, from the day you got this
11   draft and you started the editing process, who
12   did you deal with about the draft?
13        A.     I dealt with Mr. Beloreshki and
14   Erica Rose.
15        Q.     Anyone else?
16        A.     Perhaps we may have had a staff
17   person in Dallas working on this, as well,
18   Mr. Blanton.
19        Q.     Have you had a conversation with
20   anyone from DLA Piper?
21        A.     Yes, we had conversations with DLA
22   Piper.
23        Q.     And how often did you have these
24   conversations?
25        A.     Specific to the draft?

Page 99

1                - STEPHEN D. PROWSE -
2         Q.     Uh-huh.
3         A.     Probably not many. Maybe one at
4    the end; maybe two at the end. I believe we
5    probably had a WebEx set up.
6         Q.     What's a WebEx?
7         A.     Where they can look at the
8    draft -- they go into our -- we send them a
9    link to our server. They go in, they click on
10   the link and go in and can look at the draft.
11        Q.     Does that include red lines?
12        A.     Can they see red lines?
13        Q.     Does your WebEx include red lines?
14   When a draft appears on that WebEx, does it
15   include red lines?
16        A.     I don't know. If there are red
17   lines -- it shows that -- it shows literally
18   the report. So if the report has red lines in
19   it at that point, then it -- then it will show
20   them.
21        Q.     But when you did your edits, did
22   you do them as red lines?
23        A.     I can't remember whether I did
24   them or not. Probably.
25        Q.     Well, you received a subpoena in

Page 100

1                - STEPHEN D. PROWSE -
2    this case.
3         Q.     Do you recall that?
4         A.     Yes.
5         Q.     In fact, it was served on you at
6    home, right, as I recall?
7         A.     Actually, it was not served on me.
8    It was served on my wife.
9         Q.     On your wife?
10        A.     And my older daughter.
11        Q.     And your older daughter.
12        A.     Who were upset.
13        Q.     Yeah, I understand that. I heard
14   that.
15               And were you aware that the
16   subpoena had been -- a processor had attempted
17   to serve you at your office as part of that?
18        A.     I can't remember. I was traveling
19   most of that week, so I wasn't in the office.
20        Q.     Did you -- did you give
21   instructions to the people in the office not to
22   accept subpoenas for you when you were not
23   there?
24        A.     I didn't give any instructions.
25        Q.     Well, do you have standard

Page 101

1                - STEPHEN D. PROWSE -
2    instructions?
3         A.     No.
4         Q.     Do you --
5         A.     I very rarely receive -- receive
6    subpoenas.
7         Q.     Now, when you received the
8    subpoena, did you attempt to determine what
9    you had in your files in response to that
10   subpoena?
11        A.     Yes. I spoke with in-house
12   counsel, spoke with DLA Piper, spoke with
13   Erica, and I believe I spoke with Tsvetan, as
14   well, and we produced what documents we were
15   asked to produce.
16        Q.     When did you produce those?
17        A.     Soon after receiving the subpoena.
18   I can't remember the exact date.
19        Q.     Who did you produce them to?
20        A.     I think we put them on a disk and
21   sent them to DLA Piper.
22        Q.     Did you have any role in putting
23   any documents on a disk yesterday?
24        A.     I had a role in that I instructed
25   Mr. -- a person in my staff to put some

                                    26 (Pages 98 to 101)

Stephen David Prowse, Ph.D.                                March 5, 2010
New York, NY

Page 102

- STEPHEN D. PROWSE -

1  - STEPHEN D. PROWSE -
2  documents on a disk and send it as a response
3  to a supplemental request, I guess, or
4  something for something that we hadn't produced
5  before that you wanted.  So we put that
6  together and sent you a disk, which I
7  believe -- I'm not sure if you've gotten it
8  yet.  That was happening either the day before
9  yesterday or yesterday.
10     Q.    Well, when you got the subpoena,
11  did you pull together the documents that had
12  been requested in that subpoena?
13     A.    Yes, I believe so.
14     Q.    And what did you do with the
15  documents you pulled together after you
16  received the subpoena?
17     A.    Put them on -- had them put on a
18  disk and sent to DLA Piper.
19     Q.    Do you recall what the date was?
20     A.    No.
21     Q.    Was it shortly after you filed the
22  report?
23     A.    It was shortly after I receive the
24  subpoena.
25     Q.    Was it prior to the date you were

Page 103

1  - STEPHEN D. PROWSE -
2  ordered to produce the documents in the
3  subpoena?
4        MR. SOHN:  Can we just be clear if
5  we're talking about the order, you know, the
6  evening order or the return date on the
7  subpoena?
8        MR. GUIDO:  Yeah, I'm going to
9  give you that right now.  Thank you, Mr. Sohn.
10        I'd like to have marked as an
11  exhibit, next number, the subpoena that was
12  serve on Mr. Prowse, or a copy of it.
13        I think we originally talked about
14  this as being Exhibit No. 23 when I talked to
15  the --
16        MR. SOHN:  You just marked 23, so
17  this should be 24.
18        MR. GUIDO:  So it now has to be
19  24.
20        THE REPORTER:  We premarked this
21  as Exhibit 23.
22        MR. SOHN:  Why --
23        THE REPORTER:  I mean, I'm sorry,
24  we premarked this as Exhibit 22.  So do you
25  want to rename it as Exhibit 22?  Because we

Page 104

1  - STEPHEN D. PROWSE -
2  just skipped over Exhibit 22.
3        MR. SOHN:  I mean, 22 is
4  available.
5        THE REPORTER:  Twenty-two -- 21 is
6  here.  We premarked 21 and 22.  All right?  So
7  this is going to be another BP-22 then.
8        (Whereupon, exhibit is received and
9  marked BP-22 for identification.)
10        MR. SOHN:  Thank you.
11  BY MR. GUIDO:
12     Q.    Do you recognize Exhibit 22 as the
13  subpoena that was served upon you?
14     A.    It looks like it.
15     Q.    Okay.  Now, it has a return date
16  of December 11th on it.
17        Do you see that?
18     A.    Correct.
19     Q.    Did you pull together the
20  documents before December 11th?
21     A.    No, because -- I don't believe I
22  did.  I think December -- I can't remember.  I
23  think December 11th is -- it's either a Friday
24  or Saturday, I believe.  And I think I received
25  the subpoena, or my wife and daughter received

Page 105

1  - STEPHEN D. PROWSE -
2  the subpoena on Thursday night.  And I was not
3  going to be in the office on Friday, so there
4  was no way I could get the documents together
5  in response to this subpoena.
6        So I immediately called my in-house
7  counsel, and they had, I believe, discussions
8  with DLA Piper.  And I think at some point the
9  following week we produced the documents.
10     Q.    Now, the -- you testified, with
11  regard to Exhibit 13B, the only rendition of
12  13B that you saw was the one that's in your
13  expert report, which is Deposition Exhibit 4.
14        MR. GUIDO:  Mr. Sohn, can you give
15  the witness the copy of the expert report that
16  has the color highlighted?
17        MR. SOHN:  Sure.
18  BY MR. GUIDO:
19     Q.    Is Exhibit 13B from the
20  Deposition Exhibit No. 4 your Exhibit No. 24,
21  which was another rendition of Exhibit 13B?  Is
22  that the document that you reviewed?
23        MR. SOHN:  Mr. Guido, I think that
24  it's Exhibit 23, not Exhibit 24.
25        MR. GUIDO:  Oh, excuse me.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 106

1         - STEPHEN D. PROWSE -
2            MR. SOHN:  Is that right?
3            MR. GUIDO:  Yes.
4            MR. SOHN:  And I think you already
5    asked the question, but...
6            MR. GUIDO:  Sorry.
7    BY MR. GUIDO:
8       Q.    Which one of these did you review
9    when you signed the report?
10      A.    When I signed the report, I
11   reviewed the one in the report.
12      Q.    Okay.  And any time after you were
13   retained to participate in drafting the report,
14   did you review Exhibit 23?
15           MR. SOHN:  Objection.  I think you
16   already asked that question.
17      A.    I can't -- no, not that I can
18   remember.
19           MR. GUIDO:  I'd like to have
20   marked as exhibit next number, if somebody
21   would please tell me what the number is.
22           THE REPORTER:  Twenty-four.
23           MR. GUIDO:  Twenty-four?  Sorry.
24           (Whereupon, exhibit is received
25   and marked BP-24 for identification.)

Page 107

1         - STEPHEN D. PROWSE -
2    BY MR. GUIDO:
3       Q.    Have you ever seen Exhibit 24
4    before?
5       A.    I don't believe so, no.
6       Q.    Do you know how Exhibit 23 --
7    Exhibits 23 and 24 came to be produced?
8       A.    I'm sure they were in -- in the
9    work sheets that we produced to you.
10      Q.    Did you know that Exhibit No. 23
11   is the way the work sheet appeared in BP-4 when
12   it was opened and examined?
13           MR. SOHN:  Objection to the form.
14   What is "it"?
15      A.    No.
16      Q.    Did you know that the Column T,
17   the numbers in the Column T, were omitted from
18   the sheet as it appeared in the spreadsheet
19   BP-04?
20      A.    No.
21           MR. SOHN:  Objection to form.
22      Q.    Okay.  Did you know that anyone
23   had applied the hidden function to that column?
24      A.    No, I do not.
25      Q.    So you don't know that anyone had

Page 108

1         - STEPHEN D. PROWSE -
2    done that?
3            MR. SOHN:  Objection to form.
4       A.    No.
5       Q.    Did you discuss the regression
6    results for Regression No. 5 with anyone before
7    you signed the expert report No. 4, which is
8    Exhibit No. 4?
9       A.    Yes, I discussed all the
10   regression results fairly early on in the
11   analysis because this analysis is fairly easy
12   to run once you have the data up and running,
13   which we did.  So I discussed all of the
14   regression results with Erica Rose prior to
15   issuing the report.
16      Q.    The -- you discussed it with Erica
17   Rose?
18      A.    Yes, who is a staff person working
19   with me on this engagement.
20      Q.    Okay.  And what was your
21   discussions with Erica Rose about Regression
22   Number 5?
23      A.    Well, she told me, again, fairly
24   early on in the engagement, that of all the
25   regressions she ran, she got "P" values of

Page 109

1         - STEPHEN D. PROWSE -
2    greater than .05 for all of them except for
3    two, I believe, which I believe is Regression
4    Number 5 and then one other.
5       Q.    And that was Regression 4A, wasn't
6    it, initially?
7       A.    I don't know what it was
8    originally.  It's one -- it's the -- the other
9    one is the one that uses -- that doesn't use
10   the NASDAQ.  It drops the NASDAQ out and uses
11   net daily share transacted.
12      Q.    And that was the March 1st through
13   May 31st time period?
14      A.    Correct.  So she told me that out
15   of all the regressions she ran, she got a "P"
16   value greater than .05 on all of them except
17   for two.
18           And I made a mental note of that.
19   I thought, okay, I'm going to have to explain
20   in the report why these two regre -- or drop a
21   footnote and explain why these two regressions
22   don't change our opinion because of the correct
23   adjustment you have to make when you're making
24   multiple comparisons.
25           And I forgot to do that.  I

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

Page 110

1          - STEPHEN D. PROWSE -
2      forgot to drop the footnote in the final
3      version of report to indicate that there were
4      regressions run that had "P" values of greater
5      than .05.
6              And the final decision to make --
7      which regressions to display was made towards
8      the end of the engagement.  And at that point I
9      had forgotten what Regression Number 5 -- the
10     results of Regression Number 5.  And I
11     mistakenly and, unfortunately, told Erica just
12     report the first four, because I think they're
13     a fair representation of what -- of the
14     regressions we ran.
15             And I forgot to draw -- I forgot
16     to put a note in the report saying there were
17     other regressions we ran.  Two of them had "P"
18     values greater than .05, but this doesn't
19     change our opinion because of the adjustment
20     you have to make.
21             So Regression Number 5 not being
22     included in the report was my fault, and I
23     apologize for that.
24     Q.    All right.  Take a look at --
25            MR. GUIDO:  Could you give the

Page 111

1          - STEPHEN D. PROWSE -
2      witness the larger rendition of Exhibit No. 4
3      to him?
4            MR. SCHECHTMAN:  Is that this?
5            MR. SOHN:  Yeah.
6            MR. GUIDO:  It's what is referred
7      to as Tab 13B.
8      BY MR. GUIDO:
9      Q.    I want you to take a look at the
10     very last page of this.
11            Are the columns BE and BF the
12     regression that is net daily trades excluding
13     NASDAQ?
14     A.    Are you asking me is that what the
15     regression is?
16     Q.    Yes.
17     A.    I -- I believe it is.
18     Q.    Okay.  So that's one of the others
19     that you talked to Erica about excluding from
20     the report?
21            MR. SOHN:  Objection to form.
22     A.    No, I didn't talk to her about
23     excluding it from the report.  If you remember,
24     what I said was when the time came to formulate
25     what exact statistical analysis would be

Page 112

1          - STEPHEN D. PROWSE -
2      included as exhibits, I had already determined
3      I wasn't going -- I wasn't going to show as an
4      exhibit every piece of analysis we'd already
5      done.
6              And, so, I decided -- I told Erica
7      just report the first four, because I think
8      that's a fair summary of what our regressions
9      are.  And I forgot to put a note in the -- into
10     the report saying there were two other
11     regressions of the 18 we ran that had "P"
12     values of less than .05, but that that doesn't
13     change our opinion.
14     Q.    Well, let me -- let me change the
15     subject a little bit before I go any further
16     with -- with this.
17             And that is this BE/BF column --
18     forget the report.  BE/BF.  It doesn't -- it
19     doesn't describe that it's net daily trading
20     absent NASDAQ.
21             Why doesn't it have a description
22     on those columns of what those calculations
23     relate to?
24     A.    I don't know why.
25     Q.    Did you ever see it with the

Page 113

1          - STEPHEN D. PROWSE -
2      description?
3      A.    No, I never saw -- I never saw
4      this data physically.  I -- it was communicated
5      to me verbally what the results were.
6      Q.    Because you never really looked at
7      the data itself.  You have only had people tell
8      you verbally what the data showed.  Isn't that
9      correct?
10     A.    I've looked at the database that
11     we're using and I've looked at some of the
12     other results, but I didn't look at -- I
13     didn't go into the database and look at the
14     exact "P" values.  They were communicated to me
15     verbally.
16     Q.    So you -- you've never looked at
17     the document that's been marked as Exhibit No.
18     14?
19     A.    Oh, I have.  I have since issuing
20     the report, yes.
21     Q.    Since issuing.  But prior to
22     issuing your report, you didn't look at it, did
23     you?
24     A.    I may have looked at the front
25     part of the data which had the stock prices on

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                              March 5, 2010

New York, NY

Page 114

1         - STEPHEN D. PROWSE -
2    them.
3         Q.    Uh-huh.
4         A.    But I don't remember going through
5    each regression and looking at each one.
6         Q.    Now, in drafting the report -- let
7    me see if I get this right -- you decided to
8    exclude the regressions that showed a
9    significant correlation to the 95 percent
10   level?
11            MR. SOHN:  Objection to form.
12        A.    I decided to include the first
13   four.  And at the time I made that decision, I
14   had forgotten that there were two regressions
15   that had a "P" value of greater than point --
16   of than less than .05 on them.
17        Q.    Now, let me ask you some
18   questions.
19            Have you ever been involved in
20   accounting for a case measuring -- have you
21   ever been involved in cases in which you've
22   measured damages in a financial fraud or an
23   accounting fraud case?
24        A.    Yes, I believe so.
25        Q.    And have you ever been involved in

Page 115

1         - STEPHEN D. PROWSE -
2    one of those cases in which there was -- an
3    allegation of fraud involved the destruction of
4    work papers?
5         A.    Maybe.
6         Q.    Maybe.
7            So you're aware that accountants
8    are required to retain their work papers even
9    if they don't support their conclusions?
10        A.    I'm not -- I'm not aware of what
11   the exact accounting requirements are.  I'm not
12   an accountant.
13        Q.    Well, I mean, have you ever heard?
14   I'm just asking if you ever heard.
15        A.    I have a general understanding
16   that accountants need to keep their work
17   papers.
18        Q.    And do you have a general
19   understanding that at one point in time there
20   was a debate about whether or not they had to
21   keep their work papers that only supported
22   their conclusions as opposed to all of their
23   work papers that did not support their
24   conclusions?
25        A.    I don't remember that.

Page 116

1         - STEPHEN D. PROWSE -
2         Q.    Well, let me ask the question a
3    different way.
4            Do you think it's a significant
5    omission from your report that you do not
6    address the other two regressions and explain
7    why you thought that they were not significant
8    for your conclusions?
9         A.    Yes, I do.  It was a mistake and I
10   should have noted it in the report that there
11   was two regressions that we found that had "P"
12   values of less than .05.
13        Q.    Now, I think you indicated that
14   the last time that you read any literature on
15   micro kept (sic) structure was when you got
16   your study for your -- what is it, the FCA?
17   When you studied for your Ph.D.
18        A.    That's actually not technically
19   correct, no.
20        Q.    I'm sorry.  I -- sometimes my
21   memory fails me.
22            When did you -- when did you study
23   microstructures?
24        A.    I studied micro -- market
25   microstructure as part of my Ph.D. training, as

Page 117

1         - STEPHEN D. PROWSE -
2    part of my CFA training.  And in the time --
3    and in those time -- so, in those time periods.
4         Q.    Now, in those time periods when
5    you studied it, did you study about the
6    importance of how you structured the model to
7    reach conclusions based on regression
8    analysis?
9            MR. SOHN:  Objection to form.
10        A.    I can't recall specifics.  But, in
11   general, structuring the model in any manner
12   is -- is important.
13        Q.    And is it important that you have
14   a certain degree of expertise in that field for
15   which you were measuring the results in a
16   regression analysis?
17            MR. SOHN:  Objection to form.
18        A.    Well, first of all, you have to
19   have expertise in regression.
20        Q.    Okay.
21        A.    And, second of all, you have to
22   have expertise in general in the area, the
23   general area that you're looking at, whether it
24   be financial economics, financial instruments,
25   financial markets.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 118

- STEPHEN D. PROWSE -
1
2      Q.    Well, is -- what is it about your
3   background that makes you think that you're
4   qualified to decide that two regressions that
5   do not support your conclusions on their face
6   should be excluded from your report?
7          MR. SOHN:  Objection to the form.
8      A.    Well, I've already testified that
9   that was a mistake.  And I would have -- and I
10  had forgotten that there were "P" values
11  associated with those two regressions that were
12  less than .05.
13         It doesn't -- my -- my
14  qualifications as being an expert in regression
15  or understanding what's significant and what's
16  not are based on my training, my education, my
17  skills, my knowledge.  I've been doing
18  regression analysis for 25 years.  I've been
19  qualified as an expert to do regression
20  analysis and to do event studies and to
21  understand the impact on stock prices of
22  particular events.
23         So I think that's a short summary
24  of my qualifications to do a regression
25  analysis and understand the appropriate ways

Page 119

1          - STEPHEN D. PROWSE -
2   to estimate stock price impact of certain
3   events.
4      Q.    Well, I just deposed a scientist
5   who does regression analysis in determining the
6   effect of the predictiveness of a protein
7   called P65 as a predictor of cancer.  And he
8   knew a lot about statistics and he knew a lot
9   about DNA analysis.
10         Is he qualified to testify about
11  whether or not these models are correct?
12         MR. SOHN:  Objection.  I don't
13  know if that's -- if that's asking for a legal
14  conclusion.
15  BY MR. GUIDO:
16     Q.    In your view.
17     A.    I don't know enough -- I don't
18  know enough about his background to make that
19  decision and.
20     Q.    Just assume that's all you
21  know.
22         MR. SOHN:  Objection.
23     A.    Then I can't -- then I'll -- then
24  I'd say I don't know enough.
25     Q.    Okay.  If a person only was an

Page 120

1          - STEPHEN D. PROWSE -
2   expert in statistics, is that person an expert
3   qualified to opine about whether the models
4   that were used here were appropriate?
5          MR. SOHN:  Objection to the extent
6   it calls for a legal conclusion.
7      A.    Again, I'd have to know more about
8   your hypothetical.  What I would say is if that
9   person has expertise in regression and
10  statistical analysis, and also has demonstrated
11  expertise in event studies and in understanding
12  how the stock price moves in response to
13  certain events, and has experience in analyzing
14  financial markets, financial instruments,
15  applying statistical regression principals to
16  financial instruments and stock prices, I would
17  say he's qualified.
18     Q.    Okay.  What events in terms of
19  trading activity affects stock price moves in
20  your opinion?
21         MR. SOHN:  Objection.  Is this a
22  general question?
23         MR. GUIDO:  Yes.  He just
24  testified what he thought was an important
25  characteristic.

Page 121

1          - STEPHEN D. PROWSE -
2   BY MR. GUIDO:
3      Q.    And I'm just asking what --
4   what -- you know, what factors in your view, in
5   terms of trading, affect stock price movements.
6      A.    Well, I think you asked that
7   question of me before.  And I said there were a
8   number of ways a trade or an event can affect a
9   stock price.  One is through information
10  effects; two is through inventory effects on
11  broker-dealer stocks.  Those are at least two
12  channels through which a stock price -- a trade
13  can have impacts on a stock price.  And I think
14  that's generally recognized.
15     Q.    Well, in this case did you measure
16  inventory effect on stock prices?
17     A.    No, we did not.  We measured the
18  effect of the trade on the daily stock price
19  change, which is a perfectly legitimate way to
20  conduct an event study and measure the effect
21  of a trade on -- or a number of trades on the
22  stock price.
23     Q.    And you did six regressions, two
24  of which you discarded?
25         MR. SOHN:  Objection.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

**Page 122**

```
1        - STEPHEN D. PROWSE -
2        A.    We did 18 regressions, none of
3   which we discarded, all of which we included
4   and considered.
5        Q.    Let me -- let me shift a little
6   bit here and ask you another series of
7   questions.
8             When I deposed Mr. Beloreshki, I
9   found it a little confusing of what his answers
10  were. And I'm trying to get a better sense of
11  what a regression analysis means to you and to
12  him.
13            And I guess my first question is:
14  What is the hypothesis that is being tested in
15  these regressions?
16       A.    The hypothesis that is being
17  tested in this regression --
18       Q.    That are in your expert report.
19       A.    In these regressions, as well as
20  the hypothesis that's being tested in the
21  parametric and the nonparametric statistics --
22       Q.    No, I'm asking you just about --
23       A.    Well, they're the same. It's the
24  same hypothesis.
25       Q.    What's the same hypothesis?
```

**Page 123**

```
1        - STEPHEN D. PROWSE -
2        A.    It's the same hypothesis that
3   Professors Glosten and Jones used in their
4   analysis, which is the null hypothesis is that
5   there's no impact.
6        Q.    So it's fair to say that the
7   hypothesis that's being tested is that there's
8   no relationship between Badian's activity and
9   the Sedona stock price?
10       A.    The hypothesis that's being tested
11  is that there's no impact of the Rhino trades,
12  or whatever other measure of the trades is that
13  you want to use -- trading activity,
14  transactions -- on the stock price. Exactly
15  the same as Professors Glosten and Jones' null
16  hypothesis, and exactly the same as the null
17  hypothesis we used in our nonregression tests.
18       Q.    Now, is it fair to say that if the
19  coefficient significant -- is significant at
20  95 percent, the null hypothesis can be
21  rejected?
22       A.    If the coefficient is significant
23  at 95 percent, properly measured, with Alpha
24  being the threshold "P" value properly
25  measured, then you can reject the null
```

**Page 124**

```
1        - STEPHEN D. PROWSE -
2   hypothesis, which is that there is no impact.
3        Q.    Okay. If the coefficient is
4   significantly less than 75 percent, can the
5   null hypothesis be rejected?
6        A.    That question makes no sense from
7   a statistical point of view.
8        Q.    Can you say, based on these
9   analyses, that the null hypothesis is true?
10       A.    Statistics, any kind of
11  statistics, cannot allow you to say the null is
12  true. You cannot -- I'm sorry, let me back up.
13            You can either accept the null
14  or -- you can either reject the null or fail to
15  reject the null hypothesis.
16       Q.    Okay.
17       A.    So if you reject the null -- if
18  you fail to reject the null hypothesis, that's
19  the best you can do.
20       Q.    Okay.
21       A.    You can fail to reject the
22  hypothesis that there's no impact of Rhino's
23  trading activity on the stock price. That's
24  the way I set up my tests. That's the way
25  Glosten and Jones set up their tests. That's
```

**Page 125**

```
1        - STEPHEN D. PROWSE -
2   the way pretty much everybody in the academic
3   literature who's ever done research sets up
4   their tests.
5        MR. SOHN: Mr. Guido, I don't know
6   if now is a good time, but we're --
7        MR. GUIDO: What time do you have?
8        MR. SCHECHTMAN: Ten to one.
9        MR. GUIDO: Ten to one? Okay.
10  We'll come back at 1:30?
11       MR. SOHN: Okay. You didn't even
12  let me say what it's a good time for.
13       THE VIDEOGRAPHER: Going off the
14  record at 12:52 p.m.
15       (A recess is taken.)
```

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 126

1        - STEPHEN D. PROWSE -
2            A F T E R N O O N   S E S S I O N
3            THE VIDEOGRAPHER: Going back on
4    the record at 1:38 p.m.
5    BY MR. GUIDO:
6        Q.    Mr. Prowse, in -- would you take a
7    look at Exhibit No. 4 again, your report?
8            MR. GUIDO: Preferably if he
9    could have the one that has the color, I
10   would...
11   BY MR. GUIDO:
12       Q.    When you were retained to work on
13   that report, did you direct anyone to engage in
14   any statistical or empirical studies?
15       A.    Yes, I think I testified earlier
16   that I directed -- after discussions with
17   Mr. Beloreshki, I directed Erica Rose to
18   perform statistical and econometric studies,
19   yes.  Analysis.
20       Q.    Were they included in the text of
21   that report?
22       A.    You had me on Exhibit 4.  Now
23   you're talking about the text?
24       Q.    Just the whole text --
25       A.    Oh, Deposition Exhibit 4?

