UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>ANDREAS BADIAN, JACOB<br>SPINNER, MOTTES DRILLMAN,<br>JEFFREY "DANNY" GRAHAM,<br>POND SECURITIES CORPORATION<br>D/B/A POND EQUITIES,<br>EZRA BIRNBAUM AND SHAYE HIRSCH,<br><br>     Defendants. | No. 06-CV-2621 LTS (DFE) |

EXPERT REPORT

STEPHEN D. PROWSE, PH.D, CFA

TSVETAN N. BELORESHKI

NOVEMBER 24, 2009

- i -

# Table of Contents

I.    INTRODUCTION AND SUMMARY ........................................................................ 1

    A.  QUALIFICATIONS ............................................................................................. 2
    B.  COMPENSATION .............................................................................................. 4
    C.  MATERIALS REVIEWED ................................................................................... 4

II.   RISK/RETURN PROFILE OF THE CONVERTIBLE DEBENTURES ISSUED BY SEDONA
    CORPORATION AND RATIONAL TRADING STRATEGIES ............................................ 5

III.  MARKET, INDUSTRY AND COMPANY-SPECIFIC FACTORS DETERMINING THE
    UNDERPERFORMANCE OF SEDONA SHARES ......................................................... 8

    A.  MARKET AND INDUSTRY (PEER GROUP) FACTORS ........................................... 8
    B.  COMPANY-SPECIFIC FACTORS ....................................................................... 9

IV.   ANALYSES OF THE IMPACT OF RHINO'S TRADING ON SEDONA'S STOCK PRICE ............... 11

    A.  STATISTICAL ANALYSES ............................................................................... 12

V.    MISCELLANEOUS ............................................................................................ 14

- ii -

# List of Exhibits

1.  Curriculum Vitae of Stephen D. Prowse

2.  Curriculum Vitae of Tsvetan N. Beloreshki

3.  Materials Reviewed

4.  Sedona Corporation Stock Price Performance, 1998 – 2002

5.   Sedona Corporation Stock Price Performance vs. Peer Group Companies

6.  Sedona Corporation Stock Price Historical Volatility, 1998 - 2002

7.  Sedona Corporation Financial Performance, 1988- 2003

8.  Sedona Corporation: FPS Issuance and Stock Dilution, 1985-2003

9.  Sedona Corporation Stock Price History

10. Statistical Analysis of Rhino's Trading Activity and Sedona Stock Price Returns

11. Statistical Analysis of Rhino's Trading Activity and Sedona Stock Price Direction

12. Statistical Analysis of Rhino's Trading Volume and Sedona Stock Price Returns

13. Regression Analysis of Rhino's Trading Activity and Sedona Stock Price Returns

14. 95% Confidence Interval for the Performance of Sedona Stock as of March 1, 2001

- 1 -

## I.   INTRODUCTION AND SUMMARY

1.   We have been retained by counsel for Mr. Andreas Badian and asked to perform economic, financial and statistical analyses in order to answer the following questions:

- What are the major characteristics, economic implications, and risk/return profile of the 5% Convertible Debentures (the "Debentures") issued by Sedona Corporation ("Sedona" or the "Company") on November 23, 2000?

- What are some of the determinants of the performance of the Sedona stock in the time period following the issuance of such securities?

- What was the effect of the market transactions executed by Rhino Advisors ("Rhino") in Sedona's equity shares on the performance of Sedona stock?[1]

2.   Briefly, our conclusions are the following:

- The risks inherent in the Debentures issued by Sedona on November 23, 2000 exceeded those of high-yield debt instruments and approached those of distressed debt. These risks were further exacerbated by the potential adverse signals associated with the issuance of the Debentures. As a result, holders of the Debentures bore considerable risks such as those associated with the Company's creditworthiness (including the likelihood of default) and with the performance and liquidity of its stock.

  An economically rational trading strategy for holders of such debentures was to seek to reduce their overall long position in the underlying equity whenever possible, and to extend the period over which such positions were unwound.

  The basis for this opinion is discussed in section II.

- The decline in Sedona's stock price over the period of Rhino's trading was consistent with the contemporaneous deterioration in the combination of market, industry and Company-specific factors. In other words, the decline in Sedona's stock price was consistent with factors that were unrelated to the alleged market manipulation by Rhino.

  The basis for this opinion is discussed in section III.

---

[1] We understand that Rhino was an advisor to investors. For simplicity's sake, the trading and returns discussed in this report are characterized in connection with Rhino, even though in fact, these are trades and returns related to the investors in Sedona's securities.

- 2 -

- The available data indicate, based on a number of quantitative and statistical tests, that Rhino's transactions in Sedona's common shares did not have an impact on Sedona's stock price.

  In addition, the facts that the trading activity of Rhino was consistent with legitimate profit-maximizing motives and that the vast majority of the decline in Sedona's stock price occurred before Rhino began trading in Sedona's common stock demonstrate that Rhino did not pursue, and had no rational incentives to pursue, a manipulative strategy aimed at artificially depressing the price of Sedona's stock.

  The basis for this opinion is discussed in section IV.

## A. Qualifications

3.   FTI Consulting, Inc. ("FTI") is a leading global firm that organizations rely on for advice and solutions in the areas of forensic analysis, investigations, economic analysis, restructuring, due diligence, strategic communication, financial communication and technology when confronting the critical, legal, financial and reputational issues that shape their future. FTI currently employs over 3,000 professionals worldwide.

### 1.  Stephen D. Prowse

4.   I am a Senior Managing Director in the Forensic and Litigation Services Practice at FTI. The practice counts as its clients major securities exchanges, risk managers, principals needing valuation services and parties in litigation. The Forensic and Litigation Services Practice specializes in providing financial, valuation, accounting, statistical, economic, and investigative consulting services to clients.

5.   I received my B.A. in economics from Cambridge University, Cambridge, England in 1982, my M.S. in economics from the California Institute of Technology in 1984, and my Ph.D in economics from the University of California at Los Angeles in 1989. In addition, I am also a CFA Charterholder. I have authored over 20 articles on economic and financial issues that have been published in peer-reviewed academic journals, books, and other outlets. I have also served as a referee for numerous academic research journals such as the Journal of Finance, Journal of Financial Economics, and the Journal of Banking and Finance.

- 3 -

6.    I am a financial economist with expertise in securities valuation, securities trading, the statistical analysis of stock price movements and the valuation of companies. One of my responsibilities at FTI is to provide economic, statistical, valuation, financial, and damage quantification consulting services to clients. I have been qualified as an expert to testify in Federal, State and Bankruptcy court and in arbitrations regarding financial economics, securities markets, securities valuation, econometrics, statistics and damages. In these matters my clients have included both plaintiffs and defendants, individuals, corporations and the Securities and Exchange Commission. Prior to joining FTI, I was a Principal (Partner) in the Dallas office of the Forensic Practice at KPMG LLP, where I provided similar services to clients.

7.    Prior to my consulting career, I was employed by the Federal Reserve Bank of Dallas as a Senior Economist and Policy Advisor (1994-1998) and by the Board of Governors of the Federal Reserve System in Washington DC (1989-1994) as an Economist. I have also served as a Consultant Economist to the Bank for International Settlements (BIS) in Basel, Switzerland. In these positions I provided economic and financial analysis and policy advice to the Chairman of the Federal Reserve Board, the President of the Federal Reserve Bank of Dallas, and the Director of Research at the BIS in a variety of areas including securities markets and securities trading. I have also served as an Adjunct Professor at the Cox School of Business, Southern Methodist University (1998) where I taught finance and currently serve as a guest lecturer in economics and finance.

8.    My curriculum vitae is attached as Exhibit 1.

## 2.  Tsvetan N. Beloreshki

9.    I am a Managing Director in the Forensic and Litigation Consulting practice of FTI, where I specialize in securities and financial economics, concentrating on structured finance products, financial engineering, and risk management. Over my career, I have provided consulting services to individuals, financial institutions, investment managers, corporations, and governments.

- 4 -

10. I have been qualified at trial and in arbitration hearings as an expert in financial economics, securities markets, structured finance (including auction-rate securities), financial engineering, securities valuation, market microstructure, and industry customs and practices.

11. Prior to my consulting career, I was a member of Banque Paribas' Structured Products and Credit Derivatives team in London and New York. In my role as a trader, I analyzed and managed the risks associated with an array of complex financial instruments, and effected transactions with a number of broker-dealers, institutional investors, hedge funds, and high-net worth individuals. I also was responsible for developing methodologies used in the identification of credit and cross-currency arbitrage opportunities as well as in relative value trading across the spectrum of fixed income instruments, asset swaps and credit derivatives markets. I held a National Association of Securities Dealers General Securities Representative license (Series 7).

12. I have a Masters in Business Administration degree and a Bachelor of Arts degree from the University of Chicago. My studies there focused primarily on financial economics, asset pricing, derivative securities, financial engineering, statistics and econometrics.

13. My curriculum vitae is attached as Exhibit 2.

### B. Compensation

14. Our current billing rates are $575 per hour (Tsvetan N. Beloreshki) and $590 per hour (Stephen D. Prowse).

15. FTI's fees and payment for our work in connection with this report is in no way contingent upon the opinions expressed by us or upon the outcome of these proceedings.

### C. Materials reviewed

16. The materials reviewed in preparation for this report are listed in Exhibit 3.

- 5 -

## II.   RISK/RETURN PROFILE OF THE CONVERTIBLE DEBENTURES ISSUED BY SEDONA CORPORATION AND RATIONAL TRADING STRATEGIES

17.   We have examined the risk/return profile of the Debentures issued by Sedona on November 23, 2000, and the considerable risks posed to holders of the Debentures by Sedona's prior and subsequent poor operating performance and financial difficulties.

18.   We have concluded that an economically rational and beneficial trading strategy for holders of such debentures was to seek to reduce their overall long position in the underlying equity whenever possible and to extend the period over which such positions were unwound. We note that Rhino's trading strategies and the way they unwound their positions in Sedona stock were consistent with such a trading strategy.

