Tsvetan Beloreshki                                          March 2, 2010
                            New York, NY

```
 1                   UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF NEW YORK

 3              Civil Action Number 06-CV-2621 LTS (DFE)

 4

 5      - - - - - - - - - - - - - - - - - - -

 6      SECURITIES AND EXCHANGE COMMISSION   :

 7                              Plaintiff,   :

 8                   vs.                     :

 9      ANDREAS BADIAN, et al.,              :

10                              Defendants.  :

11      - - - - - - - - - - - - - - - - - - -

12

13

14                   Tuesday, March 2, 2010

15                        10:18 a.m.

16

17           Videotaped Deposition of TSVETAN

18      BELORESHKI, taken by Plaintiff, pursuant to Notice,

19      held at the offices of The Securities and Exchange

20      Commission, Three World Financial Center, New York,

21      New York, before Patricia Mulligan Carruthers,

22      Certified Shorthand Reporter and Notary Public of the

23      State of New Jersey and Notary Public of the State of

24      New York.

25
```

Tsvetan Beloreshki

March 2, 2010

New York, NY

**Page 2**

```
 1   A P P E A R A N C E S
 2
 3   SECURITIES AND EXCHANGE COMMISSION
 4   Attorneys for Plaintiff Securities and Exchange
 5   Commission
 6       100 F Street, N.E.
 7       Washington, D.C.  20549
 8       (202) 551-4480
 9       guidok@sec.gov
10   BY:  KENNETH GUIDO, ESQ.
11       Assistant Chief Litigation Counsel
12
13   DLA PIPER US, LLP
14   Attorneys for Defendant Andreas Badian
15       1251 Avenue of the Americas
16       New York, New York  10020-1104
17       (212) 335-4500
18       joshua.sohn@dlapiper.com
19       megan.vesely@dlapiper.com
20   BY:  JOSHUA S. SOHN, ESQ.
21       MEGAN K. VESELY, ESQ.
22
23
24
25
```

**Page 3**

```
 1   ALSO PRESENT:
 2       Terry Carruthers
 3       Videographer
 4
 5       Frederick C. Dunbar
 6       Economic Fellow
 7       Office of Economic Analysis
 8       Security and Exchange Commission
 9
10       Lawrence R. Glosten
11       Charles M. Jones
12       Columbia University
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                 I N D E X
 2
 3   WITNESS                      PAGE
 4   TSVETAN BELORESHKI
 5   Examination by Mr. Guido          8
 6
 7
 8           E X H I B I T S
 9   PROWSE BELORESHKI
10   NUMBER       DESCRIPTION       PAGE
11
12    1    Complaint          7
13        (No Bates)
14    2    FTI Web Site Printout    7
15        (No Bates)
16    3    Rhino "Analysis of Trading in the    7
17        Stock of Sedona Corporation
18        (No Bates)
19    4    Expert Report of S. Prowse,    7
20        T. Beloreshki dated 11-24-09
21        (No Bates)
22    5    "The Frontiers of Convertibles    25
23        Financing
24        (No Bates)
25
```

**Page 5**

```
 1           E X H I B I T S
 2   PROWSE BELORESHKI
 3   NUMBER       DESCRIPTION       PAGE
 4    6    Westlaw Printout       46
 5        (No Bates)
 6    7    Memorandum and Order      47
 7        (No Bates)
 8    8    Letter dated 2-23-10 from    49
 9        J. Rosenfeld to K. Guido
10        and Attachment (NERA 1 - 60)
11        (No Bates)
12    9    "Exhibit 3, Materials Reviewed"   73
13        (No Bates)
14   10    "Response to Order for Statement    79
15        Pursuant to Section 21(a)(1) of the
16        Securities Exchange Act of 1934"
17        (SEC-BADIAN-00022862 - 934)
18   11    Expert Report, S. Prowse,    199
19        T. Beloreshki, 2-19-09
20        (No Bates)
21   12    Rebuttal Expert Report, S. Prowse,    207
22        T. Beloreshki, 2-19-09
23        (No Bates)
24   13    Spreadsheet           227
25        (BP00004.xls, Tab: Exhibit 13b)
```

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                              March 2, 2010
New York, NY

| | Page 6 |
|---|---|

EXHIBITS

PROWSE BELORESHKI

NUMBER          DESCRIPTION          PAGE

14    Spreadsheet              229
      (BP00004.xls, Tab: Exhibit 13b)
15    "Exhibit 11, Regression Analysis    246
      3/1/2001 - 4/30/2001
      (BP00006.xls, Tab: Old Exhibit 11)
16    "Summary Output"          267
      BP6 TAB: REG #1
17    "Summary Output"          267
      BP6 TAB: REG #2
18    "Summary Output"          267
      BP6 TAB: REG #3
19    "Summary Output"          268
      BP6 TAB: REG #4
20    "Summary Output"          268
      BP6 TAB: REG #5

| | Page 7 |
|---|---|

T. Beloreshki - Direct

(Whereupon, Exhibits Prowse Beloreshki-1 through Prowse Beloreshki-4 are marked for identification by the reporter.)

THE VIDEOGRAPHER:  Good morning.  We're now on the record in the matter of the Securities and Exchange Commission versus Andreas Badian, et al., in the Southern District of New York, Civil Action 06 CV 2621 LTS.  Today is March the 2nd, 2010, and the time on the monitor is 10:18 a.m.  This is the video recorded deposition of Mr. Tsvetan Beloreshki being held at the SEC offices, Three World Financial Center, New York City.

I am the videographer.  My name is Terry Carruthers from Alderson Court Reporting with offices in Washington, D.C.  Our court reporter is Patricia Mulligan.

Will all counsel please state their appearances for the record, after which our court reporter will please administer the oath.

MR. GUIDO:  My name is Kenneth Guido.  I represent the Securities and Exchange Commission.  I'm accompanied by Mr. Lawrence Glosten and Mr. Charles Jones, as well as Mr. Fred Dunbar.

MR. SOHN:  Joshua Sohn from DLA Piper with

| | Page 8 |
|---|---|

T. Beloreshki - Direct

Megan Vesely.  We represent Andreas Badian and the witness in this proceeding.

TSVETAN BELORESHKI

65 Burnett Terrace,

Maplewood, New Jersey  07040,

having been first duly sworn according to law, testifies as follows:

EXAMINATION BY MR. GUIDO:

Q.   State your full name for the record again please.

A.   Sure.  It's Tsvetan Beloreshki.

Q.   And where are you employed?

A.   I'm employed at FTI Consulting in New York.

Q.   And what is your position at FTI Consulting?

A.   Currently I'm a senior managing director at FTI.

Q.   How long have you held that position?

A.   Since the beginning of the year.

Q.   Since the beginning of 2010?

A.   Correct.

Q.   Okay.  Prior to that, what position did you hold with FTI?

| | Page 9 |
|---|---|

T. Beloreshki - Direct

A.   I was a managing director.

Q.   You were a managing director.  And how long did you hold that position?

A.   Two years would be my best guess.

Q.   And -- and prior to that --

A.   I was just a director.  I was just a director.

Q.   Prior to that, how long were you just a director?

A.   Probably about a year-and-a-half.  Something of that nature.

Q.   Okay.  And then prior to that, what was your position?

A.   Prior to that, I was with Deloitte & Touche.

Q.   So you first joined FTI as a director.  Is that correct?

A.   Correct.

Q.   And what year did you join FTI?

A.   May 1st, 2006, I believe.

Q.   Okay.  So you've been there approximately --

A.   Coming on four years.

Q.   Coming on four years.

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 10

T. Beloreshki - Direct

1  
2        And how long were you with Deloitte?
3    A.   A year to the day.
4    Q.   A year.
5        And prior to Deloitte -- Well, what did
6  you do at Deloitte?
7    A.   I was performing tasks and functions that
8  were largely consistent with what I had been doing in
9  my consulting practice, which is securities
10 litigation.
11   Q.   Pardon?
12   A.   I was working very much along the same
13 lines as I did with -- with my consulting practice,
14 which is securities litigation, financial markets,
15 investigations, this sort of work.
16   Q.   And prior to that, where were you
17 employed?
18   A.   Prior to that, I was employed at National
19 Economic Research Associates, and I believe they go
20 by NERA Economic Consulting.
21   Q.   How long were you there?
22   A.   Six years to the day.
23   Q.   And what did you do at NERA consulting?
24   A.   I was with the finance and securities
25 litigation group at NERA.  So I was involved in

---

Page 11

T. Beloreshki - Direct

1  
2  various investigations, securities litigation
3  projects, research projects over the course of time,
4  and I would say that probably the one thing that
5  distinguishes what I do versus the general practice
6  is my work tended to be a little more on the
7  derivatives.
8    Q.   Pardon?
9    A.   My work tends to be a little bit more in
10 the derivatives part of the securities market.
11   Q.   When you were with NERA?
12   A.   Throughout my career.
13   Q.   Okay.  Is a convertible debenture a
14 derivative?
15   A.   Yes.
16   Q.   And prior to NERA, what did you do?
17   A.   I was with Banque Paribas in London and
18 New York.
19   Q.   What did you do there?
20   A.   I was a trader and a structurer in their
21 structured products desk.
22   Q.   What sort of projects did you structure?
23   A.   All the ones that you're investigating
24 these days.
25   Q.   Well, and that's the next wave.

---

Page 12

T. Beloreshki - Direct

1  
2    A.   Well, thankfully I left early on, so I
3  hope I'm clean on that.
4        But I traded bonds.  I traded loans.  I
5  traded Euro bonds.  And now we go into the
6  derivatives land, we're talking credit-linked notes,
7  quanto options, credit default swaps.  Sorry.  Things
8  like that.
9    Q.   So did you trade any convertible
10 debentures?
11   A.   We did trade bonds that had various types
12 of optionalities, whether they were, portable or
13 whether they had facets to them that made them
14 convertible into other securities, as well as some of
15 those options had warrants based on even some other
16 underlying like the price of oil.
17   Q.   So were any of those futures price
18 securities?
19   A.   No.  The answer is no.
20   Q.   And is the convertible debenture that's at
21 issue in this case a futures price security?
22   A.   Yes.
23   Q.   Now, have you had an opportunity to review
24 Exhibit Number 1, which is the complaint?
25   A.   Yes.  Yes.

---

Page 13

T. Beloreshki - Direct

1  
2    Q.   What is your understanding of the -- of
3  the time frame that was the manipulation alleged in
4  that case?
5        MR. SOHN:  You mean in the complaint?
6        MR. GUIDO:  In the complaint.
7    A.   The complaint, at least the way I read it,
8  is not entirely clear on the time frame that a
9  manipulation is being alleged.  There are a number of
10 time frames that are used in the complaint, and that
11 led to a substantial uncertainty, at least in my
12 mind.
13   Q.   Okay.  So you led -- it led you to
14 uncertainty?
15   A.   In terms of what the allegation is.
16   Q.   Did it lead you to conclude that it seemed
17 to be alleging different time frames?
18       MR. SOHN:  Objection to form.
19   A.   All I can say is there are different time
20 frames that are referenced in the complaint.
21   Q.   Okay.  And when were those time frames
22 referenced, the different time frames, as you read
23 the complaint?
24   A.   Sure.
25   Q.   Do you remember without reviewing the

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                      March 2, 2010
New York, NY

---

Page 14

T. Beloreshki - Direct

1
2  document?
3     A.  Yes.
4     Q.  Just based on your --
5     A.  Certainly.
6        There was a reference as to the month of
7  March.  There was a reference as to the period from
8  March 1st through March 23rd.  There is a reference
9  to the period, I believe, January 26th through
10 March 23rd.  I also believe there's a reference to
11 the period between March 1st to March 29.  And I'm
12 quite certain there are references in terms of April.
13    Q.  Pardon?
14    A.  There are references, I believe, in terms
15 of the month -- of the month of April.
16    Q.  Were there any references to the month of
17 May?
18       MR. SOHN:  You're asking if he remembers?
19       MR. GUIDO:  Yes.
20    A.  I don't recall.
21    Q.  Okay.  Were there any references to any
22 time periods in the Year 2000?
23    A.  I don't recall.
24    Q.  Were there any references to any time
25 periods after May of 2001?

---

Page 15

T. Beloreshki - Direct

1
2     A.  I don't recall.
3     Q.  Will you take a look at the complaint?
4     A.  Yes.
5     Q.  With regard to both of my questions, are
6  there any references in that complaint with regard to
7  the time period 2000?
8     A.  Well ...
9        MR. SOHN:  Just to be clear, the question
10 is whether there are references in the complaint to
11 anything in 2000?
12       MR. GUIDO:  The trading time period 2000.
13    A.  There's a reference as to November, 2000
14 in Paragraph 24.
15    Q.  Does that refer to trading?
16    A.  It refers to -- and I'll read it.
17       In November, 2000, Rhino helped its client
18 Amro convertible debentures with Sedona.
19    Q.  Okay.
20    A.  That's probably about it.
21    Q.  Pardon?
22       MR. SOHN:  He's asking you to review the
23 complaint.  Take your time.
24    Q.  You've reviewed the complaint?
25    A.  Yes.

---

Page 16

T. Beloreshki - Direct

1
2     Q.  Does it make any references to the time
3  period after May of 2001?
4     A.  It does in Paragraph 43.
5     Q.  What's it say?
6     A.  On June 17, 2002, pursuant to Section
7  21(a)(1) of the Exchange Act, the commission issued
8  an order, and so forth.
9     Q.  Okay.  Now, my question, I think, when I
10 started this is does it make any reference to trading
11 during particular time periods?  Does it make any
12 reference to any trading after May of 2001?
13    A.  Actually, it does.  I'll complete the
14 sentence I was reading.  I apologize.
15       "On June 17, 2002, pursuant to
16 Section 21(a) 1 of the Exchange Act, the commission
17 issued an order requiring Pond to file a statement
18 under oath as to all the facts and circumstances
19 concerning its trading in Sedona stock."
20    Q.  Okay.  Where does that make any reference
21 to trading that occurred after May 31st?
22       MR. SOHN:  Objection.
23       You may answer the question.
24    A.  This is an order that was issued in June
25 of 2002.  So the logical inference, at least in my

---

Page 17

T. Beloreshki - Direct

1
2  mind, is that this would entail trading done prior to
3  June of 2002.
4     Q.  Well, does it allege that Rhino or someone
5  engaged in any trading subsequent to May 31, 2001?
6        MR. SOHN:  I object to this whole line of
7  questioning.  You're asking him to characterize
8  what's in your --
9        MR. GUIDO:  His understanding of the
10 complaint.
11    A.  All I can say is that there are references
12 in the complaint as to periods both before March and
13 after May of 2001.
14    Q.  Trading before March and trading after
15 May 31st --
16    A.  Correct.
17    Q.  -- 2001?
18    A.  Yes.
19    Q.  Where is the specific reference in that
20 complaint to any trade that occurred after May 31,
21 2001?
22    A.  Correct me if I'm misreading this --
23 this -- this sentence, sir, but the SEC issued an
24 order in June of 2002 requiring an entity to produce
25 its record concerning its trading in Sedona stock.

---

5 (Pages 14 to 17)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 18

T. Beloreshki - Direct

1
2  That in my mind means trading performed after June of
3  2002.
4      Q.   Have you ever looked at the Pond trade
5  tickets?
6      A.   I don't recall.  No.
7      Q.   In fact, you didn't, did you?
8      A.   I don't recall seeing those.
9      Q.   Okay.  Did you ever look at any of the
10  Pond propriety account account statements?
11      A.   I don't recall seeing those.
12      Q.   Okay.  We'll get into this in a little
13  more detail.  I'd like you to take a look at Exhibit
14  Number 2.
15      A.   Yes.  Yes, sir.
16      Q.   Exhibit Number 2 is a printout from the
17  FBI web site, your profile that appears there.
18          Do you recognize that?
19      A.   Yes.
20      Q.   Hmm?
21      A.   Yes.
22      Q.   Okay.  Now, this sort of sets out a bit
23  about what you testified to, and I want to clarify
24  some things about your testimony.
25          You said that you were in the litigation

---

Page 19

T. Beloreshki - Direct

1
2  and finance group at NERA.  Is that what you called
3  it?
4      A.   It was the securities practice at NERA.
5  If I'm incorrect on the name, I'm sure that Fred will
6  correct me.
7      Q.   Pardon?
8      A.   I may be incorrect on the name, but it was
9  the securities practice of NERA who's -- a
10  significant portion of the work we did that related
11  to securities litigation.
12      Q.   Okay.  And was it primarily focused on
13  securities litigation?
14      A.   Primarily.  I'm not entirely comfortable
15  with characterizing it as primarily, but there was
16  substantial work done in securities litigation.
17      Q.   Well, did it do anything other than
18  securities litigation?
19      A.   Yes.
20      Q.   What?
21      A.   For example, we were requested to do a
22  number of studies for various market producers.  One
23  of those is actually on my CV of a rather large scale
24  study performed for the rating agencies.
25      Q.   For what?

---

Page 20

T. Beloreshki - Direct

1
2      A.   Actually, it was commissioned by the Bond
3  Market Association and it was a study that -- that
4  compared the practices and outcomes of the rating
5  agency's actions vis-a-vis structured finance
6  instruments.
7      Q.   And who requested that?
8      A.   I believe the study was commissioned by
9  the Bond Market Association.
10      Q.   And what was the purpose of the study?
11      A.   At the time there was a controversy in the
12  structured finance community related to the practice
13  of notching.
14      Q.   Practice of what?
15      A.   Notching.
16      Q.   N-O-T-C-H-I-N-G?
17      A.   Yes.
18      Q.   Okay.
19      A.   It relates to the fact that if I'm an
20  issuer of a bond, say I'm a corporate issuer of a
21  bond, and I would like that bond to be well-placed
22  and issued at a decently low yield, then it would be
23  a good thing for me to have that bond placed not only
24  with retail investors or institutional investors, but
25  attach another customer base -- attract another

---

Page 21

T. Beloreshki - Direct

1
2  customer base which would be investors in structured
3  finance instruments like, for example, CDOs.
4          And the problem with that is that if my
5  bond doesn't carry, say, Moody's rating and I would
6  like it to be included or structure would like --
7  would like that bond to be included in a CDO that is
8  to be rated by Moody's, Moody's would not typically
9  assign that bond the rating that it has been given by
10  another rating agency simply because Moody's would in
11  its own judgement determine that a rating given by,
12  say, S&P is not necessarily commensurate with its own
13  standards, and even more severely the same goes with
14  Fitch.
15          To give you a sense of that, if a bond is
16  rated, say, AA by -- by Fitch, Moody's may decide for
17  the purposes of including that bond into a
18  securitization, it will rate it as a BBB.  That would
19  be an effective downgrade or notching by six notches,
20  and it was something that there was quite a bit of
21  debate in the industry about.  It was a very large
22  scale study, probably 200-plus pages, at least six
23  months to complete.
24      Q.   Now, what other studies other than
25  litigation did you participate in?

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

Page 22

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2      A.   Another one that comes to mind -- and that
3  is not on my CV because I believe you requested -- it
4  was confidential.  We performed a study for a rating
5  agency, one of the major three, related to its
6  practices of rating municipal issues.
7      Q.   And why were you asked to do that?
8      A.   To the best of my recollection, it was an
9  internal effort on the part of the rating agency to
10  compare its rating policies versus competitors.
11     Q.   And why were you asked to do that?
12          MR. SOHN:  The question is why was he
13  retained to do that?
14          MR. GUIDO:  Yes.
15     A.   I -- I don't know all the variables that
16  may have entered into the decision to retain NERA.
17  Presumably we were good enough to -- to work on it.
18     Q.   I understand.  I wasn't asking -- I'm
19  asking you what the rating agency -- why the rating
20  agency had to have that study done.
21     A.   To the best of my recollection, again, I
22  believe it was of interest to the rating agency to
23  see how its ratings compared with ratings given by
24  other rating agencies.
25     Q.   So were you told at the time that

Page 23

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2  questions had been raised by regulators about the
3  quality of the ratings of the rating agencies?
4      A.   No.  No.  I do not believe there was a
5  regulatory angle or a litigation angle to that.
6      Q.   All right.  Anything else that you
7  worked on that didn't have a litigation or a
8  regulatory angle?
9          MR. SOHN:  While he was at NERA?
10          MR. GUIDO:  Hmm?
11          MR. SOHN:  While he was at NERA or ever?
12     Q.   Well, why don't we just jump ahead and say
13  "ever."
14     A.   Quite a bit.  I was still with NERA.  I
15  did -- I did valuation projects there -- I did
16  valuation projects, including for convertible
17  securities.  I did -- I filed an affidavit for the
18  September 11th Fund.
19     Q.   Excuse me.  An affidavit?
20     A.   Yeah.  Probably --
21     Q.   An affidavit?
22     A.   No, no.  It -- I believe it was -- if
23  memory serves me well, it was filed on behalf of a
24  widow of a victim of September 11th, valuing the --
25  whatever options he may have had at some point.  I

Page 24

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2  don't remember exact detail --
3      Q.   Was it to resolve a dispute with someone?
4      A.   I don't believe it was a dispute.  I -- I
5  believe -- And I don't know exactly, but I believe
6  you had to file a document with the September 11th
7  Commission as to what your claim is.  So if this is a
8  dispute, so be it.
9          So, again, valuation -- We would perform
10  valuations there.  And let me come a little closer in
11  time because my memory is much fresher.
12          Here we perform various litigations,
13  various investigations and quite a bit of work that
14  is outside of both litigation and investigations.
15     Q.   Okay.  Let's -- let's narrow it down a
16  little bit.  What's a future price security?
17     A.   What's a future price security?  A future
18  price security is a convertible instrument whose
19  conversion -- conversion features depend on the price
20  of the underlying equity at some future point in
21  time.
22     Q.   And does the -- the future price relate to
23  the conversion of that security into some other
24  instrument?
25     A.   Typically -- yes, typically into the

Page 25

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2  underlying stock.
3      Q.   Okay.  So with regard to future price
4  security the way you've defined it, have you done any
5  work in the time you were at NERA through the time
6  that you've been at FTI unrelated to litigation or
7  investigations with regard to the economic
8  characteristics of future price securities?
9      A.   One thing that comes to mind is the paper
10  that we put out there probably at some point in 2003.
11     Q.   The paper that you wrote with Caryn
12  Schechtman?
13     A.   She was one of the authors, yes.
14     Q.   Anything other than that paper?
15     A.   Nothing that comes to mind.
16          MR. GUIDO:  I would like to have marked as
17  exhibit next number a paper called The Frontiers of
18  Convertible Financing.
19          MR. SOHN:  Do you want this to be 3 or 5?
20          MR. GUIDO:  Next number 5.
21          (Whereupon, Exhibit Prowse Beloreshki-5 is
22  marked for identification by the reporter.)
23     Q.   Is Exhibit Number 5 the paper you just
24  referred to?
25     A.   Yes, sir.

7 (Pages 22 to 25)

Tsvetan Beloreshki                                                              March 2, 2010
New York, NY

---

Page 26

T. Beloreshki - Direct

1
2   Q.   Okay.  And that was in July 30th, 2003.
3   Correct?
4   A.   Yes.
5   Q.   How did it come about that you prepared
6   that paper?
7   A.   I will not be exactly precise on the time
8   frame, but probably 2000 or 2001, something in that
9   range, NERA was retained to perform economic analyses
10  related to future price securities.  At the end of
11  the day, we had to analyze a significant number of
12  stock prices that presumably could have been part of
13  a manipulation scheme.  And based on these studies,
14  at some point later, my understanding is -- and I'm
15  not entirely certain about it -- that a colleague of
16  mine Marcia Mayer submitted the report to the SEC
17  summarizing the findings that we had at the time,
18  so --
19  Q.   That was 2001?
20  A.   See, let me put it this way.  I joined
21  NERA in '99, and that work must have been done before
22  the publication of this paper.  So probably 2000,
23  2001.  That would be my best estimate.
24  Q.   Okay.  So you did a study of various
25  stocks for market manipulation that involved

---

Page 27

T. Beloreshki - Direct

1
2   convertible debentures --
3   A.   Future price securities.  Yes.
4   Q.   Pardon?
5   A.   Yes.
6   Q.   Okay.  And how many securities did you
7   include in that study?
8   A.   At least 50.  Perhaps more, but at least
9   50.
10  Q.   And who retained NERA to do that?
11  A.   I believe the law firm was Morrison
12  Foerster.  I also believe that the ultimate client
13  was Thomson Kernaghan.
14  Q.   Who?
15  A.   Thomson Kernaghan.
16  Q.   Could you spell it?
17  A.   T-H-O-M-S-O-N, K-E-R-N-A-G-H-A-N.
18  Q.   And what type of an attorney is that?
19  A.   I believe it was a Canadian brokerage.
20  Q.   Okay.  And Morrison Foerster was a law
21  firm based in San Francisco?
22  A.   New York.  At least the attorneys we
23  worked with was based in New York.
24  Q.   And was it in regard to an investigation
25  of Thomson Kernaghan's activities by the SEC?

---

Page 28

T. Beloreshki - Direct

1
2   MR. SOHN:  Was what?
3   MR. GUIDO:  This study that he's referred
4   to of the 50 securities.
5   A.   I don't recall that that is the natural
6   inference, given that there was, I believe, a report
7   to the SEC at some point.
8   Q.   Was there a formal order issued by the
9   commission?  Do you know?
10  A.   I don't know.  I don't know.
11  Q.   Now -- So that study eventually resulted
12  in the preparation of The Frontier of Convertible
13  Financing?
14  A.   It was -- It formed at least a part of
15  my -- I guess the intent to put -- put out a paper.
16  Q.   Okay.  And was it a study of market
17  manipulation?
18  MR. SOHN:  Was what a study of market
19  manipulation?
20  MR. GUIDO:  The Morrison Foerster 50
21  securities study.
22  A.   I'll characterize it rather as an
23  investigation as to whether or not the transactions
24  executed by a market participant, probably Thomson
25  Kernaghan, had a material impact on the prices of the

---

Page 29

T. Beloreshki - Direct

1
2   various securities that they traded in.
3   Q.   You used the term "manipulation" when you
4   first described it.  Are you describing using the
5   term "manipulation" -- Or when you use the term
6   "manipulation," were you defining it as an activity
7   that had an impact on the price of stock?
8   MR. SOHN:  Used manipulation when?
9   MR. GUIDO:  When he originally used the
10  term "manipulation" when he described his study of
11  the 50 securities.
12  A.   No.  Again, the study was centered on
13  whether or not the trading activities had an impact
14  on the stock price.  My understanding is that that is
15  kind of first stepping stone in order for somebody to
16  determine that manipulation.
17  Q.   Okay.  And was one -- one of the questions
18  that was asked by the Securities and Exchange
19  Commission that led to the study is whether or not
20  these 200 -- 200 or so -- or these 50 or so
21  securities' stocks had been manipulated?
22  A.   I don't remember what the questions asked
23  by the SEC were.
24  Q.   What happened to that study?
25  A.   I don't know.  Again, my best

---

8 (Pages 26 to 29)

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

Page 30

T. Beloreshki - Direct

1      T. Beloreshki - Direct
2  understanding is that Marcia Mayer, that she probably
3  submitted that to the SEC, but I -- I don't know that
4  for a fact. And I also know that at one point she
5  presented -- made a presentation at one of NERA's
6  annual conferences to clients related to future price
7  securities.
8      Q.  Pardon?
9      A.  My recollection, also, is that Marcia
10  Mayer made a presentation at one of NERA's annual
11  conferences to clients related on the topic of future
12  price securities.
13      Q.  Did you work on that?
14      A.  On the presentation?
15      Q.  Uh-huh.
16      A.  At the minimum -- My PowerPoint skills are
17  not terribly good, but at the minimum it was informed
18  by some of my thoughts.
19      Q.  Pardon?
20      A.  I was assisting Marcia to an extent in her
21  work on that project. She was the senior on that
22  project. So my assumption is some of my thoughts
23  were part of that presentation.
24      Q.  Was that presentation about the impact on
25  trading activity on prices of stock in future -- in

Page 31

1      T. Beloreshki - Direct
2  future price securities?
3      A.  I don't remember. It was a
4  presentation -- All I can remember is it was a
5  presentation that derived, at least to a degree, on
6  our -- from our work in this area.
7      Q.  Okay. And in that study, you said it was
8  a presentation to clients. Am I incorrect?
9      A.  You -- you are correct. In addition to
10  clients, I don't know who the audience were, but
11  typically there may even be regulators and judges
12  and -- you know, other than clients.
13      Q.  Pardon?
14      A.  There may be people other than clients in
15  the audience. There may be regulators or judges,
16  these sort of an audience.
17      Q.  Well, in the paper that was presented, did
18  you participate in preparing it?
19      A.  No. No. No. Marcia made the
20  presentation. I was not in attendance at that
21  conference.
22      Q.  But she made a presentation in which you
23  helped prepare?
24      A.  I'm reluctant to agree on the "helped
25  prepare." I'm perfectly comfortable saying that I

Page 32

1      T. Beloreshki - Direct
2  would assume some of my thoughts made their way into
3  the presentation.
4      Q.  Okay. Any others, others prior to The
5  Frontiers of Convertible Financing?
6      MR. SOHN:  Any other what?
7      MR. GUIDO:  Any other presentations.
8      MR. SOHN:  About?
9      MR. GUIDO:  That led to The Frontiers of
10  Convertible Financing.
11      MR. SOHN:  Objection. I think it
12  mischaracterizes the causation.
13      A.  This paper were -- were my desire at the
14  time, I guess, to --
15      Q.  Which paper are you referring to?
16      A.  To write The Frontiers piece was driven,
17  A, by my knowledge in the area of securities,
18  derivative securities; B, by my experience dealing
19  with -- with future price securities, and perhaps my
20  desire to share that knowledge to the extent that
21  I -- perhaps the marketplace -- it would have been
22  useful to have a piece that describes the salient
23  characteristics of these securities and the various
24  risks that market participants should keep in mind
25  when dealing with them, so that's probably the

Page 33

1      T. Beloreshki - Direct
2  impetus or the -- the idea behind why I ended up
3  writing this.
4      Q.  Well, is this article directed on advising
5  people on how to hedge future price securities?
6      A.  It was not meant as an advice piece.
7      Q.  Okay. So it wasn't an advice piece on how
8  to hedge?
9      A.  I don't presume to advise people on how to
10  hedge.
11      Q.  In fact, wasn't it a piece to explain to
12  people how to defend securities litigation when the
13  allegation is market manipulation?
14      A.  That was not my intent in writing this
15  piece. It was drawing on my knowledge in structured
16  finance as a trader and in understanding the
17  securities and providing that knowledge, you know,
18  hopefully in a reasonably organized way so somebody
19  could read it and hopefully get a better
20  understanding of these type of product and how it
21  would be traded.
22      Q.  Well, look at the first paragraph. Okay?
23  The second sentence says, "The authors argue that the
24  market underperformance and corporate failures
25  frequently associated with the issuance of future

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

---

Page 34

T. Beloreshki - Direct

1      T. Beloreshki - Direct
2 price securities cannot in themselves be interpreted
3 as evidence of either inherent flaws in the future
4 price securities contract design or market
5 manipulation on the part of future price securities
6 holders."
7      Isn't that a statement that this is to
8 explain how you would approach analyzing future price
9 securities in a litigation context?
10    A.   Look, given that this is the area I work
11 with, I guess at least some of my thinking was tinged
12 about how one would approach this in a litigation
13 context.  That said, the major discussion or debate,
14 at least at the time, related to these securities was
15 whether the declines in the stock price that was
16 typically associated with those securities was due to
17 the characteristics of the company issuers themselves
18 or whether those were precipitated by something that
19 was inherent in the contract of issuing future price
20 securities.
21      So my opinion at the time, and it still
22 is, is that this is not a flaw in the contract or the
23 contractual design.  Rather, it is a flaw with the
24 performance of the common issuers, at least in
25 general.

---

Page 35

1      T. Beloreshki - Direct
2    Q.   Could I see Exhibit Number 1 back, please?
3 I'm sorry.  Exhibit Number 5.  I think this has two
4 exhibits included in it.
5      (Whereupon, a discussion is held off the
6 record.)
7    Q.   Now, you prepared this report, and the --
8 Did you prepare any other analysis of the
9 characteristics of future price securities that you
10 made in presentations?
11      MR. SOHN:  Can we frame this -- Ever?
12      MR. GUIDO:  Ever.
13      MR. SOHN:  And outside of the litigation
14 or in the litigation or in the world?
15      MR. GUIDO:  Outside of the litigation.
16      MR. SOHN:  Did you hear the question?
17    A.   I apologize.  Could you please give me the
18 question again?  I apologize.
19    Q.   Sure.
20      Have you ever presented any papers on the
21 characteristics of future price securities in the
22 context other than litigation?
23    A.   I don't believe that outside of this piece
24 I have another paper or even a presentation on that
25 subject.

