# EXHIBIT E
# (SEC EXHIBIT 296)



# UNITED STATES DISTRICT COURT
## Southern District of New York
## - ORDERS and JUDGMENTS -

# FACSIMILE COVER SHEET

From: DENISE ROUSE/SEC  Date: 1-16-08
Direct Dial: (212) 805-0143
Facsimile: (212) 805-7954

Matter: _____

**Please Deliver As Soon As Possible To:**

| Recipient | Company | Fax No. | Phone No. |
|---|---|---|---|
| GINA TWYMAN or KENNETH GUIDO | | 202-772-9246 | 202-551-4434 |

Total number of pages including this page: 13
If you do not receive all the pages, please call the Direct number listed above.

Message: DENISE ROUSE
212-336-0154

**Please Note:** The information contained in this facsimile message is privileged and confidential, and is intended only for use of the individual named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify sender or the mail room by telephone: (212) 805-0519.

500 PEARL STREET NEW YORK NEW YORK 10007 T (212) 805-0143 F (212) 805-7954

Orders_and_Judgments@nysd.uscourts.gov



EXHIBIT 296

EXHIBIT-0296-0001

Approved: _William J Hellmuth_
Marcia R. Isaacson
Assistant United States Attorney

**03 MAG 2355**

William J. Stellmach
Special Assistant United States Attorney

Before: HONORABLE FRANK MAAS
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - x
: **TO BE FILED UNDER SEAL**
UNITED STATES OF AMERICA :
: **COMPLAINT**
- v - :
: Violation of
: 18 U.S.C. § 371
THOMAS BADIAN and :
ANDREAS BADIAN, :
: COUNTY OF OFFENSE:
Defendants. : NEW YORK
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

ANN MARIE WILLIAMSON, being duly sworn, deposes and says that she is a Postal Inspector with the United States Postal Inspection Service and charges as follows:

### COUNT ONE

### (Conspiracy To Commit Securities Fraud)

1. From in or about November 2000 up to and including in or about the summer of 2001, in the Southern District of New York and elsewhere, THOMAS BADIAN and ANDREAS BADIAN, the defendants, together with others known and unknown, unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with each other to violate the laws of the United States, to wit, to commit securities fraud in violation of Title 15 U.S.C. §§ 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Object of the Conspiracy

2. It was a part and object of the conspiracy that THOMAS BADIAN and ANDREAS BADIAN, the defendants, and others known and unknown, unlawfully, willfully and knowingly, directly

EXHIBIT-0296-0002

and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in transactions, practices, and courses of business which operated and would operate as a fraud and deceit upon the investing public and other persons and entities investing in Sedona Corporation ("Sedona"), in violation of Title 15 U.S.C. §§ 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Overt Act

3. In furtherance of the conspiracy, and to effect its illegal objects, THOMAS BADIAN and ANDREAS BADIAN, the defendants, and others known and unknown, committed the following overt act, among others, in the Southern District of New York and elsewhere:

> a. On or about March 20, 2001, ANDREAS BADIAN, the defendant, caused a registered representative at a broker-dealer located in New York, New York, to sell short shares of Sedona common stock on behalf of the trading account of an offshore entity.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

### Background

4. I have been employed by the United States Postal Inspection Service for approximately 12 years. I am currently assigned to a unit that investigates mail fraud, wire fraud, securities fraud, money laundering and related offenses. I have also received a certificate in accounting from the University of Virginia.

5. I am fully familiar with the information contained in this Complaint, either through personal investigation or

2

EXHIBIT-0296-0003

conversations with other individuals involved in this investigation, including executive officers of Sedona. I have also reviewed business documents produced to the Securities and Exchange Commission (the "SEC"), analyses of trading in Sedona common stock prepared by the SEC, and audio recordings of conversations involving ANDREAS BADIAN, the defendant, and his co-conspirators.

   6. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I learned in connection with this investigation. To the extent that there are assertions herein concerning dates and numbers, they are approximations based upon information and evidence gathered to date. Where I have reported the contents of documents, or the actions or statements of others, I have reported those matters in substance and in part, except where indicated otherwise.

### Overview

   7. Based on my training and experience, as set forth more fully below, I believe that there is probable cause to believe that from in or about November 2000 up to and including in or about September 2001, THOMAS BADIAN and ANDREAS BADIAN, the defendants, and others known and unknown, caused Sedona to make false and misleading public filings with the SEC that deceived investors in Sedona and carried out a scheme to manipulate the share price of Sedona common stock.

