# REDACTED EXHIBIT F

# (SIEGEL TRANSCRIPT EXCERPTS)

Stefan Siegel        CONFIDENTIAL        July 28, 2009
New York, NY

Page 1

```
 2              UNITED STATES DISTRICT COURT
 3
 4             SOUTHERN DISTRICT OF NEW YORK
 5   ------------------------------------------------
 6   SECURITES AND EXCHANGE
 7   COMMISSION,
 8                 Plaintiff,
 9                            Action No.
10                            1:06-cv-2621-LTS-DFE
11         -vs-
12
13   ANDREAS BADIAN, et al.,
14
15                 Defendants.
16   ------------------------------------------------
17
18            Three World Financial Center
19                 New York, New York
20                    July 28, 2009
21                     10:00 a.m.
22
23       CONFIDENTIAL VIDEOTAPED DEPOSITION of
24   STEFAN SIEGEL, before Debra Goodfriend, Certified
25   Shorthand Reporter, and Notary Public.
```

Page 14

1  STEFAN SIEGEL - CONFIDENTIAL
2  Did Mr. Badian tell you what it is he
3  wanted to you to do when you joined Rhino?
4      A. Yes.
5      Q. What did he tell you?
6      A. Due diligence on companies that he was
7  thinking of doing deals for, for his investment fund,
8  research.
9      Q. Had you discussed your previous
10 experience in doing due diligence on companies with
11 him at that time?
12     A. Yes.
13     Q. What did you discuss?
14     A. I -- I was part timing with a small
15 boutique business intelligence company, basically a
16 one-man show, kind of like a mini Croll, doing very
17 sophisticated counter-intelligence, business
18 counter-intelligence type stuff. And I was involved
19 in a couple investigations. And that required me to
20 dig very very deep into SEC filings of companies, and
21 to corporate structures. And so we had talked about
22 that, talked about my experiences with that. And it
23 kind of opened a window into the inner workings of the
24 markets and corporations.
25     Q. Did you have any academic training in

Page 15

1  STEFAN SIEGEL - CONFIDENTIAL
2  finance?
3      A. No.
4      Q. Did you have any previous experience
5  prior to joining that boutique, in finance?
6      A. No.
7      Q. Where did you acquire your knowledge
8  that you told Mr. Badian about with regard to your
9  ability to do due diligence?
10     MR. ZITTER: Object to the form of
11 the question.
12     MS. SCHECHTMAN: Object to form.
13     A. Working with the boutique firm.
14     Q. How long did you work there?
15     A. Off and on, a year, year-and-a-half.
16     Q. When you were admitted to Princeton to
17 the graduate program, did you have a degree from any
18 college?
19     A. I had a BA from Reed.
20     Q. Okay. And that at Reed, did you have
21 any experience analyzing companies?
22     A. If you call Marxist Critique of
23 Capitalism. I studied a lot of Marxist. That was
24 basically my only exposure. I could -- I read a lot
25 of Karl Marx and a lot of his devotees, and a lot of

Page 16

1  STEFAN SIEGEL - CONFIDENTIAL
2  interpretations.
3      Q. Did you explain that to Thomas Badian?
4      A. He knew I was who I was. We knew each
5  other in a social setting beforehand. He knew that I
6  was -- I don't think he had any real understanding of
7  the stuff I studied, but he knew I was a very -- I
8  don't know what, he would probably put a derogatory
9  term on it, but very much an academic, very much a
10 theoretical-type person, not a business person, at the
11 time.
12     Q. Did he know that you had studied the
13 criticism of capitalism when you were in college?
14     A. I don't know. I'm sure at times my
15 lingo and what I said -- well, actually, you know,
16 probably, because I know at the time he was working, I
17 think he had his first job in the investment field at
18 the time, and I was pretty critical of it. And he
19 knew that I thought it was -- I was very negative
20 about the whole world of finance.
21     Q. Did you explain to him the advantages of
22 your negative attitude about the world of finance when
23 you interviewed him?
24     MR. ZITTER: Object to the form of
25 the question.

Page 17

1  STEFAN SIEGEL - CONFIDENTIAL
2      MS. SCHECHTMAN: Same objection.
3      A. I doubt I was very substantive.
4      Q. Pardon?
5      A. I doubt I was very substantive, probably
6  a lot of cliches.
7      Q. Now, when did you leave Rhino?
8      A. I -- could you rephrase leave, as in
9  leave payroll or leave the office, both?
10     Q. When did you terminate your relationship
11 with Rhino?
12     A. I don't know the exact month, but the
13 end of 2003.
14     Q. During that period of time, did your job
15 at Rhino change at all?
16     A. During what period of time?
17     MS. SCHECHTMAN: Object to form.
18     Q. From the time you started, until you
19 left?
20     A. Yes.
21     Q. Can you describe what your job evolved
22 or how it evolved during that period of time?
23     A. Sure.
24     Q. Please do so.
25     A. Began doing due diligence with not many

| Stefan Siegel | CONFIDENTIAL<br>New York, NY | July 28, 2009 |

### Page 34

1    STEFAN SIEGEL - CONFIDENTIAL
2    Q.  Did you ever review the files at Rhino
3    to determine what the nature of Amro's investments
4    were in SD and A?
5    A.  Can you -- you're asking if there's a
6    file?
7          MR. ZITTER:  Repeat the question.
8    Q.  Did you ever review any files at Rhino
9    to ascertain what the nature of Amro's investments
10   were in SD and A?
11   A.  I might have at some point. It sounds
12   like a specific question, and I have to say, I don't
13   recall.
14   Q.  Now, how would you, in your words,
15   describe the nature of the investments that Rhino
16   negotiated on behalf of its clients in issuers?
17         MS. SCHECHTMAN:  Objection, form.
18         MR. ZITTER:  Yeah.
19   A.  That sounds very open ended. We were a,
20   what's called a PIPE fund, provided private capital,
21   mostly provided private capital to public companies
22   through private placements of various kinds.
23   Q.  Did that include private equity lines of
24   credit?
25   A.  Private equity lines of credit -- equity

### Page 35

1    STEFAN SIEGEL - CONFIDENTIAL
2    lines, yes. I don't understand the private.
3    Q.  Did that include equity lines of credit?
4          MS. SCHECHTMAN:  Objection, form.
5    A.  If you mean, did -- by equity lines of
6    credit, what we were talking about before, yes.
7    Q.  Did it include convertible debentures?
8    A.  Yes.
9    Q.  Did it include convertible preferred
10   shares?
11   A.  Yes.
12   Q.  Who were the clients on whose behalf
13   Rhino was making investments during the time you were
14   there?
15   A.  I know of two clients. Amro was a
16   client. I believe Creon was another client.
17   Q.  Any others?
18   A.  My understanding was those were the two
19   master funds.
20   Q.  Did they also have entities that were
21   referred to as special purpose vehicles, at the time
22   you were there?
23         MS. SCHECHTMAN:  Object to form.
24   A.  Yes.
25   Q.  I'm going to show you a document that's

