# EXHIBIT G
# (CHARRON TRANSCRIPT EXCERPTS)

Robert F. Charron                                                June 12, 2008
                              New York, NY

                                                                    Page 1

1                              oOo
2                  UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
3    --------------------------------x
     SECURITIES AND EXCHANGE         )   No. 06 CV 2621
4    COMMISSION,                     )
                                     )
5                   Plaintiff,       )
                                     )
6            vs.                     )
                                     )
7    ANDREAS BADIAN, JACOB SPINNER,  )
     MOTTES DRILLMAN, JEFFREY        )
8    "DANNY" GRAHAM, POND            )
     SECURITIES CORPORATION d/b/a    )
9    POND EQUITIES, EZRA BIRNBAUM    )
     and SHAYE HIRSCH,               )
10                                   )
                    Defendants.      )
11   --------------------------------x
12                       Thursday, June 12, 2008
                         New York, New York
13                       Time: 10:25 a.m.
14
15         Deposition of ROBERT F. CHARRON, taken by
16   Plaintiff, pursuant to Notice, held at the offices
17   of Special Counsel, 600 Fifth Avenue, New York, New
18   York, on Thursday, June 12, 2008 at 10:25 a.m.
19   before Josephine H. Fassett, a Certified Court
20   Reporter and Notary Public of the State of New York.
21
22
23
24
25

Robert F. Charron                                                June 12, 2008
New York, NY

### Page 42

1  Robert F. Charron
2  the Commission's questions?
3  A    I don't believe so.
4       MR. GUIDO: I'd like to have marked as
5  Exhibit No. 5 --
6       MR. SOHN: Exhibit No. 6.
7       MR. GUIDO: -- a letter dated June 18,
8  2003 from Terry Pritchard to Chris Ehrman.
9       MR. SOHN: It should be Exhibit 6.
10      MR. GUIDO: Exhibit 6.
11      (June 18, 2003 Letter marked as
12  Exhibit 6, as of this date.)
13  BY MR. GUIDO:
14  Q    Would you please review Exhibit No. 6?
15  A    (Complies.)
16  Q    Did you have an opportunity to review
17  Exhibit No. 6?
18      MR. AUSLANDER: Have you read that
19  completely?
20      THE WITNESS: Yes, I have.
21  BY MR. GUIDO:
22  Q    Did you participate in the drafting of
23  Exhibit No. 6?
24  A    No.
25  Q    Did you review it before it was

### Page 43

1  Robert F. Charron
2  submitted to the Commission?
3  A    I don't believe so.
4  Q    Did you discuss it with anyone before
5  it was submitted to the Commission?
6  A    I don't believe so.
7  Q    Did you discuss any of the facts that
8  are contained in there with anyone before this
9  June 18th, 2003 letter was submitted to the
10 Commission?
11      MR. AUSLANDER: Objection. And if you
12  need to go ahead and take a look at that
13  because he said any of the facts discussed in
14  here, so maybe you want to look at it again
15  before you answer the question.
16 A    (Complies.)
17      MR. AUSLANDER: Okay. Do you want the
18  question read back?
19      THE WITNESS: Yeah.
20      MR. AUSLANDER: Just read back the
21  last question.
22      (Whereupon, the requested portion was
23  read back by the Reporter:
24      "Question: Did you discuss any of the
25  facts that are contained in there with anyone

### Page 44

1  Robert F. Charron
2  before this June 18th, 2003 letter was
3  submitted to the Commission?")
4  A    I don't recall.
5  Q    This letter says on the first page
6  that no Rhino officer or employee, in the second
7  paragraph, the last sentence, it says no Rhino
8  officer or employee with knowledge of the facts was
9  willing to waive their constitutional rights, is
10 that true?
11      THE WITNESS: Can I answer?
12      MR. AUSLANDER: Yeah.
13 A    I didn't have any discussions with
14 Rhino about what their constitutional rights were.
15 Q    Did you make any effort to interview
16 any of the employees that you mentioned were
17 employees of Rhino?
18 A    Yes.
19 Q    And what did they tell you when you
20 interviewed them in preparation of the 21(a) report?
21 A    They would not speak to me with regard
22 to the 21(a), the content of the 21(a).
23 Q    Did they tell you why not?
24 A    I don't recall.
25 Q    Okay. Which employees did you attempt

### Page 45

1  Robert F. Charron
2  to speak to?
3  A    I believe I spoke to every current
4  employee of Rhino which -- yeah, I think, I believe
5  it was every current employee of Rhino.
6  Q    Was Ken Hill a current employee of
7  Rhino at that point in time?
8  A    Yes, I believe he was.
9  Q    And did he refuse to speak to you?
10 A    He said -- yes, I asked him if he
11 would speak with me in respect to the 21(a) and he
12 said no.
13      MR. BABNICK: I'm sorry, Ken, I didn't
14  catch that name, what was the employee's
15  name?
16      MR. GUIDO: Pardon?
17      MR. BABNICK: What was the employee's
18  name?
19      MR. GUIDO: Ken Hill.
20 BY MR. GUIDO:
21 Q    Did he tell you why he would not speak
22 to you?
23 A    I don't recall.
24 Q    Did you attempt to speak to Stefan
25 Siegel?

