UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    -v-

ANDREAS BADIAN et al.,

        Defendants.

--------------------------------------------------------x



No.  06 Civ. 2621 (LTS)

### MEMORANDUM ORDER

        Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC") brings this civil enforcement action against Andreas Badian ("Andreas" or "Badian") alleging that he conspired with his brother Thomas Badian[1] ("Thomas") and others in a scheme to violate the securities laws by manipulating the stock price of the Sedona Corporation ("Sedona") for the benefit of their client Amro International S.A. ("Amro").  To resolve certain evidentiary questions in advance of trial, Plaintiff has filed three motions in limine; Badian has filed five.  Each motion is addressed below.

### I.  BACKGROUND

        The SEC alleges that Badian participated in a scheme to manipulate Sedona's stock price in violation of the securities laws and for the benefit of Amro.  The scheme is alleged to have operated as follows:  Amro made a $2.5 million loan to Sedona that was structured, in part, as a future-priced convertible debenture (the "Debenture").  The terms of the Debenture allowed Amro

---

[1]      Thomas Badian is not a party to this action.

to convert each dollar of debt to equity at the rate of 85% of Sedona's average share price over the five days prior to conversion, after a set date and assuming certain conditions were met.  Thus, within certain parameters, the lower Sedona's stock price was during the five days prior to conversion, the more shares of Sedona stock Amro would receive upon conversion.  It is alleged that Badian, and persons and entities under his direction, aggressively sold short Sedona's stock to lower temporarily its price prior to conversion, thereby gaining Amro more shares.  Then, once the process of conversion had begun, they stopped aggressively selling Sedona stock short and executed a series of trades that created a false impression of increased demand for the stock, which contributed to a brief rebound in the stock price.

In response to these allegations, Badian has submitted expert reports asserting that his actions were legal, economically rational and not manipulative, and that his trading in Sedona stock had no material effect on the price of Sedona's stock.

The United States Attorney for the Southern District of New York filed a criminal complaint against Andreas and Thomas Badian on December 3, 2003, based on the same conduct alleged here.  The complaint was dismissed as against Andreas on October 21, 2004.  The complaint against Thomas has not been dismissed.  No indictments have issued.  In connection with the complaint, Stefan Siegel, a former employee of Thomas, testified before a grand jury in 2006.  Less than three weeks following his testimony, Thomas agreed to pay Siegel a "subjective bonus payment" of $170,000 that Siegel claimed he was owed from when he had worked for Thomas.  There is no written record of a contractual obligation to pay such a bonus.  The United States Attorney's Office was informed of, and did not object to, this payment.  The payment was made on Thomas' behalf by Amro.

II.   DISCUSSION

A.   The SEC and Badian's Motions Regarding Expert Testimony

The SEC and Badian have filed cross motions challenging each other's expert witnesses.  The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  A party proffering expert testimony must prove that these requirements have been met by a preponderance of the evidence.  Bourjaily v. United States, 483 U.S. 171, 175-76 (1987).

Presented with proposed expert testimony, a court must decide whether the proposed witness is, indeed, an expert and "whether the scientific, technical or other specialized testimony provided by the expert is both relevant and reliable."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).  The Court must ensure that an expert's proffered testimony is supported by "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Id.

"[I]n complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.  Its use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  "As a general rule an expert's testimony

on issues of law is inadmissable." Id. (citation omitted). "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," but an expert may not "merely tell the jury what result to reach" by drawing directly upon the language of a statute or other inadequately explored legal criteria. United States v. Scop, 846 F.2d 135, 139-40 (citations omitted). Ultimately, the court's focus must be on the experts' "principles and methodology, not on the conclusions they generate," but the Court need not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). Sometimes, "there is simply too great an analytical gap between the data and the opinion proffered." Id.

The requirements of Rule 702 "will sometimes ask judges to make subtle and sophisticated determinations about scientific methodology and its relation to the conclusions an expert witness seeks to offer." General Elec. Co. v. Joiner, 522 U.S. 136, 148 (1997) (Breyer, J., concurring). Such subtlety and sophistication does not "excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules of Evidence impose." Id. However, the gatekeeper duties do not justify the exclusion of "shaky but admissible evidence" that can be evaluated by the jury subject to the traditional means of courtroom challenge – namely, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id. at 154 n.9 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993)).

1.     Defendants' Proposed Expert Steven Thel

The SEC has moved to exclude the proposed expert testimony of Steven Thel, a professor of law at Fordham University. On December 23, 2009, Magistrate Judge Eaton reviewed the report of Thel's proposed testimony and found that it lacked a "complete statement

of all opinions the witness will express and the basis and reasons for them," as required by Rule

26(a)(2)(B).  Judge Eaton ordered Thel to submit a supplemental report.  The Court has reviewed

carefully Thel's original and supplemental reports.  Thel's proposed testimony is replete with

inadmissible generalized statements of law, legal conclusions and conclusory statements

regarding Defendant's motivations, such as:

> [S]hort selling . . . is not illegal per se, but is instead subject to regulation.  Badian appears to have complied with all rules applicable to him in the sale of Sedona common stock. (Thel Report ¶ 11.)

