# ATTACHMENT FOURTEEN

SECURITIES AND EXCHANGE COMMISSION

-------------------------------------------------- x

TRADING IN THE SECURITIES OF SEDONA     :  RESPONSE TO ORDER
CORPORATION AND OTHER ISSUERS         FOR STATEMENT PURSUANT
                                        :  TO SECTION 21(a)(1)
FILE NO. HO-09346                         OF THE SECURITIES
                                        :  EXCHANGE ACT OF 1934

-------------------------------------------------- x

I, Robert F. Charron, have been retained by Rhino Advisors, Inc. ("Rhino"), as its agent, to review certain documents and records made available to me by Rhino (the "Documents") for the purpose of responding to the Order for a Statement Pursuant to Section 21(a)(1) of the Securities and Exchange Act of 1934 ("Exchange Act" and such order, the "Order")). The information contained herein is based solely on a review of the Documents because no current Rhino employees were willing to speak with me regarding the substance of my review on this matter. In such review of the Documents, I have assumed that the information contained in the Documents is correct and complete. I have undertaken no independent verification or investigation of the information contained in the Documents. I was not denied access to any documents or records I requested. I believe I received and reviewed all relevant documents and records; however documents or records may exist of which I am not aware which may contradict or supplement the information contained in the Documents.

Rhino requests that this response and the referenced documents be treated as confidential pursuant to the Freedom of Information Act, 5 U.S.C. § 552, 18 U.S.C. § 1905, 17 C.F.R. § 200.83 and other applicable laws, regulations or policies. Because such Documents constitute investigatory records obtained by the Securities and Exchange Commission ("Commission") in connection with a potential law enforcement proceeding, they are subject to the exemption from



EXHIBIT
47-1

SEC-BADIAN-00022862

EXHIBIT-0047-0001

mandatory disclosure under Exemption 7(A) of the Freedom of Information Act, 5 U.S.C. §

552(b)(7)(A) (1976).  *See, e.g., National Labor Relations Board v. Robbins Tire & Rubber Co.,*

437 U.S. 214 *(1978); Chilivis v. Securities and Exchange Commission,* 673 F.2d 1205 (11th Cir.

1982).  In addition, various other exemptions may be applicable to this response and the

materials Rhino may provide in the future.

### Question No. 1

   Explain in detail the nature and history of Rhino's relationship with Amro International,
S.A. ("Amro") and Creon Management S.A. ("Creon"). Include in your explanation (1) when and
how Rhino's relationship began with each of these entities and a description of their businesses;
(2) the name, address, telephone number(s) and e-mail address(es) for each of Rhino's principal
contacts at each of these entities; (3) the identities of all individuals associated with each of these
entities with which Rhino has had communications of any kind; (4) a description of each
financing transaction in which Rhino has represented or acted on the behalf or at the behest of
these entities; (5) a description of the terms of Rhino's compensation arrangements with these
entities and a quantification of all compensation in any form whatsoever received by Rhino from
either of these entities; and (6) the identity of each brokerage account, by name and number, over
which Rhino has authority; custody or control or in which it is authorized to trade on behalf of
each of these entities.

### Answer No. 1

   (1)  Rhino is a New York business corporation formed on January 12, 2000.  Rhino

has served as the investment advisor for two non-US entities, Amro and Creon.

   (2)  H.U. Bachofen, Rhino's principal Amro contact, serves as director and president

of Amro. Michael Klee is the Secretary and Ruth Streitenburger is the Treasurer of Amro.  The

address for Mr. Bachofen is Ultra Finanz, Ltd., Grossmuensterplatz 6, PO Box 4401, Zurich CH-

8022 Switzerland.  The telephone number of Mr. Bachofen is 011-411-252-8680 and his fax

number is 011-411-262-5515.  I am not aware of any e-mail address for Mr. Bachofen.

   David Sims and Lamberto Banchetti of Beacon Capital Management are the directors of

Creon. Mr. Sims is Rhino's principal Creon contact. The address for Mr. Sims is Beacon Capital

– 2 –

SEC-BADIAN-00022863

EXHIBIT-0047-0002

Management, Harbor House, 2nd floor, Waterfront Drive, Road Town, Tortola, British Virgin

Islands (e-mail: davesims@surfbvi.com). The telephone number of Mr. Sims is 1-284-494-4770

and his fax number is 1-284-494-4771. Mr. Banchetti's address, telephone and fax number at

Beacon Management are the same as Mr. Sims. I am not aware of any e-mail address for Mr.

Banchetti. Additional contacts at Beacon are Arlene de Castro, assistant secretary and Murray

Todd, financial controller of Beacon. It appears that Rhino's formal relationship with Beacon

began on February 1, 2001, the date of the Portfolio Management Agreement between Creon and

Rhino with Mr. Sims signing as director of Creon. Prior to February 1, 2001, it appears that the

directors of Creon were affiliated with the firm of Dr. Dr. Batliner & Partner with an address at

Aeulestrasse 74, FL-9490 Vaduz, Liechtenstein, fax number 011-075-236-0405. The primary

signatory for Creon at that time was Hans Gassner, as director.

