# ATTACHMENT FIFTEEN



SECURITIES AND EXCHANGE COMMISSION

------------------------------------------------------------- x
TRADING IN THE SECURITIES OF SEDONA  : RESPONSE TO ORDER
CORPORATION AND OTHER ISSUERS         FOR STATEMENT PURSUANT
                                     : TO SECTION 21(a)(1)
FILE NO. HO-09346                      OF THE SECURITIES
                                     : EXCHANGE ACT OF 1934

------------------------------------------------------------- x

I, Robert F. Charron, have been retained by Rhino Advisors, Inc. ("Rhino"), as its agent, to review certain documents and records made available to me by Rhino (the "Documents") for the purpose of responding to the Order for a Statement Pursuant to Section 21(a)(1) of the Securities and Exchange Act of 1934 ("Exchange Act" and such order, the "Order")). The information contained herein is based solely on a review of the Documents because no current Rhino employees were willing to speak with me regarding the substance of my review on this matter. In such review of the Documents, I have assumed that the information contained in the Documents is correct and complete. I have undertaken no independent verification or investigation of the information contained in the Documents. I was not denied access to any documents or records I requested. I believe I received and reviewed all relevant documents and records; however documents or records may exist of which I am not aware which may contradict or supplement the information contained in the Documents.

Rhino requests that this response and the referenced documents be treated as confidential pursuant to the Freedom of Information Act, 5 U.S.C. § 552, 18 U.S.C. § 1905, 17 C.F.R. § 200.83 and other applicable laws, regulations or policies. Because such Documents constitute investigatory records obtained by the Securities and Exchange Commission ("Commission") in connection with a potential law enforcement proceeding, they are subject to the exemption from



EXHIBIT-0047-00 78

SEC-BADIAN-00022828

mandatory disclosure under Exemption 7(A) of the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(A) (1976). *See, e.g., National Labor Relations Board v. Robbins Tire & Rubber Co.*, 437 U.S. 214 *(1978); Chilivis v. Securities and Exchange Commission*, 673 F.2d 1205 (11th Cir. 1982). In addition, various other exemptions may be applicable to this response and the materials Rhino may provide in the future.

## Question No. 1

Explain in detail the nature and history of Rhino's relationship with Amro International, S.A. ("Amro") and Creon Management S.A. ("Creon"). Include in your explanation (1) when and how Rhino's relationship began with each of these entities and a description of their businesses; (2) the name, address, telephone number(s) and e-mail address(es) for each of Rhino's principal contacts at each of these entities; (3) the identities of all individuals associated with each of these entities with which Rhino has had communications of any kind; (4) a description of each financing transaction in which Rhino has represented or acted on the behalf or at the behest of these entities; (5) a description of the terms of Rhino's compensation arrangements with these entities and a quantification of all compensation in any form whatsoever received by Rhino from either of these entities; and (6) the identity of each brokerage account, by name and number, over which Rhino has authority; custody or control or in which it is authorized to trade on behalf of each of these entities.

## Answer No. 1

(1) Rhino is a New York business corporation formed on January 12, 2000. Rhino has served as the investment advisor for two non-US entities, Amro and Creon.

(2) H.U. Bachofen, Rhino's principal Amro contact, serves as director and president of Amro. Michael Klee is the Secretary and Ruth Streitenburger is the Treasurer of Amro. The address for Mr. Bachofen is Ultra Finanz, Ltd., Grossmuensterplatz 6, PO Box 4401, Zurich CH-8022 Switzerland. The telephone number of Mr. Bachofen is 011-411-252-8680 and his fax number is 011-411-262-5515. I am not aware of any e-mail address for Mr. Bachofen.

