# EXHIBIT C

Page 1

1

2               UNITED STATES DISTRICT COURT

3               SOUTHERN DISTRICT OF NEW YORK

4

5

6   SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
7                                )
         Plaintiff,              )
8                                )
              vs.                ) No. 06 CV 2621 (LTF) (DFE)
9                                )
    ANDREAS BADIAN, JACOB        )
10  SPINNER, MOTTES DRILLMAN,    )
    JEFFREY "DANNY" GRAHAM,      )
11  POND SECURITIES             )
    CORPORATION d/b/a POND       )
12  EQUITIES, EZRA BIRNBAUM      )
    and SHAYE HIRSCH,            )
13                               )
         Defendants.            )
14  _____)

15

16

17

18            DEPOSITION OF JOHN LLANES

19               Chicago, Illinois

20            Monday, November 21, 2011

21

22

23  Reported by:

24  PAULA CAMPBELL, CSR, RDR, CRR, CCP

25  JOB NO. 44026

Page 2

```
1
2
3
4
5
6
7
8                    November 21, 2011
9                    12:49 P.M.
10
11
12          Discovery deposition of JOHN LLANES,
13   held at the offices of DLA PIPER, 203 North
14   LaSalle Street, Chicago, Illinois, pursuant to
15   subpoena before Paula Campbell, CSR, RDR, CRR,
16   CCP.
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2     A P P E A R A N C E S:
3          SECURITIES AND EXCHANGE COMMISSION
4          Attorneys for the plaintiff
5             100 F Street, N.E.
6             Washington, D.C. 20549
7          BY:   KENNETH J. GUIDO, ESQ.
8
9          DLA PIPER
10         Attorneys for the defendant Andreas Badian
11            2000 University Avenue, 1st Floor
12            East Palo Alto, CA 94303
13         BY:   JEFFREY B. COOPERSMITH, ESQ.
14
15         ROSENTHAL COLLINS GROUP
16         Attorneys for the deponent
17            216 West Jackson Boulevard, Suite 400
18            Chicago, IL 60606
19         BY:   MICHAEL CONTI, ESQ.
20
21
22
23
24
25
```

Page 4

```
1              J. LLANES
2          REPORTER:  Would you please raise your
3    right hand.
4    J O H N   L L A N E S,
5       called as a witness, having been duly sworn,
6       was examined and testified as follows:
7    EXAMINATION
8    BY MR. COOPERSMITH:
9       Q. Good morning (sic), Mr. Llanes.
10         Am I saying your name right?
11      A. It's Llanes.
12      Q. Llanes.  Sorry about that.
13      A. That's all right.
14      Q. Let me introduce myself.  I'm Jeff
15   Coopersmith, and I'm at a law firm called DLA Piper,
16   and this is a deposition in the case of SEC versus
17   Andreas Badian and others.  And I represent the
18   defendant, Mr. Badian in this case.
19         Do you understand that?
20      A. Yes.
21      Q. I just want to go over with you,
22   Mr. Llanes, some ground rules in terms of the
23   deposition.  First of all, you've already met our
24   court reporter who will take down every word that's
25   spoken in the room, unless we are off the record.
```

Page 5

```
1              J. LLANES
2    Do you understand that?
3       A. Yes.
4       Q. And because of that it's important to give
5    audible answers, because sometimes people in
6    conversation tend to nod their head or say something
7    other than yes or no, and it's important to have a
8    more formal yes or no to the questions.
9          Do you understand that?
10      A. I understand.
11      Q. Now, you've been placed under oath, and do
12   you understand that means that you're sworn to tell
13   the whole and complete truth?
14      A. I do.
15      Q. And do you understand that the oath is the
16   same kind of oath that you take in a courtroom; just
17   because we are in a conference room, it's no
18   different?
19      A. I do.
20      Q. Okay.  Now, I'll be asking you questions
21   today, but if you don't understand a question, for
22   any reason, you can just let me know, and I'll try
23   to help you, or rephrase the question, or something
24   like that.
25      A. Okay.
```

Page 6

J. LLANES

1
2     Q. If you need to take a break for any reason,
3  of course that's fine.  Just let me know that as
4  well.
5     A. Okay.
6     Q. And are you ready to give full and complete
7  testimony today?
8     A. I am.
9     Q. Any reason why you can't do that?
10    A. No reason.
11    Q. Okay.  Have you been deposed before,
12  Mr. Llanes?
13    A. I have not.
14    Q. Have you ever given trial testimony?
15    A. I have not.
16    Q. Did you review any documents to prepare for
17  your deposition this afternoon?
18    A. I reviewed two documents, yes.
19    Q. What did you review?
20    A. I reviewed -- not an e-mail, but these two
21  documents that I pulled from past files.
22    Q. Okay.  What are the two documents that you
23  are referencing?
24    A. One of them was a copy of a note that I had
25  written.  It says the remainder of the 2001 tapes,

Page 7

J. LLANES

1
2  all others having with prior counsel.  Questions
3  - please do not hesitate to contact me.
4     Q. Okay.
5     A. And then the other one was a letter from
6  Mayer Brown, just stating pretty much what the tapes
7  that were given with this.
8     Q. Okay.  Could I see copy of that?
9     A. Sure.  Absolutely.
10    Q. Okay.  We may have to make copies of these.
11    A. Sure.
12    Q. But -- in fact, what I'll do is I'll just
13  set these aside for now, and we can make copies a
14  little later so we don't waste time.
15       THE WITNESS:  Do they want to see?
16       MR. GUIDO:  I saw them over his shoulder.
17       MR. COOPERSMITH:  We will just make copies
18    at the next break, and then we will maybe get
19    into those.
20    Q. Okay.  Moving on for the moment, did you
21  receive a copy of a subpoena in this case that
22  brought you to our offices?
23    A. I did not receive a copy of a subpoena.
24    Q. Okay.  I'm going to hand you a subpoena,
25  and since you haven't seen it before, we will just

Page 8

J. LLANES

1
2  consider this to be service for the subpoena.
3       And I know that you've never seen it
4  before, but I just want to direct your attention to
5  it now, and I will give a copy to your lawyer as
6  well.
7       MR. CONTI:  Thank you.
8     Q. I just want to direct your attention --
9       MR. GUIDO:  Can we have this marked as an
10    exhibit, please?
11       MR. COOPERSMITH:  We could mark it.  Yeah,
12    why don't we mark it.  We will call it Llanes
13    Exhibit 1.
14       (Llanes Exhibit 1 marked for
15       identification.)
16  BY MR. COOPERSMITH:
17    Q. I will just give you the marked copy, since
18  it's now an exhibit.
19       MR. GUIDO:  Can I have a copy?
20       MR. COOPERSMITH:  Oh, sorry.  I think, for
21    the record, you already got a copy.  Is that
22    right, Mr. Guido?
23       MR. GUIDO:  I don't know.  I mean, I didn't
24    have a copy of this.
25       MR. COOPERSMITH:  It's the same copy we

Page 9

J. LLANES

1
2  sent you via e-mail.
3  BY MR. COOPERSMITH:
4     Q. So I just want to direct your attention to
5  the very last page of the subpoena.  And since you
6  have never seen it before, I'm also assuming that
7  you haven't brought any documents with you today, is
8  that right, other than the ones you just gave me a
9  minute ago; correct?
10    A. No, I have not.
11    Q. Okay.  So I just want to note that there
12  are some document requests, and I'd ask you to pay
13  attention to that with your counsel and, you know,
14  get back to us when you have a chance to review
15  those.
16       Let me just go through them, just so I have
17  an idea of maybe what to expect.  Looking at
18  category No. 1, and it's the very last page of
19  Exhibit 1.  The first request asks for:  "All
20  documents and/or communications between you and the
21  SEC, including counsel for the SEC, concerning or
22  referencing Refco or this litigation."
23       Do you see that?
24    A. Yes.
25    Q. As you sit here today, do you believe you

J. LLANES

1  have such policies, e-mails, other correspondence,
2  anything reflecting such communications?
3      A. I have just -- just the declarations.
4      Q. You mean the declarations being transmitted
5  back and forth by e-mail?
6      A. Correct. No, not by e-mail -- well, the
7  final declaration is what I brought.
8      Q. Okay.
9      A. Right.
10     Q. Do you have any other e-mails or other
11 documents between you and the SEC or SEC counsel?
12     A. I'm sure I have something on my gmail
13 account, yes.
14     Q. Okay. Second, it asks for: "All notes
15 concerning communications between you and the SEC,
16 including counsel for the SEC, concerning or
17 referencing Refco or this litigation." That would
18 be, for example, if you were taking notes during a
19 telephone call, or something like that, you had with
20 counsel for the Securities and Exchange Commission.
21     Do you believe you have anything of that
22 nature?
23     A. Forgive me, I need to think about this.
24     Q. I'm not trying to put you on the spot,

J. LLANES

1  Mr. Llanes. I'm just trying to get a sense if you
2  have any of these categories.
3      MR. GUIDO: Objection. Speculation.
4      A. I may have something.
5      Q. Okay. With category three, it asks for:
6  "All documents and/or communications concerning or
7  referencing Refco."
8      Do you have anything like that?
9      A. I do.
10     Q. Okay. No. 4, "All documents and/or
11 communications concerning or referencing this
12 litigation," meaning the SEC versus Andreas Badian
13 litigation.
14     Do you think you have anything of that
15 nature?
16     A. Sure. I mean with respect to the
17 declarations, yes.
18     Q. Okay. No. 5 asks for: "All documents
19 and/or communications concerning or referencing
20 IPC."
21     Do you see that?
22     A. Yes.
23     Q. First of all, do you know what IPC is?
24     A. Is that the company that was -- I'll have

J. LLANES

1  you answer that for me.
2      Q. Okay. Well, I'll represent to you that
3  it's a telephone type service company that installed
4  some gear and service, some gear at Refco.
5      Does that ring a bell?
6      A. Okay, yes. Do I have documents that were
7  concerning that?
8      Q. Right.
9      A. Yes.
10     Q. Okay. No. 6 asks for: "All drafts of
11 declarations concerning or referencing this
12 litigation."
13     Do you have any draft declarations?
14     A. Yes.
15     Q. Okay. No. 7 asks for: "All documents
16 sufficient to show the dates of your employment at
17 Refco, the positions you held at Refco, and the
18 locations where you were assigned to work while you
19 were at Refco."
20     Do you have anything of that nature?
21     A. Yes, I should have something, yes.
22     Q. No. 8, "All documents and/or communications
23 with any former or current employee of Refco since
24 you left employment at Refco."

J. LLANES

1      Do you have anything of that nature?
2      A. I have e-mails.
3      Q. Okay. And No. 9 asks for: "All documents
4  and/or communications with any representative of the
5  United States Department of Justice or any division
6  or affiliate thereof."
7      Do you have anything of that nature?
8      A. I may.
9      Q. Okay. All right. In that case I would
10 just ask you and your counsel to work on that and
11 get back to me with a response.
12     MR. GUIDO: I'd like to make a relevance
13 objection to that request, and that is are you
14 restricting it to this litigation or the issues
15 in this case or, for example, it says any
16 communications with the Justice Department or
17 the state department?
18     MR. COOPERSMITH: The state department --
19     MR. GUIDO: I'm sorry, it just says United
20 States Department of Justice. Are you
21 restricting it to this case or is it broader
22 than that?
23     MR. COOPERSMITH: I'm not going to answer
24 the question, Mr. Guido. I mean they speak for

J. LLANES

1
2  themselves.
3        MR. GUIDO:  I just put a relevance
4  objection.
5        MR. COOPERSMITH:  Do you represent the
6  witness today?
7        MR. GUIDO:  No, I just put a relevance
8  objection.
9        MR. COOPERSMITH:  You can make whatever
10  objections you like.
11        MR. GUIDO:  Thank you.
12  BY MR. COOPERSMITH:
13        Q.  Moving on, Mr. Llanes.  Before the
14  deposition did you meet with anyone to prepare for
15  this session today?
16        A.  I did.
17        Q.  And who did you meet with?
18        A.  I met with my counsel here.
19        MR. CONTI:  Mike Conti.
20        A.  Mike Conti.  I'm sorry, Mike.
21        Q.  You guys go way back?
22        A.  We go way back.  Mr. Guido and Mr. McHale
23  from the SEC.
24        MR. GUIDO:  Who is the third name?  I'm
25        sorry, I have a hearing problem.

J. LLANES

1
2        A.  Mr. Guido and James McHale.
3        Q.  Okay.  Is that spelled M-c-H-A-L-E?
4        A.  Correct.
5        Q.  Okay.  When did you -- well, first of all,
6  did you meet with Mr. Guido and Mr. McHale together
7  or separately?
8        A.  Together.
9        Q.  Always -- was there only one meeting or --
10        A.  Only one.
11        Q.  Okay.  And when was that meeting?
12        A.  Last Wednesday.
13        Q.  And from your understanding --
14        A.  Thursday or Wednesday, I'm sorry.
15        Q.  So it was last week?
16        A.  It was last week.
17        Q.  And what was your understanding of the
18  purpose of that meeting?
19        A.  Just to ensure that I have my ducks in
20  order in terms of I know what I wrote in a
21  deposition -- or I'm sorry -- in the declaration was
22  to be true.
23        Q.  Okay.  Prior to that meeting with
24  Mr. McHale and Mr. Guido, did you have other
25  telephone conversations with SEC lawyers, even if it

J. LLANES

1
2  wasn't in-person meetings?
3        A.  Yes.
4        Q.  And how many such telephone calls?
5        A.  More than five/less than ten.
6        Q.  What was the telephone call -- how long
7  before -- strike that.
8        How long before the meeting, in-person
9  meeting last week, was --
10        MR. GUIDO:  Objection.  He didn't say it
11  was --
12        MR. COOPERSMITH:  If you could wait until I
13  finish my question, Mr. Guido.
14        MR. GUIDO:  I'm sorry.
15        Q.  Prior to the meeting that you had in person
16  with Mr. Guido and Mr. McHale last week, how long
17  before that was the last of the telephone calls?
18        MR. GUIDO:  Objection.  Misstates his
19  testimony.
20        A.  How long before the last call or before the
21  first call --
22        Q.  In other words, how big a gap was there
23  between a telephone call you had and then the
24  meeting you had in person?
25        MR. GUIDO:  Objection.  Mischaracterizes

J. LLANES

1
2  the testimony.
3        A.  I don't know.  It was less than a week,
4  possibly.
5        Q.  Okay.  So prior to the in-person meeting
6  you had a telephone call with Mr. Guido and
7  Mr. McHale about a week before the in-person
8  meeting?
9        A.  I'm sorry, the telephone calls -- they were
10  mainly with -- before the meeting, right, which was
11  a conference call.
12        Q.  Right.
13        A.  There was a telephone call with Mr. McHale.
14  Those were the calls I had, the less than ten/more
15  than five.
16        Q.  So the less than ten/more than five
17  telephone calls, those were all with James McHale?
18        A.  Correct.
19        Q.  Had you ever spoken to Mr. Guido on the
20  telephone?
21        A.  Goodness gracious.  That had to have been,
22  I want to say, November of 2010 is probably the last
23  time I spoke with Mr. Guido.
24        Q.  Okay.  And how long in all have you spoken
25  to Mr. Guido?