Page 127

1        - STEPHEN D. PROWSE -
2            MR. SOHN: The deposition is
3    Exhibit 4.
4        A.    The deposition is Exhibit 4.  I'm
5    sorry.
6            So, sorry, could you repeat the
7    question?
8        Q.    Well, when you were retained, and
9    I think it was November 4th --
10       A.    Yes.
11       Q.    -- did you direct anyone to
12   perform any statistical or economic studies at
13   that point in time?
14       A.    Yes.
15       Q.    Who?
16       A.    Erica Rose.
17       Q.    Okay.  And what studies did you
18   direct her to do?
19       A.    I asked her to -- Tsvetan and I
20   agreed on the statistical and regression
21   anal -- analyses and the various tests we
22   wanted to run and the various nonstatistical
23   analyses we wanted done.  And we directed her
24   to do all of that, and she did.
25       Q.    Now, let me ask you a question:

Page 128

1        - STEPHEN D. PROWSE -
2    I -- have you been through the disk that -- the
3    information you produced to DLA Piper after you
4    received the subpoena?
5        A.    I have not been through that disk.
6        Q.    I have.
7            Is there anything in that that you
8    asked Erica to do that is not in that set of
9    materials that you produced to the SEC?
10           MR. SOHN: Objection.
11       A.    Well, I haven't looked at the disk
12   you have, so I can't answer that a hundred
13   percent.  But all of the analyses,
14   statistical -- all of the analyses, as I
15   understand it, were contained in a set of work
16   sheets that were produced.
17       Q.    And they were prepared in 2003 and
18   2004.  Isn't that correct?
19       A.    I believe some of the old tabs
20   were done before I -- before we were retained
21   on this matter.
22       Q.    We --
23       A.    Before we --
24       Q.    Before we, FTI?
25       A.    Before we, FTI, were retained on

Page 129

1        - STEPHEN D. PROWSE -
2    this matter when Mr. Beloreshki was at NERA.
3    But regardless of what was done then, we redid
4    or did anew all of the statistical analyses
5    that we thought was required for this report.
6        Q.    Well, specifically what
7    statistical analyses was done for the report,
8    Exhibit No. 4, after you were retained?
9        A.    The statistical analyses breaks
10   down into three groups:  There is the
11   regression analysis, where we asked for 18
12   regressions to be performed, nine in the
13   period -- the entire trading period for Rhino,
14   and the same nine for a smaller period, March
15   1st through May 31st, 2001.
16           Then we ad -- then we directed
17   tests to be run, nonparametric statistical
18   tests and parametric statistical tests to be
19   run.  Again, in those two periods; the longer
20   period that encompasses all of Rhino's trading
21   and the shorter period, March 1 through May 31,
22   2001.  And those tests were performed.  And
23   some, but not all, were actually reported in
24   the report.  But my understanding is all of
25   the -- all of that analysis was produced.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 130

```
 1              - STEPHEN D. PROWSE -
 2      Q.    Well, I understand that.  But take
 3  a look at Exhibit 14 again.
 4              Is there any regression in Exhibit
 5  No. 14 that wasn't done prior to your retention
 6  to sign on to Exhibit No. 4?
 7      A.    Is there any regression that
 8  wasn't done --
 9      Q.    -- prior to you being hired to
10  prepare the report, Exhibit No. 4.
11      A.    Well, I don't know exactly what
12  was done prior to me being retained.
13      Q.    Okay.  So, then, you don't know
14  whether or not anything was done new after you
15  were retained?
16      A.    I know that everything was done
17  new in the sense that the regressions were
18  rerun.  Even if they had been run -- even if --
19  even if the same specification had been run on
20  the same time period prior to our engagement,
21  prior to FTI's engagement, I know that that
22  regression was rerun after we were engaged.
23      Q.    And --
24      A.    So -- and the regressions and the
25  statistical analysis that were either done anew
```

Page 131

```
 1              - STEPHEN D. PROWSE -
 2  or redone, I just described to you.
 3      Q.    Okay.  Now, just take Exhibit 14.
 4  You said there's statistical regression
 5  analyses for March 1st through May 31.  And
 6  there's a similar sheet for the longer time
 7  period.  Each of these regressions has certain
 8  variables included in it.
 9              Did you participate in deciding
10  what the variables were to be included in each
11  of these regressions you had done?
12      A.    I participated in deciding that we
13  should run nine regressions and that -- and the
14  specification of those regressions.
15      Q.    Okay.  Let's take -- did
16  someone -- when you made that decision, did
17  someone tell you that they had done nine
18  regressions and what the specifications were in
19  those regressions?
20      A.    Yes.
21      Q.    Okay.  And --
22      A.    And what the results were.
23      Q.    Okay.  And did you then tell them
24  to go back and redo those specific regressions?
25          MR. SOHN:  Objection to form.
```

Page 132

```
 1              - STEPHEN D. PROWSE -
 2      A.    Well, I'm not sure I understand
 3  your question.  I directed Erica Rose to do
 4  nine regressions in both periods.  She reported
 5  back to me the results of those nine
 6  regressions.
 7      Q.    Okay.  Now --
 8      A.    In each period.
 9      Q.    Were any of those nine regressions
10  different from the nine regressions you were
11  told had previously been performed?
12      A.    I wasn't told anything about what
13  was previously performed.
14      Q.    I thought you told me that
15  initially you were told nine regressions were
16  performed and you told them to go back and redo
17  them?
18      A.    No, I wasn't told -- no, I didn't
19  say that.  What I said was --
20      Q.    Well, the record will show what
21  you said.
22      A.    -- that my understanding is that
23  some of the regressions that I asked to be run
24  may have been run -- may have been run in a --
25  prior to FTI being retained on this matter and
```

Page 133

```
 1              - STEPHEN D. PROWSE -
 2  over a similar time period.
 3      Q.    In Exhibit 14, okay, is there any
 4  regression in here that you know had not been
 5  run prior to being retained?
 6      A.    I'm not sure.  I don't believe,
 7  although I may be wrong, I don't believe that
 8  the period March 1 through May 31 was looked at
 9  prior to FTI being retained.  I may be wrong on
10  that, but that's my belief.
11      Q.    Okay.  But that's a time issue.
12  Okay?  I'm asking you about --
13      A.    Right.  A time period defines a
14  regression.
15      Q.    Okay.  Well, okay, fine.  You
16  didn't answer.
17              But putting the time period aside,
18  were any of the models for the regressions, can
19  you point to any of those that you directed be
20  done after you became part of the team working
21  on the report that had not been done prior to
22  the time you became a member of the team?
23      A.    My understanding is that the
24  models that Tsvetan -- that Mr. Beloreshki and
25  I agreed were the appropriate models to be run
```

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

---

Page 134

- STEPHEN D. PROWSE -
1    - STEPHEN D. PROWSE -
2    were similar to the models that had been run
3    prior to FTI being retained.
4        Q.    Do you know, can you tell us how
5    they differed in any way?
6        A.    I can't -- I can't tell you that.
7        Q.    Can you tell me that they did?  Do
8    you think --
9        A.    I can't tell you that they did
10   differ.
11       Q.    Now, the -- you indicated that you
12   also asked Erica to do economic analyses that
13   were different than the regression analyses
14   that are reflected in Exhibit No. 14.  Is
15   that -- is that correct?
16       A.    I believe what I said was -- I
17   asked for nonregression analysis to be done.
18       Q.    Can you give us an example of what
19   you mean by a nonregression analysis by looking
20   at Exhibit No. 4?
21       A.    For example, all of the analysis
22   in Section 3 of the report.
23       Q.    That's paragraphs 34 through --
24       A.    Forty-eight.
25       Q.    Through 50.  Right?

---

Page 135

1    - STEPHEN D. PROWSE -
2        A.    Oh, through -- through 50.
3    Correct.
4        Q.    Okay.  Now --
5        A.    And, in addition, there's other
6    nonregression analysis.
7        Q.    Let's just stick with that.
8        A.    Okay.
9        Q.    There -- there are other
10   nonregression analysis they asked you to do.
11   But, first, is this analysis -- the analysis
12   that is reflected in 34 through 50.  Okay?
13            Were any of those analyses,
14   analyses that had not been done prior to you
15   becoming a part of the team to prepare Exhibit
16   No. 4?
17       A.    I don't know what had been done
18   prior and what hadn't.
19       Q.    Okay.  So you don't know whether
20   or not any of these were new?
21       A.    I don't know whether any of these
22   were new in the sense that they had not been
23   done prior.
24       Q.    Now, did you direct -- look at
25   paragraph 35.  I'm back to my problem with

---

Page 136

1    - STEPHEN D. PROWSE -
2    understanding what market manipulation means.
3        Do you see the sentence, the last
4    sentence says, "In other words, the decline in
5    Sedona's stock price was consistent with
6    factors that were unrelated to the alleged
7    market manipulation by Rhino."
8            I used the term "Badian."  We'll
9    use your term.
10           What do you mean by "the alleged
11   market manipulation"?  What is the alleged
12   Market manipulation you're referring to
13   there?
14       A.    I believe the alleged market
15   manipulation is referring to the allegations
16   that Rhino engaged in market manipulation to
17   move the stock price in certain directions.
18       Q.    And what was the market
19   manipulation Rhino was alleged to have engaged
20   in based on your understanding of the
21   Complaint?
22       A.    Well, their -- their Complaint's
23   not entirely clear as to the period that is
24   encompassed by the manipulation.  There's a
25   variety of different periods that are talked

---

Page 137

1    - STEPHEN D. PROWSE -
2    about.  But I would say it goes from, maybe,
3    January '01 through April or May of '01.
4        Q.    Okay.  So that's one.  Badian was
5    actually -- you use Rhino -- active during that
6    period of time.
7            And what activity do you
8    understand was manipulative during that time
9    period, or was alleged to have occurred in that
10   time period?
11       A.    I think it's alleged that Badian
12   is alleged to have -- or that Rhino is alleged
13   to have traded in a manner to try to drive the
14   stock price down and to inject false
15   information into the market.  I think that's
16   the allegations.
17       Q.    Okay.  Now, I read the Complaint.
18   I don't see where it says Rhino is the one who
19   pushed the price down.  I see allegations that
20   Badian pushed the price down and Badian said
21   certain things at certain times.
22           Is the Complaint about Rhino or is
23   it about Badian?
24       A.    I would have to look at the
25   Complaint to understand that.  My understanding

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 138

- STEPHEN D. PROWSE -
1
2    through counsel is that there's maybe a
3    complicated relationship with the various
4    trades and that we were just to assume that
5    Rhino -- we were just to use "Rhino."  And I
6    think that's what we agreed upon in our initial
7    discussion.
8        Q.    So you agreed that you would use
9    the term "Rhino" with counsel for Mr. Badian?
10       A.    Just at instruction of counsel.  I
11   don't have an opinion on --
12       Q.    No, I understand.  I'm just --
13       A.    -- on the actual engagement of the
14   trades.
15       Q.    Okay.
16       A.    And to the -- to the extent I can
17   see the data and I can see who trades, then I
18   can see it's, you know, through Pond and Refco,
19   but I don't have an opinion as to whether it's
20   Badian or Rhino.
21       Q.    But you were told to use the term
22   "Rhino"?
23       A.    I was -- we were asked to use the
24   term "Rhino."  That was not part of our task to
25   determine --

Page 139

- STEPHEN D. PROWSE -
1
2        Q.    Who asked you to use the term
3    "Rhino"?
4        A.    Counsel.
5        Q.    Which counsel?
6        A.    I can't remember.  Someone at DLA
7    Piper.
8        Q.    Okay.  Someone representing
9    Badian?
10       A.    Someone representing Badian,
11   correct.
12       Q.    Now, one of the allegations you
13   said is that Badian traded to push the price
14   down.  Is that alleged in the Complaint?  Is
15   that your understanding of the Complaint?
16       A.    I would have to look at the
17   Complaint to be more specific, but I think one
18   of the allegations is that the trades were
19   alleged to have been -- were alleged to have
20   pushed the price down, yes.
21       Q.    Okay.  And it was alleged that
22   Badian intended to push the price down.
23            Is that your understanding?
24       A.    I can't remember.
25       Q.    Okay.

Page 140

- STEPHEN D. PROWSE -
1
2        A.    I'd have to look at the Complaint
3    to be specific.
4        Q.    You're not opining on Badian's
5    intent, are you?
6        A.    No, I'm not -- I'm not opining on
7    Badian's intent.
8        Q.    You're not opining anything on the
9    state of mind?
10       A.    I'm not.
11       Q.    I mean, so, when you use the term
12   "market manipulation," you're really talking
13   about affecting price movement.
14            Is that a fair characterization?
15       A.    I think that would be a fair
16   characterization.
17       Q.    Okay.
18       A.    Affecting price movement.
19       Q.    And, also, another use of the term
20   "market manipulation" is interjecting of false
21   information into the marketplace?
22       A.    I think that's a -- I think that's
23   actually a legal requirement based on my lay
24   understanding of the law.
25       Q.    Where'd you -- where'd you get

Page 141

- STEPHEN D. PROWSE -
1
2    that understanding from of the law?  From
3    Mr. Sohn?
4        A.    No.
5        Q.    From Ms. Schechtman?
6        A.    No.  Just general knowledge.
7        Q.    Based on your reading ASTI, which
8    you asked Ms. Schechtman to send you?
9        A.    Maybe reading ASTI, yeah.
10       Q.    What about reading GFL?
11       A.    I can't remember if I've read -- I
12   don't know what you refer to as GFL.
13       Q.    Well, did you read Ms. Schechtman
14   and Mr. Beloreshki's piece before you prepared
15   your report?
16       A.    Yes.
17       Q.    Okay.  Could you have gotten it
18   from that?
19       A.    I don't know.  I'd have to look.
20       Q.    We'll take a look.
21            So, one of the questions in this
22   that you were addressing is whether or not
23   false information was reported to the market?
24       A.    No, that's what -- you asked what
25   I thought was alleged in the Complaint, and I

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010

New York, NY

Page 142

1              - STEPHEN D. PROWSE -
2    think that is alleged in the Complaint.
3         Q.    So, when you say that there was no
4    market manipulation, are you saying there was
5    no false information interjected into the
6    marketplace here based on your analysis of the
7    Sedona trades by Badian?
8         A.    I can't say that the -- the
9    statistical analysis we do shows no support for
10   that allegation.
11        Q.    I see.
12             Did you -- but I thought you said
13   the statistical analysis just told you whether
14   the price moved or didn't move.
15        A.    That's correct.  And if there's
16   false information interjected into the market,
17   you would expect the price to move.
18        Q.    Does the SEC have to show that the
19   price moves to bring a 10b case for injecting
20   of false information into the market?
21             MR. SOHN:  Objection.  This is a
22   totally inappropriate question --
23        A.    I don't know what -- I don't know
24   what the law is.  I'm not a lawyer, so I can't
25   speak to that.

Page 143

1              - STEPHEN D. PROWSE -
2         Q.    Well, it sounded like that's what
3    you were saying.  I'm just asking you to
4    clarify.
5         A.    No, what I'm saying is that the
6    statistical analyses we do shows no support for
7    any -- any notion that Rhino's trades at any
8    time influenced the price.  One --
9         Q.    Did you look at --
10        A.    Can you let me finish, please?
11             MR. SOHN:  Mr. Guido, he is --
12        Q.    I'm sorry.
13        A.    Can you let me finish?
14        Q.    I'm sorry.
15        A.    I'm sorry, you'll have to -- could
16   you read me back my answer?
17             (Whereupon, the record is read
18   back.)
19        A.    Influenced the price.  And
20   presumably the only way false information --
21   false information injected into the market can
22   work is if it moves the price.
23        Q.    Well, let me ask you something:
24   Did you -- did you see any wash trades between
25   the Westminster Emerald account and the Refco

Page 144

1              - STEPHEN D. PROWSE -
2    Emerald account when you reviewed the trade
3    data?
4         A.    Again, wash trades is a term that
5    -- I think that's a legal or a tax term.  I'm
6    not a tax expert.  I'm not a legal expert.  I
7    noticed some trades identified -- maybe alleged
8    as wash trades and maybe identified by Glosten
9    and Jones in their report as alleged trades.
10             So I'm aware of those -- I'm aware
11   of those trades, if that's what you're asking.
12        Q.    Well, what's your -- what's your
13   understanding of the term "wash trade"?
14        A.    I have a very general, lay
15   understanding of a wash trade.
16        Q.    Okay.  And what is it?
17        A.    A trade made by the same person, a
18   buy and a sell, in order to reap some tax
19   advantage.
20        Q.    So, in other words, it's a trade
21   by me in my account at what used to be Merrill
22   with me in my account at Schwab.  Is that a
23   wash trade?
24             MR. SOHN:  Objection.
25        Q.    It's a hypothetical.

Page 145

1              - STEPHEN D. PROWSE -
2         A.    Well, again, I'm not a tax expert
3    and I'm not a legal expert.  So my
4    understanding is either a trade made by -- a
5    sell followed by an immediate buy by me,
6    regardless of who the parties are, of the same
7    stock in order to gain a tax -- tax advantage.
8             That's my -- that's my lay
9    understanding.  I don't have a good legal
10   understanding of what a wash trade is.  I know
11   there are some alleged wash trades in the
12   Complaint and I know what they are and I know
13   they've been identified.
14        Q.    Didn't you claim to be an expert
15   at the outset of your testimony on financial
16   markets?
17        A.    Financial markets, financial
18   instruments, financial risks associated with
19   financial instruments.  The risks associated
20   with small firms raising finance.  Yes, all
21   that.
22        Q.    What about an expert in trading
23   -- trading in financial instruments?  Are
24   you an expert in trading in financial
25   instruments?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

Page 146

1           - STEPHEN D. PROWSE -
2       A.   I believe I have the expertise to
3   analyze the impact of trading, yes.
4       Q.   Well --
5       A.   On the stock price.
6       Q.   I mean, could one of the things
7   that you might be curious about is whether or
8   not trades are being reported between the same
9   person?
10      A.   I know what those trades are --
11           MR. SOHN:  Objection.
12      A.   -- and they were taken into
13  account in our analysis.
14      Q.   They were?
15      A.   Yeah.
16      Q.   Look at -- where do you see the
17  Westminster to Refco trades taken into account
18  in your expert report?
19      A.   We took account of all the trades
20  made by the accounts in this matter.  And
21  whether they were -- whether they were normal
22  market trades, whether they were what you might
23  call wash trades.  They're all in our data.
24  They're all in our data.  So in our analyses
25  they are taken into account.

Page 147

1           - STEPHEN D. PROWSE -
2       Q.   Did you do a separate analysis of
3   the wash trades to see what their impact was in
4   the sells?
5       A.   We didn't do a separate analysis,
6   but we did an analysis with them in it.
7       Q.   Did you do an analysis comparing
8   those transactions with other sets of
9   transactions?
10           MR. SOHN:  Objection to the form.
11      A.   What are those transactions?
12      Q.   In the -- take, for example, the
13  wash trades between April 12th and April 19th,
14  2001 between Westminster and Refco and
15  compare those to the transactions in October of
16  2000.
17           MR. SOHN:  Objection to the form.
18      A.   In the sense that they're all in
19  the database, yes, we did that.
20      Q.   But --
21      A.   We took account of them.
22      Q.   But the database doesn't compare
23  the two, does it?
24      A.   It includes them in the regression
25  analysis and in the statistical analysis, so it

Page 148

1           - STEPHEN D. PROWSE -
2   will -- it will account for the effect -- the
3   effect of both of them.
4       Q.   But it doesn't do a comparative
5   analysis of the two?
6           MR. SOHN:  Objection to form.
7       A.   It doesn't do a comparative
8   analysis, no.
9       Q.   Thank you.
10           Now, you -- you make some
11  statements in here about you had Erica do some
12  studies about non -- about market and industry
13  peer group factors.  And one of the questions I
14  think I asked you earlier is, had you done any
15  regression analyses on the relationship between
16  Sedona's stock price movement and the NASDAQ
17  price movement?  And you indicated you had and
18  that for the longer period of time, it showed
19  the statistical correlation, and for the
20  shorter period of time it did not.
21           Now, my question for you is, did
22  you do a similar analysis for the peer groups?
23      A.   By "similar analysis" you mean
24  analysis -- a regression analysis involving the
25  peer groups?

Page 149

1           - STEPHEN D. PROWSE -
2       Q.   Uh-huh.
3       A.   No, we did not.
4       Q.   Why not?
5       A.   I can't think of a particular
6   reason why we didn't.  I just can't think here,
7   sitting here right now, what the reason was if
8   there was a reason.
9       Q.   Was the reason because the
10  capitalization was different in those
11  entities?
12      A.   No.
13           MR. SOHN:  Objection to form.
14      A.   That wouldn't have been the
15  different -- that wouldn't have been the
16  reason.  Capitalization of the NASDAQ is
17  different.
18      Q.   Are there -- were there reasons
19  because you couldn't develop a sufficient
20  database to do an analysis?
21      A.   I can't -- sitting here, I can't
22  think of the reason why we didn't do that
23  specific piece of analysis.
24      Q.   But you determined that it wasn't
25  going to be done?

Stephen David Prowse, Ph.D.                                                                      March 5, 2010

New York, NY

Page 150

- STEPHEN D. PROWSE -
1
2      A.    For a reason I can't remember.
3      Q.    But you did, for a reason, decide
4  not to do it?
5            MR. SOHN:  Objection.
6      A.    For some reason.
7      Q.    Was it a good reason or a bad
8  reason?
9            MR. SOHN:  Objection.
10     A.    Sitting here, I can't remember
11 what the reason was.
12     Q.    It was just a reason.
13     A.    I can't remember what the reason
14 was.
15     Q.    But you did discuss it with
16 Ms. Beloreshki?
17     A.    Well, I can't remember -- I can't
18 remember --
19     Q.    Mr. Beloreshki, excuse me.
20     A.    I can't remember discussing it
21 with Mr. Beloreshki.  If I did remember
22 discussing it, I probably would have remembered
23 more of the context around the discussion.
24     Q.    But you just didn't do it?
25     A.    I just -- it's not here.

Page 151

- STEPHEN D. PROWSE -
1
2      Q.    It's not here.  Okay.
3            Now -- then you talk about the
4  company-specific factors starting on page 9.
5  And I think I had asked you whether you did any
6  regression analysis to determine whether or not
7  any of the events that you talked about had an
8  impact on the -- on the stock price.  In the
9  event study, excuse me, that had an impact on
10 the price.  And you indicated you had not done
11 that.
12     A.    No, that's not correct.  You were
13 talking about Exhibit 8.  And you had asked me,
14 Did you do an event study around the FPS
15 issuance?
16     Q.    Okay.
17     A.    The serial FPS issuance that
18 Sedona went through throughout its life.  And I
19 said, no, we didn't do an event study there.
20 That wasn't the point of this chart.
21     Q.    Okay.
22     A.    We did do event studies, and
23 that's what the regression results are.  They
24 are event studies looking at the impact of
25 the -- of the Rhino trading.

Page 152

- STEPHEN D. PROWSE -
1
2      Q.    Well, did you do an event study on
3  the issuance of 10-Ks?
4      A.    We did not do an event study on
5  the issuance of 10-Ks.  There wouldn't be a
6  reason to.
7      Q.    Did you do any event studies on
8  the company's issuance of equity securities?
9      A.    We did not do an event study on
10 the company's issuance of equity securities.
11     Q.    Did you do an event study on
12 any -- any news releases from the company?
13     A.    Actually, I want to qualify that
14 last statement.  To the extent that the equity
15 issuances were issuances of stock to Rhino, we
16 covered that in our database.  So we looked at
17 that.
18           And, also, to the extent your
19 question covers issuance of stock due to
20 conversions, we looked at that, as well.  So I
21 just want to qualify that last answer.
22           And then, with regards to question
23 about news events, we did not do a study, an
24 event study, regarding news events.
25     Q.    I understand your answer, and I

Page 153

- STEPHEN D. PROWSE -
1
2  think I understood the reason for your answer
3  to my question.  But my question -- my
4  question, I think, hasn't been answered.
5            And my question is, did you do a
6  specific event study on the issuance -- around
7  the issuance of securities by Sedona?
8            MR. SOHN:  Asked and answered.
9      A.    Yes, to the extent that -- to the
10 extent that that covers Rhino's purchase of
11 shares from Sedona and the conversions.
12     Q.    Well, is your answer yes, because
13 you included it in the regression analyses that
14 are in Exhibit No. 4?
15     A.    The regression analysis and the
16 nonregression analysis.
17     Q.    What's the --
18     A.    The statistical -- the parametric
19 and nonparametric analysis, I believe.  I
20 believe that includes that, too.  I'm not
21 sure.
22     Q.    Show me in Exhibit No. 4.
23     A.    Well, I believe that some of the
24 parametric tests we ran -- I would have to go
25 back and check, but I believe some of the

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

Page 154

1         - STEPHEN D. PROWSE -
2    parametric tests we ran cover conversions and
3    direct issuance of stock. I don't think any of
4    the ones reported in the -- in the exhibits to
5    Deposition Exhibit 4 do that, but I think some
6    of the other parametric or nonparametric tests
7    may do that.
8         Q.    But you can't point to anything in
9    this report, an event study on each of those
10   specific events?
11        A.    Well, this -- this wouldn't be an
12   event study. This would be a statistical
13   analysis of what happens to the stock price on
14   days when Rhino buys stock from Sedona. It
15   would be an analysis similar in concept to the
16   analyses in Exhibits 10 and 11, but it would
17   cover -- it would cover direct purchases or
18   conversions.
19        So I'm not entirely sure, but I
20   think -- I think we may have done that in some
21   of the other non -- nonregression tests.
22        Q.    But it's not included in this
23   expert report, is it?
24        A.    There's not an exhibit that
25   reports the results of those non --

Page 155

1         - STEPHEN D. PROWSE -
2    nonregression statistical tests.
3         Q.    Oh, okay.
4         Do you know what the percentage of
5    significance was in those regression event
6    studies?
7         MR. SOHN: Objection to form.
8         A.    Well, there's -- there's a
9    different "P" value for every regression, every
10   coefficient. So if you're asking me to recite
11   to you all the "P" values, I would have to go
12   and look at them to do that. So I'm not sure
13   what you're asking.
14        Q.    Well, were there any "P" values
15   that were calculated for each of those events?
16        MR. SOHN: Objection to form.
17        A.    Each of what events?
18        Q.    The issuance of stock.
19        A.    As a -- yes, there was, I believe.
20        Q.    Is that in the documents that you
21   pulled together on that disk that you provided
22   to counsel after you received the subpoena in
23   this case?
24        A.    No, it's in the results of
25   Regression 3 in the report.

Page 156

1         - STEPHEN D. PROWSE -
2         Q.    And in Regression 3 in your
3    report, as I review the report, Regression
4    Number 3 talks about various files --
5         A.    Right.
6         Q.    -- which were included in the
7    data, but there's no stand-alone regression
8    analysis for each of the stock issuances in an
9    event study to determine what that particular
10   event impact was on the price of Sedona stock,
11   was there?
12        A.    There absolutely is, and that's
13   the coefficient under the Rhino principal in
14   Regression 3. That looks at the events of
15   Rhino buying principal. And that principal
16   includes two things: One, conversions; two,
17   direct purchases.
18        Q.    What column is that?
19        A.    Well, it depends how you count the
20   columns, but it's the column entitled "Rhino
21   principal" in quotation marks in Exhibit 13A
22   and 13B.
23        Q.    I'm sorry, I'm asking you to look
24   at Exhibit 14. Tell me where.
25        A.    Okay. So this may take a while.

Page 157

1         - STEPHEN D. PROWSE -
2         Q.    I'll make it easy for you. Look
3    at AQ.
4         A.    AQ. Okay. So AQ looks to be
5    Regression 3. AQ.
6         Q.    It's a subcategory of Regression
7    3, isn't it?
8         MR. SOHN: Objection to form.
9         Q.    I think that's referred to as a
10   leading question, Mr. Prowse.
11        A.    Sorry, I was trying to find the --
12   find the right Regression 3 here. I'm trying
13   to match it up with -- oh, I'm probably looking
14   at the wrong exhibit here.
15        Q.    You're look -- I mean, I've asked
16   you to look at Exhibit 14.
17        A.    I am. I am.
18        Q.    And I suggested you take a look at
19   Column AQ.
20        A.    Yes, that's correct. That's
21   the -- that's the coefficient that is reported
22   in Exhibit 13B.
23        Q.    Okay.
24        A.    And that matches to Column AQ.
25        Q.    Okay. Now, the principal in AQ,

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 158

- STEPHEN D. PROWSE -

1      - STEPHEN D. PROWSE -
2   okay, does that show that there's a
3   statistically significant correlation between
4   the issuance of stock and Sedona stock
5   prices?
6       A.   It shows that there's not a
7   statistically significant relationship between
8   issuance of stock as I have defined it and
9   Sedona stock price.
10      Q.   Okay.
11          MR. GUIDO:  And why don't we take
12   a break.  I think that the videographer needs
13   to change a tape.
14          THE VIDEOGRAPHER:  This concludes
15   Tape Number 2 in the videotaped deposition of
16   Mr. Stephen Prowse.  Going off the record at
17   2:16 p.m.
18       (A recess is taken.)
19          THE VIDEOGRAPHER:  This begins
20   Tape Number 3 in the videotaped deposition of
21   Dr. Stephen Prowse.  Going back on the record
22   at 2:24 p.m.
23   BY MR. GUIDO:
24      Q.   The -- take a look at Exhibit No.
25   12, that Pet Quarters rebuttal report.