19.   In what follows, we present the details of these analyses.

20.   The Debentures are equity derivative instruments. Their issuance was a consequence of Sedona's prior and ongoing poor operating performance, financial difficulties and liquidity issues. In particular, their issuance was a reflection of the Company's inability to raise funds internally (through retained earnings) or through more conventional financing via the debt or equity markets. Transactions of this type are viewed by the marketplace as strong negative signals about the issuing company and its prospects.[2]

21.   The risks inherent in the Debentures exceeded those of high-yield debt instruments and approached those of distressed debt. These risks were further exacerbated by the potential adverse signals associated with the issuance of the Debentures, which often serve as a catalyst for increased selling pressure. Thus, Rhino bore considerable risks such as those associated with the Company's creditworthiness (including the likelihood of default) and with the performance and liquidity of its stock.

---

[2] Indeed, the academic research literature supports our opinions with respect to Sedona. The literature documents that companies that issue the same general types of securities that Sedona issued are often financially troubled small- to medium-sized companies with a track record of poor performance and negative cash flows from operations and that issuance of such securities is often perceived by the marketplace as a strong negative signal about the company and its prospects. For example, see Chaplinsky, Susan and Haushalter, David. "Financing Under Extreme Uncertainty: Contract Terms and Returns to Private Investments in Public Equity." May 2006.

- 6 -

22.  The Debentures offered potentially high returns that would have been difficult, if not impossible, to replicate through alternative market instruments and strategies. These (potentially) high expected returns stemmed in part from the warrants embedded in the Debentures (which offered a substantial profit potential contingent upon an increase in the price and liquidity of the underlying stock).

23.  Rhino employed a rational economic strategy by trading in Sedona's common stock in a way that managed the size of their holdings and reduced their risk exposures to the Company, including via (short) sales prior to conversions associated with the Debentures. This was particularly true given the high risks associated with investing in the Debentures.

24.  Rhino bore considerable risks such as those associated with the Company's creditworthiness (including the likelihood of default) and with the performance and liquidity of Sedona's common stock.

25.  As discussed later, Sedona was a financially troubled company with a track record of poor financial and operating performance and negative cash flows from operations. Holders of Sedona's securities thus bore a substantial degree of credit and default risk. Investors in the Debentures also bore the risk of stock price declines and liquidity risk – whether or not they had actual holdings in the Company's stock. The magnitude of this risk is illustrated by the high level of volatility historically associated with Sedona's common stock. Companies with significant risks of sharp stock price declines, like Sedona, pose significant risk management problems for investors in their securities. Significant stock price declines not only directly decrease the value of an investor's equity holdings, but also increase the risk of the company being delisted, or being unable to register its stock. It also increases the risk of default by the company and the costs of financial distress. It also leads to decreased liquidity in the stock and increased bid-ask spreads, making trading in the company's securities more costly. All of these risks were significant for holders of Sedona's securities.

26.  Given its significant (real and potential) holdings in Sedona's shares, Rhino had to, sooner or later, sell the shares it acquired as a result of the Convertible Debentures and Warrants Purchase Agreement on the open market. Therefore, Rhino's ability to obtain a profitable execution of their investment strategy was also affected by the liquidity of the marketplace in

- 7 -

which those shares were traded. As a result, Rhino had a natural built-in preference for fewer, but more valuable (higher priced) and readily marketable shares.

27.   The strategy of simply holding the Debentures until they were converted into Sedona's common shares would not have been an optimal trading strategy for at least five reasons.

28.   First, such a strategy would have ignored the time value of money. In other words, since Rhino was to receive a fixed dollar payoff, it was in Rhino's best interests to employ a strategy that allowed it to receive that payoff sooner rather than later.

29.   Second, as discussed earlier, Rhino bore substantial stock price and liquidity risks in their holdings in both the Debentures and Sedona's common shares. Therefore, Rhino stood to benefit from appropriate investment and hedging strategies that allowed them to reduce such risk exposures and to shorten the time window over which they bore risks associated with their holdings in Sedona.

30.   Third, it was economically rational and beneficial for Rhino to seek to reduce their overall long positions in the underlying equity whenever possible and to extend the period of time over which they sold (unwound) their equity holdings.

31.   Fourth, given the performance of Sedona's stock over the relevant period, it was economically rational for holders of the Debentures to sell Sedona shares prior to receiving additional shares pursuant to conversion notices.

32.   Fifth, given the number of registered shares in Sedona was limited, there was a strong economic disincentive for any holder of the Debentures to engage in a manipulative strategy aimed at artificially depressing the price of Sedona stock.

33.   Rhino managed the risks posed by Sedona and the Debentures by managing the size of their holdings in Sedona common stock. For example, on a number of occasions Rhino sold Sedona shares, and thus reduced their overall long positions, prior to receiving additional shares pursuant to conversion notices. In addition, particularly prior to acquisitions of large blocks of Company stock, Rhino reduced their exposure to the Company by (short) selling Sedona's common stock.

- 8 -

## III.   MARKET, INDUSTRY AND COMPANY-SPECIFIC FACTORS DETERMINING THE UNDERPERFORMANCE OF SEDONA SHARES

34.   We have examined the movement in Sedona's stock price over the period of Rhino's trading and compared it with stock price movements of the overall market and also of other peer companies. In addition, we have considered the deteriorating operating performance of Sedona over this period. We have performed these analyses using a number of generally accepted valuation and statistical methods that are commonly used to examine and explain a particular company's stock price movements.

35.   We have concluded that the decline in Sedona's stock price over the period of Rhino's trading was consistent with the contemporaneous deterioration in a combination of market, industry and Company-specific factors. In other words, the decline in Sedona's stock price was consistent with factors that were unrelated to the alleged market manipulation by Rhino. In what follows, we present the details of these analyses.

### A. Market and industry (peer group) factors

36.   Exhibit 4 shows the relative performance of Sedona stock relative to that of the Nasdaq market index. Sedona's stellar performance in late 1999 and early 2000 was followed by a sharp decline in 2000. In this, the stock largely followed the general pattern of the U.S. equity markets over the same period.

37.   As undistinguished as it was, the performance of the Sedona share price over the period between March 1, 2001 and May 31, 2001 (-10.40%) was in line with that (-7.92%) of an index composed of peer group companies (as identified by Bloomberg L.P. in 2004) for which pricing data were available. In fact, the return of Sedona over that period ranked it 32nd out of the 82 peer-group companies.

38.   Similarly, the performance of the Sedona share price over the entire period when Rhino traded in Sedona shares (between June 26, 2000 and June 14, 2002) (-84.36%) exceeded that (-85.72%) of an index composed of the peer group companies for which pricing data was available (see Exhibit 5A). In fact, the return of Sedona over that period ranked it 11th out of the 59 peer-group companies (see Exhibit 5B).

- 9 -

39.   The above data suggests that the performance of Sedona's share price was consistent with the general trends in the equity marketplace, as well as with the performance of Sedona's peers.

## B. Company-specific factors

### (i)  Sedona stock volatility

40.   The performance of Sedona stock was marked by substantial volatility. As demonstrated in Exhibit 6, the average historical volatility of Sedona stock exceeded those of the stocks in the S&P 500 and NASDAQ indices by three- and six-fold, respectfully.

41.   The average volatility levels for Sedona's stock implied that (even ignoring the negative drift of the stock) within any year-long time interval the Sedona stock had a large probability of experiencing large declines: a 25% chance of losing 86.5% or more and a 10% chance of losing 94.5% or more.

### (ii) Sedona's consistently poor financial performance

42.   As shown in Exhibit 7, but for four quarters in 1990 and 1993, respectively, Sedona failed to deliver positive operating income or net income throughout the 1988-2003 time period. The Company's failure to produce positive cash flows after 1988 was a factor that exacerbated its financial position and, ultimately, brought about a series of severe liquidity problems and a threat to the Company's viability.

43.   This poor operating and financial performance was reflected in the reports of Sedona Corporation's independent auditors (Ernst & Young LLP) for 2000, 2001 and 2002, which noted the auditor's "substantial doubt about the Company's ability to continue as a going concern."[3]

44.   Therefore, the repeated issuance of equity derivative securities by Sedona Corporation, which started as early as 1992, appears to be a direct consequence of the

_____

[3] See Sedona Corporation Form 10-K filings with the Securities and Exchange Commission.

- 10 -

Company's financial underperformance over an extended period prior to the announcement of the November 23, 2000 transaction.

45.    Continued poor performance and dilution of the Company's securities can thus be viewed as a confirmation of the signals of the deteriorating Company situation conveyed to the marketplace via the Company's repeated issuance of equity derivative securities. (See Exhibit 8).

46.    A number of additional Company-specific factors, such as negative Company news and corporate filings, also had an adverse effect on the Company's stock price.

47.    For example, between 1995 and 2002 Sedona directors and officers were part of a large number of transactions involving Sedona securities. Among those were loans, options and warrants. The nature, volume and types of these were indicative of the dire financial circumstances of the Company, and underscored the negative prospects for the company. For example, in 1999 the Company's CEO provided financing to Sedona Corporation "on a short-term basis bearing interest at the rate of 1.5% per month" - a fact that speaks volumes about the Company's insiders' view of the true future prospects of their Company.

**(iii) Sedona's stock market performance as a reflection of the Company's consistently poor financial performance**

48.    As shown in Exhibit 9 and the table below, during at least five separate time periods, Sedona stock suffered declines in excess of 75%. Most of those coincided with market periods and events (e.g., systemic market crises) characterized with (severely) limited market liquidity.

- 11 -

| # | Period | | Sedona Stock Price | | | Notes |
|---|--------|--------|--------|--------|--------|--------|
| | Start | End | Start | End | Return | |
| 1 | 10/05/87 | 09/12/88 | $8.75 | $1.17 | -86.61% | 1987 equity markets crash |
| 2 | 06/27/89 | 01/21/91 | $5.70 | $0.49 | -91.50% | 1990 – 1991 U.S. recession[4] |
| 3 | 03/03/92 | 10/26/94 | $5.75 | $0.31 | -94.57% | |
| 4 | 09/22/97 | 07/15/98 | $5.00 | $1.16 | -76.88% | Worldwide (Asian/Russian debt) financial crisis |
| 5 | 03/06/00 | 11/22/00 | $9.38 | $1.16 | -87.67% | NASDAQ bubble |

49.  These facts are consistent with the idea that, due to its consistent failure to produce positive cash flows from operations, the financial and market performance of Sedona was subject to severe liquidity constraints.

50.  Thus, the poor performance of Sedona shares can be viewed as an indication/market signal of ongoing and systematic poor operating performance and weak financial fundamentals of Sedona.