---

Page 36

1      T. Beloreshki - Direct
2    Q.   Okay.  Now, in the context of
3 litigation --
4    A.   Yes.
5    Q.   -- have you presented any reports, papers,
6 analyses on the characteristics of future price
7 securities?
8    A.   Yes.
9    Q.   And what was that?
10    A.   I was deposed in the -- the matter
11 involving Internet Law Library.  Don't know if there
12 was an expert report there.
13    Q.   Was there an expert report?
14    A.   Can I have a look at my CV?
15    Q.   Why don't you pull out your report, which
16 is -- is it 4?
17    A.   4, yes.
18    Q.   Okay.  You recognize that 4 is the report
19 that you prepared in this case?
20    A.   Yes.
21    Q.   Okay.
22    A.   Okay.  I'll go through Exhibit --
23    Q.   2.
24    A.   -- 2 of that report and try to identify
25 the matters that are related to future price

---

Page 37

1      T. Beloreshki - Direct
2 securities.
3      So one is at the bottom of Page 2,
4 Internet Law Library v. Southridge.  And, yes, there
5 was an expert report and deposition testimony.
6    Q.   Pardon?
7    A.   There was an expert report and deposition
8 testimony in that matter.
9    Q.   Okay.  Did that involve allegations of
10 market manipulation?
11    A.   To the best of my recollection, yes.
12      The next item, Cootes Drive versus
13 Internet Law Library, there's a declaration there.
14    Q.   Did that involve allegations of market
15 manipulation?
16    A.   You know, I'm not so -- again, same
17 answer.  To the best of my recollection, yes.
18    Q.   Okay.
19    A.   I was going to skip that one.
20      SEC versus Nelson Obus.  I apologize.
21 This is the -- the bottom one on Page 3.
22    Q.   Bottom of 3.  Okay.
23      And that involved market manipulation?
24    A.   No.
25    Q.   That was an insider trading case --

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

| Page 38 | Page 40 |
|---|---|

**Page 38**

T. Beloreshki - Direct

1
2  A.   Yeah, I believe it was an insider trading
3  case.
4          The next one I see is on Page 4, which is
5  Pet Quarters v. Thomas Badian.
6          And that's all I see.
7      Q.   Now, at the top of Page 3, presentation in
8  United States Department of Justice and SEC called
9  Analysis of Trading in the Stock of Sedona
10  Corporation, that involved market --
11      A.   I'm sorry?
12      Q.   That involved market manipulation?
13      A.   And I do apologize.  A few answers ago, I
14  told you --
15      Q.   Pardon?
16      A.   A few answers ago, I told you that I
17  probably don't have a presentation on that topic.
18  Clearly incorrect.  I do have a presentation, yes,
19  that was May of '04.
20      Q.   Now, were there any -- Other than those
21  that you mentioned where you made a presentation,
22  were there any analysis reports other than what was
23  actually presented through litigation or
24  investigation of market manipulation that you
25  performed?

**Page 39**

T. Beloreshki - Direct

1
2      MR. SOHN:  Can we have that one --
3      A.   In this case or in other cases?
4      Q.   Any cases, any situation.  Investigation,
5  clients coming and saying, We want you to look at
6  this for us, law firms coming to you and asking.
7      A.   You mean like presenting what our
8  capabilities in the area are?
9      Q.   Well, whether or not you did an analysis
10  so someone can make a determination what's in that
11  analysis.
12      A.   I was retained in a consulting capacity in
13  a matter involving Nano Pierce stock.
14      Q.   Nano Pierce?
15      A.   Yes.  I believe that's the name.
16      Q.   And what was the issue there?
17      A.   Rather similar to the one we have here.
18      Q.   An allegation that there was short selling
19  as part of the manipulation?
20      A.   Along those lines, yes.
21      Q.   Okay.  Any others?
22      A.   Recently I was approached by counsel to
23  assist in a matter that I believe involved future
24  price securities, and I declined that.
25      Q.   So you didn't prepare a report?

**Page 40**

T. Beloreshki - Direct

1
2      A.   No.
3      Q.   Was the client a plaintiff or defendant?
4      A.   I don't know.  Probably a defendant, but
5  I -- I don't know.
6      Q.   Okay.  Why did you decline it?
7      A.   I don't remember the specifics, but I
8  don't think it was -- there was something about it
9  that I wasn't comfortable with.
10      Q.   What was it that you --
11      A.   I don't recall that.
12      Q.   Who approached you?
13      MR. SOHN:  Objection.  I mean, I -- I
14  don't know that this is appropriate.  I don't know if
15  it's confidential or not.
16      A.   My sense is that probably is confidential,
17  so I would rather not go further, but -- I -- I don't
18  know -- I --
19      Q.   Well, do you know who approached you?
20      A.   Yes.
21      Q.   Do you know who the client was?
22      A.   I don't recall.
23      Q.   Pardon?
24      A.   I don't recall who the client was.  I
25  don't remember.

**Page 41**

T. Beloreshki - Direct

1
2      Q.   So you know who approached you, but -- so
3  it wasn't the client.  Someone approached you on
4  behalf of the client?
5      A.   It was an attorney.  Yes.
6      Q.   Who was that?
7      A.   I'm sorry?
8      Q.   Who approached you?
9      MR. SOHN:  Again, I'm going to object to
10  this.  I don't think that it's a relevant or
11  appropriate question.
12      Q.   You can answer the question.
13      THE WITNESS:  May I answer the question?
14      MR. SOHN:  I think it's an inappropriate
15  question.  I -- I don't see what it has to do with
16  this case, and it's inappropriate as to --
17      Q.   Is Mr. Sohn representing you as a witness
18  here?
19      A.   I don't believe so.
20      Q.   My question to you is, who approached you?
21      MR. SOHN:  Unfortunately, there's no one
22  here representing FTI, so I still think it's an
23  objectionable question and a totally inappropriate
24  question.
25      A.   Sir, I -- Again, it was a situation that,

11 (Pages 38 to 41)

Tsvetan Beloreshki                                                        March 2, 2010

New York, NY

Page 42

T. Beloreshki - Direct

1
2  to the best of my recollection, involved future price
3  securities.  It was an issue that I don't believe --
4  I did not believe I could be of assistance to
5  counsel, and I declined.
6      Q.  Okay.
7      A.  I don't know the various ramifications of
8  that situation, and I don't want to break a privilege
9  or confidentiality.
10     Q.  Did you sign a confidentiality agreement
11 before you had the discussion about this?
12     A.  No.
13     Q.  So there's no signed confidentiality?
14     A.  I would be a whole lot more comfortable if
15 say we get counsel for FTI involved; and if they
16 instruct me to answer this question, I'll be more
17 than happy to do so.
18     Q.  When we take a break, can you consult with
19 counsel for FTI to get an answer to that question?
20     A.  If I can reach him, yes, I will.
21     Q.  Now, why -- what was it about it that you
22 said you couldn't help?
23     A.  Oh, no.  I don't recall that part.
24     Q.  You don't recall it.
25     A.  No.

Page 43

T. Beloreshki - Direct

1
2      Q.  Okay.  So did you do any work with regard
3  to trading activity in a security called Calypte,
4  C-A-L-Y-P-T-E?
5      A.  Oh, the name rings a bell.  That's all I
6  can say.  I do recognize the name.  Whether I did or
7  didn't do an analysis on it, I --
8      Q.  What about Nymox, N-Y-M-O-X?
9      A.  Same answer.
10     Q.  What about eLaw?
11     A.  We talked about eLaw.  That was Internet
12 Law Library.
13     Q.  Oh, eLaw is Internet Law Library?
14     A.  Yes.
15     Q.  Where is the -- Where's the -- Where
16 physically is the work product?
17     A.  I don't know.
18     Q.  Did you attempt to find it?
19     A.  Attempt to find it.  I don't believe I was
20 asked to find that.
21     Q.  You weren't asked to.  What about the work
22 on Nano Pierce?
23     A.  Same answer.
24     Q.  Where is that work product?
25     A.  Nano Pierce.  I do have -- I -- I don't

Page 44

T. Beloreshki - Direct

1
2  know -- I don't have a recollection whether or not
3  given -- My understanding is that this litigation has
4  concluded, so there is a chance that I no longer keep
5  these files, but I don't know one way or the other.
6      Q.  Was it your practice to discard the
7  reports after you --
8      A.  There was no report.
9      Q.  There was no report.
10     A.  No.
11     Q.  What was there?  I thought you said it was
12 a consultation.
13     A.  Correct.  I was -- I was retained in a
14 consulting capacity.  I did not write a report.
15     Q.  You did not write a report.
16     A.  No.
17     Q.  Keep any notes?
18     A.  I don't -- I don't know.
19     Q.  Did you do any analysis?
20     A.  Yes.  To the extent that I was asked to
21 attend the deposition of plaintiff's expert.  I
22 believe the name is Shapiro.
23     Q.  And did you write up an analysis of that
24 after you attended that deposition?
25     A.  Whatever analyses were performed were

Page 45

T. Beloreshki - Direct

1
2  performed, to the best of my recollection, prior to
3  that in preparation for the deposition.  It was a
4  rather constrained time frame, and that's about all I
5  remember about that.
6      Q.  Who was the lawyer?
7      A.  DLA Piper.
8      Q.  Who is the DLA Piper?
9      A.  Caryn Schechtman would be one, and there
10 was -- The deposition was taken by another attorney
11 whose name is escaping me.  He has since left, I
12 believe.
13     Q.  What about the -- the work for eLaw, the
14 work for Internet Law Library, where is that?
15     A.  I answered that question.
16     Q.  Who was the lawyer at Internet Law
17 Library?
18     A.  Piper.
19     Q.  Piper.  Who at Piper?
20     A.  I don't remember.  My best sense is that
21 at my deposition Caryn was representing the client,
22 but that's as much --
23     Q.  Ms. Schechtman.
24         MR. GUIDO:  Mark this as exhibit next
25 number, the judge's order in this case.

                                    12 (Pages 42 to 45)

Tsvetan Beloreshki                                      March 2, 2010

New York, NY

Page 46

1          T. Beloreshki - Direct
2          (Whereupon, Exhibit Prowse Beloreshki-6 is
3    marked for identification by the reporter.)
4     Q.   Have you ever seen the judge's order in
5    this case with regard to expert discovery?
6     A.   I don't believe so, no.
7     Q.   Did you ever discuss the judge's order
8    with regard to expert discovery in this case with
9    anyone?
10     A.   I don't think anyone is going to listen to
11    me discussing the judge's order.
12     Q.   Pardon me?
13          MR. SOHN:  Do you have a copy of the
14    actual order?  I mean, this looks different than the
15    order we got from the Court, so to the extent you're
16    asking him --
17          MR. GUIDO:  This is the judge's record.
18          MR. SOHN:  I understand that, but you're
19    asking the witness has he seen this before and it's a
20    Westlaw version of the order.
21          MR. GUIDO:  I understand.
22     Q.   Did you ever see the judge's order with
23    regard to expert discovery in this case?
24     A.   What I do remember seeing was a marked up
25    version of the subpoena.  That, I do remember seeing.

Page 47

1          T. Beloreshki - Direct
2     Q.   The marked up version of the subpoena or
3    the judge's Attachment A of the subpoena?
4          MR. SOHN:  Do you have a copy of it?
5    Here's the issue.  I have a copy, but it has my notes
6    on it.
7          MR. GUIDO:  Why don't we just give it to
8    him to identify.  We'll put a exhibit number on it
9    and we'll substitute it after.  We'll mark this as
10    exhibit next number.  Okay?
11          MR. SOHN:  Okay.
12          (Whereupon, Exhibit Prowse Beloreshki-7 is
13    marked for identification by the reporter.)
14     Q.   Have you seen Exhibit Number 7 before?
15     A.   I may or may not have seen the entire
16    Exhibit 7.  I did see that attachment with the
17    various markings and --
18     Q.   Attachment A.
19          MR. SOHN:  B.
20     A.   I don't know.
21     Q.   Excuse me.  Attachment B.  You don't know.
22    Who showed it to you?
23     A.   My best sense is that it probably was
24    e-mailed to me.
25     Q.   Okay.  Who mailed it to you?

Page 48

1          T. Beloreshki - Direct
2     A.   I don't recall.
3     Q.   Did you discuss it with anyone after you
4    received it in the mail?
5     A.   Yes.
6     Q.   Pardon?
7     A.   Yes.
8     Q.   With who?
9     A.   With members of the team within FTI and
10    counsel.
11     Q.   Pardon?
12     A.   And counsel.
13     Q.   Which counsel?
14     A.   Oh, God.  That, I don't recall.
15     Q.   Well, look at Item Number 9.  Okay?  It
16    says, "All analyses, reports or testimony prepared
17    for and/or presented in cases or administrative
18    matters involving allegation of market manipulation
19    or effects thereof."
20     A.   Yes.  I do see that.
21     Q.   Hmm?
22     A.   I do see that.
23     Q.   Does that include the work you did on Nano
24    Pierce?
25     A.   I don't know.

Page 49

1          T. Beloreshki - Direct
2     Q.   Did you ask?
3     A.   The instruction that we received from
4    counsel was to produce the materials, essentially all
5    our work files in this matter.
6     Q.   In what?
7     A.   In this matter.
8     Q.   In this particular matter?
9     A.   Correct.
10     Q.   But not any other matter?
11     A.   Correct.
12     Q.   Were you specifically not directed not to
13    produce your work product in other matters that dealt
14    with market manipulation?
15     A.   I believe the answer is yes.
16          MR. GUIDO:  Let's take a break for five
17    minutes, please.
18          THE VIDEOGRAPHER:  The time is 11:23.
19    We're going off the record.  This marks the end of
20    Tape Number 1.
21          (Whereupon, a recess is taken.)
22          (Whereupon, Exhibit Prowse Beloreshki-8 is
23    marked for identification by the reporter.)
24          THE VIDEOGRAPHER:  The time is 11:37.
25    We're back on the record.  This is Tape Number 2.

13 (Pages 46 to 49)

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

| Page 50 | Page 52 |
|---|---|

**Page 50**

1          T. Beloreshki - Direct
2          Q.   Mr. Beloreshki, now that we're back on the
3     record, I would like you to take a look at a document
4     I've just had marked as Exhibit Number, I think, 8.
5          MR. SOHN:  This one?
6          Q.   Exhibit Number 8 is a packet of documents
7     that were sent to the Securities and Exchange
8     Commission by NERA in response to a subpoena I had
9     issued to them for documents relating to your work
10    when you were at NERA, and I would like to direct
11    your attention to the -- If you look in the bottom
12    right hand -- First of all, have you seen this
13    document that I've had marked as Exhibit Number 8?
14         A.   I don't know.  I mean, the formatting of
15    the --
16         Q.   No.  Excuse me.  Have you recently seen
17    the document with the cover letter?
18         A.   No.  I mean, DS --
19         Q.   Pardon?
20         A.   No.
21         Q.   Have you seen any of the documents
22    recently that have been marked as Exhibit Number 8?
23         A.   Can I have a moment to review it?
24         Q.   Yes.
25              Have you had an opportunity to review --

**Page 51**

1          T. Beloreshki - Direct
2          A.   Yes.
3          Q.   Have you seen -- What is the date of the
4     cover letter?
5          A.   February 23, 2000 --
6          Q.   Okay.  Have you seen any of the -- 2000 --
7          A.   10.
8          Q.   10.  Okay.
9               Have you seen any of the documents that
10    are in Exhibit Number 8?  And if you look in the
11    bottom right-hand corner, there's what's called a
12    Bates stamp number.
13         A.   Yes.
14         Q.   NERA 1 through NERA 60, have you seen any
15    of these documents?
16         A.   I don't recall seeing a document with a
17    Bates stamp NERA, but that may be just because I
18    didn't notice it, but I do remember seeing documents
19    reflecting the billing records for Sedona.  So the
20    best answer I can give you is I've seen at least
21    portions of this document.  I don't believe I've seen
22    the entire document.
23         Q.   Which portions have you seen?
24         A.   The one page that I recognize or I
25    recognize a few items on it was the one with the

**Page 52**

1          T. Beloreshki - Direct
2     Bates Number NERA 3.
3          Q.   Who provided that to you?
4          A.   That would be counsel.
5          Q.   Pardon?
6          A.   Counsel.
7          Q.   Counsel for --
8          A.   DLA Piper.
9          Q.   Who at DLA Piper?
10         A.   Mr. Sohn and/or Caryn Mazin.
11         Q.   What about the pages that deal with
12    Calypte -- C-A-L-Y-P-T-E -- Calypte?  Excuse me.
13         A.   I don't recall seeing that.
14         Q.   And what about the pages that refer to Pet
15    Quarters starting at Page 10?
16         A.   I don't have a recollection of that one,
17    the one -- Again, the one page that rang a bell for
18    me was NERA 3.
19         Q.   Let's walk through this and I'll ask you
20    some questions and maybe this will help you refresh
21    your recollection.
22              On Page NERA 1, it says, "Calypte."  Was
23    that a company that you did an analysis for?
24         A.   We did analyses related to the stock price
25    behavior of Calypte stock.

**Page 53**

1          T. Beloreshki - Direct
2          Q.   And was that a matter that involved an
3     allegation of market manipulation?
4          A.   I don't recall.
5          Q.   Well, did it involve allegations of
6     trading having an impact on stock prices?
7          A.   This is the likelihood, but I just don't
8     know.
9          Q.   What happened to the documents?
10         MR. SOHN:  Which documents?
11         Q.   After you left Calypte?  I'll get it
12    straight one of these times.
13         A.   I don't know.  What happened was that when
14    I left NERA, I was not allowed to take my work files
15    with me, and until probably last week when counsel
16    showed me the letter that was sent to NERA requesting
17    these documents, I would have said they were probably
18    still with NERA, but at least some of the work files
19    that I had at NERA I don't know related to what cases
20    or what type of materials presumably were sent to me
21    when I went to Deloitte.
22         Q.   On the work you did for Calypte, who did
23    you do it for, what firm?
24         A.   If I had to guess, it would be Piper.
25         Q.   Piper.

                                        14 (Pages 50 to 53)

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

---

**Page 54**

1        T. Beloreshki - Direct
2            Now, when you left DLA Piper write NERA
3    and say all of those papers should be sent to
4    Deloitte?
5        A.    That is the letter I just referred to.
6    That said, I don't know -- I don't know whether NERA
7    people had sufficient understanding of the work
8    product that I had in the many matters while I worked
9    there to -- to do that, so I don't know what portion
10   of -- and which cases were transmitted to me at
11   Deloitte.
12           You have to understand, we -- I have
13   worked on a number of cases.  Some of them in a more
14   junior role, some of them in a more senior role.
15   Supervised by a number of people from Andrew Carron,
16   Fred Dunbar, and I just don't know that these files
17   were organized in a way that they would have been
18   able to identify the documents and send them --
19       Q.    I'm sorry to interrupt, but look at the
20   first page on Calypte.  It says June 3rd, 2004, "work
21   on statistical analysis of Calypte trading; e.g. log
22   vs. arithmetic returns."
23       A.    Yes.
24       Q.    Do you remember preparing such an
25   analysis?

---

**Page 55**

1        T. Beloreshki - Direct
2        A.    I don't know what this analysis was, but
3    it is reflected in my time records.
4        Q.    Pardon?
5        A.    I don't remember what these analyses were,
6    but they would be reflected in my time records.
7        Q.    Well, the Court order in this case is
8    directed toward you in Attachment B, okay, and that
9    is documents sought from Mr. Prowse and
10   Mr. Beloreshki.
11           And you received the subpoena.  Right?
12       A.    I did receive the subpoena.  I do remember
13   that.
14       Q.    Okay.  And the subpoena sought all
15   analyses prepared for and/or presented in cases or
16   administrative matters involving allegations of
17   market manipulation or effects thereof.
18           Now, my question is, did you go back to
19   NERA and ask them to produce the documents?
20       A.    That is not what I did, and this is not
21   the procedure that we are asked to follow when we are
22   subpoenaed.
23       Q.    What is the procedure you're asked and who
24   asks you to follow?
25       A.    Well, typically subpoenas are transmitted

---

**Page 56**

1        T. Beloreshki - Direct
2    to counsel and perhaps in-house counsel.  In this
3    instance, the subpoena was given to me by somebody
4    who was essentially stalking me at the reception
5    area --
6        Q.    Called a process server.  Right?
7        A.    I understand that.
8            And that caused a little bit of a
9    commotion, and not of the pleasant type, among senior
10   colleagues of mine who were worried I might be
11   getting a personal subpoena for some -- something.
12   So, regardless, I did accept the subpoena, and I
13   communicated this to in-house counsel so they're
14   aware of it and they can proceed accordingly.
15       Q.    So did you get advice from inside counsel?
16           MR. SOHN:  Objection.  That's a yes/no
17   answer.  Calls for privileged information.
18       A.    Yes.
19       Q.    Pardon?
20       A.    Yes.
21       Q.    Now, what did you do after you got the
22   advice from inside counsel?
23       A.    We collected all the documents that we
24   were advised to collect, and we provided them.
25       Q.    And who did you provide them to?

---

**Page 57**

1        T. Beloreshki - Direct
2        A.    The physical transmission was done
3    probably by an associate of mine, Erica Rose, so I
4    don't know who she sent it to.
5        Q.    Did she create a list of what she
6    provided?
7        A.    I do not know if she created a separate
8    list itemizing all the documents.
9        Q.    Did she create a copy of what she
10   provided?
11       A.    That would be a fair statement.
12       Q.    Will you go back and see if there's a list
13   of the copies of the documents that were provided?
14       A.    I can certainly ask her about that.
15       Q.    Pardon?
16       A.    I can certainly ask her about that.
17       Q.    Can you do that before I take Mr. Prowse's
18   deposition?
19       A.    When is his deposition?
20       Q.    Friday.
21       A.    Yes.
22       Q.    And so where did the documents go that
23   were pulled together?
24       A.    Again, I was not the one who did that
25   transmission.

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                          March 2, 2010
New York, NY

---

**Page 58**

                    T. Beloreshki - Direct
1
2       Q.   So you don't know where they were --
3       A.   No.
4       Q.   And you didn't make any request of NERA
5   for any documents covered by the subpoena?
6       A.   Correct.
7       Q.   Now, let's take a look at, starting with
8   Page 3 through 10.  That covers all the Sedona
9   activities.
10      A.   I'm sorry.  Which page are you on?
11      Q.   Page 3.
12      A.   Yes.
13      Q.   See on December 30th, 2003, the entry of
14  4.775 hours?
15      A.   Yes, I do.
16      Q.   Hmm?
17      A.   Yes.
18      Q.   Do you see where it says Nymox, N-Y-M-O-X?
19  What does that refer to?
20      A.   I believe Nymox future price securities.
21      Q.   Pardon?
22      A.   I believe that is a company that issued
23  future price securities at some point.
24      Q.   And did you do an analysis of Nymox?
25      A.   The entry reads "Nymox chron.," which

---

**Page 59**

1                   T. Beloreshki - Direct
2   probably refers to a chronology of events, but that's
3   about as much as I can glean out of this.
4       Q.   Did you do some analysis to determine what
5   the chronology was?
6       A.   I cannot give you a better answer.  I just
7   don't recall anything more than that.
8       Q.   There's a number of references in here to
9   notes.  For example, on December 24th, there's an
10  eight-hour entry, "preparation for presentation to
11  client en route and in DC.  Notes."
12      A.   Yes.
13      Q.   Do you typically write notes in meetings
14  with counsel on projects you're working on?
15      A.   I do, but they're not the notes that you
16  would typically think of.  Those would be more like,
17  for the lack of better word, random notes, ideas that
18  I want to follow up on.
19      Q.   Pardon?
20      A.   These would be -- These would be notes
21  that would -- you know, I would jot down possibly
22  things, thoughts I might have or, you know, ideas of
23  what I might want to do --
24      Q.   Well, look at Item Number 8 in Exhibit
25  Number 7.  Do you have Exhibit Number 7?

---

**Page 60**

1                   T. Beloreshki - Direct
2       A.   Yes.
3       Q.   Asks for all documents concerning any
4   meeting, telephone conversation, or other
5   communications between Prowse, Beloreshki and/or DLA
6   Piper regarding the Prowse report documents related
7   thereto or the results of any other studies or
8   reports of market manipulation.
9            Do you see that?
10      A.   I do.
11      Q.   And you prepared such reports when you
12  were at NERA.  Right?  Notes of such conversations or
13  meetings?
14      A.   First, again, when you say notes of
15  meetings, these are not, you know, meant to be
16  minutes of a meeting or anything.  These could be
17  notes that I might jot a couple of thoughts about,
18  you know, ideas that I might want to follow up on,
19  and I don't -- I wouldn't even expect to keep those.
20      Q.   But isn't it a document concerning
21  something; a meeting, conversation?
22      A.   It is concerning something, but I don't
23  know what the something is.
24      Q.   It's a document concerning any meeting,
25  telephone conversations or other communications.

---

**Page 61**

1                   T. Beloreshki - Direct
2   Right?
3       A.   Correct.  But when you say it is a
4   document, I -- I don't believe that I do have these
5   documents.
6       Q.   You don't believe you have the documents?
7       A.   Correct.
8       Q.   But you also testified you didn't go back
9   and look?
10           MR. SOHN:  Objection.  I don't think
11  that's the testimony.
12      Q.   I don't understand how you know you don't
13  have any if you didn't go back and look.
14      A.   I did in terms of -- In terms of providing
15  documents, I did everything I was asked to --
16      Q.   I didn't ask you for your interpretation
17  of what you did.  I asked you a very specific
18  question.
19      A.   Yes.
20      Q.   Okay?
21           Did you go look for notes that are
22  referred to in Exhibit Number 8?
23      A.   We did go and look for any kind of notes
24  relating to work in this case.  If your question is
25  whether I requested NERA provide me with documents,

---

16 (Pages 58 to 61)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 62

1          T. Beloreshki - Direct
2    the answer is no.
3          Q.   Well, I mean, take a look at NERA 49 and
4    NERA 48.
5          Doesn't that relate that all files related
6    to Sedona on matters that you worked on on behalf of
7    DLA Piper were to be transferred to Deloitte &
8    Touche?
9          MR. SOHN:  You're asking if that's what
10   the letter says?
11         MR. GUIDO:  I'm asking whether or not he
12   understands.
13         A.   Let me put it this way.  As I said, I was
14   not allowed to take these documents with me, which I
15   guess is what precipitated this exchange.  I would
16   suggest -- and that's consistent with my answer to
17   your previous questions -- that I don't know the
18   extent to which NERA would have been able to identify
19   all the relevant documents.  And looking at this
20   document, I do not believe that there was a project
21   on Andreas Badian at NERA, so I don't know
22   necessarily what this refers to.
23         Q.   But there was a project Sedona?
24         A.   Correct.  There was a project Sedona.
25         Q.   That's right.  That's what this time sheet

Page 63

1          T. Beloreshki - Direct
2    is referring to, Sedona.  It doesn't say Badian, does
3    it?
4          A.   The document you are referring to refers
5    to Andreas Badian.
6          Q.   It also refers to Sedona?
7          A.   We are in agreement on that.
8          Q.   Pardon?
9          A.   We are in agreement.
10         Q.   What was the agreement?
11         A.   That it refers to Sedona and it refers to
12   Andreas Badian.  My only point is that I do not
13   recall working on a project Andreas Badian while at
14   NERA.
15         Q.   I'm referring to -- will you please answer
16   my question?
17         A.   What is the question?
18         Q.   The Sedona documents that you generated
19   when you were at NERA transferred at the request of
20   Caryn Schechtman to DLA Piper -- I mean, to
21   Deloitte & Touche?
22         A.   I do have a recollection of receiving
23   boxes of materials, not numerous amount of materials.
24   I do not have a recollection of whether those were
25   Sedona or some other project related.

Page 64

1          T. Beloreshki - Direct
2          Q.   Do you recall receiving documents while
3    you were at Deloitte & Touche for work that you did
4    while you were at NERA?
5          A.   That is correct.
6          Q.   What happened to those boxes?
7          A.   I don't have a recollection.  I don't
8    know.
9          Q.   Well, when you left Deloitte & Touche,
10   what happened to the documents relating to your work
11   that you had previously done?
12         A.   These boxes or materials were not part of
13   the materials that I took with me to FTI from
14   Deloitte.
15         Q.   So the Sedona, the PETCO and eLaw
16   documents, as far as you know, could still be at
17   Deloitte?
18         A.   I'll be speculating.  I don't know.
19         Q.   You don't know?
20         A.   I don't know.
21         Q.   You testified you didn't take them with
22   you when you went to FTI?
23         A.   Correct.
24         Q.   Did you make a request of Deloitte &
25   Touche for the documents?

Page 65

1          T. Beloreshki - Direct
2          A.   No.
3          Q.   Would you go back and do so?
4          A.   If instructed to do so, I have no reason
5    not to.
6          Q.   I'm requesting you to do so.  I'm not
7    instructing you, but I have the subpoena outstanding
8    to you and I can go to the Court and ask the Court to
9    instruct you.
10         My question to you today is, are you going
11   to go back to Deloitte with a written request for the
12   documents, provide me with that written request?
13         A.   I don't know if I can do that, but I'll
14   work through counsel to get this thing done.
15         Q.   Will you do the letter before I take
16   Mr. Prowse's deposition on Thursday if you're going
17   to do it?
18         A.   Certainly.
19         Q.   Now, this makes reference to on -- Look at
20   February 20th, 2004.
21         A.   Which page are we on?
22         Q.   On Page 4.
23         A.   Yes.
24         Q.   See it says work through additional pasts
25   per yesterday's meeting with counsel, review economic

17 (Pages 62 to 65)

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

---

Page 66

T. Beloreshki - Direct
1    literature on equity manipulation. Summary materials
2    to include in package of materials for -- it says
3    counts, but I assume it's counsel -- finalize work on
4    presentation?
5        A.  I do see that entry.
6        Q.  Now, when you received the subpoena in
7    this case, did you look for any literature, economic
8    literature on equity manipulation?
9            MR. SOHN:  That he has now?
10       Q.  When you received the subpoena, did you
11   look for any economic literature on equity
12   manipulation for Sedona?
13       A.  We provided all the files including any
14   files that may have dealt with --
15       Q.  I didn't ask you whether you provided.  I
16   asked did you look for it.
17       A.  Correct.  I provided all the files that I
18   have in my Sedona folder to Erica Rose so that those
19   could be produced.
20       Q.  Well, how voluminous was the file?
21       A.  I don't know how voluminous it was.  I
22   provided all my files related to Sedona, the work we
23   did in this particular matter to Erica, and those
24   were produced.
25

---

Page 67

T. Beloreshki - Direct
1        Q.  Who physically pulled together the
2    documents?
3        A.  That would be me.
4        Q.  All right.  So was there a banker's box
5    worth of documents?
6        A.  No.  I gave her my E mail files.
7        Q.  What?
8        A.  Those were the electronic files that I
9    had.
10       Q.  You gave her your E mail files?
11       A.  No.  I apologize.  I referred to my
12   electronic files.
13       Q.  You gave her a disk of your electronic
14   files?
15       A.  It may have been a disk.  It may have been
16   an E mail.  I don't know.
17       Q.  Okay.  But it was your electronic files
18   from your computer?
19       A.  Correct.
20       Q.  What about hard-copy files?
21       A.  I don't keep hard-copy files of the nature
22   you're referring to.
23       Q.  What do you do with them?
24       A.  These days, I try to keep things more or

---

Page 68

T. Beloreshki - Direct
1    less electronic.
2        Q.  Pardon?
3        A.  I try to keep them in electronic forms.
4        Q.  Here -- okay.  Here on February 20, 2004,
5    it says you reviewed economic literature on equity
6    manipulations.
7        A.  Yeah.
8        Q.  Did you put that in an electronic
9    database?
10       A.  I don't know what I might have done with
11   that.
12       Q.  Well, what is your practice?
13           MR. SOHN:  What is it now or what was it
14   in 2004?
15       Q.  What was it then?
16       A.  Certainly over time I have gone a whole
17   lot more towards keeping things in electronic form.
18       Q.  Well, those that are not in electronic
19   form, did you keep them in hard copy?
20       A.  I'm -- I don't know.  My inclination is to
21   say no.
22       Q.  Well, look at March 5th, 2004, and March
23   9, 1.25.  It says, "Miscellaneous data request,
24   electronic files from counsel.  Provide materials for

---

Page 69

T. Beloreshki - Direct
1    counsel -- under March 9, "Provide materials for
2    counsel, revise analysis using revised terms, notes.
3            MR. SOHN:  Didn't you just go -- didn't
4    you just go through and establish what happened to
5    the NERA files?  Are we going to go through each one
6    and see whether or not --
7            MR. GUIDO:  No.  I'm asking about -- I'm
8    asking about specific files.  I think I've already
9    gone through, and he says that he didn't make any
10   effort to go to Deloitte to get the files.  He didn't
11   think that NERA had transferred the files.  Okay.  I
12   have asked him to go back and rerequest those files,
13   okay, and now I'm talking about a set of files that
14   was transferred to your firm, and I'm asking him some
15   questions about those files.
16           MR. SOHN:  Where does it say they were
17   transferred to my firm?
18           MR. GUIDO:  "Provide materials to counsel
19   per her request."  Okay?  That sure reads like the
20   document -- He provided documents to your firm and
21   those documents haven't been produced.  May I ask the
22   witness the questions?
23           MR. SOHN:  Sure.
24       Q.  When you provided documents to counsel in

18 (Pages 66 to 69)

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

---

Page 70

T. Beloreshki - Direct
1
2  the Sedona matter, did you keep a record of providing
3  those documents?
4     A.  I don't have a recollection of keeping a
5  record of -- of these documents, no.
6     Q.  All right.  Let's go to May 24th, 2004,
7  NERA file.  See where it makes reference to
8  presentation at the SEC?
9     A.  May 24th?
10    Q.  May 24th, 8.75 hours.
11    A.  Yes.
12    Q.  Finalize presentation.  Presentation at
13 the SEC post meeting notes.
14    A.  Yes.
15    Q.  Did you make an effort to look for notes
16 after you met with the SEC?
17        MR. SOHN:  Make an effort in response to
18 the subpoena to look for records from 2004?  Yes?
19 That's the question?
20        MR. GUIDO:  My question is he had a
21 subpoena that he received.  When he received the
22 subpoena, did he look for the notes that he referred
23 to in this May 24th, 2004, entry?
24    A.  The response with respect to notes would
25 be the same.  I rarely keep notes.  Okay?  I might

---

Page 71

T. Beloreshki - Direct
1
2  jot something down.  Then it will get executed and
3  the notes will go away.  This is not something I'll
4  keep.
5     Q.  I didn't ask you what you did.  I asked
6  you -- what you typically did.  I asked you if you
7  looked for these?
8     A.  My understanding was I was required to
9  provide the presentation that was subject to that
10 data entry, and I didn't have a reason to look for
11 any materials beyond that.
12    Q.  So you didn't look is the answer?
13    A.  Correct.
14    Q.  Okay.  Now, on May 26, 2004, it says
15 complete -- 3.75 hours.  It says, "Complete market
16 model analysis."  What does that refer to?
17    A.  I don't know.
18    Q.  Did you look whether or not there was a
19 market model analysis that you did with regard to
20 Sedona?
21    A.  The -- The same answer.  I didn't have a
22 reason to look.
23    Q.  Pardon?
24    A.  I did not have a reason --
25    Q.  I didn't ask you whether you had a reason.