   8. The Badians and their co-conspirators executed the scheme by having an offshore entity (the "Offshore Entity"), a co-conspirator not named as a defendant herein, loan approximately $2.5 million to Sedona pursuant to a financing agreement (the "Financing Agreement"). Under the terms of the Financing Agreement, Sedona issued convertible debentures to the Offshore Entity, which, after a holding period of 120 days, could then convert these debentures into Sedona common stock at a floating conversion rate: the lower Sedona's share price fell, the more common stock the Offshore Entity would receive.

   9. The Financing Agreement expressly prohibited the Offshore Entity from engaging in any short sales of Sedona's common stock, which potentially could drive Sedona's share price down. A copy of the Financing Agreement was filed with the SEC on or about November 22, 2000.

   10. Contrary to the representations contained in the Financing Agreement, THOMAS BADIAN and ANDREAS BADIAN, the

3

EXHIBIT-0296-0004

defendants, and others known and unknown, defrauded Sedona and Sedona's investors by selling large quantities of Sedona common stock short through a securities brokerage account (the "Offshore Entity Brokerage Account") that the Offshore Entity held at a broker dealer located in New York, New York (the "Broker Dealer").

### Relevant Entities and Individuals

#### Sedona

11. Based on my review of Sedona's filings with the SEC and my interviews of officers of Sedona, I am aware of the following:

  a. Sedona is a corporation that was organized under the laws of the State of Pennsylvania in or about 1992. At all relevant times, Sedona was headquartered in King-of-Prussia, Pennsylvania.

  b. At all relevant times, Sedona's business consisted of providing Internet-based software to facilitate customer service relationships.

  c. At all relevant times, Sedona common stock was traded on the NASDAQ, an electronic inter-dealer securities market, under the symbol "SDNA."

#### The Offshore Entity

12. Based on my review of documents and discussions with the SEC, I have learned the following:

  a. The Offshore Entity is a Panamanian corporation headquartered in Zurich, Switzerland.

  b. Rhino Advisers, Inc. ("Rhino") is a corporation with offices in New York, New York, with fewer than 15 employees.

  c. At all relevant times, Rhino purported to provide investment advice to the Offshore Entity, including with respect to investment in public equities.

4

EXHIBIT-0296-0005

    d.    At all relevant times, THOMAS BADIAN, the defendant, was the president of Rhino.

    e.    At all relevant times, ANDREAS BADIAN, the defendant, the younger brother of THOMAS BADIAN, was an employee of Rhino and directed trading in the Offshore Entity Brokerage Account.

    f.    At all relevant times, THOMAS BADIAN and ANDREAS BADIAN exercised control over the Offshore Entity Brokerage Account.

### The Conspiracy

13. Based on my interviews of various officers of Sedona, my review of the Financing Agreement, and my review of a filing that Sedona made with the SEC on or about November 22, 2000, I have learned the following:

    a.    In or about November 2000, THOMAS BADIAN, the defendant, on behalf of the Offshore Entity, negotiated the terms of the Financing Agreement with Sedona's management.

    b.    THOMAS BADIAN represented that he served as the financial advisor to the Offshore Entity, which he described as an entity that provided equity financing to various companies.

    c.    According to the terms of the Financing Agreement, the Offshore Entity agreed to purchase debentures from Sedona that were convertible into Sedona common stock worth approximately $3 million at the then existing market price. Sedona sold the debentures in return for approximately $2.5 million that was due from the Offshore Entity immediately upon execution of the Financing Agreement.

    d.    Under the terms of the Financing Agreement, the Offshore Entity's approximately $3 million in debentures converted into a larger number of Sedona shares if the share price of Sedona's common stock fell. Conversely, if Sedona's share price rose, then the Offshore Entity was entitled to a smaller number of

5

EXHIBIT-0296-0006

           Sedona common shares.

e. Section 5.2 of the Financing Agreement prohibited the Offshore Entity from selling short any Sedona common stock while the debentures remained outstanding, meaning until the Offshore Entity had converted its debentures into Sedona stock.

f. Short selling is device whereby an investor sells stock which he does not own, anticipating that the price will decline and that he will thereby be able to "cover," or make delivery of the stock sold, by purchasing it at the lesser price. If the decline materializes, the short seller realizes as a profit the differential between the sales price and lower purchase or covering price.

g. Prior to executing the Financing Agreement, an executive officer at Sedona informed THOMAS BADIAN that Sedona would include a copy of the Financing Agreement in a public filing with the SEC.

h. On or about November 22, 2000, Sedona publicly filed the Financing Agreement with the SEC.

i. Sedona subsequently did not modify or amend its disclosures relating to the Financing Agreement.