### Page 36

1    STEFAN SIEGEL - CONFIDENTIAL
2    been marked as Exhibit No. 4, which is a 21A report
3    dated March 6, 2003. This was initially used in
4    Robert Charron's deposition in this proceeding. I'd
5    like you to take a look at Exhibit No. 4, please.
6    A.  By take a look, you want me to start
7    reading it?
8          MS. SCHECHTMAN:  Ken, do you want him
9    to read the whole document?
10   Q.  No. I just want you to take a look at
11   the first page. Let's start with that. Do you recall
12   that in May of 2003, Rhino filed a -- what's called a
13   21(a) Report with the SEC?
14         MS. SCHECHTMAN:  Do you mean for him
15   to have time to finish reviewing the first page?
16         MR. GUIDO:  Yes.
17   A.  I recall there was some requirement. I
18   wouldn't have -- if you hadn't said the name 21(a), I
19   wouldn't know it was a 21(a). But I know there was
20   something.
21   Q.  Take a look at Exhibit A that starts at
22   22639, Bates stamp.
23   A.  Okay.
24   Q.  And it goes through 22642.
25         MS. SCHECHTMAN:  Goes through what?

### Page 37

1    STEFAN SIEGEL - CONFIDENTIAL
2          MR. ZITTER:  642.
3    Q.  Did you have any discussions with anyone
4    about the special purpose vehicles under Amro
5    International that are listed at Bates stamp 22640?
6          MS. SCHECHTMAN:  Object to form. I'm
7    sorry, Ken, can you repeat that question?
8    Q.  Did you have any discussions with anyone
9    about special purpose vehicles that are listed under
10   Amro International and Bates stamped 22640 on Exhibit
11   No. 4?
12         MS. SCHECHTMAN:  Object to form.
13   A.  Just Amro or the ones that are Creon, as
14   well?
15   Q.  I'm only asking about Amro's right now.
16   A.  It's sort of open -- I mean, yes, I had
17   discussions.
18   Q.  Okay. What was the nature of the
19   discussions?
20   A.  Why they existed, why they had special
21   purpose vehicles, what the purpose of the special
22   purpose vehicles was.
23   Q.  What were you told?
24   A.  I was told that --
25         MS. SCHECHTMAN:  Hold on, I'm just

10 (Pages 34 to 37)

## Page 38

STEFAN SIEGEL - CONFIDENTIAL

2  going to caution the witness. Can you just hold one
3  second. I don't know if there's an attorney client
4  privilege.
5       MR. ZITTER: Right. If there's
6  anything you were told by any attorney, you should
7  not reveal.
8       THE WITNESS: Okay.
9       Q. Let me rephrase the question.
10      You testified you were told something
11  about these special purpose vehicles, about what
12  their purposes were, why they were created and how
13  they were used, is that your testimony, yes or no?
14      A. Yes.
15      Q. Now, what do you know about why they
16  were created, how they were used, and when they were
17  set up?
18      MR. ZITTER: To the extent your
19  information comes from an attorney, I'm directing
20  you not to answer that. If it comes from other
21  sources of information, you can freely answer the
22  question.
23      MR. GUIDO: Are you going to accept
24  the advice of your --
25      MR. ZITTER: Yes, he will.

## Page 39

STEFAN SIEGEL - CONFIDENTIAL

2       MR. GUIDO: I'm asking the witness,
3  excuse me.
4       A. What -- I don't know if it came from an
5  attorney or not --
6       Q. What do you know?
7       A. I know that special purpose vehicles
8  were set up to deal with liability issues, to insulate
9  the mother funds from potential legal liabilities.
10  Particularly, doing certain types of deals that
11  exposed -- potentially exposed, the funds to
12  shareholder actions, because we were a statutory
13  underwriter and equity lines of credit.
14      Q. What sort of shareholder actions are you
15  referring to?
16      A. The nebulous, any underwriter can get
17  sued during a period of distribution-type action.
18      Q. Was Amro a registered underwriter?
19      MS. SCHECHTMAN: Object to form.
20      A. Offshore entity doesn't need to be
21  registered to be an underwriter, there's an exemption.
22      Q. That's that your understanding?
23      A. That's my understanding.
24      Q. Now, with regard to Creon, do you see
25  the list of special purpose vehicles there?

## Page 40

STEFAN SIEGEL - CONFIDENTIAL

2       A. Yes.
3       Q. And did you discuss the reasons for the
4  creation of those special purpose vehicles with anyone
5  at Rhino?
6       MR. ZITTER: Other than an attorney.
7       A. Yes.
8       Q. Okay. And what is your understanding of
9  why they were created?
10      A. Same as the Amro.
11      Q. So the special purpose vehicles that are
12  listed under Amro, and correct me if I'm incorrect,
13  were created to insulate Amro's liability for any
14  investments that those special purpose vehicles,
15  listed under Amro, made during the time you were at
16  Rhino?
17      MR. ZITTER: Object to the form of
18  the question.
19      MS. SCHECHTMAN: Object to the form.
20      MR. ZITTER: He testified -- his
21  testimony is clear on the record. You're restating
22  of it may not be so clear.
23      Q. Please answer the question, if you can.
24      A. I believe so. I mean, this is -- I
25  understood, generally, why special purpose vehicles

## Page 41

STEFAN SIEGEL - CONFIDENTIAL

2  were populated.
3       Q. At Rhino?
4       A. At Rhino.
5       Q. And that was -- and the purpose was
6  again, what?
7       MR. ZITTER: Asked and answered.
8       MS. SCHECHTMAN: Asked and answered.
9       Q. Please answer the question.
10      MR. ZITTER: Do you want to reread
11  his testimony?
12      MR. GUIDO: No.
13      Q. Please answer the question.
14      MS. SCHECHTMAN: Your question was
15  again, what?
16      MR. GUIDO: I will call the judge if
17  you keep interrupting me.
18      MR. ZITTER: You can call the judge.
19  He testified. You asked a separate question. You
20  know, read his question.
21      MS. SCHECHTMAN: Your question was,
22  it was again what. I mean, that's asked and
23  answered. We can read back the testimony.
24      Q. Was one of the purposes of the creation
25  of the special purpose vehicles of Amro to conceal