12 (Pages 42 to 45)

Robert F. Charron　　　　　　　　　　　　　　　　　　　　　　　　　　　　June 12, 2008
　　　　　　　　　　　　　　　　New York, NY

```
                          Page 46                                        Page 48
 1           Robert F. Charron                  1           Robert F. Charron
 2      A    Yes.                               2      question?
 3      Q    And what did he tell you?          3           MR. GUIDO: That's the end of the
 4      A    He would not speak to me with respect  4      question.
 5   to the content of the 21(a).               5           MR. AUSLANDER: Ken, would you clarify
 6      Q    Did he tell you why?               6      for me the scope of that question? You said
 7      A    I don't recall.                    7      did you ever tell anyone, so at this point
 8      Q    Did you try and speak to Charity   8      he's represented, he's acting as an agent for
 9   Goodman?                                   9      Rhino, Rhino has counsel. If it's a
10      A    I don't think so.                 10      communication with counsel, it's privileged.
11      Q    And how about the Mr. Liesgang, is 11      If he was, if he's talking to partners of his
12   that how you say his last name?           12      at the time who represented counsel, that's
13      A    I think it's Liesgang.            13      privileged. That's too broad a question. As
14      Q    Liesgang. Excuse me.              14      it stands now, I'm going to direct him not to
15      A    Yes.                              15      answer on the grounds of privilege but if you
16      Q    And what did he tell you?         16      clarify the scope I may well let him answer.
17      A    That he would not speak to me on the 17      Q    Let's go back to 2000 --
18   content of the 21(a).                     18           THE WITNESS: Ken, can you give me a
19      Q    Did you attempt to speak to Andreas 19      minute? Can I talk to Jay for a second?
20   Badian?                                   20           MR. GUIDO: Sure.
21      A    Yes.                              21           (Whereupon, discussion between the
22      Q    And what did he tell you?         22      witness and his counsel.)
23      A    He would not speak to me in respect to 23           MR. AUSLANDER: I think we have a
24   the 21(a).                                24      question that was asked and then an objection
25      Q    Did anyone tell you why they would not 25      and a direction not to answer so perhaps --

                          Page 47                                        Page 49
 1           Robert F. Charron                   1           Robert F. Charron
 2   speak to you?                               2           MR. GUIDO: Can you read back the
 3      A    I do not recall.                    3      question, I don't remember the objection, or
 4      Q    Did any of them tell you they were  4      the direction not to answer?
 5   instructed not to speak to you?             5           MR. AUSLANDER: I don't think you
 6      A    I don't recall.                     6      liked it because you got up and left.
 7      Q    How did you contact them to interview 7           MR. GUIDO: No, I think you were
 8   them for information that you included in the 21(a) 8      consulting.
 9   report?                                     9           (Whereupon, the requested portion was
10           MR. AUSLANDER: Objection.          10      read back by the Reporter:
11           You can answer.                    11           "Question: Did you ever tell anyone
12      A    By telephone.                      12      that you believed that your preparation to
13      Q    Did you speak to Thomas Badian     13      file the 21(a) had been impaired by the
14   subsequent to speaking to the other employees to 14      employees' refusal to answer your
15   communicate to him what they had told you? 15      questions?")
16           MR. AUSLANDER: In connection with the 16      BY MR. GUIDO:
17   21(a)?                                     17      Q    Back in May/June of 2003 after you met
18           MR. GUIDO: In connection with the 18      with people who were employees of Rhino Advisors and
19   21(a).                                     19      you interviewed them in your preparation of the
20      A    I don't think so.                  20      21(a) report, did you ever tell anyone that their
21      Q    Did you ever tell anyone that you  21      refusal to answer your questions or discuss the
22   believed that your preparation to file the 21(a) had 22      21(a) report with you impaired your ability to
23   been impaired by the employees' refusal to answer 23      prepare the 21(a) report?
24   your questions?                            24           MR. AUSLANDER: Objection, and I'm
25           MR. AUSLANDER: Is that the end of the 25      going to direct the witness not to answer.
```