> 'Manipulation' and 'manipulative' are terms of art in securities regulation, and this is particularly true with respect to manipulative trading where manipulation consists of intentionally and artificially affecting the price of a security by injecting false information into the market. (Thel Report ¶ 7.)

> It is not illegal to break a contract, and no SEC rule requires Badian or Amro to honor their contracts.  In other words, short sales in violation of the Agreement do not violate SEC rules or the securities laws.  (Thel Supp. Report ¶ 5.)

> Badian had no incentive to manipulate the price of Sedona common stock, did not attempt to manipulate that price and in fact traded appropriately.  (Thel Report ¶ 15.)

> I remain of the opinion that Andreas Badian complied with all rules applicable to him in the sale of Sedona common stock.  (Thel Supp. Report ¶ 4.)

> The SEC alleges that certain of the defendants violated various SEC rules . . . . These rules, however, apply to regulated broker-dealers and their associated persons, not to Badian.  I have carefully studied the SEC's complaint in this manner and the materials available to me, and I have not found any evidnce whatsoever that Badian violated any SEC short-selling rule.  Indeed, beyond the SEC's conclusional allegation of illegality, I have not found any allegation that Badian violated the securities laws. (Thel Supp. Report ¶ 8.)

Furthermore, ten paragraphs of Thel's 20-paragraph supplemental report address Thel's opinion

of the meaning of non-technical words and phrases as used by Badian during recorded telephone

conversations, including the words and phrases "clobber," "collapsed" and "unbridled levels of

aggression."  Thel is not qualified to testify as to what was in the defendant's mind when he used

these words and phrases.  For these reasons, Thel's testimony will be excluded in its entirety.

      2.    <u>Defendants' Proposed Experts Stephen Prowse and Tsvetan Beloreshki</u>

      The SEC has moved to exclude the proposed expert testimony of Stephen Prowse

and Tsvetan Beloreshki, who are employees of FTI Consulting, Inc.  The SEC's motion will be

granted in part and denied in part for the following reasons.

      Prowse and Beloreshki have submitted an expert report ("the PB Report" or "the

Report"), which concludes that Badian "did not pursue, and had no rational incentive to pursue, a

manipulative strategy aimed at artificially depressing the price of Sedona shares."[2]  (PB Report

¶ 62.)  Prowse and Beloreshki arrived at this conclusion after finding that: (1) Badian's trading

strategies were consistent with "an economically rational and beneficial strategy"; (2) Sedona's

stock price performance was consistent with overall declines in the market and industry and with

the generally poor and volatile performance of Sedona's stock; and (3) Badian's "transactions in

Sedona's common stock had no effect on Sedona's stock price."  (<u>Id.</u> ¶ 53.)

      Badian has not demonstrated by a preponderance of evidence that the findings in

the PB Report regarding the nature and impact of Badian's trading strategies are based on

reliable principles and methods reliably applied to the facts of this case.  For instance, Section II

of the PB Report (titled "Risk/Return Profile of the Convertible Debentures Issued by Sedona

Corporation and Rational Trading Strategies") analyzes the nature of the Sedona Debenture and

---

[2]     The PB Report explains that "[f]or simplicity's sake, the trading and returns discussed in this report are characterized in connection with Rhino," the Badian-affiliated investment advisory firm that executed the relevant transactions, "even though, in fact, these trades and returns related to the investors in Sedona's securities" who were presumably advised by Rhino.  (PB Report 1 n.1.)  This Order uses a similar shorthand except that, instead of referring to Rhino, it refers to Badian, who the SEC alleges coordinated the manipulative scheme.

its risk/return profile and concludes that Badian had no rational incentive to pursue a

manipulative trading strategy.  However, the Report gives only cursory attention to the price-risk

protective terms of the Debenture.  This price risk protection is a key element of the SEC's

theory of the case – namely, that because the Debenture guaranteed the same dollar value payout

at the time of conversion regardless of Sedona's stock price, Badian could manipulate the stock

price downward without a decrease in the payout's dollar value and at the same time increase the

number of shares that the conversion would yield and, thus, Badian had both motive and

opportunity to commit securities fraud.  The price risk protection provided by convertible

securities with terms such as those issued by Sedona is acknowledged in an authoritative

academic article, which is cited approvingly by both the SEC and Badian in their motion papers.