     A portfolio management agreement exists between Rhino and Creon and appears to

exist between Rhino and Amro. Each agreement provides that Rhino is entitled to asset-based

management fees from Amro or Creon, as the case may be, equal to 1% per annum of total assets

under management by Rhino at the end of each semi-annual period. These documents permit

Rhino to defer the payment of all or a portion of these asset management fees. These documents

also provide that Rhino is entitled to receive a performance-based fee equal to 2% of the

appreciation of the total assets under management (including net realized and net investment

income, as adjusted pursuant to provisions of the portfolio management agreement,) allowing for

subscriptions and redemptions of capital from Amro and Creon. According to these documents,

Rhino may waive all or portion of the asset management or performance fee. To date, Rhino has

received the following compensation from Amro/Creon: 2002 - $799,998; 2001 - $500,000. No

information is available regarding compensation in 2000. I am aware of no other information in

– 3 –

SEC-BADIAN-00022864

EXHIBIT-0047-0003

the Documents that provides any other information explaining the nature and history of Rhino's relationship with Amro and Creon.

(3)    Since its formation, Rhino has advised its clients with respect to financing transactions of public companies. These investments have generally taken the form of: (1) private investment, public equity ("PIPEs"), (2) private equity lines of credit, (3) acquisitions of registered shares from shelf registration statements, and (4) a combination of one or more of the foregoing structures. Many of the financings were structured through special purpose vehicles ("SPV's"), wholly owned, controlled and operated by, and affiliated with, Amro or Creon, as the case may be. A list of the SPVs for both entities is attached as Exhibit A.

Many of the financing transactions have been structured as PIPEs, in reliance on Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"). These PIPEs have taken many forms, including bridge loans, convertible debt, convertible preferred stock, and common stock (either with or without purchase price protection). Often, the issuer receiving the financing also issued warrants to acquire additional securities. The shares of common stock acquired in the PIPE, including shares issuable in respect of any convertible securities or warrants so acquired, are usually granted registration rights. Accordingly, it is typically required that the issuer enable the investors to resell the shares it acquired in the PIPE financing to the public.

Other financing transactions have been structured as what are colloquially known as private equity lines of credit. Generally, in an equity line of credit transaction, the investor commits to purchase from time to time up to a maximum dollar amount of common stock from a publicly traded company. Purchases under the equity line follow put notices, which may be

– 4 –

SEC-BADIAN-00022865

EXHIBIT-0047-0004

delivered by the company upon the satisfaction of specified negotiated conditions, including the filing and effectiveness of an appropriate registration statement with the Commission to permit the resale of the common stock issued thereunder (including the shares of common stock that would be issuable upon exercise of warrants obtained as a commitment fee for the equity line facility). The issuer would typically pay a legal and/or due diligence allowance of up to $25,000. For a variety of reasons, not all issuers who were party to an equity line of credit transaction with the Rhino client utilized the line. Accordingly, the Rhino client was not always required to provide financing, or was only required to provide a portion of the maximum amount of financing otherwise available under the equity line.

Creon, Amro and their SPVs also purchased shares of registered common stock directly from "shelf" registrations of public companies. Sometimes warrants were also issued as part of these financings. Because the shelf registration would cover the issuance of the securities, in such financings Amro, Creon or the SPV (as the case would be) would immediately receive freely tradeable registered securities.

The purchase price of the securities have typically been set at a discount to the market price of the common stock, measured either at the time of the financing, the time of the conversion or some other agreed upon time.

A list describing each of the financing transactions in which Rhino has represented or acted on behalf its clients is attached as Exhibit B.

(5) Rhino has authority to place orders to buy and sell securities through broker dealers for Amro, Creon and their SPVs. The documents produced to the Commission pursuant to the subpoena dated June 17, 2002 issued by the Commission to Rhino (the "Subpoena"),

– 5 –

SEC-BADIAN-00022866

EXHIBIT-0047-0005

identify the brokerage firms at which Amro, Creon and their SPVs purchase and sell securities as directed by Rhino.  A chart, attached as <u>Exhibit C</u>, lists the brokerage accounts over which Rhino has authority.

Based on an analysis of the Documents, I believe that Rhino generally pursued a variety of investment and trading strategies on behalf of its clients that sought to balance profit potential with risk reduction.  In this regard, Rhino is authorized to issue orders to broker dealers in the securities of the companies to whom financing was provided.   Shares were sold before their receipt, by means of short selling, or resold shortly after their receipt in what appears to be an effort to capture as a profit the difference between the market price and the discounted purchase price paid by Amro, Creon or the SPV.  In the case of Sedona Corporation ("<u>Sedona</u>"), the short selling activities were carried out notwithstanding a contractual covenant to not do so in the transaction documents with Sedona.