David Sims and Lamberto Banchetti of Beacon Capital Management are the directors of Creon. Mr. Sims is Rhino's principal Creon contact. The address for Mr. Sims is Beacon Capital

EXHIBIT-0047-00 79

SEC-BADIAN-00022829

Management, Harbor House, 2nd floor, Waterfront Drive, Road Town, Tortola, British Virgin Islands (e-mail: davesims@surfbvi.com). The telephone number of Mr. Sims is 1-284-494-4770 and his fax number is 1-284-494-4771. Mr. Banchetti's address, telephone and fax number at Beacon Management are the same as Mr. Sims. I am not aware of any e-mail address for Mr. Banchetti. Additional contacts at Beacon are Arlene de Castro, assistant secretary and Murray Todd, financial controller of Beacon. It appears that Rhino's formal relationship with Beacon began on February 1, 2001, the date of the Portfolio Management Agreement between Creon and Rhino with Mr. Sims signing as director of Creon. Prior to February 1, 2001, it appears that the directors of Creon were affiliated with the firm of Dr. Dr. Batliner & Partner with an address at Aeulestrasse 74, FL-9490 Vaduz, Liechtenstein, fax number 011-075-236-0405. The primary signatory for Creon at that time was Hans Gassner, as director.

A portfolio management agreement exists between Rhino and Creon and appears to exist between Rhino and Amro. Each agreement provides that Rhino is entitled to asset-based management fees from Amro or Creon, as the case may be, equal to 1% per annum of total assets under management by Rhino at the end of each semi-annual period. These documents permit Rhino to defer the payment of all or a portion of these asset management fees. These documents also provide that Rhino is entitled to receive a performance-based fee equal to 2% of the appreciation of the total assets under management (including net realized and net investment income, as adjusted pursuant to provisions of the portfolio management agreement,) allowing for subscriptions and redemptions of capital from Amro and Creon. According to these documents, Rhino may waive all or portion of the asset management or performance fee. To date, Rhino has received the following compensation from Amro/Creon: 2002 - $799,998; 2001 - $500,000. No information is available regarding compensation in 2000. I am aware of no other information in

the Documents that provides any other information explaining the nature and history of Rhino's relationship with Amro and Creon.

(3)     Since its formation, Rhino has advised its clients with respect to financing transactions of public companies. These investments have generally taken the form of: (1) private investment, public equity ("PIPEs"), (2) private equity lines of credit, (3) acquisitions of registered shares from shelf registration statements, and (4) a combination of one or more of the foregoing structures. Many of the financings were structured through special purpose vehicles ("SPV's"), wholly owned, controlled and operated by, and affiliated with, Amro or Creon, as the case may be. A list of the SPVs for both entities is attached as Exhibit A.

Many of the financing transactions have been structured as PIPEs, in reliance on Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"). These PIPEs have taken many forms, including bridge loans, convertible debt, convertible preferred stock, and common stock (either with or without purchase price protection). Often, the issuer receiving the financing also issued warrants to acquire additional securities. The shares of common stock acquired in the PIPE, including shares issuable in respect of any convertible securities or warrants so acquired, are usually granted registration rights. Accordingly, it is typically required that the issuer enable the investors to resell the shares it acquired in the PIPE financing to the public.

Other financing transactions have been structured as what are colloquially known as private equity lines of credit. Generally, in an equity line of credit transaction, the investor commits to purchase from time to time up to a maximum dollar amount of common stock from a publicly traded company. Purchases under the equity line follow put notices, which may be

– 4 –

EXHIBIT-0047-00 81

SEC-BADIAN-00022831

delivered by the company upon the satisfaction of specified negotiated conditions, including the filing and effectiveness of an appropriate registration statement with the Commission to permit the resale of the common stock issued thereunder (including the shares of common stock that would be issuable upon exercise of warrants obtained as a commitment fee for the equity line facility). The issuer would typically pay a legal and/or due diligence allowance of up to $25,000. For a variety of reasons, not all issuers who were party to an equity line of credit transaction with the Rhino client utilized the line. Accordingly, the Rhino client was not always required to provide financing, or was only required to provide a portion of the maximum amount of financing otherwise available under the equity line.