Page 18

J. LLANES

1
2     A. I can't recall.
3     Q. Okay.  Now with regard to the meeting last
4  week, was it an in-person meeting or a telephone
5  conference call?
6     A. Conference call.
7     Q. Was anybody from the SEC physically present
8  with you during that call?
9     A. No.
10    Q. So that was -- I may have misunderstood.
11 It was a telephone conference call, not an in-person
12 meeting?
13    A. Correct.
14    Q. And that conference call was last week, and
15 Mr. Guido and Mr. McHale were both on the telephone;
16 is that correct?
17    A. Correct.
18    Q. Okay.  And what -- how long did that
19 telephone conference call last?
20    A. Hour.  About 60 minutes, maybe.
21    Q. Okay.  And what were the subjects that were
22 discussed during that call?
23    A. Just going through the declaration in and
24 of itself.  That's about it.
25    Q. Did the SEC attorneys on the telephone tell

Page 19

J. LLANES

1
2  you anything about the case, or what they expected,
3  or anything of that nature?
4     A. No.
5     Q. Okay.  Did the SEC attorneys during that
6  conference call that lasted around an hour last week
7  discuss with you any particular problematic areas or
8  things that you should be careful about during
9  testimony, anything of that nature?
10    A. No.  No.
11    Q. Did you express any particular concerns
12 during the telephone call?
13    A. Yeah, I wanted to make sure that I was
14 recalling everything, but that was just talking out
15 loud.
16    Q. Okay.  You wanted to make sure you recalled
17 accurately?
18    A. Correct.
19    Q. And did the SEC attorneys try to help you
20 with that?
21    A. Oh no, no.  It was you have -- you have to
22 know what you are saying.  That's --
23    Q. Did they go over any documents with you
24 during that call?
25    A. No, just, again, the declaration was the

Page 20

J. LLANES

1
2  only thing that was...
3     Q. So they did go over the prior declaration?
4     A. Correct.
5     Q. There were two declarations; is that right?
6     A. Correct.
7     Q. Can you tell me a little bit about --
8  actually, strike that.
9        Can you just go ahead and briefly describe
10 your educational background.
11    A. I was just talking to you about this.
12       My educational background, right.  I
13 graduated high school in '88, went to Milwaukee
14 School of Engineering for a year, and then had a
15 few, what was it, community colleges, College of
16 DuPage, went back to school to Loyola, then DePaul,
17 and just said forget it all.  And then just
18 concentrated on work.  And so now, as of -- as of
19 now I am back at school at Northwestern University,
20 SCS in the LOB program.
21    Q. Okay.  Now, your career and profession has
22 been in the Information Technology area; is that
23 right?
24    A. That is correct.
25    Q. And how did you acquire the knowledge or

Page 21

J. LLANES

1
2  training that you need for that type of position?
3     A. Certainly at Milwaukee School of
4  Engineering I learned about computers there, and
5  most of it was hands on.  I did some programming at
6  DePaul University, and that was it.
7     Q. And where did you grow up, Mr. Llanes?
8     A. In Chicago.
9     Q. Okay.
10    A. And then in the western suburbs of Oswego,
11 Illinois.
12    Q. And so have you always lived in Chicago
13 your whole life?
14    A. Yes.
15    Q. Was there any period of time when you
16 didn't live in Chicago?
17    A. No, residence was always here in the
18 Chicagoland area.
19    Q. Okay.  How old are you, Mr. Llanes?
20    A. I am 41.
21    Q. Have you ever been convicted of any
22 criminal offense?
23    A. I have not.
24    Q. Have you ever been involved in a civil
25 lawsuit where you were the defendant?

6 (Pages 18 to 21)

J. LLANES

1
2      A.  I have not.
3      Q.  Now we referenced a minute ago two
4  declarations that you gave in your -- in this case.
5         Do you remember that?
6      A.  Correct.  Yes.
7      Q.  We will go over those in a minute, but can
8  you tell me, if you know, what was the reason, as
9  you understood it, why the SEC was asking you to
10  give declarations?  We will start with the first
11  one, and then go to the second one.
12      A.  The reason was just to provide information
13  of my knowledge in regards to how tapes were --
14  how -- how the voice recorder worked at Refco.
15      Q.  Now, you were employed at Refco for what
16  period of time?
17      A.  '99 through 2005, and then stayed with the
18  estate through 2007.
19      Q.  And why did you leave Refco?
20      A.  I didn't -- you mean the estate or Refco?
21      Q.  Well, explain that.  When you say estate,
22  what are you referring to?
23      A.  Well, I -- Refco went under.  I think at
24  the time it was the twelfth largest bankruptcy.  And
25  I then stayed with Refco to wind the business down,

J. LLANES

1
2  and then left in 2007 to come back to Chicago.
3      Q.  And that winding down period was between
4  2005 and 2007?
5      A.  That is correct.
6      Q.  Okay.  Do you know why Refco went bankrupt?
7      A.  The fraudulent accounting behavior of
8  Mr. Phil Bennett, yes.
9      Q.  Okay.  Did you know anything about the
10  fraudulent accounting behavior while you were at
11  Refco?
12      A.  Did I know what he was doing, is that the
13  question?
14      Q.  Did you know anything about it?
15      A.  No, I did not.
16      Q.  Were you ever contacted by any
17  investigator?
18      A.  Absolutely.
19      Q.  Who were the investigators that contacted
20  you?
21      A.  Well, I was part of that initial audit in
22  two thousand -- in October.  So the first one to
23  contact me was FTI, FTI Consulting.
24      Q.  Okay.  And did you understand FTI
25  Consulting was working for a law firm that was doing

J. LLANES

1
2  some type of investigation?
3      A.  I did not, no.
4      Q.  Did you know what their role was?
5      A.  At the time I was told that we were doing a
6  standard audit, and to assist these guys as much as
7  possible.
8      Q.  And did you do that?
9      A.  Absolutely.
10      Q.  At any point did -- during the Refco
11  investigation did you believe that you were under
12  suspicion yourself for any reason at all?
13      A.  No.
14      Q.  Did you provide IT related information to
15  the people doing the investigation?
16      A.  Absolutely.
17      Q.  Does that include the Department of Justice
18  and the SEC or just the FTI Consulting group?
19      A.  Initially it was FTI, unless FTI was
20  requesting things for the DOJ, which I believe they
21  were -- I'm sorry, that's speculation.  But it was
22  mainly providing information for FTI.
23      Q.  Okay.  Why do you believe that information
24  provided to FTI might have been for the Department
25  of Justice?

J. LLANES

1
2      A.  I did see some documents that had been
3  requested by the DOJ via FTI sometimes.
4      Q.  Okay.  And so you saw documents that
5  suggested that to you?
6      A.  Sure.
7      Q.  Did anyone ever tell you that, though?
8      A.  No.
9      Q.  And did you have any direct contact with
10  any DOJ investigators or FBI agents, anything like
11  that?
12      A.  I'm trying to think.  No.
13      Q.  Did the FTI consultants who were asking you
14  for things, did they ask you for any tape recordings
15  that were made internally at Refco?
16      A.  You have to pardon me, because at the time
17  when FTI came in, they requested a lot of just the
18  pure data.  Did they ask for the actual voice
19  recordings?  I cannot remember.
20      Q.  Okay.  So when you say you can't remember,
21  it could have happened, but you can't remember, or
22  you think it didn't happen?
23      A.  It could have happened.
24      Q.  Okay.  Could it also be that any voice
25  recordings that were being requested and provided

J. LLANES

1    were being done by someone else other than yourself;
2    is that possible?
3        A.  Sure.  Yes.
4        Q.  Okay.
5        A.  Yes.
6        Q.  Did you -- you mentioned Mr. Bennett at
7    Refco.
8            Who was that?
9        A.  At the time that was our president and CEO.
10       Q.  Did you report to him?
11       A.  No.
12       Q.  At any time did you report to him?
13       A.  Do you mean answer questions or do you
14   mean --
15       Q.  Report to him like in terms of the position
16   you had at Refco?
17       A.  No.  No.
18       Q.  Who did you report to at Refco?
19       A.  I reported to Mike Mallahan.
20       Q.  Okay.  How about Santo Maggio, did you
21   report to him at any point?
22       A.  No.
23       Q.  Okay.  Going back to the declarations, when
24   were you -- you know what, we will just go ahead and

J. LLANES

1    make this an exhibit.
2            MR. COOPERSMITH:  Make this Llanes
3        Exhibit 2.
4            (Llanes Exhibit 2 marked for
5        identification.)
6        Q.  Mr. Llanes, do you recognize that as a
7    declaration that you signed on December 28th,
8    2007, in connection with this case?
9        A.  I do recognize this, yes.
10       Q.  Can you recall who asked you to put
11   together this declaration?
12       A.  It was Mr. McHale.
13       Q.  Did McHale ever tell you the reason at the
14   time why they needed this declaration from you?
15       A.  No.
16       Q.  And did you have a choice as to whether to
17   do it or not or were you, in your view, required to
18   make the declaration?
19       A.  I would say in my view, since I was the
20   only IT guy left -- well, I'm sorry.  Since myself
21   and a couple other folks were the only ones left, I
22   felt it my obligation to do it.
23       Q.  Okay.  But did anyone tell you that you
24   were required to do it?

J. LLANES

1        A.  No.
2        Q.  So your understanding was that you were
3    required to do it?
4        A.  My understanding is, yes, I was.
5        Q.  Okay.  Now, there are a number of
6    attachments to the declaration.
7            Can you tell us generally what those are?
8        A.  Voice recorder tapes from the NiceLog
9    system.
10       Q.  Okay.  Now, who actually drafted the text
11   of the declaration?
12       A.  I want to say that that was the SEC that
13   drafted that for me.
14       Q.  Would that be Mr. McHale?
15       A.  Mr. McHale, and then, of course, I had
16   input.
17       Q.  Okay.  So when you gave input, do you
18   recall making any particular changes to what the SEC
19   had drafted when you first saw it?
20       A.  The first draft, what do I recall?  I
21   recall the date of my start.  I recall -- I want to
22   say the date when I -- I think in statement 7, "In
23   or about 2003," I believe it said 2001.  But that's
24   what I -- that's all I recall.

J. LLANES

1        Q.  Okay.  So it sounds like you must have seen
2    a draft of the declaration before it was finalized;
3    is that a correct statement?
4        A.  Yes.
5        Q.  And how was that transmitted to you, that
6    draft?
7        A.  I believe that was FedEx.
8        Q.  Okay.  Do you still have a copy of the
9    draft that you got by FedEx?
10       A.  I might.
11           MR. COOPERSMITH:  Okay.  Counsel, we ask
12       that you look for that in the course of looking
13       for documents under the subpoena.
14       Q.  Did any other changes or areas where you
15   gave input stand out in your mind, Mr. Llanes?
16       A.  Certainly there was a correction to the
17   declaration after this, which is why No. 8 was
18   changed.
19       Q.  And that was -- the correction was made in
20   a second declaration?
21       A.  Correct.
22       Q.  Okay.  We will get to that.  Thanks.
23           Anything else?
24       A.  I cannot recall.

J. LLANES

1
2    Q.  Okay.  Let's take a look at the actual text
3    of Exhibit 2.  It starts out in paragraph 1 reading:
4    "From on or about January 1st, 1999, to on or
5    about June 30th, 2007, Refco Securities employed
6    me in its Information Technology Operations (IT)
7    department."
8          And is that a correct statement of the
9    period of time that you worked for Refco,
10   Mr. Llanes?
11        A.  That is correct.
12        Q.  And it was a two-year period towards the
13   end there, from '05 to '07, where you were actually
14   working for the estate rather than Refco itself; is
15   that right?
16        A.  That is correct.
17        Q.  And then it says that -- in paragraph 1:
18   "From on or about June 1st, 2003, to the on or
19   about June 30th, 2007, I served as the head of
20   that department."
21        Do you see that?
22        A.  Yes.
23        Q.  So is that a correct statement of the
24   period of time that you were head of the IT
25   department at Refco?

J. LLANES

1
2    A.  Right.  It was the head of that department,
3    that particular department in New York, yes.
4        Q.  I'm sorry?
5        A.  Yes.  The answer is yes, but the head of IT
6    in New York, yes.
7        Q.  So you were head of IT in New York between
8    June 1st, 2003, to June 30, 2007?
9        A.  That is correct.
10       Q.  Were you living in New York?
11       A.  I was living in New York, yes.
12       Q.  Okay.  Between what period --
13       A.  I'm sorry, Hoboken, yes.
14       Q.  Okay.  New Jersey?
15       A.  Yes.
16       Q.  You were living in New York for what period
17   of time?
18       A.  Between 2003 and -- when did we move --
19   2006.
20       Q.  Okay.  So when I asked you before about
21   living in Chicago the whole time --
22       A.  Oh, I'm sorry.
23       Q.  And I'm not trying to trick you.  I just
24   want to make sure I understand.
25       A.  Yes.  Yes.  I'm sorry.

J. LLANES

1
2    Q.  So there was a period of time where you
3    didn't live in Chicago, you lived in New York?
4        A.  That is correct.
5        Q.  Okay.  And that coincided with your
6    promotion to being the head of the IT department at
7    Refco?
8        A.  That is correct.
9        Q.  Okay.  And that was just -- give me the
10   dates again that you were living in New York working
11   for Refco?
12       A.  That is correct.
13       Q.  What are the dates?
14       A.  June of 2003 through, I want to say, June
15   of 2006.
16       Q.  Okay.
17       A.  My apologies.  The question, when you were
18   asking me those questions before, I was -- I was
19   just thinking still, I guess, in my 20s.
20       Q.  Okay.
21       A.  When you were going through my timeline of
22   my education.
23       Q.  I'm just trying to understand what
24   happened.
25        So there was a period of time between June

J. LLANES

1
2    '03 and some period -- sometime in '06 that you were
3    living in New York?
4        A.  Correct.
5        Q.  And during that time you were also the head
6    of the IT department at Refco?
7        A.  That is correct.
8        Q.  But before June 2003 you were living
9    in Chicago?
10       A.  That is correct.
11       Q.  Is that right?
12       A.  Yes.  In Evanston, yes.
13       Q.  What was your position at Refco before you
14   were promoted to IT director?
15       A.  I was head of the networking team.
16       Q.  What's the networking team?
17       A.  It's the -- it's a subgroup of the
18   infrastructure team that was out here in Chicago.
19       Q.  And what were your duties as the part of
20   the networking team?
21       A.  Oversaw the network connectivity of the IT
22   operations and infrastructure in the Chicago office.
23       Q.  Okay.  And when you became director of IT,
24   am I correct that you would have been overall
25   responsible for all IT operations at Refco?

TSG Reporting - Worldwide     877-702-9580

Page 34

J. LLANES

1
2     A.  All of IT operations in New York.
3     Q.  In New York?
4     A.  Yes, that is correct.
5     Q.  Was there a separate director of IT in
6  Chicago while you were serving in New York?
7     A.  Yes.
8     Q.  Okay.  Why did they make you director in
9  New York rather than Chicago?
10     A.  There was an opening.
11     Q.  Okay.  While you were at the networking
12  team in Chicago prior to 2003, who was responsible
13  for working on the NiceLog phone systems?
14     A.  Where?  Which location?
15     Q.  In New York.
16     A.  In New York?  I know it to be Gregg Blauth.
17     Q.  But that was not you; am I correct?
18     A.  It was not me.
19     Q.  Who was in charge of the NiceLog phone
20  recording system in Chicago?
21     A.  John Beatty.
22     Q.  That's B-e-a-t-t-y?
23     A.  B-e-a-t-t-y.
24     Q.  Okay.  Did you report to Mr. Beatty, or was
25  he sort of a separate track from your job?

Page 35

J. LLANES

1
2     A.  He was a separate track.  I did not report
3  to John Beatty.
4     Q.  Okay.  Now, in paragraph 1 of the
5  declaration, going back to Exhibit 2 here,
6  Mr. Llanes, the last sentence says, "MF Global
7  Securities in Chicago presently employs" -- and
8  should that be a "me" there?
9     A.  There should be a "me" there.
10     Q.  So it should read:  MF Global Securities in
11  Chicago presently employs me in its IT department;
12  is that right.
13     A.  At that time, yes.
14     Q.  So as of December 28th, '07, you were
15  working for MF Global in Chicago; is that right?
16     A.  I was.
17     Q.  And are you still working for MF Global?
18     A.  I am not.
19     Q.  When did you leave employment at MF Global?
20     A.  November -- I want to say November 15,
21  2010.
22     Q.  Why did you leave MF Global in
23  November 2010?
24     A.  There was a restructure.  They let me go.
25     Q.  Didn't they still need IT?