Page 159

1      - STEPHEN D. PROWSE -
2          The -- do you recall preparing the
3   rebuttal report in Pet Quarters?
4       A.   Yes.
5       Q.   And do you recall that one of your
6   criticisms of the -- I -- you referred to it as
7   the Shapiro/Pham report, is that they had
8   failed to do regression analyses to support
9   their claims that certain events had an impact
10   on the market, or the price of Pet Quarters'
11   stock.
12          Do you recall that?
13      A.   If you can direct me to where in
14   my report I say that, it would be helpful.
15      Q.   Well take -- it's very easy.  Take
16   a look at paragraph 7 of your report.
17      A.   Yes.
18      Q.   You see where you point out that
19   there's a need to do an event study if you
20   argue that any particular event had an impact
21   on -- on stock price?
22      A.   Yes, I see that.
23      Q.   And you criticize them for
24   Shapiro -- the Shapiro/Pham report for not
25   doing so?

Page 160

1      - STEPHEN D. PROWSE -
2       A.   Correct.
3       Q.   Okay.  Would it be fair to
4   criticize your report for making allegations
5   about Sedona's stock price performance and its
6   financial condition and its issuance of
7   convertible debentures and the performance of
8   its peers in NASDAQ without doing a regression
9   analysis?
10          MR. SOHN:  Objection; compound.
11      A.   No, it wouldn't.
12      Q.   Why not?
13      A.   Well, in part because we do a
14   regression analysis that takes into account
15   some of the variables you mentioned:  NASDAQ,
16   issuance of stock and, the most important
17   variable, trades or transactions by Rhino.
18          The discussion that we have in
19   Section 3 of our report regarding other factors
20   that influenced Sedona's stock is meant to be
21   illustrative as opposed to, you know,
22   quantitative.
23      Q.   Oh, okay.  So you didn't attempt
24   to quantify, and you don't believe you had a
25   responsibility to do that, even though you said

Page 161

1      - STEPHEN D. PROWSE -
2   that Shapiro Pham had a responsibility to do
3   that?
4          MR. SOHN:  Objection.
5       A.   Well, Shapiro/Pham -- I can't
6   remember exactly what Shapiro/Pham were doing,
7   but they didn't -- I think they were alleging
8   to estimate the response of a stock price to a
9   particular announcement.
10      Q.   Well --
11      A.   We are -- I'm not finished.
12      Q.   Excuse me.
13      A.   We are in the context of doing an
14   event study.  We do an event study with regards
15   to Rhino's trades in the context of pointing
16   out reasons why Sedona's stock price can be
17   expected to be, A, highly volatile, and, B, to
18   fall.
19          We are -- we are performing sort of
20   illustrative examples of the types of things
21   that would cause the stock price to be volatile
22   and to -- and to fall.
23      Q.   You used illustrative examples
24   without doing a regression analysis of those
25   illustrative examples.  And --

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 162

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2        A.    We did -- we did do a regression
3    analysis of some of the variables you
4    mentioned.
5        Q.    In NASDAQ?
6        A.    And issuance of stock.
7        Q.    And you found that there was no
8    statistically significant relationship between
9    those two, between --
10       A.    Between Rhino -- between issuance
11   of stock to Rhino and stock price.
12       Q.    Now, the -- the other thing I
13   found of interest in your rebuttal report was
14   your critique of the Shapiro/Pham report's
15   reliance on the certain kinds of trades.  And
16   if you look at paragraph 48, I think is where
17   you address that.
18             I think that in this section
19   you're addressing the question of what are
20   known as wash trades; and that is trades
21   between accounts in which the same person is
22   the beneficiary of it.
23             Is that a fair characterization of
24   what you're addressing in these paragraphs 48
25   through 52?

Page 163

1    - STEPHEN D. PROWSE -
2        MR. SOHN:  Objection to form.
3        A.    Forty-eight through 53?  Did you
4    say 48 through 53?
5        Q.    Well, okay, 53.  I mean, I think
6    it stopped -- for our purposes it stops at
7    paragraph 52.  I think 53 addresses a different
8    issue.
9        A.    Well, I don't see the term "wash
10   trades" anywhere in this section, so I'm not
11   sure what you mean by that.
12       Q.    Well, it talks about trading
13   between matched buyers.  Right?
14       A.    It talks about respondents' trades
15   between accounts.
16       Q.    Okay.  And are those between --
17   were the facts in those cases the accounts were
18   owned by the same party?
19       A.    I -- I can't recall.  It's been a
20   long time since I reviewed this report.
21       Q.    Weren't those transactions between
22   Westminster and Refco Emerald accounts?
23       MR. SOHN:  Objection to form.
24       A.    Are you talking about the Pet
25   Quarters report?

Page 164

1    - STEPHEN D. PROWSE -
2        Q.    Yeah.
3        A.    I can't remember.
4        Q.    You don't remember?
5        A.    I'd have to review this report in
6    detail and review the data.  So, just reading
7    this, I can't tell.  But I do believe we're
8    looking at trades between accounts and we are
9    criticizing their analysis.
10       Q.    Okay.  Well, I mean, paragraph 48
11   says that you're addressing the question of
12   transactions between the respondents' own
13   accounts?
14       A.    Yes.
15       Q.    And wasn't that a part of the
16   trading with itself?
17       MR. SOHN:  Objection to form.
18       A.    I'm not sure I necessarily agree
19   with it.  I used the language that I've used
20   here.  What's -- --
21       Q.    What's -- what's a respondent?
22       A.    The respondent in this matter is
23   the defendants.
24       Q.    Okay.  And the paragraph is
25   addressing those defendants trading with

Page 165

1    - STEPHEN D. PROWSE -
2    themselves in two different accounts?
3        A.    Transactions between defendants'
4    own accounts.  Correct.
5        Q.    Okay.  And that you conclude that
6    the Shapiro/Pham report improperly concluded
7    that those transactions interjected false
8    information into the market that resulted in a
9    price decline.
10             Isn't that what you concluded?
11       A.    We criticized their analysis.
12       Q.    Okay.  And what was the critique
13   of their analysis that you made?
14       A.    Well, it's detailed in paragraphs
15   50 through 52 or maybe 53.
16       Q.    Okay.  Well, was one of your
17   criticisms that the transactions were
18   transactions that were executed at or near the
19   ask price as opposed to the bid price?  And,
20   so, therefore the information interjected in
21   the market tended to be positive for the price
22   of Pet Quarters' stock?
23       MR. SOHN:  Objection to the form.
24       A.    I think we say the only way that
25   they, the trades, might inject negative

42 (Pages 162 to 165)

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

Page 166

1          - STEPHEN D. PROWSE -
2    information into the market would be if they
3    were executed at prices below the bid at the
4    time of the trade.
5        Q.    Okay.  Take a look at --
6        A.    So if their --
7        Q.    Take a look at the very last page
8    of Exhibit No. 12.
9        A.    Is that Exhibit 2?
10       Q.    Yes.  What is Exhibit 2?
11       A.    Exhibit 2 is an exhibit which
12   shows some analysis regarding paragraph 52.
13       Q.    Okay.  And are these intra-day
14   transactions?
15       A.    Intra-day transactions?
16       Q.    Yeah.  I mean, is this evaluating
17   intra-day data?
18       A.    This is evaluating trades.
19       Q.    In relationship to what?
20       A.    To a bid-ask spread.
21       Q.    The bid-ask spread when during the
22   day?
23       A.    I believe at the same time the
24   trade was made.  I would have to --
25       Q.    So this was --

Page 167

1          - STEPHEN D. PROWSE -
2        A.    I would have to confirm that.
3        Q.    Okay.  But it's your understanding
4    that that's what this does?
5        A.    That's my belief.
6        Q.    So is this an analysis of
7    intra-day trading?
8        A.    This is an analysis of trades made
9    with the -- with the bid-ask spread.
10       Q.    Okay.  At -- at or near the time
11   of the bid-ask spread?
12       A.    At or --
13             MR. SOHN:  Objection to the form.
14       A.    At or near the time of trade.
15       Q.    Now, paragraph 53 seems to be
16   talking about the Shapiro/Pham report's failure
17   to exclude nonmarket transfers from its
18   analysis.  Is that a fair --
19       A.    No, it's not fair.
20       Q.    -- inference to be drawn from that
21   paragraph?
22       A.    No.
23       Q.    So, why was it important to say
24   that there were three nonmarket transfers?
25       A.    I think the intent here was to say

Page 168

1          - STEPHEN D. PROWSE -
2    that if there was an intent by respondents in
3    this matter, the Pet Quarters matter, to inject
4    false information into the market, the
5    Shapiro/Pham report fails to offer an
6    explanation for why all inter-account --
7    inter-account transactions were not in the form
8    of sales.
9             If that was the intent, to inject
10   false information into the market, then why
11   aren't they all in the form of sales as opposed
12   to nonmarket transfers?
13       Q.    So, I think what -- I'm a little
14   puzzled by what you just said and let me -- let
15   me ask you a few questions.
16             Now, what you're saying is, is
17   that there couldn't have been false information
18   interjected into the market by nonmarket
19   transfers?
20       A.    What I'm saying is if there was an
21   intent to inject false information into the
22   market, there's a failure to explain why all
23   the accounts were not in the form of sales.
24   Because that would seem to be the easiest way
25   to transmit information.

Page 169

1          - STEPHEN D. PROWSE -
2        Q.    Into the market.
3        A.    Into the market.
4        Q.    Okay.  And that would be important
5    to know how the nonmarket trans -- transfers
6    interjected false information into the market?
7        A.    It would be important to know if
8    the market -- if the market transactions had an
9    effect on the stock price.
10       Q.    And it would be important to
11   factor out the nonmarket transactions to
12   determine whether or not the market
13   transactions did have an impact?
14       A.    That would be one way to do it.
15   And that's the way we do it, in fact, in our
16   analysis in the Sedona matter.
17       Q.    Well, which regressions that you
18   did that are included in your report exclude
19   nonmarket transactions?
20       A.    So, I'm going to need to get my
21   report.
22             MR. SOHN:  Here.
23       A.    So, if you turn to Exhibit 13 --
24   and you asked specifically about regressions
25   that excluded nonmarket transactions.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                            March 5, 2010
New York, NY

Page 170

1          - STEPHEN D. PROWSE -
2    Correct?
3        Q.    That's correct.  That's correct.
4        A.    Okay.  So that would be Regression
5    1, Regression 2, Regression 3 and Regression 4.
6    They all either exclude them or separate them
7    out.
8        Q.    No, but the regression -- take a
9    look at -- take a look at Exhibit No. 14, which
10   is the backup for this, and tell me which one
11   of those columns of the regressions exclude
12   nonmarket transactions.
13       A.    Well, we discussed this at length
14   in the morning.  And I'm not sure what you mean
15   by "columns," but --
16       Q.    Well, I mean at the top it has the
17   letters at the top.  That's what I mean by
18   columns.
19             Which one of your regressions
20   exclude nonmarket transactions?
21       A.    Well, the regressions in this
22   Exhibit 14 that match up with Regression 1,
23   Regression 2, Regression 3 and Regression 4 in
24   Exhibit 13A or Exhibit 13B are the ones which
25   either exclude nonmarket transactions or

Page 171

1          - STEPHEN D. PROWSE -
2    separate them out separately from market
3    transactions.
4        Q.    Okay.  Which ones exclude?  Forget
5    the separate out.
6        A.    The ones that exclude nonmarket
7    transactions are Regressions 1, 2 and 4.
8        Q.    Look at Exhibit No. 15.
9             MR. SOHN: Fifteen?
10            MR. GUIDO: Fifteen.  Deposition
11   Exhibit No. 15.
12       Q.    And also look at Deposition
13   Exhibit Number --
14            MR. GUIDO:  Can I get back the two
15   most recent exhibits?
16            MR. SOHN:  Twenty-four and --
17            MR. GUIDO:  Those.
18            MR. SOHN:  Here are the most
19   recent ones.
20   BY MR. GUIDO:
21       Q.    So it's one, two and four that
22   exclude the impact of nonmarket transactions?
23       A.    They exclude nonmarket
24   transactions.
25       Q.    Okay.  The reason -- take a look

Page 172

1          - STEPHEN D. PROWSE -
2    at spreadsheet 4.
3             MR. SOHN:  I'm sorry, what are we
4    looking at?
5             MR. GUIDO:  Exhibit No. 14.
6    Excuse me.
7    BY MR. GUIDO:
8        Q.    And look at the Columns AS through
9    AW, just to clarify the record.
10       A.    Okay.
11       Q.    They're dealing with Regression 4
12   and an alternative to Regression 4, or 4A.
13            Do you see that?
14       A.    Yes.
15       Q.    Okay.  Regression No. 4, which the
16   results are in Column A -- Column AT, are the
17   "Net daily shares transactions as percentage of
18   volume."  And then AW says "Net trading as a
19   percentage of volume."
20       A.    Right.
21       Q.    In 4A.
22            So is it Column AW that's being
23   reported on the spreadsheet?
24       A.    Yes.
25       Q.    Okay.

Page 173

1          - STEPHEN D. PROWSE -
2        A.    It's being reported in Exhibit
3    13B.
4        Q.    Okay.  Thank you.
5             Now, so, the Regression 1,
6    Regression 2 and Regression 4 do not include in
7    any way nonmarket transactions?
8        A.    Yes, that's my understanding.
9        Q.    All right.  So we've got three
10   regressions.  And let's take Regression 1.  It
11   says "Any transaction flag."  Okay?  Do you see
12   that in Column AD, or on Exhibit 13B of your
13   expert report, it's the third column.  It's
14   called "Any Rhino Trading."
15       A.    Okay.  So I'm looking at Column
16   AD?
17       Q.    AD?
18       A.    Yeah.
19       Q.    In Exhibit 14.
20       A.    Yeah.
21       Q.    It says "Any Transaction Flag."
22   And that conforms with "Any Rhino Trading"
23   column on Exhibit 13B.  Right?
24       A.    No, it doesn't.
25       Q.    It does not.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                           March 5, 2010
New York, NY

Page 174

- STEPHEN D. PROWSE -
1
2     A.    No.
3     Q.    Okay.  What information in Exhibit
4  14 -- what column corresponds to "Any Rhino
5  Trading"?
6     A.    The column in Exhibit 14 that
7  corresponds to Regression 1 reported in Exhibit
8  13B is Column AF and AG.
9     Q.    AF and AG?
10    A.    Yes.
11    Q.    Okay.  All right.  So it's a buy
12 or sell flag?
13    A.    Yes.
14    Q.    Okay.  And that is AF and AG.
15         Now, with regard to Regression
16 Number 2, how does that differ from any Rhino
17 trading?
18    A.    It separates -- separates out the
19 effect of Rhino buys from Rhino sells and lets
20 them have inde -- independent effects on the
21 price of Sedona to investigate whether
22 specifically Rhino purchases as opposed to
23 Rhino sells, or vice versa, have any impact on
24 the price.
25    Q.    So, in other words, you do two

Page 175

- STEPHEN D. PROWSE -
1
2  separate regressions and then you combine them?
3  Is that --
4     A.    No.
5     Q.    No?  How do you do that
6  mathematically?
7     A.    You just have a dummy variable
8  that is zero when Rhino does anything but buy,
9  and a one when Rhino buys.  That's a dummy or a
10 buy flag.
11    Q.    Okay.
12    A.    Then you have a dummy that is zero
13 for any other -- any time other than -- any day
14 other than when Rhino sells, and one if Rhino
15 sells.  And you just stick them in the same
16 regression.
17    Q.    Well, take a look at line 645,
18 6/20/2000, and run it over to AJ and AK, where
19 it has these "dummies."  And there are two
20 ones.
21    A.    Correct.
22    Q.    How do you distinguish between the
23 two ones and those that have just a one in one
24 of the columns?
25    A.    Well, that was a day, obviously,

Page 176

- STEPHEN D. PROWSE -
1
2  on which there was a buy and a sell.
3     Q.    Right.
4     A.    So it's appropriate to capture
5  that in both dummies, the buy dummy and the
6  sell dummy.
7     Q.    Okay.  And -- and -- and how do
8  you use buy dummies as opposed to how do you
9  use sell dummies in your regression?
10    A.    Well, I use them the same.  I
11 mean, there's a buy dummy -- there's a buy
12 dummy variable and there's a sell dummy
13 variable.  They are treated identically.
14 Identically.  They're independent variables in
15 the regression.
16         They're just -- they just have
17 different values on different days except
18 when -- except on days when Rhino doesn't do
19 anything, in which case they're both zeroes.
20 And on days when Rhino sells and buys on the
21 same day, in which case they're both one.  But
22 that's --
23    Q.    Well --
24    A.    That's no big deal.
25    Q.    -- in this regression are you

Page 177

- STEPHEN D. PROWSE -
1
2  comparing buy days against sell days?
3     A.    Where -- in this regression, which
4  is Regression 2, we are looking -- Regression 2
5  in Exhibit 13B.  We are looking at whether
6  there is an indi -- an effect specific to Rhino
7  buys on Sedona stock price, and simultaneously
8  we are looking at whether there is an effect
9  specific to Rhino sells on Sedona stock price.
10    Q.    So this is not comparing the
11 results on days where there's a sell flag with
12 the days where there are buy flags?  This
13 Regression Number 2.
14    A.    I don't know what you mean by
15 that.  You can -- you could compare the
16 coefficients of the Rhino buy dummy with the
17 Rhino sell dummy if you wanted to, if that's
18 what you mean.
19    Q.    Can I use any of these numbers
20 that you've -- that you've come up with under
21 AJ and AK to figure out what that relationship
22 would be?
23         MR. SOHN:  Objection to the form.
24    A.    Relationship between what?
25    Q.    Between comparing sell days and

45 (Pages 174 to 177)

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 178

1         - STEPHEN D. PROWSE -
2    buy days.
3         A.    Well, you can either do that by
4    looking at Column AJ or AK, or you can do that
5    by looking at the two columns in Exhibit 13B
6    underneath Rhino purchases and Rhino sales.
7         One will be .01 point estimate of
8    the coefficient, and one will be a negative .04
9    point coefficient grounded.  It's actually
10   .036, but -- negative .036.
11        Q.    Okay.  So taking these days, okay,
12   what you're doing is that you're designating a
13   day as a day when Badian was trading as opposed
14   to days he was not?
15        A.    That is what regression -- that is
16   not what Regression 2 does.  That's --
17   Regression 1 looks at the difference between
18   when Rhino was trading and when Rhino was not
19   trading.
20        Q.    Okay.
21        A.    Regression 2 looks at the
22   difference between Rhino when -- between --
23   looks at the effect of when Rhino was selling
24   and then, separately, the effect of when Rhino
25   was buying.

Page 179

1         - STEPHEN D. PROWSE -
2         Q.    Okay.  Let's go back to -- let's
3    focus on Regression 1 now.
4         I gather the variable any day of
5    trading indicates by a one the days that Rhino
6    or Badian traded Sedona stock.  Is that
7    correct?
8         A.    The days when Rhino had a -- had a
9    trade, right.
10        Q.    Okay.
11        A.    Whether it was a buy or whether it
12   was a sell.
13        Q.    Okay.  And do the results indicate
14   the coefficient that measures the difference in
15   the average daily Sedona returns on the days
16   that Rhino traded compared to days that Rhino
17   did not trade?
18        A.    Could you repeat that question or
19   read it back?
20        MR. GUIDO:  Would you read that
21   back, please?
22        (Whereupon, the record is read
23   back.)
24        A.    The coefficient measures the
25   effect on Sedona's stock returns when Rhino

Page 180

1         - STEPHEN D. PROWSE -
2    trades.
3         Q.    Well, suppose that on one of those
4    days where you put a one is that Badian's
5    activity pushes the Sedona -- or as a result --
6    or occurs at the time.  Excuse me.  The
7    causation, rather.
8         Suppose that on a day Badian's
9    activity -- Badian trades, and the price goes
10   down 5 percent and he had -- his activity
11   involved the selling of five thousand shares.
12   And on another day you have a one, and that he
13   trades/sells five hundred shares and the price
14   goes down 1 percent.
15        Does this regression formula take
16   into consideration the impact of the size of
17   his sales?
18        MR. SOHN:  Objection to the form.
19        A.    The regression does not take into
20   account the impact of the size of the trade.
21   It takes into account whether there was a trade
22   or not.
23        Q.    When you -- are you aware that the
24   literature that addresses the question of the
25   impact of trading on market price indicates

Page 181

1         - STEPHEN D. PROWSE -
2    that the quantity, the size, of the sell or buy
3    activity should be included in the measurement
4    to determine a significant relationship between
5    price and trading?
6         MR. SOHN:  Objection to the form.
7         A.    I'm generally aware that there are
8    some results that suggest that's a measure of
9    trading that could be used to measure the
10   impact of a trade, the size of it, or the size
11   of it relative to volume.  But I'm also aware
12   of numerous results that look at just whether
13   there was a trade or not.
14        Q.    Well, I'm asking -- I mean, I'm
15   not asking you about results.  I'm asking you
16   about literature.
17        A.    And I'm telling you about the
18   results that I see in the literature.
19        Q.    Okay.
20        A.    That there are results that stem
21   from measuring the size of the trade or the
22   size of the trade relative to volume versus
23   there are other results that look at just
24   whether someone is trading or whether there is
25   a trade.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                March 5, 2010

New York, NY

Page 182

1          - STEPHEN D. PROWSE -
2      Q.    Well, let me ask you this
3  question.  I've been going through this
4  material and going through the literature and
5  this term "power" comes up.
6          Can you tell me what the term
7  "power" of a regression method is?
8      A.    Generally, the power of a
9  regression is the ability to detect a
10  relationship.
11      Q.    Okay.  So that -- and do
12  different analyses or methods have different
13  powers?
14      A.    They may.
15      Q.    Okay.  And didn't the literature
16  that you reviewed indicate that a regression
17  that includes the size of the transactions is
18  of greater power than one that does not?
19      A.    I'm not aware of that.
20      Q.    You're not aware of any literature
21  that says that?
22      A.    I'm not aware of that.
23      Q.    Okay.  Now, the other is, is that
24  on -- when you have the variable "any Rhino
25  trading," that doesn't distinguish between

Page 184

1          - STEPHEN D. PROWSE -
2      Q.    And that sells at the bids have a
3  tendency to push the price down?
4      A.    Again, I don't think I've
5  testified to that yet, but it's possible.
6      Q.    Okay.  And that this doesn't --
7  this analysis in Regression Number 1 doesn't
8  take into consideration either of those facts,
9  does it?
10          MR. SOHN:  Objection to form.
11      A.    It takes into account whether
12  Rhino's buying and -- and/or selling.
13      Q.    It doesn't take into account, one,
14  the size of the transactions.  Correct?
15      A.    Correct.
16      Q.    And it doesn't take into
17  consideration whether or not the buys or sells
18  were bids or asks, does it?
19      A.    That's correct.  It just looks at
20  the overall effect.
21      Q.    Okay.  Now, let's go to Regression
22  Number 2.  I'm sorry to keep coming back to it,
23  but I am very puzzled by -- by how you've
24  described the regression and how it's modeled.
25          Does this regression take into

Page 183

1          - STEPHEN D. PROWSE -
2  whether or not Rhino bought or Rhino sold, does
3  it?
4      A.    No, it just looks at whether there
5  -- there's an impact from Rhino being in the
6  market.
7      Q.    So Rhino's in the market.  It
8  could go up or it could go down?
9      A.    Rhino's in the market.  Is there
10  an impact from Rhino being in the market on the
11  stock price?
12      Q.    Okay.  And it doesn't measure
13  whether its activities are buy or sell.  It's
14  just in the market?
15      A.    It measures whether it's a buy and
16  a sell.
17      Q.    Okay.  Now, you indicated earlier,
18  I thought, that buys at the offer, for example,
19  could have a tendency of pushing the price up.
20          MR. SOHN:  Objection to form.
21      A.    I'm not sure if I testified to
22  that.  That might be the case.
23      Q.    Okay.  You've seen literature to
24  that effect, haven't you?
25      A.    I may have, yes.

Page 185

1          - STEPHEN D. PROWSE -
2  consideration the size of the buys or sells in
3  determining the effect of a share price?
4          MR. SOHN:  Objection to form.
5      A.    No, it doesn't.  It just takes
6  into account whether there was a sell or
7  whether there was a buy.
8      Q.    Now, Regression Number 3, it has
9  these additional variables:  The transfers and
10  the principals, for example.
11          And is there any evidence in the
12  record of this case or in anything that's been
13  provided to you that indicates either of those
14  events was information that was publicly
15  available?
16          MR. SOHN:  Objection to form.
17      A.    I haven't seen any specific
18  evidence regarding whether that information was
19  publicly available.  I know it was available to
20  the parties about what they were doing.  And
21  that's a flag to catch the effects of those
22  variables -- of those -- of those transactions.
23      Q.    Well, isn't what your -- your
24  regression doing is trying to determine what
25  Badian's activity had on the price of Sedona in

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 186

1          - STEPHEN D. PROWSE -
2    the market?
3          A.    That's the overall objective of
4    the entire statistical analysis, is to figure
5    out if there is an impact from any kind of
6    Rhino activity on the stock price.
7          Q.    Well, isn't it important to
8    determine when you're modeling something
9    whether that information was factored into the
10   market by being publicly available?
11         MR. SOHN:  Objection to form.
12         A.    I don't think it's important.  I
13   don't think it's important to do that.  I think
14   it's important to check -- look at your
15   analyses and make sure you're covering all your
16   bases by checking to see if there is any impact
17   on the market through transfers of principal
18   transactions.
19         Q.    Well, isn't it correct to say that
20   any analysis is only as good as the data on
21   which it rests?
22         MR. SOHN:  Objection to form.
23         A.    I guess you want to have good
24   data.  You want to make sure your data are
25   accurate.

Page 187

1          - STEPHEN D. PROWSE -
2          Q.    What do you mean by "accurate"?
3          A.    Measuring what you think you're
4    measuring accurately.
5          Q.    So, that, you want to make sure
6    that the data is data that is data that might
7    have an impact on what you're measuring?
8          MR. SOHN:  Object to the form.
9          A.    You want to make sure that, A, the
10   data is correct.  That the data series you're
11   using or the database you're using is --
12   accurately reflects the data that you think
13   it's reflecting.
14         Q.    Okay.
15         A.    And, that, you want to use data
16   that you think could potentially have an effect
17   on the stock price, or variables that could
18   potentially have an effect on the stock
19   price.
20         Q.    And is it fair to say that the
21   design of the study determines the quality of
22   the output of that study?
23         A.    In a very general sense.
24         Q.    Is it -- what do you mean by "a
25   general sense"?

Page 188

1          - STEPHEN D. PROWSE -
2          A.    Well, it was a general question,
3    so I'm replying in a general sense.
4          Q.    So you're answering the question
5    generally.
6                Now, is it correct to say that to
7    properly interpret the results of a regression
8    that you need to understand the design of the
9    study?
10         A.    To properly interpret the results
11   of the regression, yeah, you want to understand
12   the purpose of the analysis and the various
13   different statistical analyses that are done to
14   answer the question, which is the purpose of
15   the analysis.
16         Q.    Okay.  And isn't it also true that
17   different designs can result in different
18   answers?
19         MR. SOHN:  Objection to form.
20         A.    Different designs may result in
21   different answers.
22         Q.    Okay.  Now --
23         A.    That's what you're trying --
24   that's why you try to cover all your bases, to
25   make sure that you covered all your bases.