## IV.   ANALYSES OF THE IMPACT OF RHINO'S TRADING ON SEDONA'S STOCK PRICE

51.  We performed a number of quantitative and statistical analyses in order to examine whether the trading records and other empirical evidence support the allegation that Rhino engaged in manipulative trading activities. This section discusses our analyses and conclusions as they relate to that issue.

---

[4] The eight-month period between July 1990 and March 1991 was a recession as determined by the NBER Business Cycle Dating Committee.

- 12 -

52. In the interest of providing as comprehensive an analysis as possible, we performed a number of tests based on generally accepted and reliable scientific methods of determining the impact of trades on stock prices (regression, parametric and non-parametric analyses). The tests used daily closing price data from Bloomberg and data on Rhino's trading in Sedona's stock.

53. Each of these statistical tests corroborates our conclusion that Rhino's transactions in Sedona's common stock had no effect on Sedona's stock price.

## A. Statistical analyses

54. As an initial matter, we note that, as illustrated in Exhibit 9, Sedona's stock price reached an all-time high of $9.38 on March 6, 2000 (just four days before the NASDAQ reached an all-time end-of-day high of 5,048.62). This represents an increase of 233% from a year earlier (Sedona's stock price closed at $2.81 on March 5, 1999). The subsequent decline in Sedona's stock price predated much of Rhino's trading in Sedona. Sedona's stock price started declining and declined severely, long before Rhino traded in Sedona stock or entered into the Convertible Debentures and Warrants Purchase Agreement with Sedona in November 2000. For example, approximately 64% of the Sedona stock price decline from March 6, 2000 to June 14, 2002 (the date of Rhino's last trade in Sedona's common stock) occurred before Rhino commenced trading in Sedona common stock (on June 26, 2000). In addition, 93% of the decline in Sedona's stock price from March 6, 2000 to June 14, 2002 occurred prior to the Series G Convertible Debentures being issued to Rhino (on November 23, 2000).

55. A battery of generally accepted statistical and economic tests support our conclusion that Rhino's trading in Sedona had no impact on the price of Sedona stock. As shown in Exhibit 9, a statistical analysis of market data using parametric statistical tests fails to reject the hypothesis that the price behavior of the underlying stock (Sedona) was similar whether or not Rhino was active in the marketplace. In other words, the difference between the daily returns of Sedona share prices between trading days when Rhino did and did not trade is not statistically significant either over the entire period of Rhino trading in Sedona stock (Exhibit 10A) or over a shorter period of March 1, 2001 to May 31, 2001 (Exhibit 10B).

56. A statistical analysis of market data also fails to reject the hypothesis that the price behavior of Sedona stock was similar whether or not Rhino sold Sedona shares. In other words, the difference between the daily returns of Sedona share prices between trading days when Rhino

- 13 -

sold Sedona stock and the trading days when Rhino was not active in the marketplace is not statistically significant.

57.   Further non-parametric statistical tests show that Rhino's trading in Sedona stock did not have an impact on the direction (i.e., whether the stock price went up or down) of Sedona's stock price, either over the entire period of Rhino trading in Sedona stock (Exhibit 11A), or over a shorter period of March 1, 2001 to May 31, 2001 (Exhibit 11B).

58.   In addition, Sedona's stock price performed <u>better</u> during the nine five-day look-back conversion periods (with an average daily return of +0.36%) than during the entire period when Rhino traded in Sedona shares (between June 26, 2000 and June 14, 2002) (-0.39%).

59.   In addition, the data provide no evidence to conclude that the volume in which Rhino traded Sedona shares affected Sedona's stock returns (Exhibit 12). Furthermore, the volumes (as a percentage of total market activity) at which Rhino transacted in Sedona stock during the nine five-day look-back periods were in line with Rhino's typical (average) participation in the marketplace.

60.   We also performed a number of econometric (regression) analyses using the data on Rhino's trading in Sedona shares. These were based on a number of alternative regression specifications, none of which established a relationship between Rhino's trading in Sedona shares and the performance of Sedona stock either over the entire period of Rhino's trading, or over a shorter period of March 1, 2001 to May 31, 2001 (see Exhibit 13A and 13B).

61.   Finally, we calculated a 95% confidence interval for the performance of Sedona stock as of March 1, 2000. In other words, we estimated the range within which a reasonable investor, based on the historical performance of the stock, would expect to see Sedona's stock price move after March 1, 2001.[5] As shown in Exhibit 14, at no point during the March 1, 2001 – May 30, 2001 time period did the price of Sedona stock fall below the lower bound of the 95% confidence interval for the Sedona stock price.

---

[5] Note that this analysis is conservative in that it does not take into account the long-run negative drift typical of stocks of issuers of equity derivative securities.

- 14 -

62.   In conclusion, the economic analysis and empirical investigation demonstrate that Rhino did not pursue, and had no rational incentives to pursue, a manipulative strategy aimed at artificially depressing the price of Sedona shares. Rather the decline in Sedona's stock price is consistent with market, industry and Company-specific factors that have nothing to do with any alleged manipulation by Rhino.

## V.   MISCELLANEOUS

63.   Our work is ongoing and our opinions are subject to revision based on new information (including reports or testimony by Plaintiff's experts), which subsequently may be provided to, or obtained by us. In particular, we may present analysis for additional periods of Rhino's trading, if requested. In addition, we may present demonstratives at trial based on the analysis we have performed.

Respectfully submitted,

Stephen D. Prowse

Tsvetan N. Beloreshki



Exhibit 1

# Stephen D. Prowse, Ph.D, CFA

Senior Managing Director

## Dallas

2001 Ross Avenue,
Suite 400
Dallas, TX 75201

Tel (214) 397-1696
Fax (214) 397-1785

Stephen.prowse@fticonsulting.com

## Employment

1989-1994: Economist, Federal Reserve Board

1992-1993: Economist, Bank for International Settlements (on leave from FRB)

1994-1998: Senior Economist & Policy Advisor, Federal Reserve Bank of Dallas

1997-1998: Adjunct Professor, Southern Methodist University

1998-2000: Director, PricewaterhouseCoopers LLP

2000-2003: Principal, KPMG LLP

2003-present: Senior Managing Director, FTI Consulting, Inc.

## Background

Stephen Prowse is a Senior Managing Director in FTI Consulting, Inc.'s Forensic practice in Dallas, where he provides economic, financial, statistical and valuation analysis to clients involved in litigation, arbitration, mediation and other contexts where parties are engaged in complex business disputes.  He specializes in providing advisory and expert witness services to clients involved in antitrust, intellectual property, securities, valuation, and lost profits matters.  He has offered expert testimony in all of these areas.

Dr. Prowse's clients represent the Financial Services, Retail, Manufacturing, Oil and Gas, Healthcare, Trucking and Transportation, Consumer Goods, Auto and Telecommunications Industries.

Dr. Prowse has a Ph.D in economics from UCLA and is a CFA Charterholder.  Prior to joining FTI, Dr. Prowse was a Partner (Principal) in KPMG LLP's Forensic Practice. Prior to his consulting career, Dr. Prowse was a Senior Economist and Policy Advisor in the Federal Reserve System, where he provided economic and financial policy advice to the Chairman of the Federal Reserve Board and the President of the Federal Reserve Bank of Dallas on economic and financial matters.  He has also served as an Adjunct Professor at the Cox School of Business, Southern Methodist University.  He has published numerous articles in, and has served as a referee for, academic research journals such as the *Journal of Finance*, *Journal of Financial Economics* and *Journal of Banking and Finance*.



Exhibit 1

**Selected Engagement Experience**

Securities/Fraud

Dr. Prowse has extensive experience in assessing damages in securities-related cases, including 10b-5 class action lawsuits.  He has valued corporate equities, bonds, futures, options and other derivative securities in a litigation context.  He has performed event studies, developed appropriate peer groups, and isolated economy-wide, industry-specific and company-specific factors impacting a company's stock price.  He has constructed probabilistic financial trading models to track "ins-and-outs" traders and retention shareholders. He has also valued both public and private firms in the retail, mining, trucking, energy and sports-related industries.

Antitrust

Dr. Prowse has provided advisory services to clients involved in antitrust litigation.  He has performed studies to define the relevant market, assessed the competitive attributes of markets, performed pricing studies, estimated price elasticities of demand and supply, analyzed markets in competitive, monopolistic and oligopolistic environments, and estimated damages.  He has also evaluated the competitive attributes of markets and firm's business practices to assess the firm's vulnerability to antitrust lawsuits.

Intellectual Property

Dr. Prowse has assessed economic damages and defined the market in intellectual property matters, including patent infringement, copyright and trade secrets cases.  He has calculated reasonable royalties, lost profits, lost convoyed sales, damages through price erosion and unjust enrichment in such cases.  He has also offered expert testimony in such matters.

Statistical and Econometric Analysis

Dr. Prowse has provided statistical analysis to clients involved in many types of disputes.  He has experience in applying statistical, sampling, econometric, and regression principles in determining lost profits in breach of contract suits, lost wages and lost commissions in wrongful termination suits, and damages in antitrust and intellectual property disputes.

**Education & Professional Affiliations**

Dr. Prowse holds a Ph.D in economics from UCLA and is a CFA Charterholder.  He is a member of the American Economic Association, the American Finance Association, and the CFA Institute.



Exhibit 1

**Business and Academic Publications**

"Dura's Impact on Damages", with Peri Nielsen, <u>Insights The Corporate & Securities Law Advisor</u>, Volume 22 Number 7, July 2008.

"Measuring Market Power in the Steel Industry", with Dan Slottje and Esfandiar Maasoumi, in <u>Measuring Market Power</u>, D.J. Slottje (ed.), Elsevier Science B.V. 2002.

"Antitrust Policy in Mexico", with Dan Slottje, <u>Law and Business Review of the Americas</u>, Summer 2001.

"The Private Equity Market", with George Fenn and Nellie Liang, in <u>The Handbook of Corporate Finance</u>, 2002.

"Angel Investors and the Angel Capital Electronic Network (ACE-Net)", with Zoltan Acs, in <u>Bridging the Entrepreneurial Financing Gap:  Linking Government with Regulatory Policy</u>, Michael J. Whincop (ed.), Sydney:  Federated Press 2001.