---

Page 72

T. Beloreshki - Direct
1
2  I asked you whether you looked.
3     A.  And the answer is I did not.
4     Q.  Then it says October 12th, 2004, provide
5  counsel with Sedona Corp. database.
6        Do you see that?
7     A.  I do.
8     Q.  What's a Sedona Corp. database?
9     A.  I'll be speculating.  I don't know.
10    Q.  You don't know.
11        You presented a report that was relying on
12 a database, wasn't it?
13    A.  On a database.  Correct.
14    Q.  Where did you get that database?
15    A.  That database was compiled from various
16 account statements while I was at NERA.
17    Q.  From account statements when you were at
18 NERA?
19    A.  Correct.
20    Q.  What account statements?
21    A.  Monthly account statements for the various
22 parties in -- that trading was done through.
23        MR. GUIDO:  I would like to have marked as
24 Exhibit Number 9 a -- one rendition of your Exhibit
25 Number 3, Materials Considered.

---

Page 73

T. Beloreshki - Direct
1
2        (Whereupon, Exhibit Prowse Beloreshki-9 is
3  marked for identification by the reporter.)
4     Q.  And I would like you to turn your
5  attention to Exhibit Number 3.  I'm sorry.
6        MR. SOHN:  You mean Exhibit 4.
7     Q.  What is the report?
8     A.  4.
9     Q.  Okay.  Turning to Exhibit Number 4 and
10 your Exhibit Number 3 --
11        MR. SOHN:  Which you just marked as
12 Exhibit 9.
13        MR. GUIDO:  Pardon?
14        MR. SOHN:  Which you just marked as
15 Exhibit 9.
16        MR. GUIDO:  Well, wait till I ask my
17 question.  Don't be clever, Mr. Sohn.
18    Q.  Take a look at what I've marked as Exhibit
19 Number 9 and compare it to your Exhibit Number 3 in
20 your report, Exhibit Number 4, and tell me if you see
21 any differences there.
22    A.  The one thing I do see is there are two
23 Bates ranges that are in Exhibit 9 that are not in
24 Exhibit 3 or Exhibit 4.
25    Q.  One is the Bates ranges for trading data.

---

19 (Pages 70 to 73)

Tsvetan Beloreshki                                                March 2, 2010

New York, NY

---

Page 74

T. Beloreshki - Direct

1
2   Correct?
3       A.   Yes.
4       Q.   And what were those Bates ranges on
5   Exhibit Number 9?
6       A.   The ones that are reflected in Exhibit 9
7   are RA 1 through 2591 and GOJO 1 through 945.
8       Q.   What does GOJO refer to?
9       A.   I don't know.
10      Q.   Well, did you prepare the Exhibit Number 3
11  that you put into your report, Exhibit Number 4?
12      A.   It was prepared by -- by us, by which I
13  mean, me, Steve, and Erica Rose.  Probably Erica Rose
14  is the person who did the actual preparation of the
15  exhibit.
16      Q.   I would like you to reference your Exhibit
17  Number 3 in your report, Exhibit Number 4?
18      A.   I did not.
19      Q.   You don't know?
20      A.   I did not.
21      Q.   You did not.  Who did?
22      A.   I don't know.
23      Q.   Was it in your report when you provided it
24  to DLA Piper?
25      A.   I don't know.

---

Page 75

T. Beloreshki - Direct

1
2       Q.   Do you know what it refers to?
3       A.   Which one?
4       Q.   The GOJO?
5       A.   In all likelihood, it refers to account
6   statements.
7       Q.   Hmm?
8       A.   It all likelihood, it refers to account
9   statements.
10      Q.   It refers to account statements?
11      A.   Yes.  I don't have a recollection of what
12  that range of Bates numbers refers to.
13      Q.   So let me ask you something.  That GOJO,
14  what are the Bates ranges again?
15      A.   1 through 945.
16      Q.   1 through 945.
17           There are no documents that have been
18  provided to the SEC that say GOJO 1 through -- what
19  is the number?
20      A.   945.
21      Q.   945.
22           Did you provide those to counsel, DLA
23  Piper?
24      A.   I wouldn't know one way or the other.  I
25  don't know.

---

Page 76

T. Beloreshki - Direct

1
2       Q.   Were all of the documents you provided to
3   DLA Piper when you responded to the subpoena served
4   upon you on an electronic disk?
5       A.   I provided my electronic documents to
6   Erica Rose, to the best of my recollection, in an
7   electronic form either via E mail or sending to her
8   in a CD ROM.
9       Q.   Who's Erica Rose?
10      A.   She's an associate of mine who's working
11  on this matter.
12      Q.   An associate of yours?
13      A.   Yes.
14      Q.   And that's all you provided her?
15      A.   Correct.  The rest of the materials were
16  collected by her working with Steve and counsel, yes.
17      Q.   Working with Steve who?
18      A.   Steve Prowse.
19      Q.   Who's that?
20      A.   That is the co-author of the report.
21      Q.   And who else?
22      A.   Probably -- and -- and counsel.
23      Q.   Counsel for FTI or counsel for Badian?
24      A.   I meant DLA Piper.
25      Q.   Now, you said that the database you

---

Page 77

T. Beloreshki - Direct

1
2   created was created off of account statements.
3   Right?  Am I correct?
4       A.   Yes.
5       Q.   The account statements that you relied
6   upon, you said that they were Pond account
7   statements?
8       A.   I'm sorry.  I missed the question.
9       Q.   Were they Pond account statements?
10      A.   I don't know.
11      Q.   You don't know.
12           Were they Pond trade tickets?
13      A.   I don't remember seeing trading tickets.
14      Q.   Were they Refco account statements?
15      A.   Possibly.
16      Q.   Hmm?
17      A.   Possibly.
18      Q.   Were they Refco trade confirmations?
19      A.   I wouldn't be able to give an answer one
20  way or the other.
21      Q.   So you don't know.  Today you don't know?
22      A.   Correct.
23      Q.   Well, take a look at your Exhibit
24  Number 3.  You list three categories of account
25  statements.  Is it your understanding that that's the

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                      March 2, 2010
New York, NY

Page 78

T. Beloreshki - Direct

1        T. Beloreshki - Direct
2  inclusive group of account statements that you
3  referred to to prepare your database?
4      A.   When you say "that," what are you
5  referring to?
6      Q.   Pardon me?
7      A.   I'm not --
8      Q.   Exhibit Number 3 and Exhibit Number 4 have
9  three entries of accounting statements at the bottom
10  of the page.  Okay?  Is that the universe of account
11  statements that you looked to to prepare the database
12  that you did an analysis of in this case?
13      A.   I don't know.
14      Q.   You don't know.
15          The subpoena required you to produce all
16  documents that you considered or relied upon for your
17  report, and now you don't know what it is you relied
18  upon.  This purports -- it says materials reviewed in
19  this report.
20      A.   I understand.  What -- There's a little
21  bit of a time dependency in this process.  The
22  records were assembled and combined into a database
23  while I was at NERA seven years ago, six years ago,
24  something of that range, and what I do remember is
25  that we went through a very vigorous process

Page 79

1        T. Beloreshki - Direct
2  verifying that the database was robust and complete.
3          As Dr. Fred Dunbar can probably attest,
4  there are very strict rules at NERA in terms of
5  checking very fine work that is basically each piece
6  of work done by one researcher gets replicated by a
7  second, and so forth.  So in terms of confidence in
8  the database that we analyzed, I do have that.
9          MR. GUIDO:  I would like to have marked a
10  document that's been previously marked as SEC 47 in
11  this case, and it is now going to be 10.
12          (Whereupon, Exhibit Prowse Beloreshki-10
13  is marked for identification by the reporter.)
14      Q.   Have you ever seen this before?
15      A.   I don't recall seeing these documents
16  before.
17      Q.   Well, take a look at -- It has Bates stamp
18  SEC-Badian 22917.
19      A.   229 --
20      Q.   Pardon?
21          MR. SOHN:  22917.
22      Q.   22917.
23          Have you ever seen a spreadsheet that
24  looks like the pages that are Bates-stamped 22917 to
25  22934?

Page 80

1        T. Beloreshki - Direct
2          MR. SOHN:  What do you mean, ever seen?
3  This one or --
4          MR. GUIDO:  This one.
5          MR. SOHN:  With this information on it?
6          MR. GUIDO:  I'll ask my questions,
7  Mr. Sohn.
8      Q.   Have you had an opportunity to review?
9      A.   Yes.
10      Q.   Have you ever seen that spreadsheet
11  before?
12      A.   I don't know if I have seen this
13  particular spreadsheet with the formatting.
14      Q.   Pardon?
15      A.   I don't know if I have seen that
16  particular spreadsheet, but the formatting is
17  familiar.
18      Q.   Have you ever heard of the Goodman Jones
19  report?
20      A.   I heard of Goodman Jones only over the
21  last week or so.
22      Q.   Only the last week or so.
23          Were you ever provided with an electronic
24  spreadsheet similar to Exhibit Number D that was put
25  in your Exhibit Number 10?

Page 81

1        T. Beloreshki - Direct
2      A.   I don't believe that's the case.
3      Q.   You don't believe that you've ever seen a
4  spreadsheet that contains the information that's on
5  Exhibit Number D, which is in Exhibit Number 10?
6      A.   No.  Your question was what I was
7  provided.
8      Q.   I didn't ask --
9      A.   That was your question.
10      Q.   I didn't ask you what my question was.
11  I'm asking you a question now.
12      A.   Yes.
13      Q.   Were you ever provided with an electronic
14  database in order to prepare your database to rely
15  upon?  Let me phrase the question that way.
16      A.   The answer is yes, but it would not have
17  looked like --
18      Q.   Is what?
19      A.   The answer is yes, but it would not have
20  looked like this file that I have in front of me.
21      Q.   It did not look like what I've just shown
22  you?
23      A.   Correct.
24      Q.   Who provided it to you?
25      A.   Counsel.

21 (Pages 78 to 81)

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 82

1           T. Beloreshki - Direct
2       Q.   Counsel for who?
3       A.   Caryn Mazin.
4       Q.   And when did they provide it to you?
5       A.   Very early on in the process of our work
6    on the Sedona matter, and I mean that the Sedona
7    matter that I worked while with NERA.
8       Q.   So the Sedona work you did while you were
9    at NERA?
10      A.   Pardon?
11      Q.   The Sedona work you did while you were at
12   NERA?  Is that what you said?
13      A.   Yes.
14      Q.   Now, in terms of the databases that you
15   used for your report, which is Exhibit Number 4, the
16   expert report you did with Mr. Prowse, was that data
17   all data that you had created when you were at NERA?
18           MR. SOHN:  Objection to form.
19      Q.   You may answer the question.
20      A.   I'm a little reluctant to give you an
21   answer because we don't just create data.
22      Q.   Okay.  I said created a database.
23      A.   I apologize.  My mistake.
24      Q.   Pardon?
25      A.   I apologize if I misheard you.

Page 83

1           T. Beloreshki - Direct
2           As I said, we had procedures that if one
3    research associate creates a database, then another
4    researcher would create -- would go through the same
5    steps to create a database, and those would be
6    reconciled in order to ensure that there is a quality
7    control on procedures in place.
8       Q.   Are you comfortable today that the
9    database you relied upon in trading in Sedona stock
10   by entities that were related to Amro International
11   were accurately included in your database?
12      A.   I'm comfortable with the database we used
13   and, as I said, that database was created using very
14   robust quality check controls, and on that you can
15   verify this by talking to Dr. Dunbar to the extent
16   that he understands the policies and procedures --
17      Q.   Did Dr. Dunbar work on the Sedona matter?
18      A.   I don't know how to give you an answer yes
19   or no.
20      Q.   Well, are you alleging he did?
21      A.   Dr. Dunbar was a senior colleague of mine,
22   and he was involved in -- in -- in work on a number
23   of manipulation cases, and he would have been the
24   natural choice for me to ask for guidance in work on
25   cases like this one.

Page 84

1           T. Beloreshki - Direct
2       Q.   That's not what I asked.  Are you saying
3    today that Dr. Dunbar verified the accuracy of your
4    work in generating the database for Sedona?
5       A.   That was a different question.
6       Q.   Well, that's my question.
7       A.   I would not say Dr. Dunbar verified the
8    accuracy of setting up the database.  What I did say
9    was Dr. Dunbar was a senior colleague of mine on who
10   I would seek advice --
11      Q.   You still haven't answered my question.
12   Are you saying today that Dr. Dunbar verified the
13   accuracy of the Sedona database that you relied upon?
14   Yes or no?
15           MR. SOHN:  Objection.  He did answer.
16      A.   I did answer that question.  I would not
17   expect Dr. Dunbar to verify the database, but he was
18   aware of procedures that we had in place at NERA in
19   terms of quality controls.  That's what I said.
20      Q.   So you're saying that the procedures that
21   were used at NERA you followed in verifying the
22   accuracy of the Sedona database you relied upon?
23      A.   We followed the procedures and it's a very
24   robust process because we wanted to ensure that all
25   the various sources matched up and all the numbers

Page 85

1           T. Beloreshki - Direct
2    tied out nicely, so yes.
3       Q.   Have you ever heard of anyone at NERA
4    ending up presenting an expert report and having it
5    pointed out to them by opposing counsel that there
6    was a significant error in that report?
7       A.   I don't know what you're referring to.
8       Q.   United Savings & Trust litigation in
9    Texas.
10      A.   I'm not sure what you are referring to.
11      Q.   You don't know?
12      A.   No.
13      Q.   You have never heard of an expert from
14   NERA testifying where a lawyer in cross-examination
15   pointed out to them that there was a major error in
16   their statistical analysis database?  And I will even
17   add another fact.  And in that situation, the expert
18   from NERA went back and recalculated based on the
19   correction that it, the expert, deemed to be required
20   to correct his expert report?
21      A.   Well, let me put it this way.  I don't
22   believe I'm aware of that situation.  I just didn't
23   know about it.  That said, I do have a very high view
24   of NERA, one; and, two, there were procedures that
25   were aimed squarely at avoiding situations like that.

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

| Page 86 | Page 88 |
|---|---|

**Page 86**

1           T. Beloreshki - Direct
2      Q.   Pardon?
3      A.   There were procedures to avoid exactly
4    this --
5      Q.   I just asked you whether it occurred.
6      A.   I was not aware of it.
7           MR. SOHN:  Objection.
8      Q.   Well, let me ask you this.  Have you ever
9    criticized the work of one of your colleagues at NERA
10   as a witness for being inaccurate?
11     A.   That would be correct, including
12   Dr. Dunbar.
13     Q.   Hmm?
14     A.   Yes.
15     Q.   You have?
16     A.   Yes.
17     Q.   How many times?
18          MR. SOHN:  The conclusions are inaccurate
19   or the data is inaccurate?
20          MR. GUIDO:  The data.
21     A.   In terms of the data, I have been opposite
22   a NERA --
23     Q.   I didn't ask you about opposite.  I said
24   while you were a colleague of someone at NERA.
25     A.   Well --

**Page 87**

1           T. Beloreshki - Direct
2           MR. SOHN:  That's a different question.
3    So what's the question?
4      A.   I'm sorry.  I'm a little lost.
5      Q.   It is not a different question.  My
6    question is, while you were at NERA, did you ever
7    have occasion when you were testifying to point out
8    that the data that one of your colleagues had relied
9    upon was inaccurate?
10     A.   You mean when I was at NERA and I was
11   testifying the data used by a colleague of mine was
12   inaccurate?
13     Q.   At NERA.  It's a simple answer.  Yes or
14   no.
15     A.   I don't know what you're referring to.
16     Q.   So you don't recall?
17     A.   Correct.
18     Q.   Now, when you prepared your Exhibit
19   Number 3, your review, did you intend it to be
20   inclusive of everything you reviewed?
21     A.   In preparation of this report, yes.
22     Q.   Well, it says NASDAQ audit trail report
23   for Sedona Corp., March 1, 2001 through April 30th,
24   2001.
25          See that?

**Page 88**

1           T. Beloreshki - Direct
2      A.   Yes.
3      Q.   What did you do with that audit trail
4    report when you reviewed it?
5      A.   That was the extent of the use of that
6    data.
7      Q.   So you just looked at it?
8      A.   Correct.
9      Q.   You didn't use the data at all?
10     A.   I did not.
11     Q.   Have you ever advised any clients on how
12   to hedge against a risk in a convertible debenture?
13     A.   You mean future price security?
14     Q.   Yeah.  Okay.  We'll use --
15     A.   No.
16     Q.   No.  Have you ever published any articles
17   on how to hedge against the risk in convertible -- or
18   future price securities?
19     A.   Not beyond the one that we discussed
20   earlier.
21     Q.   Okay.  Have you ever conducted any
22   empirical research on the effectiveness of the
23   various methods to assess risk in convertible
24   debenture?
25     A.   The answer to that one would probably be

**Page 89**

1           T. Beloreshki - Direct
2    yes.
3      Q.   And what was it?
4      A.   To give you a sense, part of the
5    conclusion my colleagues and I at NERA arrived at in
6    the process of working with these 50 or so companies
7    back in 2000, 2001 was that the stock price of
8    companies that resort to issuance of future price
9    securities tend to decline, and quite substantially
10   so, after issuance of future price securities.  That
11   would have clear implications as to the appropriate
12   hedging strategy that one may wish to employ.
13          MR. GUIDO:  Would the court reporter
14   please read back my question.
15          (The following is read back by the
16   reporter:
17          "Question:  Okay.  Have you ever conducted
18   any empirical research on the effectiveness of the
19   various methods to assess risk in convertible
20   debenture.")
21     A.   I can't give you a different answer.  If
22   you want --
23     Q.   No.  Please don't speculate.  Just answer
24   the question.  If you can't answer the question, ask
25   me to rephrase the question.

23 (Pages 86 to 89)

Tsvetan Beloreshki                                                      March 2, 2010

New York, NY

---

Page 90

T. Beloreshki - Direct

1    T. Beloreshki - Direct
2         A.   Then please rephrase the question.
3         Q.   Okay.  Have you ever published any
4    scholarly articles on the effectiveness of the
5    various methods to hedge the risk in convertible
6    debenture?
7         A.   Not beyond the article we discussed
8    earlier today.
9         Q.   That's the one you did with Caryn
10   Schechtman?
11        A.   And others.
12        Q.   And others.
13             Who were the others?  Were they all
14   lawyers?
15        A.   They were attorneys, yes.
16        Q.   I had planned on this being a little
17   earlier in the questions, but what I would like to do
18   before I get into the report, I would like to --
19   Since I'm a lawyer and you're an economist and
20   sometimes we don't speak the same language, is I
21   would like to sort of clarify some terms so that I
22   understand how you you're using those terms.  You
23   used the term "market manipulation" in your report.
24   Would you please define how you're using that term?
25   Let me give you an example of a term.

---

Page 91

T. Beloreshki - Direct

1    T. Beloreshki - Direct
2             When you talk about chiropractors, there's
3    a statute defines when they get compensated, and it
4    talks about that they get compensated for
5    manipulation, some kind of manipulation.  All right?
6    And it's defined as the skillful handling of a
7    treatment.  Okay?  Is that how you're using the term?
8    I thought I would give you a Little help.
9         A.   I appreciate it.
10        Q.   Hopefully add a little humor to this
11   process.
12        A.   Appreciate that, too.
13        Q.   Ms. Schechtman refers to that as being
14   silly.
15        A.   Market manipulation in my mind would refer
16   to activities that would drive the price of a
17   particular financial instrument away from its
18   efficient levels.
19        Q.   From what?
20        A.   From its efficient levels.
21        Q.   I'm sorry.  I don't understand.  It's a
22   process --
23        A.   It would be --
24        Q.   -- that would drive --
25        A.   It would drive the price of a particular

---

Page 92

T. Beloreshki - Direct

1    T. Beloreshki - Direct
2    financial instrument away from, quote/unquote, its
3    true value which would be consistent with the
4    fundamentals of that instrument or its issuer.
5         Q.   Well, isn't the true value of an
6    instrument whatever the market price indicates?
7         A.   Absent manipulation or some other
8    technical factors.
9         Q.   Well, what's true value?
10        A.   That is the value of an instrument that is
11   consistent with the underlying characteristics of the
12   instrument and the issuer.
13        Q.   So it's the underlying characteristics --
14        A.   Let me give you an example.
15        Q.   Before you do that, I really want to get
16   your definition clear in my mind.  Is it -- The true
17   value is the value that reflects the fundamentals --
18        A.   Yes.
19        Q.   -- of the issuer?  Right?  Is that what
20   you're saying?
21        A.   And the characteristics of the instrument
22   issued.
23        Q.   And the characteristics of the instrument
24   issued.  Is that fair?  Is that your definition?
25             And the manipulation is a process that

---

Page 93

T. Beloreshki - Direct

1    T. Beloreshki - Direct
2    drives the price away from that true value?
3         A.   Yes.
4         Q.   Okay.  Now, what's the function of a stock
5    market?
6         A.   There are a number of functions of the
7    marketplace.  One is provide liquidity.  Another one
8    would be price disclosure and efficient allocated
9    risk and capital.
10        Q.   Well, aren't the -- Doesn't the literature
11   indicate that the true value of a security is set by
12   the marketplace?
13        A.   And that is generally my view,
14   particularly being a former trader, except, as I
15   said, in situations when you have either manipulation
16   or some other technical factors that come into play.
17        Q.   Well, I'm sorry, but your answer sounds a
18   little circular to me, and that is what you're saying
19   is that market manipulation is when it diverges from
20   the true market and the true market is diverted when
21   there's market manipulation you still haven't
22   answered the question for me, what is market
23   manipulation, or am I just being ignorant?
24        A.   No.  I wouldn't say that part, but I am
25   afraid I can't give you a better explanation than I

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                            March 2, 2010
New York, NY

Page 94

1        T. Beloreshki - Direct
2    did.
3        Q.   Other than the circular answer?
4        MR. SOHN:  Objection.
5        A.   I don't believe it was circular.  At least
6    in my mind it is not.
7        Q.   Well, what kind of activities would move
8    the price of a security from its true value?
9        A.   One example would be what is referred to
10   as cornering the market.
11       Q.   Pardon?
12       A.   What is referred to as cornering the
13   market.
14            When a market participant is allowed to
15   have, let's say, inordinate market power which may
16   allow that market participant to affect the price of
17   a particular security or commodity.
18       Q.   Okay.  What else?
19       A.   Another one that comes to mind and
20   actually comes from a -- from a case I worked on very
21   early in my career with Fred Dunbar was a
22   manipulation investigation of a brokerage firm based
23   in Chicago which was involved in short selling of a
24   particular stock, and one of the allegations there
25   was that that brokerage would do transactions at the

Page 95

1        T. Beloreshki - Direct
2    close both in order to insert information into the
3    marketplace and in order to protect itself against
4    margin calls from the exchange.
5        Q.   Okay.
6        A.   So that would be another example.
7        Q.   Okay.  What else?
8        A.   I've heard of situations where an analyst
9    would issue analyst reports, positive or negative,
10   typically negative, in order to insert incorrect
11   information into the marketplace.
12       Q.   So an analyst would issue a false report?
13       A.   Yes.
14       Q.   What else?
15       A.   Another potential manipulation situation
16   is if you have, say, wash sales with the idea of
17   simulating higher liquidity in the marketplace than
18   actually exists.
19       Q.   What's -- what's a wash sale?
20       A.   When you essentially do both buy and sell
21   transactions simultaneously in order to inflate the
22   value.
23       Q.   You buy and sell to yourself.
24       A.   Effectively.
25       Q.   Or you buy and sell, but there's no change

Page 96

1        T. Beloreshki - Direct
2    in beneficial ownership.  Or is that too legal?
3        A.   That's a little legal for me, yes.
4        Q.   Buy and sell to yourself.  What else?
5        A.   I'm sure there's more.
6        Q.   Have you ever heard of match trades?
7        A.   Match trades.  I have, and I can't recall
8    exactly what it is.
9        Q.   Have you ever heard of structuring
10   transactions so you double report the value of a
11   transaction to the market?
12       A.   That, I had not heard.  No.  I'm not aware
13   of -- of that type of manipulation.
14            I'm -- I'm aware that there is a reporting
15   issue of market volume particularly when it goes
16   through a market maker, then each transaction could
17   be double reported, so one has to be aware of that.
18   But manipulation, I have not been involved in a
19   situation where somebody has structured a transaction
20   for the purpose of double counting.
21       Q.   All right.  But you have heard of a
22   situation where someone trades through a market maker
23   and it results in double reporting to the market?
24       A.   Correct, but that is not in a manipulation
25   context.  It's simply a function of the way the

Page 97

1        T. Beloreshki - Direct
2    marketplace works.
3        Q.   I understand.
4            If someone structured the transaction
5    through a market maker in order to double report the
6    market, in your view, wouldn't that be market
7    manipulation?
8        MR. SOHN:  Objection to form.
9        A.   I don't know.  I'll have to investigate
10   that.
11       Q.   Well, I thought you said that the wash
12   sales project false information into the market?
13       A.   First, you have to get a sense of whether
14   and what kind of information was injected into the
15   marketplace, one; and, two, whether that information
16   had any material impact on the marketplace, so I
17   don't want to separate the two.
18       Q.   But what you did testify to is market
19   manipulation is the introduction of false information
20   into the marketplace?
21       MR. SOHN:  Objection.
22       A.   No.  That's not correct.
23       Q.   No?
24            Well, what's false about -- what's market
25   manipulation about a wash trade?

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 98

T. Beloreshki - Direct

1           T. Beloreshki - Direct
2      A.  We were talking about various ways in
3  which a market participant, a nefarious one, may
4  choose to inject false information to the
5  marketplace, so wash sales would be one of those
6  ways.
7      Q.  And that would report some volume into the
8  market that you believe was a false intrajection into
9  the market?
10      A.  Correct.  Potentially.
11      Q.  And my question for you is in this
12  situation where someone trades to the market maker
13  for the purpose of double reporting, the sales to the
14  market maker into the market, is that market
15  manipulation?
16      A.  Not necessarily.
17      Q.  Why not necessarily?
18      A.  As I gave you the definition, my
19  definition of market manipulation, you also have to
20  have a situation where the price has been moved away
21  from its efficient level.
22      Q.  I thought that you said that with wash
23  sales that it was market manipulation, in your view,
24  because it intrajected a false impression of
25  liquidity into the market.

Page 99

T. Beloreshki - Direct

1           T. Beloreshki - Direct
2      A.  That would not be a correct statement.
3      Q.  Now, you refer to the use of regression
4  analyses in your report.  I'll come back to the
5  market manipulation issue later.  You refer to
6  regression analyses as a method to determine
7  something in your report.  What is that something?
8      A.  Regression analyses in general are used in
9  order to determine relationship between variables, so
10  those would be the somethings.
11      Q.  Pardon?
12      A.  So if you're interested in whether or not
13  there's a relationship between one variable, say, a
14  dependent variable, and a number of other variables,
15  one of the statistical tools that you may use is a
16  regression analysis.
17      Q.  Well, is the purpose of the regression
18  analysis methodology that you use to determine the
19  likelihood that a hypothesis is correct?
20      A.  A regression analysis would test a
21  hypothesis, whether a hypothesis is correct or not.
22  The interpretation of likelihood, I'm having a little
23  problem with.  We talk about confidence intervals and
24  the like.
25      Q.  I'll get to the confidence intervals in a

Page 100

T. Beloreshki - Direct

1           T. Beloreshki - Direct
2  minute.  I'm just asking you about what a -- it's a
3  test of the likelihood of the hypothesis having
4  occurred.  Is that a fair assessment?
5      A.  It could be used to test various
6  hypothesis.
7      Q.  And is it tested by determining whether or
8  not a null hypothesis can be rejected?
9      A.  Correct.
10      MR. GUIDO:  We'll take a five-minute
11  break.
12      THE VIDEOGRAPHER:  The time is 12:59.
13  We're going off the record.  This marks the end of
14  Tape Number 2.
15      (Whereupon, a luncheon recess is taken.)
16      THE VIDEOGRAPHER:  The time is 1:33.
17  We're back on the record.  This is Tape Number 3.
18      Q.  Mr. Beloreshki, I would like to double
19  back a little bit before we get into the statistical
20  terms with my colleagues and go back to the
21  definition of market manipulation, and I just want to
22  ask you some questions and get your answers to those.
23      Remember I asked you the hypothetical
24  about the chiropractor.  So we'll put that one aside.
25  Is market manipulation, is it activity including buys

Page 101

T. Beloreshki - Direct

1           T. Beloreshki - Direct
2  and sells the results in a change in the market price
3  of a security?  Is that how you're using the term?
4      A.  It would involve the activities that would
5  impact the price of the underlying securities away
6  from its true level.
7      Q.  So is it activity, whether it's a buy or a
8  sell, that would result in a change in the market
9  price of the security away from what you refer to as
10  the true value?
11      A.  I wouldn't confine it solely to buys and
12  sells.
13      Q.  Okay.  What else could it include?
14      A.  Well, as we discussed, you -- Well, I
15  don't want to say you, but one presumes the
16  manipulator may seek to inject false information into
17  the marketplace via other vehicles.
18      Q.  That's in addition to this?
19      A.  Correct.
20      Q.  Okay.  Now, could it be that -- So when
21  you're saying that second point, is it activity
22  that's aimed at creating a trading or appearance of
23  trading in a security?
24      A.  I'm not sure I follow.
25      Q.  Well, you talked about efforts to make the

26 (Pages 98 to 101)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 102

1              T. Beloreshki - Direct
2      price behave in a manner that it wouldn't if it were
3      reflecting its true value.  That's one.  Right?
4          A.    Yes.
5          Q.    And then the other, you said interjecting
6      clause behavior, and I'm just trying to clarify what
7      that means.  Is that activity that gives the
8      appearance of creating trading in a security that
9      does not occur in the course of determining its true
10     value?
11             MR. SOHN:  Objection to form.
12         A.    Well, that -- that's your definition.
13     I -- I don't -- I don't believe I can give an
14     exhaustive definition that would cover anything that
15     could potentially be manipulation, so --
16         Q.    All right.  But activities aimed at
17     creating a false appearance of liquidity or price,
18     would that be market manipulation?
19             MR. SOHN:  Objection.
20         A.    Two things.  At least two things.  One is
21     that, again, that particular definition excludes the
22     idea of having an impact in the marketplace and, two,
23     I don't know whether affecting the price and
24     liquidity are the only vehicles to affect market
25     manipulation.

---

Page 103

1              T. Beloreshki - Direct
2          Q.    I didn't ask you whether it was inclusive.
3      I just asked you whether it was one example of it.
4          A.    I was still saying no, to the extent you
5      also need to have an impact in the marketplace.
6          Q.    So that -- So it's important to have an
7      impact for there to be market manipulation, either
8      increasing the volume or increasing the price?
9          A.    I don't believe that increasing the volume
10     by itself would have an impact on -- would
11     necessarily have an impact on the price.
12         Q.    But interjecting false information about
13     the volume, would that in and of itself by
14     interjecting that false information, would that be,
15     in your view, market manipulation?
16         A.    Not necessarily to the extent that you
17     presumably could have a situation where you are
18     injecting false information, but that information
19     fails to produce an impact in the marketplace.
20         Q.    Are you saying that's not market
21     manipulation?
22         A.    I'm not saying -- Look, I'm not -- I'm not
23     pretending to give you the legal definition of what
24     market manipulation is, but, as I said, market
25     manipulation, at least the way I'll go about

---

Page 104

1              T. Beloreshki - Direct
2      identifying the signs of one, one thing that I'll be
3      looking for is data that are they're indicative of a
4      material impact on the marketplace from whatever
5      might be alleged.
6          Q.    Are you saying "price"?
7          A.    Market price.
8          Q.    So your definition is that it's activity
9      that would drive the price of the security away from
10     its true value.  Is that the definition as --
11         A.    At this point I'm afraid I've given you
12     ten definitions.  I don't know.  I have given you as
13     good a definition as I have -- you know, we've had a
14     number of answers there.
15         Q.    I'm sorry.  I am still confused.  Look at
16     Exhibit Number 4.
17             MR. SOHN:  His report?
18             MR. GUIDO:  His report.
19         Q.    And I want to direct your attention on
20     Page 2.  The second paragraph at the top, you say in
21     your conclusion in the bottom of the second
22     paragraph, "Rhino did not pursue a manipulative
23     strategy aimed at artificially depressing the price
24     of Sedona's stock."
25             Is that your conclusion?