    14. Based on my review of securities regulations promulgated by the SEC, my review of rules issued by the National Association of Securities Dealers (the "NASD"), my discussions with various attorneys and officers of the SEC, and my interviews with Sedona executives, I have learned the following:

a. The convertible debentures that Sedona issued to the Offshore Entity pursuant to the Financing Agreement are colloquially known as "toxic convertibles."

b. A toxic convertible is one version of a type of financing often referred to as private investment in public equities ("PIPE").

6

EXHIBIT-0296-0007

    PIPEs are frequently used by several public companies that need to raise capital but that are unable or unwilling to do so by selling shares through a share offering to the public market.

c.  Instead, the company typically raises capital by selling an equity type security that is not publicly traded to an investment fund. In effect, this typically results in the company selling shares at a significant discount to the current market price. The security is often in the form of a convertible debenture that can be converted into publicly traded shares at a later date. The conversion price, i.e., the price at which investors can buy the underlying shares when converted, traditionally is fixed when the convertible security is initially sold and never changes.

d.  By contrast, in a toxic convertible the conversion price is not fixed at the time that the company sells the debenture, but rather at the time that the investor decides that it wants to carry out the conversion to obtain the shares of stock.

e.  There have been instances where holders of toxic convertibles short sell the company's common stock to drive down the price and thereby maximize the number of shares to which they are entitled upon conversion of their debentures. In many cases this scenario has been a "death spiral" for companies, with the convertible debenture investors ending up with majority control of the financially weakened company because of the dilutive effects of the successively lowered conversion price.

f.  As noted above, Section 5.2 of the Financing Agreement expressly prohibited the Offshore Entity from short selling Sedona's common stock during the period prior to conversion of the Offshore Entity's convertible debentures.

7

EXHIBIT-0296-0008

       g.    Accordingly, because the Financing Agreement was publicly filed, Sedona and the investing public were led to believe that the Offshore Entity would not short sell Sedona's common stock and that Sedona would not become a victim of a "death spiral."

15. Based on my review of analyses of trading in Sedona stock in the Offshore Entity Brokerage Account that was prepared by the SEC for the period between in or about February 2001 and in or about March 2001, my conversations with representatives of the SEC, my interviews of members of Sedona's management team, my review of analyses of trading records for the Offshore Entity Brokerage Account that the SEC prepared, my review of account statements for the Offshore Entity Brokerage Account, my review of recordings of conversations between and among ANDREAS BADIAN and brokers employed by the Broker Dealer, and my review of reports tracking securities trading generated by the National Securities Clearing Corporation, I have learned the following:

       a.    THOMAS BADIAN and ANDREAS BADIAN, the defendants, and a Rhino employee exercised control over the Offshore Entity Brokerage Account.

       b.    Following the execution of the Financing Agreement on or about November 22, 2000, ANDREAS BADIAN directed the short selling of Sedona common stock through the Offshore Entity Brokerage Account. For example, in or about March 2001, the Offshore Brokerage Account sold short approximately 700,000 shares of Sedona common stock.

       c.    These sales were short sales because, at the time of each sale, the Offshore Entity did not own the number of Sedona shares that it was selling, and did not tender notice to Sedona to convert the Offshore Entity's debentures into Sedona common stock until on or about March 27, 2001.

       d.    Title 17, Code of Federal Regulations, Section 240.3b-3 ("Rule 3b-3") defines a short sale as "any sale of a security which the seller does not own or any sale of a security which is consummated by the delivery

EXHIBIT-0296-0009

    of a security borrowed by, or for the account of, the seller." According to Rule 3b-3(3), a seller is deemed to own a security provided that "he owns a security convertible into or exchangeable for it and has tendered such security for conversion or exchange."

 e. The Offshore Entity repeatedly failed to tender Sedona shares to the Broker Dealer for delivery to purchasers within three days of each sale, as required by industry practice. In fact, in or about March 2001, the Broker Dealer failed to deliver approximately 700,000 shares of Sedona common stock that it had sold on behalf of the Offshore Entity Brokerage Account.

 f. By engaging in short sales of Sedona stock prior to tendering such notice, THOMAS BADIAN and ANDREAS BADIAN, the defendants, and others known and unknown, defrauded Sedona and the investing public, which had relied on the prohibition against short selling contained in the publicly filed Financing Agreement.

 g. Although I have not completed my review of the trading records for the Offshore Entity Brokerage Account, based on the analyses that I have reviewed, it appears that these short sales were designed to drive down the price of Sedona common stock so that the Offshore Entity could profit by covering its short positions with stock obtained at a price below that which it had sold short.