Page 42

1    STEFAN SIEGEL - CONFIDENTIAL
2    Amro's involvement in the investments?
3        MS. SCHECHTMAN: Object to form.
4    A.    I'm troubled here, because I'm looking
5    at this list, and I don't know exactly what these
6    variation entities actually did. Some of them I
7    recognize under Creon. Conceal -- I know at one
8    points we had public relations disaster, and --
9        MR. ZITTER: Answer the question. If
10    you know, tell him. If you don't know, you don't
11    know.
12        MR. GUIDO: Counsel, will you please
13    not interrupt the witness when he's answering the
14    question.
15        MR. ZITTER: Well, he wasn't
16    answering the question, that's the problem.
17    A.    Can you rephrase the question then.
18    Q.    Was the purpose of -- one of the
19    purposes of the creation of the special purpose
20    vehicles to conceal Amro's investment in the companies
21    that it extended money to?
22    A.    I can't answer that definitively.
23    Q.    Well, can you answer it, generally?
24    A.    I don't know.
25    Q.    When your investments were made by Rhino

Page 43

1    STEFAN SIEGEL - CONFIDENTIAL
2    on behalf of Amro and Creon, did you participate in
3    any discussions leading up to those investments?
4    A.    Discussions with who?
5    Q.    Anyone at Rhino.
6    A.    Yes.
7    Q.    Okay. And was there a practice at Rhino
8    to have meetings to discuss potential investments that
9    were made on behalf of Amro and Creon in entities?
10        MS. SCHECHTMAN: Object to form.
11    A.    Nothing formal. Informally, we tried to
12    talk together to get everybody on the same page, but
13    that was totally informal, and not always successful.
14    Q.    Do you recall any discussions about the
15    concern that companies in which Amro and Creon
16    invested, about the sale of their stock short, prior
17    to any conversions?
18        MS. SCHECHTMAN: Object to form.
19        MR. ZITTER: Object to the form of
20    the question. I don't understand the question.
21    Q.    Do you understand the question?
22    A.    You asking, specifically, about short
23    sales prior to conversions?
24    Q.    Yes.
25    A.    Yes, I recall discussions.

Page 44

1    STEFAN SIEGEL - CONFIDENTIAL
2    Q.    Were there any --
3        MS. SCHECHTMAN: He was asking about
4    concerns about it.
5        MR. ZITTER: Why don't we read back
6    the question.
7        Listen to the question and answer the
8    question.
9        (The requested portion was read back
10    by the reporter.)
11        MS. SCHECHTMAN: Object to form.
12        MR. ZITTER: I object to form, again.
13    A.    Discussions of concern, we were always
14    wondering what the right way to sell short was, what
15    the rules were, what the regulations were. I don't
16    recall something, specifically, like how many days
17    prior to conversion notice you can short, but I'm sure
18    that discussion came up. But there was always
19    concerns about what the rules and regulations were and
20    how to do it right. That's how I'd answer that
21    question. So yeah, we were always concerned.
22    Q.    Did you ever discuss limitations on
23    short sales in convertible debentures with anyone at
24    Rhino?
25        MS. SCHECHTMAN: Object to form.

Page 45

1    STEFAN SIEGEL - CONFIDENTIAL
2        MR. ZITTER: Can you repeat that
3    question.
4        (The requested portion was read back
5    by the reporter.)
6        In all of these questions where he's
7    asking you about discussions, you must keep out of
8    the equation any discussions you had with attorneys,
9    because any discussions with attorneys would be
10    subject to attorney client privilege, if there's any
11    discussions that took place outside the discussions
12    with attorneys.
13        MR. GUIDO: Counsel, all I did was
14    ask him whether or not he had any discussions. I
15    didn't ask him about the subject matter of the
16    discussions.
17        MS. SCHECHTMAN: Well, the question
18    asked about the subject matter of the discussion.
19    A.    Yes.
20    Q.    With whom?
21    A.    We all did. We all talked about it.
22        MS. SCHECHTMAN: He asked you who.
23    Q.    Who is, we all?
24    A.    Thomas, Andreas, Alex, that's who I
25    recall being part of the discussion, and our attorneys

Page 46

1  STEFAN SIEGEL - CONFIDENTIAL
2  were part too, but distinguishing between what they
3  said and private conversations and privileged
4  conversations is tough for me to do, but I definitely
5  had conversations outside of attorneys.
6    Q.  Did you ever have any discussions with
7  anyone at Rhino about whether short sales of stock had
8  violated any restrictions in a convertible debenture?
9    A.  Yes.
10   Q.  Did you have any of those discussions
11 with regard to Amro's investment in Sedona?
12   A.  Yes.
13   Q.  With whom?
14   A.  The aforementioned three.
15   Q.  When?
16   A.  I can't put a time on it. I don't know
17 if it was before or after the sort of -- they
18 threatened with legal action and took legal action.
19 It was some time -- at some point, it was an issue we
20 discussed.
21   Q.  Were you aware at that time that there
22 was a limitation on short sales in the convertible
23 debenture with Sedona?
24       MR. ZITTER: At what time, at the
25 time of these discussions?

Page 47

1  STEFAN SIEGEL - CONFIDENTIAL
2    Q.  At the time of his discussions.
3    A.  That was the reason for the discussion.
4    Q.  Now, when Rhino invested Amro's funds,
5  were documents created memorializing the agreements
6  between Amro and the entities in which it invested?
7    A.  Yes.
8    Q.  And did you review those documents after
9  they were signed?
10   A.  Not all the documents. It depended
11 whether I was involved in the deal or not.
12   Q.  Let's take Sedona.
13   A.  Okay.
14   Q.  Did you review the documents with regard
15 to Sedona?
16   A.  I would say, I definitely didn't review
17 them until the issue came up, and then I probably did
18 to look at --
19       MR. ZITTER: Don't speculate. If you
20 did, tell him. If you didn't, tell him.
21   A.  I'm quite sure I looked at that language
22 at some point, the clause.
23   Q.  Was it a practice at Rhino to sell
24 shares short, on behalf of its clients in entities in
25 which it had entered into convertible debentures on

Page 48

1  STEFAN SIEGEL - CONFIDENTIAL
2  behalf of those clients?
3       MR. ZITTER: Object to the form of
4  the question.
5       MS. SCHECHTMAN: Object to the form.
6    A.  I know in certain cases, we didn't sell
7  a share short and wrote it off three years later. I
8  mean you look at some of these companies like Acquis,
9  I can list like five of them where we didn't sell a
10 share short. I can tell you other ones where we did,
11 so it was dependent.
12   Q.  Which ones were sold short?
13       MS. SCHECHTMAN: Object to form.
14   A.  The ones I know about were Affinity and
15 Sedona, off the top of my head.
16   Q.  Affinity, is that AFFI?
17   A.  That's right, yes.
18   Q.  And that's line 27 and 28 of Exhibit No.
19 162?
20   A.  That's right.
21   Q.  What about AASI?
22   A.  Do you know the name of the company?
23   Q.  I just know the symbol.
24   A.  I might know it. I don't know. I don't
25 know the name of the company. I can't say anything

Page 49

1  STEFAN SIEGEL - CONFIDENTIAL
2  until I know the name of the company.
3    Q.  Okay. Look at line 56. ERVO, were
4  sales sold short?
5    A.  That deal predated me even. I have no
6  idea. I don't know.
7    Q.  You don't know?
8    A.  No.
9    Q.  Take a look at line 64 CALY, were sales
10 sold short?
11   A.  I don't know.
12       MS. SCHECHTMAN: Object to form.
13   Q.  And Sedona?
14       MS. SCHECHTMAN: Object. Asked and
15 answered. And object to form.
16   A.  Yes.
17   Q.  Okay. Now, in the cases of the
18 companies where stocks were sold short, did you
19 participate in any discussions about the reasons for
20 such sales?
21   A.  Yes.
22   Q.  With whom?
23   A.  Alex, Thomas, Andreas, maybe at some
24 point, Ken Hill.
25   Q.  Pardon?