See Pierre Hamilton & Theo Vermaelen, Death Spiral Convertibles, Journal of Financial

Economics 71, 382 (2004) ("As long as the stock price is positive and the company honors the

conversion notice, the investor is protected against a fall in the company's stock price.") (docket

entry no. 201-5).  The PB Report claims that Badian "bore considerable risks such as those

associated with . . . the performance . . . of Sedona's common stock" and, specifically, "stock

price declines" (id. ¶ 25), but does not explain the factual basis of this claim.  The passages of

the Report that come closest to offering an explanation merely describe price risk in generic

terms or draw connections to other types of risk, such as credit and liquidity risk.  For example,

the Report opines that:

> Investors in the Debentures also bore the risk of stock price declines and liquidity
> risk – whether or not they had actual holdings in the Company's stock.  The
> magnitude of this risk is illustrated by the high level of volatility associated with
> Sedona's common stock.  Companies with significant risks of sharp stock price
> declines, like Sedona, pose significant risk management problems for investors in
> their securities.  Significant stock price declines not only directly decrease the
> value of an investor's equity holdings, but also increase the risk of the company

being delisted, or being unable to register its stock.  It also increases the risk of
default by the company and the costs of financial distress . . . .

(PB Report ¶ 25.)  Generalized statements, such as these, about economic conditions or company

attributes are insufficient to assist the jury in its evaluation of the particular circumstances of this

case and the SEC's claims.

In the same section, the PB Report opines that "the strategy of simply holding the

Debentures until they were converted into Sedona's common shares would not have been an

optimal trading strategy for at least five reasons."  (Id. ¶ 27.)  These reasons are that: (1) simply

holding the Debentures would have "ignored the time value of money"; (2) Badian "stood to

benefit from appropriate investment and hedging strategies" that would have reduced risk and

shortened "the time window over which [he] bore risks associated" with Sedona stock; (3)

Badian stood to benefit by reducing his overall long positions in the underlying equity whenever

possible and extending the period of time over which he sold the equity holding; (4) it was

economically rational "to sell Sedona shares prior to receiving additional shares pursuant to

conversion notices"; and (5) "there was a strong economic disincentive . . . to engage in a

manipulative strategy aimed at artificially depressing the price of Sedona stock."  (PB Report

¶¶ 27-32.)

With regard to the first proffered reason, the Report fails to explain how the time

value of money operated in this particular case to affect Badian's incentives.  The Report

mentions that Badian, as a rational investor, would prefer his "payoff sooner rather than later."

(Id. at 7.)  However, there are costs associated with receiving an earlier payoff, which the Report

does not address.  For instance, by short selling, Badian exposed himself to the risk that

Sedona's stock price would rise prior to conversion of the Debenture, in which case Badian

would have had to cover his short sales (for which he had contracted to receive the lower, pre-

rise stock price) with shares he received through the Debenture's conversion (which he otherwise could have sold in the market for the higher, post-rise price). The PB Report claims that Badian was engaged in legitimate hedging, but the term hedging typically means reducing one's exposure to risk not, as appears to have happened here, increasing one's exposure to risk. The Report does not explain why Badian's decision to expose himself to risk was a reasonable hedge or how doing otherwise would have "ignored the time value of money." As its second reason, the Report opines that Badian "stood to benefit from appropriate investment and hedging strategies." The Report does not, however, identify such strategies or establish that Badian's benefit from such strategies would have been greater than the benefit he would have received from simply holding the Debenture and, thus, the Report lacks a foundation for finding that either strategy was or was not optimal.

As for the third reason, the Report opines that Badian stood to benefit by reducing his long position in Sedona stock "whenever possible" and by "extending the period of time over which he sold the equity holding." The Report does not, however, compare the benefits of this proposed strategy to the potential payoff of simply holding the Debenture until conversion. Without such a comparison, the PB Report lacks an adequate basis for finding that either strategy was or was not optimal. Similarly, with regard to the fourth reason, the Report does not compare the costs and benefits of simply holding the Debenture until conversion or selling Sedona stock prior to conversion so, again, the Report lacks a foundation for determining that either strategy was or was not optimal. The fifth reason proffered by the PB Report – that Badian had a strong disincentive to engage in a manipulative strategy – lacks evidentiary and analytical support and is merely conclusory. In sum, Badian has not demonstrated by a

preponderance of the evidence that the opinions in Section II of the PB Report are supported by reliable principles and methods.