### Question No. 2

Is Rhino an investment adviser or does it act as an investment adviser, either in practice or as defined in the federal securities laws? Is Rhino registered as an investment adviser with any foreign, federal or state agency or self-regulatory organization? If so, identify the party with which Rhino is registered. If Rhino is not registered, explain why.

### Answer No. 2

As set forth in response to Question No. 1, Rhino acts as an investment adviser for only two clients, Amro and Creon. Since Rhino has only two clients and neither holds itself out generally to the public as an investment adviser nor acts as an investment adviser for any registered investment company or business development company, it is my understanding that it is not required to be registered as an investment adviser under the United States federal securities laws, or otherwise.  *See* Investment Advisers Act § 203(b)(1), 15 U.S.C. § 80(b)(3).

– 6 –

SEC-BADIAN-00022867

EXHIBIT-0047-0006

Accordingly, Rhino is not registered as an investment adviser with any foreign, federal or state agency or self-regulatory organization.

## Question No. 3

Is Rhino a broker dealer or does it act as a broker dealer, either in practice or as defined in the federal securities laws? Is Rhino registered as a broker dealer with any foreign, federal or state agency or self-regulatory organization? If so, identify the party with which Rhino is registered. If Rhino is not registered, explain why.

## Answer No. 3

As set forth in response to Question No. 1, Rhino serves as an investment adviser for only two clients, Amro and Creon.  It is my understanding that Rhino is not a broker dealer and does not act as a broker dealer, either in practice or as defined in the United States federal securities laws, because Rhino does not effect transactions in securities for its clients or for its own account. *See* the Securities Exchange Act  § 3(a)(4) and (5), 15 U.S.C. § 78c(a)(4) and (5). Accordingly, it is my understanding that Rhino is not required to register as a broker under the Exchange Act, and is not registered as a broker dealer with any foreign, federal or state agency or self-regulatory organization.

## Question No. 4

From January 1, 1999, to the present, describe:

(a)      all transactions, business arrangements, deals or similar arrangements in which Rhino sought to introduce or introduced parties seeking to obtain financing (in whatever form), including, but not limited to, cash, debt or equity and the time frame in which they occurred.

(b)      for each transaction, business arrangement, deal or similar arrangement identified in sub paragraph (a), describe Rhino's role in introducing the parties and in negotiating the terms in the financing and related documents.

(c)      for each transaction, business arrangement, deal or similar arrangement identified in sub paragraph (a), identify all persons and entities involved and the role of each person or entity, As to each individual identified, provide the following contact information: home and business addresses; home, business, pager, and cellular telephone numbers; facsimile numbers

– 7 –

SEC-BADIAN-00022868

EXHIBIT-0047-0007

(home and business); and electronic mail addresses. As to each entity identified, provide address and telephone number.

(d)     for each transaction, business arrangement, deal or similar arrangement identified in sub paragraph (a), describe the nature and type of the financing provided and the identify of the source, origin and party providing the financing.

(e)     for each transaction, business arrangement, deal or similar arrangement identified in subparagraph (a), describe the form of compensation that Rhino received (cash, debt, equity, stock purchase right, etc.), from whom the compensation was received, the amount that Amro was supposed to receive, the amount that Amro actually received, and the methodology used to determine the compensation received.

### Answer No. 4

From January 1, 1999, to the present, Rhino has not engaged in any transactions, business

arrangements, deals or similar arrangements in which Rhino sought to introduce or introduced

parties seeking to obtain financing (in whatever form), including, but not limited to, cash, debt or

equity.

### Question No. 5

From January 1, 1999 to the present, identify each of Rhino's clients. Include in your response the identity of each private fund or family of funds for which Rhino acts as a manager. Describe all services provided by Rhino to each of its clients and identify the nature and amount of compensation that Rhino has received in connection with services for its clients.

### Answer No. 5

See Answer to Question No. 1.

### Question No. 6

From January 1, 1999 to the present, has Rhino ever provided advice or assistance to its clients or other persons or entities regarding the trading of securities? If so, identify the person or entity to whom the advice was provided, the date the advice was provided and a description of the advice or assistance provided.

### Answer No. 6

See Answer to Question No. 1.

— 8 —

SEC-BADIAN-00022869

EXHIBIT-0047-0008

## Question No. 7

From January 1, 1999 to the present, has Rhino ever purchased or sold securities on behalf of its clients or any other person or entity, whether in an account in the name of Rhino or another party? If so, identify the person or entity for which the trade was made, the account in which the transaction took place and where the account is maintained.

## Answer No. 7

See Answer to Question No. 1 and Exhibit C.

## Question No. 8

From January 1, 1999 to the present, has Rhino or any of its principals, officers or employees exercised discretion or trading authority over any brokerage account. If so, identify the account, the name of the account holder and where the account is maintained. For any account identified in this question, identify all trading instructions or investment objectives provided to Rhino or its principals, officers or employees regarding trading in the account, including, but not limited to, the determination of when to buy or sell a particular security. For any accounts for which trading instructions or investment objectives were not provided, explain in detail, by account, the trading strategy or investment objectives, how the trading strategy or investment objective was determined and why the particular trading strategy or investment objective was utilized.