Creon, Amro and their SPVs also purchased shares of registered common stock directly from "shelf" registrations of public companies. Sometimes warrants were also issued as part of these financings. Because the shelf registration would cover the issuance of the securities, in such financings Amro, Creon or the SPV (as the case would be) would immediately receive freely tradeable registered securities.

The purchase price of the securities have typically been set at a discount to the market price of the common stock, measured either at the time of the financing, the time of the conversion or some other agreed upon time.

A list describing each of the financing transactions in which Rhino has represented or acted on behalf its clients is attached as Exhibit B.

(5) Rhino has authority to place orders to buy and sell securities through broker dealers for Amro, Creon and their SPVs. The documents produced to the Commission pursuant to the subpoena dated June 17, 2002 issued by the Commission to Rhino (the "Subpoena"),

EXHIBIT-0047-00 82

SEC-BADIAN-00022832

identify the brokerage firms at which Amro, Creon and their SPVs purchase and sell securities as directed by Rhino. A chart, attached as Exhibit C, lists the brokerage accounts over which Rhino has authority.

Based on an analysis of the Documents, I believe that Rhino generally pursued a variety of investment and trading strategies on behalf of its clients that sought to balance profit potential with risk reduction. In this regard, Rhino is authorized to issue orders to broker dealers in the securities of the companies to whom financing was provided. Shares were sold before their receipt, by means of short selling, or resold shortly after their receipt in what appears to be an effort to capture as a profit the difference between the market price and the discounted purchase price paid by Amro, Creon or the SPV. In the case of Sedona Corporation ("Sedona"), the short selling activities were carried out notwithstanding a contractual covenant to not do so in the transaction documents with Sedona.

**Question No. 2**

Is Rhino an investment adviser or does it act as an investment adviser, either in practice or as defined in the federal securities laws? Is Rhino registered as an investment adviser with any foreign, federal or state agency or self-regulatory organization? If so, identify the party with which Rhino is registered. If Rhino is not registered, explain why.

**Answer No. 2**

As set forth in response to Question No. 1, Rhino acts as an investment adviser for only two clients, Amro and Creon. Since Rhino has only two clients and neither holds itself out generally to the public as an investment adviser nor acts as an investment adviser for any registered investment company or business development company, it is my understanding that it is not required to be registered as an investment adviser under the United States federal securities laws, or otherwise. *See* Investment Advisers Act § 203(b)(1), 15 U.S.C. § 80(b)(3).

– 6 –

EXHIBIT-0047-00 83

SEC-BADIAN-00022833

Accordingly, Rhino is not registered as an investment adviser with any foreign, federal or state agency or self-regulatory organization.

### Question No. 3

Is Rhino a broker dealer or does it act as a broker dealer, either in practice or as defined in the federal securities laws? Is Rhino registered as a broker dealer with any foreign, federal or state agency or self-regulatory organization? If so, identify the party with which Rhino is registered. If Rhino is not registered, explain why.

### Answer No. 3

As set forth in response to Question No. 1, Rhino serves as an investment adviser for only two clients, Amro and Creon. It is my understanding that Rhino is not a broker dealer and does not act as a broker dealer, either in practice or as defined in the United States federal securities laws, because Rhino does not effect transactions in securities for its clients or for its own account. *See* the Securities Exchange Act § 3(a)(4) and (5), 15 U.S.C. § 78c(a)(4) and (5). Accordingly, it is my understanding that Rhino is not required to register as a broker under the Exchange Act, and is not registered as a broker dealer with any foreign, federal or state agency or self-regulatory organization.

### Question No. 4

From January 1, 1999, to the present, describe:

(a) all transactions, business arrangements, deals or similar arrangements in which Rhino sought to introduce or introduced parties seeking to obtain financing (in whatever form), including, but not limited to, cash, debt or equity and the time frame in which they occurred.