Page 36

J. LLANES

1
2     A.  Oh absolutely.
3     Q.  So what happened?
4     A.  They wanted to shift everything out to --
5  to London.
6     Q.  Are you aware of more recent events
7  regarding MF Global?
8     A.  Oh yes.
9     Q.  Are you involved in any litigation, or
10  anything like that, with regard to MF Global?
11     A.  I am not.
12     Q.  Did any investigators ever contact you
13  about MF Global?
14     A.  No.
15     Q.  Do you expect that anyone will contact you?
16     A.  I do not expect that.
17     Q.  Has anyone ever asked you to preserve
18  documents that you might have with regard to MF
19  Global?
20     A.  No.
21     Q.  Now let's take a look at paragraph 3 of the
22  same declaration, it's Exhibit 2.  The first
23  sentence reads:  "Refco recorded the conversations
24  of its registered representatives, including their
25  telephone conversations with those with whom they

Page 37

J. LLANES

1
2  discussed securities transactions and other
3  matters."
4     Do you see that?
5     A.  Yes.
6     Q.  Then it goes on, "Refco made these
7  recordings by using a 'NiceLog' voice logger
8  system."
9     Do you see that?
10     A.  Yes.
11     Q.  Then it reads:  "That system recorded all
12  conversations that took place on other near the
13  telephones used on Refco's trading desk."
14     Do you see that?
15     A.  Yes.
16     Q.  And then it reads:  "Refco stored these
17  recordings on Sony DD2 and Sony DD3 disks."
18     Do you see that?
19     A.  Yes.
20     Q.  Now the attachments to the declaration, are
21  those copies of these Sony DD2 and DD3 disks?
22     A.  They are.
23     Q.  What is that exactly, what sort of media?
24  Is that a disk?
25     A.  No, they are tapes.  They are magnetic --

10 (Pages 34 to 37)

Page 38

J. LLANES

1
2  magnetic recording tapes.
3      Q.  Okay.  Are they disks or tapes?
4      A.  Tapes.
5      Q.  Okay.  Any idea why it says they are disks?
6      A.  No.
7      Q.  What is a Sony DD2 and Sony DD3 disk?
8      A.  I don't know.
9      Q.  Is that like some sort of digital storage,
10  in your view, as an IT person?
11      A.  It could be.  It could be.
12      Q.  So if I understand this correctly, the
13  attachments to the declaration are copies of the
14  labels of magnetic tapes?
15      A.  Correct.
16      Q.  But they are not copies Sony DD2 and DD3
17  disks; correct?
18      A.  They are not -- these -- these copies are
19  of magnetic Sony tapes.
20      Q.  How do you know they are Sony?
21      A.  Because I can see they are Sony right here.
22      Q.  Because you can see the Sony, okay.
23          But are they Sony DD2 and DD3 disks?
24      A.  They are not disks.  They are tapes.
25      Q.  Okay.  So if you go to paragraph 4 of the

Page 39

J. LLANES

1
2  declaration, when it says:  "I have attached to this
3  declaration the labels from the Sony DD2 and DD3
4  disks" --
5      A.  Right.
6      Q.  -- "as Exhibits I through IV."  And then it
7  says:  "Those labels are true and correct copies of
8  the labels on the disks that store the
9  above-referenced Refco recordings."
10          Do you see that?
11      A.  Yes.
12      Q.  So that's not accurately; is that right?
13      A.  Correct.  They should say tapes.
14      Q.  Now going back to paragraph 3.  Now, in
15  2001, Mr. Llanes, did you have direct responsibility
16  for operating or maintaining the NiceLog voice
17  logger system?
18      A.  No.  In 2001 you asked?  No.
19      Q.  And do you understand that the NiceLog
20  voice logger system has different settings that you
21  could use depending on what you wanted to record,
22  and so forth?
23      A.  In terms of?
24      Q.  Well, so I'm trying to understand this
25  sentence that reads in paragraph 3 of Exhibit 2,

Page 40

J. LLANES

1
2  "That system recorded all conversations that took
3  place on or near the telephones used on Refco's
4  trading desk."
5          Do you see that?
6      A.  Yes.
7      Q.  Are you aware that it's possible to set the
8  NiceLog system to record only selective
9  conversations rather than all conversations?
10      A.  I am aware there were two types of phone
11  lines that were recorded.
12      Q.  What were the two types of phone lines?
13      A.  So you had the regular phone lines where
14  you just picked up a call, or picked up a line and
15  started dialing, and the voice logger system would
16  actually start -- start recording.
17          And then we had things called ARDs, which
18  is automatic ring downs.  It's ring downs straight
19  to the floors, where those are all -- you know, if
20  the phone was just picked up, any time the phone was
21  off the hook, the recording was taking place.
22      Q.  Okay.  Do you know, by the way, whether
23  people who were calling and, in fact, conversations
24  being recorded were told that their conversations
25  were being recorded?

Page 41

J. LLANES

1
2      A.  I do not know this.
3      Q.  Have you ever looked at the manual for the
4  NiceLog system?
5      A.  I have not.
6      Q.  Are you aware that the NiceLog system has a
7  feature that allows for selective recording of
8  conversations?
9      A.  I do not.
10          MR. COOPERSMITH:  I would like to mark as
11  Exhibit 3 this NiceLog Administrator's Manual.
12          (Llanes Exhibit 3 marked for
13  identification.)
14          MR. GUIDO:  Can I put some objections on
15  the record before you start?
16          MR. COOPERSMITH:  Do you have an objection
17  to a particular question or --
18          MR. GUIDO:  Yeah, to the document.
19          MR. COOPERSMITH:  Okay.
20          MR. GUIDO:  I object to the foundation, and
21  I also object to the relevance.  The relevance
22  is the manual is dated July 2004 and to this
23  date the document has not been authenticated in
24  this case.
25          MR. COOPERSMITH:  Okay.  Duly noted.

```
                    J. LLANES
1
2    BY MR. COOPERSMITH:
3        Q.  Mr. Llanes, did you ever see this document
4    before, this manual?
5        A.  I had no reason to look through the
6    document.
7        Q.  Okay.  Are you aware of any versions of the
8    NICE Administrator's Manual prior to July 2004?
9        A.  No.
10       Q.  Are you aware whether the NiceLog system
11   had different features in 2001 compared to July of
12   2004?
13       A.  No.
14       Q.  If you take a look at the -- if you take a
15   look -- well, let me make this easy for you.  If you
16   look at the very lower left, do you see there is a
17   number in the very bottom left?  And I'll represent
18   to you that for the deposition I've placed these
19   numbers on exhibits so that we could reference
20   things and be on the same page.
21       A.  Okay.
22       Q.  So I'm looking at page 8, looking at the
23   lower left of the document.
24       A.  Okay.
25       Q.  Do you see it has a chapter --
```

```
                    J. LLANES
1
2        A.  Okay.
3        Q.  Page 8, are you there?
4        A.  Page 8 in the lower right.
5        Q.  Oh, okay.  Page 8 on the lower right on
6    this particular exhibit.  My apologies.
7        A.  Okay.
8        Q.  Do you see there is a chapter called
9    Chapter 5?
10       A.  Yes.
11       Q.  And it is called Setting Up Selective
12   Recording.
13           Do you see that?
14       A.  Yes.
15       Q.  And if you look at page 143 of the same
16   document, Exhibit 3.
17       A.  Okay.
18       Q.  Can you see that that's the chapter that's
19   headed Setting Up Selective Recording?
20       A.  Yes.
21       Q.  And then if you go to page 155 of the same
22   document.
23       A.  Okay.
24       Q.  Do you see that that has a heading called
25   Recording Programs that Prevent Recording?
```

```
                    J. LLANES
1
2        A.  Okay.
3        Q.  And then it says under that, "You can
4    define a recording program that will not record
5    selected calls.  This is Negative Recording
6    Program."
7            Do you see that?
8        A.  Yes.
9        Q.  Are you familiar with that feature of the
10   NiceLog system?
11       A.  I am not familiar.
12       Q.  As you sit here today, can you tell me
13   whether or not the recording system in New York in
14   2001 was making use of any of these features?
15       A.  I cannot.
16       Q.  Can you tell me anything about the settings
17   of the NiceLog system in New York in 2001?
18       A.  I cannot.
19       Q.  Did you have any responsibility for how
20   those settings were adjusted in 2001?
21       A.  I did not.
22       Q.  Can you tell me whether in 2001, in fact,
23   they were recording every phone conversation from
24   the trading desk at Refco?
25       A.  I cannot.
```

```
                    J. LLANES
1
2        Q.  Let's go to paragraph 5 of the declaration.
3    I'm sorry, I'm skipping to -- I didn't mean
4    paragraph 5.
5            Let's take a look at paragraph 7.  That
6    reads:  "In or about July 2003 I was the custodian
7    of the above-referenced recordings."
8            Do you see that?
9        A.  Yes.
10       Q.  Okay.  So prior to that you were not the
11   custodian; is that a fair statement?
12       A.  That is correct.
13       Q.  Now, the next paragraph 8, it reads:  "At
14   that time, following the instructions from Refco's
15   outside counsel, Mayer Brown Rowe & Maw, I directed
16   Refco personnel to assemble all of their original
17   tape recordings described above in Exhibits I
18   through IV and to pack them for shipment."
19           Do you see that?
20       A.  I did.  I do.
21       Q.  Who were the Refco personnel that you are
22   referring to in that particular sentence?
23       A.  So we are going to go -- we are going to
24   touch base on that -- there was a correction to that
25   statement.
```

Page 46

J. LLANES

1
2  Q. I promise.
3  A. All right. So just to make sure.
4      I have to recall. Sorry. So in 2003, when
5  I came in, they were in the middle of a huge
6  litigation request, the IT team was. So as I took
7  over, there were three -- there were three
8  consultants that we had hired, short-term
9  consultants, to just continually to pull tapes, or
10  pull -- I'm sorry -- get the tape recordings, and
11  then copy them to disks.
12      Who were those three individuals? Because
13  they were temp employees, I cannot tell you their
14  names. Do I have that information with me? I do
15  not.
16  Q. Okay. So prior to July 2003 there were
17  people involved with this law firm, Mayer Brown,
18  working on these recordings, but you weren't
19  involved with that; is that right?
20  A. I got involved when I took over.
21  Q. In July 2003?
22  A. Correct.
23  Q. But prior to that there were other people
24  dealing with that?
25  A. Correct.

Page 47

J. LLANES

1
2  Q. And as you sit here today, you can't
3  remember who those people were?
4  A. I apologize.
5  Q. Were you working with them at the time?
6  A. Then I did work with them. Right. I did
7  direct them and say, okay, all these tapes -- I'm
8  sorry -- all these voice recordings you guys are
9  taking, you have to bring them onto disks, right.
10  We were coordinating that.
11  Q. And your work with that started in
12  approximately July 2003?
13  A. Correct.
14  Q. Do you know what particular day, date,
15  exactly, or can you be more specific than July 2003?
16  A. Probably the beginning; so maybe
17  July 1st, but...
18  Q. And then the next sentence here reads: "At
19  my further direction, these Refco personnel
20  delivered these tape recordings to Mayer Brown Rowe
21  & Maw's New York office for production to the
22  Securities and Exchange Commission pursuant to its
23  request."
24      Do you see that?
25  A. Yes.

Page 48

J. LLANES

1
2  Q. Now, I understand you say there is a later
3  declaration that corrects that; right?
4  A. Yes.
5  Q. And the correction -- why don't you
6  describe to me what the correction is?
7  A. The correction is that, from what I recall,
8  is that there was a set of tapes -- so hang on.
9      So we did burn disks for Mayer Brown. We
10  shipped those over. And then what was requested
11  were the specific tapes that we used to burn -- that
12  we used to pull this information, the voice
13  recorders -- the voice recordings of the requested
14  custodians.
15      Does that make sense? Do you understand --
16  do you follow me?
17  Q. Let me read the answer here, and I'll tell
18  you in a minute.
19      Okay. Mr. Llanes, my understanding is
20  that -- let's just get the other declaration out.
21  That might be easier.
22      MR. COOPERSMITH: Let's mark this as
23  Exhibit 4.
24      (Llanes Exhibit 4 marked for
25  identification.)

Page 49

J. LLANES

1
2  Q. Okay. Now, Exhibit 4 is a collection of
3  documents that starts with a Second Declaration of
4  Kenneth Guido on the first page.
5      Do you see that?
6  A. Yes.
7  Q. If you look at the last three pages, and
8  this one actually really does have numbers on the
9  very lower left-hand corner.
10      Do you see that?
11  A. Yes.
12  Q. So I'm actually looking at page 29, using
13  the lower left-hand number of Exhibit 4.
14  A. Okay.
15  Q. Is that your supplemental declaration --
16  A. That is.
17  Q. -- that you gave in this case?
18  A. Yes.
19  Q. Am I correct that the correction to the
20  initial declaration is in paragraph 8, which appears
21  on page 31 of this Exhibit 4?
22  A. Yes.
23  Q. And that reads: "Paragraph 8 of my
24  December 2007 declaration stated that in July 2003 I
25  directed Refco employees in New York to assemble and

J. LLANES

1
2 deliver all of the original tape recordings listed
3 in the exhibits to my declaration for production via
4 Refco's counsel to the Securities and Exchange
5 Commission.  That paragraph should have stated that
6 I directed Refco personnel to assemble and deliver
7 all original tape recordings sought by the SEC that
8 had not already been produced.  I now believe that
9 certain such recordings may have been produced
10 earlier."
11     Do you see that?
12 A.  Yes.
13 Q.  Is that an accurate statement as to what
14 the actual facts were?
15 A.  Yes.
16 Q.  Okay.  Going back to the initial
17 declaration, can you explain why there was that
18 error in the first declaration?
19 A.  Misunderstanding.
20 Q.  Between who?
21 A.  Just me.  I'm not accustomed to looking at
22 these type of documents.
23 Q.  So is it a fair statement that the SEC
24 attorney who drafted the initial declaration, based
25 on conversations with you, just got it a little bit

J. LLANES

1
2 wrong in terms of what occurred?
3 A.  Yeah, I should have looked at it better.
4 Q.  So that was an area where you should have
5 given input, but back in 2007 you just didn't do
6 that; is that fair?
7 A.  That's fair.
8 Q.  In the supplemental declaration, which is
9 Exhibit 4, when you say, "I now believe that certain
10 such recordings may have been produced earlier," can
11 you tell me which ones were produced earlier and
12 which ones were produced by you?
13 A.  Right.  So I don't know which ones were
14 produced earlier.  All I know is that we did produce
15 a set of tapes earlier.
16 Q.  When you say "we", you mean people at
17 Refco?
18 A.  Correct.
19 Q.  Okay.
20 A.  Myself and my team.
21 Q.  Okay.
22 A.  The remainder of the tapes that I mentioned
23 in this -- in Exhibit 4, right, is this Exhibit 4,
24 in the remainder of the tapes that I speak of that
25 was sent, that was during the time of the estate,

J. LLANES

1
2 when we were winding down the estate, when I was
3 told to take the rest of the tapes and ship them
4 off.
5 Q.  So the wind down of the estate, I believe,
6 you said was between 2005 and 2007?
7 A.  Correct.
8 Q.  And this paragraph of Exhibit 4, your
9 supplemental declaration, paragraph 8, talks about
10 events in 2003.
11 A.  Right.  See.
12 Q.  So I'm a little confused why you say this
13 had to do with during the time of the wind down of
14 the estate.
15 A.  Right.  I knew you were going to get that.
16 So, again, that's just me not understanding.
17 Q.  What's not you understanding?
18 A.  It's me not understanding what this part
19 said.
20 Q.  When you are referring to "this part" --
21 I'm sorry, we have a record.
22 A.  I'm sorry.  I'm sorry.  Yes.  On Exhibit 2,
23 statement 8, right.
24 Q.  Okay.
25 A.  When that first declaration came out,

J. LLANES

1
2 right, I'll be honest with you, I was under the
3 impression that -- not knowing what all these cases
4 are all about, and there are so many cases that are
5 flying around, what have you, so my understanding
6 is, to me, tapes are tapes, right.  People were
7 asking for tapes.  People were asking for
8 information.  I'm just going to give it to whomever
9 it is.  Whether it's for this case or for that case,
10 I couldn't even tell you who it was for.
11     So all -- in the understanding when this
12 came out, right, when this particular declaration
13 came out, and far be it from me to actually see that
14 it was for Andreas Badian versus the SEC, what have
15 you, all I know is tapes, right, they asked me about
16 these tapes, here is what the tapes did for me, and
17 now I'm providing you that, yes, these tapes were
18 given to Mayer Brown, boom, done.
19     And then I had a second look at it saying,
20 whoa, hang on a second, this is incorrect.  Then in
21 Exhibit 4 here, page 31, that's why there was
22 the correction.
23     So, again, under the understanding that I
24 don't know anything in specific of which case is
25 what, all I'm saying is I provided tapes to Mayer

J. LLANES

1
2 Brown, you know, or the SEC for that matter.  That
3 these are the tapes that were given, and all I know
4 is as a whole that I provided -- we provided the
5 tapes -- the remainder of the tapes, right.
6     Q.  Okay.
7     A.  Does that make sense?  I don't know what's
8 going on, and what case is what.
9     Q.  I think I understand what you are saying.
10       The question I have for you, though, for
11 the moment is:  How did the mistake in the
12 declaration between the first declaration and the
13 second declaration come to your attention?
14     A.  Just reading it again.
15     Q.  So how did you happen to be reading the
16 declaration again?
17     A.  I was winding down.  When did this come
18 out?  This was the whole -- I believe McHale
19 probably asked me to take a second look at it, and
20 said read it again, just to make sure that I was
21 okay with everything.
22     Q.  Okay.  So at Mr. McHale's direction you
23 reviewed the initial declaration that you gave in
24 this case?
25     A.  Yes.