Page 189

1          - STEPHEN D. PROWSE -
2          Q.    So, is it your position that the
3    data selected and the variables selected for
4    the independent variable has to be data that
5    can possibly have an impact on the dependent
6    variable, this being the movement of the Sedona
7    stock price in this case?
8          MR. SOHN:  Objection to form.
9          A.    Yeah.  In this matter you want to
10   look at variables that potentially could have
11   an impact on Sedona's stock price, whether they
12   be buys, sells, transfers, principal.  You want
13   to -- you want to look at all of that, so all
14   that could potentially have an effect on the
15   stock price.
16         Q.    Could the validity of a regression
17   analysis be undermined by the use of
18   overinclusive data?
19         A.    I don't know what you mean by
20   "overinclusive data."
21         Q.    Can a study be invalid because
22   it's overinclusive?
23         A.    I don't know what you mean by
24   "overinclusive."
25         Q.    Well, overinclusive in

48 (Pages 186 to 189)

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

Page 190

1          - STEPHEN D. PROWSE -
2    relationship to the impact on the dependent
3    variable that's being studied.
4        A.    Sorry, that doesn't help.
5        Q.    Remember my example of December of
6    '09 and December of '07, my hypothetical?
7        A.    Barely.
8        Q.    Do you recall that I asked you
9    whether or not what activity occurred in '07
10   and what the -- what -- what the usefulness of
11   that information would be in determining what
12   someone did in trading stock in December of
13   '09?
14       A.    I think you used different dates,
15   but I remember the hypothetical, yes.
16       Q.    Okay. Well, I used the full date
17   range. I'm just using the months now.
18          The -- is it your position that
19   you could select trading at any time during the
20   period of time Sedona stock was trading to
21   determine, for example, what happened in March
22   of 2001?
23          MR. SOHN: Objection to form.
24       A.    It's my position that there are
25   two periods that you need to look at: One is

Page 191

1          - STEPHEN D. PROWSE -
2    the entire period over which Rhino trades,
3    because that's the entity -- entity that's the
4    focus of interest. You want to understand what
5    the data tells you about whatever price impacts
6    there are from Rhino's trading over the entire
7    time period that it trades.
8          And then, there's a second period
9    to look at, which is, I think, a reasonable
10   period to look at, which concentrates -- it
11   looks at a narrower period over which, you
12   know, there's a -- there's a number of
13   conversions. So I think those -- those are the
14   two appropriate reasonable periods to look at.
15       Q.    Well, let's take the longer period
16   of time. What was the time period? June of
17   2000 through June of 2002?
18       A.    June of two -- June 26, 2000 to
19   June 14, 2002.
20       Q.    Now, this case involves
21   allegations of manipulating stock to gain an
22   advantage in converting a debenture into --
23   into that stock. Right?
24       A.    Right.
25       Q.    Okay. When -- when was the

Page 192

1          - STEPHEN D. PROWSE -
2    convertible debenture entered into?
3        A.    November of 2000.
4        Q.    Okay. And why did you include the
5    period before the convertible debenture even
6    existed --
7        A.    Because --
8        Q.    Excuse me.
9           -- if what's being measured is
10   activity that might be influenced by the
11   existence of that convertible debenture?
12       A.    Because that includes a period in
13   which Rhino was trading and in which Rhino had
14   a previous FPS from Sedona. So I think it's
15   very reasonable to want to understand what
16   happened in that period, because that can tell
17   you some things about what happens in the
18   period after the issuance of the convertible G.
19       Q.    Well, let's take that period.
20          Did you -- did you take a look to
21   see what the trading patterns were during the
22   period of time that was used to determine the
23   price at which Badian could convert into Sedona
24   stock from that preferred stock issuance?
25          MR. SOHN: Objection to form.

Page 193

1          - STEPHEN D. PROWSE -
2        A.    From which preferred stock
3    issuance?
4        Q.    The preferred stock issuance that
5    existed, that it converted during that period
6    of time.
7        A.    During what period of time?
8        Q.    Prior to November 22nd of 2000.
9        A.    I believe there was a conversion
10   period in there. I'm not sure where it was.
11   But if that is included in the date range that
12   we looked at, then we looked at it.
13       Q.    Well, I mean, what I'm asking you
14   is, did you take a look at the time period, the
15   specific time period in which the conversion
16   was priced and compare it with anything else?
17       A.    I think we have that data and I
18   think I've looked at it, but I can't remember
19   offhand what it tells you.
20       Q.    Is it in the report?
21       A.    No, it's not in the report.
22       Q.    Now, subsequent to May 31st, okay,
23   were there any events that you know of that
24   might have had an impact on Badian's trading
25   strategy?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 194

1          - STEPHEN D. PROWSE -
2              MR. SOHN:  2001?
3              MR. GUIDO:  2001.
4      Q.     After May 31st, 2001.
5      A.     After May 31st, 2001.
6      Q.     Uh-huh.
7      A.     Yeah.  Rhino still held a
8  significant position in the FPS.  That didn't
9  go away until June of 2002.  And, so, I think
10 that's legitimate to look at, too.
11     Q.     Anybody ever show you an e-mail
12 from Andreas Badian to his brother that says
13 they obviously knew what they were doing was
14 wrong?
15     A.     No.
16     Q.     Never saw that?
17     A.     Never saw that.
18     Q.     Did anyone ever tell you that, in
19 October of 2001, sedona refused to honor a
20 conversion letter because it concluded that
21 Badian was engaged in manipulation of its
22 stock?
23     A.     I may have.  I can't recall if
24 I've -- I can't recall if I've -- I don't think
25 I've seen a document that tells me that.  I

Page 195

1          - STEPHEN D. PROWSE -
2  can't recall if I knew that at one point.
3      Q.     But I think that when I asked you
4  questions about, you know, as an economist, you
5  know, what are cost benefits, I think one of
6  the things you indicated was that a person
7  might reneg on their contractual obligations
8  based on manipulative stock trading.
9              MR. SOHN:  Objection to form.
10     A.     No, I certainly didn't say that.
11     Q.     What did you say?
12     A.     I said a person might reneg on a
13 contractual provision if the economics for that
14 person works in a particular way.  If a -- if a
15 contractual provision says I have to pay a
16 million dollars to somebody and I don't have
17 the million dollars, well, I may have to -- I
18 may have to breach the contract.
19             So, you know, there's something
20 known as efficient breach.  But I certainly
21 didn't say what you said I said.
22     Q.     Well, I think that in your paper,
23 in your expert report, you talk about how there
24 are disincentives to market manipulation.  Or
25 am I wrong that you don't really think that

Page 196

1          - STEPHEN D. PROWSE -
2  that's a disincentive?
3              MR. SOHN:  Objection to form.
4      A.     Well, I don't understand your
5  question.  If you can point me to somewhere in
6  my report where you think I say that, I'd be
7  happy to look at it.
8      Q.     The -- you said that you read
9  Beloreshki's report, "The Frontiers of
10 Convertible Financing."  And that was one of
11 the things that you based your opinion on is
12 that you read the article.
13     A.     I said I had read the article,
14 yes.
15     Q.     Okay.  Well, do you recall that in
16 the article he indicated that one of the
17 disincentives to market manipulation is that
18 there's what's called a litigation contract
19 renegotiation.
20     A.     I remember that discussion, but I
21 don't remember the specifics of it.  If you
22 want me to take a look at the article, I'd be
23 happy to do so.
24     Q.     Why don't you take a look at
25 Exhibit No. 5.

Page 197

1          - STEPHEN D. PROWSE -
2              MR. SOHN:  Five?
3              MR. GUIDO:  Five.
4      Q.     And I direct your attention to
5  page 7, item number 4.
6      A.     I see that.
7      Q.     So one of the risks of -- that one
8  has to weigh is the litigation or contract
9  renegotiation risk when one chooses to try and
10 manipulate the stock price.
11             MR. SOHN:  Is that a question?
12     A.     I don't see any reference to
13 manipulating a company's stock in here.
14     Q.     Does it talk about litigation
15 risks with the issuer if the issuer is unhappy
16 about how the purchaser of a future price
17 security has acted?
18             MR. SOHN:  Is that a question?
19     A.     It -- it does talk about
20 litigation risks in the third paragraph of that
21 section.
22     Q.     Now let's turn to your -- the
23 report that you signed.  We'll start with page
24 5.  We haven't talked about the risk/return
25 profile that you have here.

50 (Pages 194 to 197)

Stephen David Prowse, Ph.D.                                     March 5, 2010
New York, NY

Page 198

1          - STEPHEN D. PROWSE -
2          Do you have the report in front of
3    you? Look at paragraph 18.
4          MR. SOHN:  Mr. Guido, can we take
5    a break at a convenient moment?
6          MR. GUIDO:  Sure.  Five-minute
7    break?
8          MR. SOHN:  Yes, thank you.
9          MS. SCHECHTMAN:  Yes.
10          THE VIDEOGRAPHER:  Going off the
11   record at 3:21 p.m.
12          (A recess is taken.)
13          THE VIDEOGRAPHER:  Going back on
14   the record at 3:32 p.m.
15   BY MR. GUIDO:
16      Q.    If you were asked to evaluate the
17   models that were used for these regressions as
18   an expert, what questions would you ask as to
19   whether or not the models were appropriate?
20          MR. SOHN:  Objection to form.
21      A.    I would ask whether -- whether
22   there was a -- I would look to see whether
23   there was a potential that the variables that
24   were being used as independent variables could
25   affect -- could be -- potentially affect

Page 199

1          - STEPHEN D. PROWSE -
2    Sedona's stock price.
3      Q.    Anything else?
4      A.    Could you repeat the question or
5    have it read back?
6          (Whereupon, the record is read
7    back.)
8      A.    I mean, I think that would be the
9    basic question.
10      Q.    Any others?
11      A.    Well, I might have to -- there
12   might have -- there might be some with regards
13   to the particular specifications of the
14   variables.
15      Q.    I'm sorry, the --
16      A.    The particular specifications or
17   combinations of the variables.  But I think
18   that's the -- that's the main question from
19   a -- from a -- from -- if the question is with
20   regards to what -- what -- given that you think
21   the regression analysis is appropriate, and in
22   this setting, and what the -- what the proper
23   independent variables should be that you should
24   look at, then I think that's the main -- the
25   main answer.

Page 200

1          - STEPHEN D. PROWSE -
2          Is there a potential for the
3    variables that you're looking at to have an
4    effect on Sedona's stock price?
5      Q.    Well, is the -- the weight of the
6    variables, is that a relevant question to ask
7    about whether or not the model is appropriately
8    created?
9      A.    I don't know what you mean by "the
10   weight of the variables."
11      Q.    Well, I mean you can -- you can
12   say trading or not trading.  Okay?  That's a
13   potential to have an impact.  Correct?
14      A.    I agree.
15      Q.    Okay.  And the -- the size of the
16   trading or the frequency of the trading on a
17   particular day could also be a relevant factor,
18   could it not?
19      A.    The side of the trade could be.
20      Q.    Anything else?
21      A.    Well, that's what I'm saying.  You
22   want to -- you want to look at variables -- you
23   want to look at your measures and see if they
24   all have a potential to affect the stock price.
25      Q.    Okay.  Is the size of the trading

Page 201

1          - STEPHEN D. PROWSE -
2    in relationship to the size of the market a
3    variable that you would think to include in an
4    appropriately structured model?
5      A.    That's a potential variable that
6    you should look at, and we did.
7      Q.    So those are the -- those are the
8    factors that you would look to to decide
9    whether or not these models were appropriately
10   structured?
11          MR. SOHN:  Objection to the form.
12      A.    Right.  Are they independent
13   variables?  Do they have a potential to affect
14   Sedona's stock price?
15      Q.    So one is whether selling exists
16   or doesn't exist, or buying exists or buying
17   doesn't exist.  That's one.
18          Whether the -- whether size of the
19   sales or the buys have an impact?
20      A.    Correct.
21      Q.    Whether the size in relationship
22   to other participants' behavior in the market
23   have an impact?
24      A.    Can you say that again?
25      Q.    The size and relationship to other

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                      March 5, 2010
New York, NY

Page 202

- STEPHEN D. PROWSE -
1    - STEPHEN D. PROWSE -
2    participants' activity in the marketplace.
3         A.   Yes.  Yes, that's -- that's a
4    potential variable.
5         Q.   Now, when you did your analysis,
6    did the data include sales by Pond into the
7    market?
8         A.   The data that we used came from
9    the account statements.  So to the extent that
10   Rhino trades were executed through Pond, that
11   was included in the data.
12        Q.   Meaning Rhino's sales to Pond were
13   reported in the data?
14        A.   To the -- to the extent that
15   Rhino's trades were executed through -- by
16   Pond, that was included in the data.
17        Q.   Well, is the data of Pond sales to
18   the market in the database?
19        A.   The database is constructed to
20   look at data -- to look at Rhino's transactions
21   as reported in Rhino's account statements.
22        Q.   Okay.
23        A.   So all of the account statement
24   data is in our -- is in our database.
25        Q.   Are you aware that the Rhino sales

Page 203

1    - STEPHEN D. PROWSE -
2    in March and Badian sales to Refco were
3    executed by Pond?
4              MR. SOHN:  Objection to form.
5         A.   I can't recall the specifics.
6    That might be the case.
7         Q.   But you don't know?
8         A.   I don't know for certain without
9    looking at the data.
10        Q.   Well, does the data that you
11   claimed to have looked at, does that include
12   sales by Pond?
13        A.   To the extent that sales by Pond
14   came from Rhino transactions as reported in
15   Rhino's account statements, yes.
16        Q.   Well, how was the data
17   constructed?
18        A.   My understanding is the data was
19   constructed in the following manner, that --
20   that we're using in this manner:  Prior to
21   FTI's engagement in this matter, I understand
22   an electronic database was constructed by NERA
23   using account statements from accounts such as
24   Westminster, Amro, Refco, brokerages such as
25   Westminster and others.

Page 204

1    - STEPHEN D. PROWSE -
2         That data was, I understand,
3    validated with NERA and edited at some point in
4    time by reference to documents Bates stamped
5    GOJO and RA, which I understand are account
6    statements and bank statements.
7         That database, that electronic
8    database, was a database that Mr. Beloreshki
9    took with him when he left NERA on CD and
10   stayed with him until he came to FTI.  So that
11   was the data that we used when doing the
12   analysis on our report that is reported in
13   our -- in our report.
14        The -- subsequently, when we did
15   our report, we didn't have the source documents
16   at FTI that went into creating the electronic
17   database.  But based on my conversations with
18   Mr. Beloreshki, I had a high confidence in the
19   accuracy and the precision of the data.
20        Subsequent to issuing our report,
21   we have now received all of the account
22   statements, all of the RA Bates document
23   statements, all of the GOJO Bates document
24   statements, all of the R statements, that we
25   have now since gone back and validated the

Page 205

1    - STEPHEN D. PROWSE -
2    electronic database that we used for the
3    analysis in our initial report.
4         And we made -- we found a number
5    of changes that we had to take.  They were all
6    minor, I would say.  Most of them had to do
7    with nonmarket transfers on dates outside,
8    dates either in 2000 or in 2002.  There were a
9    couple of market transactions that were --
10   there was one market transaction that was off
11   by a day, and I think there were a couple of
12   market transactions that were buys and sells on
13   the same days or subsequent days that were
14   actually canceled.
15        But after making -- but after
16   making those edits subsequent to issuing our
17   report, we -- we now have a database that we
18   think is as validated as it can be.  And we've,
19   since issuing our report, rerun all our
20   statistical analyses that we did and nothing
21   changed from the results we -- our opinions
22   don't change.  There may have been small
23   changes in the coefficients, but there were no
24   changes in anything of importance.
25        So our conclusions remain the same

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 206

1           - STEPHEN D. PROWSE -
2     after we validated the data using the source
3     documents.
4         Q.    So, you've gone back and you've
5     determined what the basis of the database was.
6             Last night I received, at eight
7     o'clock, a supplemental document production
8     that includes the documents that are Bates
9     stamped GOJO.
10        A.    Yes.
11        Q.    Is that the data -- is that the
12    universe of the account statements that you
13    used to verify the accuracy of the database?
14        A.    Yes.  We received last night those
15    documents, too.
16        Q.    Okay.  Let me -- let me just sort
17    of read through them, see whether or not
18    there's something missing in what I have based
19    on what you recall.
20            There was an account called
21    Cambois Finance of Westminster.  Do you recall
22    that account?
23        A.    I recall the name "Cambois."
24        Q.    Okay.  And was that one of the --
25    one of the accounts with trades that you

Page 207

1           - STEPHEN D. PROWSE -
2     included in your analysis?
3         A.    I believe so, yes.
4         Q.    Okay.  Does that also apply to an
5     account at Westminster for an entity called
6     Roseworth Group?
7         A.    I believe so, yes.
8         Q.    Does that also include an account
9     for Amro International and an entity called
10    Refco Capital Markets?
11        A.    I'm not certain about that now,
12    but I think so, but I'm not certain just
13    sitting here.
14        Q.    What about a company called BNC
15    Bach International and a broker called Rampart?
16        A.    Those -- those trades are
17    included, my understanding, yes.
18        Q.    And what about an account in Amro
19    International and Westminster?
20        A.    I understand that those dat --
21    that data is in the database.
22        Q.    And what about an account BNC Bach
23    International and Canaccord?
24        A.    I understand that's in the
25    database.

Page 208

1           - STEPHEN D. PROWSE -
2         Q.    And what about an account BNC Bach
3     International and an entity called Dundee?
4         A.    I believe that's in the database.
5         Q.    Any other?
6         A.    Not that I can remember off the
7     top of my head.
8         Q.    This is all that I received.
9         A.    Those -- all -- all those names
10    ring a bell with me.
11        Q.    Okay.  Well, did you look at any
12    Pond trade tickets?
13        A.    We did not look at any Pond trade
14    tickets.
15        Q.    And did you look at any Pond
16    account statements?
17        A.    I'm not sure.  I know Pond was a
18    broker for a lot of the transactions.  So to
19    the extent that the trades, the Rhino trades,
20    went through Pond as a broker, then they would
21    be in the database.
22        Q.    Are you sure of that?  Because
23    when I looked at the columns in the database,
24    it doesn't include a column for Pond.
25        A.    Well, my understanding is that

Page 209

1           - STEPHEN D. PROWSE -
2     Pond was a -- a broker through which some of
3     Rhino's trades were made.  And we -- my
4     understanding is we have the -- the entire
5     universe of Rhino trades regardless of who they
6     were actually trading through.
7             So to the extent that any Rhino
8     trades went through Pond in some manner, we
9     have those in our database.  Now, if there are
10    Pond trades that are coming from some other
11    non-Rhino entity, then that -- that is not a
12    defendant in this matter, we wouldn't have
13    that.
14        Q.    Well, I'm talking about
15    transactions that were transactions that were
16    initiated by Badian and that they were pre --
17    they were initiated that Pond executed into the
18    market.
19            Are those transactions included in
20    your database?
21        A.    Any Rhino transaction -- my
22    understanding is we have the universe of all
23    Rhino transactions.  So if there is a Rhino
24    transaction that goes through Pond in some
25    manner, then that is in our database.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                            March 5, 2010
New York, NY

Page 210

1         - STEPHEN D. PROWSE -
2      Q.    Is every aspect of that reported
3   transaction included in your database?
4      A.    Well, I don't know what you mean
5   about "every aspect." We have -- I think -- I
6   believe we have the price and I believe we have
7   the number of shares and whether it was a buy
8   or a sell. And I believe we have -- we
9   obviously have the date of the trade. So if
10  that's what you mean, yes.
11     Q.    I want you to take a look at
12  documents that have been marked in this action
13  as Exhibits 86 through 90.
14          MR. GUIDO: They're in reverse
15  order, Josh, so switch them.
16          Josh, can you make life easier for
17  me and pick a copy out of here for yourself?
18          One of the things I like is, in
19  the index, to do a listing of the old exhibits
20  and where they first appeared in the
21  transcript.
22  BY MR. GUIDO:
23     Q.    While Mr. Sohn is pulling the
24  exhibits, why don't you take a look at the
25  packet.

Page 211

1         - STEPHEN D. PROWSE -
2          MR. SOHN: Can we take the others
3   out? Can we take one more?
4          MR. GUIDO: I can only let you
5   have one.
6          MR. SOHN: Come on, Ken.
7          MR. GUIDO: They're only
8   accompanying you. I heard you introduce them.
9   BY MR. GUIDO:
10     Q.    Have you ever heard the name "Jake
11  Spinner"?
12     A.    Yes.
13     Q.    Who is Jake Spinner?
14     A.    Who is Jake Spinner?
15     Q.    Yeah.
16     A.    I believe he's a defendant in this
17  matter.
18     Q.    Do you know what his role was
19  in -- in this matter?
20     A.    I believe he was at Pond Equities
21  and his role is described in the Complaint. I
22  can't give you the details, but I'd be happy to
23  look at the Complaint, if you'd like.
24     Q.    Well, was he the broker at Refco
25  that was responsible for the execution of the

Page 212

1         - STEPHEN D. PROWSE -
2   transactions in Sedona stock at Badian's
3   request?
4      A.    I just don't know one way or the
5   other.
6      Q.    I'd like you to take a look at the
7   exhibit -- well, first of all, these are
8   account statements based on the testimony of
9   Mr. Spinner of a proprietary account that he
10  managed at Pond in which he executed trades on
11  behalf of Amro into the market.
12          And my question is, have you ever
13  seen Exhibits 86 through 90?
14     A.    I can't recall seeing them.
15     Q.    Is any of the data in 86 through
16  90 included in your database?
17     A.    Based on my understanding of the
18  data, if these are Rhino/Amro trades, if some
19  of these are Rhino and Amro trades, those
20  trades would be in our database. Because we
21  have all the -- my understanding is we have all
22  the data for Rhino's transactions.
23     Q.    Well, in your document production,
24  I mean, look in your exhibit -- your exhibit --
25  I can't remember if it's two or three, where

Page 213

1         - STEPHEN D. PROWSE -
2   you describe --
3      A.    Three.
4      Q.    -- what it is you looked at.
5      A.    Three.
6      Q.    Do you see any mention of these
7   Pond trade tickets in these account statements?
8      A.    No.
9      Q.    So you didn't use them?
10     A.    No, I have already described how
11  the data -- I understand the database to be
12  constructed.
13     Q.    Well --
14     A.    Five minutes ago.
15     Q.    I understand that. And we went
16  through the list of how the database was
17  constructed, did we not?
18     A.    Went through the list? I'm not
19  sure what list --
20          MR. SOHN: Objection to form.
21     Q.    Well, I asked you, based on what
22  was provided to me last night, which you
23  indicated you probably received a copy of what
24  I received last night at eight o'clock, that --
25  that in that -- that is the universe of

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010
New York, NY

Page 214

1           - STEPHEN D. PROWSE -
2      information that went into your database.
3           A.     The GOJO documents are an input
4      into the database, but my understanding is
5      there are also RA Bates stamped documents and
6      maybe some R stamped documents that are also
7      inputs into the database. So it's a
8      combination of those three documents which, in
9      their entirety, my understanding is, covers all
10     the account statements or trading activity of
11     Rhino.
12          Q.     Well, in the Exhibits 86 through
13     90, do you see any RA Bates stamp numbers on
14     those?
15          A.     No.
16          Q.     But those documents have never
17     been Bates stamped RA, have they?
18               MR. SOHN:  Objection.
19          Q.     To your knowledge.
20          A.     I don't know how I would know
21     that.
22          Q.     Okay.  So, are you aware that
23     transactions were initiated by Mr. Badian by
24     making calls to a man named Danny Graham, who
25     then called a man named Cliff Abouf at Pond,

Page 215

1           - STEPHEN D. PROWSE -
2      and that Cliff Abouf then executed the trades
3      into the market.  And at the end of the day,
4      Cliff Abouf and Danny Graham got together and
5      they decided what number of shares Refco should
6      sell to Pond to cover Pond's sales into the
7      market.
8               Are you aware of that?
9               MR. SOHN:  Objection to form.
10          A.     To the extent that's in the --
11     that description is in the Complaint, I'm aware
12     of that.
13          Q.     Other than in the Complaint?
14          A.     No.
15          Q.     Are you aware that the
16     transactions that are reflected in Exhibit Nos.
17     86 through 90 involving Sedona's shares were
18     reported to the market?
19          A.     I don't know if they were reported
20     to the market or not.
21          Q.     Are you aware that the Refco sales
22     to Pond -- out of the Amro account to the Pond
23     proprietary account managed by Mr. Spinner were
24     reported to the market?
25          A.     I'm not aware one way or the other

Page 216

1           - STEPHEN D. PROWSE -
2      of that.
3           Q.     Now, in your exhibit, the -- you
4      indicate that you looked at audit trail
5      reports?
6           A.     Yes.
7           Q.     Did you notice anything out of the
8      ordinary in the audit trail reports?
9           A.     I don't know what you mean by "out
10     of the ordinary."  They're thick reports about
11     that thick.  So, we looked at them.  We noted
12     what they were.  We understood what they were
13     based on the SEC's description of them in your
14     response to interrogatories, but that's the
15     extent of my knowledge.
16          Q.     Well, did you read the responses
17     to the interrogatories?
18          A.     Yes.
19          Q.     And did you see in the responses
20     to the interrogatories that described certain
21     highlighting on those audit trail reports?
22          A.     Yes, blue highlighting, yellow
23     highlighting, pink and orange, I believe.
24     Something like that.
25          Q.     And did you see in those responses

Page 217

1           - STEPHEN D. PROWSE -
2      to the interrogatories it explained the
3      significance of those highlights?
4           A.     It did give a definition of what
5      the highlights meant, yes.
6           Q.     And did you also, when you looked
7      at that interrogatory response, see it included
8      within the interrogatory responses was a
9      description from FINRA of what the columns
10     meant in the audit trail report?
11          A.     I believe I saw that.
12          Q.     Okay.  Did you make an effort to
13     determine which of the highlighted trades had
14     been reported to the market?
15          A.     No, we did not do that.
16          Q.     Okay.  So you don't know whether
17     or not the Pond trades in Exhibit 86 through 90
18     were reported to the market?
19          A.     We didn't do that analysis.
20          Q.     Okay.  And you don't know whether
21     the Refco to Pond transactions that were
22     reflected in that -- in those audit trail
23     reports were reported to the market?
24          A.     We didn't do that analysis.
25          Q.     Okay.  Did you include in your

55 (Pages 214 to 217)

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

Page 218

1           - STEPHEN D. PROWSE -
2    analysis both the Pond trades into the market,
3    the sales into the market, and Refco's sales to
4    Pond in your analysis?
5          A.    We accounted -- in our database,
6    we analyzed Rhino's trades; buys, sells and
7    other transactions.  To the extent that they
8    are covered by your descriptions, we -- they
9    are in our database.
10         Q.    Are you sure of that?
11         A.    I'm -- I mean, that's my
12   understanding; that we have the universe of
13   Rhino's trades, regardless of who they went
14   through, and transactions.  And to the extent
15   that's true, then we have everything that Rhino
16   did regardless of who it's through.
17         Q.    So you're saying in your database,
18   if I went back and looked at it, is that every
19   trade, every transaction involved a sale by
20   Amro, out of an Amro-related account, that
21   every aspect of that transaction, if it was
22   reported to the market, would be included in
23   your database?
24         MR. SOHN:  Objection to the form.
25         A.    Well, I'm not sure what you mean

Page 219

1           - STEPHEN D. PROWSE -
2    by "every aspect" of that trade.  If you mean
3    the number of shares, whether it was a buy or a
4    sell, the day on which it occurred, yes, all
5    that would be in the database.
6          Q.    Well, assume this hypothetical:
7    Assume that Andreas instructed Rhino to sell
8    out of the Amro account stock to Pond,
9    proprietary accounts that run by Spinner.
10   And he instructed Spinner to sell out of that
11   account into the market the Sedona shares.  And
12   that he instructed both of those transactions
13   to be reported to the market.  Just take that
14   as an assumption.
15         Would both of those transactions
16   be included in your database?
17         MR. SOHN:  Objection.
18         A.    I believe so.  I'd have to -- I
19   could check, but my assumption -- my
20   understanding is that all Rhino trades and
21   transactions are included in our database.
22         Q.    If they were not -- assume that
23   that hypothetical is true.  If they were not,
24   would your database be inaccurate?
25         MR. SOHN:  Objection to form.