"Trends and Prospects in Venture and Angel Investments in New Media Companies", working paper, 2000.

"Shareholder Litigation against Boards of Directors," co-authored with Larry Ranallo, in Weil, Wagner and Frank (eds.), <u>Litigation Services Handbook:  The Role of the Financial Expert</u>, 3rd edition (Wiley, NY).

"Corporate Governance and Corporate Finance in East Asia:  What can we Learn from the Industrialized Countries?"  <u>Banker's Journal Malaysia</u>, March 1999.

"Corporate Governance:  Emerging Issues and Lessons from East Asia", <u>World Bank Discussion Paper #24</u>, 1998.

"Corporate Control in Commercial Banks", <u>The Journal of Financial Research</u>, 1997.

Alternative Models of Financial System Development", in Edey (ed.) <u>The Future of the Financial System</u>, Proceedings of the 1996 Conference of the Reserve Bank of Australia.

"Corporate Governance in Eastern Europe and Russia:  The Role of Banks" with Peter Dittus, in Gray, Rapaczinski, and Stern, <u>Corporate Governance in the Transition Countries</u> (1995:  Blackwell).

"Corporate Finance and Governance in an International Perspective:  A Survey of Corporate Control Mechanisms Among Large Firms in the U.S., U.K., Japan and Germany", <u>Financial Markets, Institutions and Instruments</u>, Volume 4 Number 1,1995.



Exhibit 1

"The Structure of Corporate Ownership in Japan", <u>The Journal of Finance</u>, 47 (3), 1992.

"Institutional Investment Patterns and Corporate Financial Behavior in the U.S. and Japan", <u>The Journal of Financial Economics</u>, 27 (1), 1991.

"Angel Investors and the Market for Angel Investments", <u>The Journal of Banking and Finance</u>, August 1998.

"Innovation and Finance in High-Tech Firms", with George Fenn and Nellie Liang, working paper presented at the Innovation and Finance Conference at Columbia Law School, December 1997.

"An Economic Analysis of the Private Equity Market", with George Fenn and Nellie Liang, <u>Financial Markets, Institutions and Instruments</u>, Volume 6, Number 4, 1997.

"The Economics of the Private Placement Market:  A New Look", with Mark Carey, John Rea, and Greg Udell, <u>Financial Markets, Institutions and Instruments</u>, Volume 2 Number 3, 1993.

"A Look at America's Corporate Finance Markets", <u>The Southwest Economy 2</u>, 1996.

"Exploring Aggregate Asset Price Fluctuations Across Countries:  Measurement, Determinants and Monetary Policy Implications", with Claudio Borio, <u>Bank for International Settlements Economic Paper</u>, No. 40, 1994.

"Recent Developments in Corporate Finance", with John Rea, Lee Crabbe, and Mark Warshawsky, Federal Reserve Bulletin, August 1990.



Exhibit 1

# STEPHEN D. PROWSE

## DEPOSITION TESTIMONY

Service Asset Management Company v. Hibernia Corporation*, Unicorp Bancshares-Texas, Inc., Unicorp Bancshares-Delaware, Inc., Orangebank, Hovde Financial, Inc., First Capital Group, LLC and Gary Simanson (In the District Court of Orange County, Texas, Case No. A970272-C) (July 2001)

Tyler Jet, L.L.C.*, TeamXtreme Racing, L.L.C. and Burl Outlaw v. Lycos, Inc. (In the United States District Court for the Eastern District of Texas, Lufkin Division, Civil Action No. 9:00CV179) (October 2001)

In the Matter of Arbitration between Accton Technology Corporation*, Global Business Investments (B.V.I.) Corp., and SMC Networks, Inc., Claimants, against Standard Microsystems Corporation, Respondent/Counterclaimant (February 2002)

Stenograph L.L.C.* v. Advantage Software, Inc.; Gregory Seely; Portia Seely; Acculaw, Inc.; Desmond Kameka; Stenotech, Inc.; Kerry Brunner, and Sandra Brunner (United States District Court for the Southern District of Florida, Miami Division, Case No. 99-06685-CIV) (May 2002)

OCM Principal Opportunities Fund, Pacholder Value Opportunity Fund et al vs. CIBC World Markets Corp.* et al, and TCW Shared Opportunity Fund II LP et al vs. CIBC World Markets Corp.* et al (Superior Court for the State of California for the County of Los Angeles, No. BC 229069) (May 2002)

Bastion Capital Fund, L.P. v. CIBC Wood Gundy Securities Corp.* (Superior Court of the State of California for the County of Los Angeles, No. BC 186659) (July 2002)

Bill Burch and International Mercantile, Inc., Claimants, v. Nextel Communications, Inc.* and Nextel of Texas, Inc., Respondents, (In an Arbitration Proceeding Administered by the American Arbitration Association, Dallas, Texas Case No. 71 1Y 181 00114 01) (April 2003).

ConAgra Foods, Inc. vs. Weaver Popcorn Company, Inc.* (In the United States District Court for the District of Nebraska, Case No. 4:01CV595) (April 2003)

Waters Technologies Corporation*, Waters Investment Ltd., MicroMass U.K. Ltd. And MicroMass Inc. vs. Applera Corporation (United States District Court for the District of Delaware, Civil Action No. 02-128-GMS) (December 2003)

Robert Kaiser*, Plaintiff vs. John Stupka, Defendant (In the United States District Court for the Southern District of Mississippi, Jackson Division, Civil Action No. 3:03CV932BN) (April 2004)



Exhibit 1

In re American Plumbing & Mechanical Inc., Chapter 11, Case Nos. 03-55789 through 03-55814, Jointly Administered Under Case No. 03-55789-LMC  (In the United States Bankruptcy Court for the Western District of Texas, San Antonio Division) (May 2004)

Corrections Corporation of America, Plaintiff, v. Corrections Facilities Development, LLC*, Defendant. (In the United States District Court for the Middle District of Tennessee, No. 3-03-0409) (June 2004)

Intergraph Hardware Technologies Company, Plaintiff, vs. Dell Computer Corporation, Hewlett-Packard Company*, and Gateway, Inc. Defendants, Civil Action No. 2-02CV312 (TJW).  (In the United States District Court, Eastern District of Texas, Marshall Division) (October 2004)

Delno Hall, Bruce and Jan Peck, Plaintiffs and Counterdefendants, v. Medical Security Card Co.*, Charles and Jane Horn, Defendants and Counterclaimants, No. CV2002-010900 (In the Superior Court of the State of Arizona in and for the County of Maricopa) (December 2004)

United States Securities and Exchange Commission*, Plaintiff  -v- Bruce E. Snyder, Jr., Defendant, Civil Action No. H-03-4658 (United States District Court, Southern District of Texas, Houston Division) (July 2005)

W. David Sykes*, Plaintiff and Counterdefendant, vs. nSTOR Corporation and nSTOR Technologies, Inc., Defendants and Counterplaintiffs, Case No. CA 02-1933 AH (In the Circuit Court of the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida) (August 2005)

AIG Retirement Services, Inc.* (formerly known as SunAmerica Inc.), a Delaware corporation, v. Altus Finance S.A., a corporation organized under French law, et. al., Case No.: CV-05-1035 JFW (United States District Court, Central District of California, Western Division) (February 2007)

Corey Airport Services, Inc., and William E. Corey, Plaintiffs, v. The City of Atlanta, Clear Channel Outdoor, Inc.* d/b/a Clear Channel Airports, Clear Channel Airports of Georgia, Inc., f/k/a Transportation Media, Inc. et al., Civil Action No. 1:04-CV-3243 (In the United States District Court for the Northern District of Georgia, Atlanta Division) (May 2007)

Fair Isaac Corporation*, Plaintiff, vs. Texas Mutual Insurance Company, Defendant, Case No. 4:05-CV-03007 (In the United States District Court for the Southern District of Texas, Houston Division) (June 2007)

Avago Technologies General IP PTE Ltd. and Avago Technologies ECBU IP Ltd.*, Plaintiffs, v. Elan Microelectronics Corp., a Taiwanese Corporation, and Elan Information Technology Group, a California corporation, Defendants.  Case 5:04-cv-05385-JW (United States District Court, Northern District of California) (July 2007)



Exhibit 1

Mannatech, Inc. Plaintiff, v. Glycobiotics International, Inc.* Defendant.  Civil No. 3-06-CV-0471-G  ECF (In the United States District Court for the Northern District of Texas, Dallas Division) (July 2007)

A. Vernon Wright and Dynoil Refining LLC, a Louisiana limited liability company, Plaintiffs, vs. Lehman Brothers Holdings Inc., Lehman Brothers Inc.*, Carlos Fierro, Jeffrey Turnbaugh, Andrew Malik et al, Defendants. No. BC366895 Related to No. BC339157 (Superior Court of the State of California, County of Los Angeles) (October 2007)

Tessera, Inc.*, Claimants and Counter-respondent vs. Amkor Technology, Inc., Respondents and Counter-claimant (International Court of Arbitration of the International Chamber of Commerce, Ref. No.: 14 268/EBS) (January 2008)

In re Petco Corporation* Securities Litigation.  Case No. 05-CV-0823-H (RBB) (United States District Court, Southern District of California) (March 2008)

Net2Phone, Inc., Plaintiff, v. eBay, Inc.*, Skype Technologies SA, Skype, Inc., et al., Defendants. Case No. 06-2469-KSH-PS (United States District Court for the District of New Jersey) (June 2008)

In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III).  Tessera, Inc.*, Complainant.  Investigation No. 337-TA-630 (United States International Trade Commission, Washington, D.C.) (August 2008)

Starz Entertainment, LLC*, Plaintiff v. Buena Vista Television, Inc., Defendant.  Case No. CV07-01895VBF(PJWx) (United States District Court, Central District of California, Western Division) (August 2008)

Rambus Inc., Plaintiff v. Micron Technology, Inc.*, and Micron Semiconductor Products, Inc., Defendants. Case No. C06-00244 (United States District Court, Northern District of California, San Jose Division) (October 2008)

Georgia Hensley, et al, Individually and as Class Representatives on Behalf of All Similarly Situated Persons, Plaintiffs, vs. Computer Sciences Corporation, et al. Defendants. No.: CV-2005-059-3 (In the Circuit Court of Miller County, Arkansas) (December 2008)

United States Securities and Exchange Commission, Plaintiff, vs. Robert A. Berlacher*, Lancaster Investment Partners, L.P. et al., Defendants.  Civil Action No. 07-3800 – ER (In the United States District Court for the Eastern District of Pennsylvania) (March 2009)

Glazer's Wholesale Drug Company, Inc. and Glazer's Distributors of Louisiana, Inc. Plaintiffs, v. Klein Foods, Inc. d/b/a Rodney Strong Vineyards*, Defendant.  Civil Action No. 3-08CV0774-L (In the United States District Court, Northern District of Texas, Dallas Division) (April 2009)



Exhibit 1

In the Matter of Certain Mobile Telephones and Wireless Communication Devices Featuring Digital Cameras, And Components Thereof.  Eastman Kodak Company*, Complainant.  Investigation No. 337-TA-663 (United States International Trade Commission, Washington, D.C.) (July 2009)

In the Matter of Certain Digital Cameras.  Eastman Kodak Company*, Respondent.  Investigation No. 337-TA-671 (United States International Trade Commission, Washington, D.C.) (August 2009)


Retained by party indicated by a *.