---

Page 105

1              T. Beloreshki - Direct
2          A.    That was not -- That is not the
3      conclusion.
4          Q.    No?  Why not?
5          A.    I believe you misread it.
6          Q.    Hmm?
7          A.    I believe you misread the conclusion.
8          Q.    Well, why -- why isn't your conclusion
9      that Rhino did not pursue a manipulative strategy
10     aimed at artificially depressing the price of Sedona
11     stock?
12         A.    Let me read the entire sentence.
13         Q.    Pardon?
14         A.    Can I read the entire sentence?
15         Q.    Yes.
16         A.    "The facts that the trading activity of
17     Rhino was consistent with legitimate profit
18     maximizing motives and that the vast majority of the
19     decline in Sedona's stock price occurred before Rhino
20     began trading in Sedona's common stock demonstrate
21     that Rhino did not pursue and had no rational to
22     pursue -- artificial depressing the price of Sedona
23     stock."
24         Q.    I understand.  Okay?
25             But isn't your conclusion that Rhino did

---

27 (Pages 102 to 105)

Tsvetan Beloreshki                                                                    March 2, 2010
New York, NY

Page 106

T. Beloreshki - Direct

1 not pursue a manipulative strategy aimed at
2 artificially depressing the price of this stock?
3     A.    My conclusion is that data do not support
4 the idea or the allegation that Rhino pursued a
5 manipulative strategy.
6     Q.    That data did not support the conclusion
7 that Rhino engaged in a manipulative strategy.  Is
8 that what you're saying?
9     A.    The allegation, yes.
10    Q.    The data did not support the conclusion --
11 or the allegation that Rhino engaged in a
12 manipulative strategy.
13        Okay.  Now I want to go back to my
14 statistical questions for you, and that is we were
15 talking about hypotheses, I think, the hypothesis and
16 the null hypothesis in a regression analysis, and I
17 think you testified that the way of regression
18 analysis determines whether or not the hypothesis is
19 significant -- and that can be determined by various
20 correlations -- is by determining whether you can
21 exclude the null hypothesis.  Is that a fair
22 characterization?
23    A.    No.
24    Q.    Okay.  Well, what is your characterization

Page 107

T. Beloreshki - Direct

1 of what a statistical analysis that you conducted
2 regression analysis that you conducted here did?
3     A.    Are we talking only about the regression
4 analysis presented?
5     Q.    Only about the regression analysis.
6     A.    We performed what are known -- We actually
7 perform a battery of what are known as linear
8 regressions.
9     Q.    Pardon?
10    A.    Linear regressions.
11    Q.    Okay.
12    A.    Which are rather common and typically used
13 in the industry for purposes like those, and those
14 were formulated or the models were specified with the
15 goal of identifying possible ways that manipulation
16 would come out or indicators of manipulation would
17 come out, so the first step which was taken -- and
18 that was taken many, many years ago, was to think
19 about what type of variables may explain what type of
20 variables related to Rhino's trading in addition to
21 market variables may potentially explain some portion
22 of the variation in the underlying stock price.
23        So the variables that we settled at some
24 point were variables related to physical presence of

Page 108

T. Beloreshki - Direct

1 trading, whether or not transactions on behalf of
2 Rhino were executed, whether those were buys or sells
3 as a subset of those.  In addition to those variables
4 related to the volume of observed trading, and in
5 addition to that variables relating to the liquidity
6 of the marketplace, so these were the variables that
7 a priori were thought of as potential candidates to
8 explain the variability in the underlying stock
9 price.
10        So at that point we essentially specified
11 a number of family of alternative regression models,
12 basically think of it as a number of tests, testing
13 various regression specifications and, in addition to
14 that, we formulated a number of time frames that one
15 might want to perform those analyses over, and those
16 were based on objective factors that an economist
17 would take into consideration.
18    Q.    Well, that's very fine, but I don't think
19 you answered my question.  My question is, what was
20 the hypothesis that you were testing?
21    A.    There are a number of hypotheses that are
22 being simultaneously tested.  That is the point of
23 the regression analysis, and these include whether or
24 not there's a relationship between the returns of the

Page 109

T. Beloreshki - Direct

1 underlying stock and market factors and whether or
2 not there was a relationship between the returns of
3 the underlying stock and the variables that I just
4 talked about that potentially could explain the
5 valuation in these returns.
6     Q.    Well, the variables, whether it be --
7 whether Badian I was trading or not trading, that was
8 one of the variables, I think.  Whether he was
9 selling or not selling was another variable.  Whether
10 he was buying or not buying was another variable that
11 you mentioned.  Whether or not he engaged in
12 transactions or not engaged in transactions was
13 another variable.  But all of those are variables
14 about Badian's trading activities.  Correct?
15        MR. SOHN:  Objection to form.
16    A.    All variables we have used are variables
17 related to Rhino's trading tickets.
18    Q.    Weren't you trying to determine whether or
19 not -- using all of these variables, whether Badian's
20 trading activities affected Sedona's stock price?
21 Wasn't that the hypothesis that you were testing for?
22    A.    As I just said, there were multiple
23 hypotheses being tested here.
24    Q.    One of the hypothesis is whether or not he

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

---

**Page 110**

1          T. Beloreshki - Direct
2    sold had an impact on the price.  Right?  You did
3    five regression analysis, Mr. Beloreshki.  One of
4    them considered sales.  Right?
5          A.  I am --
6          MR. SOHN:  Objection.
7          A.  -- not certain what you're referring to
8    first --
9          Q.  I didn't say first.  I said one of them.
10         A.  Sales.  What do you mean by sales?
11         Q.  Badian selling stock, Sedona stock.
12         A.  That would be incomplete.  Badian was
13   buying and selling stock.
14         Q.  I understand.
15         Well, what difference did it make whether
16   there was a relationship between Badian trading stock
17   and the price of the stock?
18         A.  I do apologize.
19         Q.  I gather you are having trouble.
20         Let's take a look at Exhibit -- Exhibit
21   Number 13.  In particular -- Let's just use 13A.  See
22   the various columns running across the page?
23         A.  I do.
24         Q.  Okay.  One of them says any Rhino trading,
25   doesn't it?

---

**Page 111**

1          T. Beloreshki - Direct
2          A.  Yes, it does.
3          Q.  What does that refer to?
4          A.  That refers to an indicator variable that
5    flags any occasion when Rhino was trading.
6          Q.  Okay.  Now, is the hypothesis that's being
7    tested with that regression as reflected in that
8    column, whether any Rhino trading had an impact on
9    Sedona's price?
10         A.  Whether this impact was statistically
11   significant, yes.
12         Q.  Okay.  So that's the hypothesis that
13   you're testing?
14         A.  Yes.  I agree with you, sir.  It's just
15   that also testing in this regression is the
16   hypothesis what a NASDAQ --
17         Q.  In each of these regressions, you factored
18   out the impact of NASDAQ.  Correct?
19         A.  Yes.  So --
20         Q.  So it's a two-variable, one-sided --
21   right?
22         A.  It's a two variable analysis.
23         Q.  So the hypothesis that's being tested is
24   did Rhino's trading have an impact on Sedona's price?
25   That's the hypothesis, factoring out the impact of

---

**Page 112**

1          T. Beloreshki - Direct
2    NASDAQ.
3          A.  Did the fact of Rhino's presence in the
4    marketplace have a statistically significant impact,
5    yes.
6          Q.  So that's the hypothesis?
7          A.  Correct.
8          Q.  The second were Rhino purchases --
9          A.  Yes.
10         Q.  That's testing whether or not when Rhino
11   made purchases, did that have an effect on the Sedona
12   price.  Right?
13         A.  Purchases and sale.  Yes.
14         Q.  So that's the hypothesis?
15         A.  Correct.
16         Q.  For Rhino sales, okay.
17         And the days that it sold was the
18   hypothesis they were trying to determine whether or
19   not Rhino sales had an impact on the market in a
20   statistically significant way?
21         A.  Yes.
22         Q.  And the same thing for Rhino transfers.
23   Correct?
24         A.  Yes.
25         Q.  And the same thing for Rhino principal.

---

**Page 113**

1          T. Beloreshki - Direct
2    Correct?
3          A.  Correct.
4          Q.  And the same thing for net daily shares
5    transacted as a percentage of total reported volume.
6          A.  Regression Number 4, yes.
7          Q.  Now, let's just -- Let's just do any Rhino
8    trading.  Okay?  Let's go back to the first one.  The
9    hypothesis is did Rhino trading have an impact in
10   Sedona's stock price in a statistically significant
11   way.  That's the hypothesis.  Correct?
12         A.  I believe I answered that question.  The
13   hypothesis is, did the presence of Rhino in the
14   marketplace for Sedona stock have an impact on
15   Sedona's stock price.
16         Q.  What's the null hypothesis?
17         A.  The null hypothesis is that the
18   coefficient in front of that indicated variable is
19   zero.
20         Q.  No.  What's the null hypothesis that's
21   being determined, not what's the result of the
22   regression?  What is the null --
23         A.  I just gave you the answer.
24         Q.  So it's zero.  What does the zero reflect?
25         A.  I have no idea what you're talking about.

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                              March 2, 2010
New York, NY

Page 114

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2      Q.   You said regression one is zero.  Right?
3      A.   I did not say regression one is zero.
4      Q.   I thought you said zero.  Excuse me.  I
5   may be wrong.
6      A.   Okay.  At this point --
7      Q.   Hmm?
8      A.   At this point we're at cross-purposes.
9   Can we start this conversation again?
10     Q.   The question is, what is the null
11  hypothesis of the hypothesis that when Rhino is a
12  presence in the market it has an impact on the price?
13  What's the null hypothesis that you're trying to
14  exclude with that analysis?
15     A.   I'm not trying to exclude anything.
16     Q.   Okay.
17     A.   The null hypothesis is that the
18  coefficient related to the variable in any Rhino
19  trading is zero.
20     Q.   So the correlation means there is no
21  correlation?
22     A.   Not what I said.
23     Q.   Okay.  What does that zero mean?
24     A.   Zero.
25     Q.   Just zero?  Zero has no meaning in this

Page 115

1          T. Beloreshki - Direct
2   context?
3      A.   I gave you the meaning of your question.
4   I don't know where you're going.
5      Q.   What was the meaning?  I'm sorry.  I may
6   be dense, but I missed it.
7      A.   The hypothesis, again, is that the
8   coefficient related to that variable is equal to
9   zero.
10     Q.   Well, let me give you a hypothetical.
11  Okay?  Maybe it will make it a little easier for us.
12  Suppose you wanted to know whether X existed.  Okay?
13  By doing your regression analysis between Y and Z.
14  Please bear with me.  You're the mathematician.  I'm
15  not.
16     A.   I used to be.  Yes.
17     Q.   And suppose you obtain a 95 percent
18  correlation when you do that.  What does a 95 percent
19  correlation tell us?  To help you even further, does
20  a 95 percent correlation --
21     A.   Correlation is a linear measure -- is a
22  measure of linear co-dependence between two
23  variables.
24     Q.   So if you find a 95 percent correlation or
25  confidence, does that support the statement that an

Page 116

1          T. Beloreshki - Direct
2   inference can be drawn that X exists?
3          MR. SOHN:  Objection to form.
4      A.   First, correlation is different than
5   significance, and I don't believe that these
6   statistics would make inferences about existence.
7      Q.   What?  Why not?
8      A.   I'm lost in your question.
9      Q.   Maybe I'm misunderstanding how the formula
10  works, but it seems to me that you're comparing two
11  variables, a dependent variable and an independent
12  variable, to determine whether or not a third thing
13  occurs.  Correct?  Isn't that what a statistical
14  regression analysis does?
15     A.   I'm not sure I understand the question.
16  What it does is it tries to determine whether or not
17  there is a linear relationship between the dependent
18  variable and the various independent variables.
19     Q.   Right.  And if you come out with a 95
20  percent -- confidence, is that the right term?  95
21  percent confidence?
22     A.   What is the question?  I'm sorry.
23     Q.   What does 95 percent refer to to you when
24  you use it in the context of a regression analysis?
25     A.   Typically -- and I can't help but guess

Page 117

1          T. Beloreshki - Direct
2   what you're -- trying to tell you is 95 percent
3   typically refers to a confidence level.
4      Q.   Okay.  And when I look at Exhibit 13A,
5   when you look at these percentages, you talk in terms
6   of significance.
7      A.   Correct.
8      Q.   So it's a confidence level that something
9   exists, that a relationship exists between two
10  variables.  Is that fair enough?
11     A.   Yes.
12     Q.   So if you get a 95 percent -- what is it,
13  significance percentage?  What do you call it, the
14  correlation?
15     A.   That would be 95 percent confidence.
16     Q.   95 percent confidence.  So now we've got
17  it clear what the term is, so if you get a 95 percent
18  confidence, using my hypothetical, the relationship
19  between the Y and Z and it results in an answer that
20  there's a 95 degree confidence that X exists.  Okay?
21         MR. SOHN:  95 degree?
22     Q.   95 degree confidence that X exists?
23     A.   I don't understand what you mean by X
24  exists.  I have no idea what you mean by that.
25     Q.   I'm trying to use abstract terms.  Don't

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

---

Page 118

                T. Beloreshki - Direct
1
2    mathematicians use abstract terms?  I'm trying to get
3    away from this report.  I'm trying to get you to talk
4    about the theory.  Okay?
5        A.   Sir, you're using abstract terms and I
6    have sworn testimony.
7        Q.   Pardon?
8        A.   I can't give you abstract answers.
9        Q.   You can answer hypotheticals, can't you?
10       A.   I'm doing my best, but I don't
11   understand --
12       Q.   Hypothetical is if you want to determine
13   whether or not X exists, suppose you want to
14   determine whether X exists and to do that you want to
15   do a statistical regression analysis of the
16   relationship between Y and Z.  Okay?  And suppose you
17   end up with a result of a 95 percent confidence level
18   after doing that regression analysis.  What does that
19   tell you?
20           MR. SOHN:  Objection.
21       Q.   Can you answer the question?
22       A.   I cannot answer the question.
23       Q.   What if you do not get a 95 percent
24   confidence level?  What does that tell you?
25           MR. SOHN:  Objection.

---

Page 119

                T. Beloreshki - Direct
1
2        A.   Same, answer, sir.  I do not understand
3    your question.
4        Q.   In my hypothetical, what is the null
5    hypothesis?
6        A.   About the existence of some X, I have no
7    idea.
8        Q.   The null hypothesis is that X does not
9    exist.  Or is the null hypothesis that you can't
10   demonstrate that X exists with the regression
11   analysis?
12       A.   At this point I'm willing to call myself
13   dense, but I do not understand.
14       Q.   Pardon?
15       A.   I do not understand.
16       Q.   You just don't have a clue, do you, what
17   I'm talking about?
18           MR. SOHN:  Objection.
19       A.   I do not understand the question as you
20   have framed it, sir.
21       Q.   Okay.  Let's go back to any trading, any
22   Rhino trading since you did that statistical
23   analysis.  If you got a 95 percent confidence level,
24   okay?  Take that -- just take that as a hypothetical
25   -- with any Rhino trading in Sedona prices, can you

---

Page 120

                T. Beloreshki - Direct
1
2    show -- and the results turn out that you get a 95
3    percent confidence level, does that show you that any
4    Rhino trading with 95 degree -- 95 percent
5    confidence, had an impact on Sedona's stock price?
6            MR. SOHN:  Objection.
7        A.   First to clear --
8        Q.   I'm just giving you a hypothetical.
9        A.   It is a hypothetical, but it's based on
10   something we actually know, so --
11       Q.   It's not something you may be familiar
12   with, and maybe, you know, you -- it's easier for you
13   to deal with concrete matters than abstract matters?
14       A.   Except that your hypothetical is built on
15   the opposite result in the report.
16           If you -- if you run a statistical test
17   and the statistical test came up with an indication
18   that the coefficient in front of that variable was
19   significant to 95 percent confidence level, that
20   means that if you were to repeat that test a number
21   of times, a hundred times, 95 of those results would
22   come up roughly the same, and 5 percent of the time
23   you would reject the hypothesis when the null is
24   true.
25       Q.   You would reject the null hypothesis?

---

Page 121

                T. Beloreshki - Direct
1
2        A.   When it actually is true.
3        Q.   When -- I'm sorry.  I missed the last -- I
4    have a hard time hearing you sometimes.
5        A.   All I'm saying is that 95 percent
6    confidence interval is not -- does not give you a
7    guarantee.
8        Q.   I didn't ask you for a guarantee.  I'm
9    just asking what it told you.
10       A.   Well, sir, I'm answering your question and
11   you're interrupting.
12       Q.   Okay.  So answer my question.
13       A.   What is your question?
14       Q.   My question is, what does the 95 percent
15   confidence level tell you in my hypothetical about
16   the relationship of Rhino trade -- any Rhino trading
17   to Sedona's stock price?
18       A.   I believe I just gave you that answer.
19       Q.   Please give it to me again because I
20   didn't understand you.
21       A.   Of course.  If you have a result that
22   shows that a particular coefficient differs from,
23   say, zero, if this is the way you have set up your
24   null hypothesis and that the -- and that that
25   difference is at 95 percent significance level, that

---

                                        31 (Pages 118 to 121)

Tsvetan Beloreshki                                      March 2, 2010
New York, NY

---

Page 122

1        T. Beloreshki - Direct
2    generally means that if you were to get a hundred
3    samples from the same population and rerun this test,
4    you'll get the same result 95 percent of the time.
5        Q.   Well, what is the null hypothesis of my
6    hypothetical?
7        A.   If I follow you correctly, it is that the
8    coefficient in front of any Rhino -- associated with
9    the variable on any Rhino trading is zero.
10       Q.   Well, let me give you my hypothetical.
11   Okay?  Maybe it will clarify.  You do any correlation
12   between any Rhino trading and Sedona stock price and
13   you come up with a confidence level of 65 percent.
14   What does that tell you about the relationship of
15   Rhino trading to Sedona stock price?
16       A.   There's a significant chance that what
17   you're observing is due to chance.
18       Q.   Does -- If you come up with the 65 percent
19   confidence level in my hypothetical, does it tell you
20   that Rhino's trading did not have an impact on
21   Sedona's stock?
22       A.   What it does tell you is that you would
23   fail to reject the null hypothesis.
24       Q.   But not that the null hypothesis is true.
25   Right?

---

Page 123

1        T. Beloreshki - Direct
2        A.   Correct.
3        Q.   If -- Let's take the hypothetical one step
4    further, and let's say that you do this analysis
5    between any Rhino trading and Sedona stock and you
6    come up with a confidence level that is less than
7    zero, a negative number.  What does that tell you
8    about the null hypothesis?
9            MR. SOHN:  Objection.
10       A.   I have no idea what you're saying.
11       Q.   You have no idea.  Have you ever heard of
12   the zero correlation in statistical analyses?
13       A.   Zero correlation?
14       Q.   Yes.
15       A.   Yes.
16       Q.   What does that refer to?
17       A.   As I said correlation is a measure of
18   linear codependence between two variables and it may
19   well be that variables can be uncorrelated.
20       Q.   And if you come up with a negative
21   correlation, what does that tell you?
22       A.   Roughly speaking in the stock world, that
23   when the return of one stock goes up, the other one
24   is going down and vice versa.
25       Q.   It essentially says that the null

---

Page 124

1        T. Beloreshki - Direct
2    hypothesis is correct by some degree of confidence.
3    No?
4        A.   I don't know -- no.
5        Q.   Well, how do you prove -- if you were
6    comparing any Rhino trading to Sedona stock price,
7    okay, in a regression analysis, what result would
8    you have to get from the correlation to prove that
9    Rhino's trading did not have an impact on Sedona's
10   stock?
11       A.   First, statistics doesn't deal with
12   proofs.  We cannot prove or disprove anything.
13       Q.   Well, you demonstrate something by 95
14   percent confidence, don't you?
15       A.   Demonstrate something -- I'm not sure what
16   you mean by "demonstrate something."  You may have a
17   result that has associated with it 95 percent
18   confidence level.  Whether or not you are
19   demonstrating something, that's a different point.
20       Q.   Right.  Now, with regard to my
21   hypothetical, any Rhino trading versus Sedona stock
22   price, what confidence level do you have to reach to
23   be able to say that with 95 degree confidence,
24   Rhino's trading did not have an effect on Sedona
25   stock?

---

Page 125

1        T. Beloreshki - Direct
2            MR. SOHN:  Objection.
3        A.   Generally speaking, economists use
4    confidence interval -- confidence levels of 90, 95,
5    99.
6        Q.   I understand that.  But what confidence
7    level do you have to have to support the conclusion
8    that any Rhino trading did not have an effect on
9    Sedona's stock by a -- an acceptable degree of
10   confidence?
11           MR. SOHN:  Objection to form.
12       A.   I just gave you the three levels of
13   confidence that are typically used.  I personally
14   don't tend to subscribe to the 90 degree -- to the 90
15   percent confidence level idea, but 95 or 99.
16       Q.   Okay.  Fine.
17           Did any of your regressions that you did
18   show that the activity that you were measuring -- and
19   there are four different activities, independent
20   variables, being the trading, the Rhino trading
21   activity which you referred to --
22           Taking each of those, did any of your
23   regression analysis show by 95 degree confidence that
24   the trading that you were measuring did not affect
25   Sedona's price?

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                                    March 2, 2010
New York, NY

1        T. Beloreshki - Direct
2        MR. SOHN:  Object to form.
3        A.   First, as I testified earlier, we
4    performed a battery or a family of tests, so if you
5    were to analyze the results of our regressions
6    properly, then you cannot reach the conclusion that
7    any of these variables were significant at 95 percent
8    confidence level.
9        Q.   The null hypothesis is not 95 percent --
10   confident.
11       A.   I don't understand.
12       Q.   I'm sorry.
13           I'm looking at these -- There's six on
14   this chart, 13A, I'm looking at.  There's six
15   regression analyses.  Okay?
16       A.   No.  That's not true.
17       Q.   Excuse me.  There are four.  Okay.  I'm
18   sorry.
19           There are four.
20       A.   Yes.
21       Q.   And some of them include various factors
22   and some only include one factor.
23       A.   Correct.
24       Q.   And, with regard to the four regressions
25   that are reflected on this page, did any one of them

1        T. Beloreshki - Direct
2    demonstrate the existence of the null hypothesis;
3    i.e., that Sedona's activity -- I mean, Badian's
4    activity, or you say Rhino's activity, had no effect
5    on Sedona's stock price to 95 degree confidence?
6        MR. SOHN:  Objection to form.
7        A.   All of the regression analyses we have
8    performed, including the four on this page, failed to
9    reject the hypothesis that Rhino's trading had a
10   material impact on Sedona stock price.
11       Q.   I'm sorry.  Will you rephrase that?
12       MR. SOHN:  Objection.
13       A.   No.
14           (The last answer is read back by the
15   reporter.)
16       Q.   They failed to reject that Sedona's
17   trading -- I mean, Rhino's trading -- had an impact
18   on Sedona's stock price.  Is that what you're saying?
19       A.   That's my answer.
20       Q.   Did any of the regressions show that --
21   did any of the regressions show that Rhino's trading
22   did not have an impact on Sedona's stock price to 90
23   degree confidence?
24       A.   The null hypothesis that we are testing is
25   that Rhino's trading did have an impact, and that --

1    we failed to reject the null hypothesis in our
2    analyses.
3        Q.   Well, failure to reject means one thing.
4    Right?
5        A.   It means what it means.
6        Q.   And proving the null hypothesis is
7    another.  Correct?
8        A.   As I said earlier, statistics is not -- or
9    regression analysis cannot be used to prove
10   something.
11       Q.   Well, it can be used to demonstrate to
12   with a 95 degree confidence?
13       A.   That's a different --
14       Q.   Isn't it true that none of these
15   regression formulas demonstrate with 95 degree
16   confidence that Rhino's trading did not have an
17   impact on Sedona's stock?
18       MR. SOHN:  Objection to form.
19       A.   I can't give you a different answer than
20   what I did give you.  The null hypothesis is that --
21   tests whether or not Rhino's trading did have an
22   impact.
23       Q.   Well, you're saying that the null
24   hypothesis that you couldn't reject is that -- you

1        T. Beloreshki - Direct
2    couldn't demonstrate that the null hypothesis had
3    been rejected in your correlations.  Isn't that
4    right?
5        A.   I -- sir, at this point I'm interpreting
6    your questions, but they are not clear.  So I am
7    doing my best, but I would be amiss if I said that I
8    understand them.
9        Q.   Well, was it your conclusion that Rhino
10   did not engage in a manipulative strategy aimed at
11   artificially depressing the price of Sedona's shares?
12       A.   My conclusion was that the data do not
13   support a conclusion that Rhino's trading affected
14   Sedona's stock price.
15       Q.   That the data was what -- inconclusive,
16   did you say?
17       A.   The data failed to support the allegation
18   of manipulation, in part because it failed to support
19   the idea that Rhino trading had a material impact on
20   Sedona stock price.
21       Q.   But the data did not support the
22   conclusion that Rhino did not pursue a manipulative
23   strategy.  Isn't that correct?
24       A.   I stand by my previous answer.  I don't --
25       Q.   You just don't know.  I mean, it seems to

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 130

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2     me it's a fairly simple question.  Did Rhino's
3     traders not artificially depress the price of
4     Sedona's shares?
5          A.   As I said, we cannot prove or disprove
6     anything using statistical methods.
7          Q.   You can't -- You can't -- okay.  It says
8     here, "The economic analysis and empirical evidence
9     demonstrates that Rhino did not pursue a manipulative
10    strategy aimed at artificially depressing the price
11    of Sedona shares."
12          That's a statement of a conclusion.
13          A.   That is a statement of a conclusion and it
14    very clearly states in the beginning that this
15    conclusion is based on statistical analyses, and this
16    is the way you interpret statistical analyses, not a
17    hundred percent proofs, but for what they are, tests
18    of hypotheses.
19          Q.   Really?  Really?
20          Now, if you don't have a 95 degree
21    confidence level -- which you think is the
22    appropriate level -- correct?
23          A.   It's the one generally used.
24          Q.   Okay, and it's the one you're accepting,
25    right?

---

Page 131

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2          If you don't have a 95 degree confidence
3     level, doesn't it only tell you that the data doesn't
4     support an inference to 95 degree of confidence that
5     Sedona's trading had an effect on the stock price?
6          MR. SOHN:  Objection to form.
7          A.   The data does not allow to reject a null
8     hypothesis which would mean that Rhino's trading had
9     a material impact on Sedona's stock price.
10          Q.   So, in other words, the data doesn't
11    exclude the null hypothesis that Rhino's trading did
12    not have an impact effect on Sedona's stock price?
13          A.   We can't prove or disprove anything.
14          Q.   Okay.
15          A.   Okay?
16          Q.   But you can -- you can create inferences.
17    Right?
18          A.   I can or cannot?
19          Q.   Or you can create significance?  Okay?
20          A.   No.  I cannot create significance.
21          Q.   Really?  Why do you use the term
22    "significance" in Exhibit 13A then, if you can't
23    prove it?  It says, denotes significance of five
24    percent.  Why did you use significance if you can't
25    demonstrate it?

---

Page 132

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2          A.   Sir, your question was whether I can
3     create significance, and I was making the point that
4     I cannot create significance.
5          Q.   Can you -- can the studies create
6     significance?
7          A.   No.
8          Q.   They can't?  Why do you use the term then,
9     denote significance at 5 percent in Exhibit 13A?
10          A.   It's a term of art.
11          Q.   Okay.  What does the term of art mean to
12    you, nothing?
13          A.   Do we have to shout at each other?
14          Q.   I'm sorry.
15          A.   Sir, as I said, there are confidence
16    levels.  The typical one is 95 percent, and this is
17    the way it is used in statistics.  It is used to
18    reject or fail to reject a particular null
19    hypothesis.
20          Q.   So if you get below 95 percent, okay?  You
21    fail to reject the null hypothesis?  Is that a fair
22    conclusion?
23          A.   At 95 percent confidence level, yes.
24          Q.   All right.  And if you get below 95
25    percent, have you demonstrated the existence of the

---

Page 133

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2     null hypothesis?
3          A.   The existence of -- I have failed to
4     reject the null hypothesis.
5          Q.   Okay.  But you don't prove the existence
6     of the null hypothesis?
7          A.   The null hypothesis is something that is
8     postulated for the purpose of the test.  I can either
9     reject it or fail to reject it.  These are the only
10    two things I can do with it.
11          Q.   That's all you can do.  Okay.  You can't
12    do anything more than fail to reject it?
13          A.   I'll think very hard about it, but I don't
14    think I can.
15          Q.   Well, can you come up with an analysis to
16    prove -- a statistical analysis to prove the null
17    hypothesis that Rhino's trading did not have an
18    effect on Sedona's stock?
19          A.   I'll consider it.
20          Q.   All right.  I'm asking you to do it now.
21          A.   Can I prove it now?  Can I prove it now,
22    statistically?
23          Q.   Can you tell me how you would?
24          A.   As I said -- and even your experts have it
25    in their report, that statistical methods cannot be

---

34 (Pages 130 to 133)

Tsvetan Beloreshki                                              March 2, 2010
New York, NY

Page 134

1           T. Beloreshki - Direct
2  used to prove or disprove anything.
3       Q.   Well, I think as I read the reports -- if
4  you come up in your report, if you come up with a 95
5  degree statistical significance, that that's an
6  important finding.  Is that fair?
7       A.   A potentially important finding.
8       Q.   Huh?
9       A.   Potentially important finding.
10      Q.   Potentially.  And that -- can you come up
11 with a potentially methodology to determine whether
12 or not any Rhino trading did not have an effect --
13 effect on Sedona's stock price?
14      A.   Again, I'll -- I'll have to think about
15 it.  Probably I'll leave it to your experts.
16      Q.   Okay -- well, okay.  But your analysis
17 don't do that, do they?  Your regression?
18      A.   My analysis do what they do.
19      Q.   Pardon?
20      A.   My analysis do what they do.
21      Q.   I understand, but I'm asking you what do
22 you think they do?  You're the expert.
23      A.   We test the hypothesis whether or not
24 Rhino's trading had a statistically significant
25 impact on Sedona's stock price, and we failed to

Page 135

1           T. Beloreshki - Direct
2  reject that hypothesis.
3       Q.   You failed to reject --
4       A.   Correct.
5       Q.   -- the hypothesis that Sedona's -- or
6  Rhino's trading did not have a significant impact.
7  No?
8       A.   I believe you misspoke, but --
9       Q.   That I misspoke or you misspoke?
10           MR. GUIDO:  Why don't you read back the
11 last answer, please.
12           (The last answer is read back by the
13 reporter.)
14      Q.   Failed to reject the hypothesis that
15 Rhino's trading had a significant impact on Sedona's
16 stock price.  Is that what you said?  That's what I
17 just heard the court reporter read back.
18      A.   Correct.
19      Q.   So, in other words, you found that there
20 was a statistically significant relationship between
21 Rhino's trading and Sedona's stock price?
22      A.   Just the opposite.  We were not able to
23 find a statistically significant relationship.  The
24 data did not establish a statistically significant
25 relationship between Rhino's trading and Sedona's

Page 136

1  stock price.
2       Q.   Okay.  Did the data result in a
3  statistically significant finding that Sedona's stock
4  price did not have -- I mean, Rhino's trading did not
5  have an impact on Sedona's stock price?
6       A.   I believe I've answered this one numerous
7  times by now.
8       Q.   It seems to me it's a very simple answer,
9  yes or no.  Did it do something or didn't it do it?
10      A.   What we did was to test the hypothesis
11 whether or not Rhino's trading had a material
12 statistically significant impact on Sedona's stock
13 price.  We failed to reject that hypothesis.  That's
14 what we did.
15      Q.   Okay.  Now, I'm asking you is what you
16 did -- can one draw the conclusion that there was --
17 that there was a statistically significant
18 relationship that demonstrates that Rhino's trading
19 did not have an impact on Sedona's stock price?  I'm
20 asking you whether or not, based on your own data,
21 whether that supports that conclusion.
22      A.   The data support that conclusion to the
23 extent that the results of our analyses are what they
24 are.
25

Page 137

1           T. Beloreshki - Direct
2       Q.   In other words, you can't answer the
3  question, can you?
4       A.   Well, given that you have decided that I
5  can't, I probably can't.
6       Q.   Pardon?
7       A.   I can't give you a better answer, sir, to
8  what I have given you so far.
9       Q.   So you don't know whether or not your
10 analysis demonstrates to a significantly --
11 significant degree that Rhino's trading did not have
12 an impact on Sedona's stock?  You can't tell?
13           MR. SOHN:  Objection.
14      A.   Our analyses are aimed at determining
15 whether or not the trading had statistically
16 significant impact, and the data failed to show that.
17 That's as much as I can do as a statistician.
18      Q.   Okay.  Did the analysis that you do, was
19 it an attempt to determine whether or not there was a
20 significantly -- significant relationship that
21 demonstrated Rhino's trading did not affect Sedona
22 stock price?
23           MR. SOHN:  Object.  This is maybe the 15th
24 time you've asked this question.
25      A.   Sir, if I could give you a better answer,

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                    March 2, 2010
New York, NY

Page 138

T. Beloreshki - Direct
1
2   I would.
3       Q.   So you don't know?
4       A.   I have given you answers to that question
5   many times.  I -- I can't --
6           MR. GUIDO:  Let's take a five-minute
7   break.
8           THE VIDEOGRAPHER:  The time is 2:30.
9   We're going off the record.  This marks the end of
10  Tape Number 2.
11          (Whereupon, a recess is taken.)
12          THE VIDEOGRAPHER:  The time is 2:42.
13  We're back on the record.  This is Tape Number 4.
14  BY MR. GUIDO:
15      Q.   I have three concluding questions along
16  this line, and I want to ask them very carefully and
17  I want you to think about them very carefully.
18          The first is you have stated that you
19  failed to reject the null hypothesis that Rhino had
20  no effect on Sedona's prices.  Is that correct?
21      A.   Based on the regression analyses and the
22  statistical analyses we performed.  Correct.
23      Q.   Now, based on the regression analyses that
24  you did do, can you conclude with a high degree of
25  confidence that Rhino had no effect on Sedona's

Page 139

T. Beloreshki - Direct
1
2   prices?
3       A.   I cannot make a conclusion beyond what is
4   in the report, which is that we failed to reject the
5   hypothesis.
6       Q.   That's all I asked you.  Was it -- based
7   on the regression results that you did perform, can
8   you today testify that you conclude with a high
9   degree of confidence that Rhino had no effect on
10  Sedona's prices?
11      A.   Same answer.
12      Q.   So you can't -- you can't answer that
13  question.
14      A.   No.  I gave an answer to that question
15  numerous times.
16      Q.   When you did your analysis that is
17  reflected in Exhibit Number 4 --
18      A.   Yes.
19      Q.   -- your expert report, did you intend to
20  determine with a high degree of confidence that
21  Rhino's trading had no effect on Sedona's stock
22  price?
23      A.   My intentions have nothing to do with it.
24  My intentions have nothing to do with it.
25      Q.   So I'm asking -- You may not think they

Page 140

T. Beloreshki - Direct
1
2   have nothing to do with it, but I'm asking the
3   question and I want a yes-or-no answer.  If you
4   refuse to answer, state that you refuse to answer,
5   but you don't have the right to determine whether
6   your intentions have anything to do with this case or
7   your testimony in this case, so please answer my
8   question.
9           Did you intend to test that Rhino's
10  trading had no effect on Sedona's stock price?
11          MR. SOHN:  Objection to that admonition.
12      A.   The test we performed --
13      Q.   I didn't ask you about the test you
14  performed.  I asked you did you intend to test the
15  hypothesis that Rhino's trading had no effect on
16  Sedona's stock price?
17          MR. SOHN:  Mr. Guido, you need to let the
18  witness answer the question.
19          MR. GUIDO:  The witness was not answering
20  my question.
21      Q.   The question was did you intend to test
22  the hypothesis that Rhino's trading had no effect on
23  Sedona's stock price.
24      A.   It is difficult for me to answer that
25  question given the use of the word "intend."  We were

Page 141

T. Beloreshki - Direct
1
2   asked to perform statistical analysis to determine
3   whether or not a statistical relationship can be
4   determined between Rhino's trading and Sedona's stock
5   price, which is what we did.
6       Q.   Okay.  Were you asked to test the
7   hypothesis that Rhino's trading had no effect on
8   Sedona's stock price?
9       A.   I just described what we were asked to do.
10  And --
11      Q.   That's not what I asked you.  I asked
12  you --
13          MR. SOHN:  Please let the witness finish
14  his answers.
15          MR. GUIDO:  I understand that, but the
16  witness is being evasive and I want an answer or I'm
17  going to the Court.  We're going to take a break and
18  I'm going to the Court and have the court reporter
19  read the questions to the judge and I'm going to ask
20  the judge to order him to answer the questions.
21          Now, answer the questions!
22          MR. SOHN:  Mr. Guido, there's no reason to
23  scream at the witness, first of all.
24          MR. GUIDO:  All right.  Fine.  I don't
25  think I'm screaming.