 16. In addition, I have also listened to audio recordings made by the Broker Dealer for certain telephone lines used by its brokers in speaking with customers. From my review of those audio recordings and summaries of trading records for the Offshore Entity Brokerage Account that the SEC prepared, I am aware of the following:

 a. On or about March 20, 2001, ANDREAS BADIAN, the defendant, told a registered representative at the Broker Dealer ("Broker 1"), in substance and in part, to sell the common stock of Sedona with "unbridled levels

EXHIBIT-0296-0010

      of aggression" on behalf of the Offshore Entity Brokerage Account.

    b. Upon receiving this direction from ANDREAS BADIAN, the Broker Dealer sold short approximately 74,500 shares of Sedona common stock. On March 20, 2001, Sedona's share price closed at $0.9688 per share.

    c. The next day, on or about March 21, 2001, ANDREAS BADIAN congratulated Broker 1 on a "good job," noting that the company's share price had "collapsed." BADIAN then directed Broker 1 to be "merciless" with Sedona.

    d. The Broker Dealer then sold short an additional approximately 78,600 shares of Sedona on behalf of the Offshore Entity Brokerage Account. On March 21, 2001, Sedona's share price fell to $0.875 per share.

17. Based on my review of certain e-mails between THOMAS BADIAN and ANDREAS BADIAN, the defendants, and others known and unknown, my interviews of Sedona executives, and my review of certain court filings, I have learned the following:

    a. On or about March 27, 2001, the Offshore Entity notified Sedona that the Offshore Entity wished to convert its convertibles debentures into Sedona common stock.

    b. After Sedona refused, the Offshore Entity sued and Sedona filed a counterclaim. The case was subsequently settled.

    c. Prior to the settlement of that litigation, ANDREAS BADIAN sent an e-mail to THOMAS BADIAN on or about October 25, 2001 that stated, in relevant part:

> It seems like we always knew what where [sic] doing was well not right but we set up all these elaborate structures with seperatye [sic] entities etc. for protection, now it seems like it was all for nothing, the separatenss [sic] of the corpso and accounts was is no

10

EXHIBIT-0296-0011

> protection at all. How did this occur? There is no way we can have this go into court. Not with the records and the endless trader testimony.

WHEREFORE, deponent prays that a warrant issue for the arrest of THOMAS BADIAN and ANDREAS BADIAN, the defendants, and that they be imprisoned or bailed as the case may be.

ANN MARIE WILLIAMSON
United States Postal Inspector

Sworn to before me this DEC 0 3 2003
___ day of December, 2003.

/s/ Frank Maas
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**FRANK MAAS**
United States Magistrate Judge
Southern District of New York

11

EXHIBIT-0296-0012

*Terminated*

## COMPLAINT/REMOVAL DISMISSAL
### United States District Court
### Southern District of New York

Mag. Judge Dkt. No. __03 MAG 2355__    Date __10/21/04__

USAO No. __2003R02683__

The Government respectfully requests the Court to dismiss without prejudice the ✓ Complaint ___ Removal Proceedings in

United States v. __ANDREAS BADIAN__

The Complaint/~~Rule 40 Affidavit~~ was filed on __11/3/03 (FM)__

___ U.S. Marshals please withdraw warrant

[Stamp: U.S. DISTRICT COURT OCT 21 2004 S.D. OF N.Y.]

_/s/ Marcia Isaacson_
ASSISTANT UNITED STATES ATTORNEY

__MARCIA ISAACSON__
(Print name)

SO ORDERED:
_/s/ Theodore H. Katz_
UNITED STATES MAGISTRATE JUDGE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

DATE __10/21/04__
OCT 21 2004

Distribution: White→Court  Yellow→U.S. Marshals    Green→Pretrial Services    Pink→AUSA Copy

EXHIBIT-0296-0013