Page 58

1  STEFAN SIEGEL - CONFIDENTIAL
2  Q.  It doesn't refresh your recollection?
3  A.  No.
4  Q.  Does it refresh your recollection that
5  Rhino was selling Sedona stock in order to push down
6  its price in the spring of 2001?
7      MS. SCHECHTMAN: Object to form.
8
9  A.  No.
10 Q.  Pardon?
11 A.  No.
12 Q.  I'd like to show you Exhibit No. 135 in
13 the Badian deposition. This is the raw copy of a
14 document that was produced by Robert Charron with the
15 assist of Rhino's counsel. It's Bates stamped 42874.
16 It's Exhibit No. 135 from the Badian deposition.
17 A.  I read it.
18 Q.  You read the document?
19 A.  Yes.
20 Q.  It's dated March 30th, 2001. And it
21 pertains to a limitation on short sales in the Sedona
22 convertible debenture. Does this refresh your
23 recollection when you first were aware of the
24 limitation of short sales in the Sedona convertible
25 debenture?

Page 59

1  STEFAN SIEGEL - CONFIDENTIAL
2      MS. SCHECHTMAN: Object to form.
3  A.  No.
4  Q.  I'd like to show you Exhibit No. 137.
5  This is a document that was produced by Rhino Advisors
6  and it's Bates stamped RA26500. Have you ever seen
7  this document before?
8  A.  I saw parts of it in an SEC filing, in
9  an SEC complaint. I recall seeing parts of it in
10 either a press release or litigation release.
11     MS. SCHECHTMAN: I think he's asking
12 if you saw this e-mail.
13 A.  No, not this e-mail, no.
14 Q.  Have you seen the text?
15 A.  Again, in some sort of SEC motion or
16 Department of Justice motion, I saw some of it
17 reprinted there.
18 Q.  Who showed it to you?
19 A.  I read it on my own.
20 Q.  Were you interviewed about the Sedona
21 matter by any criminal authorities?
22 A.  Yes.
23 Q.  Who?
24 A.  The department -- U.S. Assistant
25 District Attorney, Marcia Isaacson, Marcia Isaacson.

Page 60

1  STEFAN SIEGEL - CONFIDENTIAL
2  Q.  Was there an investigator with her at
3  the time?
4  A.  Yes. I forgot his name.
5  Q.  When was that?
6  A.  We met on at least two or three
7  occasions.
8  Q.  What year?
9  A.  I don't remember. The first -- I don't
10 even remember. I don't remember. It's been a couple
11 years.
12 Q.  Do you recall what you were asked?
13 A.  I was asked hundreds of questions.
14 Q.  Was one of those questions, did Rhino
15 sell Sedona shares short?
16 A.  I don't remember.
17 Q.  Were you shown the text of this e-mail
18 in those interviews?
19 A.  I don't remember. I've seen it before
20 but --
21 Q.  Have you discussed the text of the
22 e-mail, which is marked 137, with anyone?
23 A.  I don't know. Vague recollection of
24 things intersecting with what the Department of
25 Justice was asking me, but not specific.

Page 61

1  STEFAN SIEGEL - CONFIDENTIAL
2  Q.  Anyone other than the Department of
3  Justice, did you have any discussions about the
4  subject matter of the text of the e-mail that's been
5  marked as Exhibit 137?
6      MS. SCHECHTMAN: Object to the form.
7  A.  No.
8  Q.  Are you employed?
9  A.  I'm self-employed.
10 Q.  What do you do?
11 A.  I do -- my licenses are hanging with a
12 registered broker dealer in San Diego. And I'm
13 basically like a research consultant. I read a lot of
14 filings, look for trends, and help support investment
15 banking transactions.
16 Q.  Are you paid a salary?
17 A.  No.
18 Q.  Did you file a tax return for last year?
19 A.  I filed for late filing, for last year.
20 Q.  Do you know what your income was last
21 year?
22 A.  I have two sources of income, part from
23 self-employed, part from being paid back by Thomas
24 Badian, which was an arrangement agreed by -- I don't
25 know if that's income.

Stefan Siegel                           CONFIDENTIAL                           July 28, 2009
                                        New York, NY

Page 62

STEFAN SIEGEL - CONFIDENTIAL

    MR. ZITTER: Is it really material the amount of his income?
    MR. GUIDO: I'd like to have him answer the questions.
    A. Self-employed was a very bad year, self-generated income, 20, 30,000, and then 60 or 80,000 from an agreed pay-back plan that took two years, from Rhino, from my Rhino employment.
    Q. Did you say pay-back plan?
    A. I was owed money, and never paid money. And it was brought up to the Department of Justice, and after couple years, they said, okay. My lawyer at first said, don't ask for it. And then we talked to the Department of Justice, and they said, okay. And so we entered into an arrangement through attorneys, without me dealing with Thomas, of a pay-back plan for 170,000 over two years.
    Q. And that was money that you were owed when you left Rhino?
    A. Yes.
    Q. What were you owed that money for?
    A. Bonuses, that I never collected.
    Q. Bonuses for what?
    A. I was paid a subjective bonus.

Page 63

STEFAN SIEGEL - CONFIDENTIAL

    Q. Pardon?
    A. I was paid a subjective bonus. I was paid salary and bonus.
    Q. Any documents to reflect that bonus agreement?
    A. I don't believe we ever put it in documentation. The settlement -- I mean, the pay structure being paid back is in documentation.
    Q. But when you were with Rhino, was there any documentation of the bonus?
    A. No, I don't think so.
    Q. When you were at Rhino, were there any documentations that reflected the bonus arrangement?
    A. I don't believe so.
    Q. Subsequent to leaving Rhino, when did you first have discussions about the bonus agreement?
    MR. ZITTER: With whom?
    Q. With anyone?
    A. By agreement, do you mean, how much I was owed?
    Q. Yeah.
    A. My attorney.
    Q. Who was that at the time?
    A. Paul Fishman.