Section IV of the PB Report purports to analyze "The Impact of Rhino's Trading on Sedona's Stock Price," describing the results of "quantitative and statistical" tests performed by Prowse and Beloreshki.  (Id. ¶ 51.)  According to the Report, these tests demonstrate that Badian's trading in Sedona's common stock had no effect on Sedona's stock price (id. ¶ 53) or, at least, fail to reject the null hypothesis that Badian's trading had no effect on the stock price (id. ¶ 56).  The cited tests, however, suffer from multiple methodological faults, including a failure to address facts that are central to the SEC's allegations against Badian and relevant to the proffered expert testimony.  For instance, one of the tests relied upon by the Report compares "the difference between the daily returns of Sedona share prices between trading days when [Badian] did and did not trade" and another compares days when Badian was a net seller of Sedona stock to days when he was a net buyer or net neutral.  (Id. ¶ 55.)  Neither test, however, measures the volume of Badian's trades on the days in question.  Trading volume is critically important because of its effect on share price.  Indeed, share price can be highly sensitive to trading volume – a fact acknowledged in the material that Badian submitted in connection with the instant motion practice.  See Lisa K. Meulbroek, An Empirical Analysis of Illegal Insider Trading, The Journal of Finance 1691-99 (Dec. 1992), available at docket entry no. 231-14 (finding, in the context of insider trading, that "[t]he heightened sensitivity of price to volume of insider trading days indicates that . . . trade size, number of trades, or trade direction, as well as the total volume traded by the insider, lead to the incorporation of insider information into the price" (emphasis added)).  Yet, the tests upon which the PB Report relies are, by design, blind to any distinction between days when massive quantities of stock were sold and days when only a

share or two were sold. The Report's failure to take into account such potentially critical facts indicates that Prowse and Beloreshki have not applied their analytical methods reliably to the relevant facts.

In another example of insufficient analysis, the PB Report does not distinguish between normal market trades and manipulative wash trades when analyzing Badian's trading history, although wash trades are one of the key devices by which Badian allegedly manipulated Sedona's stock. (Dep. of Stephen Prowse 146-47 ("We took account of all the trades made by the accounts in this matter. And whether they were – whether they were normal market trades, [or] whether they were what you might call wash trades . . . . We didn't do a separate analysis.").) A "wash trade" is a transaction "such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position." Reddy v. Commodity Futures Trading Comm'n, 191 F.3d 109, 115 (2d Cir. 1999). Wash trades are a generally recognized means of manipulating stock prices. Id.; cf. 7 U.S.C. § 6c(a) (proscribing the use of wash trades to manipulate commodities prices). The PB Report is facially deficient because it fails to address in its analysis evidence that indicates the presence of manipulative wash trades. Badian, thus, has not demonstrated that Prowse and Beloreshki applied their quantitative "methods reliably to the facts of the case" in this regard. See Fed. R. Evid. 702.

A further example of deficient analysis is the PB Report's choice of event study "estimation windows." An event study estimation window is the period of time used to estimate a "normal return" – that is, the return that the security under consideration would have produced without the existence of the allegedly manipulative trading. (A. Craig MacKinlay, Event Studies in Economics and Finance, Journal of Economic Literature, Vol. XXXV (March 1997) ("MacKinlay") 15.) The normal return is compared against the stock's actual return to

determine whether the allegedly manipulative trading affected the actual return.  Id.  Except

under conditions not applicable here,[3] the period of alleged manipulative trading should not be

included in the estimation window because it distorts the calculation of the normal return.  Id.

("[T]he event period itself is not included in the estimation period to prevent the event from

influencing the normal performance model parameter estimates."); RMED Intern, Inc. v. Sloan's

Supermarkets, Inc., 94 Civ. 5587, 2000 WL 310352, *6-8 (S.D.N.Y. Mar. 24, 2000) (When

choosing an estimation window, "it is important to select a sample period during which the fraud

does not affect the normal relation between the security, the market, and the industry." (quoting

Cornell & Morgan, Using Finance Theory to Measure Damages in Fraud on the Market Cases,

37 U.C.L.A. L. Rev. 883, 898 (1990)); see also Bhagat & Romano, Event Studies and the Law:

Part I: Technique and Corporate Litigation, 4 Am. L. & Ec. Rev. 121, 146 (Spring 2002)

(explaining that the standard period for an estimation window is between 100 and 200 days

preceding the event being studied); Fogarazzo v. Lehman Brothers, Inc., 263 F.R.D. 90

(S.D.N.Y. 2009) (The orthodox method, "when feasible, is to use the period prior to the" event

being studied, and not including the event itself, "for the estimation window." quoting Campbell

et al., The Econometrics of Financial Markets 152 (1997)).