## Answer No. 8

See Answer to Question Nos. 1 and 10 and Exhibit C. The Documents did not contain

any directions from Amro or Creon to Rhino regarding any trading instructions, investment

objectives or trading strategies. However, as stated in Answer to Question No. 1, Rhino appears

to have pursued a variety of investment and trading strategies that sought to balance profit

potential with risk reduction. For example, in some cases shares were sold before their receipt,

by means of short selling, in other cases shares were resold shortly after their receipt; in each

case in what appears to be an effort to capture as a profit the difference between the market price

and the discounted purchase price paid by Amro, Creon or the SPV. As a specific example of

such strategy, please refer to Exhibit D which illustrates the trading activity of AMRO and its

SPVs in Sedona's common stock. Beginning on June 26, 2000, Rhino pursued a daily strategy

– 9 –

SEC-BADIAN-00022870

EXHIBIT-0047-0009

of selling Sedona common stock, either through an account held by AMRO or an account held by an SPV, or a combination of such accounts. Accounts appear to have been chosen based on the fees charged for the use of the accounts and/or the performance of the brokerage house in executing trades and obtaining the best price during any given day. Transfers of shares between different accounts occurred from time to time in order to cover a short position in an account, which transfers are illustrated in Exhibit D. For the most part AMRO and the SPV's maintained a cumulative short position in Sedona common stock, as is demonstrated in the column titled "Cumulative Quantity Total" in Exhibit D. Rhino, through AMRO's account or the account of an SPV or a combination of such accounts would increase their cumulative short position in Sedona common stock over time and then cover that short position either with shares issued upon a conversion of an outstanding convertible instrument or shares received in connection with a shelf offering by Sedona to Roseworth Group Limited. This short selling activity was carried out notwithstanding a contractual covenant against short sales in the transaction documents relating to the issuance of Sedona convertible securities. On February 14, 2002, Sedona, Rhino and Rhino's clients entered into a settlement agreement and various general releases with respect to any claims either party may have had against the other in connection with such transaction documents or trading in Sedona's common stock generally. It does not appear that Rhino ever departed from this strategy of selling and covering Sedona common stock. However, on at least one occasion, Michael Mulshine, a director of Sedona, approached Rhino in an effort to enlist Rhino's clients to assist him in raising the price of Sedona's common stock above $1. Nothing in the documents demonstrates that Rhino or Rhino's clients acted upon such request and altered its strategy from selling to buying in an effort to raise Sedona's stock price.

– 10 –

SEC-BADIAN-00022871

EXHIBIT-0047-0010

**Question No. 9**

Describe the complete corporate history of Rhino, including, but not limited to, date and place of incorporation, incorporators, and all registered agents. Identify all current and former Rhino shareholders, officers, directors and employees. If any shareholder is an entity, identify that entity's shareholders, officers, directors and employees. For each employee or officer (from start date to present) describe their: (a) title, job description and responsibilities; (b) their home and business addresses and telephone numbers; and (c) their annual compensation, including, but not limited to, salary, bonuses, stock options and awards.

**Answer No. 9**

Rhino was incorporated in New York on or about January 12, 2000.  I was the sole

incorporator.  Pursuant to my consent as the sole director and shareholder, on January 14, 2000,

Thomas Badian was elected as president of Rhino, and I was elected as secretary of Rhino.

Pursuant to my consent on January 16, 2000, I was removed as secretary of Rhino, and Thomas

Badian was elected as secretary of Rhino. From January 16, 2000, to the present, Thomas Badian

has continuously served as president and secretary of Rhino.  Gregory Mussa is Rhino's sole

shareholder, holding 100 shares of common stock.

Rhino's former and current employees, directors, and officers are listed below along with

their title, job description responsibilities, address, telephone numbers, and annual compensation

from Rhino:

| Rosa Alaimo | |
|---|---|
| Start/end date: | 5/7/01 to present |
| Title: | Executive Assistant and Office Manager |
| Job Description: | See title above |
| Home address/phone number: | 58 Adrianne Lane, Staten Island, NY 10303, (718) 370-7326 |
| Business address/phone number: | 130 W. 29th Street, New York, NY 10001-5312, (212) 594-6555 |