(b) for each transaction, business arrangement, deal or similar arrangement identified in sub paragraph (a), describe Rhino's role in introducing the parties and in negotiating the terms in the financing and related documents.

(c) for each transaction, business arrangement, deal or similar arrangement identified in sub paragraph (a), identify all persons and entities involved and the role of each person or entity. As to each individual identified, provide the following contact information: home and business addresses; home, business, pager, and cellular telephone numbers; facsimile numbers

EXHIBIT-0047-00 84

SEC-BADIAN-00022834

(home and business); and electronic mail addresses. As to each entity identified, provide address and telephone number.

(d) for each transaction, business arrangement, deal or similar arrangement identified in sub paragraph (a), describe the nature and type of the financing provided and the identify of the source, origin and party providing the financing.

(e) for each transaction, business arrangement, deal or similar arrangement identified in subparagraph (a), describe the form of compensation that Rhino received (cash, debt, equity, stock purchase right, etc.), from whom the compensation was received, the amount that Amro was supposed to receive, the amount that Amro actually received, and the methodology used to determine the compensation received.

### Answer No. 4

From January 1, 1999, to the present, Rhino has not engaged in any transactions, business arrangements, deals or similar arrangements in which Rhino sought to introduce or introduced parties seeking to obtain financing (in whatever form), including, but not limited to, cash, debt or equity.

### Question No. 5

From January 1, 1999 to the present, identify each of Rhino's clients. Include in your response the identity of each private fund or family of funds for which Rhino acts as a manager. Describe all services provided by Rhino to each of its clients and identify the nature and amount of compensation that Rhino has received in connection with services for its clients.

### Answer No. 5

See Answer to Question No. 1.

### Question No. 6

From January 1, 1999 to the present, has Rhino ever provided advice or assistance to its clients or other persons or entities regarding the trading of securities? If so, identify the person or entity to whom the advice was provided, the date the advice was provided and a description of the advice or assistance provided.

### Answer No. 6

See Answer to Question No. 1.

EXHIBIT-0047-00 85

SEC-BADIAN-00022835

## Question No. 7

From January 1, 1999 to the present, has Rhino ever purchased or sold securities on behalf of its clients or any other person or entity, whether in an account in the name of Rhino or another party? If so, identify the person or entity for which the trade was made, the account in which the transaction took place and where the account is maintained.

## Answer No. 7

See Answer to Question No. 1 and Exhibit C.

## Question No. 8

From January 1, 1999 to the present, has Rhino or any of its principals, officers or employees exercised discretion or trading authority over any brokerage account. If so, identify the account, the name of the account holder and where the account is maintained. For any account identified in this question, identify all trading instructions or investment objectives provided to Rhino or its principals, officers or employees regarding trading in the account, including, but not limited to, the determination of when to buy or sell a particular security. For any accounts for which trading instructions or investment objectives were not provided, explain in detail, by account, the trading strategy or investment objectives, how the trading strategy or investment objective was determined and why the particular trading strategy or investment objective was utilized.

## Answer No. 8

See Answer to Question Nos. 1 and 10 and Exhibit C. The Documents did not contain any directions from Amro or Creon to Rhino regarding any trading instructions, investment objectives or trading strategies. However, as stated in Answer to Question No. 1, Rhino appears to have pursued a variety of investment and trading strategies that sought to balance profit potential with risk reduction. For example, in some cases shares were sold before their receipt, by means of short selling, in other cases shares were resold shortly after their receipt; in each case in what appears to be an effort to capture as a profit the difference between the market price and the discounted purchase price paid by Amro, Creon or the SPV. As a specific example of such strategy, please refer to Exhibit D which illustrates the trading activity of AMRO and its SPVs in Sedona's common stock. Beginning on June 26, 2000, Rhino pursued a daily strategy

EXHIBIT-0047-00 86

SEC-BADIAN-00022836