J. LLANES

1
2     Q.  And in the course of reviewing that, you
3 noticed that there was an error?
4     A.  Correct.
5     Q.  And that was in paragraph 8 of both the
6 initial and the corrected in paragraph 8 --
7     A.  Correct.  And, actually, there was one
8 more -- the date when I started in 2000, or
9 something like that.  What is it, January 2000.
10 What was it in the earlier one?  It says January 1,
11 1999.  Here in Exhibit 4 is December -- I'm sorry --
12 January 2000.
13     Q.  So actually you started at Refco in
14 January 2000 rather than January 1999?
15     A.  Right.  It was almost '99, because I -- I
16 technically started in December of '99, but that was
17 just the actual -- my start date.
18     Q.  So that was another error that you
19 corrected in the second declaration?
20     A.  Right.
21     Q.  Okay.
22     A.  I'm sorry.  I physically started in '99,
23 but I technically started in 2000.
24     Q.  Okay.  But as you sit here, again, can you
25 tell us which recordings had already been provided

J. LLANES

1
2 to Mayer Brown and which ones you provided?
3     A.  So I can tell you that within these tapes
4 that you have given -- within Exhibit 2, right, that
5 you have given here, and the internal exhibits on
6 Exhibit 2, I cannot tell you which ones specifically
7 we gave to Mayer Brown during the 2003 litigation
8 request.
9     Q.  Okay.  Am I correct that once you gave
10 anything to Mayer Brown, that was the end of it in
11 terms of your knowledge of what happened; is that
12 right?
13     A.  Yes, that's correct.
14     Q.  So you had no further involvement with the
15 tapes or any aspect of the tapes once you gave them
16 to Mayer Brown?
17     A.  That is correct.
18     Q.  Okay.  As to what they produced to the SEC,
19 or what they did with them, you just couldn't say;
20 is that right?
21     A.  I cannot say.
22     Q.  Okay.  With regard to Mayer Brown, I want
23 to show you an exhibit I'm going to mark as No. 5.
24       (Llanes Exhibit 5 marked for
25   identification.)

J. LLANES

1
2       MR. GUIDO:  I'd like to put on an
3 objection, foundation objection and a relevance
4 objection.  Go ahead.
5 BY MR. COOPERSMITH:
6     Q.  First of all, Mr. Llanes, have you ever
7 seen Exhibit 5, this letter from John Hewitt to
8 Christopher Ehrman?
9     A.  I have not.
10     Q.  And do you see it's dated May 30th, 2003?
11     A.  I do.
12     Q.  Do you know John Hewitt?
13     A.  I do not.
14     Q.  Who were the people at Mayer Brown that you
15 were working with?
16     A.  Lisa Dunsky.  She had a counterpart in New
17 York that I cannot recall.  No, I don't know.
18     Q.  Now, am I correct, Mr. Llanes, that the
19 date of the letter being May 20th -- I'm sorry --
20 May 30th, 2003, that your involvement in providing
21 recordings to Mayer Brown all occurred after the
22 date of this letter?
23     A.  That is correct.
24     Q.  If you take a look -- and, again, I have
25 some page numbers on the very lower left, bottom

J. LLANES

1
2 left.
3    A. Yes.
4    Q. So I want to start with paragraph -- I'm
5 sorry -- page 5. And there is a paragraph near the
6 top that starts with the words "counsel after
7 appropriate inquiry".
8       Do you see that?
9    A. Yes.
10    Q. And the very last sentence of that
11 paragraph, or last two sentences, read as follows:
12 "By agreement with the Staff in late January 2003,
13 Refco reviewed all relevant telephone tapes and
14 extracted from them the conversations on Graham's
15 telephone lines. These were then placed on CDs
16 which were provided to the Staff."
17       Do you see that?
18    A. Yes.
19    Q. Am I correct that you had nothing to do
20 with that process of extracting conversations from
21 Graham's telephone lines?
22    A. If it was prior to 2000 -- I'm sorry. If
23 it was prior to June -- late June 2003, I was not
24 part of this.
25    Q. Can you tell me what the methodology was

J. LLANES

1
2 for extracting conversations from Graham's telephone
3 lines was?
4    A. From Graham's telephone line or from
5 telephone lines in general?
6    Q. Can you tell me anything about what
7 Mr. Hewitt is referring to, what the process was,
8 what the methodology was for extracting
9 conversations from Graham's telephone lines, as
10 referenced in this letter?
11    A. I cannot.
12    Q. Can you tell me anything about whether
13 complete conversations from Graham's telephone lines
14 were placed on CDs and provided to the SEC staff?
15    A. I can tell you there were some
16 conversations burned under my direction, again,
17 after 2003 of June.
18    Q. Okay. Looking at the next paragraph of the
19 letter, which is Exhibit 5, do you see there is an
20 indented paragraph that starts with the words "all
21 recording sessions are an average of"?
22    A. Correct. Yes.
23    Q. And, then, in the middle there is a
24 sentence that reads: "After the voice recordings
25 have been restored, we used the query process on the

J. LLANES

1
2 software to retrieve the recordings."
3       Do you see that?
4    A. Yes.
5    Q. Can you tell me anything about how this
6 query process was utilized to retrieve recordings?
7    A. You want me to speak prior, again, to
8 June 2003?
9    Q. Let me try to be more specific.
10       This letter says that the IT department
11 provided the following explanation on
12 February 6th.
13       Do you see that?
14    A. Yes.
15    Q. And that the explanation provided by
16 Refco's IT department was, in this sentence, "After
17 the voice recordings have been restored, we used the
18 query process on the software to retrieve the
19 recordings."
20       Do you see that?
21    A. Yes.
22    Q. So I'm asking you in this matter do you
23 have any knowledge of how the IT department went
24 about retrieving recordings using a query process?
25    A. I know, again, after June of 2003 -- I'm

J. LLANES

1
2 trying to recall how the query process worked. Can
3 I just walk through?
4    Q. Go ahead.
5    A. Okay. So they would locate the location of
6 the phone in question; get the tape; put the tape
7 into the machine; use the NiceLog system to locate
8 the time and date of request -- requested, and, of
9 course, the location; take all that information,
10 restore it; so you have to restore it onto the Nice
11 logger system, which is a spinning disk. It only
12 held so much, that's why it took a long time.
13       And, then, the guys would take that
14 information, burn it into a WAV file, right.
15 NiceLogger had a way to take the information and put
16 it into a WAV file. And then -- and then the guys
17 would -- the guys, meaning the consultants, they
18 would then take that information and burn it onto a
19 disk.
20    Q. Okay.
21    A. Now, the query system you are asking about,
22 I cannot speak to it. All I know is we were able to
23 identify a location and phone and, of course, the
24 particular phone line being used, because they had
25 multiple -- traders had multiple phone lines.

16 (Pages 58 to 61)

Page 62

J. LLANES

1
2         So in terms of query system, quote unquote,
3    query system, that was just here is where person X
4    was sitting.  They had phone lines one, two, three.
5    And then you just had to cross reference where they
6    were sitting in the NiceLog system.
7         Q.  When this particular work that's referenced
8    in Exhibit 5 was done by the IT department, as
9    described in Mr. Hewitt's letter, you had no
10   involvement in that?
11        A.  I had no involvement in that.
12        MR. GUIDO:  Can we take a break at this
13   point?
14        MR. COOPERSMITH:  Are you ready for a
15   break?
16        THE WITNESS:  Yeah, it doesn't matter.
17        MR. COOPERSMITH:  Yeah, we can take a
18   break.
19        (Recess taken from 1:56 P.M. to
20   2:02 P.M.)
21   BY MR. COOPERSMITH:
22        Q.  Mr. Llanes, first of all, during the break
23   did you have any conversations with Mr. Guido?
24        A.  No.
25        Q.  I want to continue asking some questions

Page 63

J. LLANES

1
2    about Exhibit 5, which is this letter from
3    Mr. Hewitt to Mr. Ehrman dated May 30, 2003.
4         A.  Okay.
5         Q.  Do you have that in front of you?
6         A.  Yes.
7         Q.  Can you take a look at page 6, going,
8    again, by those lower left-hand, bottom left-hand
9    corner page numbers.
10        A.  Okay.
11        Q.  Are you there?
12        A.  Yes.
13        Q.  Okay.  Do you see the second-to-last
14   paragraph that starts with the word "unfortunately"?
15        A.  Yes.
16        Q.  Looking at the second sentence of that
17   paragraph, it reads:  "Counsel then sought and
18   secured an agreement with the Staff under which
19   Refco would extract relevant segments from the tapes
20   which had not yet been reviewed pursuant to the
21   original agreement and on a rolling basis provide
22   the original tapes to the Staff."
23        Do you see that?
24        A.  Yes.
25        Q.  And then it says:  "Those original tapes

Page 64

J. LLANES

1
2    that had already been copied would be sent
3    immediately to the Staff."
4         Do you see that?
5         A.  Yes.
6         Q.  And then the last sentence in that
7    paragraph reads:  "Pursuant to this agreement, 29 of
8    the 70 requested tapes were sent to the Staff on
9    April 29th, 2003, and this production is
10   continuing."
11        Do you see that?
12        A.  Yes.
13        Q.  So, again, am I correct that all of that
14   activity described in that paragraph was occurring
15   before you got involved with this project?
16        MR. GUIDO:  Objection.  There is no
17   evidence in the record or in this deposition
18   that any of this occurred.
19        A.  If this occurred, I didn't do anything.
20        Q.  You had no involvement?
21        A.  I had no involvement.
22        Q.  If it occurred?
23        A.  Correct.
24        Q.  By the way, do you have any idea why, if
25   you look at the previous page, on page 5,

Page 65

J. LLANES

1
2    second-to-last paragraph, it reads:  "Refco, by
3    April 25th, 2003, had produced the relevant
4    conversations on 29 of the 70 tapes containing these
5    conversations," but on page 6 it references
6    April 29th, 2003, rather than April 25th, 2003?
7         Do you have any idea why that is?
8         A.  No.
9         Q.  Do you have knowledge of what this letter
10   is referring to when it talks about on page 6 an
11   extraction of relevant segments from the tapes?
12        A.  No.
13        Q.  Let's go back to your supplemental
14   declaration, which I believe was Exhibit 4.  Just to
15   be clear --
16        MR. GUIDO:  Is that page 29 of 31?
17        Q.  Exhibit 4 is actually a collection of
18   documents under a declaration of Mr. Guido.  And we
19   are looking in particular at numbered pages 29
20   through 31, lower left-hand bottom.
21        A.  Okay.
22        Q.  Are you there?
23        A.  Yes.
24        Q.  I want to just start by asking you about
25   paragraph 7, which is on page 31, using that same

Page 66

J. LLANES

1  numbering system.
2  Do you see that?
3  A. Yes.
4  Q. Okay. It says: "After assuming leadership
5  of the Information Technology department in New York
6  in June 2003, I learned that tapes made in the New
7  York office were stored at 200 Liberty Street in New
8  York City."
9  Do you see that?
10  A. Yes.
11  Q. "In or around July 2003 I observed a large
12  collection of these tapes stored in a locked file
13  cabinet inside a locked equipment cage at that
14  location."
15  Do you see that?
16  A. Yes.
17  Q. Now, by the time you made that observation
18  that you are putting forth in your declaration,
19  Mr. Llanes, isn't it a fact that those tapes had
20  already been accessed and were being worked with by
21  the Mayer Brown firm?
22  A. At that time I observed it?
23  Q. Right.
24  MR. GUIDO: If you know.
25

Page 67

J. LLANES

1  A. I mean, I can't tell you if those were the
2  tapes. I mean, I do know that those were NiceLogger
3  tapes.
4  Q. But you don't know exactly what they were?
5  A. I know that they were NiceLogger tapes. I
6  didn't know if those were tapes that they were
7  working -- I mean, I do know that we were -- I do
8  know that we were pulling tapes. I just observed
9  that there were a lot of back-up tapes.
10  Q. I see. When I read paragraph 7,
11  Mr. Llanes --
12  A. Yes.
13  Q. -- just coming to this fresh, it looks to
14  me like you are trying to say that you observed
15  tapes relevant to this case that were under lock and
16  key in this locked equipment cage at Refco.
17  Is that what you are trying to say?
18  MR. GUIDO: Are you testifying, counsel?
19  Q. Is that what you are trying to say?
20  MR. GUIDO: Leading.
21  A. No. No.
22  Q. So --
23  A. I'm saying -- how can I say this again?
24  I'm saying, once again, right, that when this
25

Page 68

J. LLANES

1  declaration was produced, I don't know who it's
2  going towards or what specific case it's going
3  towards. All I know is the SEC was asking me about
4  the tapes in general. And all I could say to it is,
5  yes, in 2003 I did notice that there were a bunch of
6  tapes back there.
7  Q. Okay.
8  A. Now --
9  Q. Go ahead. I'm sorry, I didn't mean to
10  interrupt you.
11  A. Now, whether or not those were the actual
12  tapes that were specific to this case, I can't tell
13  you that, just because I don't know. I just know
14  that there were tapes back there.
15  Q. Okay.
16  A. So as a whole, looking at everything as a
17  whole, I guess, is where I'm saying.
18  Q. I see. So when the sentence reads: "On or
19  around July 2003," and I'm reading from paragraph 7
20  of the supplemental declaration, when it says: "In
21  or around July 2003 I observed a large collection of
22  these tapes stored in a locked file cabinet inside a
23  locked equipment cage at that location," when you
24  say that in the declaration, you are just saying you
25

Page 69

J. LLANES

1  saw tapes in there, you don't know whether those are
2  the tapes relevant to this SEC versus Andreas Badian
3  matter or not?
4  A. Right. All I'm just saying is there were a
5  collection of tapes that I know the whereabouts of,
6  and they were in a locked drawer in a locked cage,
7  yes.
8  Q. Do you have any understanding as to why
9  that's in the declaration, if it doesn't necessarily
10  have anything to do with this case?
11  MR. GUIDO: Objection.
12  A. No, I think they just -- again, from my
13  perspective it was do you know where the tapes were,
14  and my answer was yes. Okay. Then where were the
15  taped located? They were in this location.
16  Q. What tapes?
17  A. The back-up NiceLogger tapes.
18  Q. But were you aware when you put that down
19  that there had already been work being done on
20  NiceLogger tapes or recordings from -- relevant to
21  this particular lawsuit, that that had already been
22  done prior to your observation of these tapes in the
23  equipment cage?
24  A. I'm sorry. Yes, I do know what you are
25

J. LLANES

1               J. LLANES
2 saying here.
3      Do I know that those -- I know that those
4 are NiceLogger tapes, of the tapes that we used to
5 record voice recordings, as a whole, from -- from
6 the New York office at that particular location at
7 200 Liberty.
8      Do I know that those were the actual tapes
9 that were being worked on for this specific case?
10 The answer is no. I do know that we were pulling
11 tapes. Whether or not it was from that particular
12 location -- I do know that we were pulling tapes,
13 and then when I had requested folks for the actual
14 tapes to be given, then, to Mayer Brown, that they
15 were pulling tapes.
16      Now, I can't tell you that those -- that's
17 where the tapes were, because I wasn't the -- I
18 wasn't the keeper of those tapes, right. All I
19 could say to folks and the team was, all right, we
20 extracted the tapes, right, the tapes that you are
21 working on -- I'm sorry. We extracted the voice
22 recordings. You guys burned them on disks. We
23 provided them to Mayer Brown. They are asking us
24 for the tapes. I need the tapes.
25      Whether or not those were the tapes they

1               J. LLANES
2 were pulling from that actual location, I'll
3 speculate that it will -- that they were, but I
4 can't tell you for sure. But I can tell you they
5 did produce the tapes, the physical tapes, and those
6 were, you know, again, tapes that we gave -- gave up
7 to Mayer Brown.
8      Q. Okay. So from your perspective,
9 Mr. Llanes, this statement that I'm reading in
10 paragraph 7 about observing a collection of tapes
11 inside a locked equipment cage --
12      A. Yes.
13      Q. -- are you trying to give the impression
14 that the tapes relevant to this case were secured in
15 a locked equipment cage as of the time you came upon
16 them in July 2003?
17      A. Correct.
18      Q. You were trying to give that impression?
19      A. I was just saying -- I need to take a step
20 back. It was just a statement. Whether or not it's
21 taking that I'm -- it's just a statement, right.
22      I believe -- if I remember correct, right,
23 the question is -- the question stemmed from where
24 did these tapes come from. And my answer was, I
25 knew that there were tapes that we had held, and

1               J. LLANES
2 those tapes that were in a cabinet that were locked,
3 within a cabinet that were -- and the question was,
4 well, how did you know that? And the answer was
5 because I saw it.
6      Q. But did you ever tell the SEC that the
7 tapes you observed in the locked equipment cage were
8 the tapes that they were requesting relevant to the
9 SEC versus Andreas Badian matter?
10      A. I would not have said it was specifically
11 to that.
12      Q. So all you told the SEC was that you saw
13 tapes in a locked equipment cage?
14      A. Yes.
15      Q. You were not able to say which tapes they
16 were; is that correct?
17      A. Correct.
18      Q. And if it were true that Mayer Brown, the
19 law firm, had already been working with tapes prior
20 to your beginning of work on this project in
21 July 2003, then, by definition, those wouldn't be
22 the same tapes in the locked equipment cage?
23      A. Correct, if they had those tapes already,
24 if they were not in that locked cabinet, I --
25      Q. And the sentence that we are discussing in

1               J. LLANES
2 paragraph 7, that was a sentence drafted by the SEC
3 lawyer; is that correct?
4      A. Correct.
5      Q. Now looking at it today, as we sit here,
6 would it be correct to add to that sentence that the
7 large collection of tapes that you observed in a
8 locked cabinet may or may not have anything to do
9 with the SEC versus Badian matter?
10      A. Sure.
11      Q. Would that be accurate?
12      A. It would be accurate.
13      Q. Still on the supplemental declaration,
14 which is Exhibit 5, and I want you to take a look at
15 paragraph 2.
16      MR. CONTI: Exhibit 4 you mean?
17      MR. COOPERSMITH: Yes, Exhibit 4. What did
18 I say? Exhibit 4.
19      Q. Paragraph 2 of Exhibit 4. "This
20 supplemental declaration provides additional
21 information regarding Refco's taping of telephone
22 conversations prior to June 2003."
23      Do you see that?
24      A. Yes.
25      Q. Why was, if you know, why was that

Page 74

J. LLANES

1
2  terminology "prior to June 2003" utilized in this
3  declaration?  Why pick that date?
4      A. I do not know.
5      Q. Well, that's when you started as IT
6  director, approximately; right?
7      A. Correct.
8      Q. Now, do you understand, Mr. Llanes, that
9  the recordings that are at issue in this particular
10  lawsuit are in 2001?
11      A. I do now.
12      Q. So do you have any idea why the declaration
13  doesn't just say as to what your knowledge is in
14  2001?
15      A. Because I have no knowledge.
16      Q. Whose choice of words was that, "prior to
17  June 2003"?
18      A. That's probably me again not -- not editing
19  it properly.
20      Q. Okay.  So to your -- as you can recall, did
21  the phrasing "prior to June 2003" come from the SEC
22  or did you come up with that phrasing?
23      A. I did not prepare this document.
24      Q. So it was coming from the SEC?
25      A. Correct.