Page 220

1           - STEPHEN D. PROWSE -
2          A.    If all of Rhino's trades and
3    transactions were not in our database?  Then
4    that's something that I'd want to investigate
5    to see to what extent that database is not
6    capturing Rhino trading activity and when
7    was -- and for what period of time.  And we'd
8    obviously want to look at that and understand
9    why that's happening and try and -- try and
10   adjust for that.
11         MR. GUIDO:  I think one of the
12   exhibits that I showed Mr. Beloreshki is in the
13   originals.  It's the 21A report.
14         Could you show that to the witness,
15   please?
16         MR. SOHN:  Exhibit 10.
17   BY MR. GUIDO:
18         Q.    In Exhibit 10, which was
19   previously called the 21A report, it was filed
20   by Rhino in this case.  There's attached at the
21   end of it a schedule of transactions that I
22   think is referred to as Exhibit D in that.
23         A.    Yeah, I have it.
24         Q.    Does that look familiar to the
25   electronic database that you indicated that you

Page 221

1           - STEPHEN D. PROWSE -
2    saw had been created in NERA?
3          MR. SOHN:  Objection to the form.
4          A.    Well, obviously I can't testify as
5    to the numbers because I don't have the
6    electronic database to compare to, but some of
7    the first -- the first four columns are similar
8    in that that information is in our electronic
9    database.  The trade date, the buy/sell total
10   and the cumulative -- the quantity total and
11   the cumulative quantity total.  Those are --
12   those are columns that are also in our
13   electronic database.
14         Q.    And there are columns for
15   different brokerage accounts also in your
16   database.  Isn't that correct?
17         A.    I believe that is correct.  I'm
18   not entirely certain.
19         Q.    Well --
20         A.    I know there is a -- I know there
21   is a summary, a spreadsheet, that I'm familiar
22   with that sums everything up for all accounts,
23   brokerages, whatever.
24         Q.    I mean, that's the first three
25   column in the spreadsheet, the aggregate data?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 222

1          - STEPHEN D. PROWSE -
2        A.    Right.  And that's what I was
3    referring to.  That's the data I'm familiar
4    with.
5        Q.    But with regard to the data, have
6    you seen any spreadsheets that have columns for
7    transactions in the account at Pond Equities in
8    which Jake Spinner had traded in?
9        A.    I just don't know.
10       Q.    Well, did you see in the database
11   any equity that said "Pond Equities"?
12       A.    I can't remember seeing anything
13   that said "Pond."  That doesn't mean it's not
14   there, but I can't remember seeing it.  And
15   that doesn't -- that doesn't mean it might not
16   be covered by something else.  I just don't
17   know.
18       Q.    Well, I understand that, but I'm
19   just asking if there's anything in the database
20   that you saw, anything that said "Pond
21   Equities" in the database.  And you don't
22   recall seeing any?
23       A.    I don't recall.
24       Q.    Well, in Exhibit No. 3, the
25   documents you looked through, that also doesn't

Page 223

1          - STEPHEN D. PROWSE -
2    make any mention to the account statements that
3    I've shown you that have been marked as
4    Exhibits 86 through 90, has it?
5        A.    That's correct.
6        Q.    And the list of GOJO account
7    statements which were provided to me at eight
8    o'clock last night, those also don't include
9    any reference to Pond Equities accounts, do
10   they?
11       A.    I haven't gone through all the
12   GOJO documents, so I can't say one way or the
13   other.
14           MR. GUIDO:  All right.  Let's take
15   a break.
16           THE VIDEOGRAPHER:  This concludes
17   Tape Number 3 in the videotaped deposition of
18   Dr. Stephen Prowse.  Going off the record at
19   4:09 p.m.
20           (A recess is taken.)
21           (Whereupon, exhibit is received
22   and marked BP-25 for identification.)
23           THE VIDEOGRAPHER:  This begins
24   Tape Number 3 -- or, excuse me, Tape Number 4
25   in the videotaped deposition of Dr. Stephen

Page 224

1          - STEPHEN D. PROWSE -
2    Prowse.  Going back on the record at 4:23 p.m.
3    BY MR. GUIDO:
4        Q.    I hand you the document I've had
5    marked as BP-25.
6           Do you recognize that document?
7        A.    No, I don't.
8        Q.    Do you recall that you prepared a
9    set of notes reflecting your understanding of
10   the Pet Quarters issues?
11           MR. SOHN:  Objection to form.
12       A.    I don't recall preparing any
13   notes, and I don't believe these are my notes.
14       Q.    Is there anybody at FTI with the
15   initials DS that worked on the Pet Quarters
16   matter?
17       A.    No.  I don't -- I don't know what
18   DS stands for.
19       Q.    Okay.  Look under "Government
20   Theories."  You see Number 2, "Manipulation
21   pattern:  (i) depress stock price by showing
22   store; (ii) submit conversion notice; (iii)
23   engage in wash sales in order to enhance
24   liquidity and artificially inflate the stock
25   price"?  Do you see that?

Page 225

1          - STEPHEN D. PROWSE -
2        A.    Yes.
3        Q.    Now, does that control, to your
4    understanding, the Complaint in this case?
5           MR. SOHN:  Objection to the form.
6        A.    I think that -- I think that could
7    be close, yeah.
8        Q.    Now, the -- now, did you do an
9    evaluation of wash sales to see whether or not
10   they enhanced liquidity and artificially
11   inflated the Sedona stock price in your
12   analysis?
13           MR. SOHN:  Objection to form.
14       A.    We did analyze the wash sales to
15   the -- because they were part of the data that
16   we looked at.
17       Q.    Okay.
18       A.    So --
19       Q.    Did you separate them out to
20   anyone?
21           MR. SOHN:  Objection; asked and
22   answered.
23       A.    We did not separate them out.
24   They were part of the entire analysis.
25       Q.    Remember I showed you the

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 226

1    - STEPHEN D. PROWSE -
2    exhibit -- the rebuttal report from Pet
3    Quarters? And it had an exhibit at the end of
4    it. It did an analysis of those, of the trades
5    in Pet Quarters.
6        A.    Some trades in Pet Quarters,
7    correct.
8        Q.    Some trades. The Westminster/
9    Amro-related accounts and the Refco/Amro-
10   related accounts. Remember that?
11       A.    I'm not sure they were all
12   Westminster/Refco. I think some of them might
13   have been, but not all of them.
14       Q.    But they were trades between
15   related entities?
16       A.    I think that's right.
17       Q.    And you recall that you did an
18   analysis to determine whether or not they
19   are -- how close they were to the offer or they
20   bid or somewhere in between?
21       A.    Correct.
22       Q.    And did you do such an analysis
23   with regard to the Sedona matter?
24       A.    We did not do that analysis in
25   this matter.

Page 227

1    - STEPHEN D. PROWSE -
2        Q.    Now, this -- I want to go page 5
3    where you talk of the risk/return profile and
4    what a rational trading strategy is.
5        MR. SOHN: Page 5 of Exhibit 4.
6    Correct?
7        MR. GUIDO: Page 5 of Exhibit 4.
8        MR. SOHN: Thank you.
9    BY MR. GUIDO:
10       Q.    The -- in paragraph 18, you talk
11   about what's an economically rational and
12   beneficial trading strategy for holders of such
13   debentures; i.e., the Sedona November -- I
14   think it's November 22nd, 2000 debenture.
15           And what is your understanding of
16   the provisions of that debenture that were
17   relevant for your determination of whether or
18   not Badian had engaged in an economically
19   rational and beneficial trading strategy?
20       MR. SOHN: Objection to form.
21       A.    Well, there were -- the provisions
22   that made it an FPS, for example; that there
23   would be a conversion price -- that there would
24   be a right to convert based on a floating
25   conversion price that was linked to the stock

Page 228

1    - STEPHEN D. PROWSE -
2    price movements of Sedona. But it -- but it
3    wasn't just the characteristics of the
4    security. It was also the characteristics of
5    Sedona that made this an optimal trading
6    strategy -- or economically rational optimal
7    trading strategy.
8        Q.    But just talking about the
9    debenture in the agreement itself.
10           So that one of them was that it
11   had a convert -- a floating conversion price.
12       A.    Correct.
13       Q.    That was one of the factors --
14       A.    Correct.
15       Q.    -- to be considered?
16       A.    Right.
17       Q.    And that it was a debt instrument
18   in which Sedona's financial condition presented
19   a risk. Is that fair?
20       A.    That's correct. The fact that it
21   was a debt instrument; the fact that it was a
22   risky security. For a variety of reasons. The
23   fact that there was a floating conversion
24   price. Those were the -- there was a lockup
25   period. Those were the characteristics --

Page 229

1    - STEPHEN D. PROWSE -
2        Q.    What's a lockup period?
3        A.    A period over which after
4    issuing -- after issuance of the FPS, the
5    investor is not allowed to convert.
6        Q.    Not allowed to convert.
7           And there was a lockup period
8    here?
9        A.    Yeah.
10       Q.    What did that -- what was the
11   language of the lockup period?
12       A.    I can't remember the lockup period
13   language, but -- sitting here.
14       Q.    What was the lockup period?
15       A.    I think it was three months.
16       Q.    What time period to what time
17   period?
18       A.    November 22nd, I believe, to March
19   22nd, I believe, of 2001.
20       Q.    Was one of the other risks of the
21   instrument that it had a provision in it that
22   prohibited short sales?
23       A.    Well, I wouldn't say that was a
24   risk. That was a provision that increased the
25   riskiness of the -- of the security.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 230

- STEPHEN D. PROWSE -
1  - STEPHEN D. PROWSE -
2      Q.    That was a lockup period, wasn't
3  it?  I mean, you could interpret it that way,
4  couldn't you?
5      A.    I interpret a lockup period
6  meaning that's the period over which your --
7  you can't convert.  The company won't honor a
8  conversion notice.
9      Q.    I mean, it's -- I mean, in future
10 price securities, is one of the issues that is
11 discussed in the negotiations the limitations
12 on the ability to convert?
13     A.    Absolutely.  That's one of many
14 different contract provisions that are
15 negotiated between the parties, including the
16 discount; whether there is a lockup period and
17 the length of it; obviously the amounts.
18 The -- various other contractual provisions are
19 all negotiated.
20     Q.    Floors under conversion prices?
21     A.    You can have floors, you can have
22 caps.  Yes.
23     Q.    And do those affect the interest
24 rate that a purchaser would request in its
25 negotiations?

Page 231

1  - STEPHEN D. PROWSE -
2      A.    They all go into -- all those
3  factors go into the agreed upon -- all the
4  factors are agreed upon simultaneously and one
5  will affect the other.  So you may get a
6  longer -- a longer lockup period and a higher
7  discount or -- depending upon the preferences
8  of the parties.  Just something like that.
9      Q.    Now, you indicate that Badian's
10 trading strategies and the way he unwound
11 Amro's positions in Sedona's stock was
12 consistent with a trading strategy that you
13 refer to in paragraph 18.
14        Now, what -- what was the trading
15 strategy that you're referring to?
16        MR. SOHN:  Objection to the form.
17     A.    The trading strategy that's
18 referred to in the previous sentence.  To
19 reduce -- "seek to reduce their overall long
20 position in the underlying equity whenever
21 possible and to" the extent -- "and to extend
22 the period over which such positions were
23 unwound."
24     Q.    Can -- are those -- those two
25 statements consistent?

Page 232

1  - STEPHEN D. PROWSE -
2      MR. SOHN:  Objection to form.
3      A.    Yeah.
4      Q.    Well, it says "reduce their
5  overall long position in the underlying equity
6  whenever possible."  Okay?
7      A.    Correct.
8      Q.    And then "extend the period in
9  which such positions were unwound."
10        I mean, why are those -- I mean,
11 if you say whenever possible, doesn't that mean
12 as soon as possible?
13     A.    Yes.
14     Q.    And then --
15     A.    As soon as -- as soon as -- start
16 as soon as possible and unwind -- and unwind
17 your long position in the FPS or the underlying
18 equity by shorting the stock and -- until the
19 conversion period and then convert.
20     Q.    I'm sorry.  I'm just looking at
21 this.  I'm trying to understand what this
22 sentence means, not what you just said.
23     A.    Well, I just explained what it
24 said.
25     Q.    Well, I'm sorry, maybe I missed

Page 233

1  - STEPHEN D. PROWSE -
2  it.
3        You start as soon as possible.
4  Reduce your overall long position in the
5  underlying equity whenever possible.  That
6  means you start unwinding as soon as possible.
7  Okay?
8        Then it says "to extend the
9  period over which such positions were
10 unwound."
11        What does that mean?
12     A.    No, I would say it differently.  I
13 would say whenever you see a chance -- whenever
14 there is a chance, an optimal trading -- the
15 first clause to me means whenever there is a
16 chance to un -- to unwind your position, unwind
17 your long position, you take it.
18        And, furthermore, you -- and this
19 is the second clause.  You start that process
20 as early as possible, because as soon as you
21 invest in the FPS, you're at risk.
22     Q.    Well, if you have an FPS that
23 is -- the price is a floating price based on
24 stock price and you're buying at a discount --
25 in this case I think it's 85 cents on the

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                         March 5, 2010
New York, NY

Page 234

1           - STEPHEN D. PROWSE -
2    dollar.  Right?
3        A.    (Indicating.)
4        Q.    What's the magnitude of the risk
5    when you're holding the -- holding the
6    debenture prior to conversion?
7        A.    Well, that's where the nature of
8    the company comes in.  The magnitude of the
9    risk is -- consists of a number of risks:
10   credit risk, default risk, liquidity risk,
11   delisting risk.  And the size of those risks
12   depends on the riskiness of the company.
13          This was an extremely risky
14   company.  Highly volatile stock price, very
15   poor operating performance, unable to raise
16   money in any other way than through an FPS.
17   Periods of time over which the stock price
18   could easily fall 90 percent.
19          This was a -- this was a company
20   that presented high credit risk, high default
21   risk, high liquidity risk and high delist --
22   delisting risk.  And all that together meant
23   that your holdings in the FPS were extremely
24   risky right from the get-go.
25          And, so, you would want to cover

Page 235

1           - STEPHEN D. PROWSE -
2    yourself for that.
3        Q.    Did Amro extend the convertible
4    debenture?
5        A.    I believe it did.
6        Q.    When did it do that?
7        A.    I don't know the date.
8        Q.    When did it begin to negotiate
9    that?
10       A.    I don't know the date.
11       Q.    Did Amro and Rhino and Badian sign
12   a nondisclosure agreement to look at the
13   financials of Sedona when they did so?
14       A.    I'm not aware of whether they did
15   or didn't.
16       Q.    So you don't know?
17       A.    I don't know.
18       Q.    Well, assume that they did, okay,
19   for purposes of giving your opinions.  And they
20   decided to extend the term after they had seen
21   the financials on a confidential basis.  And
22   they extended the debenture which had a
23   provision in it which prohibited them from
24   shorting the stock prior to submitting a
25   conversion letter.

Page 236

1           - STEPHEN D. PROWSE -
2          Was that a rational economic
3    decision on their part?
4          MR. SOHN:  Objection.  It's an
5    incomplete hypothetical.
6        A.    It may or may not have been.  I
7    don't know if they were aware what they were --
8    what they were entering into in terms of a
9    nonshort provision.  It may or may not have
10   been an economically rational decision.
11          But once that decision's made and
12   you are in a position where you're in an FPS,
13   you're an extremely -- you're holding extremely
14   risky security.  And a way to hedge that risk
15   is to short and cover yourself.
16       Q.    Well, if it's a floating price
17   conversion, how great is the risk if the price
18   goes down?  Don't you just get more stock
19   that's equal to the amount that you tendered
20   for the conversion?
21       A.    That's one protection, but it's
22   not a complete protection.  You've got -- as
23   I've said, as I said five minutes ago, you've
24   got credit risk, you've got default risk, you
25   have delisting risk, you have liquidity risk,

Page 237

1           - STEPHEN D. PROWSE -
2    all of which can result in a decline of the FPS
3    and a decline in the value of the FPS and a
4    decline in the value of the stock or your
5    ability to get cash out of the stock when you
6    eventually get it.
7        Q.    Was all of that information
8    available to Badian and Rhino and Amro at the
9    time that they agreed to extend the convertible
10   debenture?
11          MR. SOHN:  Objection to form.
12       A.    I would assume that both Sedona
13   and Rhino are sophisticated parties.  And when
14   they enter into a contract, they understand the
15   risks that they are entering into.  And -- but
16   once you have entered into that contract, those
17   risks are there and you want to hedge them to
18   the -- to the greatest extent you can.
19       Q.    Now, isn't -- isn't there a risk
20   in holding Sedona stock long?
21          MR. SOHN:  When?
22          MR. GUIDO:  At any point in time.
23       A.    Sure, there's a risk with holding
24   any -- any kind of financial instrument.  It's
25   just a question of whether it's a -- it's a

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

---

**Page 238**

1         - STEPHEN D. PROWSE -
2    question of the degree.
3         Q.    The degree.  Okay.
4             When Sedona converted -- I mean
5    when Amro converted the stock in their
6    conversions in the spring of 2001, did it end
7    up long, the stock?
8         A.    It ended up long, the stock, but
9    not by much and for a short period of time.
10        Q.    Well, what do you mean by "not by
11   much"?
12        A.    Not by much.  I mean, at most I
13   think a hundred -- a couple hundred thousand
14   shares, maybe, if that.
15        Q.    Really?
16        A.    For short periods.
17        Q.    Really?
18        A.    Yeah, really.
19        Q.    Not 814,000?
20        A.    Nowhere close to that.
21        Q.    Nowhere close to that?
22        A.    No.
23        Q.    Where do you get that information?
24        A.    From our database that you have.
25        Q.    Well, you have the data -- you

---

**Page 239**

1         - STEPHEN D. PROWSE -
2    have the aggregate data, don't you, on that
3    Exhibit 14, or am I wrong in what's in Exhibit
4    14?  No, I'm sorry, it's not in Exhibit 14.
5             But in your database it shows that
6    -- in the database it shows --
7         A.    Just the accumulated position in
8    terms of shares on a daily basis.
9         Q.    On a daily basis.
10            And, so, that, after the
11   conversions, that Sedona was not long the stock
12   more than a few hundred thousand shares?
13        A.    Well, I want to be careful about
14   the time period, but -- and there may have been
15   a brief period where it was a little more than
16   that, but I don't believe it was ever close to
17   being 860,000 shares long.
18        Q.    Okay.  So your view is that they
19   should short the stock as much as possible and
20   then they should convert and get rid of the
21   stock that they have as soon as possible?
22        A.    I would phrase it differently.  I
23   would phrase it that what they should do, or
24   what an optimal strategy would be for holding
25   an FPS, is to start hedging yourself as

---

**Page 240**

1         - STEPHEN D. PROWSE -
2    quickly -- as soon as you can without having
3    any impact on the market.  Slowly unwind your
4    long position till you get to a point at which
5    you can convert.  Then make a decision about
6    whether you want to convert or not, depending
7    upon how much you've been able to cover
8    yourself.
9             And if you decide to convert, then
10   you have to decide how much you're going to
11   convert and that would depend on how much
12   you've been able to short.  And then start
13   again depending on how much you have left to go
14   in terms of your conversion.
15        Q.    Well, when did they -- when did
16   they start shorting the stock there?
17        A.    You mean after November 22nd?
18        Q.    Uh-huh.
19        A.    I mean, I would have to look at
20   the data to tell you the day when they started,
21   but I can't tell you sitting here.
22        Q.    Have you ever seen any of the
23   reports that Danny Graham sent to Andreas
24   Badian on the short transactions in the
25   Refco/Amro account?

---

**Page 241**

1         - STEPHEN D. PROWSE -
2         A.    No, I don't believe I have.
3         Q.    I'd like you to take a look at a
4    document that's been previously marked as
5    Exhibit No. 57.  And I'd like you to turn to
6    the page -- as you can see, this is an e-mail
7    on Wednesday, March 28th, from Danny Graham to
8    Andreas Badian.  It's called a Refco
9    spreadsheet.
10            Look at the page SDNA, about the
11   third or fourth in.  I guess it's not the third
12   or fourth.
13            Are you at that page?
14        A.    Yes.
15        Q.    This is a summary of the
16   transactions in the Refco account in Sedona --
17   I mean in the Amro account.  It's a -- I mean
18   the Refco account for Amro in Sedona stock.
19   And it indicates that short selling
20   started, that's involved here, on February
21   21st.  That is three months after the
22   convertible debenture was even entered, isn't
23   it?
24        A.    Yes.
25        Q.    Is that what you call as soon as

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

---

Page 242

1           - STEPHEN D. PROWSE -
2     possible?
3          A.    Well, I don't know if this is the
4     sum total of Rhino transactions. So, I just
5     don't know whether this is representing all of
6     Rhino's transactions.
7          Q.    So, Rhino or Amro could have been
8     selling through other accounts other than the
9     Refco account?
10         A.    They could have been.
11         Q.    Take a look at Exhibit No. 47
12    again.
13              Do you see that?
14              MR. SOHN:  Which one?
15              MR. GUIDO:  I think it was --
16              MR. SCHECHTMAN:  This one?
17              MR. GUIDO:  Excuse me.  It was the
18    21A report.
19              THE WITNESS:  This one?
20              MR. GUIDO:  What's the exhibit
21    number?
22    BY MR. GUIDO:
23         Q.    Does that reflect aggregate
24    transactions in Sedona stock by Amro-related
25    activities?

---

Page 243

1           - STEPHEN D. PROWSE -
2          A.    Does what --
3              MR. SOHN:  Objection to form.
4          A.    Does what reflect?
5          Q.    The Schedule D on Exhibit No. 10,
6     which is the earlier Exhibit No. 47.
7              MR. SOHN:  Does it what?
8          Q.    It's Exhibit D, or Schedule D, on
9     Exhibit No. 10.
10             MR. SOHN:  Right.  And what's the
11    question?
12         Q.    Does that reflect the aggregate
13    transactions in Sedona stock during the time
14    period after they were entering into the
15    convertible debenture?
16             MR. SOHN:  Are you asking
17    Dr. Prowse if that's accurate or if it reports
18    what it purports to report?
19    BY MR. GUIDO:
20         Q.    Does it purport?
21         A.    I don't even know what it
22    purports.  I haven't read this document.  It's
23    a very long document with 23 pages and a large
24    number of spreadsheets.  So I don't know what
25    it's supposed to purport.  So I don't know how

---

Page 244

1           - STEPHEN D. PROWSE -
2     to answer your question here.
3          Q.    Is it your understanding that
4     Badian, acting on behalf of Amro, shorted the
5     stock of Sedona prior to February 21st of
6     2001?
7          A.    As I said before, I can't give you
8     a date without looking at the data for the
9     cumulative holdings which are in our -- in our
10    work sheets.  And the date just doesn't come to
11    mind at which Rhino first was in a short
12    position after issuance of the November 22nd
13    FPS.
14         Q.    Now, assuming that you're correct,
15    that that's what rational strategy in the
16    shorts did occur at an earlier point in time,
17    is it also an economically rational strategy to
18    short the stock as much as possible, convert at
19    a low price, and by pushing the price down
20    using whatever market strength that Badian had,
21    converting the larger number of shares and
22    then, using NASDAQ trades to push up the market
23    price and unload those additional shares at the
24    higher price?
25             MR. SOHN:  Objection to form.

---

Page 245

1           - STEPHEN D. PROWSE -
2          A.    Well, number one, that's a
3     strategy that increases your risks in a number
4     of aspects.  And, number two, that's not what
5     our empirical analysis finds, that there was no
6     price impact one way or the other of Rhino's
7     trades.  And, so, with regards to number one,
8     --
9          Q.    My --
10         A.    -- the optimal strategy --
11         Q.    Excuse me.  I'm sorry for
12    interrupting, but I'm not asking what they did
13    here.  I asked you a hypothetical.
14             I said isn't it a rational
15    strategy, economically rational, if you have
16    the ability to do it -- to short stock at a
17    higher price, push it down and convert at a
18    lower price, and then to use mechanisms such as
19    wash trades to push it up to give you the
20    excess stock at a higher price?  Isn't that an
21    economically rational approach?
22             MR. SOHN:  Objection to form.
23         A.    I think a more economically
24    rational approach is just to short the stock
25    without any intent to push it down, cover

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010

New York, NY

Page 246

1         - STEPHEN D. PROWSE -
2    yourself.  When you get to a point that you can
3    convert, convert, and continue to do that all
4    the way through to the end of the FPS.  That
5    avoids risks associated with manipulating the
6    stock.
7         Q.    Well, let me give you a
8    hypothetical.  Okay?  And that is the stock is
9    trading at a buck.  And, so, I short a million
10   shares at a dollar.  And I have the ability to
11   push it down to 50 cents.  And I push it down
12   to 50 cents.  And I convert at a 50-cent price.
13   And I get my million shares -- I get the
14   million shares that I sold at 50 cents and I
15   get another million shares at 50 cents.  And
16   then I enter into wash sales and I push the
17   price back up to a buck and I unload it.
18         Don't I make much more money than
19   I had sold -- than if I had sold the million
20   shares and converted the million shares after,
21   at a buck?
22         A.    I guess in your hypothetical, to
23   the extent I understand it, you've set it up
24   that way, yes.  It's almost tautologic.
25         Q.    No, I understand that.  But isn't

Page 247

1         - STEPHEN D. PROWSE -
2    it -- isn't that also a feasible strategy?
3         A.    I don't know if it's a feasible
4    strategy or not.  It depends on the stock, it
5    depends on the entity, it depends on the risks
6    of the security, it depends on the risks of the
7    company.  It depends on the risks of
8    manipulating -- actually manipulating the
9    stock, and depends on your ability to do that.
10        Q.    Well, there are a lot of
11   uncertainties in life, including your -- your
12   hypothetical of the appropriate hedging
13   strategy, aren't there?
14             MR. SOHN:  Objection.
15        A.    That's not my hypothetical.
16   That's my opinion.
17        Q.    Okay.
18        A.    It's your hypothetical of the --
19        Q.    It's my hypothetical.  And your
20   opinion is also a hypothetical.  And that is
21   that you basically short the stock and then you
22   convert.  Right?
23        A.    That's not a hypothetical.
24             MR. SOHN:  That's a question?
25             MR. SCHECHTMAN:  Wait.  Stop.

Page 248

1         - STEPHEN D. PROWSE -
2    What's the question?
3             MR. GUIDO:  I'm sorry.
4             MR. SCHECHTMAN:  Wait.  Ken, can
5    we just get the question read back?
6             MR. GUIDO:  Yes.
7             MR. SCHECHTMAN:  Thank you.
8             (Whereupon, the record is read
9    back.)
10             MR. GUIDO:  Are we waiting for
11   something?
12             MR. SOHN:  She didn't -- she
13   didn't really have what the question was.
14             MS. SCHECHTMAN:  And it didn't
15   sound like a question.
16             MR. SOHN:  It sounded even less
17   like a question than it did the first time.
18             MR. GUIDO:  Let me ask you a
19   question, or let me ask you the question with
20   Ms. Schechtman's permission.
21   BY MR. GUIDO:
22        Q.    And that is the -- are you telling
23   me, or us, that there is no rational
24   economic -- there's no economically rational
25   reason to engage in market manipulation?