Exhibit 1

## STEPHEN D. PROWSE

## TRIAL/ARBITRATION TESTIMONY

Harmar Bottling Company, et al. vs. Coca-Cola Enterprises*, Inc., and Coca-Cola Company, et al. (In the District Court in and for Morris County, Texas, Cause No. 17,569) (June 2000)

In the Matter of Arbitration between Keenan Carstens, Claimant, against KPMG Peat Marwick, L.L.P., n/k/a KPMG, L.L.P.*, Respondent (American Arbitration Association No. 70Y1160056701) (February 2003)

In the Matter of Arbitration between Accton Technology Corporation*, Global Business Investments (B.V.I.) Corp., and SMC Networks, Inc., Claimants, against Standard Microsystems Corporation, Respondent/Counterclaimant (May 2003)

OCM Principal Opportunities Fund, Pacholder Value Opportunity Fund et al vs. CIBC World Markets Corp.* et al, and TCW Shared Opportunity Fund II LP et al vs. CIBC World Markets Corp.* et al (Superior Court for the State of California for the County of Los Angeles, No. BC 229069) (August 2003)

In the Matter of Central du Page Hospital* (Department of Public Aid Administrative Review Law Court, State of Illinois, Case No. 02MVH74) (August 2003)

In the Matter of Northwest Community Hospital* (Department of Public Aid Administrative Review Law Court, State of Illinois, Case No. 02MVH10) (August 2003)

Bill Burch and International Mercantile, Inc., Claimants, v. Nextel Communications, Inc.* and Nextel of Texas, Inc., Respondents, (In an Arbitration Proceeding Administered by the American Arbitration Association, Dallas, Texas Case No. 71 1Y 181 00114 01) (December 2003).

In re American Plumbing & Mechanical Inc., Chapter 11, Case Nos. 03-55789 through 03-55814, Jointly Administered Under Case No. 03-55789-LMC (In the United States Bankruptcy Court for the Western District of Texas, San Antonio Division) (June 2004)

Laura Ogden, et al, Plaintiffs, v. Americredit Corp.*, T.Rowe Price, Bank One Trust Co., et al, Defendants, Civil Action No. 4:03-CV-350-Y, (In the United States District Court  for the Northern District of Texas, Fort Worth Division) (December 2004)



Exhibit 1

Robert Kaiser*, Plaintiff vs. John Stupka, Defendant (In the United States District Court for the Southern District of Mississippi, Jackson Division, Civil Action No. 3:03CV932BN) (December 2004)

United States Securities and Exchange Commission*, Plaintiff -v- Bruce E. Snyder, Jr., Defendant, Civil Action No. H-03-4658 (United States District Court, Southern District of Texas, Houston Division) (July 2006)

Dan K. Johnson and Sherri K. Johnson, Claimants, vs. Sam A. Mudlin and Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Respondents. (National Association of Securities Dealers, Case No.: 05-3808) (February 2007)

Tessera, Inc.*, Claimants and Counter-respondent vs. Amkor Technology, Inc., Respondents and Counter-claimant (International Court of Arbitration of the International Chamber of Commerce, Ref. No.: 14 268/EBS) (April 2008)

In re: Crosswinds at Lone Star Ranch 1000, Ltd., Debtor.  Case No. 08-40262 (Chapter 11) (In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division) (July 2008)

In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III).  Tessera, Inc.*, Complainant.  Investigation No. 337-TA-630 (United States International Trade Commission, Washington, D.C.) (October 2008)

In re: Crosswinds at Lone Star Ranch 1000, Ltd., Debtor.  Case No. 08-40262 (Chapter 11) (In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division) (October 2008)

In the Matter of Arbitration between American Wireless License Group, LLC, Claimant, against Harvey P. White, Scot B. Jarvis, Susan G. Swenson, Thomas J. Bernard, Jeffrey P. Williams, Anthony R. Chase, Michael B. Targoff, Jill E. Barad, Robert C. Dynes, James E. Hoffman, and Stewart Douglas Hutcheson, Respondents* (American Arbitration Association Case No. 71 181 Y 00124 07) (November 2008)

Avago Technologies General IP PTE Ltd. and Avago Technologies ECBU IP Ltd.*, Plaintiffs, v. Elan Microelectronics Corp., a Taiwanese Corporation, and Elan Information Technology Group, a California corporation, Defendants.  Case 5:04-cv-05385-JW (United States District Court, Northern District of California) (April 2009)

In the Matter of Certain Mobile Telephones and Wireless Communication Devices Featuring Digital Cameras, And Components Thereof.  Eastman Kodak Company*, Complainant.  Investigation No. 337-TA-663 (United States International Trade Commission, Washington, D.C.) (October 2009)

Retained by party indicated by a *.



# Tsvetan N. Beloreshki

Managing Director – Forensic and Litigation Consulting

Tsvetan.Beloreshki@fticonsulting.com

Three Times Square
11th Floor
New York, NY 10036
Tel: (212) 499-3695
Fax: (212) 841-9350

**Education**
MBA in Econometrics,
University of Chicago
Graduate School of
Business

B.A. in Economics,
University of Chicago

Tsvetan Beloreshki is a managing director in the FTI Forensic and Litigation Consulting segment and is based in New York. Mr. Beloreshki's practice is driven by his unique combination of economics expertise, strong quantitative skills, and vast marketplace experience as a trader in fixed income and credit derivative instruments and an active participant in the securities industry.

Mr. Beloreshki specializes in securities and financial economics, focusing on credit products, foreign exchange and commodities, derivative instruments, and structured finance. He has been qualified at arbitration hearings and at trial as an expert in financial economics, securities markets, structured finance, financial engineering, securities valuation, market microstructure, and industry customs and practices.

Mr. Beloreshki has provided economic consulting and dispute resolution/litigation services in cases involving the valuation of fixed income securities, mortgage-backed securities, collateralized mortgage obligations, collateralized debt obligations, auction-rate securities, and other structured finance products. He has worked on analyses of liability and damages in commercial and broker/dealer disputes, claims of market manipulation, and lawsuits relating to hedge funds, banking, and real estate investment, as well as litigation cases involving, among others, complex financial and tax structures and derivative securities, equity, hybrid and credit derivatives, convertible securities, foreign exchange, fixed income instruments, hedge funds characteristics and performance, and the effects of financial crises on market performance and liquidity.

Prior to his consulting career, Mr. Beloreshki was a member of Banque Paribas' Structured Products and Credit Derivatives team in London and New York. In his role as a trader, he analyzed the credits and made markets in sovereign and corporate bonds as well as in an array of credit derivative instruments. In addition to his responsibilities related to the active trading and risk management of a book of complex debt instruments, Mr. Beloreshki was responsible for developing methodologies used in the identification of credit and cross-currency arbitrage opportunities as well as in relative value trading across the spectrum of fixed income instruments, asset swaps and credit derivatives markets.  Mr. Beloreshki held a National Association of Securities Dealers General Securities Representative license (Series 7).

Mr. Beloreshki has also worked with a diverse base of banking institutions in the United States, Canada and Great Britain in establishing and maintaining a proprietary software system dealing with asset-liability management in the context of portfolios of mortgage-backed securities and collateralized mortgage obligations.

Mr. Beloreshki has published articles and working papers in the areas of fixed income securities valuation, comparative analyses of the major rating agencies' methodologies with respect to modeling credit in the context of structured finance products, as well as on various liabilities and damages issues related to the litigation of fixed income instruments, hybrid derivatives, and structured finance products. He has presented at a number of seminars and conferences. Among others, the topics of his talks include the valuation of credit derivatives and structured products as well as securities litigation issues related to fixed income instruments, equity, hybrid and credit derivatives, convertible bonds, and structured finance products.



**Expert Reports, Depositions & Testimony**

Testimony and affidavits before the Supreme Court of the State of New York in *Indosuez International Finance B.V. v. National Reserve Bank* on damages stemming from a breach of non-deliverable foreign currency forward contracts following the 1998 moratorium imposed by the Russian Federation.

Memorandum and expert report before the Belgium Court of Claims and in proceedings in the United Kingdom in *National Reserve Bank v. Indosuez International Finance B.V* on the appropriate amount of Ukrainian Eurobonds required to secure plaintiff's claim. Estimated market-implied probabilities of default on sovereign debt issues and opined on expected recovery rates upon event of default.

Testimony and affidavits before the Ad Hoc International Arbitration Tribunal in *Crédit Agricole Indosuez Luxembourg, S.A. v. National Reserve Bank* on common practices in the foreign exchange marketplace, the nature and mechanics of foreign exchange option contracts, as well as on the appropriate methodology for the damages calculation given the lack of liquidity and the extreme market conditions during the relevant time period.

Expert report, deposition and court testimony before the United States District Court, Southern District of New York in *John S. Pereira v. Marshall S. Cogan et al.* on the impact of the 1998 worldwide financial crisis on certain corporate securities.

Expert reports (with Dr. Frederick C. Dunbar) on "Just Compensation Aspects of the River Center Condemnation Apart from Land Value and Entrepreneurial Profit."

Expert report before the United States District Court for the Southern District of New York in *Alvaro Davila Pena v. Gary D. Morgan* on damages associated with breach of contract to deliver shares in a restricted stock trade in an illiquid marketplace.