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

---

Page 142

1              T. Beloreshki - Direct
2      A.   You are.
3      Q.   I'm speaking with a loud voice.
4      A.   No.  I'm not speaking --
5      Q.   I'm sorry.  I have a hearing problem.
6  Sometimes I don't --
7      A.   I appreciate that, sir.
8      Q.   Okay.  So the question is, did you intend
9  to test the hypothesis that Rhino's trading had no
10  effect on Sedona's stock price?
11         MR. SOHN:  You've asked the question three
12  times already.
13      A.   As I said, I cannot answer this question
14  given your use of the word "intend."  The scope of
15  the studies is defined in the report, and I could
16  quote you from there.
17      Q.   Well, did you account to test the
18  hypothesis that Rhino's trading had no effect on
19  Sedona's stock price?
20         MR. SOHN:  Now it's about the 20th time
21  you've asked the question.
22      A.   The best way I can answer this question is
23  that this question is addressed in -- the statistical
24  analysis we did which approached it from the side of
25  whether or not one can establish a relationship

---

Page 143

1              T. Beloreshki - Direct
2  between Rhino's trading and Sedona's stock price.
3         MR. GUIDO:  Okay.  Let's take a break.
4  We're going to call the Court.
5         THE VIDEOGRAPHER:  We're going off the
6  record.
7         THE REPORTER:  The time is what?
8         THE VIDEOGRAPHER:  2:48.
9         (Whereupon, a recess is taken.)
10         THE VIDEOGRAPHER:  The time is 2:54.  We
11  are back on the record.
12  BY MR. GUIDO:
13      Q.   I would like you take a look at Exhibit
14  Number 5 which is The Frontiers of Convertibles
15  Financing.
16      A.   Yes, sir.
17      Q.   Now, you indicated that you prepared this
18  after you had done some earlier work on the question
19  of market manipulation and -- convertible debentures.
20  Is that a fair characterization?
21      A.   I believe that is the timing of it.
22      Q.   And who -- Who proposed that you prepare a
23  joint piece on The Frontiers of Convertibles
24  Financing?
25      A.   I don't have a recollection of that, who

---

Page 144

1              T. Beloreshki - Direct
2  proposed what and when, but in all likelihood, it
3  would have been me to the extent that I felt the
4  piece could benefit from somebody with legal
5  expertise, which is something I clearly lack.
6      Q.   Why do you think it would benefit from
7  having someone with legal expertise to participate?
8      A.   Because of the focus of the piece and the
9  extent that there was -- you know, I work in
10  securities litigation.
11      Q.   Pardon?
12      A.   I work in securities litigation.  I'm a
13  financial economist.  I'm not a litigator.
14      Q.   Okay.  So why did you think it was
15  important to have the input of lawyers?
16      A.   I just gave you the answer.  I'm an
17  economist; I work in securities litigation; there are
18  people who know more than I do.
19      Q.   Was the paper presented at any forum?
20      A.   Not that I know of.
21      Q.   A conference?
22      A.   Not that I know of.
23      Q.   Was it published in any way?
24      A.   It was issued as a NERA working paper at
25  the time, and I believe that's about as much as it

---

Page 145

1              T. Beloreshki - Direct
2  went in terms of formal publication.
3      Q.   Okay.  Now, in the paper, there are a
4  number of statements I would like to ask you about,
5  and one of them -- This is all about future price of
6  securities, and I gather that includes convertible
7  debentures such as existed in this case?
8      A.   That's the focus of the paper, yes.
9      Q.   And, in fact, you used the Sedona/Rhino
10  dispute as one of the examples in this paper.
11  Correct?
12      A.   I don't recall, but if you say so.
13      Q.   Have you read the paper recently?
14      A.   I did peruse it last night.
15      Q.   Huh?
16      A.   I did go over it last night.
17      Q.   Did you notice there was some reference to
18  the Rhino?
19      A.   No, I did not.
20      Q.   Okay.
21         Looking at Page 5, you talk about Risks
22  Inherent in Future Priced Securities.
23      A.   Yes.
24      Q.   One is credit and default risk.  What's
25  that refer to?

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 146

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2       A.   I apologize.  I didn't hear the question.
3       Q.   On Page 5 --
4       A.   Yes.
5       Q.   -- there is a section entitled Risks
6    Inherent in Future Priced Securities.
7       A.   Yes.
8       Q.   On the next page, one is credit and
9    default risk.  What is that?
10      A.   Credit and default risk?
11      Q.   Yes.
12      A.   Credit risks generally refer to changes in
13   the creditworthiness of the issuer of a particular
14   security -- - the issuer of a particular security.
15   And default refers to the failure of an issuer to
16   make full and timely payments of principal and
17   interest on its obligations.
18      Q.   Does every financial transaction have a
19   credit and default risk?
20      A.   In my mind that question translates into
21   is the US Treasury entailing credit risk.  My
22   inclination is to say that just about every
23   transaction entails credit risk.
24      Q.   What about stock -- brokers?  Does every
25   investment in stock involve a stock price risk?

---

Page 147

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2       A.   I wouldn't go as far as to say every
3    investment in stock.  It may be --
4       Q.   Pardon?
5       A.   It may be a hedge position, so I don't
6    know.
7       Q.   But if you have a position in stock that's
8    not hedged, is there stock price risk?
9       A.   If you're on a hedge, then the P&L would
10   move with the market, yes.
11      Q.   Isn't that what you're talking about here
12   in point number 2, an nonhedged stock price position?
13      A.   Yes.
14      Q.   Now it also -- it talks about equity
15   delisting.
16      A.   Yes.
17      Q.   Have you ever studied what the criteria
18   the NASDAQ has to keep a stock listed on the NASDAQ?
19      A.   I wouldn't be able to give you a complete
20   listing, but those do relate to the market
21   capitalization of the stock to the level of the
22   stock.  I believe the cutoff is a dollar per share,
23   possibly -- other.
24      Q.   Have you ever done any research on the
25   consequences of stock prices not meeting a certain

---

Page 148

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2    level to be trading on NASDAQ?
3       A.   I believe that's research -- not me
4    personally.  That's -- I believe I am citing a paper
5    by Tyler Shumway on that.
6       Q.   Who?
7       A.   I believe the name is Tyler Shumway.
8       Q.   The delisting bias that you list on Page 6
9    in footnote 8?
10      A.   Oh, yes.  Yes.  He was a colleague of mine
11   at the University of Chicago.
12      Q.   What did you learn from that?  What was
13   the delisting criteria in NASDAQ?
14      A.   The gist of the argument is that when a
15   stock gets delisted, then its liquidity would be
16   reduced which may result in lower valuations.  And in
17   addition to that, the bid-ask spread may widen, which
18   may entail investor losses as well.
19      Q.   Isn't it true that the paper is really
20   about the consequences of delisting and not what the
21   criteria are to determine whether or not that stock
22   should be delisted?
23           MR. SOHN:  The Tyler Shumway paper?
24           MR. GUIDO:  Yes.
25      A.   That is correct, I believe.

---

Page 149

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2       Q.   Okay.  My question to you is do you know
3    what the listing requirements are for NASDAQ in terms
4    of maintaining a certain stock price level?
5       A.   I gave you my understanding.  General -- a
6    cutoff with respect to market capitalization, minimum
7    stock price, and there is a period over which a
8    company would be -- they would be allowed to cure any
9    deficiencies.
10      Q.   Okay.  Then what was the stock price level
11   of the NASDAQ at the time the Sedona transactions
12   occurred?
13      A.   I mean, it varied quite substantially.  I
14   don't know.
15      Q.   I'm asking you during the period of time
16   covered by the complaint, so let's say that that --
17   assume that that is the spring of 2001.
18      A.   I'm looking at Exhibit 9 of my report.
19      Q.   It doesn't say, does it?
20      A.   What?
21      Q.   It doesn't say anything about the price
22   level that you have to maintain to avoid delisting,
23   does it?  That was my question.
24      A.   No.  If I understood, your question was
25   what was the price of Sedona stock in the spring of

---

38 (Pages 146 to 149)

Tsvetan Beloreshki                                          March 2, 2010
                          New York, NY

---

Page 150

1              T. Beloreshki - Direct
2    2001.
3        Q.   No.
4        A.   I apologize.
5        Q.   My question was what was the price level
6    that had to be maintained for Sedona stock to be
7    traded in the spring of 2001 on NASDAQ?  That was my
8    question.
9        A.   It's -- my best answer is it would be a
10   dollar, but I may be incorrect on that.
11       Q.   A dollar.
12       A.   Yes.
13       Q.   And where do you get that information?
14       A.   From memory, which is always a dangerous
15   place to go.
16       Q.   Did you ever listen to any audiotapes that
17   were recorded by Refco?
18       A.   No.
19       Q.   Did you know any existed?
20       A.   I do.
21       Q.   When did you learn that?
22       A.   Prior to the presentation at the US
23   attorney's office and the SEC.
24       Q.   And did you ever ask to listen to them?
25       A.   No.

---

Page 151

1              T. Beloreshki - Direct
2        Q.   Do you know that DLA Piper has transcripts
3    of them?
4        A.   I don't -- My understanding, they have
5    access to them; but in what shape or form, I don't
6    know.
7        Q.   Did you ever ask to look at them?
8        A.   No.
9        Q.   Did they ever offer them to you?
10       A.   No.
11       Q.   Did you know that DLA Piper has audited
12   the audiotapes that go with those transcripts?
13       A.   I don't know.
14       Q.   You don't know.  Did anyone ever tell you?
15       A.   If they told me, it's likely I would not
16   remember --
17       Q.   Pardon?
18       A.   I don't know.
19       Q.   Did you ever ask to listen to the
20   audiotapes?
21       A.   No.
22       Q.   Why not?
23       A.   Because the -- the task that I was asked
24   to perform had to deal with data.
25       Q.   Pardon?

---

Page 152

1              T. Beloreshki - Direct
2        A.   The task I was asked to perform had to
3    deal with data.
4        Q.   Well, take a look at Page 1 of Exhibit
5    Number 4.
6        A.   Yes.
7        Q.   We have been retained by counsel for Mr.
8    Andreas Badian and asked to perform economic,
9    financial, and statistical analyses in order to
10   answer the following questions.  And bullet point 2:
11   What are some of the determinants of the performance
12   of Sedona stock in the time period following the
13   issuance of such securities?
14            You see that?
15       A.   I do.
16       Q.   Okay.  Is the orders that were placed by
17   someone on behalf of Rhino one of the determiners of
18   the performance of Sedona's stock price?
19       A.   I would believe so, and those are
20   reflected in the data that we analyzed.
21       Q.   You're saying that the orders that were
22   placed were reflected in the data?  That data that
23   you have -- and I may be incorrect, is the data of
24   executed transactions.
25       A.   Correct.  Correct.

---

Page 153

1              T. Beloreshki - Direct
2        Q.   It's not the orders that were placed?
3        A.   Fair enough.  I appreciate the
4    distinction.  Yes.
5        Q.   So -- wasn't -- what the orders were one
6    of the determinants of the performance of the stock?
7        A.   Those orders, whatever they may have been,
8    those would have been reflected in the actual
9    transactions being executed.
10       Q.   Well, let's look at -- back at Exhibit
11   Number 5, Page 6.
12       A.   Yes.
13       Q.   The next category is liquidity risk.
14            Do you see that?
15       A.   I do.
16       Q.   What do you mean by liquidity risks?
17       A.   Liquidity generally speaking refers to
18   one's ability to monetize its holding in a particular
19   security without affecting the marketplace for that
20   security.
21       Q.   Does liquidity refer to the volume that's
22   being traded?
23       A.   Volume could be used as one measure of
24   liquidity.  I would not equate liquidity and volume.
25       Q.   Pardon?

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

| Page 154 | Page 156 |
|---|---|

Page 154

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2      A.  I would not equate liquidity and volume.
3      Q.  Well, how are you using liquidity in this
4  section starting at Page 6, if you're not using what
5  the volume is?
6      A.  I'm using it in the sense that I gave you
7  the answer on your preceding question of what my
8  understanding of liquidity is.
9      Q.  Well, I'm -- I'm confused.
10     A.  I apologize.
11     Q.  Liquidity is not trading volume, reflected
12  in trading volume?
13     A.  As I said, trading volume may be one
14  measure that can be used to gauge liquidity, but it
15  is not the only thing that you would need to know or
16  to use in order to judge liquidity.
17     Q.  Okay.  What else would you need to know?
18     A.  You may need to know, say, number of
19  market makers that are in the marketplace.  You may
20  need to know what type of marketplace the security's
21  being traded in.  You may need to know the
22  distribution of that security across investors.
23     Q.  I'm sorry.  The distribution, you say?
24     A.  Yes.
25     Q.  All right.  Did you attempt to determine

Page 155

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2  who the market makers were in Sedona stock during the
3  period of time you were analyzing the trades?
4      A.  No.
5      Q.  Did you determine where Sedona stock was
6  traded during that period?
7      A.  Yes.
8      Q.  And what did you learn?
9      A.  NASDAQ.
10     Q.  On the NASDAQ.  Okay.
11         What's Island?
12     A.  It's a trading platform.  I probably
13  wouldn't be able to tell you a whole lot more than
14  that.
15     Q.  Did you say it was a trading platform?
16     A.  I don't know a whole lot about Island one
17  way or another, so --
18     Q.  Pardon?  You don't know what?
19     A.  I don't know a whole lot about Island.  My
20  understanding is it's a trading platform.
21     Q.  Did you determine whether or not Sedona's
22  trades were executed -- on that -- when you did your
23  analysis?
24     A.  No.
25     Q.  You said the other thing you needed to

Page 156

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2  know the distribution among various investors.
3      A.  That would be something of interest.  Yes.
4      Q.  Pardon?
5      A.  Yeah.
6      Q.  Did you attempt to determine what the
7  distribution of Sedona's holdings were among various
8  investors?
9      A.  So, to the extent we were aware of the
10  holdings of Rhino, in Sedona stock.
11     Q.  Other than Rhino?
12     A.  No.
13     Q.  Did Rhino hold the stock in its own name?
14     A.  My sense is that would be in Amro.
15     Q.  It was held in the name of Amro?
16     A.  That would be my sense.  May be incorrect.
17     Q.  Not BNC Bach?
18     A.  I don't know.
19     Q.  Do you know whether or not there's a
20  relationship between BNC Bach and Amro?
21     A.  I believe there is a relationship.
22     Q.  Pardon?
23     A.  I believe there is a relationship.  I have
24  seen BNC Bach in account statements.
25     Q.  Do you know what the relationship is?

Page 157

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2      A.  I don't recall.
3      Q.  Well, in the data you looked at, did you
4  see that there were trades between BNC Bach and Amro
5  -- the --
6      A.  I don't recall.
7      Q.  Now, next you say litigation contract
8  renegotiation risks.
9          Do you see that?
10     A.  Yes.
11     Q.  Did you determine whether or not there was
12  any litigation or contract renegotiation in Sedona
13  stock?
14     A.  I don't know how to answer that.  I mean,
15  I was retained in the context of the litigation.
16     Q.  Pardon?
17     A.  NERA and then FTI were retained in the
18  context of a litigation, so --
19     Q.  Well, did anyone ever tell you that Sedona
20  had refused to honor a conversion letter received
21  from Amro?
22     A.  I believe that's the case.
23     Q.  When did that occur?
24     A.  I don't know.
25     Q.  Well, you indicate that contract

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                          March 2, 2010
New York, NY

---

Page 158

T. Beloreshki - Direct
1
2     renegotiation or litigation could be one of the risks
3     that a holder of -- of future priced security.  Isn't
4     that correct?
5         A.   It is one of the risks associated with
6     these type of instruments, yes.
7         Q.   Did you attempt to determine what that
8     risk was for Sedona?
9         A.   I must be missing a question here.  I was
10    retained after there was a litigation to begin with,
11    so --
12        Q.   Did you study the convertible debenture in
13    this case?
14        A.   Yes.
15        Q.   Did you study the convertible debenture
16    agreement to this case?
17        A.   Yes.
18        Q.   And did you find that there were
19    provisions that applied to when stock could be
20    converted or when the debenture could be converted
21    into stock?
22        A.   Correct.
23        Q.   And what did you determine?
24        A.   If memory serves me well, that window
25    opened March of '01.

---

Page 159

T. Beloreshki - Direct
1
2         Q.   Was it March 22nd of '01?  22nd.
3         A.   I believe you're correct, yes.
4         Q.   So it's the 22nd.  Now prior to that, was
5     there a conversion feature?
6         A.   I do not believe so.  Not with respect to
7     this instrument.
8         Q.   Pardon?
9         A.   Not with respect to this instrument.
10    There was another conversion in November of 2000.  I
11    don't know if you're referring to that.
12        Q.   I'm asking with regard to the convertible
13    debenture that you've addressed in your report, was
14    the stock convertible prior to March 22nd?
15        A.   I'll have to refer to the document.
16        Q.   So you don't know.
17        A.   I don't recall.
18        Q.   You don't recall.
19             Were there -- in the document, were there
20    restrictions on when stock could be sold short?
21        A.   I believe so.
22        Q.   Do you recall what that provision was?
23        A.   I don't recall the exact nature of the
24    provision, but I do know there was a restriction on
25    short selling of the stock.

---

Page 160

T. Beloreshki - Direct
1
2         Q.   Now, you talk about, I think in your
3     report, economically rational behavior.
4         A.   Yes.
5         Q.   Okay?  Is it economically rational to
6     violate an agreement in a convertible debenture?
7         A.   Let me take the question a little more
8     general.  It may be rational to breach a contract.
9     That's my understanding of it.
10        Q.   Well, you also in your expert report talk
11    about the value of short selling prior to conversions
12    as a hedging mechanism.  Right?
13        A.   Yes.
14        Q.   Okay.  Now, if that is an economically
15    rational approach --
16        A.   Yes.
17        Q.   -- is it economically rational to agree to
18    a covenant not to sell the stock short prior to
19    submitting the conversion?
20        A.   It may well be.  Yes.
21        Q.   Pardon?
22        A.   It may well be, yes.
23        Q.   It may be?
24        A.   May well be.  I apologize.
25        Q.   Well, you testified that the trading

---

Page 161

T. Beloreshki - Direct
1
2     strategy here was economically rational.  Hedging
3     strategy I think is what you testified.
4         A.   Correct.
5         Q.   Or indicated.
6         A.   Correct.
7         Q.   Okay.  Now, was Rhino, acting on behalf of
8     Amro, acting economically irrational when it agreed
9     to a provision not to sell the stock short prior to
10    converting?
11        A.   No.  The idea there is there are a number
12    of features to these instruments that they're each
13    subject to negotiation.  So --
14        Q.   I understand, but you're looking at it
15    after the negotiation occurred and after the contract
16    was entered into.
17        A.   Well, if I have a choice between, just to
18    give you an example a larger discount and some sort
19    of a short selling restriction, versus a smaller
20    discount and no restriction on short selling, those
21    may be a choice that one might be -- you know, could
22    reasonably consider both of them.
23        Q.   Is it economically rational to have your
24    cake and eat it too?
25             MR. SOHN:  Objection.

41 (Pages 158 to 161)

Tsvetan Beloreshki                                              March 2, 2010
New York, NY

Page 162

T. Beloreshki - Direct

1
2      A.   I have no idea what you're talking about.
3      Q.   Well, is it economically rational to agree
4  not to do something with regard to a credit
5  instrument, and then do exactly the opposite, in
6  violation of that agreement?
7      A.   As I said --
8           MR. SOHN:  Objection.
9      A.   -- contracts do get breached, and on
10 occasion such breach can be efficient.
11     Q.   Economically rational?
12     A.   Yes.
13     Q.   Was the agreement ever extended, the
14 convertible debenture?
15     A.   I don't recall.
16     Q.   You don't know.
17     A.   I don't recall.
18     Q.   Did you ever ask to find out whether or
19 not it was ever extended?
20     A.   At one point -- or not -- I would have
21 known that.  I don't recall.
22     Q.   You don't recall.  Would your view of
23 whether or not it was economically rational to breach
24 the agreement not to sell short be affected, if you
25 learned that during the period of time this stock was

Page 163

T. Beloreshki - Direct

1
2  shorted, as alleged in this complaint in this action,
3  that that -- that the convertible debenture was being
4  renegotiated and extended?
5      A.   Correct me if I'm wrong, but I don't
6  believe that short selling is one of the allegations
7  in the complaint.  So I don't know the violation of
8  the short selling provisions or the breach of the
9  short selling provisions are part of the complaint.
10     Q.   I didn't ask you whether or not that was
11 being violated.  I asked you whether or not short
12 selling occurred.
13     A.   Short selling did occur.
14     Q.   And was it alleged in the complaint that
15 it was in violation of the covenant not to sell
16 short?  Not whether it was a charged violation, but
17 was it alleged to have occurred?
18     A.   The complaint does occur that short
19 selling occurs, yes.
20     Q.   Now, you indicated that the convertible
21 debentures here, there were a series of convertible
22 debentures that were issued by Sedona, and to you
23 that that's an indication of a declining or a weak
24 financial condition in the firm, in Sedona.  Right?
25     A.   Sedona was an issuer of future priced

Page 164

T. Beloreshki - Direct

1
2  securities.  My general view is that the fact of the
3  first issuance of a future priced securities
4  instrument is perhaps the most significant to the
5  marketplace.  The fact that there are subsequent
6  issuances serves to confirm that and probably
7  reinforce that effect.
8      Q.   Did FTI recently issue a convertible
9  debenture?
10     A.   No one asked me about that.  I don't know.
11     Q.   You don't know.
12     A.   No.
13     Q.   Do you know whether or not it was a future
14 price security?
15     A.   I don't.
16     Q.   Is FTI a financially insecure company?
17     A.   I believe FTI is relatively -- either
18 double B or triple B, something in that range.
19     Q.   Double B or triple B, is that a
20 financially insecure company?
21     A.   BBB is the lower grade of the investment
22 grade securities, so that's about as much as I can
23 give you that.
24     Q.   Is that a junk bond rating?
25     A.   BBB is not.

Page 165

T. Beloreshki - Direct

1
2      Q.   Now look at Exhibit 8.  Exhibit 8 of
3  Exhibit 4, excuse me.  Your tab, exhibit number 8.
4      A.   Yes.
5      Q.   Did Sedona issue stock during that period
6  of time that's reflected in that chart?
7           MR. SOHN:  From 1985 to 2003?
8           MR. GUIDO:  Uh-huh.
9      A.   I believe the answer is yes.
10     Q.   Why didn't you include it?
11     A.   This exhibit reflects --
12     Q.   Pardon?
13     A.   This exhibit reflects the number of shares
14 outstanding, so that's included.
15     Q.   Well, I mean you have a bunch of arrows
16 here in convertible debentures, but you don't have
17 any arrows for stock issuance.
18     A.   The chart is meant to illustrate the
19 significant increase in the number of shares
20 outstanding and the issuance of future priced
21 securities by Sedona, and incidentally the scale on
22 the left-hand side is logarithmic.  So that volume of
23 outstanding stock increased by a very large factor
24 and that was the point of this chart.
25     Q.   Well, I mean, didn't one of the things

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 166

T. Beloreshki - Direct

1
2    that you say that Sedona was a -- was in poor
3    financial condition because -- as reflected by the
4    fact that it could not raise stock through issuance
5    of common stock?
6        A.   Or regular debt financing.
7        Q.   But it did issue common stock --
8        A.   It did issue common --
9        Q.   -- in this time period, didn't it?
10       A.   Correct, but a substantial portion of that
11   was issued pursuant to future priced security
12   agreements.
13       Q.   Was also a substantial portion of it not
14   related to future priced securities?
15       A.   I'm also aware of purchases, shelf
16   purchases at a discount.
17       Q.   Well, I understand that.  But you said
18   that here is an entity that could not raise capital
19   by issuing common stock, and it ended up doing so
20   when you excluded it from your chart.
21           MR. SOHN:  During what time period are you
22   talking about?
23           MR. GUIDO:  1985 through 2003.
24       A.   Well, but this chart -- this chart does
25   show the initial public offering.

---

Page 167

T. Beloreshki - Direct

1
2        Q.   Pardon?
3        A.   It does show the initial public offering,
4    that chart.
5        Q.   I understand that.
6        A.   Yes.
7        Q.   But there are also other stock issuances
8    after that, weren't there?
9        A.   I don't recall.
10       Q.   You don't recall.
11       A.   No, I don't.
12       Q.   Did you ever attempt to figure that out?
13       A.   I don't recall one way or the other.
14       Q.   Isn't it true that Amro purchased a
15   substantial amount of common stock of Sedona during
16   this time period, 1985 through 2003, separate from
17   future priced securities?
18       A.   Correct.  That is what I was referring to
19   as purchasing actions off the shelf at a discount.
20       Q.   But there were purchases.  Correct?
21       A.   Yes.  I testified to that.  Yes.
22       Q.   And -- and they were purchased at a
23   discount to what?
24       A.   To the prevailing marketplace.
25       Q.   Now, are -- were those private placements?

---

Page 168

T. Beloreshki - Direct

1
2    Let me rephrase that.  Were they negotiated
3    transactions?
4        A.   That would be my assumption.
5        Q.   Why was -- did you ever attempt to
6    determine why Amro or Rhino acting on behalf of Amro
7    was purchasing Sedona stock in this time period if it
8    was a financially vulnerable entity?
9        A.   One possible reason is --
10       Q.   I didn't ask you possibilities.  I asked
11   you did you know?
12       A.   Do I know what?
13       Q.   Do you know why it was purchasing the
14   stock if, in your view, this entity was a financially
15   vulnerable institution?
16       A.   If your question is whether I knew the
17   state of mind of Rhino, no.
18       Q.   Did you ever ask anybody what their
19   intentions were?
20       A.   No.
21       Q.   Now with regard to Page 9, you talk about
22   Adverse Market Signal.
23       A.   Page 9 of what document?
24       Q.   Pardon?
25       A.   What document are we on?

---

Page 169

T. Beloreshki - Direct

1
2        Q.   I'm back on Exhibit Number 5.  Excuse me.
3           See the Adverse Price Signal?
4        A.   Yes.  I do.
5        Q.   Okay.  Now, one of the -- You say that
6    news about the negotiation and/or (pending)
7    completion of a financing deal may boost albeit
8    temporarily the price of liquidity levels of the
9    outstanding securities of a company.
10          Do you see that?
11       A.   I do.
12       Q.   Now, and then it goes on to talk, in the
13   next two paragraphs, it talks about corporate finance
14   theory and the empirical evidence.  Did you do any
15   empirical studies yourself of the impact of a future
16   priced security on the market?
17       A.   On the issuance of future priced security,
18   yes.
19       Q.   You did studies yourself?
20       A.   As a part of a team at NERA, yes.
21       Q.   Pardon?
22       A.   As part of a team at NERA, yes.
23       Q.   Okay.  And in what context did you do the
24   studies?
25       A.   The context was that probably SEC

43 (Pages 166 to 169)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 170

1          T. Beloreshki - Direct
2    investigation in the 2000, 2001 range that we
3    discussed --
4        Q.   Of the 50 securities.
5        A.   Or so, yes.
6        Q.   And that -- what did you learn about those
7    50 securities with regard to the impact of the
8    issuance of the convertible debentures?
9        A.   It's been awhile since I've seen that
10   chart, but I believe that study or that part of the
11   study represented what is known as an event study,
12   and for those 50 or so companies we performed event
13   studies to determine the behavior of their stock
14   prices at various points in time before, prior to,
15   and subsequent to the first issuance, I believe, of a
16   future priced security instrument.
17       Q.   Okay.
18       A.   And the findings, as I remember, were that
19   these stock prices tended to underperform the
20   marketplace substantially during the year prior to
21   issuance, and that effect increased in the --
22   probably -- year subsequent to the issuance.  It
23   might have been six months before and six months
24   after or one year before and one year after.  I don't
25   know now.