Page 64

STEFAN SIEGEL - CONFIDENTIAL

    Q. Now, with regard to that, when was that?
    MR. ZITTER: When was what?
    Q. When was it that you had the discussions with Paul Fishman about the bonus agreement?
    A. I disclosed it initially upon his retainment, which was sometime in 2004 or late 2003, 2004.
    Q. Was that before or after you were interviewed by the Department of Justice?
    A. I disclosed it to Paul Fishman before.
    Q. Before you --
    A. That this was an issue.
    Q. Okay. And did you enter into the agreement with Thomas Badian to have that money paid to you before or after you were interviewed by the Department of Justice?
    A. After all the meetings, after the last meeting.
    Q. Pardon?
    A. After the last meeting.
    Q. Okay. Did you have any discussions with Thomas Badian about the bonus agreement before you were interviewed by the Department of Justice?
    A. No.

Page 65

STEFAN SIEGEL - CONFIDENTIAL

    Q. Did anyone on your behalf have discussions with Thomas Badian?
    A. No. I was told to not talk about it at all.
    Q. Now, subsequent to that, did you have any discussions with Thomas Badian about that bonus agreement?
    MR. ZITTER: Subsequent to when?
    Q. Subsequent to being interviewed by the Department of Justice?
    A. The actual documentation and --
    MR. ZITTER: It's a simple question, subsequent to that, did you have any conversations.
    A. Yes, yes.
    Q. Who did you have that discussion with?
    MS. SCHECHTMAN: The question was, did you have discussions with Thomas Badian.
    Q. Excuse me. When was that?
    A. This was sometime in 2005.
    Q. Okay.
    A. I think, or 2006, I don't know. But after my attorney and I talked to the Department of Justice, my attorney contacted his attorney, and I told Thomas to expect this. We didn't talk about it

17 (Pages 62 to 65)

Stefan Siegel                         CONFIDENTIAL                         July 28, 2009
                                      New York, NY

### Page 66

    STEFAN SIEGEL - CONFIDENTIAL
 2  in specifics. I was told not to talk about it in
 3  specifics, not to talk about numbers. That all went
 4  through the attorneys but.
 5      Q.  So did you call Thomas?
 6      A.  I don't recall how we talked, maybe
 7  e-mail.
 8      Q.  And that was sometime in 2005, did you
 9  say?
10      A.  I don't know the date. It might have
11  been 2006. I don't recall.
12      Q.  In that conversation that you had with
13  Thomas, where you told him that you thought he owed
14  you money?
15      A.  Uh-huh.
16      Q.  Is that what you did?
17          MR. ZITTER: Object to the form of
18  the question.
19          MS. SCHECHTMAN: Object to the form.
20      Q.  In that conversation, did you tell
21  Thomas you thought he owed you money?
22          MS. SCHECHTMAN: Object to form.
23      A.  I said, you know, we have this
24  outstanding balance, and you know, I really need the
25  money now. And the DOJ is fine with it. He said,

### Page 67

 1      STEFAN SIEGEL - CONFIDENTIAL
 2  fine, have your attorney call my attorney, set it up
 3  between the attorneys. He recognized that he owed me
 4  money, but didn't want to talk about it in specifics.
 5      Q.  Did you tell him in that conversation
 6  that you had spoken to the Department of Justice?
 7          MS. SCHECHTMAN: Object to form.
 8      A.  Yes.
 9      Q.  Did you say anything about what you told
10  the Department of Justice to Thomas in that
11  conversation?
12      A.  No, no.
13      Q.  Did you tell him why he owed you money?
14          MS. SCHECHTMAN: Object to form.
15      A.  I didn't need to. He knew he owed me
16  money.
17      Q.  And it was a bonus?
18      A.  It was every year, like industry
19  practice, we were paid a subjective bonus. And I let
20  it collect. I don't know, it represented maybe a
21  year-and-a-half bonuses, or two years.
22      Q.  How many years were you employed there?
23      A.  I was there for almost four --
24  three-and-three-quarters of a year,
25  three-and-two-thirds of a year.

### Page 68

 1      STEFAN SIEGEL - CONFIDENTIAL
 2      Q.  The first year, were you paid a bonus?
 3      A.  Yes.
 4      Q.  How much?
 5      A.  I don't remember.
 6      Q.  Was that 2000, the year 2000?
 7      A.  Yes.
 8      Q.  The second year, were you paid a bonus?
 9      A.  Second year, yes.
10      Q.  How much?
11      A.  The second year was, I recall 100,000.
12      Q.  And that was 2001; is that correct?
13      A.  Yeah.
14      Q.  2002, were you paid a bonus?
15      A.  2002, yes, yes.
16      Q.  How much was it?
17      A.  I don't know the exact number. I don't
18  remember.
19      Q.  Was it paid to you?
20      A.  Only partially.
21      Q.  Only partially?
22      A.  Right. When I needed money, I asked for
23  it, and there was a running tally.
24      Q.  How was the bonus calculated?
25      A.  Subjectively. And by 2002, we were

### Page 69

 1      STEFAN SIEGEL - CONFIDENTIAL
 2  renegotiated, and I asked for a certain percentage of
 3  the profits and losses. And he said he would pay me
 4  4% of profits.
 5      Q.  Of the profits of what?
 6      A.  Of the investments that Rhino was
 7  responsible for for that year, as calculated that
 8  year.
 9      Q.  He would pay you 4% of the profits that
10  Rhino had generated for its clients; is that what
11  you're saying?
12      A.  Yeah. By 2002, that was the agreement.
13      Q.  In 2002?
14      A.  At some point in 2002.
15      Q.  Take a look at Exhibit No. 4.
16          MS. SCHECHTMAN: He's going to direct
17  you.
18      Q.  I'm going to direct your attention to
19  page 22609.
20      A.  Okay.
21      Q.  You see the paragraph says; a portfolio
22  management agreement exists between Rhino and Creon?
23      A.  Right.
24      Q.  And it appears to exist between Rhino
25  and Amro?

                                                18 (Pages 66 to 69)

| Stefan Siegel | CONFIDENTIAL<br>New York, NY | July 28, 2009 |

**Page 70**

1  STEFAN SIEGEL - CONFIDENTIAL
2   A.  Okay.
3   Q.  Now, look down the fifth line, at the
4  end it says; these documents also provide that Rhino
5  is entitled to receive a performance based fee equal
6  to 2% of the appreciation of the total assets under
7  management, including net realized and net investment
8  income as adjusted pursuant to provisions of the
9  portfolio management agreement. See that?
10  A.  Uh-huh.
11  Q.  You just testified that you had an
12  unwritten agreement with Thomas that he would pay you
13  4% of the profits of those entities?
14  A.  That was my understanding.
15  Q.  Isn't it true, no such agreement
16  existed?
17      MR. ZITTER:  Object to the form of
18  the question.
19  A.  Such an agreement what?
20  Q.  Between you and Thomas for a bonus.
21      MS. SCHECHTMAN:  Object to form.
22  A.  There was definitely a verbal agreement.
23  Q.  There was a verbal agreement?
24  A.  Yes.
25  Q.  But it wasn't ever put into writing?