        The PB Report uses estimation windows that include the period of alleged

manipulative trading.  In fact, each of the Report's estimation windows covers at least two

periods of allegedly manipulative trading – one when Badian allegedly pushed the stock price

down and another when he allegedly pushed the price up.  The decision to include not just one,

---

[3]     For an example of conditions under which the estimation window could properly
        include the period of alleged manipulation, see RMED Intern, Inc. v. Sloan's
        Supermarkets, Inc., 94 Civ. 5587, 2000 WL 310352, *6-8 (S.D.N.Y. Mar. 24,
        2000).

but both, of these periods of alleged manipulation in the same estimation window undermines the purpose of an estimation window, which is to estimate a normal return <u>without</u> the influence of the suspect trades, and renders these tests methodologically unsound.  "An event study may be rejected . . . if it is methodologically unsound or unreliable."  <u>Teamsters Local 445 Freight Div.</u> <u>Pension Fund v. Bombardier, Inc.</u>, 546 F.3d 196, 208 n.15 (2d Cir. 2008) (citation omitted).  In sum, Section IV of the PB Report excludes an analysis of key facts and suffers from improper test design.  Badian has failed to show by a preponderance of the evidence that this section of the Report is based on reliable principles and methods applied reliably to the facts of this case.  <u>See</u> Fed. R. Evid. 702; <u>Kumho Tire Co.</u>, 526 U.S. at 137.

The SEC's motion to strike will, however, be denied with regard to the testimony proffered in Section III of the PB Report.  Section III examines "the movement in Sedona's stock price over the period of [Badian]'s trading and compare[s] it with stock price movements of the overall market and also of other peer companies."  (PB Report ¶ 34.)  Section III also "considers the deteriorating operating performance of Sedona over this period" and concludes that the decline in Sedona's stock price "was consistent with the contemporaneous deterioration in a combination of market, industry and Company-specific factors."  (<u>Id.</u> ¶¶ 34-35.)  This section of the PB Report does not opine on Badian's state of mind or the incentives created by the Debenture.  The analysis involves standard and uncontroversial methods for measuring stock price performance and for comparing those measurements to market and industry indicators.  Badian has demonstrated by a preponderance of the evidence that the testimony contained in this section of the PB Report satisfies the requirements of Rule 702.

In sum, the SEC's motion to exclude the proposed expert testimony of Stephen Prowse and Tsvetan Beloreshki will be granted as to the opinions and analysis proffered in

sections II ("Risk/Return Profile of the Convertible Debentures Issued by Sedona Corporation and Rational Trading Strategies") and IV ("Analyses of the Impact of Rhino's Trading on Sedona's Stock Price") of the PB Report.  The motion will be denied as to section III ("Market, Industry and Company-specific Factors Determining the Underperformance of Sedona Shares") of the Report.  Badian will be permitted to proffer testimony regarding Prowse and Beloreshki's credentials as well as any background material relevant to presenting the analysis in Section III.

> 3.     Plaintiff's Proposed Experts Lawrence Glosten and Charles Jones

Badian has moved to exclude the expert testimony of Lawrence Glosten and Charles Jones, asserting that they are unqualified to opine on the securities or issues involved in this matter.  An expert may be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Glosten is the S. Sloan Colt Professor of Banking and International Finance at Columbia Business School and Co-director of the Program in the Law and Economics of Capital Markets at Columbia Law School.  He has published articles on, inter alia, evaluating the performance of portfolio managers and asset pricing, and won an award for his work on electronic exchanges in the Journal of Finance.  Charles Jones is the Robert W. Lear Professor of Finance and Economics at Columbia Business School, where he teaches courses on debt instruments and econometric models.  The two professors' knowledge, skill and experience in finance make them more than qualified to opine on the securities and issues involved here. Their extensive experience, although not specific to future-priced securities, is sufficient to provide them with the knowledge and skill necessary to evaluate the securities involved in this matter, especially their experience studying asset pricing, debt instruments and econometric models.

Badian also challenges Glosten and Jones' proposed testimony as irrelevant because, he claims, they cannot agree on the meaning of the word "manipulation." The Glosten and Jones expert report evidences no sign of confusion or conflict over the meaning of the words "manipulate" or "manipulation." At a deposition, Glosten declined to opine on the legal definition of the word "manipulation," choosing instead to illustrate his non-legal use of the word by analogizing to his hand moving a glass of water, thereby manipulating it. (Sohn Decl. in Support of Mot. To Exclude Glosten and Jones, Ex 5, 59-61.) This is not inconsistent with Jones' more technical definition of manipulation as "trading in order to drive the price [of a stock] away from its fundamental value, to artificially increase or artificially depress the share price for a temporary amount of time." Id. Ex 6, 115. Both professors referred to altering a variable, be it the position of a water glass or the price of a stock, through one's actions.

Badian also challenges Glosten and Jones' testimony as irrelevant on the grounds that the "price impact model" that they used is outdated and inapplicable to the facts of this case. The fact that a methodology is old does not necessarily make it outdated, and Defendants have provided no other evidence of the model's desuetude. Defendants' reliance on Premium Plus Partners, L.P. v. Davis, 653 F. Supp. 2d 855 (N.D. Ill. 2009), is unavailing because, in that case, the court found inadequate indicia of reliability to support a comparative analysis based on "vastly different securities during vastly different times," whereas, in this case, Glosten and Jones focus their analysis on the security and time period material to this dispute.