– 11 –

SEC-BADIAN-00022872

EXHIBIT-0047-0011

| Annual compensation from Rhino: | $37,471.16 (2001) |
|---|---|

| **Richard Austin** | |
|---|---|
| Start/end date: | 1/1/02 to present |
| Title: | none |
| Job Description: | Buys antiquities for investment |
| Home address/phone number: | 327 W. 21st Street, #1E, New York, NY 10011 |
| Business address/phone number: | 130 W. 29th Street, New York, NY 10001-5312, (212) 594-6555 |
| Annual compensation from Rhino: | unknown |

| **Andreas Badian** | |
|---|---|
| Start/end date: | 6/30/00 to 4/30/01, 9/1/01 to present |
| Title: | Trader |
| Job Description: | See title above |
| Home address/phone number: | 305 W. 13th Street, Apt. #3b, New York, NY 10014, (212) 675-3445 |
| Business address/phone number: | 130 W. 29th Street, New York, NY 10001-5312, (212) 594-6555 |
| Annual compensation from Rhino: | $19,999.98 (2000); $27,530.05 (2001) |

| **Thomas Badian** | |
|---|---|
| Start/end date: | 1/13/00 to present |
| Title: | Investment Manager/President |

SEC-BADIAN-00022873

EXHIBIT-0047-0012

| Job Description: | Supervises business of Rhino |
| --- | --- |
| Home address/phone number: | 99 Jane Street, Apt. #8C, New York, NY 10014, (212) 842-9636 |
| Business address/phone number: | 130 W. 29th Street, New York, NY 10001-5312, (212) 594-6555 |
| Annual compensation from Rhino: | $66,666.64 (2000) |

| **Marla Edwards** | |
| --- | --- |
| Start/end date: | 5/28/02 to 8/19/02 |
| Title: | Receptionist |
| Job Description: | See title above |
| Home address/phone number: | 200 Claremont Ave, Apt. #65, New York, NY 10027, (212) 316-4361 |
| Business address/phone number: | Unknown |
| Annual compensation from Rhino: | unknown |

| **Severo Espinoza** | |
| --- | --- |
| Start/end date: | 1/1/01 to present |
| Title: | Driver/Maintenance |
| Job Description: | See title above |
| Home address/phone number: | 141-41 85th Road, Apt. 2G, Queens, NY 11435 |
| Business address/phone number: | 130 W. 29th Street, New York, NY 10001-5312, (212) 594-6555 |
| Annual compensation from Rhino: | unknown |

| **Charity L. Goodman** | |
| --- | --- |

– 13 –

SEC-BADIAN-00022874

EXHIBIT-0047-0013

| Start/end date: | 7/17/00 to 4/18/01 |
|---|---|
| Title: | Receptionist |
| Job Description: | Answering telephones, facsimileing, copying and general administrative duties |
| Home address/phone number: | 141 E. 89th Street, Apt. #3F, New York, NY 10128 |
| Business address/phone number: | Unknown |
| Annual compensation from Rhino: | $15,416.65 (2000); $9,740.43 (2001) |

| **Kenton L. Hill** | |
|---|---|
| Start/end date: | 1/13/00 to 8/31/01 |
| Title: | Investment Manager/Vice-President |
| Job Description: | Assisted President concerning investments |
| Home address/phone number: | P.O. Box 3298, New York, NY 10163 |
| Business address/phone number: | Unknown |
| Annual compensation from Rhino: | $72,499.97 (2000); $63,006.64 (2001) |

| **Alex Liesegang** | |
|---|---|
| Start/end date: | 8/21/00 to present |
| Title: | Co-Manager Due Diligence |
| Job Description: | See title above |
| Home address/phone number: | 333 East 70th Street, 8, New York, NY 10021 |
| Business address/phone number: | 130 W. 29th Street, New York, NY 10001-5312, (212) 594-6555 |
| Annual compensation from Rhino: | $31,666.68 (2000); $90,795.12 (2001) |

– 14 –

SEC-BADIAN-00022875

EXHIBIT-0047-0014

| **Gregory Mussa** | |
|---|---|
| Start/end date: | 1/13/00 to present |
| Title: | Sole Director and Shareholder |
| Job Description: | N/A |
| Home address/phone number: | 9 Avenue d'Ostende, MC 98000 Monaco |
| Business address/phone number: | c/o United Oversee Management<br>27 Boulevard Albert 1er<br>5000 Euro S<br>MC 9800<br>Monaco |
| Annual compensation from Rhino: | 5,000 Euros |

| **Stefan P. Siegel** | |
|---|---|
| Start/end date: | 1/13/00 to present |
| Title: | Portfolio Manager, Manager of Due Diligence and Business Development |
| Job Description: | See title above |
| Home address/phone number: | 320 West 42nd Street, New York, NY 10017 |
| Business address/phone number: | 130 West 29th Street, New York, NY 10001-5312, (212) 594-6555 |
| Annual compensation from Rhino: | $66,666.64 (2000), $91,590.12 (2001) |

**Question No. 10**

For the time period January 1, 1999 to the present, describe all current and former brokerage accounts in the name of or controlled by Rhino, Thomas Badian, Andreas Badian or Goodman Jones in which any of them is authorized to trade or traded securities for themselves or for clients. Specifically identify in which account trades were placed for clients. As to each account identified, provide the account number, where the account is or was maintained, the date

SEC-BADIAN-00022876

EXHIBIT-0047-0015

the account was opened and the purpose for which the account was opened. Identify the registered representative or associated person at the broker dealer with responsibility for the account and all persons with authority to direct trades in the account.