Page 75

J. LLANES

1
2      Q. Now, in the next paragraph, which is
3  paragraph 3, we see that same phrase again, "prior
4  to June 2003".
5      Do you see that?
6      A. Yes.
7      Q. Then it says:  "I was familiar with Refco's
8  practice of taping the telephone calls made to or
9  from Refco's trading desks."
10      Do you see that?
11      A. What number are you on again?
12      Q. In paragraph 3.
13      A. Yes.
14      Q. Now, it says "prior to June 2003".  Can you
15  tell me at what point precisely prior to June 2003
16  you were "familiar with Refco's practice of taping
17  telephone calls"?
18      A. Prior to 2003 I was not.
19      Q. So was this first sentence of paragraph 3
20  of Exhibit 4 inaccurate?
21      A. That is correct.
22      Q. The next sentence reads:  "I knew that this
23  taping occurred at most or all of Refco's offices,
24  including its Chicago and New York offices, and that
25  this practice had been in effect for several years."

Page 76

J. LLANES

1
2      Do you see that?
3      A. You are on 4?
4      Q. Yes.  Sorry, paragraph 3 of Exhibit 4.
5      A. (Reading sotto voce.)  Yes.  Yes.
6      Q. So why did you -- what's your understanding
7  of the words "most or all" as used in that sentence?
8      A. Now are we talking on the corrected -- past
9  2003?  You know what, forget that.
10      I do know "most or all" means that the
11  trading desks were typically recorded, if not all of
12  them were recorded, right.  We had to do that for
13  the reason of if there were disputes on trades, or
14  whatnot, and folks, you know, traders had to clarify
15  some things with their customers, or whatnot.
16      I say most or all because not all of them
17  were recorded -- not all phone lines were recorded,
18  because from an IT perspective, they were not
19  recorded, the accounting folks were not recorded.  I
20  don't recall the executives being recorded.  That's
21  what I mean.
22      Q. And is it also true that not all of Refco's
23  offices even did the recording, as far as you know?
24      A. There are certainly some satellite remote
25  offices that had one or two folks there.  Were they

Page 77

J. LLANES

1
2  recorded?  I can't tell you.
3      Q. So you don't know one way or the other
4  whether all Refco offices were recorded; right?
5      A. That's correct.
6      Q. And in 2001 you had no specific knowledge
7  of whether the New York office recorded all
8  telephone conversations from traders' desks; is that
9  right?
10      A. I cannot say.
11      Q. On paragraph 5 of the same Exhibit 4, do
12  you see it says:  "On two occasions prior to
13  June 2003 I was assigned to obtain and listen to
14  recordings made on the NiceLog logger in Refco's New
15  York office."
16      Do you see that?
17      A. Yes.
18      Q. Can you tell me exactly when that was prior
19  to June 2003?
20      A. Yes, and that's wrong again.  I should not
21  have said prior.  It should have been after.
22      Q. So prior to June 2003 you never were
23  assigned to obtain and listen to any recordings made
24  on the NiceLog logger in Refco's New York office; is
25  that correct?

J. LLANES

1
2  A. That is correct.
3      MR. COOPERSMITH:  Can we go off the record
4  for five minutes.
5      (Recess taken from 2:22 P.M. to
6  2:25 P.M.)
7      MR. COOPERSMITH:  I have no further
8  questions.
9  EXAMINATION
10 BY MR. GUIDO:
11     Q.  Mr. Llanes, I'm Ken Guido.  I think we
12 spoke, was it last week?
13     A.  Yes.
14     Q.  And I have some clarifying questions.  I
15 would like to start with your last answer was with
16 regard to Exhibit No. 4, page 25 -- page 30,
17 paragraph 5.
18     You were asked a question whether or not on
19 two occasions prior to June 2003 you were assigned
20 to obtain and listen to recordings made on the
21 NiceLog logger in Refco's New York office.
22     Do you see that?
23     A.  Yes.
24     Q.  Okay.  And you are saying that that should
25 have read on at least two occasions after June 2003?

J. LLANES

1
2  A. Yes.
3      Q.  How many occasions after June 2003 did you
4  attempt to listen to recordings made on the NiceLog
5  logger in Refco's New York office?
6      A.  With respect to this case or as a whole?
7      Q.  Just in the whole.
8      A.  There were multiple times.
9      Q.  Okay.  Now --
10     A.  Sorry.
11     Q.  All right.  Now, with regard to this
12 particular case, did you listen to any tapes on the
13 Nice logger system after June 2003?
14     A.  Can you clarify who the custodians were in
15 this case?
16     Q.  Let me -- let me back up.
17     I think you testified that the Nice logger
18 system recorded conversations at different
19 locations; is that correct?
20     MR. COOPERSMITH:  Objection.
21 Mischaracterizes the prior testimony.
22     A.  Which locations?
23     Q.  Any locations.  The Nice logger system,
24 what did it do?
25     A.  Right.  Yes --

J. LLANES

1
2      Q.  Did it record conversations?
3      A.  It recorded trader -- the phone calls of
4  the traders, yes.
5      Q.  Okay.  Now, this says, this declaration --
6  I'm asking you questions about paragraph 5.
7      Do you have that in front of you?
8      A.  Yes.
9      Q.  Okay.  It says you listened to recordings
10 made on the NiceLog logger in Refco's New York
11 office; correct?
12     A.  Yes.
13     Q.  And that was numerous times?
14     A.  Yes.
15     Q.  Okay.  Now, with regard to --
16     MR. COOPERSMITH:  Objection.  Leading.
17     Q.  With regard to conversations by Spinner
18 Drillman or Graham, did you specifically look for
19 their conversations?
20     A.  That is correct, yes.
21     Q.  And how often did you do that?
22     A.  In 2003, when I came in -- first of all,
23 that request was occurring.
24     Q.  Pardon?
25     A.  That request had occurred.

J. LLANES

1
2      Q.  Okay.
3      A.  I'm sorry.  How can I state this?  Prior to
4  me taking over the IT department in New York --
5      Q.  I'm only asking about you.
6      MR. COOPERSMITH:  Objection.  The question
7  was asked, and the witness had not completed
8  his answer.
9      A.  With me -- with me listening to the tapes?
10 I did listen to once or two conversations to ensure
11 that we were pulling the tapes for that Spinner,
12 Drillman and Graham litigation request.
13     Q.  Okay.  Now, with regard to your use of the
14 logger system in 2003 --
15     A.  Yes.
16     Q.  -- what did you do to listen to the
17 conversation?
18     A.  So the Nice logger system had a front end,
19 of which -- the Nice logger system had a front end
20 system, of which you were able to listen to WAV file
21 conversations -- I'm sorry -- conversations that
22 were converted into WAV files of specific --
23 specific, you know --
24     Q.  I'm sorry.
25     A.  -- conversations.

Page 82

J. LLANES

1
2  Q.  That's not what I asked you.
3      My question is:  What did you do to start
4  listening to the conversations?
5      MR. COOPERSMITH:  Objection.  Assumes facts
6  not in evidence.
7  A.  Double click a restored WAV file.
8  Q.  Well, were the files on the logger system
9  in WAV files or were they subsequently into WAV
10  files?
11  A.  They were subsequently into WAV files.
12  Q.  So my question for you is:  When you
13  listened to conversations after 2003, you said
14  numerous times you were only listening to WAV files?
15      MR. COOPERSMITH:  Objection.
16  Mischaracterizes prior testimony.
17  A.  Whenever I -- understand that whenever I
18  listened to them, right, I wasn't the primary
19  individual that was pulling them.  I would listen to
20  one or two just to ensure that we were getting --
21  how can I say this -- that the data that we were
22  providing to counsel was workable data.  Meaning the
23  only time I listened to them was to ensure that it
24  wasn't choppy.  It, meaning data, meaning the WAV
25  file, wasn't choppy.  It wasn't -- that it was a

Page 83

J. LLANES

1
2  decent enough data that we could actually burn onto
3  a disk, right.
4      I wasn't listening just to listen to it.  I
5  was listening to ensure that what we were giving to
6  counsel was data that was -- I was just double
7  checking the integrity of it.
8  Q.  Okay.
9  A.  Understand not integrity that it was true
10  and right, it was checking that it was available and
11  audible -- audio-able.  Does that make sense?
12  Q.  Yeah, but can I ask you a question?  Were
13  you essentially doing what you would interpret to be
14  a quality control on those tapes?
15  A.  Sure.
16      MR. COOPERSMITH:  Objection.  Leading.
17  Q.  Now, with regard to that, in 2003 whenever
18  you went back and looked or listened to tapes, did
19  you ever determine that the tapes were inaccurate?
20      MR. COOPERSMITH:  Objection.
21  Mischaracterizes prior testimony.
22  A.  I can't say if they are inaccurate.
23  Q.  Well, did you ever find that there were
24  gaps on the tapes that didn't make any sense in
25  terms of the flow of conversations?

Page 84

J. LLANES

1
2      MR. COOPERSMITH:  Objection.  Leading.
3  A.  No.
4  Q.  Now, your experience with the taping system
5  in New York, I think you testified, started in June
6  of 2003, or sometime in 2003?
7  A.  In New York.
8      MR. COOPERSMITH:  Objection.
9  Mischaracterizes prior --
10  Q.  Pardon?
11  A.  In New York?
12  Q.  Yeah.
13      MR. COOPERSMITH:  I'm sorry.  Objection.
14  Mischaracterizes prior testimony.  I'm sorry
15  for the interruptions, but I have to object for
16  the record, Mr. Llanes.
17      MR. CONTI:  And why don't you take a breath
18  before answering his questions so that he can
19  get his objections in.
20  A.  Okay.  Can you ask again?  I'm sorry.
21  Q.  When did your experience with the taping
22  system in New York begin?
23  A.  In June of 2003.
24  Q.  Prior to June of 2003, did you have any
25  experience with the taping system in Chicago?

Page 85

J. LLANES

1
2  A.  Yes.
3  Q.  Okay.  And what was that experience?
4  A.  There were litigation requests that we
5  pulled in the Chicago office -- sorry.  Yeah.  I'm
6  sorry.  No, that's right.
7      There were litigation -- we pulled -- I
8  worked with John Beatty to pull conversations from
9  the Chicago Nice logger system for both litigation
10  requests and for traders who had requested to
11  listen.
12  Q.  Now and how often did that occur prior to
13  2003?
14  A.  There were several litigation requests when
15  I was there in the Chicago office.  I want to say
16  maybe one or -- I'm sorry.  Less than five.
17      In terms of pulling the -- pulling the
18  recordings or restoring -- restoring the recordings
19  for traders, that was multiple times.
20  Q.  Pardon?
21  A.  That was multiple times.
22  Q.  Now, in any times that you pulled those
23  conversations prior to 2003, did that include
24  pulling conversations in the year 2001?
25  A.  Sure.

22  (Pages 82 to 85)

J. LLANES

1
2     Q. Okay.  And did you do that multiple times
3  in 2001?
4     A. Sure.
5     Q. And any time when you pulled those
6  conversations, did you find that there were
7  technical problems with the tapes?
8        MR. COOPERSMITH:  Just so we're clear, we
9  are talking about the Chicago office?
10       MR. GUIDO:  Chicago office.
11    A. Chicago office.  I want to be accurate
12 here.  No.
13    Q. Okay.  Now, at any time that you pulled
14 tapes from the New York office, did you ever find
15 that there were technical problems with the tapes?
16       MR. COOPERSMITH:  I'm sorry, what time?
17    Q. Post 2003.
18    A. No.
19    Q. Did the taping system, the Nice logger
20 system, in New York change any time between 2000 and
21 2003?
22       MR. COOPERSMITH:  Objection.  Lacks
23 foundation.
24    A. Did it change?  I cannot say.
25    Q. You can't say or you don't know?

J. LLANES

1
2     A. I do not know.
3     Q. Did anybody ever tell you it had changed?
4        MR. COOPERSMITH:  Objection.  Calls for
5  speculation.
6     A. No, no one told me it had changed.
7     Q. When you took over the IT operations in the
8  New York office, did you have meetings with people
9  in the New York office about the Nice logger taping
10 system when you assumed responsibility for its
11 operations?
12    A. No.
13    Q. Who was responsible for the taping system,
14 the Nice logger taping system, in New York prior to
15 you joining --
16    A. Prior to --
17    Q. -- the New York office?
18    A. Prior to me joining, there was Melissa
19 Montella and Gregg Blauth.
20       Can I ask you to repeat your question, your
21 last question?
22    Q. When you took over the IT operations in the
23 New York office, you had meetings with people in the
24 New York office about the Nice logger taping system
25 when you assumed responsibility for its operations.

J. LLANES

1
2     A. Okay.  So --
3     Q. Your answer was no.
4     A. My answer was no.  But certainly in two
5  thousand -- 2005, post bankruptcy, I did have
6  conversations in terms of winding it down; who
7  does -- who does the Nice logger system go to; does
8  it get transferred over to Man in the assets that
9  were purchased.
10    Q. In 2005?
11    A. In 2005, post bankruptcy.
12    Q. No, I understand that.
13       I'm asking you when you took over --
14    A. Right.  I just -- I just want to clarify.
15    Q. -- did you meet with anybody to discuss the
16 Nice logger system?
17    A. I did not, no.
18    Q. Did anybody ever tell you that the Nice
19 logger system in New York in 2001 was different than
20 the one that you were working with in Chicago in
21 2001?
22       MR. COOPERSMITH:  Objection.  Calls for
23 speculation.
24    A. Right.
25    Q. Did anyone ever tell you?

J. LLANES

1
2        MR. COOPERSMITH:  I'm sorry, the witness
3  didn't answer the question.
4     A. I can speculate.
5     Q. I'm not asking you to speculate.
6        I'm asking did anybody tell you?
7     A. Nobody told me.
8     Q. Okay.  Was it your understanding that the
9  Nice logger system that was used in Chicago was the
10 same Nice logger system that was used in New York in
11 2001?
12       MR. COOPERSMITH:  Objection.  Lacks
13 foundation.  Calls for speculation.
14    A. I can say it was possibly different because
15 of the 9/11 incident.
16    Q. Do you know any way in which it was
17 different?
18       MR. COOPERSMITH:  Objection.  Calls for
19 speculation.  Lacks foundation.
20    A. New hardware.
21    Q. Was the technology the same?
22    A. Oh, yes, because it's NiceLog.  I don't
23 think we used anything different.
24    Q. Okay.
25    A. It may have been -- yeah.