Page 249

1         - STEPHEN D. PROWSE -
2        A.    What I'm telling you is that,
3    hypothetically, I can see that there would be
4    economic incentives to engage in manipulation.
5    Manipulation happens.  It just doesn't happen
6    in this case.
7             There was a -- there was an
8    economically rational strategy for trading the
9    equity of Sedona based on the riskiness of the
10   FPS, which was largely mirrored by Rhino's
11   strategy, and there was no empirical evidence
12   to support Rhino having -- having any impact on
13   the price.  And Sedona was a highly risky
14   company whose stock price could go up, was
15   extremely volatile.  And that contributed to
16   the optimality of the hedging strategy and also
17   contributed to the riskiness of the stock and
18   why it would go down.
19        Q.    Well, let me read you something.
20   And that is, "Contract-based and trade-based
21   manipulation is neither impossible nor
22   self-deterring.  Possible economic models
23   indicate that manipulation can be profitable."
24   Manipulation -- "Manipulative trading may or
25   may not be common, but it is possible and

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010

New York, NY

Page 250

- STEPHEN D. PROWSE -

1     - STEPHEN D. PROWSE -
2  tempting in a variety of significant and common
3  situations."
4        Do you agree or disagree with that
5  statement?
6      A.   I think that's what I largely
7  said, that there could be economic situations
8  where manipulation works, but it just didn't
9  work in this case. It didn't happen in this
10 case for the reasons I just gave.
11     Q.   And you said it was based on
12 empirical evidence?
13     A.   It's based on an analysis of the
14 optimal trading strategy; it was based on an
15 analysis of the risks Sedona presented to
16 investors; and it was based on empirical
17 analysis. Yes.
18     Q.   Was it based on what the people
19 who were engaged in the activity themselves
20 thought they were doing?
21     MR. SOHN: Objection to form.
22     A.   It was based on the three inputs
23 that I -- the three pieces of analysis that I
24 talked about.
25     Q.   Okay. Did you consider at all

Page 251

1     - STEPHEN D. PROWSE -
2  what the people who were executing the
3  transactions thought they were doing?
4      A.   We didn't get -- we didn't get
5  into that. We weren't asked to look at that.
6      Q.   So you've never seen or
7  listened -- seen transcripts or -- of
8  audiotapes or heard audiotapes of what
9  Mr. Badian was saying or that people who were
10 executing trades on his behalf were saying
11 about what he was doing?
12     A.   I have not.
13     Q.   Would your opinion be affected if
14 you learned that the people who had executed
15 the trades had concluded that Badian had pushed
16 the price down in order to increase his
17 conversion, the number of shares to get on
18 conversion?
19     MR. SOHN: Objection to form.
20     A.   That's not what the data I've
21 analyzed tells me. That's not what I've
22 concluded in my report. So that wouldn't
23 change my opinion.
24     Q.   So it wouldn't change your
25 opinion?

Page 252

1     - STEPHEN D. PROWSE -
2      A.   No.
3      Q.   The numbers, as far as you're
4  concerned, are the controlling variable?
5      A.   No. My report is the -- my report
6  is my report and all the elements of my
7  report --
8      Q.   Okay.
9      A.   -- that go into that.
10     Q.   Okay. But I'm giving you another
11 variable that you didn't consider.
12     A.   Correct.
13     Q.   And that is that the people who
14 engaged in the activity concluded that they had
15 pushed the price down to 75 cents at Badian's
16 direction.
17     MR. SOHN: Objection.
18     Q.   Does that affect your conclusions
19 in your report?
20     MR. SOHN: Objection to form.
21     A.   The evidence doesn't support that
22 notion.
23     Q.   Well, let's go -- let's talk about
24 the regressions now. You did five regressions
25 on the March 1st to May 31st transactions. And

Page 253

1     - STEPHEN D. PROWSE -
2  then there's another one that you don't list,
3  and that is net daily trading excluding the
4  impact to the NASDAQ, which you don't even
5  mention.
6      A.   That's incorrect.
7      Q.   Well, I -- I don't see a piece of
8  paper that says you did it. I had to have
9  somebody go back and reconstruct the model to
10 determine it. There's not a piece of paper
11 that you've produced in this case that said you
12 did that last regression.
13     A.   Which last regression?
14     Q.   The regression of net daily
15 trading absent the impact of the NASDAQ. There
16 is not a piece of paper that says you did that
17 regression anywhere in what you've produced.
18     A.   Well, I understand -- I understand
19 that we did that regression. I understand we
20 did nine regressions, not five.
21     Q.   Okay.
22     A.   Nine regressions for each period.
23     Q.   Okay. Well, I'm sticking to the
24 March 1st to May 31st -- March 1st to May 31st
25 time period right now. Okay?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

---

Page 254

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2         And the -- the question is, you
3    came up -- you did what you call nine
4    regressions, and that three of them show a
5    significant correlation, although one of them
6    is weak.  It's a 7.08, one which is net trading
7    as a percentage of total volume.
8         One of them is net daily trading
9    factoring out the impact of the NASDAQ.  And
10   the third is net daily trading ignoring the
11   impact of the NASDAQ, which you, in another
12   correlation, have indicated during this time
13   period is statistically insignificant in terms
14   of its impact.
15        So you've got three regressions
16   that show a statistically significant
17   relationship between Badian's trading activity
18   and the stock price of Sedona.
19        Now, why isn't that consistent
20   with the testimony that I've just told you
21   exists in this record that the people that
22   engaged in the trading activity on behalf of
23   Badian concluded that Badian had pushed the
24   price down to 75 cents?
25        MR. SOHN:  Objection to form.

---

Page 255

1    - STEPHEN D. PROWSE -
2         A.    For a variety of reasons.  First
3    off, none of the relationships that you've just
4    described are properly considered to be
5    significant when -- when considered in the
6    context of the battery of tests we ran.
7         We ran numerous parametric
8    analysis, nonparametric analysis.  We ran 18
9    regressions.  It doesn't surprise me at all
10   that I would get a spurious correlation in two
11   of them.  It just doesn't.  That's what --
12   that's what to be expected from statistics.
13        Controlling for that spurious
14   correlation tells you that you cannot reject
15   the hypothesis of no impact when you have a
16   mass of results that tell you where the
17   piece -- where the "P" value is greater than 5
18   percent, and only two that tell you the "P"
19   value is less than 5 percent.
20        Q.    Let's --
21        A.    So there is --
22        MR. SOHN:  Mr. Guido.
23        A.    There's a mass of evidence that
24   shows no impact.
25        Q.    Okay.  Mass of evidence --

---

Page 256

1    - STEPHEN D. PROWSE -
2         A.    And that is --
3         MR. SOHN:  Mr. Guido, please let
4    the witness finish his answer.
5         A.    That is inconsistent with the --
6    with the information you just gave me.  And
7    it's also consistent with your experts'
8    analysis.  Your experts ran our regressions for
9    another time period, yet another time period.
10   And in their time period, they found no -- even
11   on a stand-alone basis no statistically
12   significant -- a "P" value of less than 5
13   percent.
14        Q.    All right.  Let's talk about the
15   massive evidence.  Okay?  One of them is
16   NASDAQ.  Right?  The background.  I'm taking --
17   I'm using your report.
18        A.    Okay.  I'm not sure what
19   particular part of my report you're referring
20   to.
21        Q.    Well, I mean, you're talking that
22   you did a lot of analysis and there's a massive
23   amount of amount.  One of them is what NASDAQ
24   did.  The other is what the peer group did.
25   The third is the events, the company-specific

---

Page 257

1    - STEPHEN D. PROWSE -
2    events.
3         A.    Actually I was talking about --
4         Q.    Anything else?
5         A.    -- the actual statistical
6    analysis.  But if -- but, certainly, that's
7    true.
8         Q.    Okay.
9         A.    That's broadening out --
10        Q.    And you found that NASDAQ --
11        (Indiscernible cross-talk; Reporter
12   requests one speaker at a time.)
13        A.    Broadening it out to Section 3,
14   yes, you're correct, those other factors also
15   play a role.
16        Q.    Okay.  And you testified that with
17   NASDAQ, March -- March 1st to May 31st, there's
18   no statistical correlation between the NASDAQ
19   and Sedona's price.  Correct?
20        A.    Correct, that's what the
21   regression showed.
22        Q.    All right.  And with regard to the
23   peer group, you didn't do it, because you
24   didn't have the data to do it.  Right?
25        A.    I'm not sure if we didn't have the

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

Page 258

1           - STEPHEN D. PROWSE -
2      data. I'm not sure that's the exact reason,
3      but we didn't do it.
4           Q.    But you didn't do it.
5           A.    We didn't -- we didn't put it in
6      the regressions. We looked at it and compared
7      Sedona's stock price --
8           Q.    No, I understand. You didn't --
9           A.    -- decline --
10              MR. SOHN: Mr. Guido.
11          A.    -- with the average decline of the
12     peer group, found that it was totally in line.
13          Q.    You didn't do a statistical
14     analysis comparing -- a regression analysis
15     comparing the peer group performance with
16     Sedona's stock performance, did you?
17          A.    We didn't do a regression
18     analysis --
19          Q.    Thank you.
20          A.    -- with the peer index. We did
21     another type of analysis.
22          Q.    Thank you.
23                And you didn't do an event study
24     on the various events that you cite in your
25     report: The issuance of 10-Ks, the purchases

Page 259

1           - STEPHEN D. PROWSE -
2      of stock. You didn't do any event studies to
3      indicate whether those in isolation had an
4      impact on Sedona's stock price performance.
5           A.    That's incorrect, as we talked
6      about a couple hours ago. And we went into
7      that in detail a couple hours ago. That's just
8      incorrect.
9           Q.    Where is the event study for each
10     of those events? I didn't see it anywhere in
11     your report.
12          A.    You mentioned an event study for
13     stock purchases, and I -- we went through this
14     two or three hours ago. I told you that we had
15     indicator variables in our regressions for
16     direct purchases of stock. And --
17          Q.    And when I looked at the -- when I
18     looked at it, I think that the purchases of
19     stock, you told me that you didn't see any
20     significant correlation.
21          A.    Exactly. There was no impact on
22     the price for Rhino's purchase of stock.
23          Q.    Okay. And there was no impact in
24     terms of the transactions when you looked at
25     those in isolation in your regression analyses.

Page 260

1           - STEPHEN D. PROWSE -
2      Isn't that correct?
3           A.    That's exactly correct.
4           Q.    Okay.
5           A.    There was no impact of the -- of
6      the trans -- of the transactions. And there
7      was also no impact of the trades.
8           Q.    Now, so, then you've got -- you
9      put those aside and you've got left the
10     statistical analyses that you did on these
11     three situations: One is that daily trades as
12     a percentage of volume; net daily trades
13     including factoring out the impact of NASDAQ;
14     and, third, net daily trades of -- for not --
15     not including the impact of the NASDAQ.
16     Correct?
17          A.    As well as the other regressions
18     we ran.
19          Q.    Okay. The other regressions.
20                And the other regressions included
21     regressions in which you put information that
22     you have testified as far as you know was not
23     public information?
24              MR. SOHN: Objection.
25          Q.    Including transfers and -- and

Page 261

1           - STEPHEN D. PROWSE -
2      principal purchases.
3           A.    But potentially could have
4      affected the price.
5           Q.    Okay.
6           A.    But reasonable --
7           Q.    You don't know --
8           A.    That's what were tested.
9           Q.    Okay. But you don't know?
10          A.    I don't know what?
11          Q.    I mean, isn't it a tautology?
12     That's what we're testing? I mean, the
13     question is, is the information public to have
14     an impact? Don't have you to, you know, come
15     to a conclusion of whether or not the
16     information could possibly have had an impact?
17          A.    No, the question is, did Rhino's
18     presence in the marketplace have an impact on
19     the stock? Rhino was a large trader of this
20     stock. It had potentially a very large supply
21     of stock to sell into the market based on its
22     FP -- because it was an FPS holder. Market
23     participants would have understood that.
24     Rhino's presence is absolutely -- in the
25     marketplace is absolutely a potential factor in

66 (Pages 258 to 261)

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 262

1         - STEPHEN D. PROWSE -
2    determining the price because Rhino is an
3    important trader in Sedona stock.
4         Q.    So, how can you conclude that it
5    didn't have an impact on the price of the stock
6    if what you just said was it was a major trader
7    and everybody perceived it as being a major
8    trader?
9         A.    Rhino was potentially a big trader
10   in Sedona stock. So that's why you want to
11   look at if, when it trades, it has an impact on
12   the stock. We find it doesn't.
13        Q.    Well --
14        A.    So that's what -- that's what the
15   data tell us. That's what we're testing.
16        Q.    One of the data -- when you
17   talk about magnitude in impact, one of the
18   data's net daily trades. Right?
19        A.    One of the?
20        Q.    One of the regressions is net
21   daily trades?
22        A.    One of the regressions has net
23   daily trades in it.
24        Q.    Why isn't that significant in
25   light of what you just said about, you know,

Page 263

1         - STEPHEN D. PROWSE -
2    Amro's market power in the marketplace?
3         A.    That's what the data tells you.
4    That's what you want -- that's what you use the
5    data to test. You have a theory.
6         Q.    Okay.
7         A.    And you want to test it. The
8    theory is Rhino's presence in the marketplace
9    potentially impacts the stock price. We want
10   to test that. We did test that. We found that
11   we could not -- we could not reject the null
12   hypothesis of no impact.
13        We did the same with Rhino's net
14   daily trades, and the same with Rhino's net
15   daily trades as a percentage of total volume.
16        Q.    Did you --
17        A.    Again, we couldn't reject the
18   hypothesis.
19        Q.    Well, did --
20        A.    Hang on. I'm not finished.
21        We couldn't reject the hypothesis
22   of no impact.
23        Q.    I enjoy your filibustering, but I
24   do have a limitation of time --
25        MR. SOHN: Mr. Guido, that's

Page 264

1         - STEPHEN D. PROWSE -
2    entirely inappropriate. He's answering your
3    question.
4         MR. GUIDO: I think he keeps
5    avoiding the question.
6    BY MR. GUIDO:
7         Q.    My question is, okay -- I have a
8    simple question for you. And it's just the
9    same question I had for Mr. Beloreshki, and I
10   believe he tried to avoid answering the
11   question.
12        And I want you to answer this
13   question: Is if you take net daily trades,
14   okay, and it shows a 95 percent significance of
15   the impact of Badian's trading, what is the
16   reason for rejecting that statistical analysis
17   which you've done here and you didn't even
18   include it because you say it was an oversight
19   in your report?
20        Explain to me why you exclude that
21   without all of this other discussion about
22   other things which you've testified are
23   statistically not significant to the impact of
24   Sedona stock. Just tell me with regard to that
25   one regression analysis why you rejected it and

Page 265

1         - STEPHEN D. PROWSE -
2    why you didn't include it in -- in your report
3    and why you didn't explain why you excluded it
4    from your report.
5         MR. SOHN: Mr. Guido, the tone of
6    your question is entirely inappropriate. The
7    finger pointing is inappropriate. You're free
8    to ask whatever questions, you know that, but
9    there's an appropriate way to do it and an
10   inappropriate way to do it.
11        MR. GUIDO: I haven't said
12   anything inappropriate.
13   BY MR. GUIDO:
14        Q.    Would you please answer the
15   question?
16        A.    First of all, you claimed that I
17   didn't answer the question, and then you
18   changed the question. We can go back and ask
19   the court reporter what the question was that I
20   was answering when you went off on me. And you
21   will find that it's a different question than
22   you just asked me.
23        Q.    Okay, let's --
24        A.    Secondly -- I'm not finished.
25   Secondly, you asked me about four different

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                      March 5, 2010
New York, NY

Page 266

- STEPHEN D. PROWSE -

1   - STEPHEN D. PROWSE -
2   questions. So please ask me a question one at
3   a time that I can answer.
4       MR. GUIDO: Will the court
5   reporter read back the question to the witness
6   who doesn't seem to understand.
7       MR. SOHN: Mr. Guido, I mean, the
8   comments are inappropriate. Your question goes
9   on for about four pages and -- and it's
10  entirely reasonable that the witness is going
11  to have a problem answering a four-page
12  question.
13      So if you could just ask a simple
14  question, a straightforward question,
15  Dr. Prowse is happy to answer it, as he's been
16  doing all day.
17      MR. GUIDO: All he has to say is
18  "I don't understand the question" --
19      MR. SOHN: Which is what he just
20  said.
21      MR. GUIDO: He didn't say
22  that.
23      A.   I did say that. I said you asked
24  me four questions and I don't know which one to
25  answer. So ask -- ask me one and I'll answer

Page 267

1   - STEPHEN D. PROWSE -
2   it.
3       Q.   Fine.
4       MR. GUIDO: Can you read back the
5   question?
6       (Whereupon, the record is read
7   back.)
8       MR. SOHN: That's four questions.
9       MR. GUIDO: That's five.
10      A.   I counted five.
11      Q.   Okay. One --
12      MR. SOHN: We agree it's more than
13  one.
14      MS. SCHECHTMAN: We accept your
15  apology, Mr. Guido.
16      MR. SOHN: Do you have a question?
17  BY MR. GUIDO:
18      Q.   Why did you regret -- reject
19  Regression 5?
20      A.   What do you mean by "reject"? We
21  didn't reject any regressions.
22      Q.   Well, you deemed that it wasn't
23  significant, didn't you?
24      A.   It was -- it's not significant.
25      Q.   Okay. And why isn't it

Page 268

1   - STEPHEN D. PROWSE -
2   significant?
3       A.   Because after you adjust for the
4   fact that you're making multiple tests, you
5   have to adjust for the fact that multiple tests
6   complicate the interpretation of a "P" value.
7   This is a widely accepted scientific result.
8       Q.   What's the literature support --
9       MR. SOHN: Mr. Guido.
10      A.   Now you interrupted me, so do you
11  want me to now answer the next question?
12      Q.   Well, you just said you make an
13  adjustment for multiple tests.
14      A.   You make an adjustment for
15  multiple tests. And when you make that
16  adjustment, it doesn't pass the Alpha
17  threshold.
18      Q.   Okay. And what's the literature
19  that supports that?
20      A.   There's a widely accepted
21  literature. It's in many standard statistical
22  text -- textbooks on multiple comparisons.
23  David Kaye and David Freedman have talked about
24  it in the Reference Guide on Statistics, which
25  is part of the Reference Manual of Scientific

Page 269

1   - STEPHEN D. PROWSE -
2   Evidence that is issued by the Federal Judicial
3   Center, I believe; that multiple comparisons
4   complicate the interpretation of a "P"
5   statistic, of a probability statistic. And
6   that if you run 20 different regressions, you
7   shouldn't be surprised to find a spurious
8   correlation even when the null hypothesis is
9   true.
10      Q.   What edition of David Kaye's piece
11  in the Reference Guide of Statistics are you
12  referring to?
13      A.   I don't know.
14      Q.   When did you read that?
15      A.   I have a copy of it. I don't know
16  what edition it is.
17      Q.   And you're -- you're saying that
18  David Kaye supports your view when there are
19  statistical -- that there are statistical
20  methods for coping with multiple looks at the
21  data.
22      Is that a fair assessment?
23      A.   I don't remember reading that. I
24  remember reading that multiple comparisons
25  complicate the interpretation of a "P"

68 (Pages 266 to 269)

Stephen David Prowse, Ph.D.                                                March 5, 2010

New York, NY

Page 270

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2    statistic. And that if you do multiple tests,
3    you shouldn't be surprised to find a spurious
4    correlation when the null is true.
5         Q.    Well, I have David Kaye in 2000,
6    and this is what David Kaye says in 2000. And
7    do you think this supports what you just said:
8    "There are statistical methods for coping with
9    multiple looks at the data which permit the
10   calculation of meaningful 'P' values in
11   certain cases."
12        Is that what you're referring to?
13        MR. SOHN: Mr. Guido, you're --
14   first of all, I mean, you're asking the witness
15   about a document that you haven't shown him.
16        MR. GUIDO: Well, the --
17        MR. SOHN: And you're -- and
18   you're pulling an excerpt out of it. So, I
19   mean, it's an unfair question.
20        MR. GUIDO: I'm making a
21   representation that that's a sentence that
22   appears in this -- in this piece.
23   BY MR. GUIDO:
24        Q.    Is that what you're referring
25   to?

Page 271

1    - STEPHEN D. PROWSE -
2         A.    I would have to see the context of
3    it.
4         Q.    Why do you have to see the
5    context? Because you know --
6         A.    Because whenever -- because
7    whenever I'm quoted a sentence and asked what
8    it means, I like to see what the context is of
9    what's being talked about.
10        Q.    Well, let me ask you this. I
11   mean, you -- you cited David Kaye. Anyone else
12   you want to cite?
13        A.    There's a variety of articles out
14   there. Bonferroni, Dunn, Tukey. There's talk
15   about this in some -- in, I think, standard
16   statistical textbooks about multiple
17   comparisons. There's a variety of literature
18   out there on it.
19        Q.    Well, let me ask you about the
20   literature.
21        Does the literature primarily
22   address this hypothetical, this situation? I
23   want to rebuild the World Trade Center just
24   exactly the way it was. So I -- and I want to
25   get support for that, to lobby the city

Page 272

1    - STEPHEN D. PROWSE -
2    council. Okay? Take that example.
3         And, so, I decide that I'm going
4    to go out and do a survey of the residents of
5    lower Manhattan to get their view of whether or
6    not it should be rebuilt exactly the way it
7    existed before it came down.
8         And I go out and I do a survey.
9    You know, I apply all of the same appropriate
10   sampling methods and I come up with the answer
11   and I say, no, we don't want it rebuilt the way
12   it was. And I say, oh, boy.
13        So I commission another
14   statistical analysis, and they go out and they
15   come up with the same result. And, so, I end
16   up commissioning 20. So I come up with five of
17   the people that say, yes, I want it rebuilt.
18        Is what you're referring to -- and
19   I think your colleague referred to it as the
20   Bonferroni correction -- is that the situation
21   that is designed to apply to?
22        MR. SOHN: Objection to the form.
23        A.    Well, I'm not sure I can reply to
24   your hypothetical. But the situation it's
25   supposed to apply to is when you have multiple

Page 273

1    - STEPHEN D. PROWSE -
2    tests or multiple comparisons trying to find a
3    result and -- a universal result.
4         And the fact is that it's just --
5    it's just the logic of statistics that if you
6    have -- the more regressions you run or the
7    more tests you do, the more likely you are to
8    find a spurious correlation. And you need to
9    control for that.
10        Q.    The -- and what is the mathematics
11   that you do to control for that?
12        A.    I think there are a variety of
13   different things you can do. There's the
14   Bonferroni correction; there's the Sidak
15   correction. They're very close, very similar.
16   There are --
17        Q.    Could you spell the second one?
18        A.    S-i-d-a-k.
19        There are -- there are others that
20   are more subjective in terms of parsing the "P"
21   values across different tests, but the
22   Bonferroni correction is a very simple and
23   widely known correction to do.
24        Q.    Have you read any of the
25   literature that's critical of the application

69 (Pages 270 to 273)

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

Page 274

1            - STEPHEN D. PROWSE -
2    of the Bonferroni correction?
3        A.    I'm aware of some of it.
4        Q.    And what does that literature say?
5        A.    It generally says that,
6    particularly when you're doing extremely large
7    sampling, with very, very large number of
8    tests, that the Bonferroni correction can be
9    conservative.
10       Q.    Have you ever read any literature
11   that indicates that the statistical methods for
12   coping with multiple looks of data would be of
13   little help in a case where analysts have run
14   through a variety of regression models to
15   arrive at the one considered the most
16   satisfactory?
17            MR. SOHN:  You're asking if he's
18   ever read that sentence?
19            MR. GUIDO:  No.
20   BY MR. GUIDO:
21       Q.    Are you aware of literature that
22   indicates that that's a problem with using the
23   statistical approach?
24       A.    I'm aware of literature -- the way
25   I interpret what you just said is what I've

Page 275

1            - STEPHEN D. PROWSE -
2    been saying for the past half an hour.  And
3    that is that there's a -- there's a problem,
4    which is generally called data mining, which is
5    running multiple tests and then relying on one
6    in which you get a spurious correlation where
7    at -- where the result of the spurious
8    correlation is the fact -- simply the fact that
9    you've run multiple tests and the logic of
10   statistics tells you that you're getting hit a
11   spurious correlation for completely random
12   reasons even when the null is true.
13       Q.    Well, did you actually do a
14   Bonferroni correction here?
15       A.    I did.
16       Q.    How come it's not in any of these
17   materials that were produced to me?
18       A.    Well, the Bonferroni correction is
19   very easy to do.  You -- all you do is adjust
20   the Alpha or the threshold "P" value by the
21   number of tests that you've run.
22            And when I -- when Erica reported
23   the "P" values to me, as I've discussed earlier
24   this morning, I noted that there was a "P"
25   value less than .05.  And I reminded myself to

Page 276

1            - STEPHEN D. PROWSE -
2    drop a footnote in the report to that effect;
3    that this doesn't change my opinion because
4    this is a -- this is a spurious result as a
5    result of running a number of multiple tests
6    and because we need to control for that.
7            If you apply a Bonferroni
8    correction, it's -- this particular regression
9    still is not significant, as are -- as are none
10   of the -- as are all of the others not
11   significant.  And, therefore, it doesn't --
12   doesn't change my opinion.
13            I explained this morning that,
14   unfortunately, I forgot to drop that footnote
15   into the report before it issued.
16       Q.    Well, isn't it -- isn't it
17   important for -- for an expert to include all
18   of the information that he bases his opinion on
19   in his report?
20       A.    I don't often include all of the
21   analysis I do on a particular project in the
22   exhibits or in the text of my report.  It
23   exists as a work sheet.  It's a supporting work
24   sheet to either an exhibit or a piece of data
25   in the report.

Page 277

1            - STEPHEN D. PROWSE -
2        Q.    So you don't think it's relevant
3    to the jury to know that you did a regression
4    analysis that showed there was a statistical
5    correlation between Badian's trading activities
6    and Sedona's stock price?
7            MR. SOHN:  Asked and -- asked and
8    answered.  You just asked the same question.
9        A.    And what -- what I just said is I
10   do think it's important to know.  And that's
11   why I wanted to put a footnote into the report,
12   but, unfortunately, I forgot.  But I'm telling
13   you now.
14       Q.    Well, don't you have quality
15   control at FTI?
16       A.    We do have quality control.
17   Unfortunately, you know, no one's perfect and
18   this was my fault because I was the one in
19   charge of the -- the last hurdle of this report
20   in terms of issuing it.  And it was my fault
21   that that did not get into the report.
22       Q.    Well, did you ever make an
23   attempt to evaluate whether or not each of the
24   models that were the basis for each of the
25   regressions were less strong than any of the

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                             March 5, 2010
New York, NY

---

Page 278

1              - STEPHEN D. PROWSE -
2    other models?
3              MR. SOHN:  Objection to the form.
4         A.    I think they're all legitimate.
5    This is what Mr. Beloreshki and I discussed at
6    the beginning.  We want to try to understand
7    all the potential ways that Sedona's stock
8    price could be impacted by Rhino's trading and
9    Rhino's transactions.  We want to understand
10   all the different ways that that could happen.
11             And we understood going in that
12   that would mean we might get a spurious result.
13   But, you know, that's -- that's the problem
14   with running multiple comparisons.  Sometimes
15   you will get a spurious result when you -- when
16   you run a lot of them.
17        Q.    Well, why --
18        A.    But we wanted to cover all the
19   bases.
20        Q.    I'm sorry.  You did all of these
21   regressions.  Okay?  And I think three of them
22   include data that you don't even know whether
23   or not -- was in the marketplace, could
24   potentially affect the market.  You're just
25   surmising that.