Testimony before the National Association of Securities Dealers in *Angela Streater v. Scotia Capital, Inc. and Scotia Capital (USA), Inc.* on the structuring, origination, marketing, and trading in equity derivative products (e.g., prepaid forward contracts, equity collars, total return swaps).

Expert report and deposition testimony before the United States District Court, Southern District of New York in *Internet Law Library, Inc., et al.  v. Southridge Capital Management, LLC, et al.* on the salient economic characteristics, optimal investing strategies, and empirical evidence of market manipulation via short selling of the underlying equity related to certain equity derivative securities.

Declaration before the United States District Court, Southern District of New York in *Cootes Drive LLC v. Internet Law Library, Inc.* in support of Cootes Drive LLC's motion for summary judgment on the materiality of its short positions in the common stock of Internet Law Library, Inc.

Expert report before the United States District Court for the Northern District of Alabama, Southern Division in *AAL High Yield Bond Fund and Delaware Delchester Fund v. Harold Ruttenberg, Randall L. Haines, Deloitte & Touche LLP and Banc of America Securities LLC f/k/a NationsBanc Montgomery Securities LLC* in opposition to plaintiffs' motion for class certification of the class of holders of high yield corporate (convertible) debt instruments issued as restricted securities pursuant to the provisions of Rule 144A of the Securities Act of 1933.

Affidavit to the September 11th Victim Compensation Fund of 2001 regarding the valuation of a victim's equity options compensation.



Presentation to the U.S. Department of Justice and U.S. Securities and Exchange Commission, "Analysis of Trading in the Stock of Sedona Corporation by Rhino Advisors, Inc."

Expert reports and deposition testimony before the United States District Court for the District of Connecticut in *Jeffrey Saye v. Old Hill Partners, Inc.* on the nature of a typical hedge fund's operations, the value of proprietary information in the context of the hedge fund industry, the appropriate methodology for the valuation of illiquid minority shareholdings, and the reasonableness of a portfolio manager's mark-to-market of certain portfolio holdings.

Expert report (with Andrew S. Carron), in the Matter of an Arbitration Before the CPR Institute for Dispute Resolution, *AT&T Corp. v. AT&T Wireless Services, Inc.* on the value of certain employee <u>stock</u> options in the context of a corporate transaction (acquisition).

Expert report and deposition testimony before the United States District Court for the Southern District of Texas in re *Enron Corporation Securities Litigation* on liability and damages issues related to a hedge fund's investments in convertible securities and convertible arbitrage strategies.

Expert report and deposition testimony before the United States District Court for the Southern District of Texas in re *Enron Corporation Securities Litigation* on whether the termination claims related to certain swap transactions were "actively traded" contracts under the relevant definition for the purposes of the physical settlement of credit default swaps.

Expert report and testimony before the Financial Industry Regulatory Authority in *Ramius Capital Group et al. v. Bear, Stearns & Co., Inc. et al.* investigating whether the underperformance of the senior tranche of a hybrid structured finance collateral debt obligation ("CDO") is attributable to a mispricing of the CDO collateral assets as a result of an application of a pricing methodology that is inherently flawed and inconsistent with standard industry practices (fair market valuation).

Declarations and testimony before the United States District Court for the Southern District of Texas in *Oscar S. Wyatt, Jr. v. El Paso Corporation, et al.* on the economic rationale and empirical foundation, or lack thereof, for the imposition of certain limitations, within the context of a class action litigation settlement, on the damages recoverable by holders of equity option contracts on the basis of an asserted "speculative and derivative nature" of these financial instruments.

Expert report before the American Arbitration Association in *William N. Melton, Patricia S. Smith and Myer Berlow v. Deutsche Bank A.G. and Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown* on the economic characteristics, rationale, and valuation of certain foreign exchange option transactions, as well as on the performance of the calculating agent in certain structured derivative transactions.

Expert report and deposition testimony before the United States District Court for the Southern District of Indiana in *Interactive Intelligence, Inc. v. KeyCorp, KeyBank National Association and Adam Ravens* on certain salient characteristics of the over-the-counter foreign exchange marketplace and on common business practices related to the setting of prices and transaction costs in that marketplace.

Expert report and deposition testimony before the United States District Court for the Southern District of New York  in *Securities and Exchange Commission v. Nelson J. Obus et al.* on issues related to alleged insider trading, portfolio holdings and investment strategies, as well as on the impact of long-term debt issuance on the performance of a company's common stock.



Expert reports, declaration and deposition testimony before the United States District Court for the Southern District of New York in *The Pension Committee of the University of Montreal Pension Plan, et al. v. Banc of America Securities LLC, et al.* on the issues of due diligence, loss causation and investor damages stemming from the failure of a family of offshore hedge funds.

Expert report and deposition testimony before the American Arbitration Association in *Forethought Investment Management, Inc., et. al. v. SCM Advisors LLC* on the role of collateral managers in the structured finance marketplace, on the reasonableness of the due diligence performed by respondent, and on liability and damages issues related to the losses incurred by claimant on its holdings of certain collateralized debt obligations.

Expert Reports (with Stephen R. Prowse) before the American Arbitration Association in *Pet Quarters, Inc. v. Thomas Badian, Rhino Advisors, et al.,* on the salient economic characteristics, optimal (profit-maximizing) investing strategies, and evidence of market manipulation via short selling of the underlying equity related to certain equity derivative (hybrid) securities.

Hearing testimony in *ST Microelectronics v Credit Suisse Securities (USA) LLC* (FINRA) on liability and damages issues related to the losses incurred by claimant as a result of misrepresentations of the risk/return characteristics of certain structured finance instruments (auction-rate securities backed by collateralized debt obligations and credit-linked notes).

Expert reports in *CoStar Group, Inc. v Credit Suisse Securities (USA) LLC* (FINRA) and *460 Park Avenue South et al., v. CitiGroup Global Markets, Inc.* (FINRA) on liability and damages issues related to the losses incurred by claimant as a result of misrepresentations of the risk/return characteristics of certain structured finance instruments (auction-rate securities backed by student loans).

Expert report in re *Schwab Corporation Securities Litigation* on the accuracy or reliability of the duration estimates of certain asset- and mortgage-backed securities comprising the portfolio of a fixed income fund.

Economic analyses, expert report and testimony *(forthcoming)* in The High Court of the Republic of Singapore in *Jurong Shipyard Pte Ltd. v. Société Générale* on issues related to losses incurred as a result of certain (allegedly unauthorized) foreign exchange transactions. In particular, I have been asked to describe the salient characteristics of the OTC marketplace for foreign exchange derivatives and to opine on: (i) the duties owed by defendant to plaintiff, in particular with respect to ensuring the plaintiff entered into the transactions solely for hedging purposes; (ii) the salient characteristics of the transactions as being potentially indicative of speculative, i.e., other than hedging, purpose; and (iii) the appropriateness of defendant's inquiries and actions in carrying out the transactions, taking into account reasonable and prudent banking practices.



Exhibit 2

## Publications

"Default and Recovery Rates in Emerging Markets," in Frank J. Fabozzi and Efi Pilarinu, eds. *Investing in Emerging Fixed Income Markets*, First Edition (John Wiley & Sons, Inc., 2002).

"Default and Recovery Rates in Emerging Markets," in Frank J. Fabozzi, ed., Professional *Perspectives on Fixed Income Portfolio Management*, Volume 3, (John Wiley & Sons, Inc., 2002).

with Perrie M. Weiner, Esq., Michael S. Rosenblum, Esq., and Caryn G. Mazin, Esq., "The Frontiers of Convertibles Financing: An Economic and Legal Perspective on Litigating Future Priced Securities," NERA Working Paper Series, June 2003.

with Andrew S. Carron and Phoebus J. Dhrymes, "Credit Ratings for Structured Products: A Review of Analytical Methodologies, Credit Assessment Accuracy, and Issuer Selectivity among the Credit Rating Agencies," NERA Economic Consulting, November 6, 2003.

"How Much is Options Back-dating Worth?," FTI Consulting, Inc. White Paper, June 2006.

"The Global Credit Crisis: What Directors Need to Know," *Corporate Board Member*, Board Governance Series, Volume XI, 2008.


## Presentations

"Use of Credit Derivatives in Emerging Markets," Emerging Markets Investor (Risk magazine) conference, October 30, 1997, London

"Same Side of the Law, Different Interests: Convertible Bonds in Securities Litigation," Finance, Law and Economics Securities Litigation Seminar, National Economic Research Associates, July 2, 2001, Ojai Valley

"Recent Trends in Securities Litigation," The Insider Trading & Responsible Corporate Governance Forum, Marsh & McLennan/Mellon Bank, March 14, 2002, Boston

"Enforcing Derivatives," Finance, Law and Economics Securities Litigation Seminar, National Economic Research Associates, July 5, 2003, Sun Valley

 "Structured Finance Litigation Arbitrage," 11th Annual CDO and Credit Derivatives Summit, February 22-23, 2007, New York.

"Utilizing Listed Options To Enhance Returns," 2007 Hedge Fund Leadership Forum, Argyle Executive Forum, May 24, 2007, New York.

"Impact of the Credit Crisis on the Bond Market: What Every Lawyer Needs to Know about the Subprime Crisis," West Legalworks, March 12, 2008, New York.

"Structured Finance Securities Litigation," FTI Consulting, Inc., June 2, 2009, New York



### Selected Additional Professional Experience

**Credit Derivatives and Structured Finance Products**

- Performed economic analyses in order to evaluate various quantitative models and statistical methodologies used by a major broker-dealer and data provided to the major credit rating agencies in the process of securitization of CDO transactions.

- Performed economic analyses in the course of an investigation into the information flow and business practices of the credit derivatives / (synthetic) structured finance trading desks of a major broker-dealer.

- Performed economic analyses in the course of an investigation into the causes of the failure of the Bear Stearns High-Grade Structured Credit Fund and the Bear Stearns High-Grade Structured Credit Enhanced Leveraged Fund in 2007.

- Performed economic and quantitative analyses of the public finance and structured finance business lines of a major monoline insurance company following its placement on credit watch with negative implications by a major credit rating agency in order to determine the loss exposure(s) over time of that company's various counterparties in the event of a subsequent credit rating downgrade, which would result in that company's failing to post sufficient collateral, defaulting on policy obligations, and being forced into a regulatory receivership.