Page 171

1          T. Beloreshki - Direct
2        Q.   So the price increased afterwards?  Is
3    that right?
4        A.   Oh, did I say that?  I apologize.  No.
5    The price was decreasing prior to the issuance and
6    decreased at a faster pace afterwards.
7        Q.   Now.  Let's go to Page 12.  You talk about
8    Hedge Against Stock Price and Liquidity Risk.  Okay?
9        A.   Yeah.
10       Q.   It says until the moment of a conversion
11   notice is submitted, FPS investors bear virtually no
12   risk of a stock price decline (as long as the decline
13   is not associated with an event such as a corporate
14   bankruptcy, refusal to honor the terms of the FPS
15   contract, etc.)
16          Do you see that?
17       A.   I do see that.
18       Q.   Now prior to the conversion notice here,
19   did Rhino's -- I use Rhino interchangeably with Amro,
20   but it's Amro's account that we're talking about.
21   Did Amro bear no risk of a price decline?
22       A.   I'll give you the same answer as the one
23   contained in the sentence.  As long as that decline
24   was not associated with an event of corporate
25   bankruptcy or refusal to honor the terms -- I

Page 172

1          T. Beloreshki - Direct
2    apologize.
3          It's much easier to read.  Sorry.
4          So as long as the decline was not
5    associated with an event such as corporate
6    bankruptcy, refusal to honor the terms of the
7    contract, et cetera.
8        Q.   Okay.  Now, it says in the second
9    sentence, however, once FPS are converted into common
10   shares of the underlying stock, they are exposed to
11   the risks of significant stock price decreases.
12       A.   Yes.
13       Q.   Okay?  After the conversion in this case,
14   the Sedona conversion by Amro, in Rhino and Badian's
15   direction, did Amro run the risk of price decreases?
16       A.   Yes.  To different degrees.  You would
17   have at least three components in your position.  One
18   would be the remaining debenturers, and let's say
19   that those have minimal exposure to a stock price
20   risk.  Let's say that for the sake of argument credit
21   risk is not a concern or there will be -- litigation.
22          Then you have Rhino's holdings of stock.
23   So to the that extent Rhino is long a stock position,
24   then they will be exposed to that risk.  And finally
25   Rhino had warrants which would be exposed to stock

Page 173

1          T. Beloreshki - Direct
2    price risk as well.
3        Q.   Okay.  So let's just talk about the
4    converted shares.  When Rhino converted in the spring
5    of 2001, didn't it end up with over 800,000 shares of
6    stock?
7          MR. SOHN:  Are you referring to a
8    particular day?
9          MR. GUIDO:  After the four conversions in
10   the spring of 2001.
11       A.   I'm not certain about the number.  They
12   did end up with long positions at points in time.
13       Q.   Was it more than a half a million shares?
14       A.   Again, I'm not certain about a number.
15       Q.   Okay.  But did it have a substantial price
16   risk at that point in time?
17          MR. SOHN:  Objection to form.
18       A.   I don't know how you define substantial
19   price risk, but it did have risks.
20       Q.   And whatever the risk is would be
21   determined by the number of shares?
22          Let me rephrase it, make it easier?
23          The significance of the risk would be
24   determined by the number of shares it had left
25   over -- after conversion.

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 174

T. Beloreshki - Direct

1              T. Beloreshki - Direct
2      A.   Correct it would be determined by the size
3   of the long of the long position, and, again,
4   ignoring the rest of the holdings.
5      Q.   Now, look at Page 13. It says -- see
6   where it says, Allegations of Market Manipulation By
7   FPS Defy Economic Logic?
8      A.   Yes.
9      Q.   Now, is -- is it fair to say that if by
10  pushing down the stock of price -- the price of a
11  stock, you can create an advantage under a contract
12  that you have to convert a debt to a security into
13  that stock?
14         MR. SOHN:  Objection to form.
15      A.   What was the question?
16      Q.   Is it economically rational if you have a
17  contractual agreement, to push down the stock of
18  price -- price of the stock, in order to take
19  advantage of some provision in that contract to your
20  financial advantage?
21         MR. SOHN:  Objection to form.
22      A.   If one were to ignore everything else,
23  perhaps.
24      Q.   Okay.  And what's the everything else?
25      A.   The fact that your actions would have

---

Page 175

T. Beloreshki - Direct

1              T. Beloreshki - Direct
2   consequences related to the value of your position as
3   well as create potential exposure to say, regulatory
4   investigations.  Plus you have risks associated with
5   the execution of such strategy.
6      Q.   Pardon?
7      A.   Plus you would have risks associated with
8   the execution of such a strategy.
9      Q.   Well, take insider trading.  Have you ever
10  studied insider trading?
11      A.   Have I studied -- They didn't offer a
12  class on that one.
13      Q.   Have you ever investigated an insider
14  trading allegation?
15      A.   I have done work related to insider
16  trading cases.
17      Q.   So you know insider trading?
18      A.   Yes.
19      Q.   And you had a Series 7 license.  Right?
20      A.   Correct.
21      Q.   Okay.  To get the Series 7 license you
22  were taught various things about the trading
23  practices.
24      A.   Yes.
25      Q.   And one of them you were taught about was

---

Page 176

T. Beloreshki - Direct

1              T. Beloreshki - Direct
2   insider trading.  Right?
3      A.   I believe so.
4      Q.   Are there risks associated with insider
5   trading?
6      A.   I hope there are, yes.
7      Q.   And one of those is regulatory risks,
8   isn't it?
9      A.   And possibly criminal exposure.
10      Q.   And one of those is execution risks, isn't
11  it?
12      A.   Correct.
13      Q.   And one of those is -- it could have a
14  negative impact on the value of your other holdings.
15  Right?
16      A.   Yes.
17      Q.   Pardon?
18      A.   Yes.
19      Q.   But people still engage in insider
20  trading, don't they?
21      A.   Correct.  What I'm saying here is not that
22  nobody would ever engage in insider trading or
23  manipulation.  There is risk.  You're trading
24  instrument that if a manipulation-free trading
25  strategy is executed, could potentially yield you a

---

Page 177

T. Beloreshki - Direct

1              T. Beloreshki - Direct
2   few hundred percent return annually.  This is a
3   return that is in my view very difficult, if not
4   impossible to replicate otherwise.  So the costs
5   associated with that manipulation strategy have to
6   outweigh that few hundred percent of annualized
7   return, and this is where the cost analysis
8   comes in.
9      Q.   Did you ever determine how much was made
10  on the trading strategy that was adopted by -- in the
11  Sedona stock by Mr. Badian?
12      A.   I believe such analyses or some version of
13  such analyses was performed years ago.
14      Q.   And didn't it show that there was a profit
15  of somewhere around two and a half million dollars?
16      A.   I don't recall the number.
17      Q.   But it would be reflected in those papers.
18  I think it's called -- it's BP 6 -- and it's a tab
19  called P&L analysis?
20      A.   Okay.
21      Q.   Now the -- did you also years ago do an
22  analysis of a hypothetical trading in the stock?
23      A.   I may have.  I don't know.
24      Q.   Did you determine that the profits from
25  the actual trading were substantially greater than

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 178

T. Beloreshki - Direct
1
2  the hypothetical that you had done?
3      A.  I don't have a recollection of what you're
4  referring to.
5      Q.  Why did you do the hypothetical?
6      A.  As I said I have no recollection of what
7  this analysis was.
8      Q.  You have no recollection of doing it?
9      A.  I apologize.  I don't.
10     Q.  Turning to Page 14, look at the paragraph
11 that starts:  "Clearly, the potential benefits of an
12 alleged manipulation strategy depends on one's
13 ability to artificially affect stock prices, thereby
14 increasing the spread between S average and
15 S conversion."
16         Okay?  Do you see that?
17     A.  I do.
18     Q.  It says:  "To the extent that this ability
19 is in term of the liquidity and the depth
20 of the marketplace, one would expect that such
21 alleged manipulative scheme would be most effective
22 when applied to the stock of small and
23 illiquidly-traded companies."
24         In your report didn't you say that Sedona
25 was illiquid?

---

Page 179

T. Beloreshki - Direct
1
2      A.  I don't recall.
3      Q.  Well, was it?
4      A.  Sedona was a relatively illiquid stock.
5  Relatively illiquid.
6      Q.  Relatively liquid?
7      A.  Illiquid.
8      Q.  Illiquid.  Okay.  And was it a small stock
9  in terms of capitalization?
10     A.  Yes.
11     Q.  So would it be fair to say that an alleged
12 manipulative scheme would be more effective when
13 applied to Sedona than to other, larger stocks and
14 more liquid stocks?
15         MR. SOHN:  Objection to form.
16     A.  It would be difficult for me to see how
17 one would be able to execute or move the price of a
18 large stock like Goldman.
19     Q.  Did you ever attempt to do a market price
20 model in the Sedona stock?
21     A.  I believe that the regression analyses
22 that we discussed earlier would fall into that
23 category.
24     Q.  Did you ever attempt to do a price impact
25 model analysis?

---

Page 180

T. Beloreshki - Direct
1
2      A.  You mean of the nature that Drs. Glosten
3  and Jones did?
4      Q.  Yes.
5      A.  No.
6      Q.  Have you ever read the literature of a
7  price impact model similar to what they had done?
8      A.  The literature is a rather large body of
9  literature.  I have reviewed certain papers.
10     Q.  Yeah?  And did you do such an analysis of
11 the Sedona transaction?
12     A.  No, I didn't.
13     Q.  Why not?
14     A.  Because I'm not convinced that -- because
15 I'm not convinced that such analysis is appropriate.
16 In fact, I would say that it is not appropriate in
17 the context that we're talking about.  One is that it
18 uses -- We're interested in a trading over a long
19 period of time, days.
20     Q.  Pardon?
21     A.  We're interested in trading over a
22 substantial period of time.  The minimum interval
23 that I would guess we could agree is that there are
24 five-day conversion periods.  So you're interested in
25 knowing what happened to that stock over a five-day

---

Page 181

T. Beloreshki - Direct
1
2  period.
3         So looking into intraday struck me as a
4  level of granularity that does not necessarily inform
5  what happens or how the stock price behaved for those
6  long periods of times that I believe are relevant to
7  this investigation, the example being the five-day
8  low back periods.
9         In addition, an analysis of that
10 granularity assumes a level of market efficiency that
11 I don't believe has been established.  That is, that
12 the market price responds instantaneously, Sedona's
13 market price responds simultaneously to any user
14 information that comes to the marketplace.
15         Three, there are various issues related to
16 the independence of the various variables used by
17 opposing experts.
18         Four, the analyses performed assumes no
19 new information during, say, the month of March,
20 which is certainly not the case here.
21         And, five, and perhaps quite importantly,
22 that line of analysis ignores other market and
23 industry factors which are particularly important
24 here.  To give you a sense of what I'm talking about,
25 NASDAQ fell down somewhere between 15 and 20 percent,

---

46 (Pages 178 to 181)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 182

                  T. Beloreshki - Direct
1
2    if memory serves me right, during the month of March.
3    That fact is not a part of the analysis performed.
4         Q.   Well, let me ask you something.  Did
5    anybody else ask you this question before your
6    deposition today?
7         A.   Probably not.  It is something that I have
8    discussed with Steve Prowse.
9         Q.   With who?
10        A.   Steve Prowse.
11        Q.   When did you discuss it?
12        A.   We had discussed various aspects since we
13   received opposing expert reports.
14        Q.   Pardon?
15        A.   Since the point in time when received
16   opposing expert reports, we have looked at them.
17        Q.   And did you discuss what your answer would
18   be to the question?
19        MR. SOHN:  Which question?
20        Q.   My question of whether they attempted to
21   use a price impact model and your answer was no and
22   you gave, I think, in a very concise way, five
23   reasons.  Did you discuss that --
24        A.   Coming in today, I would not have said I
25   will give you five reasons.  But these are the ones

Page 183

1                 T. Beloreshki - Direct
2    that came to mind.
3         Q.   Did you rehearse that answer?
4         A.   I'm sorry?
5         Q.   Did you rehearse the answer you just gave
6    to me with anybody?
7         A.   No.
8         Q.   Did you discuss it with counsel or
9    Mr. Badian?
10        A.   No.
11        Q.   Now, when you talked -- When we were
12   talking about percentages that are a test of
13   reliability and we talked about the significance of
14   various terms, did you -- you talked about 95 percent
15   confidence interval, and I think you testified that
16   there were other confidence intervals.
17        A.   Yeah.  I have seen economic literature
18   using or relying on 90 percent, 95, 99.
19        Q.   So the literature, some literature
20   recognizes 90 percent confidence level?
21        A.   Correct.
22        Q.   All right.  Now, the -- Now, on Page 18 of
23   your paper that you did with Ms. Schechtman, it talks
24   about factors impacting the price of underlying stock
25   and you talk about marketwide and industry factors,

Page 184

1                 T. Beloreshki - Direct
2    and you also talk about company-specific factors such
3    as company news, corporate filings, insider trading
4    activities.
5         Do you see that?
6         A.   Yes.
7         Q.   Okay.  Now, do you recall in your rebuttal
8    report in the Pet Quarters case that the plaintiff's
9    expert had used marketwide industry factors in its
10   analysis and you were -- you critiqued the use of
11   those in the plaintiff's expert's report?
12        A.   We did have critiques of opposing expert
13   analyses.  I am not sure I know what you're referring
14   to.
15        Q.   In the rebuttal report, you have indicated
16   that the plaintiff's counsel had made generalized
17   statements about the performance of other companies
18   in comparison to Pet Quarters.
19        Do you recall that?
20        A.   If you could give me the document, I --
21        Q.   We'll save that until I get to the
22   document.
23        On your report or your paper, you also
24   discuss the other steps that you would recommend as
25   an analysis to be taken in addition to statistical

Page 185

1                 T. Beloreshki - Direct
2    regression analysis.
3         Do you recall that?
4         A.   I do.
5         Q.   Pardon?
6         A.   I do.
7         Q.   Now, in effect, that's on Page 18 and 19
8    of Exhibit Number 5?
9         A.   Yes.
10        Q.   Okay?
11        Now, in your performance of the analysis
12   that you did for Sedona, did you do any of those
13   analyses?
14        Pardon?
15        A.   The answer is probably no.  And the reason
16   is that the analyses that you're referring to are
17   essentially a note that the fact of finding a
18   statistical significance would not even by itself be
19   sufficient to establish manipulation.  That is, what
20   if you had somebody in Rhino's position with large
21   holdings of a relatively liquid stock and they were
22   simply wanting -- assume for the moment, I'll even
23   use a different name.
24        Let's say the company ABC had large
25   holdings in Sedona and unwound those holdings over a

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 186

T. Beloreshki - Direct
1
2    period of time.  It would stand to reason that if
3    these sales were significant, they may well have an
4    impact on the stock price, even though that entity
5    may not have been engaged in any manipulative
6    strategy.  So, you may have a situation where you can
7    establish a relationship, a statistically significant
8    relationship between one's trading and the underlying
9    stock price, and that may not be sufficient to
10   establish manipulation.
11      Q.   So what you're saying is you're only
12   advocating a follow-up analysis if the correlation
13   is -- is significant?
14      A.   This is typically the way you would view
15   statistical analyses.  The finding of statistical
16   significance has to go through essentially a reality
17   check whether the finding is meaningful in economic
18   terms --
19      Q.   But also if you have a finding of low
20   correlation or statistical significance, a follow-up
21   analysis isn't important to do?
22      A.   There was nothing in the data that led me
23   down this path to indicate that there is something
24   that I might want to follow up on.
25      Q.   So we can make it clear what you did and

---

Page 187

T. Beloreshki - Direct
1
2    didn't do I'll ask you some questions.
3           You said that careful consideration should
4    be given to follow-up analysis of, one, changes in
5    the trading pattern.
6      A.   Where are you talking?
7      Q.   On Page 19.
8      A.   19.  Yes.
9      Q.   Okay.  Order placement strategies.
10     A.   Yes.
11     Q.   Nature rationale and timing of sales and
12   conversions.
13     A.   Yes.
14     Q.   Okay?  Did you do any of those?
15     A.   Yes.
16     Q.   When did you do -- Where are they
17   reflected in your report?
18     A.   They're reflected in the conclusions and
19   the analyses of the report.
20     Q.   Where in the data backing up to the
21   report?
22     A.   Where in the data backing up the report?
23   Let me give you a sense of what I have in mind as an
24   example.
25           The March conversion period, which I

---

Page 188

T. Beloreshki - Direct
1
2    understand is one of -- it is part of opposing
3    expert's focus, has five trading days in it.  And the
4    stock price declines, I believe, over the first four
5    days rather significantly, probably to the tune of 30
6    or so percent.  And on the fifth day, the stock price
7    increases by 33 percent.  So while this is not a
8    statistical analysis, this is an economic analysis,
9    and it is informed by my experience as a trader.
10          If you have a look back option and at the
11   end of Day 5 the stock price is decreased by only
12   6 percent or so, which is probably within the average
13   drift of that stock, then clearly your -- if your
14   intention was to manipulate that stock was not
15   terribly successful and you may decide not to
16   exercise your conversion option and try your
17   manipulation again.  And the other thing that would
18   come out from just looking at the stock price history
19   is about a -- the possibility of a manipulator
20   allowing on Day 5 of a presumed manipulation
21   period --
22     Q.   I'm sorry, but I'm not asking you about
23   possibilities.  I'm asking you about what you did
24   here.
25     A.   Sir --

---

Page 189

T. Beloreshki - Direct
1
2      Q.   As part of your answer, you said you were
3    looking at certain transactions and you used an
4    example the fifth day, the 26th.  Correct?
5      A.   Sir, you're interrupting my train of
6    thought.
7      Q.   I understand.  Your train of thought is
8    talking speculatively.
9      A.   No, that was not a speculative answer.
10     Q.   I'm asking you what you did?
11     A.   That was not a speculative answer.  This
12   was an answer based on what I did based on the data
13   available.
14     Q.   So what did you do to determine the
15   changes in trading patterns?  That's all I'm asking
16   you.
17     A.   That was not your question.
18     Q.   I'm not asking you your conclusions.  I'm
19   asking you what you did to examine the changes in
20   trading patterns.
21     A.   The trading patterns, for example, are
22   shown in one of the exhibits to my report.  Okay.
23          I apologize.  It was not part of the
24   exhibit.  It was part -- probably part of the
25   presentation to the -- to the U.S. Attorney's Office,

---

48 (Pages 186 to 189)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 190

1              T. Beloreshki - Direct
2      where we looked at the trading patterns.  And the
3      trading pattern generally was to establish a short
4      position followed by a conversion notice, and then
5      establishing another short position followed by
6      conversion notice.  So, we did --
7          Q.   Take a look at Exhibit Number 3.
8          A.   Okay.  I don't see it here either.
9          Q.   It's not there, is it?
10         A.   No.
11         Q.   Let's use your example which you just
12     gave, and I can tell you what the dates are.  The
13     26th is the date where you said the price went up 33
14     percent.
15         A.   I believe you are correct.
16         Q.   I believe that was the last day of the
17     first conversion period?
18         A.   Yes.
19         Q.   Did you ever look to determine why that
20     happened?
21         A.   I do not know why that happened.
22         Q.   Did you ever listen to an audiotape that
23     indicated why it happened?
24         A.   No.
25         Q.   Did Ms. Schechtman or anyone from Piper

Page 191

1              T. Beloreshki - Direct
2      ever tell you on that day that Andreas Badian called
3      up Danny Graham and said, I want to -- I want to
4      now -- and I have been selling, I want to buy 20,000
5      shares before 10 o'clock to push the price above a
6      dollar?  Did anyone ever tell you about that tape?
7              MR. SOHN:  Objection.
8          A.   No.  I'm not aware of that.  No.
9          Q.   Anyone ever tell you that Westminster on
10     that day bought 30,000 shares starting in the morning
11     to push it up, as well?
12         A.   I'm aware of the transactions on that
13     date.
14         Q.   What do you mean, you're aware of the
15     transactions on that date?
16         A.   I have the data on the transactions that
17     were executed on that date.
18         Q.   You just know that the transactions
19     occurred.  You don't know why they occurred?
20         A.   Correct.
21         Q.   Do you know that some of those
22     transactions were purchases above the offer?
23         A.   I'm a little lost.  I thought we had an
24     allegation of manipulating things down.
25         Q.   Well --

Page 192

1              T. Beloreshki - Direct
2              THE VIDEOGRAPHER:  The time is 4:10.
3      We're going off the record.  This marks the end of
4      Tape Number 4.
5              (Whereupon, a recess is taken.)
6              THE VIDEOGRAPHER:  The time is 4:23.
7      We're back on the record.  This is Tape Number 5.
8          Q.   Did you make an attempt to see whether or
9      not there were any washed trades in the Sedona during
10     the period of time that you were analyzing or doing
11     your regression analysis?
12         A.   Those were not part of our analysis.
13         Q.   So you didn't do that?
14         A.   Correct.
15         Q.   Did you see any washed trades in the data
16     that you looked at?
17         A.   Again, those were not the focus of the
18     analysis.
19         Q.   I didn't ask you whether they were a
20     focus.  I asked you whether or not you saw any.
21         A.   No.
22         Q.   Now, the data that you did see, would you
23     take a look at that.  I think it's Exhibit Number 10,
24     the original Exhibit Number 47, the spreadsheet.
25     Remember I asked you about it, if you saw something

Page 193

1              T. Beloreshki - Direct
2      similar --
3              MR. SOHN:  Exhibit D to Exhibit --
4              MR. GUIDO:  No.  The 21(a) report.
5              MR. SOHN:  Exhibit D.
6              MR. GUIDO:  Exhibit D to the 21(a) report.
7      Thank you very much, gentlemen.
8          Q.   Look at Exhibit Number D.
9          A.   Yes.
10         Q.   Take a look at April 12th?
11         A.   Which year?
12         Q.   In Exhibit D.
13         A.   2001?
14         Q.   2001.  Do you have it, April 12, 2001?
15         A.   Yes.
16         Q.   Do you see the entry for Refco?
17         A.   Would you refer me to a page that you're
18     referring to?
19         Q.   I don't have a copy of the exhibit.
20         A.   I'll find it.
21         Q.   22919?
22         A.   Okay.  I'm on that page.
23         Q.   Do you see the entry for Refco, the buys.
24     I think it's 225,000 shares?
25         A.   I can't see the number, but something of

49 (Pages 190 to 193)

Tsvetan Beloreshki                                                    March 2, 2010
                              New York, NY

---

Page 194

T. Beloreshki - Direct

1       T. Beloreshki - Direct
2   that nature, yes.
3       Q.   And do you have an entry for Westminster?
4       A.   I do see that page.
5       Q.   22925?
6       A.   Yes.
7       Q.   Do you see a sale from Westminster to
8   Amro?
9            MR. SOHN:  Which day are we talking about
10  again?
11           MR. GUIDO:  April 12th.
12      A.   Yes, I do see a sale.
13      Q.   Do you see that those trades offset each
14  other?
15      A.   I can't quite make out the numbers, but it
16  appears to be that the share numbers are the same,
17  but the value of those shares or the transaction
18  price is different.
19      Q.   There are transaction costs, aren't there,
20  in any transaction?
21      A.   On a general -- generally speaking, yes.
22      Q.   But the figures are fairly close together?
23           MR. SOHN:  Objection.
24      A.   I don't know.  One of the numbers I see is
25  233,000.  The other one I see is 285,000.  And,

---

Page 195

1       T. Beloreshki - Direct
2   again, I may be incorrect on that.
3       Q.   But there are shares purchased in the
4   Refco account in the mid to 200,000 range?
5       A.   Yes.
6       Q.   And there's sales from the Westminster
7   account somewhere in the mid 2,000 share range?
8       A.   Yes.
9       Q.   Did you look to see whether or not those
10  were washed trades?
11      A.   No.
12      Q.   Did anyone ever tell you that there were
13  wash trades on that date between Amro Westminster and
14  Amro Refco?
15      A.   I don't know if I had been told about
16  washed sales.
17      Q.   Pardon?
18      A.   I don't know if we had been told about
19  wash sales prior to issuance of the report.
20      Q.   Prior to the Glosten report?
21      A.   Correct.
22      Q.   You just don't recall or you don't think
23  it --
24      A.   I just don't recall.  I don't want to mix
25  it with a different case.

---

Page 196

1       T. Beloreshki - Direct
2       Q.   Now, look at your expert report, the
3   Paragraph 62.
4       A.   Yes.
5       Q.   You got that?
6       A.   Yes.
7       Q.   Now, you're talking about manipulative
8   strategy aimed at artificially depressing the price
9   of Sedona shares.  Did you make an effort to
10  determine whether or not there was a manipulative
11  strategy aimed at artificially increasing the price
12  of Sedona shares?
13      A.   Some of our analyses, statistical
14  analyses, would be responsive to that question.  They
15  may identify relation between Rhino transactions and
16  stock price increases.
17      Q.   But you didn't express an opinion on that,
18  did you?  You only addressed suppressing the shares
19  not increasing -- artificially increasing the price?
20      A.   Correct.  I would just note that none of
21  the statistical analyses that we had performed were
22  indicative of -- of manipulation on the outside.
23      Q.   Is one of the risks in a market
24  manipulation that you may not be able to sell the
25  stock that you acquire in the manipulation at a high

---

Page 197

1       T. Beloreshki - Direct
2   enough price to make it profitable?
3            MR. SOHN:  Objection.
4       A.   That would be a risk generally associated
5   with trading.
6       Q.   That is a risk in market manipulation
7   particularly, isn't it?
8       A.   I don't know why in particular.
9       Q.   It is a risk in market manipulation?
10      A.   To the extent you may be holding shares
11  and those may decline in value, yes, it is a risk.
12      Q.   Well, I mean, didn't you opine in the
13  article if one of the disincentives to engage in
14  market manipulation is that you may push it down and
15  get the price at a lower price, but it may bounce up
16  in a way that hurts you after the manipulation?
17      A.   You may be conflating at least two
18  concepts from that piece.  One is that it may not be
19  advantageous for a manipulator to push the price low
20  enough as to precipitate financial distress for the
21  company.  And the other concept is that if a
22  manipulation strategy is executed via short selling,
23  the profit of that strategy may suffer should the
24  stock price rebound for whatever reason.
25      Q.   Well, is it in the interest of a

---

Tsvetan Beloreshki                                              March 2, 2010
New York, NY

## Page 198

1          T. Beloreshki - Direct
2    hypothetical manipulator who has a convertible
3    debenture, who has pushed the price down to
4    converting at a lower price and therefore get more
5    shares also in that manipulator's interest to you
6    interest to push the price back up to increase the
7    profit on those converted shares?
8          MR. SOHN:  Objection to form.
9       A.   I mean, generally speaking, if you have a
10   short position, you'll benefit from a decline in the
11   stock price; and if you have a long position, you'll
12   benefit from an increase in the stock price.
13      Q.   Is that your answer?
14      A.   Yes.
15      Q.   So, is your answer that there's -- that a
16   manipulator who converts at a lower price has no
17   interest in pushing the price up?
18      A.   That's not what I said.
19      Q.   Okay.  Well, my answer -- my question is,
20   does he have an interest in pushing the price up to
21   sell it at a higher price?
22         MR. SOHN:  Objection.
23      A.   Assuming one has a long position, other
24   things equal, yes.
25         MR. GUIDO:  I would like to have marked as

## Page 199

1          T. Beloreshki - Direct
2    exhibit next number the expert report that you issued
3    in Pet Quarters.
4          (Whereupon, Exhibit Prowse Beloreshki-11
5    is marked for identification by the reporter.)
6       Q.   Do you have Exhibit 11 in front of you?
7       A.   Yes, sir.
8       Q.   Did you -- I want to direct your attention
9    to Page 19.  See Paragraph 57 talks about the NASDAQ
10   Equity Trade Journal?
11      A.   Yes.
12      Q.   What is the NASDAQ Equity Trade Journal?
13      A.   I do see that.
14      Q.   Pardon?
15      A.   I do see the reference to NASDAQ Equity
16   Trade Journal.
17      Q.   What is it?
18      A.   It was effectively a database that had
19   transactions in it.
20      Q.   Was it like the audit trail report?
21      A.   Similar.
22      Q.   It contains similar data, doesn't it?
23      A.   Yes.
24      Q.   It includes the time the trades were
25   executed, the times they were reported, the price and

## Page 200

1          T. Beloreshki - Direct
2    the volume?
3       A.   Yes, sir.
4       Q.   And who the brokerage firms were on each
5    side of the trade?
6       A.   I believe so.
7       Q.   Why did you look at it when you were doing
8    the Pet Quarters analysis?
9       A.   Why did I look at it?
10      Q.   Yes.
11      A.   This was in response to opposing experts
12   analyzing these data and doing inappropriate
13   analysis -- analysis that were not proper.
14      Q.   This is not the rebuttal expert report.
15   This is the expert report.
16      A.   Is it?
17      Q.   There was no other expert report at this
18   time.
19      A.   Yes.  So there was a previous report.
20      Q.   Okay.  What page?
21      A.   On the same page, Paragraph 57.  As you
22   can see, in the later part of that paragraph it says.
23      Q.   What paragraph is this?
24      A.   The same paragraph, 57.
25      Q.   Hmm?

## Page 201

1          T. Beloreshki - Direct
2       A.   57.
3           "We implemented the following procedure
4    described by Claimant's expert, Dr. Shapiro, in a
5    previous matter with similar allegations."
6       Q.   Okay.  So, what you did is you saw that
7    Dr. Shapiro in a previous matter did this.  You're
8    not responding to a previous report in Pet Quarters,
9    are you?
10      A.   My recollection was incomplete on that,
11   yes.
12      Q.   Where did you get the NASDAQ Equity Trade
13   Journal?
14      A.   I don't know.
15      Q.   You don't know?
16      A.   I don't know.
17      Q.   Did you get it from Dr. Shapiro?
18      A.   Unlikely.
19      Q.   Okay.  Turn to the next page, Page 20
20   paragraph 61?
21      A.   Yes.
22      Q.   It says we conducted a regression
23   analysis.  Do you see the next paragraph you define
24   it.  You say:  A regression analysis is a statistical
25   tool that estimates the relationship between one

51 (Pages 198 to 201)

Tsvetan Beloreshki                                                  March 2, 2010
New York, NY

Page 202

1            T. Beloreshki - Direct
2   variable, the dependent variable, and another
3   variable, the independent variable, by controlling
4   for the effect of other variables that might also
5   affect, A-F-F-E-C, the dependent variable.
6            How are you using the term "affect" there?
7        A.  As in have an effect on.
8        Q.  Well, are you using it in terms of
9   statistically significant?
10       A.  That is the context.
11       Q.  Okay.  Now, on -- I want to direct your
12  attention to Page 23.  Look at footnote 21.
13       A.  Yes.
14       Q.  See where it says:  The regression
15  coefficients to the relationship between Pet
16  Quarters' stock price and the NASDAQ Composite index
17  range from between .3 and .31 are not statistically
18  significant at the 95 percent confidence level, the
19  level most commonly used by statisticians, but the
20  regression coefficients for the relationship between
21  Pet Quarters' stock price and the NASDAQ Composite
22  index are statistically significant at the 95
23  confidence level, the level occasionally used by
24  economists and statisticians.  No confidence levels
25  below 90 percent are generally accepted for use by

Page 203

1            T. Beloreshki - Direct
2   economists and statisticians.
3            Is that your position?
4        A.  Yes.
5        Q.  And did you use a 90 percent confidence
6   level in your regression analysis in Pet Quarters?
7        A.  I don't recall.  Generally we -- the one
8   that carries weight with me is 95 or 99.
9        Q.  Pardon?  Take a look at Paragraph 71?
10       A.  I'm sorry?
11       Q.  Take a look at Paragraph 71, the Pet
12  Quarters report.
13       A.  Yes.
14       Q.  It says:  While the regression analysis
15  are indicative of a, quote, weak, unquote,
16  relationship between the performance of Pet Quarters
17  stock and the performance of NASDAQ in terms of
18  day-to-day stock price movements, they do not
19  demonstrate that Respondents' transactions in Pet
20  Quarters' common stock had any impact on Pet Quarters
21  stock price.
22           Does that refresh your recollection that
23  you use the 90 percent percentage in your analysis?
24       A.  As was reported in -- as we just cited
25  about.  There was a discussion footnote about 90, and

Page 204

1            T. Beloreshki - Direct
2   this is the reason why there is the statement weak
3   relationship in Paragraph 71.
4        Q.  But you did use the 90 percent impact to
5   reach a conclusion in Paragraph 71?
6        A.  We used it, and we properly noted that
7   that relationship was weak.
8        Q.  Okay.  But you used it?  I'm just asking a
9   simple question, did you or did you not rely upon it
10  for the Paragraph 71?  It's a simple yes-or-no
11  answer.
12       A.  Yes.
13       Q.  Yes?
14       A.  Yes.
15       Q.  Okay.  Now, let's go to Paragraph 32.  I
16  want to direct your attention to Paragraph 105.
17           MR. SOHN:  Page 32?
18           MR. GUIDO:  Page 32, Paragraph 105.
19       Q.  This says:  Respondents executed a number
20  of large inter-account transfers off-market without
21  having those transfers affect reported market
22  volumes.  This fact belies the idea of Respondents'
23  attempt to create a misleading picture of liquidity
24  in the marketplace for Pet Quarters common stock.
25           Do you see that?