**Page 71**

1  STEFAN SIEGEL - CONFIDENTIAL
2      MS. SCHECHTMAN:  Asked and answered.
3  A.  No.
4      MR. ZITTER:  That's the definition of
5  a verbal agreement.
6  Q.  And were you paid this in, part of it,
7  in 2002, I think you testified?
8  A.  Well, the bonuses were handed down
9  basically at the end of the year, so I would have been
10  paid over the next year, right. As I took it in, you
11  know, I never, you know, I just left it there.
12  Q.  What was your salary at Rhino?
13  A.  It was either 90 or 100,000 a year.
14      MR. GUIDO:  Why don't we take a break
15  for lunch. It is now 12:30. Why don't we reconvene
16  at quarter after 1.
17      MR. ZITTER:  Okay.
18      THE VIDEOGRAPHER:  This marks the end
19  of tape number two in the videotape deposition of
20  Stefan Siegel. The time is 12:31. We are off the
21  record.
22      This marks the beginning of tape
23  number 3 in the deposition of Stefan Siegel. The
24  time is 1:24. We are back on the record.
25  Q.  Mr. Siegel, when we broke, we were

**Page 72**

1  STEFAN SIEGEL - CONFIDENTIAL
2  discussing an agreement that you had with Thomas
3  Badian to pay you funds?
4  A.  Right.
5  Q.  Is there any outstanding balance on
6  that?
7  A.  No, it's done.
8  Q.  When was the last time you received a
9  payment?
10  A.  It was the -- what would the date be,
11  the date would be the end -- the beginning of Q4, last
12  year.
13  Q.  So the beginning of?
14  A.  Q4, it was quarterly. So last payment
15  was Q3, the end of Q3.
16      MR. GUIDO:  We have to go off the
17  record. I'm sorry.
18      THE VIDEOGRAPHER:  Going off the
19  record. The time is 1:25.
20      We're back on the record. The time
21  is 1:28.
22  Q.  When did the payments start with this
23  agreement with Thomas?
24      MS. SCHECHTMAN:  Object to form,
25  asked and answered.

**Page 73**

1  STEFAN SIEGEL - CONFIDENTIAL
2  A.  My recollection is the -- there was a
3  payment, first payment at the end of 2006, and then it
4  continued through 2007, and three quarters of 2008.
5  Q.  And when was the agreement entered into
6  with him in writing?
7      MS. SCHECHTMAN:  Object to form.
8      MR. ZITTER:  Object to the form of
9  the question.
10  A.  I don't recall the exact date.
11  Q.  Was it before or after he -- the
12  criminal authorities filed a complaint against him?
13      MS. SCHECHTMAN:  Object to form.
14      MR. ZITTER:  Yeah. You're assuming
15  he knows when the criminal authorities filed the
16  complaint. I mean, I think that was unfair.
17  Q.  I'm going to show you Exhibit No. 163,
18  which is a printout from Pacer which has the
19  transactions that you were involved in U.S.A. versus
20  Badian, and this is defendant Thomas Badian, at 163,
21  is that what your Exhibit No. says, Exhibit 163?
22  A.  Yes, so much after, long after.
23  Q.  Long after. Okay. When you met with
24  the people from the Department of Justice, was it an
25  interview?

19 (Pages 70 to 73)

Stefan Siegel          CONFIDENTIAL          July 28, 2009
                       New York, NY

### Page 74

1    STEFAN SIEGEL - CONFIDENTIAL
2    A.   I don't know how to define it.
3    Q.   Well, did you appear before a grand
4    jury?
5    A.   Yes.
6    Q.   You did?
7    A.   Uh-huh.
8    Q.   Were you interviewed by somebody before
9    that?
10   A.   Yes.
11   Q.   Was it a Mr. Mancheck?
12   A.   I don't know.
13   Q.   Was it a man?
14   A.   The first time there were a few people
15   there, but it was, Marcia Isaacson was the DA that I
16   knew.
17   Q.   Okay. Did you meet with Marcia
18   Isaacson, did you meet with her more than one time
19   before you went before the grand jury?
20   A.   I recall just one. My recollection is
21   one day, and then partial of another day, and then
22   going into the grand jury.
23   Q.   How long did you testify before the
24   grand jury?
25   A.   No longer than an hour.

### Page 75

1    STEFAN SIEGEL - CONFIDENTIAL
2    Q.   Now, was it before or after the criminal
3    complaint that's referred to in Exhibit 163?
4    A.   After.
5         MS. SCHECHTMAN: Object to form.
6         MR. ZITTER: Can we establish a date,
7    'cause I don't see a date that's clear.
8         THE WITNESS: 12 --
9         MR. ZITTER: Well, that's the date on
10   this particular sheet. I don't know if that's the
11   date the complaint was filed.
12   Q.   Date filed was 12/3, 2003. So it was
13   after that date?
14   A.   Uh-huh.
15   Q.   Was it a year after?
16   A.   Probably about a year.
17        MR. ZITTER: If you don't recall,
18   don't speculate.
19   Q.   Did you appear before the grand jury
20   before you made the telephone call to Thomas Badian to
21   tell him he owed you money?
22        MS. SCHECHTMAN: Object to form.
23   A.   Yes, before.
24   Q.   Pardon?
25   A.   Before.

### Page 76

1    STEFAN SIEGEL - CONFIDENTIAL
2    Q.   And would you provide us with a copy of
3    the written agreement that you entered into with
4    Thomas?
5         MR. ZITTER: We'll take that under
6    advisement.
7    Q.   Now, how much money in total did you
8    receive from Thomas Badian under that agreement that
9    you entered into with him after you testified before
10   the grand jury?
11        MS. SCHECHTMAN: Object to form.
12   A.   I think it was 170.
13   Q.   170,000?
14   A.   Yes.
15   Q.   What was that for, what year's bonuses?
16        MS. SCHECHTMAN: Object to the form.
17   A.   Part of '01, '02, that was it,
18   basically.
19   Q.   Prior to making the call to Thomas
20   Badian after you appeared before the grand jury, did
21   you ever contact him and notify him that you thought
22   he owed you money under a bonus agreement that you had
23   entered into when you were at Rhino?
24        MR. ZITTER: Objection to form of the
25   question.