Badian challenges Glosten and Jones' report as unreliable because Glosten and Jones admitted to having concerns about "discrepancies" in the raw data that they were asked to analyze by the SEC and because Glosten and Jones deviated from their original work plan. Neither allegation is inconsistent with good methodology. Defendants are free at trial to

challenge the strength of Glosten and Jones' analysis as a result of these modifications by, for example, conducting vigorous cross-examination, but the motion to preclude their testimony is denied.

B.    Badian's Motion to Exclude the Refco Recordings and Transcripts

Badian has moved to preclude any party from using or referencing Refco audio recordings and transcripts, or their contents, at trial, arguing that the SEC cannot lay a sufficient foundation to authenticate the recordings. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). This standard requires only that "sufficient proof has been introduced so that a reasonable jury could find in favor of authenticity . . . ." Ricketts v. City of Hartford, 74 F.3d 1397, 1409 (2d Cir. 1996). This standard is not a "particularly high hurdle" and favors the admission of evidence that it may be evaluated by the jury. SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 344 (2d Cir. 2004).

Badian urges that an audio recording's authenticity must be established by clear and convincing evidence, evaluated pursuant to a seven-factor rubric. He is mistaken. The clear and convincing standard has been applied to authentication of audio recordings in the context of criminal cases, see United States v. Bello, 90 Cr. 501, 1991 WL 450046, at *2 (S.D.N.Y. Mar. 29, 2001), but this case is a civil one. Defendants have cited to a single civil case where the court applied a clear and convincing standard to the authentication of an audio recording – Penguin Books USA, Inc. v. New Christian Church of Full Endeavor, Ltd., 262 F. Supp. 2d 251, 263-264 (S.D.N.Y. 2003). That decision, which noted the absence not only of evidence concerning the integrity of the tapes and transcripts in question, but also of the identity of the

speakers and even of the relevance of the proffered statements, is not dispositive of the standard to be applied here.  Rather, this Court is guided by the direction of the Court of Appeals for the Second Circuit in <u>Ricketts</u>, a civil case, that the ultimate authentication issue is properly one for the jury so long as there is evidence sufficient to permit a rational juror to conclude that the statement was made by the party the proponent contends made it.  See <u>Ricketts</u>, 74 F.3d at 1409. The Plaintiff has met its burden under that standard by proffering, <u>inter alia</u>, a declaration from the head of Refco's Information Technology department in the New York office explaining how the recordings were made and Defendants' deposition testimony identifying their voices on the recording.[4]  Accordingly, the motion to preclude the introduction of the recordings and transcripts will be denied.[5]

C.    <u>Plaintiff's Motion to Exclude from Trial Evidence that Refers or Relates to Defendant</u>
      <u>Badian's Second, Third, Fourth and Fifth Affirmative Defenses</u>

Badian will be permitted to submit evidence in support of his second affirmative defense – that a five-year statute of limitations applies to bar the civil remedy aspect of the claim against him – and his fifth affirmative defense, which is based on a theory of accord and satisfaction.  The SEC did not make a timely motion for summary judgment or motion to strike

---

[4]    Badian has challenged whether Richard Digilio did, in fact, recognize defendant Drillman's voice on the tapes.  (Badian's Reply 5-6, docket entry no. 255).  The Court need not address this dispute as the Plaintiff has cited to multiple other examples of the Defendants identifying each other's voices on the tapes.

[5]    In letters dated December 13, 2010, and January 3, 2011, Defendants complain that the SEC did not identify in its Rule 26(a)(3) disclosures all of the witnesses whose declarations the SEC has not proffered in support of the authenticity of the recordings.  If Defendants wish to depose any of those witnesses, they may give notice of their intention to do so within two weeks of the entry of this Memorandum Order, and the deposition(s) must be conducted prior to the Final Pretrial Conference date set in the concluding paragraphs of this Memorandum Order.  Badian's application for sanctions and an award of attorney's fees associated with the December 13, 2010, and January 3, 2011, letters is denied.

these defenses pursuant to Federal Rule of Civil Procedure 12(f), and the time for such motions

has passed.  Even if a Rule 12(f) motion were timely, the SEC would need to overcome a

particularly high burden.  See Salcer v. Envicon Equities Corp., 744 F.2d 935, 939 (2d Cir.

1984) ("A motion to strike an affirmative defense under Rule 12(f), Fed.R.Civ.P. for legal

insufficiency is not favored and will not be granted 'unless it appears to a certainty that plaintiffs

would succeed despite any state of the facts which could be proved in support of the defense.'")