### Answer No. 10

See Answer to Questions No. 1, and 14 and Exhibit C.  Exhibit C sets forth the brokerage accounts over which Thomas Badian or Andreas Badian have control.  Other than as set forth in Exhibit C, Rhino does not have information regarding any other brokerage accounts in the name of, or controlled by, Thomas Badian, Andreas Badian or Goodman Jones.  Other than perhaps shopping for better fees, the documents do not indicate the purpose of opening the accounts set forth in Exhibit C.

### Question No. 11

For the time period January 1, 1999 to the present, describe all current and former bank accounts in the name of or controlled by Rhino, Thomas Badian, Andreas Badian or Goodman Jones. Specifically identify in which accounts cash belonging to clients or persons other than Rhino, Thomas Badian, Andreas Badian or Goodman Jones was held.  As to each account identified, provide the account number, where the account is or was maintained, the date the account was opened and the purpose for which the account was opened.

### Answer No. 11

For the period January 1, 1999 to the present, Rhino has had a checking and savings account at Citibank.  The account number is 00546265.  In addition, Rhino makes direct deposit payments of salary into the personal checking account of Thomas Badian at Citibank.  The account number at Citibank is ███ 7245. Rhino has no other bank account information concerning Thomas Badian, Andreas Badian or Goodman Jones.

### Question No. 12

For each of the accounts maintained at broker dealers identified in 10, for each sale of Sedona Corporation ("Sedona") stock: (1) identify the person who placed the order; (2) state the date and time of the sale and number of shares sold; (3) state the price at which the shares were sold; (4) state the rationale for the price and timing of each sale; (5) identify the account representative who received the order for the sale; (6) identify the contra broker purchasing the

– 16 –

SEC-BADIAN-00022877

EXHIBIT-0047-0016

Sedona stock; (7) state the reason why each trade was made with a specific contra party; (8) describe any communications concerning the trade between Rhino and its broker or Rhino and the contra broker at any time prior to executing or reporting the trade; (9) if the sale was executed or reported after the market closed at 4:00 p.m. e.s.t., state the reasons for the timing of such trade; (10) state whether the seller held any shares of Sedona stock in its account at the time of the sale; (11) state whether the seller delivered the shares that it sold by settlement date (T+3); (12) if the seller failed to deliver the shares by settlement date, state whether the brokerage firm where the account was maintained effected a mandatory buy in of stock in the seller's account by settlement date; (13) state whether Rhino or the seller made an affirmative determination as to whether the seller could acquire the shares or whether the firm where the account was held could borrow the shares by settlement date; (14) describe the bases for the determination and identify each document memorializing or noting the determination that Rhino or the seller made; (15) if Rhino's or the seller's position is that the seller was "selling on prospectus," explain what this means and state all facts known to Rhino concerning the seller's rationale for this strategy; and (16) if Rhino's or the seller's position is that the sales constituted a bona fide hedging strategy, state all facts known to Rhino concerning such strategy; and (17) state whether the seller ever held a "net short" position in Sedona stock and, if so, state the extent of that position.

### Answer No. 12

The Sedona transaction and trading generally follow the trading strategies described in the response to Question 1. It is evident that Amro was, overall, a seller of Sedona stock and had at times a short position.

The following is a general chronology of the Sedona transaction and Amro's trading in Sedona securities. A more detailed chart regarding the finance and trading activity in Sedona is attached as Exhibit D.

| Late 1999/ early 2000 | Ladenburg Thalmann & Co. introduces Sedona to Rhino for possible investment by Rhino's clients. |
|---|---|
| 2/25/00 and 2/28/00 | Amro participates in a convertible preferred stock transaction with Sedona. Amro purchases $1.7 Million of principal of convertible preferred stock and receives 56,666 warrants with an exercise price of $5.037. |
| 4/10/00 | Sedona files an S-3 registration statement to register the conversion shares which is declared effective on 4/18/00. |
| 6/26/00 | Amro executes its first short sale in Sedona common stock. |
| 6/28/00 | Amro converts $250,000 of principal, plus interest, into 86,795 shares. |
| 6/28/00 - 8/18/00 | Amro sells the shares received in the conversion. |
| 8/18/00 | Roseworth, a Creon SPV, buys 476,190, shares of common stock from a |