J. LLANES

1
2      Q.  Would you consider yourself knowledgeable
3   about the operations of the Nice logger system?
4      A.  Knowledgeable enough to know the
5   functionality.
6      Q.  Okay.  Let me ask you some questions --
7      A.  Can I expand on that?  Knowledgeable enough
8   to know the functionality, not knowledgeable enough
9   to know specifics like what version we were using.
10     Q.  Pardon?
11     A.  Specifics such as what version we were
12  using.
13     Q.  Okay.  Now, you were asked some questions
14  about the large thick exhibit.
15        What number do you have on that?
16     A.  Exhibit 3.
17     Q.  Okay.  Exhibit 3.  You were asked some
18  questions about some pages on that exhibit.  Let me
19  direct your attention to those pages.  I think one
20  of them was page 8.
21        Do you see on page 8 it has the -- it looks
22  like Chapter 5, Setting Up Selective Recording?
23     A.  Yes.
24     Q.  And then it makes reference to various
25  pages in that.  And I think you were directed to

J. LLANES

1
2   take a look at page 143.
3        Will you take a look at page 143?
4      A.  Yes, I'm there.
5      Q.  And page 143 it says:  "The NICE Recording
6   Planner is an optimal feature that enables you to
7   set up selective recording programs at a site."
8        Do you see that?
9      A.  Yes.
10     Q.  Do you know whether or not that feature was
11  activated in Chicago when you were working with the
12  Nice logger system?
13        MR. COOPERSMITH:  At what time?
14     Q.  After -- prior -- 2001.
15        MR. COOPERSMITH:  Objection.  Assumes facts
16  not in evidence.
17     A.  Do I know in 2001 if in Chicago we used the
18  selective set up recording?
19     Q.  Uh-huh.
20     A.  No, I do not know.
21     Q.  What was your understanding of how the
22  system worked in Chicago in 2001?
23     A.  That we captured -- we captured the
24  recordings of traders, traders that were on the
25  floor, and the brokers that were on the desk in the

J. LLANES

1
2   office.
3      Q.  Now your declaration, I think you were
4   asked about -- if you look at, I think it's
5   Exhibit 2 -- you were asked about paragraph 3.  And
6   you were asked specifically about this sentence that
7   says:  "That system," referring to the Nice logger
8   system, "recorded all the conversations that took
9   place on or near telephones used on Refco's trading
10  desk."
11     A.  Yes.
12     Q.  Okay.  And then I think you were then asked
13  about paragraph -- page 145 of Exhibit 3, which
14  talks about selective recording.
15        At any time did you observe the Nice logger
16  system working in Chicago, did you ever notice that
17  the selective recording function had been turned on?
18        MR. COOPERSMITH:  Objection.  Lacks
19  foundation.  Calls for speculation.
20     A.  Give me a second.  I want to read this.
21        My understanding of the Nice logger feature
22  on Chapter 5, selective -- Setting Up Selective
23  Recording, without reading this, is that there are
24  specific -- it's a specific feature within NiceLog
25  to set up a specific type of recording, right.  And,

J. LLANES

1
2   again, I don't know any of that.
3        I will tell you that from what I know, the
4   way NiceLog was distributed out -- out in Refco, was
5   that the system was out there capturing specific
6   lines and users, again, specifically for traders.
7   It wasn't a system that was distributed in all of
8   the full -- the full breadth of the Refco phone
9   system, right.  It was more of -- it was more of,
10  okay, I'm going to take this person; I'm going to
11  take that person; I'm going to take trader X, Y and
12  Z, right.
13        And, again, without -- without reading this
14  or understanding this NiceLog system, or Chapter 5,
15  I should say, all I know is that we were able to
16  capture -- we were able to capture specific lines
17  and specific locations, right.  Whether or not
18  Chapter 5 it was -- it was done by the selective set
19  up recording on Chapter 5 or whether or not that was
20  just some other method, I cannot tell you that's
21  what they used.
22     Q.  But your declaration says the system
23  recorded all conversations that took place on or
24  near the telephones used on Refco's traders' desks.
25        My question for you is:  Any of those phone

J. LLANES

1  lines that were set up on traders' desk, did you
2  activate selective recording?
3      MR. COOPERSMITH: Objection. Lacks
4  foundation. Calls for speculation.
5      A. I did not call to utilize the selective set
6  up.
7      Q. Did -- do you know whether or not anyone
8  did?
9      A. I do not know of anyone.
10     Q. Was it your understanding that the system,
11 when it was connected to the line, was intended to
12 capture all conversations on that line?
13     A. To my understanding, yes.
14     Q. Both in New York and Chicago?
15     MR. COOPERSMITH: Objection. Lacks
16 foundation. Calls for speculation.
17     Q. You may answer.
18     A. Yes.
19     Q. Now, on page 155 of this document it talks
20 about recording programs that prevent recording.
21     A. Yes.
22     Q. Do you know whether in Chicago or New York
23 in 2001 the Negative Recording Program was ever
24 activated on the lines on the trading desks?

J. LLANES

1      MR. COOPERSMITH: Objection. Lacks
2  foundation. Calls for speculation.
3      A. I do not know.
4      Q. Were you ever told that was the case?
5      A. I was not told.
6      Q. Now, your declaration, your initial
7  declaration, which is Exhibit 2, I think --
8      A. Yes.
9      Q. -- has attached to it copies of Sony
10 cassettes. And when you signed that declaration,
11 did you review the descriptions on the cassettes
12 that were provided to you as Exhibits I through IV?
13     A. I reviewed them briefly, yes.
14     Q. And did you -- did you recognize any of the
15 writing on any of those?
16     A. I cannot tell you who wrote that, no.
17     Q. Pardon?
18     A. I cannot tell you who wrote that.
19     Q. Okay. So you don't know? You can't
20 identify the writing?
21     A. I can't identify them, no, I cannot.
22     Q. Will you take a look at all of them just to
23 make sure.
24     A. I cannot recognize any of the writing.

J. LLANES

1      Q. Now I'd like to go through your Exhibit 2,
2  your declaration --
3      A. Sure.
4      Q. -- and ask you some specific questions
5  about that.
6          In paragraph 2 on page 1 it says: "As the
7  head of Refco's IT operations, I acquired the
8  experience and knowledge to make this declaration
9  about Refco's audio recordings of telephone and
10 other conversations between and among Refco's
11 personnel and others."
12         Do you see that?
13     A. Yes.
14     Q. Is that true?
15     A. Yes.
16     Q. Now, I think you testified that you don't
17 really know the details of the technology that's
18 embedded in the NICE system; is that correct?
19     A. Correct.
20     Q. But you do know how it functions?
21     A. Correct.
22     Q. And you do know what it does and doesn't
23 do?
24     MR. COOPERSMITH: Objection. Leading.

J. LLANES

1      A. Correct.
2      Q. And based on your experience, do you know
3  that it was placed on the trading desks of Refco's
4  associated persons?
5      MR. GUIDO: Objection. Lacks foundation.
6  Leading.
7      A. I do know that that's the way it was
8  installed.
9      Q. Okay. And in paragraph 3 it says: "Refco
10 recorded the conversations of its registered
11 representatives, including those telephone
12 conversations with those with whom they discussed
13 security transactions and other matters."
14         Is that correct?
15     A. Yes.
16     Q. What was -- why did Refco do that?
17     MR. COOPERSMITH: Objection. Calls for
18 speculation.
19     Q. To your knowledge.
20     A. Why did they record the conversations?
21     Q. Uh-huh.
22     A. For one, I believe it was a regulatory
23 requirement. The second one being that certainly to
24 get the accuracy of the trades and discussions that

Page 98

J. LLANES

1
2  were occurring at any given time on a trader's desk
3  for disputes, potential disputes, to clarify
4  potential disputes on trades.
5      Q.  So the purpose was to ensure accuracy; is
6  that fair?
7      A.  That is correct.
8      Q.  Now, I think you were asked a number of
9  questions about the very last word on page 1 that
10  says "Sony DD2 and Sony DD3 disks".
11      Do you see that?
12      A.  Yes.
13      Q.  Now, you indicated that that should
14  essentially say tapes; is that fair?
15      A.  That is correct.
16      Q.  Okay.  And take a look at page -- take a
17  look at page 19.
18      A.  Okay.
19      Q.  See where it says "Logger 4 Tape 5
20  8/29/01."
21      Do you see that?
22      A.  I do see that.
23      Q.  Do you see right above that it says DD
24  something there?
25      A.  Yes.

Page 99

J. LLANES

1
2      Q.  3, Digital Data Storage?
3      A.  Correct.
4      Q.  Is that a tape?
5      A.  That is -- I'm sorry.
6      Q.  Based on your experience, that's a tape?
7      A.  That is a tape.
8      Q.  You weren't trying to mislead anyone by
9  using the word "disks", were you?
10      MR. COOPERSMITH:  Objection.  Leading.
11      A.  I was not, sir.
12      Q.  Let me ask the question in another way.
13      Were you trying to mislead anybody by using
14  the term "disks"?
15      A.  I was not.
16      Q.  And paragraph 5 on page 2 of your
17  declaration, Exhibit 2, says:  "From personal
18  familiarity with the Nice system, I know that it
19  recorded these conversations at or near the time
20  when persons using the Refco's telephone system
21  conducted these conversations."
22      Is that statement true?
23      A.  Yes.
24      Q.  Can you think of any way that the Nice
25  logger system could have recorded conversations that

Page 100

J. LLANES

1
2  occurred at a time different than when it was
3  operating?
4      MR. COOPERSMITH:  Objection.  Lacks
5  foundation.  Speculation.  Compound.
6  Unintelligible.
7      A.  I can tell you that trader --
8      Q.  Please answer my question first, and then
9  you can explain.
10      A.  Okay.
11      Q.  Yes or no.
12      A.  Ask the question again.
13      Q.  Can you think of any way that the Nice
14  logger system could have recorded conversations that
15  occurred at a time different than when it was
16  operating?
17      MR. COOPERSMITH:  Object.  Same objections.
18      Q.  Do you want me to clarify?
19      A.  Yes.
20      Q.  Okay.  Do you know whether or not the Nice
21  logger system could ever have recorded a
22  conversation at a time other than when the
23  conversation occurred?
24      MR. COOPERSMITH:  Same objections.
25      A.  Yes.

Page 101

J. LLANES

1
2      Q.  Okay.  How would it do that?
3      A.  Occasionally traders would keep their
4  phones off the hook.  So as we noted before, on ARD
5  phones, which is automatic ring down to the trader's
6  lines, if the phone was off the hook, obviously it
7  would be -- it would continue to ring down to the
8  floors, which is in the pits, but yet the Nice
9  logger system would continue to record it.
10      If your question -- if -- that's how I
11  understand your question.  If your question is if at
12  any time the Nice logger system recorded something
13  that it was not supposed to record --
14      Q.  No.
15      A.  -- the answer is no.
16      Q.  Are you asking me for clarification?
17      A.  Yes.
18      Q.  My question is -- let me give you a
19  hypothetical.  I'm sitting here.  I'm asking you a
20  question.
21      MR. COOPERSMITH:  Objection.  Calls for a
22  hypothetical.
23      Q.  Did the Nice logger system ever record a
24  conversation that occurred in the past?
25      MR. COOPERSMITH:  Objection.  Calls for

26 (Pages 98 to 101)

Page 102

J. LLANES

1
2  speculation.
3      A.  No.
4      Q.  Did it ever record a conversation that was
5  going to occur in the future?
6      A.  Of course not.
7      Q.  So all conversations on the Nice logger
8  system were recorded at or near the time the person
9  using the telephone system conducted the
10  conversations?
11      MR. COOPERSMITH:  Objection.  Leading.
12  Lacks foundation.
13      A.  Say it again.
14      Q.  Look at paragraph 5.
15      A.  Yes, I mean --
16      Q.  I just repeated paragraph 5 for you.
17      A.  Yes.
18      Q.  Paragraph 6 says:  "I also know that Refco
19  made these recordings as an ordinary practice in the
20  course of its regularly conducted business."
21      Do you see that?
22      A.  Yes.
23      Q.  Is that true?
24      A.  Yes.
25      Q.  And was the reason to ensure that trading

Page 103

J. LLANES

1
2  activity was accurate?
3      A.  Yes.  And I also believe it was for
4  regulatory purposes.
5      Q.  Now, it says in or about July --
6  paragraph 7 says:  "July 2003 I was the custodian of
7  the above-referenced recordings."
8      Do you see that?
9      A.  Yes.
10      Q.  Now, you were not the head of IT in Chicago
11  in July of 2003, were you?
12      A.  I was not.
13      Q.  Okay.  So did you have custody of the
14  recordings in Chicago in 2003?
15      A.  I did not.
16      Q.  Okay.  And is your reference to the
17  above-referenced recordings those that are referred
18  to in paragraph 4 of your declaration?
19      A.  If these were the same tapes that were in
20  that tape library, yes.
21      Q.  Okay.  Now, let me ask you about how tapes
22  were maintained at Refco.  And I guess I need to go
23  back to how they were created.
24      Did the Nice logger system record directly
25  to Sony DD2/DD3 tapes?

Page 104

J. LLANES

1
2      A.  No.
3      Q.  Okay.  What did it record to?
4      A.  It recorded on spinning disks, hard drive
5  disks.
6      Q.  Okay.
7      A.  And then after a period of time it would
8  then -- it would then transfer that information to
9  these -- these magnetic tape -- these disks.
10      Q.  Okay.  And then when they were transferred
11  to the magnetic tapes, did the magnetic tapes stay
12  in the machine?
13      A.  They did not.
14      Q.  Okay.  What happened to the tapes when they
15  filled up?
16      A.  Typically after a period of two weeks they
17  would be rotated out.
18      Q.  Okay.  And where did they go?
19      A.  In Chicago, I do not know.  In New York
20  they went to that --
21      Q.  To what?
22      A.  To the aforementioned area.  The area
23  where, again, the close -- in the locked cabinet
24  behind the locked cage.
25      Q.  Okay.  In 2003?

Page 105

J. LLANES

1
2      A.  2003.
3      Q.  Okay.  Do you know where they went in 2001?
4      A.  I cannot tell you.
5      Q.  Okay.  Was it Refco's practice to keep the
6  tapes that were extracted from the loggers in a
7  secure location?
8      MR. COOPERSMITH:  At what period of time?
9      MR. GUIDO:  At any time.
10      A.  Yes.
11      Q.  And when you became the head of the office
12  in New York in 2003, was that the case?
13      A.  Yes.
14      Q.  Prior to you becoming the head of the
15  office in 2003, was that the case?
16      MR. COOPERSMITH:  Objection.  Lacks
17  foundation.  Calls for speculation.
18      A.  I do not know.
19      Q.  Now, you were the head of the office in
20  2003; right?
21      A.  I was the head of the IT department, yes.
22      Q.  IT.  And you were responsible for the Nice
23  logger machine operating in 2003; correct?
24      A.  It was under my direction, yes.
25      Q.  Okay.  That's fine.

1           J. LLANES
2           Now, who was responsible for the tapes in
3 2003?
4     A.  There were two individuals.
5     Q.  Who were they?
6     A.  Melissa Montella and Tony Visconti.
7     Q.  Now, prior to 2003 who was responsible for
8 the tapes?
9     A.  My understanding was my -- my predecessor,
10 Gregg Blauth.
11    Q.  Okay.  Now when you took over in 2003, did
12 you -- did you learn where the tapes were stored
13 after they were extracted from the Nice logger?
14    A.  Yes.
15    Q.  Okay.  And what did you learn?
16    A.  I learned that they were in the locked
17 cabinet behind a locked cage at 200 Liberty.
18    Q.  Okay.  Now, had any of those tapes been
19 stored in a temporary secure location prior to being
20 in the locked cage at 200 --
21    A.  At 200 Liberty?
22    Q.  Pardon?
23    A.  At 200 Liberty?
24    Q.  Yeah.
25    A.  No, not to my knowledge.

1           J. LLANES
2     Q.  Not to your knowledge.
3           Were the tapes ever, to your knowledge, in
4 an unsecure location?
5           MR. COOPERSMITH:  Objection.  Lacks
6 foundation.  Calls for speculation.
7     A.  Not to my knowledge.
8     Q.  Had anyone ever told you that they weren't
9 secure?
10    A.  No one ever told me.
11          MR. GUIDO:  Let's take a short five-minute
12 break.
13          (Recess taken from 3:06 P.M. to
14 3:11 P.M.)
15 BY MR. GUIDO:
16    Q.  I think you were asked a question about
17 paragraph 7 of your supplemental declaration, on
18 page 31 of Exhibit 4.  Exhibit 4 starts out Second
19 Declaration of Kenneth Guido.
20    A.  Okay.
21    Q.  And I think you were asked whether or not
22 you know whether the particular tapes that are
23 involved in this case were at that location.
24          Do you recall that question?  Do you recall
25 the question?