---

Page 279

1              - STEPHEN D. PROWSE -
2              MR. SOHN:  Objection to form.
3              MR. GUIDO:  Let me finish.
4    BY MR. GUIDO:
5         Q.    And you also indicated, I think
6    you testified, that the magnitude of Badian's
7    activity could be a relevant factor to
8    consider.
9              Why did you decide that the rules
10   of finding correlation were spurious and not
11   others?
12        A.    Because there's a -- there's a
13   potential to affect the stock price through any
14   mechanism of a Rhino trade.
15             Secondly, the results that we get
16   have to be adjusted for the fact that you're
17   going to get a spurious correlation.  We just
18   didn't -- we just didn't run nine regressions
19   and rely on that.  We wanted -- we wanted to
20   rely on all the statistical analysis we did,
21   including the nine regressions.
22             And when you do that and you make
23   a correction for the fact that you're testing
24   this every which way, then you could -- then an
25   appropriate conclusion, I believe, is that

---

Page 280

1              - STEPHEN D. PROWSE -
2    there's no impact on Sedona's stock from any
3    measure of Rhino's trading.
4              What we've got here is two
5    spurious results out of very, very many.  Two
6    results where the "P" value is greater than --
7    less than .05, out of very, very many results,
8    both from the regression analysis and from the
9    nonparametric and parametric analysis that tell
10   us that there is no effect, including your own
11   expert -- your own experts' specification of
12   our Regression 5, which shows the same thing
13   which -- over a different period which shows no
14   statistically different effect.
15        Q.    Well, maybe, you know, I don't
16   understand your vernacular.
17             What do you mean by a "parametric
18   test"?
19        A.    A parametric test is a test that
20   assumes a distribution of the underlying stock
21   returns in this particular case.  Basically we
22   assume a normal distribution in a parametric
23   test.
24        Q.    And what's the normal distribution
25   that you assumed here?

---

Page 281

1              - STEPHEN D. PROWSE -
2         A.    It's normal.  That it's normal.
3         Q.    The distribution to what?
4         A.    The distribution of stock returns
5    over a period of time.  The distribution, is it
6    a bell-shaped curve or not?
7         Q.    And that that -- you knew
8    eventually we were going to get to my little
9    graph.
10             MR. GUIDO:  I'd like to have this
11   marked as exhibit next number.
12             (Whereupon, exhibit is received
13   and marked BP-26 for identification.)
14   BY MR. GUIDO:
15        Q.    I only hand you this because I
16   wanted you to look at the little red graph
17   there.
18             Is that what you were referring to
19   when you talk about normal distribution?
20        A.    A bell-shaped curve.
21        Q.    Okay.  And is that an example of a
22   bell-shaped curve, type curve?
23        A.    This is an example of a
24   bell-shaped curve.  The curve.
25        Q.    Okay.  And one of the things that

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                          March 5, 2010
New York, NY

Page 282

1         - STEPHEN D. PROWSE -
2    you're doing with these statistical regressions
3    is to decide where the data falls on that
4    bell-shaped curve?
5         A.    Well, now we're back to
6    regressions.  I was talking about the
7    parametric analysis.
8         Q.    Okay.
9         A.    But --
10        Q.    Excuse me.
11        A.    Okay.  So if you want to go back
12   to the regressions, that's fine.
13        Q.    No.  Okay.  How do you apply a
14   parametric analysis to that?
15        A.    Well, a parametric analysis that
16   we do in our report basically tests the
17   difference between a particular distribution
18   between the effect of Rhino's trade -- the
19   affect of Rhino's buys versus sells on the
20   stock price and whether the stock price -- and
21   how much the stock price goes up or down based
22   on the buys versus the sells versus the --
23   versus the days when Rhino doesn't trade.
24        Q.    Okay.
25        A.    This is in -- summarized in

Page 283

1         - STEPHEN D. PROWSE -
2    Exhibit -- in Exhibit 10, for example.
3         Q.    Okay.  Let me ask you a question:
4    Is there another way -- is there other ways --
5    other data to analyze in that parametric test
6    that was done here?
7         MR. SOHN:  Did other than what?
8         Q.    Other than buys and sells and no
9    transactions.
10        A.    There could be.  This is the way
11   we did it.  We felt this was the easiest way to
12   do it, to group the -- to group the
13   observations by buys and sells and nothing
14   happening.
15        Q.    I just asked you whether there
16   were other ways.  I didn't ask you why you
17   didn't do the other ways.
18        A.    Okay.
19        Q.    Let me ask my next question:  What
20   are the other ways?  What are the other data
21   points that you could include here?
22        A.    I mean, there's all sorts of ways
23   you could group the data if you wanted to.
24        Q.    Well, let me give you an -- let me
25   give you an example.

Page 284

1         - STEPHEN D. PROWSE -
2         What about buys at the offer as
3    opposed to no buys?
4         A.    Buys at the offer versus no buys?
5         Q.    Uh-huh.
6         A.    I would have to think about that.
7         Q.    Okay.  Did you think about it when
8    you prepared that exhibit?
9         A.    No, we thought this was the
10   appropriate way to do it.
11        Q.    No, I understand that.  But you
12   didn't think about the alternatives, did you?
13        A.    No.
14        MR. SOHN:  He just answered the
15   question.
16        A.    I just said we felt this was the
17   appropriate way to conduct the parametric
18   test.
19        Q.    And you just now said you'd have
20   to think about the alternative I gave you.
21        And my question is:  Why didn't
22   you think about that when you did this
23   exhibit?
24        A.    Well, I'd have to think about the
25   specific -- think about if that was a

Page 285

1         - STEPHEN D. PROWSE -
2    reasonable way.  We thought this was the
3    reasonable way to do it.
4         Q.    Okay.  Fine.  Tell me what the
5    other alternatives were that you thought
6    about.
7         A.    I can't remember.  There were -- I
8    mean, you could group by -- could group by the
9    extent to which the stock price moves versus a
10   buy and a sell.  You could group, you know --
11   you could create a finer distinction instead of
12   stock price moves between 0 and five, five and
13   ten, ten and 15.  Something like that.
14        Q.    Okay.
15        A.    You could create as big a matrix
16   as you wanted in terms of buys and sells versus
17   some characteristic of a stock price.  You just
18   have to be careful about the number of
19   observations or the expected value you would
20   get in each of those cells.
21        Q.    Well, could you -- could you do
22   one of these -- what is it, Exhibit 10A? --
23   using the percentage of volume, Sedona's
24   percentage of volume or Badian's percentage of
25   Sedona volume?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                        March 5, 2010
New York, NY

Page 286

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2        A.    Rhino's percentage of Sedona
3    volume.  You might be able to do that.
4        Q.    Did you think about doing that?
5        A.    Well, we looked at that in our
6    regression analysis, and we looked at that in
7    our Exhibit 13, I believe -- 14 -- 12.  Exhibit
8    12.  So that was covered in other exhibits.
9        Q.    In Exhibit 12.  Okay.  Let's look
10   at Exhibit 12.
11              And what did you conclude Exhibit
12   12 demonstrated?
13       A.    That there was no significant
14   relationship between trading volume and Sedona
15   stock price returns.
16       Q.    Well, isn't this Exhibit 12 a
17   graph of the Regression Number 5?
18       A.    No, it's not.
19       Q.    Well, it is a Regression Number 5
20   for the larger time period, isn't it?
21       A.    No, it's not.
22       Q.    It's not?
23       A.    No.
24       Q.    This says this is a proportion of
25   Rhino volume to market volume.

Page 287

1    - STEPHEN D. PROWSE -
2        A.    Right.
3        Q.    And isn't that -- Rhino's --
4    Sedona trades as a percentage of the total
5    volume?
6        A.    No.
7        Q.    Well, did you do this for the
8    shorter period of time?
9        A.    Did we do Exhibit 12 for the
10   shorter period of time?  I don't believe we
11   did.  We may have.  If we did, it's in the work
12   sheets.
13       Q.    Pardon?
14       A.    If we did, it's in the work
15   sheets, but I don't believe we did.
16       Q.    Well, I mean, just take Exhibit
17   No. 12.  I mean, this, to me, is a scattergram.
18   I don't know if that's an appropriate term.
19   But it looks like I can a scattergram.  You have all
20   these points --
21       A.    You could call it that.
22       Q.    Huh?
23       A.    You could call it that.
24       Q.    You have all of these points that
25   are all over this scattergram.  Okay?  And that

Page 288

1    - STEPHEN D. PROWSE -
2    you have -- and it's supposed to be an analysis
3    of the proportion of Rhino volume to market
4    volume, and then it has impacts on price
5    returns.  And that the -- a couple of questions
6    I have about -- about this study.
7              If you take a look at -- look
8    between the 250 and the 300 percent range.  You
9    see that dot right above the black line?
10       A.    Yeah.
11       Q.    What is that?
12       A.    That's a -- that's a data point.
13       Q.    So what you're saying is that
14   Rhino's trading volume was almost 300 percent
15   of the total volume?
16       A.    On that particular day.
17       Q.    It was?  How'd -- how'd that
18   happen?
19       A.    Volume is measured here as buys
20   plus sells.  So, on that particular day, buys
21   plus sells would have -- may have -- would have
22   been greater than 300 percent.  I think there's
23   one day, actually -- I don't know if it's this
24   day.  I think there's one day in our database
25   where we observed Rhino volume being greater

Page 289

1    - STEPHEN D. PROWSE -
2    than the market volume.  And we're not sure of
3    the reason why.
4        Q.    Well, I mean, how can that be?
5        A.    Well --
6        Q.    I mean, my understanding --
7        A.    Well, if the statements -- if the
8    statements say a transaction occurred on this
9    day, we have volume at a particular amount, we
10   can't reconcile that.  So that is one data
11   point that may be -- may be problematic.  But I
12   don't know if it's this one.
13       Q.    Well, what is your understanding
14   of how the total volume reported on Bloomberg
15   is calculated?
16       A.    For the NASDAQ, both sides of the
17   transaction are reported.
18       Q.    As one transaction.
19       A.    So you may -- so you get some
20   double counting as you go through.  You may
21   get --
22       Q.    What?
23       A.    You may get some double counting
24   as you go through.
25       Q.    Really?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                    March 5, 2010
New York, NY

Page 290

1           - STEPHEN D. PROWSE -
2      A.     You may do.
3      Q.     You may?
4      A.     Yeah.
5      Q.     So the buys are reported to the
6   market?
7      A.     So volume may be -- may be double
8   what it's supposed to be.
9      Q.     Have you ever studied the audit
10  trail reports on how the Bloomberg is developed
11  off of the audit trail reports?
12     A.     No, I have not.
13     Q.     You have no idea how the Bloomberg
14  data gets reported?
15     A.     I'd have to look and see.
16     Q.     But you can't tell us today?
17     A.     I can't tell you sitting here
18  today.
19     Q.     Did you ever know?
20     A.     Yeah, I think I've known.  I think
21  I've known.
22     Q.     Did you ever -- did you ever do
23  any research on that question?
24     A.     I've read articles on that.
25     Q.     On the question?

Page 291

1           - STEPHEN D. PROWSE -
2      A.     Yeah.
3      Q.     Have you ever read any of the
4   NASDAQ guidance on riskless principal
5   transactions?
6      A.     No, I have not.
7      Q.     No?
8             Well, you didn't do the
9   scattergram for the shorter period of time?
10     A.     I'm saying I can't remember if we
11  did it.  If we did it, it's in the work sheets.
12  If it's not in the work sheets, we didn't do
13  it.
14     Q.     Now, I'm still a little puzzled by
15  what it is that you did that led you to
16  conclude that the three analyses that showed
17  correlation -- or significant -- excuse me.  I
18  you used the "C" word and I'm sorry, Mr. Sohn
19  and Mr. Glosten.
20             That you rejected the three in the
21  shorter period of time.  And your reason for
22  doing that is because, in the longer period of
23  time, you didn't show any statistical
24  significance for -- was it nine regressions you
25  said that you did for the longer period of

Page 292

1           - STEPHEN D. PROWSE -
2   time?
3      A.     We did nine --
4             MR. SOHN:  Objection to the form.
5   I think there are least three false
6   assumptions in there and three or four
7   questions in there.
8      A.     That's correct, there are.  But in
9   answer to your final question, we did nine in
10  the long period and nine in the shorter
11  period.
12     Q.     Okay.  Fine.
13             And is the reason you rejected the
14  findings of statistical significance in the
15  three, in the shorter period of time -- one of
16  which I think the literature we characterized
17  as weak, that being the daily trading as a
18  percentage of volume because it isn't at the 95
19  percent significance level.  The reason you
20  rejected those three is because you came up
21  with 15 others that showed no statistical
22  significance?
23             MR. SOHN:  Objection;
24  mischaracterizes the previous testimony.
25     A.     Right, it does.  We didn't reject

Page 293

1           - STEPHEN D. PROWSE -
2   any regression.  We considered all the
3   regressions.  We set up the design of the study
4   to investigate the -- all the potential routes
5   that Rhino's trades could impact Sedona's stock
6   price.
7             After running all the regressions,
8   all 18 of them, we found that there was a "P"
9   value greater than .05 in two of them.  Those
10  are spurious correlations, and you can't use
11  them to deduce an impact on a stock price when
12  you've got numerous other results that tell you
13  that there's no impact.
14     Q.     Well, why are those spurious?  And
15  why -- why not the others be spurious?
16     A.     The others aren't spurious -- the
17  others -- the others failed to reject the --
18  failed to -- failed to reject the null on their
19  face.  They have "P" values that are sometimes
20  very high.
21             It's a generally accepted
22  principle that when you run multiple tests and
23  you get -- you should expect to get -- just by
24  the nature of statistics, you should expect to
25  get a spurious correlation now and again.  And

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010
New York, NY

Page 294

1         - STEPHEN D. PROWSE -
2    if you properly adjust for that, you get --
3    what you get from the entire battery of tests
4    is the fact that there's the conclusion that
5    there's no impact.
6         Q.    So --
7         A.    And, again, I would say that's
8    confirmed by your own experts who ran the
9    Number 5 regression on a shorter period of time
10   than we did and found -- and found on its face
11   a "P" value greater than .05, greater than 5
12   percent.  That just shows you how spurious this
13   correlation is.
14        Q.    So you're saying that Professors
15   Glosten and Jones ran the regression of the net
16   daily trades for a shorter period of time and
17   found that their hypothesis couldn't -- that
18   their analysis could not be checked?  The null
19   hypothesis.
20        A.    Correct.  It's in their work
21   sheets.
22        Q.    It's in their work sheets?  Which
23   work sheet?
24        A.    Well, I don't know.
25        Q.    Well, I mean, you're the one who's

Page 295

1         - STEPHEN D. PROWSE -
2    making the allegation and I just want to know
3    what you're talking about.
4         A.    Well, I told you what I know.  And
5    I can't identify the particular page, but --
6         Q.    Is it in --
7         A.    -- if I'm right, I'm right; and if
8    I'm wrong, I'm wrong.
9         Q.    Is it in their report?
10        A.    No.
11        Q.    Oh, it's not in their report?
12        A.    No.
13        Q.    Where is it?
14        A.    It's in the work sheets that they
15   produced.
16        Q.    And it's -- it's in the work
17   sheets that they produced to whom?
18        A.    To us.
19        Q.    And in those work sheets, you said
20   it was a shorter period of time?
21        A.    I believe it was through -- I
22   think it was the month of March.
23        Q.    So it was March 1st through March
24   30th was the regression --
25        A.    Maybe, yeah.

Page 296

1         - STEPHEN D. PROWSE -
2         Q.    -- that you said that they
3    prepared.  And that it reject -- it failed to
4    reject the null hypothesis?
5         A.    That's my understanding, yeah.
6    But --
7         Q.    What were the -- and it was net
8    daily trades?
9         A.    I believe -- that's my
10   understanding.  I believe so.
11        Q.    Now -- so, based on that result
12   and the fact that you came up with 15 other
13   results, you rejected the three analyses that
14   found a statistically significant relationship
15   between Badian's trading activity and Sedona's
16   stock price?
17             MR. SOHN:  Objection;
18   mischaracterizes the testimony again.
19        A.    Yeah, you have mischaracterized my
20   testimony.  We did not, for the third or fourth
21   time, we did not reject any regressions.  We
22   considered all the regressions as a family
23   based on the fact -- and based on the fact that
24   the "P" values for most of our regressions --
25   and, by the way, all our nonregression

Page 297

1         - STEPHEN D. PROWSE -
2    statistical analysis -- is greater than .05.
3             The "P" values that are greater
4    than .05 are clearly spurious correlations.
5    And when you do multiple comparisons, you need
6    to adjust for that danger.  When you run --
7    when you run an extra regression, you increase
8    the chance of finding a statistically -- or a
9    "P" value of greater than .05.
10        Q.    And --
11        A.    Less -- less than .05.
12        Q.    And doesn't the literature suggest
13   that to determine which of those are the
14   regressions that should be relied upon for your
15   conclusions that you look to how the model has
16   been developed?
17        A.    Well, presumably the models that
18   you are developing hypothetically -- in your
19   hypothetical are all appropriate models for
20   looking at the impact or whatever relationships
21   you're trying to find.
22        Q.    Well, aren't some models more
23   powerful than others?
24        A.    Some may be.
25        Q.    Well, what does the concept of

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                    March 5, 2010
New York, NY

Page 298

1          - STEPHEN D. PROWSE -
2    power mean when you're talking about comparing
3    different regressions?  Not the results of the
4    regressions, but power when you're trying to
5    decide whether the Regression 1, 2, 3, 4, 5, 6
6    are more or less powerful than any of the
7    others?
8          A.    Well, that doesn't have to do with
9    the economic theory behind the variables.  It
10   has to do with the ability of the regression to
11   find a relationship or not.
12         MR. SOHN:  May I make a
13   suggestion?  Just because I know they lock the
14   door at six and it's ten to six right now.  So
15   maybe now's a good time for five minutes.
16         MR. GUIDO:  We'll take a break.
17         THE VIDEOGRAPHER:  This concludes
18   Tape Number 4 in the videotaped deposition of
19   Dr. Stephen Prowse.  Going off the record at
20   5:52 p.m.
21         (A recess is taken.)
22         THE VIDEOGRAPHER:  This begins
23   Tape Number 5 in the videotaped deposition of
24   Dr. Stephen Prowse.  Going back on the record
25   at 6:05 p.m.

Page 299

1          - STEPHEN D. PROWSE -
2    BY MR. GUIDO:
3          Q.    Now, Mr. Prowse, when -- when you
4    first came into working on the Sedona matter,
5    in all of the -- had the 18 regression analyses
6    been done?
7          A.    I don't know what had been done
8    prior to me getting involved.  I know some of
9    the -- some or all of the nine specifications
10   or the nine regression models that
11   Mr. Beloreshki and I decided were appropriate
12   to run in this matter had been run previously,
13   but I don't know over what time periods those
14   regressions --
15         Q.    Do you know --
16         A.    -- had been run.
17         Q.    -- who selected those?
18         A.    I believe it was Mr. Beloreshki.
19         Q.    Okay.  Did you ever attempt to
20   determine whether or not he had any biases?
21         A.    I don't know what you mean by
22   whether he had any biases.
23         Q.    A bias towards -- towards finding
24   a null hypothesis.
25         A.    I don't believe he had a bias

Page 300

1          - STEPHEN D. PROWSE -
2    towards finding -- towards -- I don't believe
3    he had any biases, as neither do I.  We
4    discussed the appropriate regression models to
5    run in this matter.  We agreed on them and we
6    ran them.
7          Q.    Well, did you read The Frontiers
8    of Convertible Financing that he wrote with
9    Caryn Schechtman?
10         A.    Yes.
11         Q.    Did that indicate to you that he
12   had any biases?
13         A.    No, that didn't indicate to me he
14   had any bias.  I regard him as a very, very
15   accomplished economist and statistician who has
16   a former trading background.  And I value his
17   opinion very highly and I think he's a very --
18   he has a very high level of integrity in terms
19   of running empirical analyses.
20         Q.    Okay.  Is the existence of a bias
21   by an expert something that the jury should be
22   concerned about?
23         MR. SOHN:  Objection.
24         A.    Well, I don't know what you mean
25   by bias.  I know I'm not biased.  I know

Page 301

1          - STEPHEN D. PROWSE -
2    Mr. Beloreshki isn't biased in any manner.
3    We're economists.  We perform economic and
4    financial analysis, and we are guided by
5    what that economic and financial analysis
6    tells us.
7          Q.    Okay.  What percentage of your
8    income in the last five years has come from
9    activities other than fees for testifying as an
10   expert witness?
11         MR. SOHN:  Objection to the form.
12         A.    That's a question I can't answer
13   because I don't get paid on the basis of fees
14   that I generate for expert witness work versus
15   other work that I do.  I get paid a salary by
16   FTI for performing a variety of different
17   economic and financial analyses, some of which
18   are involved in litigation or disputes; some of
19   which is not.
20         Q.    Okay.  Well, what percentage is
21   involved in litigation or disputes of the work
22   that you've done over the last five years?
23         A.    Over the last five years, I would
24   say -- I don't know what time period you're
25   talking about within those five years, but on

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                        March 5, 2010

New York, NY

Page 302

1         - STEPHEN D. PROWSE -
2    average I would say maybe about 50 percent is
3    litigation or dispute related.  There may or
4    may not be a litigation.  There may be a
5    potential dispute between two parties, and I'm
6    hired before litigation to maybe find an answer
7    that might be acceptable to both parties, but
8    there's the potential for a lawsuit there.
9         Q.    What about in the last two
10   years?
11        A.    I would say probably the same.  I
12   don't really -- I don't really track how much
13   of my time is on one type of project versus
14   another type of project.
15        Q.    How important is the timeliness
16   of the disclosure of the material that you
17   relied upon to the credibility of an expert
18   witness?
19        A.    I don't understand the question.
20        Q.    Well, you testified in how many
21   matters?
22        A.    At trial?
23        Q.    Uh-huh.
24        A.    I don't know.  A dozen, maybe a
25   little more than a dozen.

Page 303

1         - STEPHEN D. PROWSE -
2         Q.    And have you ever had a situation
3    where you produced documents the night before
4    your deposition?
5         A.    Yes.
6         Q.    You have?
7         A.    Uh-huh.
8         Q.    Did the opposing party object to
9    that?
10        A.    I can't remember them objecting,
11   no.
12        Q.    How often has that happened?
13        A.    More than once.
14        Q.    How voluminous was the material
15   that was produced the night before?
16        A.    I can't tell you.
17        Q.    Do you know how voluminous the
18   material was that was produced to the SEC last
19   night at 8:07?
20        A.    Are you referring to the GOJO
21   documents or the RA documents or something
22   else?
23        Q.    The disk.
24        A.    What do you mean by "the disk"?  I
25   don't know what you mean by "the disk."

Page 304

1         - STEPHEN D. PROWSE -
2         Q.    Well, there was a disk that was
3    provided to the SEC last night.
4              Do you know that?
5         A.    Yes, I believe I do know it.
6         Q.    Okay.  And you participated in
7    preparing that disk.  Correct?
8         A.    I instructed that certain files be
9    put on that disk, right.
10        Q.    How many files were put on that
11   disk?
12        A.    I don't know the total because I
13   was only a part of the production.  But I know
14   that my production -- I understand that my
15   production was from the Pet Quarters file,
16   basically, that you requested and that we
17   produced.
18              And I'll tell you right now that
19   99 percent of what I produced is completely
20   irrelevant to what -- to the issues in this
21   matter, because it has to do with our response
22   to a Pet Quarters expert who basically did a
23   valuation analysis or a damages analysis.  But
24   we decided to give it to you because we didn't
25   want to -- even though it was completely

Page 305

1         - STEPHEN D. PROWSE -
2    irrelevant, we didn't want to -- we just wanted
3    to give it to you.
4         Q.    Did the magistrate think it was
5    irrelevant?
6         A.    Did the who?
7         Q.    The magistrate.
8         A.    Well, I don't know what the
9    magistrate decided, but we were asked to
10   produce our Pet Quarters file.  And even though
11   I knew it was going to be completely
12   irrelevant, I said fine.  So I can guarantee
13   you that 99 percent of what I produced on there
14   you needn't waste any time on because it
15   doesn't address --
16        Q.    Do you know how many files were
17   included?
18        A.    From what --
19              MR. SOHN:  Asked and answered.
20        A.    From what I produced?
21        Q.    Yeah.
22        A.    I can't tell you the number of
23   files.  I know we did a lot of work on Pet
24   Quarters on the valuation or damages piece, so
25   I expect there were a lot of files.  But I can

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                March 5, 2010
New York, NY

---

Page 306

- STEPHEN D. PROWSE -

1   - STEPHEN D. PROWSE -
2   tell you now you can save time by not going
3   through them because you won't find them of
4   interest. At least I don't believe you'll find
5   them of interest unless you're interested in
6   valuation and damages analyses.
7       Q.    Do you know -- do you know how
8   large in terms of gigabytes the files were that
9   were produced last night?
10      A.    I can't tell you how large they
11  are. I can just tell you what I produced in
12  terms of substance, content.
13      Q.    Do you have a -- is there a limit
14  on your -- do you have an Outlook file?
15      A.    Do I have an -- you mean an
16  e-mail?
17      Q.    An e-mail Outlook file.
18      A.    Yeah.
19      Q.    And you allow -- are you allocated
20  a certain size on the server for that Outlook
21  file?
22      A.    For my e-mail file?
23      Q.    Uh-huh.
24      A.    I presume -- I presume so. I
25  don't know.

---

Page 307

1   - STEPHEN D. PROWSE -
2       Q.    Do people at FTI have certain
3   space, size limitations, on what they can put
4   on the servers at FTI?
5       A.    I just don't know the answer to
6   that.
7       Q.    Would it surprise you that the
8   disk that was produced to us last night had
9   over eight hundred files on it?
10      A.    I can't speak to what was put on
11  there apart from what I put on there. I know
12  we did a lot of work on the valuation and
13  damages aspect of the Pet Quarters matter. And
14  you're free to look at it, but I can tell you
15  now you probably don't want to waste too much
16  time on it.
17      Q.    Well, would the existence of all
18  of those files on that disk last night have
19  made it impossible for me to go through the
20  files to find files that are relevant to ask
21  you questions today?
22      A.    Was that a question?
23      Q.    Yeah.
24      A.    What is the question?
25      Q.    Well, is the existence of all of

---

Page 308

1   - STEPHEN D. PROWSE -
2   those files which you say are totally
3   irrelevant, on a disk with over eight hundred
4   files, would that have made it difficult for me
5   to find the files to question you today?
6           MR. SOHN: Objection to the
7   suggestion in the question.
8       A.    I can't -- I can't speak to that
9   question. I don't know exactly how many files
10  were part -- were my production with regards to
11  the valuation/damages analysis of Pet Quarters.
12  I'm not -- I don't know how quick you are with
13  your computer.
14      Q.    Well, no matter how proficient I
15  am with a computer, do you think that anyone
16  could have gone through two gigabytes of
17  documents to prepare for your deposition today
18  if they received them at eight o'clock last
19  night?
20          MR. SOHN: Objection.
21      A.    I'm -- I can't answer that
22  question. Sorry.
23      Q.    Well, you've worked with data,
24  haven't you?
25      A.    Yeah.