- Reverse-engineered structured finance products (e.g., CDO, credit- and foreign exchange-linked notes) and analyzed issues of suitability and liability. Established mispricing of the derivative structure based on incorrect assumptions regarding, among others, expected default probabilities, recovery rates, and diversification benefits.

- Consulted on liability and damages issues related to a dispute over the waterfall structure of a collateralized loan obligation following the decision of the majority of preferred share holders to exercise an optional early redemption of the structure.

- Performed economic and statistical analyses on behalf of a number of broker-dealers in response to requests by regulators to analyze the effects, if any, of certain actions taken by major broker-dealers, on the marketplace for auction-rate securities.

- Performed a forensic investigation into whether a broker-dealer abetted the market manipulation schemes of a rogue commodities trader by extending him credit disguised as combinations of options, futures, and other derivative instruments.

- Analyzed liability issues related to allegations of unsafe banking practices related to the marketing and sale of certain leveraged derivatives and structured notes. Examined whether or not the assumptions (e.g., implied volatilities) used in the valuation of these instruments were consistent with the relevant variables contemporaneously observable in the marketplace.

- Economic analyses in *Stephen James Brown and Patricia Brown v. Wells Fargo Investments, LLC* (FINRA) on liability and damages issues related to losses incurred as a result of alleged misrepresentations of the marketplace for and the risk/return characteristics of certain auction-rate securities.



**Fixed Income and Asset-Backed Securities**

- Developed an analytical framework for the valuation and performance assessment of bond portfolios in broker/dealer arbitration cases. Modeled default experience of broker customers' fixed income portfolios in order to compare the actual and expected default experience.

- Analyzed suitability and liability issues arbitration disputes involving claims of suitability, improper trading, mispricing, and liquidation of investors' accounts invested in high-grade and high-yield debt instruments (Eurobonds, Brady bonds, sovereign and corporate bonds and notes, local currency bonds).

- Performed quantitative and qualitative analysis of allegations of insider trading on the part of a major investment bank's U.S. Treasuries trading desk following the premature refunding disclosure on October 31, 2001.

- Evaluated and assessed allegations related to potential flaws in the quantitative and statistical methodologies used by a major government sponsored entity (GSE) in certain credit models related to the valuation and risk management of mortgage-backed securities.

- Analyzed liability and damages issues in a litigation matter involving allegations against a major broker-dealer for its role as the lender and underwriter for a financial institution (mortgage originator) allegedly involved in deceptive and discriminatory practices in providing high-cost sub-prime mortgages to homeowners.

- Consulted in a number of cases involving issues of class certification, liability and damage estimation involving sub-prime mortgage originators and securitizers. Established connection and causal relationship between the difficulties experienced by the sub-prime mortgage origination industry and the financial markets crisis of 1998.

- Analyzed liability and damages issues stemming from claims of alleged mispricing against (hedge) fund portfolio managers in cases involving mortgage-backed securities, collateralized mortgage obligations, interest rates derivatives, and senior loan portfolios.

- Analyzed liability and damages issues stemming from suitability claims made by a number of CMO investors. Assisted counsel in reaching settlements in arbitration claims.

- Analyzed liability and damages issues relating to claims of alleged fraud associated with transactions in inverse IO (interest-only) securities.

- Analyzed liability and damages issues related to losses associated with a broker-dealer's holdings in collateralized mortgage obligations (including interest-only strips) backed by Ginnie Mae collateral as a result of a prepayment lockout override by the U.S. Department of Housing and Urban Development.

- Estimated the profit and loss associated with the active hedging of broken commercial real estate loan commitments.

- Performed economic and damages analyses related to erroneous formulas and calculations relied on by Sallie Mae in determining principal and accrued interest amounts on a large number of student loans. Put forward restructuring alternatives aimed at minimizing impact on borrowers.

- Analyzed liability issues related to allegedly excessive mark-ups in trades involving fixed income and mortgage-backed securities.



**Equity Derivatives and Hybrid Securities**

- Analyzed issues related to a failed (long credit spread) strategy of a hedge fund specializing in convertible bond arbitrage. Evaluated liability and damage claims resulting from allegedly improper collateral call.

- Analyzed the economics behind a failed convertible bonds arbitrage strategy in the context of a litigation regarding losses resulting from forced conversion. Applied quantitative analysis to derive implied market probability of an event of change of corporate control.

- Provided suitability, valuation and hedging analyses in the context of an arbitration dispute related to equity monetization strategies (e.g., prepaid forward contracts, equity collars, equity monetization securities) pursued by high net-worth individuals who sought to protect the value of certain highly concentrated positions in a volatile internet stock during the late 1990s / early 2000s.

- Performed quantitative and statistical analyses in order to assess liability and calculate damages in a number of regulatory investigations and litigation matters related to alleged practices of equity options back-dating. Analyzed and quantified the exposures faced by corporate entities with liability related to the issuance of back-dated option grants under various damage theories.

- Valued employee and executive compensation packages. Developed models for the valuation of employee stock options. Established appropriate marketability discounts associated with grants of restricted shares.

- Performed valuation of the equity shares and equity options held by investors in a non-publicly traded companies.

- Analyzed liability issues and quantified alleged losses related to the execution of a trading strategy via synthetic, rather than over-the-counter, equity derivative contracts.

- Calculated damages on the basis of alternative mitigation strategies available to plaintiff claiming losses due to its inability to dispose of certain equity derivative contracts as a result of the issuing corporation's failure to provide sufficient documentation.

- Analyzed an "enhanced synthetic" index arbitrage strategy and identified loss causation. Calculated daily portfolio values and sensitivity exposures. Separated the effects of active (e.g. fund transactions) and passive (market movements and passage of time) portfolio management on portfolio values and sensitivity changes. Identified indicia of fraud/negligence. Calculated damages under alternative damage theories.

- Analyzed the appropriateness of adjustments to the terms of, and the resulting effects, if any, on the economic value of certain variable prepaid forward transactions following a change in the dividend policy of the company issuer of the underlying equity.

- Analyzed the merits of allegations of failure to comply with short equity sale regulations and of effecting concentrated transactions at the market close, which were leveled against a brokerage house trading on the Chicago Stock Exchange following the emergence of a company from Chapter XI bankruptcy protection.



**Tax Disputes and Complex Derivative Structures**

- Analyzed and quantified the benefits conferred upon a financial institution through the process of loan accumulation and securitization for the purpose of resolving a dispute between the company and the IRS.

- Reverse-engineered complex structured transactions (with embedded components based on, among others, foreign exchange option contracts, interest rate derivatives, U.S. Treasury repurchase agreements and asset swaps) in order to determine risk/return characteristics and economic substance.

- Analyzed the structure, risk/return characteristics, and economic substance of a series of complex structured transactions used by a large U.S. corporation to generate foreign tax credits.

**Real Estate and Construction**

- Provided statistical, econometric and valuation analyses related to the escalation and contingency costs associated with a rebuilding of the World Trade Center.

- Performed a suitability and performance analysis of real estate limited partnerships. Assisted in the evaluation of the merits of the settlement proposal related to investments in real estate limited partnerships.

- Analyzed and quantified harms to conterparties in a complex credit tenant lease (CTL) transaction resulting from a permanent injunction.

**Business and Asset Valuation**

- Valued the shares and related securities of a health care company for the purposes of an LBO. Estimated the dilutive effects of issuance of convertible preferred corporate securities on share value.

- Valued the restructured investments of a U.S. company in the convertible preferred stock of a European start-up.

- Valued warrant options embedded in the structure of high-yield convertible bonds issued by a U.S. company.

- Valued equity derivative instruments (and component embedded options) issued by a public company.

- Assisted counsel for a large diversified financial company in arguing against allegations of excessive charges associated with variable annuity life insurance contracts. Developed an analytical framework to estimate the value of different components and options (e.g. "free-look" period, guaranteed interest rate, guaranteed death benefit, etc.) embedded in variable annuity life insurance contracts.

- Estimated damages related to breach of contract related to electricity project participation in El Salvador. Derived appropriate cash flow discount rates. Valued equity participation and synthetic lease guarantee through credit default swaps.

- Developed models for the valuation of liabilities associated with Asset Retirement Obligations (FAS 143), e.g., production facilities, gas pipelines with stochastic remaining economic life.



**Investment Advisor Performance**

- Identified issues, developed analytic framework approaches and performed statistical analysis for a compensation arbitration case involving dispute regarding the degree of commonality between offshore hedge funds.

- Analyzed performance and valuation of emerging markets bonds and foreign exchange options for a large hedge fund considering litigation against a major U.S. investment bank. Estimated losses suffered by the fund as a result of wrongful actions on behalf of its primary broker during the financial crisis of 1998.

- Analyzed liability issues and estimated damages in a case involving a pseudo-arbitrage market-timing strategy (across international equity markets) through mutual fund investments. Advised a major financial institution on issues related to various claims brought by hedge fund investors affected by that institution's decision to discontinue policies enabling the execution of market timing investment strategies.

**Class Action Securities Litigation**

- Consulted on both liability and damages issues in a number of securities fraud class actions involving equity, debt and hybrid securities. Among other issues, performed analyses on

  - Class certification and market efficiency,

  - Causation and materiality of alleged fraud,

  - Impact of alleged (accounting) fraud on stock prices,

  - Affected trading volume and damages,

  - Opt-out claims involving individual securities and funds,

  - Settlement value of shareholder class actions.

- Developed an analytical framework for estimation of damages related to equity derivative instruments, convertible bonds, and structured financial products in the context of arbitration and (class-action) securities litigation.

- Developed an analytical framework for the evaluation of liability issues and estimation of damages in class action litigations involving bonds and other fixed income instruments ("spread reaction" methodology).

- Calculated damages and recoveries from short-swing profits related to insider trading under Section 16(b) of the Securities Exchange Act of 1934.



## Exhibit 3

## Materials Reviewed

**Case-Related**

Complaint, SEC v. Andreas Badian, et al., United States District Court Southern District of New York, April 3, 2006.

The SEC's Responses and Objections to Defendant Badian's Second Set of Interrogatories, SEC v. Andreas Badian et al., United States District Court Southern District of New York, December 3, 2008.

The SEC's First Supplemental Responses and Objections to Defendant Badian's Second Set of Interrogatories, SEC v. Andreas Badian, et al., United States District Court Southern District of New York, December 22, 2008.