Page 205

1            T. Beloreshki - Direct
2        A.  I do.
3        Q.  If the Respondents had executed a large
4   number of inter-account transfers on market having
5   those transfers reported into the market, would that
6   indicate an intent to create a misleading picture of
7   liquidity in the marketplace for the stock?
8            MR. SOHN:  In this case?
9            MR. GUIDO:  Yeah.
10       Q.  If the opposite had occurred?
11       A.  It may be something that one might look
12  into.  It's not sufficient to jump to a conclusion,
13  but it may be something that one might look at.
14       Q.  But it could indicate an intent to create
15  a misleading picture?
16       A.  Potentially.
17       Q.  Okay.
18       A.  It has to be looked into.
19       Q.  Now, then on Page 41, there's a discussion
20  at the bottom of the page about a thing called an
21  Altman's Z-score?
22       A.  Yes.
23       Q.  It's a generally accepted method by
24  financial analysts, academics and others to predict
25  the likelihood of business failure leading to

Tsvetan Beloreshki                                           March 2, 2010
                          New York, NY

| Page 206 |
| --- |

T. Beloreshki - Direct

1                T. Beloreshki - Direct
2  bankruptcy?
3      A.  Yes.
4      Q.  Did you perform an Altman's Z-score on
5  Sedona?
6      A.  I don't recall doing that.
7      Q.  You don't recall or you didn't do it?
8      A.  I don't believe I had done that.
9      Q.  Why not?  Why not?
10     A.  Oh.  Why not.  That was the question?
11     Q.  Yes.
12     A.  I don't have a recollection of -- you
13 know, of making a decision one way or the other to
14 include it or not to include it.  I just note these
15 are different cases.
16     Q.  But both of them involved allegations of
17 market manipulation?
18     A.  That is correct, but at least I don't
19 treat them as cookie cutters.
20     Q.  Pardon?
21     A.  At least I don't treat them as cookie
22 cutting.
23     Q.  Now, I would like you to take a look at
24 Exhibit Number 12.
25         Do you recall that you prepared a rebuttal

| Page 207 |
| --- |

1                T. Beloreshki - Direct
2  expert report in Pet Quarters?
3         (Whereupon, Exhibit Prowse Beloreshki-12
4  is marked for identification by the reporter.)
5      Q.  Have you had an opportunity to review
6  Exhibit Number 12?
7      A.  Yes.
8      Q.  Do you recall preparing this report?
9      A.  Yes.
10     Q.  Pardon?
11     A.  Yes.
12     Q.  Now, on Page 8, I may have asked you this
13 question once before, but I'll repeat it.  You talk
14 about a thing called a firm's beta coefficient in
15 Paragraph 16 on Page 8.
16         See that paragraph?
17     A.  Yes.
18     Q.  It talks about a capital asset pricing
19 model.  Do you see that?
20     A.  Yes.
21     Q.  Did you perform that on Sedona?
22     A.  If the question is whether we performed a
23 regression that had solely Sedona price, Sedona
24 returns as a dependent variable and say a NASDAQ as
25 the independent variable, I don't believe we did

| Page 208 |
| --- |

1                T. Beloreshki - Direct
2  that.
3      Q.  Now, did you -- You identified a number of
4  peer group companies that you referred to in one of
5  your exhibits in this -- in this case.  And you have
6  their performance, and you -- it's in Exhibit 5A in
7  your report.
8      A.  Yes.
9      Q.  Now, when you selected those peer groups,
10 because you didn't use -- I think you only used 59 of
11 121 that were in a peer group identified by
12 Bloomberg?
13     A.  Correct.  So they were not selected by me.
14     Q.  Who selected them?
15     A.  Bloomberg.
16     Q.  121 were selected by Bloomberg?
17     A.  Correct.
18     Q.  Why did you only come up with 59?
19     A.  As the footnote says, that was due to data
20 limitations.
21     Q.  With regard to those peer group companies,
22 did you go take a look at the specifics of those
23 companies, their fundamentals?
24     A.  No.  I relied on the Bloomberg analytics
25 to identify these companies.

| Page 209 |
| --- |

1                T. Beloreshki - Direct
2      Q.  Well, what do the Bloomberg analytics do
3  when they define a peer group?
4      A.  I don't know the analytics behind it.
5      Q.  Well, one of your backups refers to an
6  industry group as the peer group.  Was the Bloomberg
7  peer group analysis just merely an identification of
8  an industry group in this case being software
9  vendors?
10     A.  Again, I don't know the analytics that go
11 behind Bloomberg's determination of peer group
12 companies.
13     Q.  So you just accepted whatever they said
14 were peer group companies, and you just applied it
15 here without determining for yourself whether or not
16 there were actual peer --
17     A.  Correct.  I tend to like Bloomberg.
18     Q.  Okay.  You tend to like Bloomberg.  Now,
19 did you look at the companies in terms of their
20 market capitalization?
21     A.  The companies where?
22     Q.  The peer group companies.  And compared
23 them to Sedona?
24     A.  No.
25     Q.  Did you look at them in terms of the

53 (Pages 206 to 209)

Tsvetan Beloreshki                                                  March 2, 2010
New York, NY

| Page 210 | Page 212 |
|---|---|
| T. Beloreshki - Direct | T. Beloreshki - Direct |

**Page 210**

1        T. Beloreshki - Direct
2   liquidity of their stock?
3        A.   No.  As I said, I used the Bloomberg data.
4        Q.   Did you look at them in terms of their net
5   return?
6        A.   I believe the net returns are part of
7   this -- this chart.
8        Q.   Did you look at them in terms of their --
9   what I meant by net returns is their profit, their
10  net profit.  Excuse me.  Not stock price.
11       A.   I wouldn't think so.
12       Q.   Did you look at them in terms of number of
13  shareholders?
14       A.   No.
15       Q.   Did you look at them in terms of the
16  number of shares outstanding?
17       A.   No.
18       Q.   Did you look at them in terms of number of
19  shares registered?
20       A.   No.
21       Q.   Did you look at them in terms of price
22  sales ratio?
23       A.   No.
24       Q.   Now, one of the things that you talked
25  about is that during the time period that you

**Page 211**

1        T. Beloreshki - Direct
2   analyzed the Sedona stock, it was a declining stock.
3   The price was declining during this period of time.
4   Do you recall that?
5        A.   During what period?
6        Q.   During the period of time that you
7   analyzed it.
8        A.   Well, we have analyzed a number of time
9   periods.
10       Q.   Well, look at Page 8 of your report.
11            MR. SOHN:  The report in this case?
12            MR. GUIDO:  The report in this case,
13  Exhibit 4.
14       A.   Yes.
15       Q.   You say that the performance of the stock
16  price over this period declined between March 1st and
17  May 31st, 2001.  And then in -- Take a look -- And
18  then it directs your attention to Exhibit Number 5A?
19       A.   Yes, sir.
20       Q.   Now, when I look at -- And maybe I'm
21  misreading this -- this chart, but if I look at the
22  red line which is Sedona price returns --
23       A.   Yes.
24       Q.   -- it looks like between March 1st and
25  May 31st, that the stock price increased.

**Page 212**

1        T. Beloreshki - Direct
2            MR. SOHN:  2001?
3            MR. GUIDO:  2001.
4        Q.   Is that correct or am I misreading this
5   chart?
6        A.   I can't see the exact dates, but I'm
7   inclined to agree with you.
8        Q.   So during that period of time that, at
9   least my reading of the complaint about the market
10  manipulation of the price, at least in one portion of
11  it, is that the price increased it didn't decrease
12  during this period of time?
13       A.   It's a little bit too general a statement.
14  And I -- and, again, I don't see the exact date, so I
15  would say that the way I look at the chart, the first
16  part of 2001 both -- well, Sedona, NASDAQ, and the
17  peer group were declining.  And after that, there was
18  a period when all the three were increasing.  But
19  that's an eyeball test.
20       Q.   No, I understand for the longer period of
21  time.  I'm asking you about the shorter period of
22  time.
23       A.   I'll be happy to answer that question if I
24  had the data in front of me.
25       Q.   But if I want know -- if I want to see the

**Page 213**

1        T. Beloreshki - Direct
2   specific data, one of the places I could look is the
3   backup data that you produced for the SEC for this
4   chart or graph?
5        A.   Correct.
6        Q.   But you agree with me that peers, based on
7   this -- this -- this graph that the price increased
8   between March of --
9        A.   No, I do not agree with that.  I just
10  don't know.  I don't see the dates, so I -- I -- I
11  just don't know.
12       Q.   I thought you just said it appeared to
13  increase.
14       A.   No.  You attached particular dates to my
15  statement.  My statement was that looking at the
16  chart and not being certain about the dates, it would
17  appear to me that Sedona, NASDAQ and the peer group
18  companies declined in the first -- in some first
19  portion of 2001, after which all the three of them
20  increased, but I don't know the exact date ranges.
21       Q.   Okay.  Let's take a look at Page 19 of
22  your rebuttal report.
23       A.   Yes.
24       Q.   This is a response to the plaintiff's
25  report that the -- the respondent, the client you

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                          March 2, 2010
New York, NY

Page 214

T. Beloreshki - Direct
1
2   were testifying on behalf of, trades between the
3   accounts injected false information into the market.
4   And Paragraph 50 is -- includes the claim that the
5   trades -- you're addressing a claim by the
6   plaintiff's counsel that trades between respondents'
7   accounts were perceived by market participants as
8   selling pressure in the market, depressing the
9   company's share price.  And then you say that the
10  plaintiff's report provides no evidence or basis of
11  this claim, and then you add this statement.  In
12  basic finance -- "In fact, basic finance area
13  suggests exactly the opposite conclusion."
14        Why did you say that?  What was the basis
15  of that?
16     A.   I don't recall the context of -- of these
17  analyses.  It may be -- I don't know what the nature
18  of these trades between respondents' accounts was.
19     Q.   Why don't you look at Paragraph 51.  Maybe
20  that will help refresh your memory of what your
21  understanding of the market is.
22        It says:  "Second, the trade themselves,
23  to the extent they suggest active trading in the
24  marketplace, suggest greater liquidity which would
25  tend to increase the value of Pet Quarters' stock."

Page 215

1            T. Beloreshki - Direct
2   And then the last sentence of the paragraph says:
3   Thus, this is another reason higher volume might be
4   regarded by the market is good news for Pet Quarters.
5     A.   So --
6     Q.   So these are wash trades.  Right?
7     A.   I don't know if they're wash trades.  I
8   don't remember that part.
9     Q.   Well, I mean, it says it's trades between
10  respondents' accounts.  Those are, by definition,
11  wash trades, aren't they?
12     A.   They may be wash trades.  I don't know if
13  they are wash trades.
14     Q.   Okay.  But wash trades have a tendency to
15  interject false information about the liquidity in
16  the market?
17     A.   Wash sales may create the impression of
18  high liquidity and value -- there actually is.
19     Q.   I want to go to Page 20 and Paragraph 53.
20     A.   Yes.
21     Q.   Paragraph 53 says -- This is your analysis
22  of the transactions that were included in the
23  plaintiff's report, and you explain why in your view
24  inter-account transactions were not appropriately
25  included in the analysis to prove that there was

Page 216

1            T. Beloreshki - Direct
2   market manipulation.  Isn't that correct?
3     A.   I don't have a recollection of these
4   analyses.
5     Q.   It talks about non-market transfers.
6          Do you see that?
7     A.   Three transactions were non-market
8   transfers.  Yes, I do.
9     Q.   Okay.  What's a non-market transfer?
10     A.   Transfers that were not reported to the
11  marketplace.
12     Q.   And what kind of transfers would those be?
13     A.   I don't know what you mean.
14     Q.   Well, let me give you some examples.  If I
15  DTC shares from one account to another, is that a
16  non-market transfer?
17     A.   I don't know the answer to that question.
18     Q.   Well, did non-market -- Can non-market
19  transfers in any way have an effect on the price of
20  the stock in the market?
21          MR. SOHN:  Ever?
22          MR. GUIDO:  Ever.
23     A.   They may.
24     Q.   In what situation?
25     A.   I don't know particular situations.

Page 217

1            T. Beloreshki - Direct
2     Q.   In fact, you don't know of any, do you?
3          MR. SOHN:  Mr. Guido, he wasn't finished
4   with his answer.
5     A.   If such information becomes available to
6   all market participants through some channel of
7   information transfer other than the market tape,
8   potentially yes.
9     Q.   Other than it becoming available for the
10  other channels?
11     A.   Well, that was the one example I could
12  think of.
13     Q.   All right.  Well, let's speed this up.
14        You included non-market transactions in
15  your regression analysis?
16     A.   For some of the regression analysis,
17  that's correct.
18     Q.   Why?
19     A.   For the reason I just explained.  I did
20  not know that these had no impact on the trading of
21  Sedona.
22     Q.   And you didn't know whether they did have
23  an impact either, did you?
24     A.   A priori, I did not know whether any of
25  the materials that were determined were potentially

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                      March 2, 2010
New York, NY

## Page 218

T. Beloreshki - Direct

1    relevant would indeed be relevant.
2        Q.   Well, I mean you were -- you were
3    attempting to determine whether or not the writer of
4    transactions, the so-called writer of transactions
5    had an impact on the Sedona market price, weren't
6    you?
7        A.   Correct, which is why we looked at all
8    types of Rhino transactions in an --
9        Q.   Why did you include transactions that were
10   not reported to the market?
11       A.   For the reason I explained to you.
12   Because I do not know that those necessarily would
13   have no impact.
14       Q.   But you don't know whether they did have
15   an impact either, did you?
16       A.   I didn't know whether any of the variables
17   we used would have an impact, a priori, going into --
18       Q.   Well, you were measuring reported
19   transactions, weren't you?
20       A.   I was using the data.
21       Q.   If you were trying to determine whether
22   Sedona -- Rhino -- Rhino transactions had an impact
23   on Sedona's stock price, one of the things you would
24   naturally look to are reported transactions to the

## Page 219

T. Beloreshki - Direct

1    market.  Right?
2        A.   That would be one thing to look at.
3        Q.   And the one thing that you would typically
4    exclude would be transactions that are not reported
5    to the market, unless you had reason otherwise to
6    includes them?
7        A.   As I said, a priori, I did not have a
8    reason to include those.
9        Q.   Did Caryn Schechtman tell you to include
10   desk transfers into you analysis?
11       A.   Caryn Schechtman has nothing to do with
12   the specification of our analysis.
13       Q.   Well, wait a minute.  You didn't talk to
14   Caryn Schechtman about the data that you were
15   including in your report?
16       A.   I said she didn't have inputs into the
17   model specifications.
18       Q.   You didn't discuss with her what you
19   included into the -- into the data that you analyzed?
20       A.   She would have seen outputs.  She would
21   have seen the results, but the model specification
22   was determined by us.
23       Q.   Where did you get the information to put
24   in your database other than from Caryn Schechtman?

## Page 220

T. Beloreshki - Direct

1        A.   Those were the complete transaction
2    records.  Without those we would not have been able
3    to reconcile the accounts.
4        Q.   I understand.  What were the complete
5    transaction records that were provided to you?
6        A.   Those were all transactions as reflected
7    in the account statements.
8        Q.   But I mean -- I'm sorry.  I mean, but if I
9    look at Exhibit Number 3, which is the material you
10   say you considered --
11       A.   Yes.
12       Q.   -- I don't see account statements for
13   Westminster, for example, at all.  So, how can you
14   say you looked at them, when here in your report that
15   you signed you said you didn't review those.
16           MR. SOHN:  Objection.
17       A.   I know I looked at them, and I know my
18   team at NERA looked at them because this is how we
19   assemble the database.
20       Q.   Really?  Then why didn't you conclude that
21   information in Exhibit Number 3?  It's not here.
22       A.   I -- again, I don't know what was subsumed
23   on the trading data.
24       Q.   Well, you were issued a subpoena to

## Page 221

T. Beloreshki - Direct

1    produce all documents that you relied upon?
2        A.   Yes.
3        Q.   And a court order to do that.  Are you
4    saying that that trading data that you produced to
5    the SEC includes the Westminster account statements?
6    I have those statements in my office.
7        A.   Okay.
8        Q.   Okay?  My question for you is, are those
9    statements in my office?  The purported trade data
10   which has the Bates stamps --
11       A.   Okay.
12       Q.   -- that are on your original
13   unexpurgated Exhibit 3 are in my office.
14       A.   Okay.
15       Q.   Are you telling me today under oath that I
16   have in my office the trading data in the Westminster
17   account statements in that group?
18           MR. SOHN:  Objection to form.
19       A.   I don't know what you have in your office.
20       Q.   You don't know what I have in the office,
21   and don't what you produced and you don't know what
22   you looked at, do you?
23       A.   That -- Well, I don't know and I don't
24   recall everything that I have looked at.  That would

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

Page 222

T. Beloreshki - Direct

1       T. Beloreshki - Direct
2   be a fair statement.  It has been a number of years.
3       Q.   Isn't it true that either Caryn Schechtman
4   or someone working with her provided you with an
5   electronic database from which you prepared your
6   report?
7       A.   No.  I don't believe that's the case.
8       Q.   Did anyone from Rhino provide you with a
9   database?
10      A.   The only electronic data that I had been
11  provided was the one we discussed hours earlier which
12  was years ago and was data that was used to
13  essentially double-check the information in the
14  account statements.  But there was no electronic
15  database or anything of that nature provided to me in
16  the preparation of this report.
17      Q.   Well, let's turn to your report, the
18  regressions in your report.
19          MR. SOHN:  Exhibit 4?
20          MR. GUIDO:  Exhibit 4.
21      A.   Yes, sir.
22      Q.   Now, the regressions in your report are on
23  Exhibit 13A and B.  Is that correct?
24      A.   Correct.
25      Q.   And these are the reports -- regressions

---

Page 223

1       T. Beloreshki - Direct
2   that you did, that you relied upon for your
3   conclusions in your report.  Correct?
4          MR. SOHN:  Objection.
5       A.   These are some of the regression analyses
6   we performed.
7       Q.   Well, did you rely upon them for any of
8   the conclusions in your report?
9       A.   We relied on all the regressions we
10  performed.
11      Q.   Well, let's go through the -- columns
12  here in Exhibit 13A.
13      A.   Okay.
14      Q.   On one of them it says any Rhino trading.
15  How was that -- How did you determine what any Rhino
16  trading was.
17      A.   Again, this is an indicated variable that
18  flags whether or not Rhino is present in the
19  marketplace.
20      Q.   Whether they bought or sold or just a bar?
21      A.   Let it be bar.
22      Q.   And that it -- It also included -- a flag
23  for any transfers into an account, did it not?
24      A.   What is it?
25      Q.   Transfers, any transfers.

---

Page 224

1       T. Beloreshki - Direct
2       A.   No.  What includes transfers?
3       Q.   Any Rhino trading on a day.  If there was
4   just -- there was only a transfer -- any time, any
5   day, did it get marked with a "1" for trading?
6       A.   I don't recall about these variable, but
7   it's possible.
8       Q.   Okay.  And if there was a deposit of a
9   conversion, did it get marked as a 1?
10      A.   I don't recall the specifics of that.
11      Q.   So you don't know?
12      A.   I don't know.
13      Q.   Rhino purchases.  Did you mark any
14  transfers in as purchases?
15      A.   My inclination is to say no, but I'll have
16  to double-check with the data.
17      Q.   What about Rhino sales?
18      A.   Same answer.
19      Q.   What about Rhino transfer?  What's that
20  refer to?
21      A.   Those are transfers into and out of
22  accounts.
23      Q.   Okay.  And did you attempt to determine
24  how they were transferred in and out?
25      A.   No.

---

Page 225

1       T. Beloreshki - Direct
2       Q.   And then it says Rhino principal.
3          Do you see that?
4       A.   Yes.
5       Q.   What does that refer to?
6       A.   That -- that refers to -- like in
7   conversion transactions and off shelf purchases.
8       Q.   And exercise of words?
9       A.   Yes.
10      Q.   And they're all transactions with Sedona.
11      A.   Yes.
12      Q.   Okay.  Have you ever -- I think you
13  indicated you looked at the auto train reports for
14  March and April?
15      A.   I looked through the file, yes.
16      Q.   Did you see any reporting of transfers of
17  principals increasing those auto train reports?
18      A.   No.
19      Q.   Now, the next says net daily shares
20  transacted as a percentage of the total reported
21  trading volume.
22      A.   Yes.
23      Q.   What's the reported trading volume
24  referred to there?
25      A.   That is the trading volume as obtained

---

57 (Pages 222 to 225)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 226

1            T. Beloreshki - Direct
2    from probably Bloomberg.
3        Q.   Okay.  Now, then there's a note.  It says
4    denote significance at 5 percent with one asterisk,
5    and two denotes significance at 1 percent level.  Do
6    you see where it says NASDAQ return?
7        A.   Yes.
8        Q.   And it has the asterisk?
9        A.   Yes.
10       Q.   Does that mean that -- that the
11   relationship between NASDAQ and Sedona's price during
12   this time period, June 26, 2000, through June 14,
13   2002, were related to each other in a significant way
14   at the 1 percent level?
15           MR. SOHN:  Object to form.
16       A.   I don't know.
17       Q.   Well, let me ask you:  You're the one who
18   put the asterisk next to NASDAQ returns.  What's it
19   mean?
20       A.   I just don't recall, or I don't know
21   whether the asterisks were put --
22       Q.   Pardon?
23       A.   I don't recall whether the asterisks were
24   put on the basis of individual regressions or a
25   family of tests.

Page 227

1            T. Beloreshki - Direct
2            MR. GUIDO:  I would like to have marked as
3    exhibit next number a document that we pulled off of
4    a production, an electronic production that was made
5    to us, and it's in a spreadsheet that is BP, and a
6    number of zeroes, 4.XLS.
7            We have put in a label on this sheet that
8    doesn't have all the numbers -- all the zeroes, but
9    we refer to it as BP 4.  And the tab under which it
10   exists is -- the tab is marked Exhibit 13B.
11           In fact, let me give the original to the
12   court reporter, and I'll get that document.
13           (Whereupon, Exhibit Prowse Beloreshki-13B
14   is marked for identification by the reporter.)
15       Q.   Did you prepare Exhibit 13B?
16       A.   No.
17       Q.   Who did?
18       A.   That would have been Erica Rose.
19       Q.   Pardon?
20       A.   Erica Rose.
21       Q.   Erica Rose.  Who's Erica Rose?
22       A.   An associate of mine who works with me and
23   Dr. Prowse on a number of occasions.
24       Q.   Okay.  When was this prepared?
25       A.   I don't know.

Page 228

1            T. Beloreshki - Direct
2        Q.   Well, was the original Exhibit 13B
3    prepared when you were at NERA?
4        A.   No.
5        Q.   No?
6        A.   The original 13B -- I don't know what is
7    the original 13B.
8        Q.   Pardon?
9            MR. SOHN:  You mean the one attached to
10   the report?
11           MR. GUIDO:  No.
12       Q.   This Exhibit Number 13.  Was the original
13   of this spreadsheet -- this is a copy of an
14   electronic spreadsheet on Excel.  Was this prepared
15   when you were first at NERA?
16       A.   I don't know whether this particular thing
17   was prepared first at NERA.  What did happen was that
18   I provided Erica an Excel spreadsheet that was
19   coming from my NERA days with various statistical and
20   econometric analysis, and she used that as the basis
21   for her work.
22       Q.   That's to prepare Exhibit 13?
23       A.   And other exhibits, possibly.
24       Q.   Okay.  Now, the -- behind that in BP 4 is
25   a spreadsheet that has various calculations and I

Page 229

1            T. Beloreshki - Direct
2    would like to have that marked as Exhibit 14.
3            (Whereupon, Exhibit Prowse Beloreshki-14
4    is marked for identification by the reporter.)
5            MR. SOHN:  Do you want -- it looks like
6    there's a bunch of them --
7            MR. GUIDO:  Keep the blue pages in.  I'll
8    explain why.
9        Q.   Now, the reason the blue pages are in
10   there is that this document, when it was printed --
11   you probably have looked at this before, but this is
12   a very wide spreadsheet, and it goes from A to --
13   Column A to Column AX and then from BA to BF, so it
14   has a series of regressions.  I want to see if we can
15   match these up with the one-page summary which has
16   been marked as Exhibit Number 13.  You can help us do
17   that.
18           Now, if you look at the first page of
19   Exhibit Number 14, it says Regression Number 1.  Do
20   you see that?  It says Column AC and AD.
21       A.   I do.
22       Q.   Now, does that correspond to the
23   Regression 1 for any Rhino trading on Exhibit 13?
24       A.   I don't know.
25       Q.   You don't know.  You can't tell.

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                      March 2, 2010

New York, NY

Page 230

1              T. Beloreshki - Direct
2       A.   It's not the usual way I look at an Excel
3   spreadsheet.
4       Q.   Does it -- take a look at Columns AE
5   through AG and look at the P value for Regression
6   Number 1 in Exhibit 13 and compare it to Exhibit 14,
7   Column AE through AG.  Are Columns AE through AG
8   reflective of Regression Number 1, which is all Rhino
9   trading?  And then to speed --
10      A.   It would appear that way.
11      Q.   When you compare the P values on 13 it's
12  463942, and on 14 it's 4639.  Right?
13      A.   Yes.
14      Q.   That would indicate that there's -- now
15  take a look at Regression Number 2.  That is the --
16  and that is A1 through AI.  Look at the Regression
17  35.
18      A.   Yes.  I see that.
19      Q.   What did it conform to?
20      A.   That would be -- I'm comparing the
21  P values, because I see them on that page with the
22  P values on Regression 2 of Exhibit 13 and they
23  appear to be the same.
24      Q.   In Column AJ.  Right?  And then you look
25  at the regressions for Rhino sales, which is

Page 231

1              T. Beloreshki - Direct
2   Regression Number 2, and under Rhino sales you hit
3   34.6 --
4       A.   I see that.
5       Q.   The column on Exhibit 13 that says Rhino
6   sales would conform to the Row AK on Exhibit 14.
7       A.   It appears that way, yes.
8       Q.   Okay.  And in the -- in the Rhino
9   transfer, you have to go to the next column, which is
10  on -- following the next -- the first blue sheet,
11  which would conform to the AP --
12           MR. SOHN:  When you say conform, you mean
13  have the same number?
14           MR. GUIDO:  Pardon?
15           MR. SOHN:  When you say conform, you mean
16  have the same number?
17           MR. GUIDO:  Yes.  I'm trying to figure out
18  where the numbers are derived from.
19      Q.   AP, which has the 88.7839, which conforms
20  to the 88.78 on Exhibit 13 for Regression 3?
21      A.   I do see that.
22      Q.   Hmm?
23      A.   I do see that.
24      Q.   And then the Rhino principal flag is 41.63
25  in AQ, and that conforms to the Rhino principal?

Page 232

1              T. Beloreshki - Direct
2       A.   I do see that.
3       Q.   Now, then we get to the net daily shares
4   -- net daily shares transacted as a percentage of
5   total reported trading volume.  Okay?  You see that.
6   In what column does that -- it seems like it would be
7   AT, but the numbers don't match, do they?
8       A.   I don't know what your question is.
9       Q.   Well, the question is:  If you take, on
10  Exhibit 13, for Regression Number 4 is net daily
11  shares transacted as a percentage of the total
12  reported trading volume --
13           Do you see that?
14      A.   Yes.
15      Q.   What column in Exhibit 14 would correspond
16  to that column on Exhibit 13?
17           MR. SOHN:  Objection.
18      A.   I don't know.
19      Q.   They both have the same heading, don't
20  they?
21      A.   They do have the same heading.
22      Q.   Except one is 417 and the other is 74.46,
23  so it can't be AT.  Right?
24      A.   I don't know.
25      Q.   Let's go to the next.  Take a look at AW,

Page 233

1              T. Beloreshki - Direct
2   net trading as a percentage of volume.
3           Do you see that one?
4       A.   Yes.
5       Q.   Look at the P value there and compare it
6   to the P value on Exhibit 13, net daily shares
7   transacted as a percentage of the total reported
8   daily volume.
9       A.   Okay.  That would appear, if I'm reading
10  things correctly, to correspond to what you refer to
11  as Exhibit 4.
12      Q.   Pardon?  That would correspond to the net
13  daily shares transacted as a percentage of total
14  reported trading value on Exhibit 13.  Right?
15      A.   The numbers on that page of Exhibit 14
16  appear to correspond to the P values of Regression 4
17  on Exhibit 13.
18      Q.   You mean 4A?
19      A.   Okay.  Now I'm lost.
20      Q.   Pardon?  4 or -- 4 has a 74.46.  4A is
21  74.08.
22      A.   The numbers in Columns AU -- no.  Yes.  AU
23  through AW appear to correspond to the P values of
24  Regression 4 in Exhibit 13.
25      Q.   Okay.  Now, take -- now -- then there's a

59 (Pages 230 to 233)

Tsvetan Beloreshki                                                   March 2, 2010
New York, NY

---

Page 234

1          T. Beloreshki - Direct
2   column called net daily shares transacted on Exhibit
3   Number 13.
4          Do you see that?
5      A.   Yes.
6      Q.   Now, that is listed as a fifth regression
7   on Exhibit Number 13.  Is that correct?
8      A.   You keep referring to Exhibit 13.  This is
9   -- just to make a distinction between Exhibit 13 on
10  the record and Exhibit 13 in the report.
11     Q.   Exhibit 13 on -- let's call it Deposition
12  Exhibit.  When I refer to the document that's in your
13  spreadsheet, it's a tab.
14     A.   As long as there's that distinction, I'm
15  fine.
16     Q.   Well, we need to make the record clear,
17  and I'm glad you pointed that out.
18          Now, with regard to the net daily shares
19  transacted on Exhibit 13 -- do you see that?
20          MR. SOHN:  Deposition Exhibit 13.
21     A.   Okay.
22     Q.   Net daily shares transacted, it has a
23  figure of 0.108 under Regression 5.
24          What does that conform to on Exhibit
25  Number 14?

---

Page 235

1          T. Beloreshki - Direct
2          MR. SOHN:  Objection.
3      A.   I don't know.
4      Q.   Take a look at -- you need to go to the
5   next blue divider.  I'm sorry.  I didn't make myself
6   clear, how this spreadsheet was set up.  Go past the
7   next blue sheet.  Now you'll get the next set of
8   columns in your spreadsheet.
9          Now, where do you find the corresponding
10  number for regression, the P value for Regression
11  Number 5?
12     A.   The P values on the Deposition Exhibit 13
13  appear to correspond to the P values in Columns -- on
14  the page of Exhibit 14 that I'm looking at with
15  column number -- Column headings BA, BB, and BC.
16     Q.   And that is net daily trading?
17     A.   That's what it is labeled, yes.
18     Q.   And that doesn't include transfers in or
19  principals.  Right?
20     A.   I believe that's correct.
21     Q.   And, in fact, if you look at your
22  Deposition Exhibit Number 13, it indicates at the top
23  when transfers and principals are not included in the
24  regressions.
25          Do you see that in the upper right-hand

---

Page 236

1          T. Beloreshki - Direct
2   corner of your Deposition Exhibit 13?
3      A.   I don't see that note.  So I don't know
4   what it necessarily means.
5      Q.   Pardon?
6      A.   I do see that note.  I don't know exactly
7   what it is referring to.
8      Q.   You don't know whether or not it --
9          THE VIDEOGRAPHER:  Excuse me, Counsel, I
10  have to stop you here.  The time is 5:44.  We're
11  going off the record.  This marks the end of Tape
12  Number 5.
13          (Recess.)
14          THE VIDEOGRAPHER:  The time is 5:54.  We
15  are back on the record.  This is tape Number 6.
16     Q.   Now, in your report under Tab 13 -- I'm
17  sorry.  There's a 13A and 13B.
18     A.   Yes.
19     Q.   And we've been basically looking at 13B
20  on -- or Tab Exhibit 13B, which is Exhibit 13.  And
21  that the -- you have a regression -- you have four
22  regressions in your report in 13B for this time
23  period March 1st through May 31st.
24          Do you see that?
25     A.   Correct.  Exhibit --

---

Page 237

1          T. Beloreshki - Direct
2      Q.   And it goes through what we've just marked
3   Column AW through Column 14.
4      A.   The last part I missed.
5      Q.   Well, on Exhibit 13 -- let's just --
6   Deposition Exhibit 13 is -- it says, "net daily
7   shares transacted as a percentage of total reported
8   trading volume."
9          Do you see that column?
10     A.   Yes.
11     Q.   And that is reported as a Regression 4,
12  and it has a -- a figure, a P value figure, of .070.
13  Okay?  Which conforms to -- you have a number under
14  Regression 4 and the top part is .15.
15          Do you see that?
16     A.   I do see the .15 number.
17     Q.   What does the .15 number mean, refer to?
18     A.   That's the coefficient associated with
19  this variable.
20     Q.   The coefficient, and it's .15?
21     A.   Yes.
22     Q.   Now -- and that -- then in Exhibit Number
23  13, there's net daily shares transacted, and there's
24  no number and, in fact, there's no regression listed
25  up there.  Why not?