### Page 77

1    STEFAN SIEGEL - CONFIDENTIAL
2         MS. SCHECHTMAN: Objection to form.
3    A.   I was told not to talk about it with
4    him, so I didn't.
5    Q.   Who told you not to talk about that?
6    A.   My attorney, Paul Fishman.
7    Q.   When did you hire Mr. Fishman?
8    A.   He was hired, I think, in 2004.
9    Q.   In 2004. Prior to 2004, did you ever
10   tell Thomas Badian that he owed you bonus money from
11   your work at Rhino?
12        MS. SCHECHTMAN: Objection to form.
13   A.   Yes. He knew there was an outstanding
14   balance.
15        MR. ZITTER: That's not the question.
16   Listen to the question. Answer the question.
17   A.   Prior to --
18   Q.   Prior to 2004, when you retained
19   Mr. Fishman, did you ever tell --
20   A.   Probably a year prior to.
21   Q.   Pardon?
22   A.   Yes, yes.
23   Q.   When?
24   A.   I left New York in the summer of 2003.
25   So I would imagine around then.

20 (Pages 74 to 77)

Stefan Siegel  CONFIDENTIAL  July 28, 2009
New York, NY

Page 78

1    STEFAN SIEGEL - CONFIDENTIAL
2    Q. What did you tell him, when you told him
3    that he owed you money under a bonus agreement that
4    you had with Rhino when you were employed by them?
5    MS. SCHECHTMAN: Object to form.
6    A. Actually, I recall now, at some point I
7    was still on payroll, and that ended sometime in '03,
8    maybe September, October of '03. And we had a
9    conversation. And he said, I know, I owe you money,
10   do you want it now. And I said, no.
11   Q. You were employed at Rhino in '03?
12   A. I was still on payroll.
13   Q. Was Rhino still in operation in '03?
14   A. Yeah.
15   Q. Now, when you called Thomas after you
16   appeared before the grand jury, where was he located?
17   MR. ZITTER: Object to the form of
18   the question.
19   MS. SCHECHTMAN: Object to the form.
20   A. I realize, now, I'm not sure whether I
21   called him or not or whether it was e-mail or he
22   called me or the attorney talked, but at some point I
23   communicated to him that it was okay with the DOJ, and
24   my lawyer, the lawyers were going to talk. And he
25   said, do it all through the attorney. And the second

Page 79

1    STEFAN SIEGEL - CONFIDENTIAL
2    part of question was --
3    Q. Where was he?
4    A. Where was he?
5    Q. Yeah.
6    A. My understanding, I don't know where he
7    was. I don't know where he was. I'd have to
8    speculate.
9    Q. But you called him?
10   MS. SCHECHTMAN: Object to the form.
11   MR. ZITTER: Object to the form.
12   He's testified at least three times to that subject.
13   A. I don't know if I called him or not, I
14   don't know.
15   Q. Okay. But you did --
16   A. I had a phone number.
17   Q. Pardon?
18   A. I had a cell phone number.
19   Q. When you received the payments in
20   satisfaction of that agreement that you had with
21   Thomas Badian that you had entered into after you
22   appeared before the grand jury, were the payments in
23   cash?
24   MS. SCHECHTMAN: Object to form.
25   A. They were wire transfers from his law

Page 80

1    STEFAN SIEGEL - CONFIDENTIAL
2    firm, initially from -- I forgot Steven Cohen's law
3    firm. And then from another law firm.
4    Q. And where were those wire transfers sent
5    to?
6    A. To my checking account.
7    Q. Where is your checking account?
8    A. A bank called Torrey Pines.
9    Q. Pardon?
10   A. Called Torrey Pines.
11   Q. Called the Bank of Torrey Pines bank?
12   A. It's called Torrey Pines bank.
13   Q. Do you know the bank account number?
14   A. I don't know it offhand.
15   Q. Is it an account in your name?
16   A. Yes.
17   Q. What's your Social Security number
18   again?
19   A. ████████
20   Q. Will you obtain the wire bank transfer
21   records from your bank for us?
22   MR. ZITTER: We'll take that under
23   advisement, also.
24   Q. Do you know the source of funds for
25   Amro's investments in the companies that it invested

Page 81

1    STEFAN SIEGEL - CONFIDENTIAL
2    in while you were at Rhino?
3    A. I don't know for sure.
4    Q. What do you know?
5    MS. SCHECHTMAN: Object to form.
6    A. It would be speculation.
7    MR. ZITTER: Don't speculate.
8    Q. Don't speculate. Were you ever told?
9    MS. SCHECHTMAN: Object to form.
10   Were you ever told what?
11   Q. Were you ever told the source of funds
12   that Amro had to make the investments in the companies
13   while you were at Rhino?
14   A. I knew who some of the investors were,
15   but not all of them.
16   Q. Okay. Who did you know?
17   A. I knew at least his family was an
18   investor.
19   Q. Thomas Badian's family?
20   A. Uh-huh.
21   Q. Which members of his family?
22   A. That I don't know.
23   Q. How do you know that?
24   A. It was just known.
25   Q. What do you mean, it was just known?

21 (Pages 78 to 81)

| Stefan Siegel | CONFIDENTIAL<br>New York, NY | July 28, 2009 |
|---|---|---|

Page 90

1  STEFAN SIEGEL - CONFIDENTIAL
2     Q.  Pardon?
3     A.  My understanding was that it was family
4  writ large.
5     Q.  What do you mean writ large?
6     A.  Family, I don't know if it was uncle,
7  cousin, father, a mixture, don't know.
8     Q.  Blood relatives?
9     A.  Badian family.
10    Q.  Huh?
11    A.  Badian family.
12    Q.  Blood relatives?
13       MS. SCHECHTMAN:  Objection.
14    A.  I can't answer that, I don't know.
15    Q.  What do you mean by Badian family?
16    A.  His people he -- related to him.
17    Q.  In what way?
18    A.  I don't know. I don't know. I know he
19 had a lot of family in Europe. I didn't know all the
20 members. I didn't know who did what or where they all
21 got their money from, but I didn't know.
22    Q.  But it's your understanding that the
23 initial funding for Amro came from what you call the
24 Badian family?
25       MS. SCHECHTMAN:  Object to form.