It is not clear that the SEC would meet that burden.  For these reasons, the SEC's motion to

exclude evidence related to the second affirmative defense will be denied.

The SEC asserts that, if Badian is permitted to argue a statute of limitations

defense, that presentation should be made to the Court, not the jury, because the statute of

limitations defense applies only to the civil penalty aspect of the case and it is the Court, not the

jury, that is responsible for determining a civil penalty.   The SEC's argument is unavailing

because it improperly conflates the determination of whether the facts are such that the

defendants can be subjected to a civil penalty, which is a question for the jury, with the

determination of the severity of the civil penalty to be imposed, which is a question for the

Court, once liability is established.  See SEC v. Castaldo, 08 civ. 8397, 2009 WL 2591376, *1

(S.D.N.Y. Aug. 19, 2009) (citing Tull v. United States, 481 U.S. 412, 427 (1990), for the holding

that "there is a right to a jury trial on the issues of liability in a civil penalty action but that the

court may determine damages where a statute so provides").

Badian will not, however, be permitted to submit evidence in support of his third

and fourth affirmative defenses based on theories of res judicata, waiver or estoppel.  This Court

has twice rejected Badian's res judicata defense.  See SEC v. Badian, 06 civ. 2621, 2008 WL

3914872, *7 (S.D.N.Y. Aug. 22, 2008) ("Badian failed to establish that the claims at issue here

are the same as those in the prior action or could have been brought in the prior action."); <u>SEC v. Badian</u>, 06 civ. 2621, 2010 WL 1028256, *2-3 (S.D.N.Y. March 11, 2010) (Cott, M.J.) (Defendants could not compel discovery on their <u>res judicata</u> defense because "principles of preclusion, whether articulated as <u>res judicata</u> or waiver and estoppel defenses, may not be invoked against the SEC.") (relying on <u>SEC v. Culpepper</u>, 270 F.2d 241 (2d Cir. 1959)). Accordingly, the SEC's motion to exclude evidence related to the third and fourth affirmative defenses will be granted.

D.    <u>Badian's Motion for an Order Precluding Any Party From Referencing or Offering Evidence Concerning the 2003 Criminal Complaint Against the Badians</u>

Badian has moved to preclude any party from referencing the 2003 criminal Complaint brought against him and his brother Thomas.  The SEC asserts that the Complaint is relevant to the credibility and potential bias of the witness Stefan Siegel, who received a bonus payment of $170,000 from Thomas Badian in 2006, after Siegel had testified before a grand jury in connection with the Complaint.[6]  The SEC also asserts that the Complaint is relevant to Andreas Badian's consciousness of liability.

The criminal Complaint was dismissed against Andreas in 2004.  Two years, approximately, lapsed between the Complaint's dismissal as against Andreas and the payments to Siegel.  The payments were made by Thomas, who is not a party to the instant case.  Further, the United States Attorney's Office was informed of, and did not object to, the payments. In light of these facts, the probative value of the existence of the Complaint is slight.  The potential for unfair prejudice, however, is high, as it would likely lead the jury to make improper propensity

---

[6]    Another witness, Alex Liesegang, also received a bonus payment under similar circumstances from Thomas Badian. The analysis herein regarding Siegal also applies to Liesegang.

inferences about Andreas and could lead the jury to confuse the allegations in the criminal Complaint with the allegations in the instant case and/or to impute allegations against Thomas to his brother Andreas.  Accordingly, Badian's motion will be granted, as the Court finds that the probative value of the Complaint is substantially outweighed by the danger of unfair prejudice.

E.    Badian's Motions for an Order Striking Certain Witnesses and for an Order Striking Certain Exhibits

Badian has filed two motions challenging the content of the SEC's Rule 26(a)(3) disclosures on the grounds that the materials submitted are voluminous and poorly identified, that certain summary exhibits have not been provided to the defendants, and that some exhibits and the names of summary witnesses were provided to the defendants after the deadline for fact discovery.  Badian asserts that the SEC's voluminous and poorly organized disclosures amount to a "document dump," making it difficult to determine whether objectionable evidence has been tendered, to locate such evidence and to raise meaningful challenges in a timely manner.

The SEC disclosures were made pursuant to Federal Rule of Civil Procedure 26(a)(3)(A), which provides:

> [A] party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment:
>
> (i) the name and, if not previously provided, the address and telephone number of each witness – separately identifying those the party expects to present and those it may call if the need arises;
>
> *         *         *
>
> (iii) an identification of each document or other exhibit, including summaries of other evidence – separately identifying those items the party expects to offer and those it may offer if the need arises.