– 17 –

SEC-BADIAN-00022878

EXHIBIT-0047-0017

| | |
|---|---|
| | Sedona shelf registration statement. At this point, Rhino's clients are net long. |
| 9/1/00 | Roseworth sells 21,000 shares of common stock at market. |
| 8/18/00 - 10/23/00 | Amro sells its long shares of common stock and builds a short position. |
| 11/3/00 | Amro converts $100,000 of convertible preferred stock into 95,497 shares common stock, leaving Amro with $1,350,000 in principal of preferred stock. |
| 11/22/00 | Amro buys a $3 million convertible debenture and warrants described below for $2.5 million, made up of the $1,350,000 principal preferred stock that is tendered at a redemption premium and cash. Amro also receives 400,000 warrants with a strike price of $1.35. |
| 10/23/00 - 12/7/00 | Rhino's clients sell short shares of Sedona common stock. |
| 12/5/00 | Cambois Finance, a Creon SPV, purchases 1,030,920 shares of common stock off of the Sedona shelf registration statement. This reduces the net short position. |
| 12/7/00 - 1/24/01 | Rhino's clients increase their short position. |
| 1/23/01 | Amro buys 32,000 shares of common stock through Dundee |
| 1/23/01 | Amro buys 1,538,462 shares of common stock off of the Sedona shelf registration statement at $0.60 per share. Amro also sells Sedona shares of common stock in the market. |
| 3/26/01 | Amro buys 50,000 shares and sells 31,300 shares of common stock through Refco Securities. |
| 4 - 5/01 | Amro makes a series of conversions, eliminating its short position, and selling its conversion shares. |
| 4/26/01 | Sedona and Amro enter into a note extension agreement. As part of that agreement, the exercise price on the original 56,666 warrants is reduced to $.001. Amro exercises the warrants on 5/2/01. |
| 4 - 7/01 | Amro takes conversion shares at its Amro Westminster account and does a directed sale to its Refco account and the BNC–Bach account at Canaccord to cover its short position. |
| 9/01 | Amro delivers to Sedona a conversion notice, which Sedona refuses to honor. |
| 10/24/01 | Amro brings an action against Sedona seeking to require Sedona to honor the conversion notice. The lawsuit is withdrawn shortly thereafter |
| 2/02 | A settlement agreement between Amro and Sedona is reached whereby Amro receives cash and shares of common stock over time from Sedona. As part of the settlement, the parties exchange mutual general releases. Amro had been 800,000 shares short at the time of the settlement. It slowly transferred settlement shares to cover the short position and sold the remaining shares. |

SEC-BADIAN-00022879

EXHIBIT-0047-0018

### Question No. 13

For each of the accounts maintained at broker dealers identified in 10, for each purchase of Sedona stock: (1) identify the person who placed the order; (2) state the date and time that the order was executed; (3) state the number of shares purchased; (4) state the price at which the shares were purchased; (5) state the rationale for the price and timing of each purchase; (6) identify the account representative who received the order for the purchase; (7) identify the contra broker selling the Sedona stock; (8) state the reason why each trade was made with a specific contra party; (9) describe any communications concerning the trade between Rhino and its broker and the contra broker at any time prior to executing or reporting the trade; (10) for each purchase of Sedona stock on March 26, 2001, state the reason for each purchase, describe all communications concerning such purchase; and  (11) state what the purchaser did with the Sedona shares that it purchased.

### Answer No. 13

See Answer to Question No. 12 and Exhibit D.

### Question No. 14

From January 1, 1999 to the present, for each person or entity (including its employees, officers, directors, principals, agents or associated persons) listed below, (1) describe Rhino's (including its employees, officers, directors, principals, agents or associated persons) knowledge of, and relationship with, each such person or entity; (2) identify and describe the manner, substance, and date of all communications between such person and entity with Rhino; (3) provide contact information for each person or entity with whom Rhino has a relationship; and (4) identify any understanding, agreement or contract that Rhino had with any such individual or entity:

    (1)    Amro;

    (2)    Hans Bacofen [sic];

    (3)    Ezra Birnbaum;

    (4)    BNC Bach International Ltd.;

    (5)    BNY Clearing Services, L.L.C.;

    (6)    Canaccord Capital Corp;

    (7)    Creon;

    (8)    Matthew Drillman a.k.a. Mottes Drillman;

    (9)    Eastside Holdings LLC or Eastside Holdings II LLC;

– 19 –

SEC-BADIAN-00022880

EXHIBIT-0047-0019

(10)   Epstein, Becker & Green P.C.;

(11)   Michael Finkelstein;

(12)   William D. Frankel & Co.;

(13)   Hornblower, Fischer & Company;

(14)   Ladenburg Thalmann & Co., Inc.;

(15)   Olympia Partners LLC;

(16)   John P. O'Shea;

(17)   Pershing Division of Donaldson, Lufkin & Jenrette Securities Corporation;

(18)   Pond Equities LLC;

(19)   Refco Securities LLC;

(20)   Sedona Corporation;

(21)   Jacob Spinner;

(22)   Westminster Securities LLC; and

(23)   Wexford Clearing Services, Corp.

### Answer No. 14

1   **Amro**

a.   Amro is a client of Rhino.   Rhino managed investment transactions on behalf of Amro during the period in question. Amro directors are H. U. Bachofen, Michael Klee, and Ruth Streitenbuerger.

b.   Communications between Rhino and Amro occur by facsimile, mail, or telephone. Written communications between Rhino and Amro were included in the documents produced by Rhino pursuant to the Subpoena. The contact information for Amro and its directors is:

Ultra Finanz Limited

– 20 –

SEC-BADIAN-00022881

EXHIBIT-0047-0020

Grossmuensterplatz 6

P.O. Box 4401

Zurich CH-8022 Switzerland

Tel: 011 411 252 8680

Fax: 011 411 262 5515

d.     There is a partially executed Portfolio Management Agreement (i.e., investment advisory agreement) by H. U. Bachofen of Amro and Rhino.