1           J. LLANES
2     A.  Can you -- can you recall the question?
3     Q.  Do you recall being asked whether or not
4 you know whether or not the tapes that the Mayer
5 Brown firm were producing to the SEC were in that
6 storage area mentioned in paragraph 7 when you
7 became the head of the IT operation in New York?
8     A.  Okay.  I do recall that question.
9     Q.  Okay.  You recall that question.
10          And do you recall being asked whether --
11 what your purpose of writing paragraph 7 was?
12          MR. COOPERSMITH:  Objection.  I think he
13 testified that he didn't write it.
14    Q.  You may answer the question.
15          Do you want me to rephrase the question?
16    A.  Yes, because actually --
17    Q.  Let me rephrase the question.
18          Paragraph 7 says: "After assuming
19 leadership of the Information Technology department
20 in New York in June 2003, I learned that tapes made
21 in the New York office were stored at 200 Liberty
22 Street in New York City."
23          Do you see that sentence?
24    A.  Yes.
25    Q.  Okay.  Is that statement true?

1           J. LLANES
2     A.  Yes.
3     Q.  Okay.  And was it the practice, prior to
4 you assuming the leadership of the office in 2003,
5 to your knowledge, to have those tapes stored at 200
6 Liberty Street in New York City?
7           MR. COOPERSMITH:  Objection.  Lacks
8 foundation.  Calls for speculation.
9     A.  To my knowledge that is where they were
10 stored.
11    Q.  Okay.  And how did you get that knowledge?
12    A.  Because if you open up the drawers, there
13 were tapes there that indicated that date.
14    Q.  Okay.  Now, and when you joined -- or you
15 became the head of the department in 2003.  Did you
16 observe in that locked cabinet there were tapes
17 prior to June of 2003 in those locked cabinets?
18    A.  Yes.
19    Q.  Okay.  Now, was -- I want to repeat my
20 question again.
21          Specifically with regard to this locked
22 cabinet, was this location and this locked cabinet
23 inside a locked equipment cage the method that you
24 understand that Refco had used to secure those tapes
25 off the Nice logger system?

28 (Pages 106 to 109)

J. LLANES

1
2   MR. COOPERSMITH: Objection to the phrase
3   "those tapes". I'm not sure which tapes we are
4   referring to.
5   A. Yes.
6   Q. Now, I think you were asked a number of
7   questions about the Mayer Brown firm --
8   A. Yes.
9   Q. -- producing tapes?
10  A. Producing tapes for them, yes.
11  Q. And you provided the tapes to them, or you
12  had someone provide the tapes to them; is that
13  correct?
14  A. That is correct.
15  Q. And what was the purpose of providing them
16  the tapes?
17  A. They requested the tapes.
18  Q. Okay. Do you know why they requested the
19  tapes?
20  A. I do not know.
21  Q. Did anyone tell you that part -- one of the
22  reasons was to produce the tapes to the SEC?
23  MR. COOPERSMITH: Objection. Leading.
24  A. No.
25  Q. Well, did you ever, during the time that

J. LLANES

1
2   you were pulling together tapes for the Mayer Brown
3   firm, learn that they were being produced to the
4   SEC?
5   A. Sorry, I have to think of this. No.
6   Q. So when you testified earlier that you were
7   pulling tapes for Mayer Brown's use to provide to
8   the SEC, that was inaccurate?
9   A. No. No. Hang on. Sorry.
10  I believe we actually hit on whether or not
11  it was for the DOJ and not for the SEC.
12  Q. Pardon?
13  A. I believe we -- when we were talking about
14  that question, it was specifically about the DOJ and
15  not for the SEC. Did I know whether or not Mayer
16  Brown was working for the DOJ -- I cannot recall
17  this.
18  MR. GUIDO: Could we make copies of the two
19  documents that Mr. Llanes produced.
20  MR. COOPERSMITH: Oh yeah. Sure. I forgot
21  about that.
22  Do you want to take a break so I can do
23  that?
24  MR. GUIDO: Let's take a break.
25  (Recess taken from 3:19 P.M. to

J. LLANES

1
2   3:23 P.M.)
3   BY MR. GUIDO:
4   Q. While we are waiting for this, why don't I
5   ask you some conclusion questions.
6   To your knowledge, did the Nice logger
7   system ever record conversations that did not occur?
8   A. No.
9   Q. Did the tapes generated by the logger
10  system identify the location of the conversation
11  recorded?
12  A. The tapes did not identify the location,
13  the Nice logger system did.
14  Q. Okay. The Nice logger system did?
15  A. Yes.
16  Q. The information on the Nice logger system,
17  where the conversation recorded, did it also include
18  the location?
19  A. Sorry, say again. Did the Nice logger
20  system include the location?
21  Q. Yes. Did the Nice logger --
22  A. The Nice logger, yes, it identified the
23  location and the phone line.
24  Q. Okay. Was that called channel?
25  A. Yes.

J. LLANES

1
2   Q. And it would record -- the Nice logger
3   system would record the channel; correct?
4   A. Correct.
5   Q. Did it also record the logger on which it
6   was recorded?
7   A. Right. It would identify which logger that
8   channel was associated with.
9   Q. Okay.
10  A. Yes.
11  Q. All right. Did it also have the date range
12  or the time range of the conversation?
13  A. Yes.
14  Q. And did it also have the date of the
15  conversation?
16  A. Yes.
17  Q. And did it also have a thing called a
18  session number?
19  A. I don't recall a session number. To be
20  honest with you, I don't recall the session number
21  on that.
22  Q. Okay. Would the Nice logger record
23  anything other than what transpired at the time of
24  the conversation that was recorded?
25  A. Not to my knowledge. It was fairly

J. LLANES

1
2 accurate. It was an accurate system.
3     Q. So if it had a session number for each of
4 the conversations recorded, would that be accurate?
5     A. I'm sorry, yes.  Yes.  I say I'm sorry
6 because, yes, I know what you are saying now.  Per
7 session was each hang up -- each particular
8 conversation, hang up.  After the phone was hung up
9 or after the conversation had ended, the session
10 number would be created.
11     Q. Please don't speculate.
12     A. Okay.
13     Q. I think you just speculated.
14     A. Okay.
15     Q. Don't do that.  All right.
16        Is it -- did the logger record something as
17 a session from the time it was activated by sound to
18 the time sound ceased?
19     A. By sound?
20     Q. Yeah.
21     A. Or by --
22     Q. Voice.
23     A. It was typically when the phone was picked
24 up.
25     Q. Was it also when it was off the hook?

J. LLANES

1
2     A. If it was -- if the phone was off the hook,
3 it would pick up, yes.
4     Q. So it would pick up all of the sound until
5 sound ceased; correct?
6     A. It would pick up until the phone was hung
7 up.
8     Q. And did -- and were those recorded as
9 separate session numbers?
10     A. You asked me not to speculate, so I will
11 say --
12     Q. You just don't know?
13     A. I don't know.
14     Q. Were any of the tapes ever altered?
15        MR. COOPERSMITH:  Objection.  Lacks
16 foundation.  Calls for speculation.
17     Q. If you know.
18     A. Not that I know of.
19        MR. GUIDO:  Do you have the exhibits?
20        MR. COOPERSMITH:  So I will put on the
21 record that the witness produced two documents.
22 One is a one-page document.  The other is a
23 two-page document.  I've had someone make
24 copies here at our office, and I'm now giving
25 them to Mr. Guido, keeping a copy for myself.

J. LLANES

1
2        MR. CONTI:  Did you get both sides?
3        MR. COOPERSMITH:  He can --
4        MR. CONTI:  They were double sided.
5        MR. GUIDO:  This one is double sided.
6        MR. COOPERSMITH:  So I will take the
7 original back.  The other one is not double
8 sided?
9        THE WITNESS:  There is something on the
10 back also.
11        MR. COOPERSMITH:  They are both double
12 sided.
13        (Recess taken from 3:29 P.M. to
14 3:30 P.M.)
15 BY MR. GUIDO:
16     Q. While we are waiting for that, I have one
17 other follow-up question for the sessions.  And that
18 is did -- when you went back to listen to tapes, did
19 you learn that there were multiple phone
20 conversations within one session recorded on the
21 logger?
22     A. I do not know.
23     Q. You just don't recall?
24     A. I don't recall.
25        MR. GUIDO:  Let's wait for the documents.

J. LLANES

1
2     (Pause.)
3        MR. COOPERSMITH:  So at Mr. Guido's request
4 we had a secretary here copy the documents
5 provided by the witness.  It was pointed out
6 that they were double sided copies; so now they
7 are copied in double sided form.
8        MR. GUIDO:  I'd like to have the court
9 reporter mark as Exhibit 6 a one-page document
10 that has on the first page it looks like a
11 business card John G. Llanes, Director of New
12 York City IT Operations, and it's a handwritten
13 note.
14        And then I'd like to have marked as
15 Exhibit 7 a --
16        MR. CONTI:  We would like to keep the
17 originals.  Can we have one of the copies?
18        MR. GUIDO:  Is that the original?
19        MR. CONTI:  This is the original.
20        MR. GUIDO:  Do you want to keep the
21 originals?
22        MR. CONTI:  Right.
23        MR. COOPERSMITH:  That's fine by me.  But
24 you are going to mark the exhibit, and that
25 will be the copy the witness looks at, I

Page 118

J. LLANES

1
2  assume, the marked copy.
3      MR. CONTI:  I will pass that down to the
4  reporter.
5      MR. GUIDO:  That's Exhibit 6.
6      (Llanes Exhibit 6 marked for
7  identification.)
8      MR. GUIDO:  And I'd like to have marked as
9  Exhibit 7 a copy of a two-page letter dated
10  May 8, 2003, from John Hewitt to Christopher
11  Ehrman.
12      (Llanes Exhibit 7 marked for
13  identification.)
14  BY MR. GUIDO:
15      Q.  Mr. Llanes, will you take a look at
16  Exhibit 6.
17      A.  Yes.
18      Q.  Will you tell us what that is?
19      A.  So as I recall it, this was in -- this was
20  in response to post bankruptcy --
21      Q.  Excuse me.  Let me rephrase the question.
22      A.  Yes.
23      Q.  Where did you get this document?
24      A.  So I got this document from my files.
25      Q.  And how did it appear in your files?

Page 119

J. LLANES

1
2      A.  This was during bankruptcy that I got this
3  file.
4      Q.  Was this provided to you by the SEC?
5      A.  Probably.  I'm not sure now.  I'm
6  speculating.
7      Q.  Yeah, please don't speculate.
8      A.  I don't recall.
9      Q.  Okay.  You don't recall how you got this.
10      Is this your handwriting?
11      A.  It is my handwriting, yes.
12      Q.  Okay.  And it says:  "Remainder of 2001
13  tapes.  All others should be with prior counsel.
14  Questions - please do not hesitate to contact me."
15  And then there is some initials.
16      Are those your initials?
17      A.  Those are my initials, yes.
18      Q.  And this was a note that you wrote at some
19  point in time?
20      A.  That is correct.
21      Q.  Okay.  And it pertains to a production of
22  2001 Nice logger tapes?
23      MR. COOPERSMITH:  Objection.  Leading.
24      A.  Yes.
25      Q.  Now, in the back it says something.

Page 120

J. LLANES

1
2      Can you read that into the record?
3      A.  Yep.  It says:  "XX Refco XX, Projects,
4  Current Projects, Wind Down, SEC."
5      Q.  Okay.  Is that reference to a file that it
6  came out of?
7      A.  This is in reference -- yes.
8      Q.  Okay.  And it says SEC.
9      What does that refer to?
10      A.  Securities and Exchange Commission.
11      Q.  Okay.  Now I'd like you to take a look at
12  Exhibit 7.
13      A.  Yes.
14      Q.  That makes reference to a transmittal of
15  tapes by Mayer Brown to the SEC on May 8th, 2003.
16      Do you see that?
17      A.  Yes.
18      Q.  Did you have anything to do with that
19  production?
20      A.  No, because it was prior to me being there.
21      Q.  Okay.  Does your note that says remainder
22  of 2001 tapes, was that included in Exhibit 6
23  because you knew an earlier production had taken
24  place?
25      A.  That is correct.

Page 121

J. LLANES

1
2      Q.  And was it your understanding that that
3  earlier production had been to the SEC?
4      A.  I cannot remember.
5      Q.  Well, why does it -- why does Exhibit 6
6  come out of a file that was marked SEC?
7      A.  It most likely is.  Why is it in there?
8  Again, that was during the wind down, and I probably
9  just stuck this -- these two exhibits in there, in
10  that -- in my electronic file.
11      Q.  Well, I mean, so these -- these two
12  exhibits came from an electronic file?
13      A.  Correct.
14      Q.  Do you know how you received them to place
15  them in your electronic file?
16      A.  Most likely e-mail.
17      Q.  Pardon?
18      A.  Most likely via e-mail.
19      Q.  E-mail, okay.
20      Can you tell by going back to that file
21  who -- who produced these to you?
22      A.  I cannot, because it was just these
23  documents themselves.  Exhibit 6, I believe, was a
24  JPEG.  You know, I would have to look again.  And I
25  believe Exhibit 7 was -- it may have been a JPEG as

Page 122

J. LLANES

1  well.
2      Q.  Well, in Exhibit 6 it says:  "Remainder of
3  2001 tapes."  Okay.  And then it says:  "Questions -
4  please do not hesitate to contact me."
5      What were you referring to about questions?
6      A.  If they have any questions.  If whoever was
7  receiving the rest of these tapes had any questions,
8  had any additional questions, they want more voice
9  recordings, did they want, you know, where did these
10  tapes come from.
11      Q.  Did anyone from the SEC call you and
12  discuss the card on which Exhibit 6 was copied from?
13      A.  I cannot remember.  I'm sure --
14      Q.  Did you ever discuss the card with Jim
15  McHale?
16      A.  Yes, probably.
17      Q.  Now, please don't speculate.
18      A.  Okay.
19      Q.  To the best of your knowledge --
20      A.  To the best of my knowledge, someone
21  contacted me, and it was Jim McHale.
22      Q.  Pardon?
23      A.  And it was Jim McHale.
24      Q.  Or was it Ken Guido?

Page 123

J. LLANES

1      MR. COOPERSMITH:  Hold on.  The witness
2  wasn't done with his answer.
3      A.  Let me back up.  Everything is just so
4  blurred to me right now, because I cannot recall now
5  if this particular card that was sent with the tapes
6  was for the -- was for the Spinner/Drillman case
7  that was back in 2003 or if this was for the
8  remainder of the tapes that we just gave post the
9  bankruptcy in 2005.
10      So because I foolishly didn't put a date on
11  here, I can't tell you which one -- which one this
12  is actually for.
13      Q.  Okay.  Can I ask some clarifying questions?
14  I understand that this is many years after the fact,
15  and so it's important if you remember, you remember.
16  If you don't remember, you don't remember.
17      A.  Okay.
18      Q.  Let me -- so, you know, with regard to this
19  card, okay, was the card inserted in one of the
20  boxes produced by Refco in response to one of the
21  investigations?
22      A.  Yes.
23      Q.  And was one of the investigations the SEC's
24  investigation of Spinner and Drillman?

Page 124

J. LLANES

1      A.  To my knowledge, yes.
2      Q.  Okay.  And was there also an SEC
3  investigation of Refco?
4      A.  Yes.
5      Q.  And were tapes from the Nice logger system
6  produced in both of those investigations?
7      A.  Yes.
8      Q.  So when you signed your declaration,
9  Exhibit 2, that had attached to it labels of various
10  audio tapes on it, to your knowledge, was that --
11  were those tapes produced in either the Spinner and
12  Drillman SEC investigation or the SEC's
13  investigation of Refco?
14      A.  Yes.
15      Q.  It was one or the other?
16      A.  Yes, it was one or the other.
17      Q.  And to the best of your knowledge, those
18  tapes are accurate reflections of what was recorded
19  on the Nice logger system at the time they were
20  recorded?
21      MR. COOPERSMITH:  Objection.  Lacks
22  foundation.  Calls for speculation.
23      A.  Yes.
24      Q.  And at the time you signed the declaration,

Page 125

J. LLANES

1  you were the head of the IT department at Refco?
2      A.  Which declaration?
3      Q.  Exhibit 2.
4      MR. COOPERSMITH:  Objection.  Lacks
5  foundation.
6      MR. GUIDO:  Pardon?
7      MR. COOPERSMITH:  Lacks foundation.
8      A.  At the time I signed this declaration,
9  Exhibit 2, what was that date?
10      Q.  Is it -- or is that when you were at MF
11  Global?
12      A.  It was when I was with MF Global, I
13  believe.  I'm trying to find a date on here.
14      Yes, I was with MF Global.
15      Q.  But the production that was done in the
16  Spinner -- what you understand to be the Spinner and
17  Drillman SEC investigation and the SEC's
18  investigation of Refco occurred at a time when you
19  were the head of the IT department in New York for
20  Refco?
21      MR. COOPERSMITH:  Objection.
22  Mischaracterizes the prior testimony.  Lacks
23  foundation.
24      A.  That is correct.