---

Page 309

1   - STEPHEN D. PROWSE -
2       Q.    I mean, you have a sense of how
3   quickly you can go through files, don't you?
4       A.    Yeah. And if you -- I don't know
5   how the files were organized and I don't know
6   what the titles of them were on. But if you
7   had read the Pet Quarters report closely, which
8   was produced weeks ago, you would know that we
9   had a substantial amount of analysis that was
10  devoted to rebutting a plaintiff's expert
11  called Mr. Trugman, who did a valuation and
12  damages analysis.
13          And to the extent that you can
14  identify quickly files on that disk that relate
15  to Trugman and valuation and damages, I would
16  think, clearly, that you wouldn't want to spend
17  any time with them.
18      Q.    Well, taking the files that you
19  produced, how were they described?
20      A.    I can't tell you. I don't know
21  how they were organized. There was probably
22  some logic to them and there was probably
23  some -- there was probably some names that --
24  that I would recognize in terms of the types of
25  analysis that went into the Trugman analysis

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

Page 310

1       - STEPHEN D. PROWSE -
2    and that you may have read if you were familiar
3    with the analysis we did in Pet Quarters with
4    regards to the valuation analysis.
5        Q.    I looked at this disk and I spent
6    a fair amount of time looking at this disk, and
7    there are no files in here that have a
8    description on the file, when I open up the
9    disk, that say that this is the damages
10   analysis from Pet Quarters.
11            Did you -- when you provided the
12   disk, did you provide a description with them
13   so that they could be easily reviewed to
14   determine which ones were relevant for your
15   testimony today?
16           MR. SOHN:  Objection.
17       A.    I just asked for the files to be
18   produced.  I would assume they would just be
19   produced as they existed on our server.
20       Q.    And didn't the files exist on your
21   server under the numbering system "BP" and then
22   a number?
23       A.    No, they didn't exist under a "BP"
24   number.  They existed in the Pet Quarters files
25   under probably various different subfolders

Page 311

1       - STEPHEN D. PROWSE -
2    with different pieces of analysis in them.
3        Q.    Well, did the subfolders mention
4    the subject matter of each of the files?
5        A.    I would have to go back and look
6    at the folder to tell you that.
7        Q.    So you don't know.  All right.
8        A.    I don't know sitting here.
9        Q.    The -- with regard to the issue of
10   multiple statistical regressions, have you ever
11   read any articles where he explains what was
12   wrong with the Bonferroni adjustment?
13       A.    I've read articles that discuss
14   the Bonferroni adjustment.
15       Q.    Have you ever read any article by
16   Thomas Perneger, P-e-r-n-e-g-e-r?
17       A.    If you show me the article, I
18   could look at it.  I may have.
19       Q.    But you don't recall reading it?
20       A.    I don't recall that specific name,
21   but I may well have read the article.
22       Q.    Have you ever -- are you aware of
23   an article by Kenneth Rothman on no adjustments
24   are needed for multiple comparisons?
25       A.    I may have read that article.  I

Page 312

1       - STEPHEN D. PROWSE -
2    just don't know.  I can't tell just by the name
3    of the author.
4        Q.    Have you read any articles on the
5    impact of various trading strategies on stock
6    prices?
7        A.    I don't know exactly what you mean
8    by that.
9        Q.    Well, I mean, when you -- when you
10   prepared your report, you cite one article
11   that you reviewed in your -- in Exhibit No. 2.  I
12   remember last night, as I was stumbling through
13   the two-gigabyte file and I was not able to
14   retract it, that I found another example --
15   another sheet of material that you had
16   considered, or somebody had purportedly
17   considered, when they prepared the expert
18   report.  And it included a great number of
19   other articles.
20            Was there -- was there a lot of
21   literature that you read to prepare your expert
22   report that are not listed in what you
23   considered there?
24           MR. SOHN:  In this case?
25           MR. GUIDO:  In this case.

Page 313

1       - STEPHEN D. PROWSE -
2        A.    I can't recall seeing -- I can't
3    recall creating an Exhibit 3, which would be
4    the exhibit that details the documents
5    reviewed, that lists a large number of
6    articles.  I just can't remember them being
7    there.
8            I do know that the Chaplinsky
9    article was one I definitely reviewed in the
10   context of performing this report.
11           I am also just generally aware of
12   other articles that I didn't refer to
13   specifically for this report, but I -- that
14   formed the background of my professional
15   knowledge of FPS securities.
16       Q.    Well, let me ask you a question:
17   Is there any literature or paper that you've
18   read that supports the running of Regression
19   Number 1 that you did in this case?
20       A.    A specific article or report?
21       Q.    Yeah.
22       A.    Not sitting here that I can think
23   of one.
24       Q.    Is there any that supports the
25   running of Regression Number 2?

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                          March 5, 2010
New York, NY

---

Page 314

- STEPHEN D. PROWSE -
1
2       A.    Let me look at what Regression
3   Number 2 is.
4           Well, generally there are articles
5   that look at flags for whether someone is in
6   the market or whether someone buys or sells.
7   There are many articles that have flags for
8   that, when looking at the impact of a trade.
9       Q.    Can you give us an example?
10      A.    Well, articles written by
11  Professors Glosten and Jones have, in some of
12  their regressions specifications, have flags
13  for whether someone buys or whether someone
14  sells -- or what they determine to be a
15  seller-initiated trade or a buyer-initiated
16  trade.
17          And in much of the market
18  microstructure literature, there are
19  specifications that have flags or dummies for
20  that type of -- for measuring that activity.
21      Q.    Well, in the literature that you
22  saw simply flags for buys or sells, or buys
23  that are identified as buys because they're at
24  the offer and sells because they're at the bid?
25      A.    They're -- they're certainly --

---

Page 315

- STEPHEN D. PROWSE -
1
2   they're certainly dummy variables.  They don't
3   have anything to do with volume.  But, as I
4   said in my last answer, based on a particular
5   definition of what a buy is will determine
6   whether that zero-one dummy is a buy or is a
7   zero or a one.
8           Now, there may be different
9   definitions of how you define a buy that --
10  that differ across the literature.  I'm not
11  certain whether there are or not.
12      Q.    Well, I mean in terms of the
13  literature definitions of buy, do you know of
14  any literature that uses your definition of
15  buy?  Just a simple buy as opposed to a
16  transaction at the bid?
17      A.    There may be.  I can't think of --
18      Q.    But you --
19      A.    I can't think of a piece of
20  literature as I sit here.
21      Q.    But Mr. Glosten, Professor
22  Glosten, has written papers on the use of
23  analyzing trades by characterizing them as
24  buys.  And in those papers didn't he define
25  buys as transactions at the bid -- at the

---

Page 316

- STEPHEN D. PROWSE -
1
2   offer?
3       A.    I believe that's correct.
4       Q.    Okay.  And -- but you didn't do
5   that when you did your regression, did you?
6       A.    No.  We -- we looked at Rhino's --
7   whether Rhino just bought.  We wanted to be as
8   comprehensive as possible.
9       Q.    You didn't look to determine
10  whether or not it was at the bid or the offer
11  or where it was in that range?
12      A.    We did not do that.
13      Q.    Okay.  Now, with regard to
14  Regression Number 3, is there any literature
15  that supports the running of Regression Number
16  3?
17      A.    Well, all Regression 3 is, is --
18  Regression 3 differs from Regression 2 by also
19  looking at transfers in principal and direct
20  purchases of stock.  And there's certainly a
21  lot of literature out there that tells you that
22  when an entity issues stock, that is an
23  important piece of information for the market.
24      Q.    Well, that's public issuances.
25  Right?  That literature --

---

Page 317

- STEPHEN D. PROWSE -
1
2       A.    It's public issuances of stock.
3   But, again, if the market knows about it,
4   because Rhino is a big player in this market,
5   then that would, in turn, be an important piece
6   of information for the market.
7       Q.    Okay.  But you don't have any
8   information that the Rhino or Amro purchases
9   were -- was information that was available to
10  the public?
11      A.    We did not do that determination,
12  but that's -- that's part of the reason we're
13  testing it, because we wanted to cover all our
14  bases here.
15      Q.    Well, but if it turns -- one of
16  the reasons that you could determine not to
17  have a significance is that that information
18  could have turned out not to have been
19  available to the market.  Isn't that true?
20      A.    Actually, that's wrong, because
21  the more regressions you run, the in -- the
22  more likely you are to get a spurious result.
23  So you run an additional regression, the more
24  likely you are to get a spurious result.
25      Q.    Well, is there an incentive to run

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                    March 5, 2010
New York, NY

Page 318

1           - STEPHEN D. PROWSE -
2    spurious regressions so that you could get a
3    spurious result?
4        A.    A spurious result would be a
5    result that has a "P" value of less than .05,
6    which would, if interpreted incorrectly, would
7    be viewed as price impact.  And that is what
8    we're trying to avoid here.  We're trying to
9    avoid data mining.
10       Q.    And one of the -- and one of the
11   ways to do data mining is to run regressions
12   that you know are going to result in no
13   significant relationship, isn't it?
14       A.    No, I would say data mining is the
15   opposite of that.  I would say data mining is
16   running regressions until you find a
17   significant relationship and then that's
18   your -- that's your model.
19       Q.    What was the first regression that
20   was ever run of Sedona's stock price in
21   relationship to Badian's activity?
22       A.    Well, I can't speak to that
23   because if you're talking about -- well, are
24   you talking about at FTI or are you talking
25   about prior to FTI?

Page 319

1           - STEPHEN D. PROWSE -
2        Q.    Ever.
3        A.    Well, I don't know.
4        Q.    You don't know.
5              So Regression Number 5, the one
6    that found the significant relationship, could
7    have been the first regression that was run.
8    Right?
9        A.    It certainly wasn't the first
10   regression run.  When we did our analysis at
11   FTI, we ran all of the regressions.
12       Q.    Simultaneously or --
13       A.    We instructed for them all to be
14   run.
15       Q.    Right.  Okay.  But that's after
16   they had already been run once before.
17   Right?
18       A.    That's -- that's after they had
19   been run once before, but I'm not sure on the
20   same time periods that we ran them on -- at
21   FTI.
22       Q.    When -- did you search for any
23   literature on the PIPEs market for financial
24   future price securities other than the one
25   article that you cite in your -- in your expert

Page 320

1           - STEPHEN D. PROWSE -
2    report?
3        A.    I didn't search for any articles
4    on the PIPEs market for this specific
5    engagement.  I was aware of, just based on my
6    professional knowledge in the economics and
7    finance literature, I've been aware of a number
8    of articles out there that are -- that speak to
9    future price securities.  And I've talked about
10   at least one of them earlier this morning.
11       Q.    I think one of them was an article
12   by Hillion?
13       A.    Hillion and Vermaelen.
14             MR. GUIDO:  I'd like to have
15   marked as the exhibit next number an article by
16   Hillion and Vermaelen.
17             (Whereupon, exhibit is received
18   and marked BP-27 for identification.)
19   BY MR. GUIDO:
20       Q.    Is this the article that you were
21   referring to?
22       A.    Yes.
23       Q.    Does the paper exclude the
24   possibility that someone would or could
25   manipulate the stock price to take advantage of

Page 321

1           - STEPHEN D. PROWSE -
2    a low conversion price?
3              MR. SOHN:  Does it say that that's
4    not possible?  Is that the question?
5              MR. GUIDO:  Yeah.
6        A.    Well, this is a 35-page article
7    with -- and although I'm very aware of it, I
8    don't know every single piece of analysis or
9    conclusion they come to.  So, I can't speak to
10   that.
11             I know, basically, the focus of
12   the -- of the paper, the thrust of the paper,
13   in my opinion, is to demonstrate the fact that
14   floating price convertibles are issued by very
15   risky firms and are, therefore, very risky for
16   investors that hold them.
17       Q.    And isn't it -- does it also talk
18   about the firm -- that they are firms that
19   stock prices are very responsive to external
20   events?
21       A.    It -- it may talk about that.
22   You'd have to point me to exactly where that
23   is.  I can't recall that.  But certainly the
24   stock prices of these companies, just like
25   Sedona's, are very volatile.

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.           March 5, 2010

New York, NY

Page 322

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2 Q. Have you ever studied any
3 literature on -- on the -- what's referred to
4 as the scalping phenomenon in trading?
5 A. The scalping phenomenon?
6 Q. Uh-huh.
7 A. I may have in the past.  I can't
8 remember sitting here.
9 Q. Well, have you ever heard the term
10 "pump and dump"?
11 A. Yes.
12 Q. In what context?
13 A. In the context of the SEC bringing
14 litigation against individuals for alleging
15 pump-and-dump schemes.
16 Q. Have you ever seen any statistical
17 analyses or regression analyses of the impact
18 of those pump-and-dump schemes?
19 A. I haven't seen any statistical --
20 do you mean statistical analyses on the
21 frequency of them or -- the frequency of the
22 suits or statistical analysis in a particular
23 pump-and-dump --
24 Q. Of the impact --
25 A. -- scheme?

Page 323

1    - STEPHEN D. PROWSE -
2 Q. Of the impact of them.
3 A. I don't believe I have.  I may
4 have, but I can't remember.
5 Q. Do you consider the production of
6 this disk that I received at eight o'clock to
7 be a timely disclosure under the court order in
8 the subpoena issued against you in this case?
9 MR. SOHN:  Objection.
10 A. I don't know what the time -- what
11 would be considered a timely disclosure or not.
12 It's a -- it's a disclosure.  If there was a
13 gap in what was produced before, I apologize.
14 And we've produced to you a supplement.  And,
15 like I said, most, if not all, of what I
16 produced to you I would consider to be not
17 relevant to this case, but you're free to look
18 at it.
19 Q. Take a look at the Hillion
20 article, which is Exhibit 27, at page 384.  Do
21 you see the paragraph that says, "This paper
22 makes several contributions..."?
23 A. Yes.
24 Q. And the first one, it says, "It
25 illustrates the difficulties of designing

Page 324

1    - STEPHEN D. PROWSE -
2 financial innovations aimed at resolving
3 asymmetrical information problems in small,
4 risky firms.  In theory, a floating price
5 convertible is ideal for such firms.  In
6 practice, the stocks of such firms are illiquid
7 and subject to manipulation by short sellers
8 and hedge funds.  The floating price
9 convertible may, thus, produce a downwards
10 spiral in the stock price."
11 Do you see that?
12 A. Yes.
13 Q. Do you agree with it?
14 A. Yeah, I think the stocks of such
15 firms could be subject to manipulation.  I
16 don't rule that out.
17 Q. Oh, okay.  The -- on the
18 Bonferroni adjustments, I'd like to hand you
19 the Perneger article.
20 MR. GUIDO:  And may I have it
21 marked as Exhibit No. 28?
22 (Whereupon, exhibit is received
23 and marked BP-28 for identification.)
24 MR. SOHN:  Do you have another
25 copy?

Page 325

1    - STEPHEN D. PROWSE -
2 MR. GUIDO:  Oh, excuse me.
3 MR. SOHN:  Thank you.
4 BY MR. GUIDO:
5 Q. Have you ever read this Perneger
6 article?  Perneger.
7 A. I may have.  It looks somewhat
8 familiar, but I can't say for certain.
9 Q. Well, I think you testified
10 earlier that one of the things that you did was
11 apply the Bonferroni adjustment to determine
12 that the Regression 5 was, I think, spurious, I
13 think was your term?
14 A. Spurious correlation.
15 Q. Yeah.
16 Can there be a spurious
17 noncorrelation?
18 A. Well, generally I think that's not
19 the problem.  I think the problem is spurious
20 correlations.
21 Q. I understand --
22 A. So I'm not -- I'm not sure whether
23 there could be or could not be in a
24 hypothetical.  But certainly there's not a
25 spurious noncorrelation here since the vast

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010
New York, NY

---

Page 326

- STEPHEN D. PROWSE -

1    - STEPHEN D. PROWSE -
2    majority of all our results show no impact and
3    the vast minority do. And, so, that would
4    be -- that would be -- those would be the
5    spurious correlations.
6        Q.   Well, is a -- is a spurious
7    correlation one in which you have a variable
8    that you don't know what -- whether it actually
9    had an impact in the market, or could likely
10   have an impact on the market?
11       A.   No, that's not a spurious
12   correlation. Not the way you asked that
13   question.
14       Q.   What if Andreas Badian had -- had
15   lent Sedona $35 million in cash and it wasn't
16   public? And you included that in your
17   regression analysis on the stock price of
18   Sedona. Would that be a spurious
19   regression?
20       MR. SOHN: Objection. The
21   question is whether he lent a public company
22   money and it wasn't publicly known that he lent
23   the public company money?
24       MR. GUIDO: That's correct.
25       A.   I can't answer the question the

---

Page 327

1    - STEPHEN D. PROWSE -
2    way you've asked it. It just doesn't make any
3    sense.
4        Q.   Okay. Now, let's go -- let's take
5    a look at the Perneger article. It says -- and
6    there's a number of points. See the blue?
7        A.   Yes.
8        Q.   That says "Adjusting Statistical
9    Significance for the number of tests that have
10   been performed on study data -- the Bonferroni
11   method -- creates more problems than it
12   solves."
13       Do you agree or disagree with
14   that?
15       A.   I disagree with that in the sense
16   that this is an article designed pri -- it
17   looks solely for biomedical research, where
18   typically you have very, very large numbers of
19   tests performed. And, therefore, the
20   Bonferroni method may be more problematic
21   there.
22       But for the types of cases that I'm
23   involved in or that don't involve those types
24   of -- those numbers of tests. And, therefore,
25   I think the Bonferroni method is perfectly

---

Page 328

1    - STEPHEN D. PROWSE -
2    legitimate.
3        Q.   So, you're saying the Bonferroni
4    method is less legitimate when there are large
5    number of tests that are being looked at?
6        A.   May be more problematic when you
7    have thousands of tests or large numbers of
8    tests.
9        Q.   And not when you have a smaller
10   number of tests?
11       A.   Right. That's just the way the --
12   the statistics work. And that's -- that's
13   verified in the literature. I mean, that's
14   talked about in the literature, Bonferroni.
15       Q.   Really? What literature?
16       A.   I can't cite an article right off
17   the top of my head, but I do understand that's
18   part of the issue, or that's part of the
19   literature.
20       Q.   Well, I mean, this article,
21   okay -- take a look at the paragraph that says
22   "Adjustment for multiple tests."
23       How many tests are being addressed
24   there?
25       A.   In this example, it's 20.

---

Page 329

1    - STEPHEN D. PROWSE -
2        Q.   How many were you talking about?
3        A.   I'm talking about nine or 18
4    regressions.
5        Q.   Okay. Well, this article is
6    addressing nine -- I mean 20 trials.
7        Is that a significantly larger
8    number than the 18 or 19 that you conducted?
9        A.   This example isn't, but my
10   understanding is that the literature talks
11   about the Bonferroni adjust -- or correction
12   being problematic when you have very large
13   numbers of tests.
14       Q.   Well, doesn't this article talk
15   about Bonferroni adjustments being problematic
16   when there are 20 independent tests that are
17   being performed?
18       A.   Well, I would have to read the
19   whole article to understand it, but my
20   understanding is that this is an article that's
21   focused on biomedical research or epit --
22   epitomology, not the types of issues that we're
23   dealing with here.
24       Q.   What difference does it make if
25   you're just talking about application of

---

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                    March 5, 2010

New York, NY

Page 330

1         - STEPHEN D. PROWSE -
2    mathematical statistical analyses what -- what
3    you're looking at?
4         A.    Well, one difference is that we're
5    looking at a universal null here.  We're
6    looking at is there a pricing impact or not,
7    regardless of the channel?  And this article
8    itself says that a Bonferroni adjustment may be
9    appropriate in those cases.
10        Q.    Wait a minute.  You're saying that
11   you're looking at is there a price impact or
12   not?
13        A.    Yes.
14        Q.    I thought what we were looking at
15   is could you reject the null hypothesis that
16   there was a price impact?
17        A.    Fine.  If you want to put it that
18   way, we're looking at a null hypothesis,
19   universal null, which is, is there a price
20   impact or not?  Or is there a price -- the null
21   hypothesis being no impact.  That's the
22   universal null that we're looking at.
23             We can test that in a number of
24   different ways.  And that's -- that's what
25   we're doing here.  There's no pre-established,

Page 331

1         - STEPHEN D. PROWSE -
2    specific hypothesis about exactly how the
3    transmission mechanism would go from a Badian
4    or a Rhino trade to the Sedona stock price.
5         Q.    What's the --
6         A.    And, therefore, so there's no
7    specific transmission mechanism.  There's lot
8    of potentially different ones.
9         Q.    Okay.  What's a Type II error?
10        A.    A Type II error is the opposite of
11   a Type I error.  Type I error is rejecting the
12   null when it's true, and a Type II error is
13   failing to reject the null when it's false.
14        Q.    Okay.  And does the application of
15   the Bonferroni method increase the likelihood
16   of a Type I error?
17        A.    It generally increases the
18   likelihood of a Type II error and decreases the
19   likelihood of a Type I error.
20        Q.    And the Type II error being a
21   finding of no significance?
22        A.    A Type II error is failing to
23   reject the null when it is -- I'm sorry.  It's
24   very late.  Failing to reject the null when it
25   is false.  Yes.  I got that right.  There's all

Page 332

1         - STEPHEN D. PROWSE -
2    these --
3         Q.    Failing to reject the null when it
4    is false.
5         A.    Yes, that's right.  Yeah.  Now
6    you've said it and I agree.  It's very late.
7         Q.    So, failing to reject the null.
8    Isn't that what the 15 regressions did in your
9    analyses here?
10        A.    That's what all of the regressions
11   did.
12        Q.    Well, 15 of the 18.  Three of them
13   showed that there was a significant
14   correlation, which you indicated you think are
15   spurious.  But 15 of them failed to reject the
16   null.  Right?
17        A.    I would disagree with that.  I
18   would say all of them failed to reject the null
19   when you properly adjust for the spurious
20   correlation property.
21        Q.    Okay.  But if you do the
22   adjustment, okay, doesn't it increase the
23   likelihood of the results that the null
24   hypothesis has not been rejected?  Does it
25   increase the error?

Page 333

1         - STEPHEN D. PROWSE -
2         A.    No, what it does is it restores
3    the Type I error to the original Type I error
4    rate that you would expect from just running
5    one regression.  You want to restore the Type I
6    error rate to 5 percent, and that's what the
7    Bonferroni correction does.
8         Q.    Based on the use of regression
9    analyses that may generate a false result
10   themselves.
11        A.    I don't know what you're talking
12   about.
13        Q.    Well, isn't it true -- isn't it
14   true that any one of these regression analyses
15   could have resulted in a false result?
16             MR. SOHN:  Objection to the
17   form.
18        A.    I don't know what you mean by a
19   "false result."
20        Q.    A false positive significance, a
21   false negative significance.
22        A.    There's always an error of -- in
23   all statistics, there's always an error of a
24   false positive or a false negative.  The
25   generally accepted way of going about any kind

84 (Pages 330 to 333)

Stephen David Prowse, Ph.D.                                                              March 5, 2010

New York, NY

Page 334

- STEPHEN D. PROWSE -
1
2    of statistical analysis is to set the Type I
3    error at 5 percent, and that's what the
4    Bonferroni correction does when you're doing
5    multiple comparisons.
6         Q.    The -- remember I asked you a
7    question about the powers of tests?
8         A.    I believe so.
9         Q.    Now, isn't it true that if you do
10   a regression and you find the results are not
11   significant and the null hypothesis is not
12   rejected, one of the reasons that this can
13   happen is because the null hypothesis is false,
14   but by chance the data happened to be of the
15   kind expected under the null hypothesis?
16        A.    That is certainly a possibility.
17        Q.    If the power of the test is low,
18   is this more likely to be possible?
19        A.    If the power of the test is low,
20   then the chances of a Type II error are higher,
21   yes, I believe.
22        Q.    Okay.  And if the study that has
23   low power fails to show a significant effect,
24   are the results more fairly described as
25   inconclusive than as negative?

Page 335

- STEPHEN D. PROWSE -
1
2         A.    I'm sorry, I missed that.
3         Q.    When a study with low power fails
4    to show a significant effect, are the results
5    more fairly described as inconclusive than
6    negative?
7              MR. SOHN:  Objection to the form.
8         A.    I'd have to think about that.
9         Q.    Have you ever thought about it
10   before?
11        A.    Not exactly in those words, but --
12   so I'd have to think about it.
13        Q.    Well, when was the last time you
14   read the Kaye-Freedman piece?
15        A.    What piece are you talking about?
16        Q.    The piece that you cited from
17   the -- what is it?  The section on statistics
18   from the -- from the judiciary.
19        A.    Not -- certainly not within the
20   last few weeks or months.
21        Q.    Well, did you read it when you
22   were preparing your report?
23        A.    No.  I was aware of it.
24        Q.    What is a low power?
25        A.    With regards to a statistical

Page 336

- STEPHEN D. PROWSE -
1
2    analysis?
3         Q.    Yeah, with regard to any
4    particular regression.  What does low power
5    mean?
6         A.    Low power means a higher level of
7    Type II error.
8         Q.    And the Type II error being that
9    you find that you can't reject the null
10   hypothesis when the null hypothesis should be
11   rejected?
12        A.    Failure to reject the null when
13   the null is false, right.
14        Q.    Okay.
15             MR. SOHN:  Mr. Guido, I think
16   we've hit seven.
17             MR. GUIDO:  One more question.
18   BY MR. GUIDO:
19        Q.    Did you attempt to determine what
20   the probability of accepting the false on a
21   null hypothesis was in any of your regressions?
22        A.    Did I attempt to -- no.  I mean, I
23   attempted to fix the probability of a Type II
24   error at the generally accepted level.
25             MR. GUIDO:  Okay.  No further

Page 337

- STEPHEN D. PROWSE -
1
2    questions.
3             MR. SOHN:  Mr. Guido, I just, you
4    know, expected that you will instruct your
5    colleagues who are here today to maintain their
6    notes, whatever they've been writing.
7             MR. DUNBAR:  Could we go off the
8    record?  Is that really what you meant to say?
9             MR. GUIDO:  About the -- I'm
10   sorry, Fred.  You're not asking the questions.
11            THE VIDEOGRAPHER:  This concludes
12   the videotaped deposition of Dr. Stephen Prowse
13   consisting of five videotapes.  Going off the
14   record at 6:56 p.m.
15            (Whereupon, the deposition
16   concluded at 6:56 p.m.)

Alderson Reporting Company
1-800-FOR-DEPO

Stephen David Prowse, Ph.D.                                                    March 5, 2010
New York, NY

Page 338

1           CERTIFICATE OF DEPONENT
2    I hereby certify that I have read and examined the
3    foregoing transcript, and the same is a true and
4    accurate record of the testimony given by me.
5    Any additions or corrections that I feel are
6    necessary, I will attach on a separate sheet of
7    paper to the original transcript.
8
9
10          _____
11              Signature of Deponent
12
13   I hereby certify that the individual representing
14   himself/herself to be the above-named individual,
15   appeared before me this _____ day of _____,
16   2010, and executed the above certificate in my
17   presence.
18
19
20          _____
21            NOTARY PUBLIC IN AND FOR
22
23          _____
24                  County Name
25   MY COMMISSION EXPIRES:

Page 339

1               CERTIFICATE
2
3          I, Bridget Lombardozzi, Certified
4    Shorthand Reporter and Notary Public, hereby
5    certify that the foregoing is a true and
6    accurate transcript of the deposition of said
7    witness who was first duly sworn by me on the
8    date and place hereinbefore set forth.
9
10         I FURTHER CERTIFY that I am neither
11   attorney nor counsel for, nor related to or
12   employed by, any of the parties to the action
13   in which this deposition was taken and further
14   that I am not a relative or employee of any
15   attorney or counsel employed in this action,
16   nor am I financially interested in this case.
17
18      Dated this 7th day of March, 2010.
19
20
21         _____
22              Bridget Lombardozzi
23         Certified Realtime Reporter - NCRA
24          Certified Shorthand Reporter
25              New York Notary Public

86 (Pages 338 to 339)