NASD Audit Trail Reports for Sedona Corp., March 1, 2001 – April 30, 2001.

Amro International SA Account Statement from Coutts Bank (Schweiz), November 22, 2000 (RA000930).

Sedona Corporation, 5% Convertible Debenture Due March 22, 2001, November 22, 2000.

Amro International SA Account Statement from Coutts Bank (Schweiz), January 25, 2001 (RA001051).

Notice of Conversion, 6/20/01 Conversion signed by H.U. Bachofen (RA002768).

Notice of Conversion, 2/25/02 Conversion signed by H.U. Bachofen (RA003074).

Amro International SA Account Statement from Coutts Bank (Schweiz), April 26, 2002 (RA001817).

Trading data

BNC Bach International Ltd. Statement of Account, August 1 – August 31, 2000.

Amro International SA Account Statements for Refco Capital Markets Ltd, August 1, 2000 – May 28, 2002.

BNC Bach International Ltd. Statement of Account for Canccord Capital Corporation, January 1, 2002 – May 31, 2002.

- 2 -

**Other**

Chaplinsky, Susan and Haushalter, David. "Financing Under Extreme Uncertainty: Contract Terms and Returns to Private Investments in Public Equity." May 2006.

Data from Bloomberg L.P.

Data from FactSet Research Systems, Inc.

NBER Business Cycle Dating Committee.

SEC Filings.



**Exhibit 4**
**Sedona Corporation Stock Price Performance**
**1998 - 2002**

**Sources and Note:**
Bloomberg L.P. and Factset Research Systems, Inc.
Prices are pegged at 100 on January 2, 1998.

**Exhibit 5A**
**Stock Price Performance: Sedona Corporation vs. Peer Group Companies**
**June 26, 2000 - June 14, 2002**



**Source and Notes:**
Bloomberg L.P.
Prices are pegged at 100 on June 26, 2000.
(Partial) data are available for 59 of the 121 peer group companies identified by Bloomberg L.P. for which prices on June 26, 2000 and June 14, 2002 are available.

**Exhibit 5B**
**Stock Price Performance: Sedona Corporation vs. Peer Group Companies**
**June 26, 2000 - June 14, 2002**



**Source and Note:**
Bloomberg L.P.
(Partial) data are available for 59 of the 121 peer group companies identified by Bloomberg L.P. for which prices on June 26, 2000 and June 14, 2002 are available.



**Exhibit 6**
**Sedona Corporation Stock Price Historical Volatility**
**1998 - 2002**

**Sources:**
Bloomberg L.P. and Factset Research Systems, Inc.



**Exhibit 7**
**Sedona Corporation Financial Performance**
**1988 - 2003**

**Exhibit 8**
**Sedona Corporation: FPS Issuance and Stock Dilution, 1985 - 2003**



**Exhibit 9**
**Sedona Corporation Stock Price History**
**January 1, 1985 - December 31, 2003**

02/28/2000:  Series G Preferred issued
03/06/2000:  Sedona stock price peak
03/10/2000:  NASDAQ all-time high

Rhino Advisors trading

Market crash of October 1987

65% of the price drop had occurred prior to Rhino Advisors' activity in SDNA equity.

1/9/2003: Stock delisted from Nasdaq SmallCap. SDNA trades on OTC Bulletin Board.

12/01/1985: Initial public offering

11/22/2000: Series G Debentures issued

Sedona Corporation's Stock Price
Nasdaq Composite Index

**Exhibit 10A**

**Statistical Analysis of Rhino's Trading Activity and Sedona Stock Price Returns**

**June 26, 2000 - June 14, 2002**

| | All Trading Days | Rhino Advisors Sedona Transactions | |
|---|---|---|---|
| | | **No** | **Yes** |
| **Observations** | 493 | 213 | 280 |
| **Mean** | -0.39% | -0.58% | -0.24% |
| **St. Dev.** | 8.47% | 7.35% | 9.24% |
| **T-statistic** | n/a | n/a | 0.44 |

| | Net Buys | Net Zeros | Net Sales |
|---|---|---|---|
| **Observations** | 25 | 18 | 237 |
| **Mean** | 1.39% | 0.12% | -0.44% |
| **St. Dev.** | 8.11% | 4.70% | 9.60% |
| **T-statistic** | 1.25 | 0.40 | 0.17 |

**Exhibit 10B**
**Statistical Analysis of Rhino's Trading Activity and Sedona Stock Price Returns**
**March 1, 2001 - May 31, 2001**

| | All Trading Days | Rhino Advisors Sedona Transactions | |
| --- | --- | --- | --- |
| | | No | Yes |
| **Observations** | 64 | 7 | 57 |
| **Mean** | -0.17% | 2.60% | -0.51% |
| **St. Dev.** | 9.27% | 8.13% | 9.40% |
| **T-statistic** | n/a | n/a | -0.84 |

| | Net Buys | Net Zeros | Net Sales |
| --- | --- | --- | --- |
| **Observations** | 2 | 5 | 50 |
| **Mean** | 13.06% | 1.16% | -1.22% |
| **St. Dev.** | 22.21% | 3.93% | 9.02% |
| **T-statistic** | 1.16 | -0.36 | -1.06 |

**Exhibit 11A**
**Statistical Analysis of Rhino's Trading Activity and Sedona Stock Price Direction**
**June 26, 2000 - June 14, 2002**

**Sedona Stock Return vs. Rhino Advisors Market Participation**

|  | Net Buy | Net Zero | Net Sell | Total |
|---|---|---|---|---|
| **Decline** | 15 | 122 | 124 | 261 |
| **Increase** | 10 | 78 | 84 | 172 |
| **Total** | 25 | 200 | 208 | 433 |

**Test Hypothesis: Relationship Between Sedona Stock Price Returns and Rhino Advisors, Inc. Transactions**

**Rhino Advisors Actions Contingent**
**Upon Sedona Stock Returns**

| Sedona Stock Price | Net Buy | Net Zero | Net Sell |
|---|---|---|---|
| **Decline** | 6% | 47% | 48% |
| **Increase** | 6% | 45% | 49% |
| **Total** | 6% | 46% | 48% |

**Sedona Stock Returns Contingent**
**Upon Rhino Advisors Actions**

| Sedona Stock Price | Net Buy | Net Zero | Net Sell | Total |
|---|---|---|---|---|
| **Decline** | 60% | 61% | 60% | 60% |
| **Increase** | 40% | 39% | 40% | 40% |

Statistical test: $\chi^2 = 0.082$ (critical value of 5% significance level 5.991).
P-value: 0.96

**Notes:**
1. Significance level: a test for determining the probability that a given result could not have occurred by chance.
2. P-value: the smallest fixed level of significance at which the null hypothesis can be rejected.

**Exhibit 11B**
**Statistical Analysis of Rhino's Trading Activity and Sedona Stock Price Direction**
**March 1, 2001 - May 31, 2001**

**Sedona Stock Return vs. Rhino Advisors Market Participation**

|  | Net Buy | Net Zero | Net Sell | Total |
|---|---|---|---|---|
| **Decline** | 1 | 5 | 28 | 34 |
| **Increase** | 1 | 6 | 18 | 25 |
| **Total** | 2 | 11 | 46 | 59 |

**Test Hypothesis: Relationship Between Sedona Stock Price Returns and Rhino Advisors, Inc. Transactions**

**Rhino Advisors Actions Contingent**
**Upon Sedona Stock Returns**

| Sedona Stock Price | Net Buy | Net Zero | Net Sell |
|---|---|---|---|
| **Decline** | 3% | 15% | 82% |
| **Increase** | 4% | 24% | 72% |
| **Total** | 3% | 19% | 78% |

**Sedona Stock Returns Contingent**
**Upon Rhino Advisors Actions**

| Sedona Stock Price | Net Buy | Net Zero | Net Sell | Total |
|---|---|---|---|---|
| **Decline** | 50% | 45% | 61% | 58% |
| **Increase** | 50% | 55% | 39% | 42% |

Statistical test: $\chi^2 = 0.913$ (critical value of 5% significance level 5.991).
P-value: 0.63

**Notes:**
1. Significance level: a test for determining the probability that a given result could not have occurred by chance.
2. P-value: the smallest fixed level of significance at which the null hypothesis can be rejected.



**Exhibit 12**
**Statistical Analysis of Rhino's Trading Volume and Sedona Stock Price Returns**
**June 26, 2000 - June 14, 2002**

**Exhibit 13A**
**Regression Analysis of Rhino's Trading Activity and Sedona Stock Price Returns**
**June 26, 2000 - June 14, 2002**

| | Intercept | Nasdaq Return | Any Rhino Trading | Rhino Purchases | Rhino Sales | Rhino "Transfer" | Rhino "Principal" | Net Daily Shares Transacted As A Percent of the Total Reported Trading Volume |
|---|---|---|---|---|---|---|---|---|
| Regression 1 | 0.00 | 0.40** | 0.00 | | | | | |
| Regression 2 | -0.01 | 0.39** | | 0.01 | 0.00 | | | |
| Regression 3 | -0.01 | 0.39** | | 0.01 | 0.00 | 0.02 | 0.02 | |
| Regression 4 | 0.00 | 0.40** | | | | | | 0.03 |

Note: * denotes significance at 5%, and ** denotes significance at 1% level.

**Exhibit 13B**
**Regression Analysis of Rhino's Trading Activity and Sedona Stock Price Returns**
**March 1, 2001 - May 31, 2001**

| | Intercept | Nasdaq Return | Any Rhino Trading | Rhino Purchases | Rhino Sales | Rhino "Transfer" | Rhino "Principal" | Net Daily Shares Transacted As A Percent of the Total Reported Trading Volume |
|---|---|---|---|---|---|---|---|---|
| Regression 1 | 0.03 | 0.52 | -0.03 | | | | | |
| Regression 2 | 0.03 | 0.52 | | 0.01 | -0.04 | | | |
| Regression 3 | 0.02 | 0.46 | | 0.01 | -0.03 | 0.01 | 0.03 | |
| Regression 4 | 0.02 | 0.47 | | | | | | 0.15 |

Note: * denotes significance at 5%, and ** denotes significance at 1% level.

**Exhibit 14**
**95% Confidence Interval for the Performance of Sedona Stock as of March 1, 2001**