---

60 (Pages 234 to 237)

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

---

Page 238

T. Beloreshki - Direct

1
2      A.   I don't know how this file was organized.
3      Q.   Hmm?
4      A.   I don't know how this file was organized.
5  This is probably the portion of the file that was
6  used in preparation for Exhibit 13B in the report.
7      Q.   Which is Exhibit Number 4?
8      A.   The report is Exhibit 4, yes.
9      Q.   So the first 4 regressions were used, but
10 not the fifth regression?
11     A.   They were all used.  Exhibit 13B reflects
12 four regressions.
13     Q.   What is the result of Regression Number 5
14 in terms of the statistical significance on Exhibit
15 Number 13, which is BP4 Tab 13B?
16     A.   In the Deposition Exhibit 13, you mean?
17     Q.   Yes, in Exhibit 13.  What is the
18 significance of the P value of .0108?
19     A.   That would not be a statistically
20 significant result.
21     Q.   That would what?
22     A.   That would not be a statistically
23 significant result.
24     Q.   Why not?
25     A.   As I explained earlier, and as it is

---

Page 239

T. Beloreshki - Direct

1
2  mentioned in the report, we used a battery or family
3  of tests, and when you do so you have to interpret
4  these statistics and P values accordingly.
5      Q.   What was the battery of other tests?
6      A.   For example -- well, there's exhibits that
7  reflect statistical analyses -- let me not talk -- so
8  you have Exhibit 11, which refers to statistical --
9      Q.   Hold it.  Don't go so quickly.
10     A.   Let's look at Exhibit 10.
11     Q.   Let's look at Exhibit 11.
12     A.   Okay.
13     Q.   First of all, Exhibit 11.  Okay?  We're
14 looking at 11B.  Right?
15     A.   Correct.  11B -- Exhibit 11 in general
16 reflects nonparametric tests that were performed, and
17 the reason we did this is so that you or somebody
18 who's looking at the data need not rely on a
19 parametric assumption as to the distribution of the
20 underlying data, so that's why Exhibit 11 was added
21 to the analysis.  Then Exhibit 10 --
22     Q.   Let's stick with Exhibit 11.
23     A.   Okay.
24     Q.   I'm sorry.  Exhibit 11, you're saying, was
25 done because you wanted to check whether or not the

---

Page 240

T. Beloreshki - Direct

1
2  figure .0108 was statistically significant in your
3  Deposition Exhibit 13?
4      A.   No.  I believe the question you had was
5  what other tests we had performed.
6      Q.   That wasn't my question.
7      A.   Then I apologize.
8      Q.   My original question was:  What does -- in
9  the regression 5 on Exhibit 13, what does .108 stand
10 for in terms of statistical significance?
11     A.   And I responded that it is not a
12 statistically significant result.
13     Q.   Is it within 95 percent confidence?
14     A.   No.
15     Q.   What would that number have to be to be
16 within 95 percent confidence?
17         MR. SOHN:  What number?
18         MR. GUIDO:  Regression Number 5 on
19 Deposition Exhibit 13.
20     A.   Roughly speaking, something in the range
21 of 002.  I apologize.  .05 divided by 18, whatever
22 that number happens to be.
23     Q.   .05 divided by what?
24     A.   18.
25     Q.   Hmm?

---

Page 241

T. Beloreshki - Direct

1
2      A.   18.  The number of regressions that he
3  performed.
4      Q.   I don't see 18 regressions.
5      A.   Well, there were nine regressions
6  performed and provided in our working papers for each
7  of the two time frames.
8      Q.   Wait a minute.  Aren't you mixing apples
9  and oranges?  You're taking one time frame and using
10 it to measure the results of another time frame?
11 What is this, Fantasy Land?
12         MR. SOHN:  Objection.
13     A.   No, it is not.
14     Q.   This is not statistics, and you know it.
15         MR. SOHN:  Mr. Guido, that's absolutely
16 inappropriate.
17     Q.   Well, tell me the literature that supports
18 that conclusion.  What is the literature?  Cite it.
19     A.   Sir, when you perform a statistical
20 analysis, as we discussed earlier, there is a
21 probability that you would reject a nonhypothesis
22 when that hypothesis is true; that is, there is what
23 is called a Type 1 error.  The likelihood of
24 observing Type 1 error increases with the number of
25 tests performed.  This is why statisticians use

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

---

Page 242

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2    various adjustments, in order to account for that.
3        Q.    And the literature says you compare
4    different time frames to do that calculation of
5    platform error.  Where do you find that?
6        A.    When you run a number of tests, you have
7    to adjust for the fact that you're increasing the
8    likelihood of a Type 1 error, and this is what the
9    adjustment that needs to be made is.
10       Q.    But you chose not to report it?
11       A.    Report what?
12       Q.    You chose not to include the net daily
13   shares transacted column in your report.  Why not?
14       A.    The report includes exhibits -- various
15   exhibits, various components.  I -- what I can tell
16   you is that Exhibit 13 fairly summarizes our
17   findings.
18       Q.    No.  I understand -- I understand what
19   you're saying in terms of you think it supports your
20   findings, but it also admits something that doesn't
21   support your findings, and that is Regression Number
22   5 that is, on its face, a correlation of less than 95
23   percent, just on its face.
24            Don't give me this sort of testing.  I
25   just want to know that this regression standing on

---

Page 243

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2    its own on Exhibit 13 of your deposition, is that
3    within 95 percent confidence level on its own?
4        A.    This regression cannot be viewed on its
5    own because we ran a family of tests.
6        Q.    I understand that.  I want to know whether
7    based on its own -- okay, forget your battery of
8    tests -- we'll deal --
9        A.    I --
10       Q.    Sure you can.  You did this regression.
11   The question is:  What does 0.0108 stand for in terms
12   of a P value?
13       A.    It's a P value associated with that
14   regression.
15       Q.    And is it a P value that shows 95 percent
16   confidence level?
17       A.    No.
18       Q.    And is it because of the battery of tests,
19   standing on its own, does it show a P value --
20       A.    It cannot stand on its own.
21       Q.    I'm sorry.  Where in your report do you
22   talk about making any such adjustments?  Exhibit
23   Number 4.  Show me where you talk about the need to
24   make such adjustments.
25       A.    The report, I believe, refers to the

---

Page 244

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2    family or battery of tests.
3        Q.    Where?  Show me.
4        A.    I'll look it up.  That would be Paragraph
5    55.
6        Q.    Where?  Paragraph 55?
7        A.    Yes.
8        Q.    A battery of generally accepted
9    statistically supported conclusions that Rhino
10   principals had no impact, as shown in Exhibit 9, a
11   statistical analysis using parametric statistical
12   tests fails to reject the hypothesis that the
13   statistical analysis was similar to whether Rhino was
14   active in the marketplace.  Okay?  That's only
15   talking about a test.  When you're talking about
16   Regression Number 1, that's not talking about
17   Regression Number 5.
18       A.    No.  The question was whether we refer to
19   battery of tests in the report, and that's the
20   answer.
21       Q.    That's go back to Exhibit Number 13.
22   Okay?  Maybe this is will help you understand --
23   Deposition Exhibit 13.  See the column that says
24   "mark," or the line that says "mark"?
25       A.    I do see that.

---

Page 245

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2        Q.    All right.  Now -- And you see that
3    there's a mark under net daily shares transacted?
4        A.    What do you mean?
5            MR. SOHN:  An asterisk?
6        A.    I do see an asterisk.
7        Q.    You see the asterisk?
8        A.    Yes.
9        Q.    Okay.  And it's under net daily shares
10   transacted?
11       A.    Yes.
12       Q.    And you see your footnote, "Asterisk
13   denotes significance at 5 percent"?
14       A.    Where's that footnote?
15       Q.    Under the notes that are on Exhibit 13.
16       A.    Correct.  I do see that.
17       Q.    Now, doesn't the asterisk indicate that
18   the net daily sales transacted P value regression
19   denotes a significance at 5 percent?
20       A.    If you don't take into consideration the
21   proper adjustment for P value.
22       Q.    That was my question.  Okay?  So if you
23   don't take your battery of tests adjustment, which
24   you now say is required, if you don't take that into
25   consideration, is it that that figure, 0.0108,

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                            March 2, 2010
New York, NY

Page 246

T. Beloreshki - Direct

1  
2  denotes significance at 5 percent if you don't do
3  your battery of test analysis?
4      A.   If one were to run a single regression
5  analysis and -- and that would result in a P value of
6  .01, that would be a statistically significant
7  result.
8      Q.   Thank you.  Now, why didn't you include
9  that figure in your report and then explain that your
10  battery of tests indicated that it wouldn't be relied
11  upon?
12      A.   There was no discussion of including or
13  not including that I can recall.
14      Q.   No.  I didn't ask you that.  I asked you
15  why you didn't include it and then explain in your
16  report why it wasn't relevant.
17      A.   There was -- there was no decision on my
18  part one way or the other.
19      Q.   Who made the decision?
20      A.   I don't know the that a decision was made.
21      Q.   Let me show you what has been marked in
22  your spreadsheet as old Exhibit 11.
23           MR. GUIDO:  This is Exhibit Number 15.
24           (Whereupon, Exhibit Prowse Beloreshki-15
25  is marked for identification by the reporter.)

Page 247

T. Beloreshki - Direct

1  
2      Q.   This came from BP 6 in the spreadsheet you
3  produced and it's under Tab old Exhibit 11.  Okay?
4  And it's for a different time period, 3-1-2001 to
5  4-30-2001.
6      I want to know -- one of the questions I
7  have for you is why -- why did you prepare Exhibit
8  Number 11 with the time period March 1st, 2001,
9  through April 30th, 2001?
10      A.   I don't have a recollection of asking
11  anyone to prepare that exhibit.  There may have been
12  a discussion to use that time frame.
13      Q.   Pardon?
14      A.   I don't have a recollection of performing
15  that analysis or asking Erica to do it.
16      Q.   Was Erica working with you at FTI?
17      A.   Yes.
18      Q.   Wasn't Exhibit 15, old Exhibit 11,
19  prepared when you were at NERA?
20      A.   Oh.  I didn't realize that.  I don't know.
21      Q.   The metadata with this document indicates
22  it was prepared in 2002.  Was it prepared at NERA?
23      A.   If it was prepared at NERA, I don't know
24  who prepared this.
25      Q.   You have no idea.  You're the expert

Page 248

T. Beloreshki - Direct

1  
2  testifying about this report and this report has all
3  of these statistical regression analyses, and you
4  produce this tab old Exhibit 11 to us, and you don't
5  know what it is?
6      A.   The question was if I knew who performed
7  these analyses, and the answer is I don't know.
8      Q.   Who directed the performing the analysis?
9      A.   That would have been me, in all
10  likelihood.
11      Q.   All right.  Now, this has the -- it has
12  the same sort of format, although it has certain
13  things cut off on it and it has certain time periods
14  on it, and the one that this one is is the time
15  period number 5, which is March 1st, 2001 and April
16  30th, 2001, and it lists five different time periods.
17      Do you see that, 1 through 5?  How were
18  those time periods selected?
19      A.   When I was initially approached to work in
20  the criminal case, my task -- the way I understood it
21  was to perform any statistic analysis, slice and dice
22  the data any which way, in order to figure out how
23  manipulation could have occurred.
24      As a result, we developed a framework and,
25  you know, set up a number of model specifications and

Page 249

T. Beloreshki - Direct

1  
2  in addition, used various time frames.  These -- time
3  frame 2 is one of the time frames we have used in
4  this case.  It reflects, one, the vast portions of
5  the time frames that are specified in the complaint,
6  as well as a concentration of six of the nine, I
7  believe, conversion periods.  This is a reason why
8  you might want to look into this time frame.  Time
9  frame 3 includes, I believe, all the trading that was
10  done by Rhino, so this would be the objective reason
11  for relying on that.
12      Exhibit 4 -- my sense is that the first
13  conversion was done at some point in November, so in
14  between November of 2000 and September of 2001, that
15  period would probably encompass all the conversions,
16  or at least a substantial portion of them.
17      Period Number 1, probably the same thing.
18  It includes probably seven of the nine conversions
19  and it creates a rather shorter -- you know, somewhat
20  shorter time frame.  I don't know about Number 5,
21  but, you know, these will be objective criteria that
22  come to mind when I look at these time frames.
23      Q.   So the first -- Regression 5 you don't
24  know what the significance of March 1st through April
25  30th was?

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 250

T. Beloreshki - Direct
1
2      A.   No.  No.  I don't have a --
3      Q.   Who made this -- who made these
4  selections?
5      A.   I was probably involved in this.
6      Q.   Who else?
7      A.   I don't know.
8      Q.   Was Caryn Schechtman?
9      A.   No.
10     Q.   Well, how did you know what the criteria
11  were that you just gave me?
12     A.   There may well have been something in the
13  criminal complaint and for the others I gave you
14  reasons that make sense to an economist why you might
15  want to look at this period from an objective point
16  of view.
17     Q.   What's the reason for 11-22-2000 to
18  5-31-01?
19     A.   11-22-2000 was the issuance day for the
20  convertible, I believe, so it makes sense to look at
21  that.  At least one other conversion was in November,
22  so it might have been included in that time frame
23  although it might have been early in November.  And
24  then you run a period through the end of May, so you
25  include at least six of the conversion five-day

Page 251

T. Beloreshki - Direct
1
2  look back periods that one would be particularly
3  interested in, so this period strikes a balance
4  between an objectively selected start date and an
5  objectively selected final date, so as to include the
6  life of the security and a heavy concentration of the
7  conversion look back periods, which is presumably the
8  type of periods if one would want to have a more
9  serious look.
10     Q.   Why was 9-28-2001 picked as a closing
11  date?
12     A.   My sense is that that probably would
13  include, if not all, maybe seven or eight of the
14  conversion periods.
15     Q.   And why was -- the only two that were
16  included were Regression Number -- Time period 2 and
17  Time period 3, correct?
18     A.   Correct.
19     Q.   Why were all the others excluded?
20     A.   They were not excluded.
21     Q.   Well, there's nothing in the report to
22  reflect the results of those regressions for those
23  time periods, is there?
24     A.   This was -- the selection of the time
25  periods reflected in the report are the results of a

Page 252

T. Beloreshki - Direct
1
2  joint decision by me and Steve Prowse as to what time
3  frames would be appropriate to analyze from an
4  economist's point of view.
5      Q.   And what was it -- what was the criteria
6  that you and Mr. Prowse used to determine what was
7  appropriate?
8      A.   Well, the one thing that I tried to do is
9  use as objective a set of criteria as possible, so
10  the first period includes all Rhino trading.  The
11  start point and the end point are determined by the
12  data.  There is no input by me or by Steve Prowse on
13  that, and to the extent that you have the same
14  participants, presumably guided by consistent set of
15  incentives, perhaps too many too late, perhaps not,
16  that is a set of data that warrants analysis.
17          The other one, the period between March
18  and May of '01 bows to -- as I said, includes the
19  many time frames that we were reading into the
20  complaint as possible focus of the complaint, and it
21  also includes the first time when the debentures
22  become convertible and includes five or six of the
23  conversion periods -- basically, a huge concentration
24  of the conversion periods, all the look back periods
25  that I and Steve understood were the focus of SEC's.

Page 253

T. Beloreshki - Direct
1
2  So that's the rationale.
3      Q.   You know, you talked about a number of
4  ways of sort of determining the validity of this
5  statistical analysis.  You talked about a bank of
6  analysis.  Was that the term that you used?
7      A.   Family?
8      Q.   Family of analysis.
9      A.   Of tests.
10     Q.   And that's why you decided not to include
11  the net daily share of trading in your report?
12          MR. SOHN:  Objection.
13     A.   No.
14     Q.   Or a battery, I think you said a battery?
15     A.   Battery of tests, family of tests.
16     Q.   I'm sorry?
17     A.   Battery of tests, family of tests.  I use
18  them interchangeably.
19          None of the analyses we performed were
20  consistent with statistical significance, and Exhibit
21  13 in the report reflects that.
22     Q.   So you chose not to include something
23  which you just now testified on its own denotes
24  statistical significance, but a battery of other
25  analyses led you to exclude that from your report?

64 (Pages 250 to 253)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

Page 254

T. Beloreshki - Direct
1          T. Beloreshki - Direct
2      MR. SOHN:  Objection to form.
3      A.  I believe that mischaracterizes my
4  testimony.  We performed a number of regression
5  analyses.  I believe the number is 9 per time frame,
6  and Exhibit 13 summarizes our findings.
7      Q.  But where -- okay.  Where does it say in
8  this report that you prepared nine regression
9  analyses for two time frames?
10      A.  The report doesn't say that.  We did
11  provide it with our working files.
12      Q.  Pardon?
13      A.  We did provide it with our working files.
14      Q.  You did?  I'm sorry, but I -- I get a
15  little confused.  I don't see -- you say that Exhibit
16  Number 14, okay, which is for the time frame March
17  1st through May 31st, that includes nine different
18  regressions?
19      MR. SOHN:  Objection.
20      A.  I don't know where Exhibit 14 exactly
21  comes from.  My understanding is that we performed
22  nine regressions for each of the two time frames.
23      Q.  Then there were nine regressions of
24  different independent variables?
25      A.  Correct.  Nine different model

Page 255

T. Beloreshki - Direct
1          T. Beloreshki - Direct
2  specifications.
3      Q.  And none of them, other than the fifth
4  regression, regression Number 5A which is on
5  Exhibit 14, Tab 13B, Column BC, showed on its face a
6  statistical correlation?
7      A.  None of them showed significance including
8  Exhibit 5, what you refer to --
9      Q.  Exhibit 5, I said, on its face?
10      A.  There is no such term as "on its face."
11      Q.  Well, why did you put the mark -- take a
12  look at Exhibit Number 15 again.  Okay?  Or to make
13  it easier, look at Exhibit 13.  That's the March 1
14  through May 31st?
15      A.  Yes.
16      Q.  See the mark under Regression 5?
17      A.  Correct.
18      Q.  The asterisk?  And then you testified that
19  that means, denotes significance at 5 percent.
20  That's what this document says?
21      A.  That's what the document says, yes.
22      Q.  So on its own, without doing your battery
23  of tests, it denotes statistical significance, does
24  it not?
25      MR. SOHN:  Objection.

Page 256

T. Beloreshki - Direct
1          T. Beloreshki - Direct
2      A.  Not with respect to that regression.
3      Q.  Because of the battery of tests.  Right?
4      A.  Because there was a family of tests
5  conducted.
6      MR. GUIDO:  Let's take a short break and I
7  think I can finish up.
8      THE VIDEOGRAPHER:  The time is 6:28.
9  We're going off the record.
10      (Whereupon, a recess is taken.)
11      THE VIDEOGRAPHER:  The time is 6:40.
12  We're back on the record.
13      Q.  Now, let me see if I understand what you
14  said about the battery of tests and how you correct
15  them.  Is the reason for the battery of tests to
16  address an issue that's called data mining?
17      A.  Yes.
18      Q.  So you do it -- it's done in a situation
19  where you do a series of regressions until you
20  finally get one that shows a statistical significance
21  and then the question is you want to double-check
22  whether or not you're engaged in data mining.  Is
23  that a fair characterization of what the battery of
24  tests is?
25      A.  No.  That's a -- a incorrect

Page 257

T. Beloreshki - Direct
1          T. Beloreshki - Direct
2  characterization.  If you want a large number of
3  tests, some portion of those are likely to show
4  significance even if there is no such thing in the
5  data.
6      Q.  Okay.  So, therefore, you do what to
7  correct for the possibility of data mining?
8      A.  In circumstances when a large number of
9  tests are performed, one needs to adjust either the
10  interpretation of the P values or the T statistics.
11      Q.  How is that done?
12      A.  That adjustment is done -- it's called a
13  Bonferroni adjustment.
14      Q.  Could you spell that?
15      A.  B-O-N-F-E-R-R-O-N-I.
16      Q.  Bonferroni adjustment?
17      A.  Correction.  I would call it correction.
18      Q.  Mathematically, what would you do?
19      A.  With respect to P values, you simply
20  divide the P value by the number of tests performed.
21      Q.  Did you produce to the SEC all the
22  analyses that you did in preparing your report?
23      A.  I have no reason to believe we didn't do
24  that.
25      Q.  Did you produce a Bonferroni correction to

65 (Pages 254 to 257)

Tsvetan Beloreshki                                                    March 2, 2010
New York, NY

---

**Page 258**

1          T. Beloreshki - Direct
2    the SEC?
3         A.   I don't know.  I just don't know.
4         Q.   Do you recall doing a spreadsheet of that
5    Bonferroni correction?
6         A.   No.  I certainly didn't do a spreadsheet
7    like that.  Whether Erica did or not, I don't know.
8         Q.   Pardon?
9         A.   What Erica did or didn't do, I don't know.
10        Q.   Wasn't she working for you?
11        A.   She is.
12        Q.   She was working under your direction.
13   Right?
14        A.   Yes.
15        Q.   Did you direct her to do it?
16        A.   No.  We have worked together for quite a
17   number of -- I was going to say years.  12 years, so
18   there was no need for such an instruction.
19        Q.   Did she tell you she had done it?
20        A.   I believe these conversations generally
21   were -- none of the tests we ran.
22        Q.   Pardon?
23        A.   These conversations were essentially that
24   none of the tests we ran showed statistical
25   significance.

---

**Page 259**

1          T. Beloreshki - Direct
2         Q.   Did you discuss with her specifically
3    whether she had performed a Bonferroni correction
4    analysis?
5         A.   I don't recall --
6         Q.   Would you spell her name?
7         A.   Sure.  Erica Rose.
8         Q.   E-R --
9         A.   I-C-A.
10        Q.   Where does she live?
11        A.   Seattle.
12        Q.   Seattle, Washington?
13        A.   Yes.
14        Q.   Does FTI have an office there?
15        A.   No.
16        Q.   Do you know her phone number?
17        A.   Her work number?
18        Q.   Uh-huh.
19        A.   Yes.  206-689 --
20        Q.   Pardon?
21        A.   206-689-4479.
22        Q.   44 what?
23        A.   79.
24        Q.   Do you mind if we call her and interview
25   her?

---

**Page 260**

1          T. Beloreshki - Direct
2         MR. SOHN:  I may.
3         MR. GUIDO:  I don't think you have any
4    standing in this.
5         Q.   Do you mind if we call her and ask her
6    what she did?
7         A.   I don't have a say on this.
8         Q.   Pardon?
9         A.   I don't have a say on this.  You can --
10        MR. SOHN:  Mr. Guido, I don't see how
11   that's, first of all, an appropriate question of
12   Mr. Beloreshki --
13        MR. GUIDO:  We just had a question of
14   whether or not he has an objection to me doing it.
15   It's his report.  He just testified that he -- that
16   she may have -- may or may not have done this
17   Bonferroni correction.  I just want to know if she
18   did it or not.
19        A.   When you interpret the results -- and we
20   have done this in the past in these circumstances and
21   in the circumstances of cases that don't involve
22   market manipulation -- we have applied Bonferroni
23   adjustments.  That's as much as I can tell you.
24        Q.   And when you've done that, is there some
25   sort of spreadsheet that reflects doing it?

---

**Page 261**

1          T. Beloreshki - Direct
2         A.   There is a spreadsheet --
3         Q.   Let me -- isn't there just a form?  Isn't
4    there a form spreadsheet that you have with the
5    statistical analysis to do the Bonferroni correction
6    in your files?
7         A.   I do not have a form spreadsheet.
8         Q.   Have you form spreadsheet in the past?
9         A.   The Bonferroni adjustment, it's a rather
10   straightforward arithmetic calculation, so I can look
11   at a P value and tell you whether or not that is
12   indicative of significance or not, so I don't
13   necessarily need to do the calculation on a
14   spreadsheet.
15        And, two, I have a general sense of what
16   the critical values are in terms of T statistics, so
17   that I don't necessarily need to perform these
18   calculations either.
19        Q.   What was the T statistic?
20        We have done a search of your BP0006
21   spreadsheet that you produced to us, and we found
22   that there were a number of tabs in there, Regression
23   1 through Regression 5, and what I would like to know
24   is:  In determining applying the Bonferroni
25   correction, what is the significance of the T

---

Alderson Reporting Company
1-800-FOR-DEPO

Tsvetan Beloreshki                                                    March 2, 2010

New York, NY

---

Page 262

1          T. Beloreshki - Direct
2    statistic?
3          Called a T stat. in your form --
4    spreadsheets.
5      A.   Could well be.  Generally speaking, if you
6    have a single regression and if the T statistic
7    associated with a particular coefficient is 1.96 or
8    above that's when you would talk about projecting now
9    and finding statistical significance.
10         When you have a Bonferroni adjustment,
11   that would mean that that level of T statistic,
12   statistical level of T statistic that has to be
13   overcome, has to be higher.
14     Q.   How much higher would it have to be?
15     A.   That would depend on the number of tests
16   that they're analyzed.
17     Q.   Let's say that you did five regressions
18   for this time period in this set of data.
19     A.   I don't know the exact number.
20     Q.   Well, wouldn't you use the time -- the
21   five regressions that you did for that time period?
22     A.   We did not.
23     Q.   So you didn't do a Bonferroni correction?
24     A.   No, we did.
25     Q.   Hmm?

---

Page 263

1          T. Beloreshki - Direct
2      A.   We -- We were interpreted the results of
3    our regression analysis with Bonferroni adjustment.
4      Q.   Didn't you just throw it out because you
5    didn't like the results you got?
6      A.   No.
7      Q.   Why did you include the others if you
8    decided that under the Bonferroni adjustment, none of
9    them were relevant?
10     A.   I don't understand the question.
11     Q.   You say you used the Bonferroni
12   correction?
13     A.   Yes.
14     Q.   And you threw out --
15     A.   No regression has been thrown out.
16     Q.   It's not included in your report.
17     A.   We have run nonregressions for those in
18   the report.  No regressions have been thrown out.
19   All have been provided to you.
20     Q.   I understand that, but why didn't you put
21   it in the report?
22     A.   A report is not something that would
23   include every single piece of analysis or every
24   thought that an expert would have.
25     Q.   But you only provided it to us after the

---

Page 264

1          T. Beloreshki - Direct
2    Court ordered it to be provided.  You didn't provide
3    it to the SEC, did you?
4          MR. SOHN:  Objection.
5      A.   I provided what I was requested to
6    provide.
7      Q.   And you weren't requested until the Court
8    ordered you to.  Right?
9          MR. SOHN:  Objection.
10     A.   I requested them -- I provided them when I
11   was requested to provide them.
12     Q.   I didn't ask you that?
13     A.   I don't understand the question.
14     Q.   Remember, you looked at Exhibit Number 7
15   and that was the one that had the judge's hand --
16     A.   Yes.
17     Q.   That was the first time you were asked to
18   provide any documents to the SEC, isn't it?
19     A.   Correct.
20     Q.   So it was after the Court ordered you to
21   provide the documents?  You didn't provide the backup
22   documents voluntarily, the Court had to order you to
23   do it?
24         MR. SOHN:  Objection.  Objection.
25     A.   It was never an issue.  I was -- the data

---

Page 265

1          T. Beloreshki - Direct
2    was there.  Whoever was interested could have taken
3    it.
4      Q.   You've been an expert witness in previous
5    cases, haven't you?
6      A.   Yes.
7      Q.   In those previous cases, when you produced
8    documents -- forget when DLA Piper is counsel.  In
9    cases when DLA Piper is not in it, isn't it typical
10   that you provide all the backup spreadsheets for your
11   reports?
12     A.   It is typical, and it rarely goes to
13   subpoena.  Typical situation, at least in my
14   experience, is that someone asks me for my work
15   papers and I provide it to them.
16     Q.   And that's usually at the same time you
17   produce your report, isn't it?
18     A.   No.
19     Q.   No?
20     A.   No.
21     Q.   Sometime afterwards?
22     A.   Typically afterwards.
23     Q.   Typically afterwards.  Okay, but nobody
24   asked you for the information prior to it being
25   subpoenaed from you, did they?

Tsvetan Beloreshki                                                          March 2, 2010
New York, NY

## Page 266

T. Beloreshki - Direct

1          T. Beloreshki - Direct
2       A.   Not that I can recall.
3       Q.   In fact, nobody asked you until it was
4    ordered to be produced?
5          MR. SOHN:  Objection.  Fifth time you've
6    asked the question.
7       A.   I produced my files when I was asked to do
8    so.
9       Q.   And the first time you were asked to do so
10   was when you were handed the handwritten Court order.
11   Correct?
12         MR. SOHN:  Objection.
13      A.
14         MR. GUIDO:  Counsel, what's the basis of
15   your objection?
16         MR. SOHN:  You've asked it five times and
17   you have got five minutes to go on this deposition,
18   and I'm thinking that maybe you have something else
19   you want to cover.  You can ask this one for the next
20   five minutes.  That's fine, but you tend to ask the
21   same questions over and over again and if you don't
22   like the answer -- he's answered it five times.
23         MR. GUIDO:  You can just say asked and
24   answered.
25         MR. SOHN:  I actually said objection,

## Page 267

1          T. Beloreshki - Direct
2    which is shorter.
3       A.   I have no idea what's happening.
4       Q.   I understand that in many different ways.
5          Let's take a look at the regressions that
6    you performed on the earlier time frame, which is the
7    March 1st through April 30th, 2001.
8          MR. GUIDO:  I would like to have marked as
9    exhibit next number a document that has been marked
10   as BP6, Tab Reg G.
11         Reg 1.  Excuse me.
12         I would like to have a document that we've
13   extracted from BP6 and it is Reg 2.
14         (Whereupon, Exhibit Prowse Beloreshki-16
15   is marked for identification by the reporter.)
16         (Whereupon, Exhibit Prowse Beloreshki-17
17   is marked for identification by the reporter.)
18         MR. GUIDO:  BP Reg 2 and it's exhibit next
19   number.
20         The next one BP6 Reg 3.
21         (Whereupon, Exhibit Prowse Beloreshki-18
22   is marked for identification by the reporter.)
23         MR. SOHN:  I don't know if you have a lot
24   of questions planned, but you're out of time.
25         MR. GUIDO:  Have we used seven hours?

## Page 268

1          T. Beloreshki - Direct
2          THE VIDEOGRAPHER:  We have used 5 hours,
3    58 minutes.  Excuse me.  We have used 6 hours.
4          MR. GUIDO:  Let's take a break.
5          THE VIDEOGRAPHER:  The time is 6:58.
6    We're going off the record.
7          (Whereupon, a recess is taken.)
8          MR. GUIDO:  This is BP 4.
9          (Whereupon, Exhibit Prowse Beloreshki-19
10   is marked for identification by the reporter.)
11         MR. GUIDO:  This is 5.
12         (Whereupon, Exhibit Prowse Beloreshki-20
13   is marked for identification by the reporter.)
14         THE VIDEOGRAPHER:  The time is 7:06.
15   We're back on the record.
16   BY MR. GUIDO:
17      Q.   Will you take a look at your expert report
18   in the Pet Quarters and turn to Page 22?
19      A.   You mean the February 19 or the March 19
20   report?
21      Q.   I said the expert report.  Not the
22   rebuttal expert report.  February 19.  Page 22.
23      A.   Yes.
24      Q.   You see that that chart in the middle of
25   the page shows five regressions?

## Page 269

1          T. Beloreshki - Direct
2       A.   Yes.
3       Q.   One of the regressions is number of net
4    daily trades transacted by respondents?
5       A.   Number 5.  Yes.
6       Q.   Why did you include it in the Pet Quarters
7    report but exclude it from the Sedona report?
8       A.   It was not excluded from the analysis we
9    did in Sedona.
10      Q.   Well, it doesn't state it in the text?
11      A.   Correct.  It is not in the body of the
12   report.
13      Q.   Okay.  Thank you.
14         MR. GUIDO:  I've marked as Exhibits 16
15   through 20 the regression analyses that you did.
16         Would the court reporter please provide
17   the witness with the copies.
18      Q.   Those have T statistics on them, and I
19   want to direct your attention to 20, the very last
20   one.  See the T statistic there?
21         MR. SOHN:  Is there another copy?
22         This is 20.
23         MR. GUIDO:  Yes.  Exhibit 20.
24      Q.   See the T statistic on -- 2.42?
25      A.   I do.

68 (Pages 266 to 269)

Tsvetan Beloreshki                                        March 2, 2010
New York, NY

```
                                             Page 270
 1            T. Beloreshki - Direct
 2      Q.   The X variable, the last one under T stat?
 3      A.   I do.
 4      Q.   What do the other T stats refer to?
 5      A.   The T statistics in the first row refers
 6 to the intersect, and the other two refer to the two
 7 independent variables.
 8      Q.   What are the independent variables?
 9      A.   I can't tell from this page.
10      Q.   Well, do you remember what the independent
11 variables were that you considered when you did the
12 analysis?
13      A.   I don't know what analysis this page
14 refers to.
15      Q.   This applies to old 11B, which is March 1
16 through April 30th, 2001.
17      A.   Okay.  In which case, looking at Exhibit
18 15, that, in all likelihood, would be the regression
19 with two independent variables:  One is NASDAQ local
20 transactions and one is daily shares transacted.
21      Q.   And that's the one that -- that you did
22 for Exhibit 13B net daily sales transacted that you
23 did not include in the body of your report.
24      A.   Actually, that is included in the report
25 as part of Regression 4, and I take my statement back
```

```
                                             Page 271
 1            T. Beloreshki - Direct
 2 from the previous answer.  Regression 4 did include
 3 exactly that variable in that shares transacted.  It
 4 just included them also, with a view of the liquidity
 5 of the market.  So it's net sales transacted --
 6      Q.   I understand that, but regression Number 5
 7 -- okay.  Regression Number 5 that you performed in
 8 13B, which is Exhibit Number 15, was not in the body
 9 of your expert report?
10      A.   That would be correct.
11           MR. GUIDO:  No further questions.
12           MR. SOHN:  I have nothing.
13           THE VIDEOGRAPHER:  The time is 7:11 p.m.
14 This is the end of Tape Number 6 and concludes our
15 deposition.
16           (Whereupon, the deposition is concluded at
17 7:12 p.m.)
```

Alderson Reporting Company
1-800-FOR-DEPO