Page 91

1  STEFAN SIEGEL - CONFIDENTIAL
2       MR. ZITTER:  Objection.
3     A.  I don't know about initial funding. I
4  don't know about what the first dollar came from. I
5  don't know the source of that. I don't know.
6     Q.  Well, to your understanding, did Amro
7  have any other sources of funds, other than the Badian
8  family?
9     A.  I don't know.
10    Q.  Did Creon have any other sources of
11 funds, other than the Badian family?
12       MS. SCHECHTMAN:  Object to form. I
13 don't believe there's been any testimony about that.
14    A.  I have -- I don't know. I don't know.
15    Q.  Have you ever heard, before I asked you
16 the question, a reference to a Badian family trust?
17    A.  A family trust, no, trust -- no.
18    Q.  Did Thomas Badian have a source of
19 income, other than the profits that were derived from
20 Rhino's operations?
21       MS. SCHECHTMAN:  Object to form.
22    A.  I don't know. I don't know.
23    Q.  Did Andreas Badian have a source of
24 funds, other than the money that he derived from his
25 activities from the acts of Rhino?

Page 92

1  STEFAN SIEGEL - CONFIDENTIAL
2       MS. SCHECHTMAN:  Object to form.
3     A.  I don't know.
4     Q.  Do you know Robert Charron?
5     A.  Yes.
6     Q.  How do you know him?
7     A.  He was frequently engaged as a lawyer by
8  Rhino, by us, to do deal documents, to paper the
9  transactions.
10    Q.  Look at Exhibit No. 4, again, please.
11       MR. ZITTER:  Is that the 21(a)?
12    A.  This one.
13    Q.  Did you provide any information to
14 Robert Charron, when he was preparing this report
15 that's been marked as Exhibit No. 4?
16    A.  I don't know. I don't know. I don't
17 remember.
18    Q.  Did he ever approach you --
19    A.  I don't recall.
20    Q.  Excuse me -- and ask you for information
21 to be included in that report?
22    A.  I don't recall.
23    Q.  Were you employed by Rhino in June of
24 2003?
25       MS. SCHECHTMAN:  Objection.  Asked

Page 93

1  STEFAN SIEGEL - CONFIDENTIAL
2  and answered.
3     A.  I was still on payroll, yes, I was
4  employed. But about that time I was leaving New York.
5  I think I left in June.
6     Q.  Let me hand you Exhibit No. 12. I want
7  to direct your attention to Exhibit No. 12, this is a,
8  an amended response to the Security and Exchange
9  Commission's request, and it's dated -- it's unclear.
10 It's either June or July 17th of 2003, on the last
11 page. And I want to direct your attention to page 15.
12 See where it says, Stefan Siegel?
13    A.  Yes.
14    Q.  And it has a date of January 13th, 2000,
15 as a start date. Do you see that?
16    A.  Yes.
17    Q.  And then it says, to present. Okay?
18    A.  Yes.
19    Q.  And it has other information about you
20 on there. The title, portfolio manager, manager of
21 due diligence and business development; is that
22 accurate?
23    A.  Loosely, I mean --
24    Q.  Okay. Then it has home address; is that
25 accurate at the time?

24 (Pages 90 to 93)

Stefan Siegel CONFIDENTIAL July 28, 2009
New York, NY

**Page 94**

1  STEFAN SIEGEL - CONFIDENTIAL
2  A. No, that was years' old.
3  Q. Pardon?
4  A. That was years' old.
5  Q. That address was years' old?
6  A. Yes.
7  Q. I didn't say accurate at this time. At
8  that time?
9  A. No, it was still years' old.
10 Q. So that was inaccurate?
11 A. It was inaccurate.
12 Q. The business address, was that accurate?
13 A. Yeah, except for the floor number.
14 Q. And the compensation figures, were those
15 accurate?
16 A. Those are -- that's what I received from
17 Rhino payroll, yes.
18 Q. Now, look at the first page of the
19 document, four lines down, and it's the sentence that
20 says; the information contained herein is based solely
21 on a review of the documents, because no current Rhino
22 employees were willing to speak with me regarding the
23 substance of my review on this matter. See that
24 sentence?
25 A. Yes.

**Page 95**

1  STEFAN SIEGEL - CONFIDENTIAL
2  Q. Does that refresh your recollection that
3  Robert Charron asked you questions to prepare the
4  document that's marked as Exhibit No. 4?
5  MS. SCHECHTMAN: Object to form.
6  A. No, not really.
7  Q. When you were interviewed by the U.S.
8  Attorney's Office, did you refuse to answer any of
9  their questions?
10 A. We're getting into legal matters here.
11 Q. No, I just asked you whether you
12 refused?
13 A. I know I initially took the Fifth or was
14 going to take the Fifth and --
15 Q. You were?
16 A. And then an agreement was negotiated,
17 and I talked to them after that.
18 Q. Okay.
19 MR. GUIDO: I'd like to have that
20 marked as Exhibit No. 164.
21 (Exhibit No. 164, Memo dated 11/8/01,
22 was marked for identification at this time.)
23 (Exhibit No. 165, duplicate of
24 Exhibit 164, was marked for identification at this
25 time.)

**Page 96**

1  STEFAN SIEGEL - CONFIDENTIAL
2  Q. Would you read 164.
3  A. Yeah.
4  Q. Have you had a chance to read 165?
5  A. They appear to be the same text.
6  Q. Huh?
7  A. I think it's a copy of the same, to a
8  different person.
9  Q. Did you write those e-mails?
10 A. Says I did, yes, it looks like my
11 writing. And it says it's from me, yes.
12 MS. SCHECHTMAN: He's asking, do you
13 recall writing these e-mails.
14 A. Vaguely. I know the situation. I know
15 the context.
16 Q. What is the context?
17 A. The context is, Stacy Mosher, who wrote
18 for the Daily Deal was writing these articles that
19 were based on this anonymously submitted report, that
20 was accusing us of all sorts of stuff, accused Rhino
21 of all sorts of conspiracies and called us terrorists
22 and drug dealers and all sorts of stuff.
23 Q. Who is Stacy Mosher, again?
24 A. She was an author for a web based --
25 well, actually, I think they were print at the time,

**Page 97**

1  STEFAN SIEGEL - CONFIDENTIAL
2  but business periodical called the Daily Deal.
3  MS. SCHECHTMAN: I just want to
4  clarify, are you basing that on what you're reading
5  or your recollection?
6  THE WITNESS: I recollect her.
7  Q. Well, who is T. Morris, on 165?
8  A. I don't remember him, but I can make a
9  guess.
10 MR. ZITTER: Don't guess.
11 A. You don't want me to guess.
12 Q. Who is Ed Fitzgerald in Exhibit 164?
13 A. Him I remember. He was a CFO of a
14 biotech company. I don't recall the name of it.
15 Q. Of a what?
16 A. Of a biotech company, but I don't recall
17 the name of it.
18 Q. Was it a biotech company that you were
19 negotiating financing for?
20 A. Yes.
21 MS. SCHECHTMAN: Object to form.
22 Q. Is Mr. Morris also a person who you were
23 negotiating with?
24 A. I believe so. I don't recall, though.
25 Q. Now, see the second sentence of Exhibit

25 (Pages 94 to 97)