Rule 26(a)(3)(A).  The rule expressly calls for the identification of <u>each</u> document or other exhibit individually.  The advisory committee notes to the 1993 amendment of the rule explain that:

> The rule requires a separate listing of each such exhibit, though it should permit voluminous items of a similar or standardized character to be described by meaningful categories.  For example, unless the Court has otherwise directed, a series of vouchers might be shown collectively as a single exhibit with their starting or ending dates.

Fed. R. Civ. P. 26(a)(3)(A) (Advisory Committee Note, 1993 Amendment).  Thus, in most cases, each exhibit must be identified individually, but a party may identify collectively especially voluminous evidence that is "of a similar or standardized character."  Here, the SEC has taken evidence such as emails, letters and memos, and grouped them as single exhibits, even though it appears that they would be tendered for the significance of particular statements made in the individual communications rather than for patterns or easily identifiable aspects of standardized documents.  A group of emails may be similar in the facile sense that they are all emails and all from the same sender or sent on the same date, but they are rarely "similar or standardized" in the same way as a collection of vouchers with a standardized format.  The SEC's collective exhibit approach unreasonably hinders Defendants' ability to prepare for trial and makes it unlikely, as well, that the documentary evidence can be presented to the jury in an appropriately clear and efficient manner.

The SEC must therefore cull, revise, redesignate and re-disclose its exhibits in accordance with the following principles.  Each document (<u>i.e.</u>, each email or letter and any attachments) must be designated as a separate exhibit.  A series of items may be grouped as a single exhibit only when they are documents of the same type (for instance, transaction records for a particular class of stock of a particular entity) and are offered for their significance as a

collection.  Each page of any exhibit more than three pages in length must be given a unique Bates number that is shown on the copies of the exhibits provided to Defendants, the Court, the jury, witnesses, and other trial participants.  In revising its designations and disclosure of exhibits, the SEC must give due regard to considerations of relevance, avoidance of cumulation, clarity of presentation of issues at trial and whether the volume of material proposed to be presented is consistent with a jury's likely ability to comprehend its content and significance. The revised and redesignated exhibits must be disclosed, and copies provided to defense counsel and the Court, within three weeks of the entry of this Memorandum Order.

Badian's motion to exclude the testimony of the SEC's summary witness(es) is denied because a summary witness is not a fact witness and will not be offering new information, and Badian has not demonstrated a likelihood of prejudice resulting from the summary witness's testimony or the late disclosure of the witness's name.

CONCLUSION

For the foregoing reasons, it is hereby:

ORDERED, that Plaintiff's motion to preclude the testimony of Defendants' expert witness Steven S. Thel is granted (resolving docket entry number 177);

ORDERED, that Plaintiff's motion to preclude the testimony of Defendants' expert witnesses Stephen Prowse and Tsvetan Beloreshki is granted, except that Prowse and Beloreshki will be permitted to testify as to the opinions and analysis proffered in Section III of their report (captioned "Market, Industry and Company-Specific Factors Determining The Underperformance of Sedona Shares") (resolving docket entry number 198);

ORDERED, that Badian's motion to preclude the testimony of Plaintiff's expert witnesses Lawrence Golsten and Charles Jones is denied (resolving docket entry number 191);

ORDERED, that Badian's motion to exclude any part of the Refco recordings and their transcripts is denied (resolving docket entry numbers 194 and 197), and that any deposition of the SEC's additional authentication witnesses must be noticed and conducted in accordance with the deadlines set forth in note four to Section C of this Memorandum Order;

ORDERED, that Plaintiff's motion to exclude from the trial evidence that refers to or relates to certain of Andreas' affirmative defenses is denied with regard to his second and fifth affirmative defenses and granted with regard to his third and fourth affirmative defenses (resolving docket entry number 180);

ORDERED, Badian's motion to preclude any party from referring to or offering evidence concerning the criminal complaint that was filed against Thomas and Andreas Badian in 2003 is granted (resolving docket entry number 182); and

ORDERED, that Plaintiff is instructed to revise and re-disclose its exhibit list designations in accordance with the criteria and timetable set forth in Section E of this Memorandum Order (resolving docket entry numbers 185 and 188).  It is further

ORDERED, that the parties must file with this Court a revised Joint Pretrial Statement incorporating Plaintiff's revised exhibit designations and identifying any objections to the revised exhibits.  The revised Joint Pretrial Statement must be filed (and a courtesy copy provided for Chambers) at least seven (7) days before the Final Pretrial Conference, which is hereby adjourned from October 7, 2011, to **Friday, December 9, 2011, at 3:00 p.m.**

This Memorandum Order resolves docket entry numbers 177, 180, 182, 185, 188, 191, 194, 197 and 198.


Dated: New York, New York
       September 28, 2011

LAURA TAYLOR SWAIN
United States District Judge