**2     Hans Bachofen**

See Answer No. 1 to Question 14 above.

**3     Ezra Birnbaum**

Rhino has no information concerning this individual.

**4     BNC Bach International ("<u>BNC Bach</u>")**

a.     BNC Bach is an Amro SPV by which Amro invests in certain financing transactions described generally in response to Question No. 1. The directors are H.U. Bachofen and Michael Klee and Ruth Streitenburger.

b.     Communications between Rhino and Amro/BNC Bach occurred by facsimile, mail and telephone. Written communications between Rhino and Amro/BNC Bach were included in the documents produced by Rhino pursuant to the Subpoena.

c.     See Answer to Question No. 1(c) above.

d.     There are no agreements between BNC Bach and Rhino.

**5     BNY Clearing Services LLC**

Rhino has no information concerning this entity.

**6     Canaccord Capital ("<u>Canaccord</u>")**

– 21 –

SEC-BADIAN-00022882

EXHIBIT-0047-0021

a.  Canaccord is a Canadian brokerage house at which there are several trading accounts belonging to BNC Bach, Roseworth, Creon, Amro, Paul Revere and Belmont Park. The toll free number of Canaccord is 1-800-382-9280. Michael Finkelstein is the account manager. The telephone number of Finkelstein is 1-416-869-7368 and his email address is m_finkelstein@canaccord.com. Other contacts at Canaccord are Reka Kikeli and Paula MacPhee.

b.  Canaccord communicated by telephone concerning trading orders, and by facsimile and mail for account statements. Rhino received account statements on behalf of the designated entity. Written communications with Canaccord are included in the documents produced by Rhino pursuant to the Subpoena. See documents bates stamped R 21517 to R 21523 and in Rhino's files.

c.  The contact information for Canaccord is as follows:

> PO Box 6
>
> 1210-320 Bay Street
>
> Toronto, ON
>
> M5H 4A6
>
> Tel: (416) 869-7368
>
> Toll Free: 1-800-382-9280
>
> Facsimile: (416) 869-7356

d.  There are no agreements between Canaccord and Rhino. There are account opening documents and trading authorizations agreements between Canaccord and Rhino's clients.

7    **Creon**

– 22 –

SEC-BADIAN-00022883

EXHIBIT-0047-0022

a.    Creon is a client of Rhino. Rhino managed investments for Creon and its SPVs. The directors of Creon are David Sims and Lamberto Banchetti.

b.    Creon and Rhino communicate via facsimile mail and telephone. Written communications with Creon are included in the documents produced by Rhino pursuant to the Subpoena and in Rhino's files.

c.    The contact information for Creon and its directors is:

c/o Beacon Capital Management

Harbor House, 2nd Floor

Waterfront Drive

Road Town, Tortola

British Virgin Islands

Tel: 284-494-4770

d.    There is a fully executed Portfolio Management Agreement (investment advisors agreement) between Creon and Rhino.

**8    Mathew Drillman**

a.    The Documents indicate that Mathew Drillman was an employee at Refco.

b.    Documents indicate that Communications occurred via e-mail.

c.    I do not know the current contact information for Drillman.

d.    There are no agreements between Drillman and Rhino.

**9    Eastside Holdings**

Rhino has no information regarding this entity.

-- 23 --

SEC-BADIAN-00022884

EXHIBIT-0047-0023

**10**     **Epstein Becker & Green, P.C.**

a.     Epstein Becker & Green, P.C. provided legal representation to Amro and Creon. The principal lawyers were Joseph Smith and later myself.

b.     Communications between Amro or Creon and Epstein Becker & Green, P.C. occurred by phone, facsimile, and e-mail.  Non-privileged written communications with Epstein Becker & Green, P.C. are included in the documents produced by Rhino pursuant to the Subpoena.  See documents bates stamped R 21524 to R 21575 and in Rhino's files.

c.     The contact information for Epstein Becker & Green, P.C. is as follows:

> 250 Park Avenue
>
> New York, New York 10177-1211
>
> Tel. 212/351-4500
>
> Facsimile 212/661-0989

Smith's and my current contact information is:

> Feldman Weinstein LLP
>
> 420 Lexington Ave.
>
> New York, New York 10107
>
> (212) 869-7000

d.     No agreements exist between Rhino and Epstein Becker & Green, P.C.

**11**     **Michael Finkelstein**

See Answer No. 6 to Question 14 above.

**12**     **William D. Frankel & Co.  ("Frankel & Co.")**

a.     Frankel & Co. is a market maker.

– 24 –

SEC-BADIAN-00022885

EXHIBIT-0047-0024