32 (Pages 122 to 125)

J. LLANES

1
2     Q.  And when you were involved in the
3  production of the tapes, the labels of which are
4  attached to your first declaration, Llanes
5  Exhibit 2, as you understood, you were producing
6  tapes that accurately reflected what was extracted
7  from the Nice loggers --
8           MR. COOPERSMITH:  Objection.
9     Q.  -- at Refco?
10          MR. COOPERSMITH:  Objection.  Leading.
11    Lacks foundation.  Calls for speculation.
12    A.  Yes, I believe them to be either for that
13  Spinner/Drillman case or the post Refco bankruptcy
14  case.
15    Q.  Did you produce these intending to mislead
16  the SEC?
17    A.  Absolutely not.
18    Q.  Did you produce these to provide accurate
19  information to the SEC?
20    A.  I did.
21          MR. GUIDO:  I have no further questions.
22          MR. COOPERSMITH:  I just have a few
23    follow-up questions, Mr. Llanes.
24
25

J. LLANES

1
2  EXAMINATION
3  BY MR. COOPERSMITH:
4     Q.  First of all, as we discussed earlier, you
5  were not in the New York office in 2001; is that
6  correct?
7     A.  That is correct.
8     Q.  Nor were you the head of the IT department
9  in 2001; is that correct?
10    A.  That is correct.
11    Q.  So in terms of what the Nice logger system
12  was set to record or not set to record, you can't
13  testify one way or the other as to that, can you?
14          MR. GUIDO:  Objection.
15    A.  In New York?
16    Q.  Correct.
17    A.  That is correct.
18    Q.  And it's also true, isn't it, Mr. Llanes,
19  that you can't testify that the recordings that were
20  made in New York on the Nice logger system at Refco
21  are complete recordings of everything on the trading
22  desks, can you?
23    A.  I do not know.
24    Q.  Now, Mr. Llanes, one other thing.  If you
25  go to Exhibit 4, page 29 through 31, that's your

J. LLANES

1
2  supplemental declaration.
3     A.  Yes.
4     Q.  And also look at the same time, if you can,
5  at Exhibit 2, your initial declaration.
6     A.  Yes.
7     Q.  I notice on Exhibit 2 you sign the
8  declaration, and it's dated December 28th, 2007.
9       Do you see that?
10    A.  Yes.
11    Q.  Did you fill in the date?
12    A.  Yes.
13    Q.  And then I notice on the supplemental
14  declaration it's dated December 6th, 2010.
15      Do you see that?
16    A.  Yes.
17    Q.  Did you type in the date on that?
18    A.  Yes.
19    Q.  Okay.  And who -- who, if you know, typed
20  in the /S/John G. Llanes on the supplemental
21  declaration, page 31 of Exhibit 4?
22    A.  That is me.  I had to do it electronically.
23    Q.  So you put that on?
24    A.  That is correct.
25    Q.  So explain to me how that worked?  Like why

J. LLANES

1
2  did you sign one physically and put an electronic
3  signature on the other one?
4     A.  Time.  My understanding was -- well, I had
5  time to look this one over.
6     Q.  When you say "this one," which one are you
7  referring to?
8     A.  Exhibit 2.
9     Q.  Okay.
10    A.  And I was able to sign that.
11      With respect to Exhibit 4, my understanding
12  was the SEC needed this document immediately, and so
13  I just electronically signed it.  I agreed to
14  electronically sign it.
15    Q.  So is it fair to say that Exhibit 4, page
16  29 through 31 of Exhibit 4, which is your
17  supplemental declaration, that was done, from your
18  standpoint, in a bit of haste; is that a fair
19  statement?
20    A.  I suppose that's fair, yes.
21    Q.  And is it also fair to say that you,
22  because of that, may not have had a chance to read
23  it over as thoroughly as you might want?
24    A.  I had plenty of time to read it.  I just
25  didn't look over it.

J. LLANES

1
2      Q.  And you wish you read it more thoroughly;
3  is that what you are saying?
4      A.  Yes.
5          MR. COOPERSMITH:  Nothing further.
6          MR. GUIDO:  A few clarifying questions,
7  Mr. Llanes.  I hope this is our last round.
8          THE WITNESS:  No, that's okay.
9          MR. GUIDO:  I don't mean to keep you.
10         THE WITNESS:  No, as long as I'm helping.
11 EXAMINATION
12 BY MR. GUIDO:
13     Q.  You were -- I think you were asked whether
14 or not you were in New York City in 2001, and that I
15 think you answered that you couldn't testify based
16 on your personal knowledge that the tapes were
17 accurate from New York City in 2001.
18         Did I hear you correctly?
19     A.  I mean, I cannot say that I was -- I did
20 not do any QA in terms of that, in terms of those
21 tapes.
22     Q.  But you did do a quality control for the
23 tapes that you listened to when you were in Chicago;
24 correct?
25         MR. COOPERSMITH:  Objection.  Leading.

J. LLANES

1
2      A.  No.
3      Q.  You didn't do a quality control?
4      A.  To the ones that we provided?
5      Q.  Did you review it in Chicago?
6      A.  Did I review --
7      Q.  Prior to 2003.
8      A.  Did I review which ones in Chicago?  I did
9  not review --
10     Q.  Let me rephrase the question.
11     A.  Yes.
12     Q.  We will accept Mr. Badian's counsel's
13 objection, and I will try and clarify.
14         When you produced the tapes to the SEC, you
15 didn't review each of them for accuracy, did you?
16     A.  Not every single one of them, no.
17     Q.  But you did do something to ensure yourself
18 that they accurately reflected what was on the
19 labels; correct?
20         MR. COOPERSMITH:  Objection.  Leading.
21     Q.  Well, did you do anything?
22     A.  For the 2001 tapes and recordings that we
23 provided for the Spinner/Drillman case, I checked to
24 see whether or not -- I spot checked, I should say,
25 to see whether or not the recordings that we were

J. LLANES

1
2  providing to counsel were audible.
3      Q.  Okay.  And what did you find?
4      A.  They were fine.
5      Q.  Was it the practice at Refco, when you were
6  the head of the IT office in New York, to attempt to
7  capture the complete conversations that were
8  recorded on the Nice logger system?
9          MR. COOPERSMITH:  Objection.  Lacks
10 foundation.  Calls for speculation.
11     A.  Yes.
12     Q.  And is it your understanding that that was
13 the practice in New York in 2001?
14         MR. COOPERSMITH:  Objection.  Lacks
15 foundation.  Calls for speculation.
16     A.  I have no reason to believe why it would be
17 any different.
18     Q.  And when you produced the tapes to the SEC
19 in the Spinner and Drillman case, was it your
20 understanding that those tapes were to accurately
21 reflect the conversations recorded on those tapes?
22         MR. COOPERSMITH:  Objection.  Calls for
23 speculation.  Lacks foundation.
24     A.  Sorry, I was thinking ahead of you.
25         Ask me the question one more time.

J. LLANES

1
2      Q.  And when you produced -- the question
3  was -- the problem is it keeps rolling.
4          And when you produced the tapes to the SEC
5  in the Spinner and Drillman case, was it your
6  understanding that those tapes were to accurately
7  reflect the conversations recorded on those tapes?
8          MR. COOPERSMITH:  Same objections.
9      A.  Yes.
10     Q.  Okay.  Now, you were asked a question about
11 the timing for the second declaration.
12         Does the second declaration accurately
13 reflect your memory at that time of what had
14 transpired that you recorded in that declaration?
15     A.  My memory at that time?  Yes; however, I
16 should have proofread a couple of the words.
17     Q.  Okay.  Well, let me take you through one of
18 the paragraphs, paragraph 6.  "The method used by
19 Refco to record, identify, and store telephone calls
20 was essentially the same in New York and Chicago."
21         When you signed that declaration, did you
22 understand that to be true?
23     A.  Yes.
24     Q.  Okay.  Do you understand that to be true
25 today?

Page 134

J. LLANES

1       MR. COOPERSMITH: Objection. Lacks
2   foundation. Calls for speculation.
3       A. Yes.
4       Q. Okay. And the second sentence says: "In
5   both locations Refco maintained seating charts
6   identifying the employee using each telephone or
7   headset in which a microphone was located."
8       When you signed that declaration, did you
9   understand that statement to be true?
10      MR. COOPERSMITH: Objection. Lacks
11  foundation. Calls for speculation.
12      A. Yes.
13      MR. COOPERSMITH: As to New York?
14      A. Sorry.
15      Q. Did you understand that to be true? That's
16  all I want to know.
17      A. Yes.
18      Q. Okay. Now and the next sentence says:
19  "The recording process was voice activated."
20      Do you see that?
21      A. Yes.
22      Q. Was that true at the time you signed the
23  declaration?
24      MR. COOPERSMITH: Same objection.

Page 135

J. LLANES

1       A. At the time, yes.
2       Q. Okay. And is that your understanding
3   today?
4       A. No.
5       Q. Why is it different?
6       A. It's only different, as I recall, and the
7   only reason why I said it was voice activated, that
8   was just in terms of if the phone in an ARD line was
9   picked up, it just recorded.
10      Q. So the ARD line was what?
11      A. ARD line is called an auto ring down, where
12  a broker or trader who is in the office would just
13  pick up a phone, and it would automatically --
14  without having to dial specific numbers, it would
15  just automatically ring down to a trader on the --
16  in the pits.
17      Q. So that if there was an ARD phone off the
18  hook, it would pick up dead time?
19      A. It would pick up the conversations that are
20  around that phone.
21      Q. Okay. But it would also record, and there
22  would be nothing on the tape?
23      A. It would continue to record if there was
24  nobody talking, yes.

Page 136

J. LLANES

1       Q. So that's what you mean by modifying your
2   testimony today based on that statement?
3       A. That is correct.
4       Q. Then the next sentence says:
5   "Conversations from each microphone were
6   automatically recorded on the Nice[Log] logger to
7   which the microphone was connected."
8       Was that statement true at the time you
9   signed the declaration?
10      MR. COOPERSMITH: Same objections.
11      A. Yes.
12      Q. Okay. And, to your knowledge, is that true
13  today?
14      A. Yes.
15      Q. And it says: "Several microphones were
16  connected to the same logger, but each microphone
17  was assigned a distinct track."
18      Do you see that?
19      A. Yes.
20      Q. Was that statement true at the time --
21      MR. COOPERSMITH: Same objections.
22      Q. -- you signed the declaration?
23      MR. COOPERSMITH: Same objections.
24      A. Yes.

Page 137

J. LLANES

1       Q. Is that statement true today?
2       A. Yes.
3       Q. Now, it makes reference to distinct track.
4       Does that refer to channels?
5       A. That is correct.
6       Q. Okay. To my -- and then it says: "To my
7   knowledge, there was never any uncertainty" as to
8   which Refco -- "as to which Refco employee had been
9   recorded on a particular track."
10      Do you see that?
11      A. Yes.
12      Q. Okay. Was that true at the time you signed
13  that declaration?
14      MR. COOPERSMITH: Same objections.
15      A. Yes.
16      Q. Is that true today?
17      A. Yes.
18      Q. "The system operated continuously during
19  business hours" is the next sentence.
20      Was that statement true at the time you
21  signed the declaration?
22      A. Yes.
23      Q. Is that statement true today?
24      MR. COOPERSMITH: Same objections.

35 (Pages 134 to 137)

Page 138

J. LLANES

1   J. LLANES
2       A.  Yes.
3       Q.  Then it says, "When the hard drive on a
4   logger became filled, the recordings were downloaded
5   to cassette tapes and stored."
6       Was that statement true at the time you
7   signed the declaration?
8       MR. COOPERSMITH:  Same objections.
9       A.  Yes.
10      Q.  Is that statement true today?
11      MR. COOPERSMITH:  Same objections.
12      A.  Yes.
13      MR. GUIDO:  No further questions.
14      MR. COOPERSMITH:  I have nothing further.
15      MR. CONTI:  Can I just ask a couple
16  clarifying questions?
17      MR. GUIDO:  Sure.
18  EXAMINATION
19  BY MR. CONTI:
20      Q.  You've been variously referred to in
21  conversations as the head of IT.
22      Were you the global head of IT at Refco?
23      A.  No.
24      Q.  Was there a global head of IT at Refco?
25      A.  Yes.

Page 139

J. LLANES

1   J. LLANES
2       Q.  You were the head of the New York office
3   only?
4       A.  That is correct.  New York -- I'm sorry,
5   New York and New Jersey, but it was considered New
6   York, yes.
7       Q.  And you've been asked a couple of times
8   whether or not you reviewed tapes for quality
9   assurance today.
10      Do you remember that?
11      A.  Yes.
12      Q.  Did you review those tapes for the content
13  or just their quality of audibility, I think you
14  said?
15      A.  Just the quality.
16      Q.  When you signed either of these
17  declarations, Exhibit 2 or Exhibit 4, at the time
18  you signed those, did you believe that any of the
19  statements contained in these declarations were
20  inaccurate or misleading in any way?
21      A.  No.
22      (Continued on next page to include jurat.)
23
24
25

Page 140

J. LLANES

1       J. LLANES
2       MR. CONTI:  I don't have anything else.
3       (Time noted:  4:02 P.M.)
4
5
6   _____
7            JOHN LLANES
8
9   Subscribed and sworn to before me
10  this _____ day of _____ 20__.
11  _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 141

1
2       C E R T I F I C A T E
3       I, Paula Campbell, CSR, RDR, CRR, CCP, do
4   hereby certify that on Monday, November 21, 2011
5   appeared before me, JOHN LLANES.
6       I further certify that the said witness was
7   first duly sworn to testify to the truth in the
8   cause aforesaid.
9       I further certify that the signature of the
10  witness to the foregoing deposition was not waived
11  by agreement of counsel.
12      I further certify that I am not counsel for
13  nor in any way related to any of the parties to
14  this suit, nor financially interested in the
15  action.
16      IN TESTIMONY WHEREOF, I have hereunto set my
17  hand on this 23rd day of November, 2011.
18
19  _____
20      Paula Campbell, CSR, RDR, CRR, CCP
        Certified Shorthand Reporter
21      Registered Diplomate Reporter
        Certified Realtime Reporter
22      Certified CART Provider
        Illinois C.S.R. No. 084-003481
23
24
25

36 (Pages 138 to 141)

Page 142

1
2      ---------------------- I N D E X ------------------
3
4      WITNESS              EXAMINATION BY      PAGE
5      JOHN LLANES           MR. COOPERSMITH      4
6                      MR. GUIDO        78
7                      MR. COOPERSMITH    127
8                      MR. GUIDO        130
9                      MR. CONTI        138
10     ----------------------EXHIBITS----------------------
11     LLANES                    PAGE  LINE
12     Exhibit 1   Subpoena to Testify at a      8   14
                   Deposition in a Civil
13                 Action
14     Exhibit 2   Declaration of John      27    5
                   Llanes Certifying Records
15                 of Regularly Conducted
                   Business Activity
16
       Exhibit 3   NICE Administrator's       41   12
17                 Manual 8.9
18     Exhibit 4   Second Declaration of      48   24
                   Kenneth J. Guido
19
       Exhibit 5   5/30/03 letter from       56   24
20                 John Hewitt to Christopher
                   Ehrman with attachment
21
       Exhibit 6   two-sided photocopy of      118    6
22                 the business card of John
                   G. Llanes and a note
23
       Exhibit 7   5/8/03 letter from John     118   12
24                 Hewitt to Christopher
                   Ehrman Bates stamped
25                 SECLIT 0080176 and 80177

Page 143

1
2          ERRATA SHEET FOR THE TRANSCRIPT OF:
3      CASE NAME:       SEC vs. Badian, et al.
4      DEPOSITION DATE:   November 21, 2011
5      WITNESS NAME:     John Llanes
6      Reason codes:
7          1. To clarify the record.
           2. To conform to the facts.
8          3. To correct transcription errors.
9      Page _____ Line _____ Reason _____
       From _____ to _____
10
       Page _____ Line _____ Reason _____
11     From _____ to _____
12     Page _____ Line _____ Reason _____
       From _____ to _____
13
       Page _____ Line _____ Reason _____
14     From _____ to _____
15     Page _____ Line _____ Reason _____
       From _____ to _____
16
       Page _____ Line _____ Reason _____
17     From _____ to _____
18     Page _____ Line _____ Reason _____
       From _____ to _____
19
       Page _____ Line _____ Reason _____
20     From _____ to _____
21
                    _____
22                  JOHN LLANES
23     SUBSCRIBED TO AND SWORN BEFORE ME
       THIS _____ DAY OF _____, 20___.
24
25     (Notary Public)  MY COMMISSION EXPIRES:_____

TSG Reporting - Worldwide     877-702-9580